BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (175783)
Albert Y. Chang (296065)
Yury A. Kolesnikov (271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW CALCATERRA, derivatively on behalf of BOFI HOLDING, INC., <br><br> Plaintiff, <br><br> vs. <br><br> GREGORY GARRABRANTS, ANDREW J. MICHELETTI, THEODORE C. ALLRICH, NICHOLAS A. MOSICH, JAMES S. ARGALAS, JOHN GARY BURKE, PAUL J. GRINBERG, JAMES J. COURT, EDWARD J. RATINOFF, ESHEL BAR-ADON, JOHN C. TOLLA, and UZAIR DADA, <br><br> Defendants, <br><br> -and- <br><br> BOFI HOLDING, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. **'15CV2722 BTM KSC** <br><br> (Derivative Action) <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

NATURE OF THE ACTION .................................................................................. 1

JURISDICTION AND VENUE ............................................................................. 3

PARTIES ................................................................................................................ 4

    I.      Plaintiff .................................................................................... 4

    II.     Nominal Defendant ............................................................... 4

    III.    The Individual Defendants .................................................... 4

THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES ............................. 6

    I.      General Duties as Directors and Officers ............................. 6

    II.     Compliance with the Generally Accepted Accounting Principles .......... 9

    III.    The Duty of Reasonable and Prudent Supervision ............... 10

BREACHES OF FIDUCIARY DUTIES ............................................................. 11

CONTROL, ACCESS, AND AUTHORITY ...................................................... 12

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION .. 12

FACTUAL ALLEGATIONS ............................................................................... 14

    I.      The Individual Defendants' Role in Overseeing Risk
           Management at BofI ............................................................. 15

    II.     The Individual Defendants Cause the Company to
           Issue False and Misleading Statements ............................... 16

BOFI HOLDING, INC. AND SUBSIDIARY SELECTED
CONSOLIDATED FINANCIAL INFORMATION ........................................... 17

    III.    The Emergence of the Truth ................................................ 42

DAMAGES TO BOFI ......................................................................................... 42

DERIVATIVE ALLEGATIONS ........................................................................ 43

    I.      Demand Is Futile Because a Majority of the Director
           Defendants Lacks Independence and Faces a Substantial
           Likelihood of Liability ........................................................ 44

        A.    Garrabrants Lacks Independence ................................. 44

        B.    The Entire Board Faces a Substantial Likelihood
            of Liability for Retaliating Against Whistleblower
            Erhart in Violation of the Sarbanes-Oxley Act ........... 46

C.     Additional Reasons Demonstrating Futility of Demand ............ 48

COUNT I - For Breaches of Fiduciary Duties Against All Defendants ..................... 49

COUNT II - For Abuse of ControlAgainst All Defendants ......................................... 51

COUNT III - For Unjust Enrichment Against All Defendants ................................. 51

COUNT IV - For Breach of the Duty of Honest Services Against
            Defendants Garrabrants, Micheletti, Bar-Adon, and Tolla ................. 52

PRAYER FOR RELIEF ......................................................................................... 53

DEMAND FOR JURY TRIAL ............................................................................. 54

Plaintiff Andrew Calcaterra ("Plaintiff"), derivatively on behalf of BofI Holding, Inc. (hereafter "BofI," the "Bank," the "Bank of Internet," or the "Company"), submits this Verified Shareholder Derivative Complaint against the members of BofI's Board of Directors (the "Board") (collectively, the "Individual Defendants") for breaches of their fiduciary duties, gross mismanagement, abuse of control, and unjust enrichment.  Plaintiff makes the following allegations, except as to allegations pertaining to Plaintiff (which are based on personal knowledge), based on his investigation and the investigation of his counsel, including a review of legal and regulatory filings, press releases, media reports about BofI, the allegations in the complaint filed on October 13, 2015 by Charles M. Erhart in *Erhart v. BOFI Holding, Inc.*, Case No. 15-cv-2287-BAS (NLS) (S.D. Cal.), and other public statements issued by BofI.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

In support of these derivative claims, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.     This is a shareholder derivative action to remedy the wrongdoing committed by BofI's directors and officers between February 6, 2013 and the present (the "Relevant Period").

2.     BofI operates as the holding company for BofI Federal Bank, a provider of consumer and business banking products through the Internet in the United States. BofI Federal Bank's deposit products include consumer and business checking, demand, savings, and time deposit accounts. Its loan portfolio comprises residential single family and multifamily mortgage loans; commercial real estate secured and commercial lending products; specialty finance factoring products; and consumer lending products consisting of prime loans to purchase new and used recreational vehicles and automobiles, as well as deposit-related overdraft lines of credit.

1

3.     BofI Federal Bank's most significant business is making mortgages to high-net-worth individuals for the purchase of expensive properties through BofI Federal Bank's Bank of Internet USA ("Bank of Internet") brand.

4.     The Company was incorporated in 1999.  BofI is headquartered in San Diego, California, and its shares trade on the NASDAQ under the ticker symbol "BOFI."

5.     Throughout the Relevant Period, the Individual Defendants caused the Company to make false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, prospects, and performance. Specifically, during the Relevant Period, Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that:

(a)     the Company's internal controls were frequently disregarded;

(b)     BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

(c)     many BofI accounts lacked required tax identification numbers;

(d)     in violation of the anti-retaliation laws contained in the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or "SOX") and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), the Board caused the Company to fire an internal auditor who raised the foregoing issues to senior management and to federal regulators; and

(e)     as a result of the above, the Company's statements regarding BofI's internal controls and other financial statements were materially false and misleading at all relevant times.

6.     On October 13, 2015, after the close of trading, *The New York Times* reported that Matt Erhart ("Erhart"), a former internal auditor at the Bank of Internet, had filed a lawsuit against the Company for violating federal laws designed to protect whistleblowers (the "*Erhart* Complaint"). The *Erhart* Complaint alleged,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*inter alia*, that:

- Erhart was instructed by senior officers at BofI, including Defendant Tolla, to refrain from putting anything in writing regarding the Company's violations of laws;

- Erhart was instructed by senior officers at BofI, including Defendant Tolla, to label anything he did in his audit function which might be incriminating to the Company as "attorney client work product/communication" in order to shield such documents from later production;

- BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

- Erhart had seen a spreadsheet that contained as many as 200 accounts without tax identification numbers, contrary to BofI's representations to the Office of the Comptroller of the Currency ("OCC"), its primary regulator;

- BofI at times failed to provide full and timely information to regulators; and

- Erhart was fired after he revealed wrongdoing at BofI to management and federal regulators.

7.     On this news, shares of BofI fell $42.87, or 30.2%, to close at $99.13 on October 14, 2015.

8.     As a result of Defendants' wrongful acts and omissions, the Company has been named as a defendant in at least two securities class action lawsuits filed in this Court and has suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     Subject-matter jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity between plaintiff and defendants and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     Venue is proper in the Southern District of California under 28 U.S.C. §§ 1391 and 1401 because BofI maintains its principal executive offices in this District and because a substantial portion of the acts and conduct complained of

3

herein — including the dissemination of materially false and misleading information to the investing public — occurred in this District.

11.     Each defendant has minimum contacts with this District, as they have entered into contracts in this District, or have frequently traveled here, on BofI's business, or have authorized acts and actions that have had a sufficient impact in this District or on BofI's shareholders and investors residing here to justify the exercise of jurisdiction over them.

## PARTIES

### I.     Plaintiff

12.     Plaintiff Andrew Calcaterra is a current shareholder of BofI.  Plaintiff first purchased BofI stock on January 14, 2013, and has continuously held his BofI stock since that time.  Plaintiff is a citizen of Michigan.

### II.    Nominal Defendant

13.     Nominal Defendant BofI is a Delaware company headquartered and operating at 4350 La Jolla Village Drive, Suite 140, San Diego, California 92122. BofI's shares trade on the NASDAQ under the ticker symbol "BOFI." At all material times to this action, Defendant BOFI Holding, Inc., an entity d/b/a/ "BOFI Federal Bank" and "Bank of the Internet," was a publicly traded company. BofI is a citizen of California and Delaware.

### III.   The Individual Defendants

14.     Defendant Gregory Garrabrants ("Garrabrants") has served at all relevant times as the Company's President, Director, and Chief Executive Officer ("CEO").  Garrabrants is a citizen of California.

15.     Defendant Andrew J. Micheletti ("Micheletti") has served at all relevant times as the Company's Executive Vice President and Chief Financial Officer ("CFO").  Micheletti is a citizen of California.

16.     Defendant Theodore C. Allrich ("Allrich") has served as Chairman of

4

the Board since October 2009 and served as Vice Chairman of the Board from 1999 to 2009. Allrich also serves as a member of the Compensation Committee of the Board. Allrich is a citizen of California.

17. Defendant Nicholas A. Mosich ("Mosich") has served as Vice Chairman of the Board since October 2010 and as a member of the Board since May 2009. Mosich is a citizen of California.

18. Defendant James S. Argalas ("Argalas") has served as a member of the Board since August 19, 2011. He has served as a member of the Company's Internal Asset Review Committee. Argalas is a citizen of California.

19. Defendant John Gary Burke ("Burke") has served as a member of the Board since October 2005 and is a member of the Compensation Committee of the Board of Directors of the Company and the Chairman of the Internal Assets Review Committee of the Board of Directors of the Bank ("IAR Committee"). Upon information and belief, Burke is a citizen of Ohio.

20. Defendant Paul J. Grinberg ("Grinberg") has served as a member of the Board since April 2004. Grinberg also serves as a member of the Compensation Committee of the Board. Grinberg is a citizen of California.

21. Defendant James J. Court ("Court") has served as a member of the Board since April 2011. Court is a citizen of California.

22. Defendant Edward J. Ratinoff ("Ratinoff") has served as a member of the Board and as a member of the Nominating Committee since 2010. Ratinoff is a citizen of California.

23. Defendant Eshel Bar-Adon ("Bar-Adon") is an officer of the Company, holding the titles of Executive Vice President and Chief Legal Officer. Bar-Adon is a citizen of California.

24. Defendant John C. Tolla ("Tolla") is an officer of BofI who has served as Chief Governance Risk and Compliance Officer at BofI since December 2013.

5

1    Tolla is a citizen of California.

2        25.    Defendant Uzair Dada ("Dada") has served as a member of the Board

3    since January 22, 2015.  Dada is a citizen of California.

4        26.    The Defendants referenced in ¶¶ 14–25 are sometimes referred to

5    herein, collectively, as the "Individual Defendants."  The Individual Defendants,

6    because of their positions with the Company, possessed the power and authority to

7    control the contents of BofI's reports to the U.S. Securities and Exchange

8    Commission ("SEC"), press releases, and presentations to securities analysts, money

9    and portfolio managers, and institutional investors, *i.e.*, the market. The Individual

10   Defendants caused the Company to make specific false and misleading statements

11   and/or reviewed and approved the Company's reports and press releases alleged

12   herein to be misleading prior to, or shortly after their issuance, and had the ability

13   and opportunity to prevent their issuance or cause them to be corrected. Because of

14   their positions and access to material non-public information available to them, the

15   Individual Defendants knew that the adverse facts specified herein had not been

16   disclosed to, and were being concealed from, the public, and that the positive

17   representations which were being made were then materially false and/or misleading.

18       27.    BofI and the Individual Defendants are collectively referred to herein

19   as the "Defendants."

20              **THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

21   **I.    General Duties as Directors and Officers**

22       28.    By reason of their positions as BofI's officers and directors and

23   because of their ability to control BofI's business and corporate affairs, the

24   Individual Defendants owed BofI and its shareholders fiduciary obligations of trust,

25   loyalty, good faith, and due care, and were required to use their utmost ability to

26   control and manage BofI in a fair, just, honest, and equitable manner.  The

27   Individual Defendants were required to act in furtherance of the best interests of

28                                          6

BofI and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

29.   Each director and officer defendant owes to BofI and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of fair dealing, in the administration of BofI's affairs and in the use and preservation of its property and assets.

30.   The Individual Defendants, because of their positions of control and authority as directors and officers of BofI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.   To discharge their duties, the Individual Defendants, as BofI's officers and directors, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.   By virtue of such duties, the Individual Defendants were required to, among other things:

(a)   ensure that BofI was operated in a diligent, honest, and prudent manner in accordance with its bylaws and charter, as well as the laws and regulations of Delaware and the United States;

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of BofI's business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   fully inform themselves as to how BofI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)   establish and maintain systematic and accurate records and reports of the business and internal affairs of BofI and procedures for the

7

reporting of the business and internal affairs and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      (e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that BofI's operations and financial statements comply with all laws;

      (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

      (g)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

32.    Each Individual Defendant, by virtue of his or her position as a director or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The Individual Defendants' misconduct complained of herein involves a knowing and culpable violation of their obligations as BofI's directors and officers, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised BofI's Board at all relevant times.

33.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities

8

Exchange Act of 1934 (the "Exchange Act") and traded on NASDAQ, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' conduct in causing the Company to make misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.   Accordingly, the Individual Defendants breached their fiduciary duties including their duties of good faith, candor, and loyalty.

34.     At all times relevant hereto, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

## II.     Compliance with the Generally Accepted Accounting Principles

35.     In issuing its financial statements, BofI was required to comply with Generally Accepted Accounting Principles ("GAAP") — a common set of accounting principles, standards, and procedures recognized by the accounting profession and used to compile financial statements.

36.     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.   Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual

9

disclosures, per 17 C.F.R. § 210.10- 01(a).

37.     During the Relevant Period, BofI stated in its annual reports on Forms 10-K dated September 4, 2013, August 28, 2014, and August 26, 2015 that its financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America."

38.     In reality, however, the Individual Defendants failed to ensure that BofI adhered to GAAP during the Relevant Period.

## III.     The Duty of Reasonable and Prudent Supervision

39.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls;

(d)     remain fully informed as to how BofI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and

10

take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(e)     ensure that BofI was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; and

(f)     refrain from breaching their duty of loyalty to the Company to benefit themselves at the expense of the Company.

## BREACHES OF FIDUCIARY DUTIES

40.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to BofI and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of BofI, as well as in the use and preservation of BofI's property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BofI, the absence of good faith on their part, or a reckless disregard for their duties to BofI and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to BofI.

41.     The Individual Defendants each breached their duties of loyalty and good faith by causing the Company to make false and/or misleading statements and/or failing to disclose that:

(a)     the Company was doing business with foreign nationals who should have been off-limits under federal anti-money-laundering laws;

(b)     the Company had as many as 200 customer accounts without tax identification numbers, contrary to BofI's representations to the OCC, its primary regulator;

(c)     as a result, the Company's revenue and financial results were overstated;

(d)     the Company's financial statements were not prepared in

11

accordance with GAAP;

(e)    the Company lacked adequate internal and financial controls; and

(f)    as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.

42.    In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of federal securities laws, and a whistleblower lawsuit alleging violations of federal law.  As a result, BofI has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONTROL, ACCESS, AND AUTHORITY

43.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by BofI.

44.    Because of their advisory, executive, managerial, and directorial positions with BofI, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of BofI.

45.    Each of the Individual Defendants was the agent of each of the other Defendants and of BofI, and was at all times acting within the course and scope of such agency.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

46.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or

12

assisted each other in breaching their respective duties.

47.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that: (a) the Company was doing business with foreign nationals who should have been off-limits under federal anti-money-laundering laws; (b) the Company had as many as 200 customer accounts without tax identification numbers, contrary to BofI's representations to the OCC, its primary regulator; (c) as a result, the Company's revenue and financial results were overstated; (d) the Company's financial statements were not prepared in accordance with GAAP; (e) the Company lacked adequate internal and financial controls; and (f) as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

48.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to:  (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, and unjust enrichment; and (b) disguise and misrepresent the Company's future financial results and prospects.

49.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to falsely represent that the Company had adequate internal controls in place, and by purposefully, recklessly, or negligently causing the Company to release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

50.   Each of the Defendants aided and abetted and rendered substantial

13

assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

51.   BofI Holding, Inc. (NASDAQ: BOFI) is the holding company for BofI Federal Bank, a nationwide bank that provides financing for single and multifamily residential properties, small-to-medium size businesses in target sectors, and selected specialty finance receivables.  With approximately $6.3 billion in assets, BofI Federal Bank provides consumer and business banking products through its low-cost distribution channels and affinity partners.  BofI Holding, Inc.'s common stock is listed on the NASDAQ Global Select Market under the ticker symbol BOFI and is a component of the Russell 2000® Index and the S&P SmallCap 600® Index.

52.   BofI operates in a highly-regulated field.  It is regulated by, among others, the OCC, the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the SEC, the Financial Industry Regulatory Authority ("FINRA"), and the Consumer Financial Protection Bureau ("CFPB").  BofI is subject to a variety of statutory schemes including, without limitation, the Bank Secrecy Act of 1970 ("BSA"), the USA Patriot Act, including the Know Your Customer Rule ("KYC"), Dodd-Frank Act, Sarbanes-Oxley, the Securities Act of 1933, and the Exchange Act.

53.   BofI Federal Bank's most significant business is making mortgages to high-net-worth individuals for the purchase of expensive properties through BofI Federal Bank's Bank of Internet brand.

54.   The Company was incorporated in 1999 and is headquartered in San Diego, California.

14

## I.   The Individual Defendants' Role in Overseeing Risk Management at BofI

55.   According to BofI's 2015 Proxy Statement, the Board, together with the Audit Committee, the Nominating Committee, and the Compensation Committee, as well as four risk committees (which are the Credit, the IAR, the Operations and Technology, and the ALCO committees), to provide enterprise-wide oversight of the Company's management and handling of risk.

56.   These committees report regularly to the Board on risk-related matters and provide the Board with insight about BofI's management of strategic, credit, interest rate, financial reporting, technology, liquidity, compliance, operational, and reputational risks.

57.   In addition, at meetings of the Board and its committees, directors receive regular updates and reports from management regarding risk management practices, including credit quality, financial reporting, internal controls, compliance, legal matters, asset liability, and liquidity management, among others. Furthermore, current risk management issues are discussed regularly with the Board and its committees.

58.   BofI's 2015 Proxy Statement represented that: "Our Board is actively involved in oversight and review of the Company's risk management efforts either directly or through its standing committees.  The Company's management is responsible for assessing and managing risk and communicating risks to the Board. The Enterprise Risk Management ("ERM") program, led by certain officers of the Company, including Mr. Garrabrants, our President and Chief Executive Officer, with oversight from the Board, identifies and evaluates key business risks within the financial, operational, regulatory and strategic arenas and to develop risk monitoring processes and response strategies to transfer, avoid, reduce or accept individual risks as appropriate.  The ERM program assists management in determining appropriate risk tolerance levels which balance risk mitigation with opportunities to create

15

stockholder value. ERM program leaders make regular reports to the Board regarding the ERM program's risk identification, management and mitigation strategy recommendations. While the Board has retained the responsibility for general oversight of risks and of our ERM program, the Board's standing committees support the Board by regularly addressing various risks in their respective areas of oversight. Specifically, the Audit Committee primarily oversees those risks that may directly or indirectly impact our financial statements, including the areas of financial reporting, internal controls and compliance with public reporting requirements, while the Compensation Committee assists the Board in fulfilling its risk management oversight responsibilities associated with risks arising from employee compensation policies and practices. Each standing committee provides reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting."

## II. The Individual Defendants Cause the Company to Issue False and Misleading Statements

59. On February 6, 2013, the Individual Defendants caused BofI to file a Form 10-Q with the SEC, disclosing BofI's financial results for the quarter ending December 31, 2012. The Quarterly Report was reviewed and approved by the Board, and signed by Defendants Garrabrants and Micheletti, and represented the following to be BofI's financial results for the quarter:

///
///
///
///
///
///
///
///

16

# BOFI HOLDING, INC. AND SUBSIDIARY
## SELECTED CONSOLIDATED FINANCIAL INFORMATION

| *(Dollars in thousands, except per share data)* | At or for the Three Months Ended December 31, | | At or for the Six Months Ended December 31, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| **Selected Income Statement Data:** | | | | |
| Interest and dividend income | $ 33,567 | $ 28,616 | $ 64,556 | $ 56,381 |
| Interest expense | 8,631 | 9,530 | 17,135 | 19,118 |
| Net interest income | 24,936 | 19,086 | 47,421 | 37,263 |
| Provision for loan losses | 1,950 | 1,600 | 4,500 | 3,963 |
| Net interest income after provision for loan losses | 22,986 | 17,486 | 42,921 | 33,300 |
| Non-interest income | 6,249 | 2,986 | 13,010 | 7,556 |
| Non-interest expense | 12,781 | 9,204 | 24,313 | 18,756 |
| Income before income tax expense | 16,454 | 11,268 | 31,618 | 22,100 |
| Income tax expense | 6,686 | 4,608 | 12,861 | 8,907 |
| Net income | $ 9,768 | $ 6,660 | $ 18,757 | $ 13,193 |
| Net income attributable to common stock | $ 9,436 | $ 6,280 | $ 18,348 | $ 12,687 |
| **Per Share Data:** | | | | |
| Net income: | | | | |
| Basic | $ 0.71 | $ 0.56 | $ 1.44 | $ 1.15 |
| Diluted | $ 0.70 | $ 0.54 | $ 1.37 | $ 1.14 |
| Book value per common share | $ 17.08 | $ 14.80 | $ 17.08 | $ 14.80 |
| Tangible book value per common share | $ 17.08 | $ 14.80 | $ 17.08 | $ 14.80 |
| **Weighted average number of shares outstanding:** | | | | |
| Basic | 13,224,612 | 11,174,947 | 12,707,837 | 11,036,046 |
| Diluted | 13,824,440 | 12,304,628 | 13,538,503 | 11,415,793 |
| Common shares outstanding at end of period | 12,824,195 | 11,419,584 | 12,824,195 | 11,419,584 |
| Common shares issued at end of period | 13,665,957 | 12,162,604 | 13,665,957 | 12,162,604 |

17

*Performance Ratios and Other Data:*

| | | | | |
|---|---|---|---|---|
| Loan originations for investment | $ 331,999 | $ 132,153 | $ 611,696 | $ 384,779 |
| Loan originations for sale | 280,569 | 227,810 | 535,365 | 318,179 |
| Loan purchases | — | — | 1,541 | — |
| Return on average assets | 1.45% | 1.23% | 1.45% | 1.26% |
| Return on average common stockholders' equity | 17.32% | 15.86% | 17.85% | 16.55% |
| Interest rate spread[1] | 3.69% | 3.44% | 3.63% | 3.47% |
| Net interest margin[2] | 3.81% | 3.60% | 3.76% | 3.62% |
| Efficiency ratio | 40.98% | 41.70% | 40.23% | 41.85% |
| *Capital Ratios:* | | | | |
| Equity to assets at end of period | 8.44% | 8.71% | 8.44% | 8.71% |
| Tier 1 leverage (core) capital to adjusted tangible assets[3] | 8.52% | 8.27% | 8.52% | 8.27% |
| Tier 1 risk-based capital ratio[3] | 13.95% | 13.19% | 13.95% | 13.19% |
| Total risk-based capital ratio[3] | 14.60% | 13.77% | 14.60% | 13.77% |
| Tangible capital to tangible assets[3] | 8.52% | 8.27% | 8.52% | 8.27% |
| *Asset Quality Ratios:* | | | | |
| Net annualized charge-offs to average loans outstanding | 0.13% | 0.39% | 0.28% | 0.41% |
| Non-performing loans to total loans | 0.95% | 0.76% | 0.95% | 0.76% |
| Non-performing assets to total assets | 0.79% | 0.64% | 0.79% | 0.64% |
| Allowance for loan losses to total loans at end of period | 0.52% | 0.53% | 0.52% | 0.53% |
| Allowance for loan losses to non-performing loans | 54.92% | 68.79% | 54.92% | 68.79% |

60.    The Form 10-Q also stated the following with respect to the quarter's financial results:

> **"RESULTS OF OPERATIONS**
> **Comparison of the Three and Six Months Ended December 31, 2012 and December 31, 2011**
>
> For the three months ended December 31, 2012, we had net income of $9.8 million compared to net income of $6.7 million for the three months ended December 31, 2011.   Net income attributable to common stockholders was $9.4 million or $0.70 per diluted share compared to net income attributable to common shareholders of $6.3 million or $0.54 per diluted share for the three months ended

18

December 31, 2012 and 2011, respectively.  For the six months ended December 31, 2012, we had net income of $18.8 million compared to net income of $13.2 million for the six months ended December 31, 2011.  Net income attributable to common stockholders was $18.3 million or $1.37 per diluted share compared to net income attributable to common shareholders of $12.7 million or $1.14 per diluted share for the six months ended December 31, 2012 and 2011, respectively.

Other key comparisons between our operating results for the three and six months ended December 31, 2012 and 2011 are:

• Net interest income increased $5.9 million and $10.2 million in the quarter and six months ended December 31, 2012 due to a 23.4% and 22.7%, increase in average earning assets primarily from the growth in our loan portfolio in those respective periods.  Our net interest margin increased 21 basis points and 14 basis points in the quarter and six months ended December 31, 2012 compared to December 31, 2011.  The overall rate on interest earning assets was lower by 27 and 37 basis points in the three and six month periods ended December 31, 2012 compared to December 31, 2011, primarily because loan rates have been pushed lower by the economy and competition.  This reduction on the asset side was more than offset by a 52 and 53 basis point reduction in rates paid on interest bearing liabilities for the three and six months ending December 31, 2012 compared to December 31, 2011.  The primarily reduction was due to a decrease in the rates paid on time deposits of 57 and 52 basis points , respectively, as we allowed the higher rate time deposits to roll of the books.

• Non-interest income increased $3.3 million and $5.5 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011.  The increase in non-interest income for the quarter was primarily the result of a $2.5 million increase in mortgage banking income, a $448,000 increase in prepayment penalty income and a $507,000 increase in banking service fees.  The increase in non-interest income for the six months ended December 31, 2012 compared to December 31, 2011 was primarily the result of a $4.2 million increase in mortgage banking income, a $589,000 increase in prepayment penalty income and a $756,000 increase in banking service fees.

19

- Non-interest expense increased $3.6 million and $5.6 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011. For the three months ended December 31, 2012 compared to the three months ended December 31, 2011 salaries and compensation was up $2.0 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank. Advertising and promotions were up $510,000 mainly due to the cost of lead generation in the mortgage area. Other general and administration expenses were $689, 000 higher primarily due to an increase of $258,000 in loan related expenses, an increase of $144,000 related to software, licenses and associated costs, an increase of $72,000 in expenses related travel, and an increase of $53,000 in losses on deposit accounts. For the six months ended December 31, 2012 compared to the six months ended December 31, 2011 salaries and compensation was up $3.6 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank. Advertising and promotions were up $846,000 mainly due to the cost of lead generation in the mortgage area. Other general and administration expenses were $1.4 million higher primarily due to an increase of $708,000 in loan related expenses, an increase of $198,000 related to software, licenses and associated costs, an increase of $77,000 in expenses related travel, and an increase of $57,000 in losses on deposit accounts."

61. The Form 10-Q filed on February 6, 2013 contained the following disclosure: "During fiscal year 2011, the Bank changed its growth strategy to originate more mortgage loans rather than purchasing loans." With respect to its loans and other assets held as of the end of the quarter which closed on December 31, 2012, the Form 10-Q represented the following:

"**FINANCIAL CONDITION**
**Balance Sheet Analysis**

Our total assets increased $487.5 million, or 20.4%, to $2,874.3 million, as of December 31, 2012, up from $2,386.8 million at June 30, 2012. The increase in total assets was primarily due to an increase of $434.7 million in net loans held for investment. Total liabilities increased a total of $451.5 million, primarily due to an increase in deposits of $353.2 million and an increase in borrowings of $105.0 million from

20

the Federal Home Loan Bank of San Francisco (the "FHLB"). Our deferred income taxes increased $2.0 million to $17.0 million primarily due to the impairment in our securities portfolio, loan loss provision, and state taxes.

**Loans**

Net loans held for investment increased 25.3% to $2,155.3 million at December 31, 2012 from $1,720.6 million at June 30, 2012. The increase in the loan portfolio was due to loan originations and purchases of $613.2 million, offset by loan repayments of $215.1 million, net transfers from our held for sale portfolio of $42.2 million and a net increase in the allowance of $1.8 million during the six months ended December 31, 2012.

The following table sets forth the composition of the loan portfolio as of the dates indicated:

| | December 31, 2012 | | June 30, 2012 | |
|---|---|---|---|---|
| *(Dollars in thousands)* | Amount | Percent | Amount | Percent |
| Residential real estate loans: | | | | |
| Single family (one to four units) | $1,215,744 | 55.6% | $ 863,624 | 49.6% |
| Home equity | 25,742 | 1.2% | 29,167 | 1.7% |
| Multifamily (five units or more) | 766,247 | 35.0% | 687,661 | 39.5% |
| Commercial real estate | 28,681 | 1.3% | 35,174 | 2.0% |
| Consumer—Recreational vehicle | 21,494 | 1.0% | 24,324 | 1.4% |
| Commercial secured and other | 128,267 | 5.9% | 100,549 | 5.8% |
| Total loans held for investment | $2,186,175 | 100.0% | $1,740,499 | 100.0% |
| Allowance for loan losses | (11,449) | | (9,636) | |
| Unamortized premiums/discounts, net of deferred loan fees | (19,420) | | (10,300) | |
| Net loans held for investment | $2,155,306 | | $1,720,563 | |

62.   The February 6, 2013 Form 10-Q also contained Sarbanes-Oxley Section 302 certifications signed by Defendants Garrabrants and Micheletti which stated the following:

"I have reviewed this quarterly report on Form 10-Q of BofI Holding, Inc. (the "registrant");

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

21

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report;

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d -15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting or, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures, and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

"The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting."

63.     The February 6, 2013 Form 10-Q also contained Sarbanes-Oxley Section 906 certifications signed by Defendants Garrabrants and Micheletti which stated that Garrabrants and Micheletti had reviewed the Form 10-Q and that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods presented in the financial statements included in such Report."

64.     On May 8, 2013, the Individual Defendants caused BofI to file a Form 10-Q with the SEC, disclosing BofI's financial results for the quarter ending March 31, 2013.  The Quarterly Report was reviewed and approved by the Board, and signed by Defendants Garrabrants and Micheletti, and represented the following to

23

be BOFI's financial results for the quarter:

"For the three months ended March 31, 2013, we had net income of $10.4 million compared to net income of $7.7 million for the three months ended March 31, 2012. Net income attributable to common stockholders was $10.1 million or $0.74 per diluted share compared to net income attributable to common shareholders of $7.3 million or $0.58 per diluted share for the three months ended March 31, 2013 and 2012, respectively. For the nine months ended March 31, 2013, we had net income of $29.2 million compared to net income of $20.9 million for the nine months ended March 31, 2012. Net income attributable to common stockholders was $28.4 million or $2.12 per diluted share compared to net income attributable to common shareholders of $20.0 million or $1.68 per diluted share for the nine months ended March 31, 2013 and 2012, respectively."

65.   The May 8, 2013 Form 10-Q also stated:   "Net interest income increased $5.9 million and $16.0 million in the quarter and nine months ended March 31, 2013 due to a 28.3% and 24.6%, increase in average earning assets primarily from the growth in our loan portfolio in those respective periods."

66.   The May 8, 2013 Form 10-Q also contained certifications signed by Defendants Garrabrants and Micheletti under Sections 302 and 906 of Sarbanes-Oxley which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (referenced *supra*).

67.   In addition to these SOX certifications by Garrabrants and Micheletti, the May 8, 2013 Form 10-Q specifically stated, at p. 63:   "The Company's management, with the participation of its Chief Executive Officer [Garrabrants] and Chief Financial Officer [Micheletti], conducted an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures, pursuant to Exchange Act Rule 13a-15(e). Based upon that evaluation, our Chief

24

Executive Officer along with our Chief Financial Officer concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures were effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.  There were no changes in the Company's internal control over financial reporting that occurred during the quarter ended March 31, 2013 that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting."

68.  On September 4, 2013, BofI filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2013 (the "2013 Form 10-K").  The Form 10-K Annual Report was prepared and signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, and Ratinoff.

69.  For the quarter, the Company reported net income of $11.13 million, or $0.78 per diluted share, on net revenue of $35.87 million, compared to net income of $8.57 million, or $0.64 per diluted share, on net revenue of $26.55 million for the same period in the prior year. For fiscal year 2013, the Company reported net income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million, compared to net income of $29.48 million, or $2.33 per diluted share, on net revenue of $95.56 million for fiscal year 2012.

70.  Among other things, the 2013 Form 10-K described that the BofI Federal Bank was subject to extensive federal regulation, as follows:

25

## REGULATION OF BOFI FEDERAL BANK

*General*.  As a federally-chartered savings and loan association whose deposit accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"), BofI Federal Bank is subject to extensive regulation by the FDIC and . . . the [Office of the Comptroller of the Currency].  Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.  The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

\*   \*   \*

*Anti-Money Laundering and Customer Identification*.  The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.  The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti- money laundering requirements.  In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

71.    The 2013 Form 10-K contained signed certifications pursuant to SOX by Individual Defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

72.    Beginning on or about September 23, 2013, Matt Erhart, a former FINRA regulator, began working for BofI as an internal auditor, performing audits of a variety of aspects of BofI's operations.

///

26

73.     On November 5, 2013, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "2014Q1 Form 10-Q").  The Form 10-Q Quarterly Report was reviewed and approved by the Board, and prepared and signed by Defendants Garrabrants and Micheletti.  For the quarter, the Company reported net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million, compared to net income of $8.99 million, or $0.67 per diluted share, on net revenue of $29.25 million for the same period in the prior year.

74.     The 2014Q1 Form 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the 2014Q1 Form 10-Q was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

75.     On December 4, 2013, BofI filed a Form 8-K with the SEC, signed by Defendant Micheletti, containing as an attachment an Investor Presentation concerning the Company's Q1 2014 financial and operating results (the "2014Q1 Investor Presentation") which indicated it was presented by Defendant Garrabrants and that investors should contact Garrabrants for more information.  Among other things, the 2014Q1 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

27

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

76.    On or about December 19, 2013, Erhart completed an internal audit of BofI's Structured Settlements and Lottery practice, pursuant to which BofI, through its subsidiary Anfed Bank, has a team that calls individuals receiving structured settlements in litigation or lottery payments with the goal of purchasing those income streams in return for a lump sum.  One of Erhart's major findings during the internal audit was that BofI's callers were not notifying the individuals they called that the calls were being recorded, in violation of California Penal Code § 632.

77.    On or about December 19, 2013, Erhart and his manager, Jonathan Ball ("Ball") were summoned to a meeting with Defendant Bar-Adon, BofI's Chief Legal Officer.  Defendant Bar-Adon instructed both employees to remove evidence of the violation of California Penal Code § 632 from the Structured Settlements and Lottery audit.  When Ball informed him that an internal auditor could not do that, Defendant Bar-Adon instructed Erhart to mark the entire report "Attorney Client Privileged," stating that the finding could be discoverable in class action litigation against BofI and that the Company wanted to prevent that.  In addition, Defendant Bar-Adon instructed Erhart not to speak to any employee in the Structured Settlements and Lottery Department with whom he was friendly.

78.    On the same day, Defendant Tolla, Senior Vice President, instructed Erhart to never state in an audit report that BofI had violated a federal or state law.

79.    In or about January 2014, Thomas Constantine, BofI's Chief Credit Officer, told Erhart, Ball, and others at a meeting that he could not be responsible for any of BofI's numbers after they are turned over to the Chief Financial Officer, Defendant Micheletti.  He reiterated that he could not and would not vouch for the accuracy of the numbers once they had been delivered to Defendant Micheletti.  Erhart understood this comment to mean that Constantine believed that Defendant Micheletti changed the numbers after he received them.

28

80.     On February 5, 2014, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended December 31, 2013 (the "2014Q2 Form 10-Q").   The Form 10-Q was prepared and signed by Defendants Garrabrants and Micheletti, and reviewed and approved by BofI's Board.   For the quarter, the Company reported net income of $13.15 million, or $0.91 per diluted share, on net revenue of $38.37 million, compared to net income of $9.77 million, or $0.70 per diluted share, on net revenue of $31.19 million for the same period in the prior year.

81.     The 2014Q2 Form 10-Q contained signed certifications pursuant to SOX by the Defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the 2014Q2 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

82.     On February 6, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2014Q2 financial and operating results (the "2014Q2 Investor Presentation").   The Form 8-K and the 2014Q2 Investor Presentation were prepared and signed by Defendant Micheletti and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

29

83.     On May 6, 2014, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "2014Q3 Form 10-Q").  The Form 10-Q was reviewed and approved by the Board, and prepared and signed by Defendants Garrabrants and Micheletti.  For the quarter, the Company reported net income of $14.61 million, or $1.00 per diluted share, on net revenue of $40.88 million, compared to net income of $10.40 million, or $0.74 per diluted share, on net revenue of $33.04 million for the same period in the prior year.

84.     The 2014Q3 Form 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the 2014Q3 Form 10-Q was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

85.     On May 7, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's third quarter 2014 financial and operating results (the "2014 Q3 Investor Presentation").  The Form 8-K and the 2014 Q3 Investor Presentation were prepared and signed by Defendant Micheletti, and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and
- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

30

86.     On August 7, 2014, BofI issued a press release and filed a Form 8-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2014 (the "2014 Form 8-K").  The Form 8-K and the accompanying press release were prepared by Defendants Garrabrants and Micheletti, and signed by Micheletti.  For the quarter, the Company reported net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million, compared to net income of $11.13 million, or $0.78 per diluted share, on net revenue of $35.87 million for the same period in the prior year. For fiscal year 2014, the Company reported net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million, compared to net income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million for fiscal year 2013.

87.     On August 28, 2014, BofI filed an annual report on Form 10-K with the SEC (the "2014 Form 10-K").  The Form 10-K Annual Report was prepared and signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, and Ratinoff.  The 2014 Form 10-K reiterated the financial and operating results previously announced in the 2014 Form 8-K.

88.     Among other things, the 2014 Form 10-K described that the BofI Federal Bank was subject to extensive federal regulation, as follows:

**REGULATION OF BOFI FEDERAL BANK**

*General*.  As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC.  Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.  The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

\* \* \*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

***Anti-Money Laundering and Customer Identification***.   The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.   The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti- money laundering requirements.   In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

89.    The 2014 Form 10-K contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the 2014 Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

90.    On September 3, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2014 Q4 financial and operating results (the "2014 Q4 Investor Presentation"). The Form 8-K and the 2014 Q4 Investor Presentation were prepared and signed by Defendant Micheletti, and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

91.     On November 4, 2014, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "2015 Q1 Form 10-Q").  The Form 10-Q Quarterly Report was reviewed and approved by the Board, and prepared and signed by Defendants Garrabrants and Micheletti.  For the quarter, the Company reported net income of $17.84 million, or $1.20 per diluted share, on net revenue of $50.12 million, compared to net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million for the same period in the prior year.

92.     The 2015 Q1 Form 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the 2015 Q1 Form 10-Q was accurate and disclosed that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

93.     On November 17, 2014, BofI filed a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2015 Q1 financial and operating results (the "2015 Q1 Investor Presentation").  Among other things, the 2015 Q1 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

33

94.     On or about November 21, 2014, Erhart sent an e-mail to BofI's Chief Risk Officer, Thomas Williams, in preparation for the upcoming Enterprise Risk Management ("ERM") audit.  Erhart asked whether Williams thought BofI had a deposit concentration risk.  Erhart was concerned and reported that a mere four customers accounted for approximately 25% of total deposits, and nine customers accounted for approximately 40% of total deposits.

95.     On or about December 12, 2014, the SEC served a subpoena on BofI, requesting account-identifying information for a certain investment advisory firm with the initials ETIA LLC ("ETIA").

96.     On or about December 18, 2014, BofI responded to the SEC that it did not have any information regarding ETIA.

97.     In or about early January 2015, Erhart became aware of the SEC subpoena, and knew that BofI did indeed have a loan file containing information regarding ETIA.  Erhart further learned that a file had been created in response to the SEC subpoena, containing the information regarding ETIA.  Erhart learned from a BofI employee that she had informed the Bank's legal department of the existence of the file on or about December 17, 2014, *before* the Bank sent its response to the SEC denying the existence of any such files.

98.     On or about January 15, 2015, BofI's principal regulator, the OCC, requested information on bank accounts at BofI with no Tax Identification Numbers ("TINs").  BofI responded to the OCC that there were no accounts without TINs.  Erhart had viewed a spreadsheet in the BSA folder disclosing approximately 150–200 accounts where the borrowers did not have a TIN.

99.     In or about January 2015, Erhart conducted a Loan Origination Audit. During the Loan Origination Audit, Erhart discovered that BofI was making substantial loans to foreign nationals including Politically Exposed Persons ("PEPs") in potential violation of BSA/KYC rules. Erhart was able to readily uncover

34

information that many of the borrowers were criminals and other suspicious persons who put the Bank at high risk for violating the BSA's Anti-Money Laundering Rules ("AML Rules"), as well as exposing BofI to reputational risk.  The purpose of the AML Rules is to help detect and report suspicious activity including the predicate acts to money laundering and terrorist financing.  The PEPs included very high-level foreign officials from major oil-producing countries and war zones.

100.    On January 29, 2015, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended December 31, 2014 (the "15Q2 Form 10-Q").  The Form 10-Q Quarterly Report was reviewed and approved by the Board, and prepared and signed by Defendants Garrabrants and Micheletti.  For the quarter, the Company reported net income of $19.37 million, or $1.26 per diluted share, on net revenue of $54.81 million, compared to net income of $13.15 million, or $0.91 per diluted share, on net revenue of $38.37 million for the same period in the prior year.

101.    The 15Q2 Form 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 15Q2 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

102.    In or about February 2015, the OCC requested that BofI disclose all correspondence with federal and state banking agencies and law enforcement, including any and all subpoenas, criminal or otherwise.  BofI responded that it had not received any such documents for the review period in question.  However, Erhart alleges that the Bank had a BSA spreadsheet Erhart had seen that identified many subpoenas, including from law enforcement agencies, grand juries, and even from the U.S. Department of the Treasury, of which OCC is a part.  Erhart also knew that the Bank indeed had been served with subpoenas.

103.    On March 2, 2015, BofI filed Form 8-K with the SEC containing an

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Investor Presentation concerning the Company's 2015 Q2 financial and operating results (the "2015 Q2 Investor Presentation"). The Form 8-K was signed by Defendant Micheletti, and the 2015 Q2 Investor Presentation was prepared by Defendants Micheletti and Garrabrants, and presented by Defendant Garrabrants. Among other things, the 2015 Q2 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

104.   On April 30, 2015, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "2015 Q3 Form 10-Q"). The Form 10-Q Quarterly Report was reviewed and approved by the Board, including Defendant Dada (who had joined the Board effective January 22, 2015), and prepared and signed by Defendants Garrabrants and Micheletti. For the quarter, the Company reported net income of $21.07 million, or $1.35 per diluted share, on net revenue of $59.03 million, compared to net income of $14.61 million, or $1.00 per diluted share, on net revenue of $40.88 million for the same period in the prior year.

105.   The 2015 Q3 Form 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2015 Q3 Form 10-Q was accurate and disclosed that the Company had disclosed all significant deficiencies and material weaknesses in the

design or operation of the Company's internal controls over financial reporting.

106.   On May 6, 2015, BofI filed Form 8-K with the SEC, signed by Defendant Micheletti, containing an Investor Presentation concerning the Company's 2015 Q3 financial and operating results (the "2015 Q3 Investor Presentation"). The 2015 Q3 Investor Presentation was prepared by Defendants Garrabrants and Micheletti and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

107.   On July 30, 2015, BofI issued a press release and filed a Form 8-K with the SEC, prepared by Defendants Garrabrants and Micheletti, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2015 (the "2015 Form 8-K").   For the quarter, the Company reported net income of $24.40 million, or $1.54 per diluted share, on net revenue of $65.57 million, compared to net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million for the same period in the prior year.  For fiscal year 2015, the Company reported net income of $82.68 million, or $5.37 per diluted share, on net revenue of $229.54 million, compared to net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million for fiscal year 2014.

108.   On August 10, 2015, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2015 Q4 financial and operating results (the "2015 Q4 Investor Presentation").   The Form 8-K and the 2015 Q4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Investor Presentation were prepared by Defendants Garrabrants and Micheletti and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

109. On August 22, 2015, *The New York Times* published an article concerning BofI's strong growth during Defendant Garrabrants's tenure as CEO. The article was entitled "An Internet Mortgage Provider Reaps the Rewards of Lending Boldly" and stated, in relevant part:

As the leader of Bank of Internet USA, based in San Diego, Mr. Garrabrants has been issuing big mortgages to high earners whom other lenders might not necessarily welcome with open arms.   But because its financial performance has, in many ways, been spectacular, Bank of Internet has been turning heads — and setting off alarm bells as well.  ***The bank has made loans to people who were later found to have run afoul of the law***, and Mr. Garrabrants has had to reassure investors that the bank has good relations with regulators.

Bank of Internet's loans have increased fivefold, to nearly $5 billion, over the last five years — an almost unheard-of rate of growth for these tepid times in banking.  Its losses from bad loans are practically nonexistent, and profits are surging, in part because it charges a much higher interest rate than the bigger banks operating in the same market.

\* \* \*

[Some investors] contend that the bank is attracting people who simply can't get cheaper loans — borrowers who may be more risky.  ***Bank of Internet also makes large mortgages to wealthy foreigners, a***

38

*practice that requires meticulous controls to comply with federal regulations aimed at stopping money laundering.*  The bank's critics wonder whether its compliance department is up to the task, though Mr. Garrabrants vigorously defended its practices.  They also take issue with the bank's funding, contending that the lender is too dependent on customer deposits that could evaporate if turbulence returns to the banking world.

\* \* \*

Mr. Garrabrants, who has also worked at Goldman Sachs and McKinsey & Company, says the critics are spreading disinformation — and losing money — as they bet against his firm's soaring stock.

"Here's the problem for them:  They are going into an earnings juggernaut that has none of the things that they're talking about," Mr. Garrabrants said.  And he says the bank is as judicious as any other lender in picking its borrowers.  "It's about being thoughtful about what risks you take and watching them and being careful," he said, adding that Bank of Internet's deposits are a reliable source of funding.

\* \* \*

Still, *Bank of Internet has lent money to some unsavory characters*. For example, in 2012 it issued a $5 million mortgage to Purna Chandra Aramalla on a house in Sands Point, an affluent section of Long Island, according to local property records.  In 2013, federal law enforcement authorities in New York charged Mr. Aramalla with Medicare and Medicaid fraud.  In March, he was sentenced to three years in prison.

In mid-2014, Bank of Internet lent $1.05 million to Frederick Elm for a house in Fort Lauderdale, Fla., property records show.  In January, the Securities and Exchange Commission accused Mr. Elm of running a "Ponzi-like" scheme that had raised $17 million since November 2013.  Mr. Elm partly settled with the agency in June.

And in 2012, Bank of Internet issued a $1.26 million mortgage to Deepal Wannakuwatte, a Sacramento businessman who received a 20-year prison sentence last year for operating, for more than 10 years, what the F.B.I. called a Ponzi scheme.

\* \* \*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Then there are questions about Bank of Internet's marketing of itself as a lender to "foreign nationals."  It does not disclose exactly what proportion of its loans are made to foreigners*.  When asked, Mr. Garrabrants said it was "nowhere near the majority."  *Banks that do this sort of lending can expect extra scrutiny from federal regulatory agencies, which have punished banks for not properly applying bank secrecy and anti-money-laundering laws when vetting their international customers.*

In recent months there has been unrest in the division of Bank of Internet that deals with regulatory compliance.  *Earlier this year, a senior internal auditor, Jonathan Ball, and another employee in the division, Matt Erhart, left the bank.  Mr. Ball did not respond to requests for comment.  Mr. Erhart's lawyer, Carol L. Gillam, said that she had communicated with regulators, including the Office of the Comptroller of the Currency, the bank's primary regulator.  She declined to provide details*.

Regulators have not publicly warned or penalized the bank for its lending to foreign nationals, and Mr. Garrabrants often sounds exasperated when defending that business.  In his view, short-sellers had sought to stir up concerns about those loans to try to persuade regulators to stop Bank of Internet from acquiring parts of H&R Block's banking unit.  The deal was concluded this month.

[Emphases added.]

110.   On August 26, 2015, BofI filed an annual report on Form 10-K with the SEC (the "2015 Form 10-K").  The Form 10-K Annual Report was prepared and signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, Dada, and Ratinoff.  The 2015 Form 10-K reiterated the financial and operating results previously announced in the 2015 Form 8-K.

111.   Among other things, the 2015 Form 10-K described that the BofI Federal Bank was subject to extensive federal regulation, as follows:

**REGULATION OF BOFI FEDERAL BANK**

*General*.  As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to

40

extensive regulation by the FDIC and, as of the Transfer Date, the OCC. Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act. The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

\* \* \*

***Anti-Money Laundering and Customer Identification.*** The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001. The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti- money laundering requirements. In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

112. The 2015 Form 10-K contained signed certifications pursuant to SOX which were signed by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2015 Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

113. The statements referenced in ¶¶ 59–112 were materially false and misleading because the Individual Defendants caused the Company to make false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, prospects, and performance. Specifically, during the Relevant Period, Defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company's internal controls were frequently disregarded; (b) BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws; (c) many BofI accounts lacked required tax identification numbers; (d) BofI fired an internal auditor who raised the foregoing issues to management and to federal regulators; and (e) as a result of the

41

above, the Company's statements regarding its internal controls and other financial statements were materially false and misleading at all relevant times.

## III.  The Emergence of the Truth

114.  On October 13, 2015, after the close of trading on the stock market, *The New York Times* reported that Erhart, a former internal auditor at BofI, had filed a lawsuit in this Court against the Company for violating federal laws designed to protect whistleblowers.  The *Erhart* Complaint alleged, *inter alia*, that:

- Bank of Internet's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

- Erhart had seen a spreadsheet that contained as many as 200 accounts without tax identification numbers, contrary to Bank of Internet's representations to the OCC, its primary regulator;

- Bank of Internet at times failed to provide full and timely information to regulators; and

- Erhart was fired after he revealed wrongdoing at Bank of Internet to management and federal regulators.

115.  On this news, shares of BofI fell $42.87, or 30.2%, to close at $99.13 on October 14, 2015.

116.  As a result of the Individual Defendants' wrongful acts and omissions, the Company has suffered significant losses and damages.

## DAMAGES TO BOFI

117.  BofI has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

118.  As a direct and proximate result of the Individual Defendants' conduct, BofI has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

42

(a)    legal fees associated with the lawsuits filed against the Company for violations of the federal securities laws and for violation of the anti-retaliation provisions of the Dodd-Frank Act and SOX by Mr. Erhart;

(b)    loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

(c)    amounts paid to outside lawyers, accountants, and investigators in connection with BofI's internal investigation; and

(d)    loss of revenues and profits due to any subsequent restatements.

## DERIVATIVE ALLEGATIONS

119.   Plaintiff brings this action for the benefit of BofI to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

120.   BofI is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

121.   Plaintiff is and has been a BofI shareholder during the entire Relevant Period because he has continuously owned BofI common stock since January 14, 2013.  Plaintiff therefore will adequately and fairly represent the interests of BofI in enforcing and prosecuting its rights.

122.   BofI's Board at the time this action was initiated consisted of the following nine directors:  Theodore C. Allrich, Nicholas A. Mosich, James S. Argalas, Gregory Garrabrants, John G. Burke, Paul J. Grinberg, James J. Court, Edward J. Ratinoff, and Uzair Dada.  Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because, for the reasons set forth below, such demand would be a futile and useless act.

123.   Where the board consists of nine directors, plaintiff need only show that five of the directors lack independence or face a substantial likelihood of liability

43

to establish that a demand on the board would be futile.  As shown below, the demand in this case would be futile because at least five of the Director Defendants lack independence and/or face a substantial likelihood of liability.

## I.   Demand Is Futile Because a Majority of the Director Defendants Lacks Independence and Faces a Substantial Likelihood of Liability

### A.   Garrabrants Lacks Independence

124.   Demand is futile as to Garrabrants because he lacks independence.  As admitted by BofI in its 2015 Proxy Statement: "Mr. Garrabrants is not an independent director because he is our President and Chief Executive Officer." This decision as to Garrabrants's lack of independence was made by the Board itself.

125.   Garrabrants is also interested in this litigation for purposes of demand futility because he faces a substantial likelihood of liability for his individual misconduct.  Garrabrants is a named defendant in the currently-pending federal class actions, alleging that he violated § 10(b) of the Exchange Act and Rule 10b-5 when he disseminated or approved the false and misleading statements set forth above.

126.   If Garrabrants pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws. As such, Garrabrants is fatally conflicted and, therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims.  Thus, demand is futile.

127.   Additionally, Garrabrants is interested because he prepared, signed, or caused the Company to issue many of the false and misleading statements.  In fact, Garrabrants signed the Company's SEC filings that contained false and misleading statements, including the Forms 10-K dated September 3, 2013, August 28, 2014, and August 26, 2015, and the Forms 10-Q dated November 5, 2013, February 5, 2014, May 6, 2014, November 4, 2014, January 29, 2015, and April 30, 2015. Moreover, in conjunction with the filing of each of the above Forms 10-K and Forms 10-Q, Garrabrants signed certifications as required by SOX that, *inter alia*:

44

(a)   affirmed that he was "responsible for establishing and maintaining disclosure controls and procedures … and internal control over financial reporting" for BofI;

(b)   certified that he has disclosed to BofI's auditors and the audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [BofI's] ability to record, process, summarize and report financial information," and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [BofI's] internal controls over financial reporting"; and

(c)   certified that, to the best of his knowledge:  (i) the Annual and Quarterly Reports did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (ii) "the financial statements, and other financial information included in [each] report, fairly present in all material respects the financial condition, results of operations and cash flows of [BofI]"; and (iii) the information contained in the Forms 10-K and Forms 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

The above representations were false and misleading (and thereby violated SOX) because, as noted above, during the Relevant Period, the Company's internal controls were frequently disregarded, and the Company's statements regarding its internal controls and other financial statements were materially false and misleading.

128.   Garrabrants also participated in conference calls with analysts and

investors during the Relevant Period.  Garrabrants therefore faces a substantial likelihood of liability for breaching his fiduciary duties.  Consequently, Garrabrants cannot disinterestedly consider a demand.

**B.     The Entire Board Faces a Substantial Likelihood of Liability for Retaliating Against Whistleblower Erhart in Violation of the Sarbanes-Oxley Act**

129.    As alleged in detail by BofI former audit employee Erhart in a whistleblower complaint pending in this Court (and of which the Court can take judicial notice), Erhart brought numerous specific violations of the law by BofI senior officers, including Tolla and Garrabrants, to the attention of the Company. After Erhart's good-faith whistleblower complaints were brushed aside by Tolla and Garrabrants, Erhart lodged his complaints with the OCC and SEC.

130.    Section 806 of the Sarbanes-Oxley Act prohibits employers such as BofI from discharging, constructively discharging, demoting, threatening, harassing, or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders. In addition, an employer may not discharge or in any manner retaliate against employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders.  If an employer takes retaliatory action against an employee because he or she engaged in any of these protected activities, the employee can file a complaint with the Secretary, United States Department of Labor, Occupational Safety and Health Administration ("OSHA").

131.    Erhart filed a complaint with OSHA regarding the retaliation he was

faced with after reporting allegedly unlawful activities at BofI to federal agencies and regulators.

132.   On March 12, 2015, Defendant Bar-Adon met with Erhart and told him he was acting as General Counsel to BofI's Audit Committee, comprised of Defendants Grinberg (Chairman), Mosich, and Argalas.  Thus, Grinberg, Mosich, and Argalas had actual knowledge of Erhart's whistleblower complaints, and had directed Bar-Adon to meet with Erhart regarding such activities.

133.   As noted by BofI in its 2015 Proxy Statement, the Audit Committee "reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting." Therefore, a reasonable inference is that BofI's Audit Committee (Grinberg, Mosich, and Argalas) reported Erhart's complaints and whistleblowing activity to the full Board at the next meeting it held subsequent to March 12, 2015.  During fiscal year 2015, BofI's Board met eight times; as a result, the Board was meeting on average approximately every six weeks.  As a result, Defendants Allrich, Garrabrants, Burke, Court, Ratinoff, and Dada received actual knowledge of Erhart's complaints and whistleblowing activity shortly after March 2015.

134.   Despite having actual knowledge of Erhart's whistleblowing activity, and despite knowing that Dodd-Frank, Sarbanes-Oxley, and other laws prohibit retaliation against employees who report alleged wrongdoing, the Board authorized and approved the firing of Erhart on June 9, 2015.

135.   All Board members thus face a substantial likelihood of liability for breaching their fiduciary duties by causing the Company to violate the anti-retaliation provisions of Sarbanes-Oxley and Dodd-Frank.

136.   Moreover, all Board members can reasonably be charged with actual knowledge or reckless disregard of the unlawful activity alleged by Erhart during the Relevant Period because the wrongdoing concerned the Company's core (and only)

47

business — consumer and business banking products and services.

### C.    Additional Reasons Demonstrating Futility of Demand

137.   The entire Board has demonstrated its inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein.  Every Board member has acted in violation of their fiduciary duties to the Company's shareholders, as described herein.

138.   For example, in addition to Garrabrants, Defendants Allrich, Mosich, Argalas, Garrabrants, Burke, Grinberg, Court, and Ratinoff approved and signed the Company's SEC filings that contained false and misleading statements, including the Forms 10-K dated September 3, 2013, August 28, 2014, and August 26, 2015.[1] Therefore, no reasonable stockholder would reasonably believe that a majority of the members of the Board would be able to independently and properly consider a demand in good faith and, accordingly, demand is excused.

139.   Every member of the Board declined to inform themselves of the misconduct complained of herein, even when they had a reasonable basis to believe that further investigation was warranted, as is evidenced for example by the Board's approval of the firing of Erhart just months after he filed whistleblower complaints against the Company with the OCC and SEC and claimed whistleblower protection. Thus, demand is excused.  Intentionally causing the Company to violate the anti-retaliation protection of multiple federal laws amply demonstrates the Board's disloyal and bad faith conduct.  Any conduct evidencing bad faith and a lack of loyalty to the Company is outside the protection of the business judgment rule and constitutes conduct that is non-indemnifiable.  Thus, demand is excused as to the entire Board.

---

[1] Defendant Dada, who joined the Board on January 22, 2015, only signed the false and misleading Form 10-K dated August 26, 2015.

48

140.    Defendants Grinberg, Mosich, and Argalas are members of the Audit Committee and therefore had a clear duty to be kept informed about the Company's accounting procedures, and yet just as clearly they disregarded such duties. Defendants Grinberg, Mosich, and Argalas have violated the terms of the Audit Committee Charter, which, among other things, required Defendants Grinberg, Mosich, and Argalas to "[r]eview the Company's annual audited financial statements with management, including a review of major issues regarding accounting and auditing principles and practices, and evaluate the adequacy and effectiveness of internal controls that could significantly affect the Company's financial statements, as well as the adequacy and effectiveness of the Company's disclosure controls and procedures and management's reports thereon."  As such, Defendants Grinberg, Mosich, and Argalas are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

141.    Although the Company has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing, the Board has not filed any lawsuits against any directors or officers who were responsible for the losses.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a substantial likelihood of liability for their breaches.  Indeed, the Director Defendants are more interested in protecting themselves than they are in protecting the Company by bringing this action. Thus, demand on the Board is futile.

**COUNT I**
**For Breaches of Fiduciary Duties**
**Against All Defendants**

142.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of BofI's

49

business and affairs, particularly with respect to issues regarding the Company's compliance with laws.

144.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, and loyalty.

145.   The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of BofI.

146.   In breach of their fiduciary duties owed to BofI, the Individual Defendants willfully participated in misrepresentation of the Company's financial condition, failed to correct the Company's public statements, and failed to properly oversee BofI's business, rendering them personally liable to the Company for breaching their fiduciary duties.

147.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misrepresentations and omissions of the material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly.

148.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

149.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, BofI has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT II
### For Abuse of Control
### Against All Defendants

150.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence BofI, for which they are legally responsible.

152.   As a direct and proximate result of the Individual Defendants' abuse of control, BofI has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, BofI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT III
### For Unjust Enrichment
### Against All Defendants

153.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, BofI.

155.   During the Relevant Period, the Individual Defendants either received bonuses, stock options, or similar compensation from BofI that was tied to the financial performance of BofI or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

156.   Plaintiff, as shareholder and representative of BofI, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct

51

and breach of their fiduciary duties.

## COUNT IV
### For Breach of the Duty of Honest Services
### Against Defendants Garrabrants, Micheletti, Bar-Adon, and Tolla

157.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.   This claim is brought derivatively on behalf of the Company against Defendants Garrabrants, Micheletti, Bar-Adon, and Tolla for breach of their undivided duty of loyalty to their employer.

159.   Garrabrants, Micheletti, Bar-Adon, and Tolla were employees of the Company during the Relevant Period.

160.   Garrabrants, Micheletti, Bar-Adon, and Tolla breached their duty of loyalty to the Company by not acting solely in the Company's interests in performing their employment duties.

161.   Those breaches of duty consisted of the conduct alleged in this complaint including, without limitation, their conduct in causing the Company to issue false statements regarding its operations and financial results, misstate the fact that the Company maintained adequate internal controls, fire whistleblower Erhart in violation of the Dodd-Frank and Sarbanes-Oxley laws, and cause the Company to make other false and misleading statements during the Relevant Period.  Defendants benefitted from their wrongdoing because they were allowed to retain their jobs in exchange for their unlawful conduct and because they received compensation that was directly tied to the Company's financial performance, which was greater than it would have been absent the Defendants' wrongful conduct.

162.   The Company was harmed by these Defendants' breaches of the undivided duty of loyalty.

163.   By reason of the foregoing, the Company was harmed and will continue to suffer harm as described in greater detail above.

52

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and the Company and against all Individual Defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of BofI and that Plaintiff is an adequate representative of the Company;

B.      Declaring that the Individual Defendants have breached and/or aided and abetted the breaches of their fiduciary duties to BofI;

C.      Determining and awarding to BofI the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.      Directing BofI and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BofI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

(1)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(2)     a provision to permit the shareholders of BofI to nominate at least two candidates for election to the Board;

(3)     a proposal to strengthen the Board's supervision of the Company's CEO;

(4)     a provision to appropriately test and then strengthen the internal audit and control functions; and

(5)     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

53

1        E.     Awarding BofI restitution from the Individual Defendants, and each of

2    them;

3        F.     Awarding Plaintiff the costs and disbursements of this action, including

4    reasonable attorneys' and experts' fees, costs, and expenses; and

5        G.     Granting such other and further relief as the Court may deem just and

6    proper.

7    **DEMAND FOR JURY TRIAL**

8        Plaintiff demands a trial by jury on all issues so triable.

9    Dated:  December 3, 2015         Respectfully submitted,

10                       BOTTINI & BOTTINI, INC.

11                       Francis A. Bottini, Jr. (175783)
                         Albert Y. Chang (296065)

12                       Yury A. Kolesnikov (271173)

13

14                            s/ Francis A. Bottini, Jr.
                            Francis A. Bottini, Jr.

15

16                       7817 Ivanhoe Avenue, Suite 102
                         La Jolla, California  92037

17                       Telephone:   (858) 914-2001
                         Facsimile:    (858) 914-2002

18

19                       *Attorneys for Plaintiff*

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, Andrew Calcaterra, verify that I am a shareholder of Nominal Defendant BofI Holding, Inc., and that I have continuously owned BofI stock since January 14, 2013.  I have reviewed the allegations in this Verified Shareholder Derivative Complaint (the "Complaint").  As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true.  Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on ____November 23rd____, 2015, at Rochester, Michigan.

_Andrew Calcaterra_
_____
Andrew Calcaterra