BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (175783)
Albert Y. Chang (296065)
Yury A. Kolesnikov (271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:   (858) 914-2001
Facsimile:     (858) 914-2002

*Proposed Lead Counsel for Plaintiffs and*
*Counsel for Plaintiff Andrew Calcaterra*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW CALCATERRA, derivatively on behalf of BOFI HOLDING, INC., <br><br> Plaintiff, <br><br> vs. <br><br> GREGORY GARRABRANTS, *et al.*, <br><br> Defendants, <br><br> – and – <br><br> BOFI HOLDING, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. 15cv2722 BAS (NLS) <br><br> **Declaration of Francis A. Bottini, Jr. in Support of Plaintiffs Andrew Calcaterra, Zhang Yong, and Laborers Pension Trust Fund of Northern Nevada's Motion to Consolidate Related Actions and to Appoint Lead Counsel** <br><br> Date:        March 21, 2016 <br> Time:       None <br> Judge:      Hon. Cynthia A. Bashant <br> Courtroom:  4B (Schwartz) <br><br> **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

[Caption continues on following page.]

| | |
|---|---|
| DAVID DEYOUNG, derivatively and on behalf of BOFI HOLDING, INC., | Case No. 16cv0163 BAS (NLS) |
| Plaintiff, | |
| vs. | |
| GREGORY GARRABRANTS, *et al.*, | |
| Defendants, | |
| – and – | |
| BOFI HOLDING, INC., a Delaware corporation, | |
| Nominal Defendant. | |
| ZHANG YONG, derivatively on behalf of BOFI HOLDING, INC., | Case No. 16cv0241 BEN (WVG) |
| Plaintiff, | |
| vs. | |
| GREGORY GARRABRANTS, *et al.*, | |
| Defendants, | |
| – and – | |
| BOFI HOLDING, INC., a Delaware corporation, | |
| Nominal Defendant. | |

[Caption continues on following page.]

| | |
|---|---|
| 1 | LABORERS PENSION TRUST FUND )    Case No. 16cv0259 BTM (RBB) |
| 2 | OF NORTHERN NEVADA,                    ) |
|   | derivatively on behalf of BOFI              ) |
| 3 | HOLDING, INC.,                                ) |
|   |                                                        ) |
| 4 |                                          Plaintiff,) |
| 5 |                                                        ) |
| 6 |                        vs.                        ) |
|   |                                                        ) |
| 7 | THEODORE C. ALLRICH, *et al.*,       ) |
| 8 |                                     Defendants,) |
| 9 |                                                        ) |
|   |                      – and –                     ) |
| 10 |                                                       ) |
| 11 | BOFI HOLDING, INC., a Delaware      ) |
|   | corporation,                                     ) |
| 12 |                                                        ) |
| 13 |                       Nominal Defendant.) |

I, Francis A. Bottini, Jr., declare as follows:

1.    I am a partner of Bottini & Bottini, Inc., counsel for plaintiff Andrew Calcaterra, who filed the first of the above-captioned related cases: *Calcaterra v. Garrabrants*, No. 15cv2722 BAS (NLS), filed on December 3, 2015; *DeYoung v. Garrabrants*, No. 16cv0163 BAS (NLS), filed on January 22, 2016; *Yong v. Garrabrants*, No. 16cv0241 BEN (WVG), filed on January 29, 2016; and *Laborers Pension Trust Fund of Northern Nevada v. Allrich*, No. 16cv0259 BTM (RBB), filed on February 2, 2016. I submit this declaration in support of the motion of plaintiffs in *Calcaterra*, *Yong*, and *Laborers* to consolidate the related cases and to appoint Bottini & Bottini, Inc. as lead counsel for plaintiffs in the consolidated action. I have personal knowledge of the facts stated in this declaration. I could and would testify to these facts, if called upon to do so.

2.    Attached hereto as Exhibit A is a true and correct copy of the complaint in *Calcaterra*.

3.    Attached hereto as Exhibit B is a true and correct copy of the complaint in *DeYoung*.

4.    Attached hereto as Exhibit C is a true and correct copy of the complaint in *Yong*.

5.    Attached hereto as Exhibit D is a true and correct copy of the complaint in *Laborers*.

6.    Attached hereto as Exhibit E is a true and correct copy of Bottini & Bottini, Inc.'s firm resume.

7.    I have exclusively practiced plaintiffs' class action litigation for over 20 years. My firm specializes in prosecuting claims in consumer, securities, antitrust, ERISA, and other complex class action litigation, as well as shareholder derivative actions and whistleblower actions. I have served as lead or co-lead counsel in numerous shareholder derivative actions in state and federal courts across the United States, including *Cook v. McCullough*, No. 11 C 9119 (N.D. Ill.) (Career Education Corporation), *In re SunPower Corp. Shareholder Derivative Litigation*, Master File No. C-09-5731 (N.D. Cal.), *Klein v. Cook*,

1

No. 14-cv-3634 EJD (N.D. Cal.) (Apple Inc.), *In re Pacific Capital Bancorp Derivative Litigation*, No. CIVRS1340306 (Cal. Super. Ct., Cnty. of Santa Barbara), *In re First Solar Derivative Litigation*, No. CV-12-0769-PHX-DGC (D. Ariz.), and *In re Dell, Inc. Derivative Litigation*, No. 06-cv-0839 (W.D. Tex.).

8.    As demonstrated in my firm's resume, Bottini & Bottini has substantial experience litigating shareholder derivative actions and has a demonstrated record of success.  In *In re Brocade Communications Systems, Inc.*, No. 05-cv-2233 (N.D. Cal.), I was retained as co-counsel to Brocade Communications Systems, Inc. by the Special Litigation Committee of Brocade's board of directors to help litigate Brocade's claims against its former officers and directors.  After litigation of the case for over five years, over $24 million was recovered for Brocade through the litigation.

9.    In another shareholder derivative litigation involving Career Education Corporation in 2012, Bottini & Bottini, serving as plaintiff's lead counsel, successfully defeated defendants' motion to dismiss the complaint challenging the demand futility allegations.  *See Cook v. McCullough*, No. 11 C 9119, 2012 U.S. Dist. LEXIS 114621 (N.D. Ill. August 13, 2012).  Bottini & Bottini eventually secured a $20 million recovery, in addition to valuable corporate governance reforms, for Career Education.

10.    More recently in this District, Bottini & Bottini, working with other counsel, helped secure a settlement of a multi-venue, two-year-long shareholder derivative litigation involving San Diego, California-based Maxwell Technologies, Inc.  *See In re Maxwell Technologies, Inc. Derivative Litigation*, No. 12cv0966 BEN (RBB) (S.D. Cal.).

11.    Bottini & Bottini has committed and will continue to commit all resources necessary to vigorously prosecute the claims asserted in this litigation.

12.    Bottini & Bottini has met and conferred with counsel for plaintiff Laborers, Robbins Geller Rudman & Dowd LLP, and counsel for plaintiff Yong, The Shuman Law Firm, to establish a protocol to ensure efficiency in assigning tasks among Plaintiffs' counsel.

Declaration of Francis A. Bottini, Jr.                                                                15cv2722 BAS (NLS)

13.     Bottini & Bottini has extensive experience working side-by-side with both Robbins Geller and The Shuman Law Firm.  For example, my firm has served as co-counsel with Robbins Geller in numerous securities cases, including *Robinson v. Audience, Inc.*, No. 1:12-cv-232227 (Cal. Super. Ct., Cnty. of Santa Clara), *Mogenson v. Body Central Corp.*, No. 12-cv-0954-HES-JRK (M.D. Fla.), *Plymouth County Retirement System v. Model N, Inc.*, No. CIV530291 (Cal. Super. Ct., Cnty. of San Mateo), and *Wiley v. Envivio, Inc.*, No. CIV517185 (Cal. Super. Ct., Cnty. of San Mateo). In addition, my firm and Robbins Geller are currently working together to prosecute a shareholder derivative action on behalf of Lumber Liquidators Holdings, Inc. pending in the Eastern District of Virginia. *See In re Lumber Liquidators Holdings, Inc. S'holder Derivative Litig.*, No. 15-cv-0016 AWA (LRL) (E.D. Va.).

14.     My firm has also served as co-lead counsel with The Shuman Law Firm in several shareholder derivative cases, including *In re American Capital, Ltd. Derivative Litigation*, No. 11-cv-2424-PJM (D. Md.), and *In re OSI Systems, Inc. Derivative Litigation*, No. 14-cv-2910 MWF (VBKx).

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 19, 2016, at La Jolla, California.

s/ Francis A. Bottini, Jr.
_____
Francis A. Bottini, Jr.

Declaration of Francis A. Bottini, Jr.                                    15cv2722 BAS (NLS)

## TABLE OF CONTENTS OF EXHIBITS TO THE DECLARATION OF FRANCIS A. BOTTINI, JR. IN SUPPORT OF PLAINTIFFS' MOTION TO CONSOLIDATE RELATED ACTIONS AND TO APPOINT LEAD COUNSEL

| Exhibit No. | Exhibit Description | Page Nos. |
|---|---|---|
| Exhibit A | Complaint filed on December 3, 2015 in *Calcaterra v. Garrabrants*, No. 15cv2722 BAS (NLS) | 005-063 |
| Exhibit B | Complaint filed on January 22, 2016 in *DeYoung v. Garrabrants*, No. 16cv0163 BAS (NLS) | 064-133 |
| Exhibit C | Complaint filed on January 29, 2016 in *Yong v. Garrabrants*, No. 16cv0241 BEN (WVG) | 134-195 |
| Exhibit D | Complaint filed on February 2, 2016 in *Laborers Pension Trust Fund of Northern Nevada v. Allrich*, No. 16cv0259 BTM (RBB) | 196-252 |
| Exhibit E | Firm Resume of Bottini & Bottini, Inc. | 253-265 |

# EXHIBIT A



# EXHIBIT A

Exhibit A
005

1   BOTTINI & BOTTINI, INC.
2   Francis A. Bottini, Jr. (175783)
    Albert Y. Chang (296065)
3   Yury A. Kolesnikov (271173)
    7817 Ivanhoe Avenue, Suite 102
4   La Jolla, California 92037
5   Telephone: (858) 914-2001
    Facsimile: (858) 914-2002
6

7   *Attorneys for Plaintiff*

8
          UNITED STATES DISTRICT COURT
9
        SOUTHERN DISTRICT OF CALIFORNIA
10

11

12   ANDREW CALCATERRA, derivatively )   Case No. **'15CV2722 BTM KSC**
    on behalf of BOFI HOLDING, INC., )
13                           )   (Derivative Action)
                 Plaintiff, )
14                           )   **VERIFIED SHAREHOLDER**
             vs.           )   **DERIVATIVE COMPLAINT**
15                           )
    GREGORY GARRABRANTS, )
16   ANDREW J. MICHELETTI, )   <u>DEMAND FOR JURY TRIAL</u>
    THEODORE C. ALLRICH, )
17   NICHOLAS A. MOSICH, JAMES S. )
    ARGALAS, JOHN GARY BURKE, )
18   PAUL J. GRINBERG, JAMES J. )
    COURT, EDWARD J. RATINOFF, )
19   ESHEL BAR-ADON, JOHN C. )
    TOLLA, and UZAIR DADA, )
20                           )
21              Defendants, )
                          )
22            -and-         )
23                           )
24   BOFI HOLDING, INC., )
    a Delaware corporation, )
25                           )
26         Nominal Defendant. )
27

28

_____
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

NATURE OF THE ACTION .................................................................... 1

JURISDICTION AND VENUE ............................................................... 3

PARTIES .................................................................................................. 4

    I.      Plaintiff ...................................................................................... 4

    II.    Nominal Defendant .................................................................. 4

    III.   The Individual Defendants ........................................................ 4

THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES ................. 6

    I.      General Duties as Directors and Officers ................................ 6

    II.    Compliance with the Generally Accepted Accounting Principles .......... 9

    III.   The Duty of Reasonable and Prudent Supervision ................ 10

BREACHES OF FIDUCIARY DUTIES ................................................ 11

CONTROL, ACCESS, AND AUTHORITY .......................................... 12

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION .. 12

FACTUAL ALLEGATIONS ................................................................. 14

    I.      The Individual Defendants' Role in Overseeing Risk
         Management at BofI ................................................................ 15

    II.    The Individual Defendants Cause the Company to
         Issue False and Misleading Statements .................................. 16

BOFI HOLDING, INC. AND SUBSIDIARY SELECTED
CONSOLIDATED FINANCIAL INFORMATION ............................... 17

    III.   The Emergence of the Truth ................................................... 42

DAMAGES TO BOFI ............................................................................ 42

DERIVATIVE ALLEGATIONS ........................................................... 43

    I.      Demand Is Futile Because a Majority of the Director
         Defendants Lacks Independence and Faces a Substantial
         Likelihood of Liability ........................................................... 44

         A.    Garrabrants Lacks Independence .................................. 44

         B.    The Entire Board Faces a Substantial Likelihood
             of Liability for Retaliating Against Whistleblower
             Erhart in Violation of the Sarbanes-Oxley Act ............ 46

i

C.      Additional Reasons Demonstrating Futility of Demand ............48

COUNT I - For Breaches of Fiduciary Duties Against All Defendants ....................49

COUNT II - For Abuse of ControlAgainst All Defendants.........................................51

COUNT III - For Unjust Enrichment Against All Defendants .................................51

COUNT IV - For Breach of the Duty of Honest Services Against
          Defendants Garrabrants, Micheletti, Bar-Adon, and Tolla..................52

PRAYER FOR RELIEF.........................................................................53

DEMAND FOR JURY TRIAL................................................................54

Exhibit A
008

Case 3:15-cv-02722-BTM-KSC  Document 1  Filed 12/03/15  Page 4 of 38  Page

Plaintiff Andrew Calcaterra ("Plaintiff"), derivatively on behalf of BofI Holding, Inc. (hereafter "BofI," the "Bank," the "Bank of Internet," or the "Company"), submits this Verified Shareholder Derivative Complaint against the members of BofI's Board of Directors (the "Board") (collectively, the "Individual Defendants") for breaches of their fiduciary duties, gross mismanagement, abuse of control, and unjust enrichment.  Plaintiff makes the following allegations, except as to allegations pertaining to Plaintiff (which are based on personal knowledge), based on his investigation and the investigation of his counsel, including a review of legal and regulatory filings, press releases, media reports about BofI, the allegations in the complaint filed on October 13, 2015 by Charles M. Erhart in *Erhart v. BOFI Holding, Inc.*, Case No. 15-cv-2287-BAS (NLS) (S.D. Cal.), and other public statements issued by BofI.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

In support of these derivative claims, Plaintiff alleges as follows:

**NATURE OF THE ACTION**

1.    This is a shareholder derivative action to remedy the wrongdoing committed by BofI's directors and officers between February 6, 2013 and the present (the "Relevant Period").

2.    BofI operates as the holding company for BofI Federal Bank, a provider of consumer and business banking products through the Internet in the United States. BofI Federal Bank's deposit products include consumer and business checking, demand, savings, and time deposit accounts. Its loan portfolio comprises residential single family and multifamily mortgage loans; commercial real estate secured and commercial lending products; specialty finance factoring products; and consumer lending products consisting of prime loans to purchase new and used recreational vehicles and automobiles, as well as deposit-related overdraft lines of credit.

1

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
009

3.      BofI Federal Bank's most significant business is making mortgages to high-net-worth individuals for the purchase of expensive properties through BofI Federal Bank's Bank of Internet USA ("Bank of Internet") brand.

4.      The Company was incorporated in 1999. BofI is headquartered in San Diego, California, and its shares trade on the NASDAQ under the ticker symbol "BOFI."

5.      Throughout the Relevant Period, the Individual Defendants caused the Company to make false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, prospects, and performance. Specifically, during the Relevant Period, Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that:

        (a)      the Company's internal controls were frequently disregarded;

        (b)      BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

        (c)      many BofI accounts lacked required tax identification numbers;

        (d)      in violation of the anti-retaliation laws contained in the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or "SOX") and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), the Board caused the Company to fire an internal auditor who raised the foregoing issues to senior management and to federal regulators; and

        (e)      as a result of the above, the Company's statements regarding BofI's internal controls and other financial statements were materially false and misleading at all relevant times.

6.      On October 13, 2015, after the close of trading, *The New York Times* reported that Matt Erhart ("Erhart"), a former internal auditor at the Bank of Internet, had filed a lawsuit against the Company for violating federal laws designed to protect whistleblowers (the "*Erhart* Complaint"). The *Erhart* Complaint alleged,

2

*inter alia*, that:

- Erhart was instructed by senior officers at BofI, including Defendant Tolla, to refrain from putting anything in writing regarding the Company's violations of laws;

- Erhart was instructed by senior officers at BofI, including Defendant Tolla, to label anything he did in his audit function which might be incriminating to the Company as "attorney client work product/communication" in order to shield such documents from later production;

- BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

- Erhart had seen a spreadsheet that contained as many as 200 accounts without tax identification numbers, contrary to BofI's representations to the Office of the Comptroller of the Currency ("OCC"), its primary regulator;

- BofI at times failed to provide full and timely information to regulators; and

- Erhart was fired after he revealed wrongdoing at BofI to management and federal regulators.

7.     On this news, shares of BofI fell $42.87, or 30.2%, to close at $99.13 on October 14, 2015.

8.     As a result of Defendants' wrongful acts and omissions, the Company has been named as a defendant in at least two securities class action lawsuits filed in this Court and has suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     Subject-matter jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity between plaintiff and defendants and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.    Venue is proper in the Southern District of California under 28 U.S.C. §§ 1391 and 1401 because BofI maintains its principal executive offices in this District and because a substantial portion of the acts and conduct complained of

3

1 herein — including the dissemination of materially false and misleading information
2 to the investing public — occurred in this District.

3       11.    Each defendant has minimum contacts with this District, as they have
4 entered into contracts in this District, or have frequently traveled here, on BofI's
5 business, or have authorized acts and actions that have had a sufficient impact in this
6 District or on BofI's shareholders and investors residing here to justify the exercise
7 of jurisdiction over them.

8 <div align="center">**PARTIES**</div>

9 **I.    Plaintiff**

10       12.    Plaintiff Andrew Calcaterra is a current shareholder of BofI.  Plaintiff
11 first purchased BofI stock on January 14, 2013, and has continuously held his BofI
12 stock since that time.  Plaintiff is a citizen of Michigan.

13 **II.    Nominal Defendant**

14       13.    Nominal Defendant BofI is a Delaware company headquartered and
15 operating at 4350 La Jolla Village Drive, Suite 140, San Diego, California 92122.
16 BofI's shares trade on the NASDAQ under the ticker symbol "BOFI." At all
17 material times to this action, Defendant BOFI Holding, Inc., an entity d/b/a/
18 "BOFI Federal Bank" and "Bank of the Internet," was a publicly traded company.
19 BofI is a citizen of California and Delaware.

20 **III.    The Individual Defendants**

21       14.    Defendant Gregory Garrabrants ("Garrabrants") has served at all
22 relevant times as the Company's President, Director, and Chief Executive Officer
23 ("CEO").  Garrabrants is a citizen of California.

24       15.    Defendant Andrew J. Micheletti ("Micheletti") has served at all relevant
25 times as the Company's Executive Vice President and Chief Financial Officer
26 ("CFO").  Micheletti is a citizen of California.

27       16.    Defendant Theodore C. Allrich ("Allrich") has served as Chairman of

28

<div align="center">4</div>

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

<div align="center">Exhibit A
012</div>

the Board since October 2009 and served as Vice Chairman of the Board from 1999 to 2009. Allrich also serves as a member of the Compensation Committee of the Board. Allrich is a citizen of California.

17.     Defendant Nicholas A. Mosich ("Mosich") has served as Vice Chairman of the Board since October 2010 and as a member of the Board since May 2009. Mosich is a citizen of California.

18.     Defendant James S. Argalas ("Argalas") has served as a member of the Board since August 19, 2011. He has served as a member of the Company's Internal Asset Review Committee. Argalas is a citizen of California.

19.     Defendant John Gary Burke ("Burke") has served as a member of the Board since October 2005 and is a member of the Compensation Committee of the Board of Directors of the Company and the Chairman of the Internal Assets Review Committee of the Board of Directors of the Bank ("IAR Committee"). Upon information and belief, Burke is a citizen of Ohio.

20.     Defendant Paul J. Grinberg ("Grinberg") has served as a member of the Board since April 2004. Grinberg also serves as a member of the Compensation Committee of the Board. Grinberg is a citizen of California.

21.     Defendant James J. Court ("Court") has served as a member of the Board since April 2011. Court is a citizen of California.

22.     Defendant Edward J. Ratinoff ("Ratinoff") has served as a member of the Board and as a member of the Nominating Committee since 2010. Ratinoff is a citizen of California.

23.     Defendant Eshel Bar-Adon ("Bar-Adon") is an officer of the Company, holding the titles of Executive Vice President and Chief Legal Officer. Bar-Adon is a citizen of California.

24.     Defendant John C. Tolla ("Tolla") is an officer of BofI who has served as Chief Governance Risk and Compliance Officer at BofI since December 2013.

5

Exhibit A
013

1   Tolla is a citizen of California.

2        25.    Defendant Uzair Dada ("Dada") has served as a member of the Board

3   since January 22, 2015.  Dada is a citizen of California.

4        26.    The Defendants referenced in ¶¶ 14–25 are sometimes referred to

5   herein, collectively, as the "Individual Defendants."  The Individual Defendants,

6   because of their positions with the Company, possessed the power and authority to

7   control the contents of BofI's reports to the U.S. Securities and Exchange

8   Commission ("SEC"), press releases, and presentations to securities analysts, money

9   and portfolio managers, and institutional investors, *i.e.*, the market. The Individual

10  Defendants caused the Company to make specific false and misleading statements

11  and/or reviewed and approved the Company's reports and press releases alleged

12  herein to be misleading prior to, or shortly after their issuance, and had the ability

13  and opportunity to prevent their issuance or cause them to be corrected. Because of

14  their positions and access to material non-public information available to them, the

15  Individual Defendants knew that the adverse facts specified herein had not been

16  disclosed to, and were being concealed from, the public, and that the positive

17  representations which were being made were then materially false and/or misleading.

18       27.    BofI and the Individual Defendants are collectively referred to herein

19  as the "Defendants."

20            **THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

21  **I.    General Duties as Directors and Officers**

22       28.    By reason of their positions as BofI's officers and directors and

23  because of their ability to control BofI's business and corporate affairs, the

24  Individual Defendants owed BofI and its shareholders fiduciary obligations of trust,

25  loyalty, good faith, and due care, and were required to use their utmost ability to

26  control and manage BofI in a fair, just, honest, and equitable manner.  The

27  Individual Defendants were required to act in furtherance of the best interests of

28                                          6

1  BofI and its shareholders so as to benefit all shareholders equally and not in

2  furtherance of their personal interest or benefit.

3      29.    Each director and officer defendant owes to BofI and its shareholders

4  the fiduciary duty to exercise good faith and diligence, as well as the highest

5  obligations of fair dealing, in the administration of BofI's affairs and in the use and

6  preservation of its property and assets.

7      30.    The Individual Defendants, because of their positions of control and

8  authority as directors and officers of BofI, were able to and did, directly and/or

9  indirectly, exercise control over the wrongful acts complained of herein.

10      31.    To discharge their duties, the Individual Defendants, as BofI's officers

11  and directors, were required to exercise reasonable and prudent supervision over the

12  management, policies, practices, and controls of the affairs of the Company.  By

13  virtue of such duties, the Individual Defendants were required to, among other

14  things:

15          (a)    ensure that BofI was operated in a diligent, honest, and prudent

16      manner in accordance with its bylaws and charter, as well as the laws and

17      regulations of Delaware and the United States;

18          (b)    conduct the affairs of the Company in an efficient, business-like

19      manner so as to make it possible to provide the highest quality performance

20      of BofI's business, to avoid wasting the Company's assets, and to maximize

21      the value of the Company's stock;

22          (c)    fully inform themselves as to how BofI conducted its operations,

23      and, upon receipt of notice or information of imprudent or unsound

24      conditions or practices, to make reasonable inquiry in connection therewith,

25      and to take steps to correct such conditions or practices;

26          (d)    establish and maintain systematic and accurate records and

27      reports of the business and internal affairs of BofI and procedures for the

28                      7

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
015

1    reporting of the business and internal affairs and to periodically investigate, or

2    cause independent investigation to be made of, said reports and records;

3        (e)   maintain and implement an adequate and functioning system of

4    internal legal, financial, and management controls, such that BofI's operations

5    and financial statements comply with all laws;

6        (f)   exercise reasonable control and supervision over the public

7    statements made by the Company's officers and employees and any other

8    reports or information that the Company was required by law to disseminate;

9    and

10       (g)   examine and evaluate any reports of examinations, audits, or

11   other financial information concerning the financial affairs of the Company

12   and to make full and accurate disclosure of all material facts concerning, inter

13   alia, each of the subjects and duties set forth above.

14   32.   Each Individual Defendant, by virtue of his or her position as a

15   director or officer, owed to the Company and to its shareholders the highest

16   fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in

17   the management and administration of the affairs of the Company, as well as in the

18   use and preservation of its property and assets.   The Individual Defendants'

19   misconduct complained of herein involves a knowing and culpable violation of their

20   obligations as BofI's directors and officers, the absence of good faith on their part,

21   or a reckless disregard for their duties to the Company and its shareholders that the

22   Individual Defendants were aware or should have been aware posed a risk of serious

23   injury to the Company.   The conduct of the Individual Defendants who were also

24   officers and directors of the Company has been ratified by the remaining Individual

25   Defendants who collectively comprised BofI's Board at all relevant times.

26   33.   As senior executive officers and directors of a publicly-traded company

27   whose common stock was registered with the SEC pursuant to the Securities

28

8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
016

1  Exchange Act of 1934 (the "Exchange Act") and traded on NASDAQ, the

2  Individual Defendants had a duty to disseminate accurate and truthful information

3  with respect to the Company's financial condition and performance, growth,

4  operations, financial statements, business, products, management, earnings, and

5  present and future business prospects; and to correct any previously issued

6  statements that had become materially misleading or untrue, so that the market price

7  of the Company's common stock would be based upon truthful and accurate

8  information.  The Individual Defendants' conduct in causing the Company to make

9  misrepresentations and omissions during the Relevant Period violated these specific

10  requirements and obligations.  Accordingly, the Individual Defendants breached

11  their fiduciary duties including their duties of good faith, candor, and loyalty.

12      34.    At all times relevant hereto, the Individual Defendants were the agents

13  of each other and were at all times acting within the course and scope of such

14  agency.

15  **II.    Compliance with the Generally Accepted Accounting Principles**

16      35.    In issuing its financial statements, BofI was required to comply with

17  Generally Accepted Accounting Principles ("GAAP") — a common set of

18  accounting principles, standards, and procedures recognized by the accounting

19  profession and used to compile financial statements.

20      36.    GAAP are those principles recognized by the accounting profession as

21  the conventions, rules, and procedures necessary to define accepted accounting

22  practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states

23  that financial statements filed with the SEC that are not prepared in compliance with

24  GAAP are presumed to be misleading and inaccurate, despite footnotes and other

25  disclosures.  Regulation S-X requires that interim financial statements must also

26  comply with GAAP, with the exception that interim financial statements need not

27  include disclosures that would be duplicative of disclosures accompanying annual

28

9

Exhibit A
017

Case 3:15-cv-02722-BTM-KSC Document 1 Filed 12/05/15 Page 13 of 58

disclosures, per 17 C.F.R. § 210.10- 01(a).

37.     During the Relevant Period, BofI stated in its annual reports on Forms 10-K dated September 4, 2013, August 28, 2014, and August 26, 2015 that its financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America."

38.     In reality, however, the Individual Defendants failed to ensure that BofI adhered to GAAP during the Relevant Period.

**III.     The Duty of Reasonable and Prudent Supervision**

39.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls;

(d)     remain fully informed as to how BofI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and

10

Exhibit A
018

1    take steps to correct such conditions or practices and make such disclosures

2    as necessary to comply with securities laws;

3          (e)     ensure that BofI was operated in a diligent, honest, and prudent

4    manner in compliance with all applicable laws, rules, and regulations; and

5          (f)     refrain from breaching their duty of loyalty to the Company to

6    benefit themselves at the expense of the Company.

7                        **BREACHES OF FIDUCIARY DUTIES**

8          40.     Each Individual Defendant, by virtue of his or her position as a

9    director and/or officer, owed to BofI and to its shareholders the fiduciary duties of

10   loyalty and good faith and the exercise of due care and diligence in the management

11   and administration of the affairs of BofI, as well as in the use and preservation of

12   BofI's property and assets.  The conduct of the Individual Defendants complained

13   of herein involves a knowing and culpable violation of their obligations as directors

14   and officers of BofI, the absence of good faith on their part, or a reckless disregard

15   for their duties to BofI and its shareholders that the Individual Defendants were

16   aware or should have been aware posed a risk of serious injury to BofI.

17         41.     The Individual Defendants each breached their duties of loyalty and

18   good faith by causing the Company to make false and/or misleading statements

19   and/or failing to disclose that:

20         (a)     the Company was doing business with foreign nationals who

21   should have been off-limits under federal anti-money-laundering laws;

22         (b)     the Company had as many as 200 customer accounts without tax

23   identification numbers, contrary to BofI's representations to the OCC, its

24   primary regulator;

25         (c)     as a result, the Company's revenue and financial results were

26   overstated;

27         (d)     the Company's financial statements were not prepared in

28                                     11

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Exhibit A
019**

1    accordance with GAAP;

2         (e)    the Company lacked adequate internal and financial controls;

3    and

4         (f)    as a result of the foregoing, the Company's financial statements

5    were materially false or misleading at all relevant times.

6         42.    In addition, as a result of the Individual Defendants' actions and course

7    of conduct, the Company is now the subject of class action lawsuits that allege

8    violations of federal securities laws, and a whistleblower lawsuit alleging violations of

9    federal law.  As a result, BofI has expended, and will continue to expend, significant

10   sums of money to rectify the Individual Defendants' wrongdoing.

11                    **CONTROL, ACCESS, AND AUTHORITY**

12        43.    The Individual Defendants, because of their positions of control and

13   authority, were able to and did, directly or indirectly, exercise control over the

14   wrongful acts complained of herein, as well as the contents of the various public

15   statements issued by BofI.

16        44.    Because of their advisory, executive, managerial, and directorial

17   positions with BofI, each of the Individual Defendants had access to adverse, non-

18   public information about the financial condition, operations, and improper

19   representations of BofI.

20        45.    Each of the Individual Defendants was the agent of each of the other

21   Defendants and of BofI, and was at all times acting within the course and scope of

22   such agency.

23                    **CONSPIRACY, AIDING AND ABETTING, AND**
24                             **CONCERTED ACTION**

25        46.    In committing the wrongful acts alleged herein, the Individual

26   Defendants have pursued, or joined in the pursuit of, a common course of conduct,

27   and have acted in concert with and conspired with one another in furtherance of

28   their wrongdoing.  The Individual Defendants further aided and abetted and/or

                                          12

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
020

1     assisted each other in breaching their respective duties.

2         47.    During all times relevant hereto, the Individual Defendants collectively

3 and individually initiated a course of conduct that was designed to and did conceal

4 the fact that: (a) the Company was doing business with foreign nationals who should

5 have been off-limits under federal anti-money-laundering laws; (b) the Company had

6 as many as 200 customer accounts without tax identification numbers, contrary to

7 BofI's representations to the OCC, its primary regulator; (c) as a result, the

8 Company's revenue and financial results were overstated; (d) the Company's

9 financial statements were not prepared in accordance with GAAP; (e) the Company

10 lacked adequate internal and financial controls; and (f) as a result of the foregoing,

11 the Company's financial statements were materially false or misleading at all relevant

12 times. In furtherance of this plan, conspiracy, and course of conduct, the Individual

13 Defendants collectively and individually took the actions set forth herein.

14         48.    The purpose and effect of the Individual Defendants' conspiracy,

15 common enterprise, and/or common course of conduct was, among other things,

16 to: (a) disguise the Individual Defendants' violations of law, including breaches of

17 fiduciary duties, and unjust enrichment; and (b) disguise and misrepresent the

18 Company's future financial results and prospects.

19         49.    The Individual Defendants accomplished their conspiracy, common

20 enterprise, and/or common course of conduct by causing the Company to falsely

21 represent that the Company had adequate internal controls in place, and by

22 purposefully, recklessly, or negligently causing the Company to release improper

23 statements. Because the actions described herein occurred under the authority of

24 the Board, each of the Individual Defendants was a direct, necessary, and substantial

25 participant in the conspiracy, common enterprise, and/or common course of

26 conduct complained of herein.

27         50.    Each of the Defendants aided and abetted and rendered substantial

28

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Exhibit A
021**

1  assistance in the wrongs complained of herein.    In taking such actions to

2  substantially assist the commissions of the wrongdoing complained of herein, each

3  Individual Defendant acted with knowledge of the primary wrongdoing, substantially

4  assisted the accomplishment of that wrongdoing, and was aware of his or her overall

5  contribution to and furtherance of the wrongdoing.

6                                **FACTUAL ALLEGATIONS**

7        51.    BofI Holding, Inc. (NASDAQ: BOFI) is the holding company for BofI

8  Federal Bank, a nationwide bank that provides financing for single and multifamily

9  residential properties, small-to-medium size businesses in target sectors, and selected

10 specialty finance receivables.  With approximately $6.3 billion in assets, BofI Federal

11 Bank provides consumer and business banking products through its low-cost

12 distribution channels and affinity partners.  BofI Holding, Inc.'s common stock is

13 listed on the NASDAQ Global Select Market under the ticker symbol BOFI and is a

14 component of the Russell 2000® Index and the S&P SmallCap 600® Index.

15       52.    BofI operates in a highly-regulated field.  It is regulated by, among

16 others, the OCC, the Board of Governors of the Federal Reserve System ("Federal

17 Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the SEC, the

18 Financial Industry Regulatory Authority ("FINRA"), and the Consumer Financial

19 Protection Bureau ("CFPB").  BofI is subject to a variety of statutory schemes

20 including, without limitation, the Bank Secrecy Act of 1970 ("BSA"), the USA

21 Patriot Act, including the Know Your Customer Rule ("KYC"), Dodd-Frank Act,

22 Sarbanes-Oxley, the Securities Act of 1933, and the Exchange Act.

23       53.    BofI Federal Bank's most significant business is making mortgages to

24 high-net-worth individuals for the purchase of expensive properties through BofI

25 Federal Bank's Bank of Internet brand.

26       54.    The Company was incorporated in 1999 and is headquartered in San

27 Diego, California.

28                                        14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
022

**I.     The Individual Defendants' Role in Overseeing Risk Management at BofI**

55.     According to BofI's 2015 Proxy Statement, the Board, together with the Audit Committee, the Nominating Committee, and the Compensation Committee, as well as four risk committees (which are the Credit, the IAR, the Operations and Technology, and the ALCO committees), to provide enterprise-wide oversight of the Company's management and handling of risk.

56.     These committees report regularly to the Board on risk-related matters and provide the Board with insight about BofI's management of strategic, credit, interest rate, financial reporting, technology, liquidity, compliance, operational, and reputational risks.

57.     In addition, at meetings of the Board and its committees, directors receive regular updates and reports from management regarding risk management practices, including credit quality, financial reporting, internal controls, compliance, legal matters, asset liability, and liquidity management, among others. Furthermore, current risk management issues are discussed regularly with the Board and its committees.

58.     BofI's 2015 Proxy Statement represented that: "Our Board is actively involved in oversight and review of the Company's risk management efforts either directly or through its standing committees.   The Company's management is responsible for assessing and managing risk and communicating risks to the Board. The Enterprise Risk Management ("ERM") program, led by certain officers of the Company, including Mr. Garrabrants, our President and Chief Executive Officer, with oversight from the Board, identifies and evaluates key business risks within the financial, operational, regulatory and strategic arenas and to develop risk monitoring processes and response strategies to transfer, avoid, reduce or accept individual risks as appropriate.   The ERM program assists management in determining appropriate risk tolerance levels which balance risk mitigation with opportunities to create

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
023

1  stockholder value.  ERM program leaders make regular reports to the Board

2  regarding the ERM program's risk identification, management and mitigation

3  strategy recommendations.  While the Board has retained the responsibility for

4  general oversight of risks and of our ERM program, the Board's standing

5  committees support the Board by regularly addressing various risks in their

6  respective areas of oversight.  Specifically, the Audit Committee primarily oversees

7  those risks that may directly or indirectly impact our financial statements, including

8  the areas of financial reporting, internal controls and compliance with public

9  reporting requirements, while the Compensation Committee assists the Board in

10  fulfilling its risk management oversight responsibilities associated with risks arising

11  from employee compensation policies and practices.  Each standing committee

12  provides reports to the full Board at regular meetings concerning the activities of the

13  committee and actions taken by the committee since the last regular meeting."

14  **II.     The Individual Defendants Cause the Company to Issue False and
        Misleading Statements**

15

16      59.      On February 6, 2013, the Individual Defendants caused BofI to file a

17  Form 10-Q with the SEC, disclosing BofI's financial results for the quarter ending

18  December 31, 2012.  The Quarterly Report was reviewed and approved by the

19  Board, and signed by Defendants Garrabrants and Micheletti, and represented the

20  following to be BofI's financial results for the quarter:

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

16

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
024

# BOFI HOLDING, INC. AND SUBSIDIARY
## SELECTED CONSOLIDATED FINANCIAL INFORMATION

| *(Dollars in thousands, except per share data)* | At or for the Three Months Ended December 31, | | At or for the Six Months Ended December 31, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| *Selected Income Statement Data:* | | | | |
| Interest and dividend income | $ 33,567 | $ 28,616 | $ 64,556 | $ 56,381 |
| Interest expense | 8,631 | 9,530 | 17,135 | 19,118 |
| Net interest income | 24,936 | 19,086 | 47,421 | 37,263 |
| Provision for loan losses | 1,950 | 1,600 | 4,500 | 3,963 |
| Net interest income after provision for loan losses | 22,986 | 17,486 | 42,921 | 33,300 |
| Non-interest income | 6,249 | 2,986 | 13,010 | 7,556 |
| Non-interest expense | 12,781 | 9,204 | 24,313 | 18,756 |
| Income before income tax expense | 16,454 | 11,268 | 31,618 | 22,100 |
| Income tax expense | 6,686 | 4,608 | 12,861 | 8,907 |
| Net income | $ 9,768 | $ 6,660 | $ 18,757 | $ 13,193 |
| Net income attributable to common stock | $ 9,436 | $ 6,280 | $ 18,348 | $ 12,687 |
| *Per Share Data:* | | | | |
| Net income: | | | | |
| Basic | $ 0.71 | $ 0.56 | $ 1.44 | $ 1.15 |
| Diluted | $ 0.70 | $ 0.54 | $ 1.37 | $ 1.14 |
| Book value per common share | $ 17.08 | $ 14.80 | $ 17.08 | $ 14.80 |
| Tangible book value per common share | $ 17.08 | $ 14.80 | $ 17.08 | $ 14.80 |
| *Weighted average number of shares outstanding:* | | | | |
| Basic | 13,224,612 | 11,174,947 | 12,707,837 | 11,036,046 |
| Diluted | 13,824,440 | 12,304,628 | 13,538,503 | 11,415,793 |
| Common shares outstanding at end of period | 12,824,195 | 11,419,584 | 12,824,195 | 11,419,584 |
| Common shares issued at end of period | 13,665,957 | 12,162,604 | 13,665,957 | 12,162,604 |

17

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
025

| Performance Ratios and Other Data: | | | | |
|---|---|---|---|---|
| Loan originations for investment | $   331,999 | $   132,153 | $   611,696 | $   384,779 |
| Loan originations for sale | 280,569 | 227,810 | 535,365 | 318,179 |
| Loan purchases | — | — | 1,541 | — |
| Return on average assets | 1.45% | 1.23% | 1.45% | 1.26% |
| Return on average common stockholders' equity | 17.32% | 15.86% | 17.85% | 16.55% |
| Interest rate spread[1] | 3.69% | 3.44% | 3.63% | 3.47% |
| Net interest margin[2] | 3.81% | 3.60% | 3.76% | 3.62% |
| Efficiency ratio | 40.98% | 41.70% | 40.23% | 41.85% |
| Capital Ratios: | | | | |
| Equity to assets at end of period | 8.44% | 8.71% | 8.44% | 8.71% |
| Tier 1 leverage (core) capital to adjusted tangible assets[3] | 8.52% | 8.27% | 8.52% | 8.27% |
| Tier 1 risk-based capital ratio[3] | 13.95% | 13.19% | 13.95% | 13.19% |
| Total risk-based capital ratio[3] | 14.60% | 13.77% | 14.60% | 13.77% |
| Tangible capital to tangible assets[3] | 8.52% | 8.27% | 8.52% | 8.27% |
| Asset Quality Ratios: | | | | |
| Net annualized charge-offs to average loans outstanding | 0.13% | 0.39% | 0.28% | 0.41% |
| Non-performing loans to total loans | 0.95% | 0.76% | 0.95% | 0.76% |
| Non-performing assets to total assets | 0.79% | 0.64% | 0.79% | 0.64% |
| Allowance for loan losses to total loans at end of period | 0.52% | 0.53% | 0.52% | 0.53% |
| Allowance for loan losses to non-performing loans | 54.92% | 68.79% | 54.92% | 68.79% |

60. The Form 10-Q also stated the following with respect to the quarter's financial results:

"**RESULTS OF OPERATIONS**
**Comparison of the Three and Six Months Ended December 31, 2012 and December 31, 2011**

For the three months ended December 31, 2012, we had net income of $9.8 million compared to net income of $6.7 million for the three months ended December 31, 2011. Net income attributable to common stockholders was $9.4 million or $0.70 per diluted share compared to net income attributable to common shareholders of $6.3 million or $0.54 per diluted share for the three months ended

18

Exhibit A
026

December 31, 2012 and 2011, respectively. For the six months ended December 31, 2012, we had net income of $18.8 million compared to net income of $13.2 million for the six months ended December 31, 2011. Net income attributable to common stockholders was $18.3 million or $1.37 per diluted share compared to net income attributable to common shareholders of $12.7 million or $1.14 per diluted share for the six months ended December 31, 2012 and 2011, respectively.

Other key comparisons between our operating results for the three and six months ended December 31, 2012 and 2011 are:

- Net interest income increased $5.9 million and $10.2 million in the quarter and six months ended December 31, 2012 due to a 23.4% and 22.7%, increase in average earning assets primarily from the growth in our loan portfolio in those respective periods. Our net interest margin increased 21 basis points and 14 basis points in the quarter and six months ended December 31, 2012 compared to December 31, 2011. The overall rate on interest earning assets was lower by 27 and 37 basis points in the three and six month periods ended December 31, 2012 compared to December 31, 2011, primarily because loan rates have been pushed lower by the economy and competition. This reduction on the asset side was more than offset by a 52 and 53 basis point reduction in rates paid on interest bearing liabilities for the three and six months ending December 31, 2012 compared to December 31, 2011. The primarily reduction was due to a decrease in the rates paid on time deposits of 57 and 52 basis points , respectively, as we allowed the higher rate time deposits to roll of the books.

- Non-interest income increased $3.3 million and $5.5 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011. The increase in non-interest income for the quarter was primarily the result of a $2.5 million increase in mortgage banking income, a $448,000 increase in prepayment penalty income and a $507,000 increase in banking service fees. The increase in non-interest income for the six months ended December 31, 2012 compared to December 31, 2011 was primarily the result of a $4.2 million increase in mortgage banking income, a $589,000 increase in prepayment penalty income and a $756,000 increase in banking service fees.

19

Exhibit A
027

- Non-interest expense increased $3.6 million and $5.6 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011.  For the three months ended December 31, 2012 compared to the three months ended December 31, 2011 salaries and compensation was up $2.0 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank.  Advertising and promotions were up $510,000 mainly due to the cost of lead generation in the mortgage area.  Other general and administration expenses were $689, 000 higher primarily due to an increase of $258,000 in loan related expenses, an increase of $144,000 related to software, licenses and associated costs, an increase of $72,000 in expenses related travel, and an increase of $53,000 in losses on deposit accounts. For the six months ended December 31, 2012 compared to the six months ended December 31, 2011 salaries and compensation was up $3.6 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank.  Advertising and promotions were up $846,000 mainly due to the cost of lead generation in the mortgage area.  Other general and administration expenses were $1.4 million higher primarily due to an increase of $708,000 in loan related expenses, an increase of $198,000 related to software, licenses and associated costs, an increase of $77,000 in expenses related travel, and an increase of $57,000 in losses on deposit accounts.”

61.    The Form 10-Q filed on February 6, 2013 contained the following disclosure:  “During fiscal year 2011, the Bank changed its growth strategy to originate more mortgage loans rather than purchasing loans.”  With respect to its loans and other assets held as of the end of the quarter which closed on December 31, 2012, the Form 10-Q represented the following:

**“FINANCIAL CONDITION**
**Balance Sheet Analysis**

Our total assets increased $487.5 million, or 20.4%, to $2,874.3 million, as of December 31, 2012, up from $2,386.8 million at June 30, 2012. The increase in total assets was primarily due to an increase of $434.7 million in net loans held for investment. Total liabilities increased a total of $451.5 million, primarily due to an increase in deposits of $353.2 million and an increase in borrowings of $105.0 million from

20

the Federal Home Loan Bank of San Francisco (the "FHLB"). Our deferred income taxes increased $2.0 million to $17.0 million primarily due to the impairment in our securities portfolio, loan loss provision, and state taxes.

**Loans**

Net loans held for investment increased 25.3% to $2,155.3 million at December 31, 2012 from $1,720.6 million at June 30, 2012. The increase in the loan portfolio was due to loan originations and purchases of $613.2 million, offset by loan repayments of $215.1 million, net transfers from our held for sale portfolio of $42.2 million and a net increase in the allowance of $1.8 million during the six months ended December 31, 2012.

The following table sets forth the composition of the loan portfolio as of the dates indicated:

| | December 31, 2012 | | June 30, 2012 | |
|---|---|---|---|---|
| *(Dollars in thousands)* | Amount | Percent | Amount | Percent |
| Residential real estate loans: | | | | |
|     Single family (one to four units) | $1,215,744 | 55.6% | $ 863,624 | 49.6% |
|     Home equity | 25,742 | 1.2% | 29,167 | 1.7% |
|     Multifamily (five units or more) | 766,247 | 35.0% | 687,661 | 39.5% |
| Commercial real estate | 28,681 | 1.3% | 35,174 | 2.0% |
| Consumer—Recreational vehicle | 21,494 | 1.0% | 24,324 | 1.4% |
| Commercial secured and other | 128,267 | 5.9% | 100,549 | 5.8% |
| Total loans held for investment | $2,186,175 | 100.0% | $1,740,499 | 100.0% |
| Allowance for loan losses | (11,449) | | (9,636) | |
| Unamortized premiums/discounts, net of deferred loan fees | (19,420) | | (10,300) | |
| Net loans held for investment | $2,155,306 | | $1,720,563 | |

62. The February 6, 2013 Form 10-Q also contained Sarbanes-Oxley Section 302 certifications signed by Defendants Garrabrants and Micheletti which stated the following:

"I have reviewed this quarterly report on Form 10-Q of BofI Holding, Inc. (the "registrant");

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
029

1    statements made, in light of the circumstances under which such statements

2    were made, not misleading with respect to the period covered by this report;

3    Based on my knowledge, the financial statements, and other financial

4    information included in this report, fairly present in all material respects the

5    financial condition, results of operations and cash flows of the registrant as of,

6    and for, the period presented in this report;

7    The registrant's other certifying officer and I are responsible for establishing

8    and maintaining disclosure controls and procedures (as defined in Exchange

9    Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial

10   reporting (as defined in Exchange Act Rules 13a-15(f) and 15d -15(f)) for the

11   registrant and have:

12        (a)    Designed such disclosure controls and procedures, or caused

13        such disclosure controls and procedures to be designed under our

14        supervision, to ensure that material information relating to the

15        registrant, including its consolidated subsidiaries, is made known to us

16        by others within those entities, particularly during the period in which

17        this report is being prepared;

18        (b)    Designed such internal control over financial reporting or, or

19        caused such internal control over financial reporting to be designed

20        under our supervision, to provide reasonable assurance regarding the

21        reliability of financial reporting and the preparation of financial

22        statements for external purposes in accordance with generally accepted

23        accounting principles;

24        (c)    Evaluated the effectiveness of the registrant's disclosure controls

25        and procedures, and presented in this report our conclusions about the

26        effectiveness of the disclosure controls and procedures, as of the end

27        of the period covered by this report based on such evaluation; and

28

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
030

1    (d)    Disclosed in this report any change in the registrant's internal

2    control over financial reporting that occurred during the registrant's

3    most recent fiscal quarter (the registrant's fourth fiscal quarter in the

4    case of an annual report) that has materially affected, or is reasonably

5    likely to materially affect, the registrant's internal control over financial

6    reporting.

7    "The registrant's other certifying officer and I have disclosed, based on our

8    most recent evaluation of internal control over financial reporting, to the

9    registrant's auditors and the audit committee of registrant's board of directors

10   (or persons performing the equivalent functions):

11   (a)    All significant deficiencies and material weaknesses in the design or

12   operation of internal control over financial reporting which are

13   reasonably likely to adversely affect the registrant's ability to record,

14   process, summarize and report financial information; and

15   (b)    Any fraud, whether or not material, that involves management or other

16   employees who have a significant role in the registrant's internal

17   controls over financial reporting."

18   63.    The February 6, 2013 Form 10-Q also contained Sarbanes-Oxley

19   Section 906 certifications signed by Defendants Garrabrants and Micheletti which

20   stated that Garrabrants and Micheletti had reviewed the Form 10-Q and that "the

21   information contained in the Report fairly presents, in all material respects, the

22   financial condition and results of operations of the Company as of the dates and for

23   the periods presented in the financial statements included in such Report."

24   64.    On May 8, 2013, the Individual Defendants caused BofI to file a Form

25   10-Q with the SEC, disclosing BofI's financial results for the quarter ending March

26   31, 2013.    The Quarterly Report was reviewed and approved by the Board, and

27   signed by Defendants Garrabrants and Micheletti, and represented the following to

28

23

be BOFI's financial results for the quarter:

"For the three months ended March 31, 2013, we had net income of $10.4 million compared to net income of $7.7 million for the three months ended March 31, 2012. Net income attributable to common stockholders was $10.1 million or $0.74 per diluted share compared to net income attributable to common shareholders of $7.3 million or $0.58 per diluted share for the three months ended March 31, 2013 and 2012, respectively. For the nine months ended March 31, 2013, we had net income of $29.2 million compared to net income of $20.9 million for the nine months ended March 31, 2012. Net income attributable to common stockholders was $28.4 million or $2.12 per diluted share compared to net income attributable to common shareholders of $20.0 million or $1.68 per diluted share for the nine months ended March 31, 2013 and 2012, respectively."

65.     The May 8, 2013 Form 10-Q also stated:   "Net interest income increased $5.9 million and $16.0 million in the quarter and nine months ended March 31, 2013 due to a 28.3% and 24.6%, increase in average earning assets primarily from the growth in our loan portfolio in those respective periods."

66.     The May 8, 2013 Form 10-Q also contained certifications signed by Defendants Garrabrants and Micheletti under Sections 302 and 906 of Sarbanes-Oxley which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (referenced *supra*).

67.     In addition to these SOX certifications by Garrabrants and Micheletti, the May 8, 2013 Form 10-Q specifically stated, at p. 63:   "The Company's management, with the participation of its Chief Executive Officer [Garrabrants] and Chief Financial Officer [Micheletti], conducted an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures, pursuant to Exchange Act Rule 13a-15(e). Based upon that evaluation, our Chief

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
032

1   Executive Officer along with our Chief Financial Officer concluded that, as of the

2   end of the period covered by this report, the Company's disclosure controls and

3   procedures were effective to ensure that information required to be disclosed by the

4   Company in reports that it files or submits under the Exchange Act is recorded,

5   processed, summarized and reported within the time periods specified by the

6   Securities and Exchange Commission's rules and forms, and that such information is

7   accumulated and communicated to our management, including our Chief Executive

8   Officer and Chief Financial Officer, as appropriate, to allow timely decisions

9   regarding required disclosure.  There were no changes in the Company's internal

10  control over financial reporting that occurred during the quarter ended March 31,

11  2013 that have materially affected, or are reasonably likely to materially affect our

12  internal control over financial reporting."

13          68.     On September 4, 2013, BofI filed an annual report on Form 10-K with

14  the SEC announcing the Company's financial and operating results for the quarter

15  and fiscal year ended June 30, 2013 (the "2013 Form 10-K").  The Form 10-K

16  Annual Report was prepared and signed by Defendants Garrabrants, Micheletti,

17  Allrich, Mosich, Argalas, Burke, Court, Grinberg, and Ratinoff.

18          69.     For the quarter, the Company reported net income of $11.13 million,

19  or $0.78 per diluted share, on net revenue of $35.87 million, compared to net income

20  of $8.57 million, or $0.64 per diluted share, on net revenue of $26.55 million for the

21  same period in the prior year. For fiscal year 2013, the Company reported net

22  income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34

23  million, compared to net income of $29.48 million, or $2.33 per diluted share, on net

24  revenue of $95.56 million for fiscal year 2012.

25          70.     Among other things, the 2013 Form 10-K described that the BofI

26  Federal Bank was subject to extensive federal regulation, as follows:

27

28                                          25

Exhibit A
033

**REGULATION OF BOFI FEDERAL BANK**

*General*.  As a federally-chartered savings and loan association whose deposit accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"), BofI Federal Bank is subject to extensive regulation by the FDIC and . . . the [Office of the Comptroller of the Currency].  Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.  The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

\* \* \*

*Anti-Money Laundering and Customer Identification*.  The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.  The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti- money laundering requirements.  In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

71.    The 2013 Form 10-K contained signed certifications pursuant to SOX by Individual Defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

72.    Beginning on or about September 23, 2013, Matt Erhart, a former FINRA regulator, began working for BofI as an internal auditor, performing audits of a variety of aspects of BofI's operations.

///

26

73.  On November 5, 2013, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "2014Q1 Form 10-Q").  The Form 10-Q Quarterly Report was reviewed and approved by the Board, and prepared and signed by Defendants Garrabrants and Micheletti.  For the quarter, the Company reported net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million, compared to net income of $8.99 million, or $0.67 per diluted share, on net revenue of $29.25 million for the same period in the prior year.

74.  The 2014Q1 Form 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the 2014Q1 Form 10-Q was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

75.  On December 4, 2013, BofI filed a Form 8-K with the SEC, signed by Defendant Micheletti, containing as an attachment an Investor Presentation concerning the Company's Q1 2014 financial and operating results (the "2014Q1 Investor Presentation") which indicated it was presented by Defendant Garrabrants and that investors should contact Garrabrants for more information.  Among other things, the 2014Q1 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

27

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
035

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

76.    On or about December 19, 2013, Erhart completed an internal audit of BofI's Structured Settlements and Lottery practice, pursuant to which BofI, through its subsidiary Anfed Bank, has a team that calls individuals receiving structured settlements in litigation or lottery payments with the goal of purchasing those income streams in return for a lump sum.  One of Erhart's major findings during the internal audit was that BofI's callers were not notifying the individuals they called that the calls were being recorded, in violation of California Penal Code § 632.

77.    On or about December 19, 2013, Erhart and his manager, Jonathan Ball ("Ball") were summoned to a meeting with Defendant Bar-Adon, BofI's Chief Legal Officer.  Defendant Bar-Adon instructed both employees to remove evidence of the violation of California Penal Code § 632 from the Structured Settlements and Lottery audit.  When Ball informed him that an internal auditor could not do that, Defendant Bar-Adon instructed Erhart to mark the entire report "Attorney Client Privileged," stating that the finding could be discoverable in class action litigation against BofI and that the Company wanted to prevent that.  In addition, Defendant Bar-Adon instructed Erhart not to speak to any employee in the Structured Settlements and Lottery Department with whom he was friendly.

78.    On the same day, Defendant Tolla, Senior Vice President, instructed Erhart to never state in an audit report that BofI had violated a federal or state law.

79.    In or about January 2014, Thomas Constantine, BofI's Chief Credit Officer, told Erhart, Ball, and others at a meeting that he could not be responsible for any of BofI's numbers after they are turned over to the Chief Financial Officer, Defendant Micheletti.  He reiterated that he could not and would not vouch for the accuracy of the numbers once they had been delivered to Defendant Micheletti. Erhart understood this comment to mean that Constantine believed that Defendant Micheletti changed the numbers after he received them.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
036

1       80.     On February 5, 2014, BofI filed a quarterly report on Form 10-Q with

2    the SEC announcing the Company's financial and operating results for the quarter

3    ended December 31, 2013 (the "2014Q2 Form 10-Q"). The Form 10-Q was

4    prepared and signed by Defendants Garrabrants and Micheletti, and reviewed and

5    approved by BofI's Board. For the quarter, the Company reported net income of

6    $13.15 million, or $0.91 per diluted share, on net revenue of $38.37 million,

7    compared to net income of $9.77 million, or $0.70 per diluted share, on net revenue

8    of $31.19 million for the same period in the prior year.

9       81.     The 2014Q2 Form 10-Q contained signed certifications pursuant to

10   SOX by the Defendants Garrabrants and Micheletti which were identical to the

11   certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form

12   10-Q (quoted *supra*), certifying that the financial information contained in the

13   2014Q2 Form 10-Q was accurate and disclosed any material changes to the

14   Company's internal control over financial reporting.

15       82.     On February 6, 2014, BofI filed Form 8-K with the SEC containing an

16   Investor Presentation concerning the Company's 2014Q2 financial and operating

17   results (the "2014Q2 Investor Presentation"). The Form 8-K and the 2014Q2

18   Investor Presentation were prepared and signed by Defendant Micheletti and

19   contained, in part, the following statements:

20            &bull;      BofI is "Consistently Ranked among the Best of the Biggest
21                   Thrifts by SNL Financial";

22            &bull;      BofI is "a Top Performer among the Broader Universe of All
                    Public Banks and Thrifts";

23            &bull;      BofI is "a Top Quartile Performer Versus Bank Peer Group";

24            &bull;      The Company's "Business Model is More Profitable Because
25                   [the Company's] Costs are Lower"; and

26            &bull;      The Company's "Asset Growth has been Driven by Strong and
                    Profitable Organic Loan Production."

27

28                                 29

1          83.    On May 6, 2014, BofI filed a quarterly report on Form 10-Q with the

2   SEC announcing the Company's financial and operating results for the quarter

3   ended March 31, 2014 (the "2014Q3 Form 10-Q").  The Form 10-Q was reviewed

4   and approved by the Board, and prepared and signed by Defendants Garrabrants

5   and Micheletti.  For the quarter, the Company reported net income of $14.61

6   million, or $1.00 per diluted share, on net revenue of $40.88 million, compared to

7   net income of $10.40 million, or $0.74 per diluted share, on net revenue of $33.04

8   million for the same period in the prior year.

9          84.    The 2014Q3 Form 10-Q contained signed certifications pursuant to

10  SOX by Defendants Garrabrants and Micheletti which were identical to the

11  certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form

12  10-Q (quoted *supra*), certifying that the financial information contained in the

13  2014Q3 Form 10-Q was accurate and that the Company had disclosed all significant

14  deficiencies and material weaknesses in the design or operation of the Company's

15  internal controls over financial reporting.

16         85.    On May 7, 2014, BofI filed Form 8-K with the SEC containing an

17  Investor Presentation concerning the Company's third quarter 2014 financial and

18  operating results (the "2014 Q3 Investor Presentation").  The Form 8-K and the

19  2014 Q3 Investor Presentation were prepared and signed by Defendant Micheletti,

20  and contained, in part, the following statements:

21           •    BofI is "Consistently Ranked among the Best of the Biggest
22               Thrifts by SNL Financial";

23           •    BofI is "a Top Performer among the Broader Universe of All
             Public Banks and Thrifts";

24           •    BofI is "a Top Quartile Performer Versus Bank Peer Group";

25           •    The Company's "Business Model is More Profitable Because
26               [the Company's] Costs are Lower"; and

27           •    The Company's "Asset Growth has been Driven by Strong and
28               Profitable Organic Loan Production."

30

1    86.    On August 7, 2014, BofI issued a press release and filed a Form 8-K

2  with the SEC announcing the Company's financial and operating results for the

3  quarter and fiscal year ended June 30, 2014 (the "2014 Form 8-K"). The Form 8-K

4  and the accompanying press release were prepared by Defendants Garrabrants and

5  Micheletti, and signed by Micheletti. For the quarter, the Company reported net

6  income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22

7  million, compared to net income of $11.13 million, or $0.78 per diluted share, on net

8  revenue of $35.87 million for the same period in the prior year. For fiscal year 2014,

9  the Company reported net income of $55.96 million, or $3.85 per diluted share, on

10 net revenue of $159.55 million, compared to net income of $40.29 million, or $2.89

11 per diluted share, on net revenue of $129.34 million for fiscal year 2013.

12   87.    On August 28, 2014, BofI filed an annual report on Form 10-K with

13 the SEC (the "2014 Form 10-K"). The Form 10-K Annual Report was prepared

14 and signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke,

15 Court, Grinberg, and Ratinoff. The 2014 Form 10-K reiterated the financial and

16 operating results previously announced in the 2014 Form 8-K.

17   88.    Among other things, the 2014 Form 10-K described that the BofI

18 Federal Bank was subject to extensive federal regulation, as follows:

19 **REGULATION OF BOFI FEDERAL BANK**

20 *General*. As a federally-chartered savings and loan association whose
   deposit accounts are insured by FDIC, BofI Federal Bank is subject to

21 extensive regulation by the FDIC and, as of the Transfer Date, the

22 OCC. Under the Dodd-Frank Act, the examination, regulation and
   supervision of savings associations, such as BofI Federal Bank, were

23 transferred from the OTS to the OCC, the federal regulator of national

24 banks under the National Bank Act. The following discussion
   summarizes some of the principal areas of regulation applicable to the

25 Bank and its operations.

26                          *   *   *

27

28                          31

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

***Anti-Money Laundering and Customer Identification***.  The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.  The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti- money laundering requirements.  In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

89.    The 2014 Form 10-K contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the 2014 Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

90.    On September 3, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2014 Q4 financial and operating results (the "2014 Q4 Investor Presentation"). The Form 8-K and the 2014 Q4 Investor Presentation were prepared and signed by Defendant Micheletti, and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

32

91.     On November 4, 2014, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "2015 Q1 Form 10-Q").  The Form 10-Q Quarterly Report was reviewed and approved by the Board, and prepared and signed by Defendants Garrabrants and Micheletti.  For the quarter, the Company reported net income of $17.84 million, or $1.20 per diluted share, on net revenue of $50.12 million, compared to net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million for the same period in the prior year.

92.     The 2015 Q1 Form 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the 2015 Q1 Form 10-Q was accurate and disclosed that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

93.     On November 17, 2014, BofI filed a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2015 Q1 financial and operating results (the "2015 Q1 Investor Presentation").  Among other things, the 2015 Q1 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

33

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    94.    On or about November 21, 2014, Erhart sent an e-mail to BofI's Chief

2    Risk Officer, Thomas Williams, in preparation for the upcoming Enterprise Risk

3    Management ("ERM") audit.   Erhart asked whether Williams thought BofI had a

4    deposit concentration risk.   Erhart was concerned and reported that a mere four

5    customers accounted for approximately 25% of total deposits, and nine customers

6    accounted for approximately 40% of total deposits.

7    95.    On or about December 12, 2014, the SEC served a subpoena on BofI,

8    requesting account-identifying information for a certain investment advisory firm

9    with the initials ETIA LLC ("ETIA").

10   96.    On or about December 18, 2014, BofI responded to the SEC that it

11   did not have any information regarding ETIA.

12   97.    In or about early January 2015, Erhart became aware of the SEC

13   subpoena, and knew that BofI did indeed have a loan file containing information

14   regarding ETIA.   Erhart further learned that a file had been created in response to

15   the SEC subpoena, containing the information regarding ETIA.   Erhart learned

16   from a BofI employee that she had informed the Bank's legal department of the

17   existence of the file on or about December 17, 2014, **before** the Bank sent its

18   response to the SEC denying the existence of any such files.

19   98.    On or about January 15, 2015, BofI's principal regulator, the OCC,

20   requested information on bank accounts at BofI with no Tax Identification

21   Numbers ("TINs").   BofI responded to the OCC that there were no accounts

22   without TINs.   Erhart had viewed a spreadsheet in the BSA folder disclosing

23   approximately 150–200 accounts where the borrowers did not have a TIN.

24   99.    In or about January 2015, Erhart conducted a Loan Origination Audit.

25   During the Loan Origination Audit, Erhart discovered that BofI was making

26   substantial loans to foreign nationals including Politically Exposed Persons ("PEPs")

27   in potential violation of BSA/KYC rules. Erhart was able to readily uncover

28

34

1   information that many of the borrowers were criminals and other suspicious persons

2   who put the Bank at high risk for violating the BSA's Anti-Money Laundering Rules

3   ("AML Rules"), as well as exposing BofI to reputational risk. The purpose of the

4   AML Rules is to help detect and report suspicious activity including the predicate

5   acts to money laundering and terrorist financing. The PEPs included very high-level

6   foreign officials from major oil-producing countries and war zones.

7   100.   On January 29, 2015, BofI filed a quarterly report on Form 10-Q with

8   the SEC announcing the Company's financial and operating results for the quarter

9   ended December 31, 2014 (the "15Q2 Form 10-Q"). The Form 10-Q Quarterly

10  Report was reviewed and approved by the Board, and prepared and signed by

11  Defendants Garrabrants and Micheletti. For the quarter, the Company reported net

12  income of $19.37 million, or $1.26 per diluted share, on net revenue of

13  $54.81 million, compared to net income of $13.15 million, or $0.91 per diluted share,

14  on net revenue of $38.37 million for the same period in the prior year.

15  101.   The 15Q2 Form 10-Q contained signed certifications pursuant to SOX

16  by Defendants Garrabrants and Micheletti, stating that the financial information

17  contained in the 15Q2 Form 10-Q was accurate and disclosed any material changes

18  to the Company's internal control over financial reporting.

19  102.   In or about February 2015, the OCC requested that BofI disclose all

20  correspondence with federal and state banking agencies and law enforcement,

21  including any and all subpoenas, criminal or otherwise. BofI responded that it had

22  not received any such documents for the review period in question. However,

23  Erhart alleges that the Bank had a BSA spreadsheet Erhart had seen that identified

24  many subpoenas, including from law enforcement agencies, grand juries, and even

25  from the U.S. Department of the Treasury, of which OCC is a part. Erhart also

26  knew that the Bank indeed had been served with subpoenas.

27  103.   On March 2, 2015, BofI filed Form 8-K with the SEC containing an

28

35

Investor Presentation concerning the Company's 2015 Q2 financial and operating results (the "2015 Q2 Investor Presentation"). The Form 8-K was signed by Defendant Micheletti, and the 2015 Q2 Investor Presentation was prepared by Defendants Micheletti and Garrabrants, and presented by Defendant Garrabrants. Among other things, the 2015 Q2 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

104. On April 30, 2015, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "2015 Q3 Form 10-Q"). The Form 10-Q Quarterly Report was reviewed and approved by the Board, including Defendant Dada (who had joined the Board effective January 22, 2015), and prepared and signed by Defendants Garrabrants and Micheletti. For the quarter, the Company reported net income of $21.07 million, or $1.35 per diluted share, on net revenue of $59.03 million, compared to net income of $14.61 million, or $1.00 per diluted share, on net revenue of $40.88 million for the same period in the prior year.

105. The 2015 Q3 Form 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2015 Q3 Form 10-Q was accurate and disclosed that the Company had disclosed all significant deficiencies and material weaknesses in the

36

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

design or operation of the Company's internal controls over financial reporting.

106.  On May 6, 2015, BofI filed Form 8-K with the SEC, signed by Defendant Micheletti, containing an Investor Presentation concerning the Company's 2015 Q3 financial and operating results (the "2015 Q3 Investor Presentation"). The 2015 Q3 Investor Presentation was prepared by Defendants Garrabrants and Micheletti and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and
- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

107.  On July 30, 2015, BofI issued a press release and filed a Form 8-K with the SEC, prepared by Defendants Garrabrants and Micheletti, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2015 (the "2015 Form 8-K").  For the quarter, the Company reported net income of $24.40 million, or $1.54 per diluted share, on net revenue of $65.57 million, compared to net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million for the same period in the prior year.  For fiscal year 2015, the Company reported net income of $82.68 million, or $5.37 per diluted share, on net revenue of $229.54 million, compared to net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million for fiscal year 2014.

108.  On August 10, 2015, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2015 Q4 financial and operating results (the "2015 Q4 Investor Presentation").  The Form 8-K and the 2015 Q4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
045

Investor Presentation were prepared by Defendants Garrabrants and Micheletti and
contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and
- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

109. On August 22, 2015, *The New York Times* published an article
concerning BofI's strong growth during Defendant Garrabrants's tenure as CEO.
The article was entitled "An Internet Mortgage Provider Reaps the Rewards of
Lending Boldly" and stated, in relevant part:

As the leader of Bank of Internet USA, based in San Diego, Mr. Garrabrants has been issuing big mortgages to high earners whom other lenders might not necessarily welcome with open arms. But because its financial performance has, in many ways, been spectacular, Bank of Internet has been turning heads — and setting off alarm bells as well. ***The bank has made loans to people who were later found to have run afoul of the law***, and Mr. Garrabrants has had to reassure investors that the bank has good relations with regulators.

Bank of Internet's loans have increased fivefold, to nearly $5 billion, over the last five years — an almost unheard-of rate of growth for these tepid times in banking. Its losses from bad loans are practically nonexistent, and profits are surging, in part because it charges a much higher interest rate than the bigger banks operating in the same market.

\* \* \*

[Some investors] contend that the bank is attracting people who simply can't get cheaper loans — borrowers who may be more risky. ***Bank of Internet also makes large mortgages to wealthy foreigners, a***

38

VERIFIED SHAREHOLDER DERIVATIVE... AINT

*practice that requires meticulous controls to comply with federal regulations aimed at stopping money laundering.* The bank's critics wonder whether its compliance department is up to the task, though Mr. Garrabrants vigorously defended its practices. They also take issue with the bank's funding, contending that the lender is too dependent on customer deposits that could evaporate if turbulence returns to the banking world.

\* \* \*

Mr. Garrabrants, who has also worked at Goldman Sachs and McKinsey & Company, says the critics are spreading disinformation — and losing money — as they bet against his firm's soaring stock.

"Here's the problem for them: They are going into an earnings juggernaut that has none of the things that they're talking about," Mr. Garrabrants said. And he says the bank is as judicious as any other lender in picking its borrowers. "It's about being thoughtful about what risks you take and watching them and being careful," he said, adding that Bank of Internet's deposits are a reliable source of funding.

\* \* \*

Still, *Bank of Internet has lent money to some unsavory characters*. For example, in 2012 it issued a $5 million mortgage to Purna Chandra Aramalla on a house in Sands Point, an affluent section of Long Island, according to local property records. In 2013, federal law enforcement authorities in New York charged Mr. Aramalla with Medicare and Medicaid fraud. In March, he was sentenced to three years in prison.

In mid-2014, Bank of Internet lent $1.05 million to Frederick Elm for a house in Fort Lauderdale, Fla., property records show. In January, the Securities and Exchange Commission accused Mr. Elm of running a "Ponzi-like" scheme that had raised $17 million since November 2013. Mr. Elm partly settled with the agency in June.

And in 2012, Bank of Internet issued a $1.26 million mortgage to Deepal Wannakuwatte, a Sacramento businessman who received a 20-year prison sentence last year for operating, for more than 10 years, what the F.B.I. called a Ponzi scheme.

\* \* \*

39

Exhibit A
047

*Then there are questions about Bank of Internet's marketing of itself as a lender to "foreign nationals." It does not disclose exactly what proportion of its loans are made to foreigners*. When asked, Mr. Garrabrants said it was "nowhere near the majority." *Banks that do this sort of lending can expect extra scrutiny from federal regulatory agencies, which have punished banks for not properly applying bank secrecy and anti-money-laundering laws when vetting their international customers.*

In recent months there has been unrest in the division of Bank of Internet that deals with regulatory compliance. *Earlier this year, a senior internal auditor, Jonathan Ball, and another employee in the division, Matt Erhart, left the bank. Mr. Ball did not respond to requests for comment. Mr. Erhart's lawyer, Carol L. Gillam, said that she had communicated with regulators, including the Office of the Comptroller of the Currency, the bank's primary regulator. She declined to provide details*.

Regulators have not publicly warned or penalized the bank for its lending to foreign nationals, and Mr. Garrabrants often sounds exasperated when defending that business. In his view, short-sellers had sought to stir up concerns about those loans to try to persuade regulators to stop Bank of Internet from acquiring parts of H&R Block's banking unit. The deal was concluded this month.

[Emphases added.]

110.   On August 26, 2015, BofI filed an annual report on Form 10-K with the SEC (the "2015 Form 10-K"). The Form 10-K Annual Report was prepared and signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, Dada, and Ratinoff. The 2015 Form 10-K reiterated the financial and operating results previously announced in the 2015 Form 8-K.

111.   Among other things, the 2015 Form 10-K described that the BofI Federal Bank was subject to extensive federal regulation, as follows:

**REGULATION OF BOFI FEDERAL BANK**

*General*.  As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to

40

extensive regulation by the FDIC and, as of the Transfer Date, the OCC. Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act. The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

* * *

***Anti-Money Laundering and Customer Identification***. The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001. The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti- money laundering requirements. In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

112. The 2015 Form 10-K contained signed certifications pursuant to SOX which were signed by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2015 Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

113. The statements referenced in ¶¶ 59–112 were materially false and misleading because the Individual Defendants caused the Company to make false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, prospects, and performance. Specifically, during the Relevant Period, Defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company's internal controls were frequently disregarded; (b) BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws; (c) many BofI accounts lacked required tax identification numbers; (d) BofI fired an internal auditor who raised the foregoing issues to management and to federal regulators; and (e) as a result of the

41

above, the Company's statements regarding its internal controls and other financial statements were materially false and misleading at all relevant times.

### III. The Emergence of the Truth

114.   On October 13, 2015, after the close of trading on the stock market, *The New York Times* reported that Erhart, a former internal auditor at BofI, had filed a lawsuit in this Court against the Company for violating federal laws designed to protect whistleblowers.  The *Erhart* Complaint alleged, *inter alia*, that:

- Bank of Internet's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

- Erhart had seen a spreadsheet that contained as many as 200 accounts without tax identification numbers, contrary to Bank of Internet's representations to the OCC, its primary regulator;

- Bank of Internet at times failed to provide full and timely information to regulators; and

- Erhart was fired after he revealed wrongdoing at Bank of Internet to management and federal regulators.

115.   On this news, shares of BofI fell $42.87, or 30.2%, to close at $99.13 on October 14, 2015.

116.   As a result of the Individual Defendants' wrongful acts and omissions, the Company has suffered significant losses and damages.

### DAMAGES TO BOFI

117.   BofI has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

118.   As a direct and proximate result of the Individual Defendants' conduct, BofI has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Exhibit A
050**

1      (a)    legal fees associated with the lawsuits filed against the Company

2  for violations of the federal securities laws and for violation of the anti-

3  retaliation provisions of the Dodd-Frank Act and SOX by Mr. Erhart;

4      (b)    loss of reputation and goodwill, and a "liar's discount" that will

5  plague the Company's stock in the future due to the Individual Defendants'

6  false statements and lack of candor to the marketplace;

7      (c)    amounts paid to outside lawyers, accountants, and investigators

8  in connection with BofI's internal investigation; and

9      (d)    loss of revenues and profits due to any subsequent restatements.

10  **DERIVATIVE ALLEGATIONS**

11  119.    Plaintiff brings this action for the benefit of BofI to redress injuries

12  suffered as a result of the Individual Defendants' breaches of fiduciary duties and

13  violations of law, as well as the aiding and abetting thereof.

14  120.    BofI is named solely as a nominal party in this action.  This is not a

15  collusive action to confer jurisdiction on this Court that it would not otherwise have.

16  121.    Plaintiff is and has been a BofI shareholder during the entire Relevant

17  Period because he has continuously owned BofI common stock since January 14,

18  2013.  Plaintiff therefore will adequately and fairly represent the interests of BofI in

19  enforcing and prosecuting its rights.

20  122.    BofI's Board at the time this action was initiated consisted of the

21  following nine directors:  Theodore C. Allrich, Nicholas A. Mosich, James S.

22  Argalas, Gregory Garrabrants, John G. Burke, Paul J. Grinberg, James J. Court,

23  Edward J. Ratinoff, and Uzair Dada.  Plaintiff has not made any demand on the

24  Board to institute this action against the Individual Defendants because, for the

25  reasons set forth below, such demand would be a futile and useless act.

26  123.    Where the board consists of nine directors, plaintiff need only show

27  that five of the directors lack independence or face a substantial likelihood of liability

28

<center>43</center>

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

<center>Exhibit A
051</center>

to establish that a demand on the board would be futile.  As shown below, the demand in this case would be futile because at least five of the Director Defendants lack independence and/or face a substantial likelihood of liability.

## I.  Demand Is Futile Because a Majority of the Director Defendants Lacks Independence and Faces a Substantial Likelihood of Liability

### A.  Garrabrants Lacks Independence

124.  Demand is futile as to Garrabrants because he lacks independence.  As admitted by BofI in its 2015 Proxy Statement: "Mr. Garrabrants is not an independent director because he is our President and Chief Executive Officer." This decision as to Garrabrants's lack of independence was made by the Board itself.

125.  Garrabrants is also interested in this litigation for purposes of demand futility because he faces a substantial likelihood of liability for his individual misconduct.  Garrabrants is a named defendant in the currently-pending federal class actions, alleging that he violated § 10(b) of the Exchange Act and Rule 10b-5 when he disseminated or approved the false and misleading statements set forth above.

126.  If Garrabrants pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws. As such, Garrabrants is fatally conflicted and, therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims.  Thus, demand is futile.

127.  Additionally, Garrabrants is interested because he prepared, signed, or caused the Company to issue many of the false and misleading statements.  In fact, Garrabrants signed the Company's SEC filings that contained false and misleading statements, including the Forms 10-K dated September 3, 2013, August 28, 2014, and August 26, 2015, and the Forms 10-Q dated November 5, 2013, February 5, 2014, May 6, 2014, November 4, 2014, January 29, 2015, and April 30, 2015. Moreover, in conjunction with the filing of each of the above Forms 10-K and Forms 10-Q, Garrabrants signed certifications as required by SOX that, *inter alia*:

44

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
052

<table>
<tbody>
<tr><td>1</td><td>(a)</td><td>affirmed that he was "responsible for establishing and</td></tr>
</tbody>
</table>

1     (a)    affirmed that he was "responsible for establishing and
2           maintaining disclosure controls and procedures … and internal
3           control over financial reporting" for BofI;

4     (b)    certified that he has disclosed to BofI's auditors and the audit
5           committee "[a]ll significant deficiencies and material weaknesses
6           in the design or operation of internal control over financial
7           reporting which are reasonably likely to adversely affect [BofI's]
8           ability to record, process, summarize and report financial
9           information," and "[a]ny fraud, whether or not material, that
10          involves management or other employees who have a significant
11          role in [BofI's] internal controls over financial reporting"; and

12    (c)    certified that, to the best of his knowledge: (i) the Annual and
13          Quarterly Reports did not "contain any untrue statement of a
14          material fact or omit to state a material fact necessary to make
15          the statements made, in light of the circumstances under which
16          such statements were made, not misleading"; (ii) "the financial
17          statements, and other financial information included in [each]
18          report, fairly present in all material respects the financial
19          condition, results of operations and cash flows of [BofI]"; and
20          (iii) the information contained in the Forms 10-K and Forms 10-
21          Q "fairly presents, in all material respects, the financial condition
22          and results of operations of the Company."

23 The above representations were false and misleading (and thereby violated SOX)
24 because, as noted above, during the Relevant Period, the Company's internal
25 controls were frequently disregarded, and the Company's statements regarding its
26 internal controls and other financial statements were materially false and misleading.

27     128.    Garrabrants also participated in conference calls with analysts and

28

45

Exhibit A
053

investors during the Relevant Period. Garrabrants therefore faces a substantial likelihood of liability for breaching his fiduciary duties. Consequently, Garrabrants cannot disinterestedly consider a demand.

**B. The Entire Board Faces a Substantial Likelihood of Liability for Retaliating Against Whistleblower Erhart in Violation of the Sarbanes-Oxley Act**

129. As alleged in detail by BofI former audit employee Erhart in a whistleblower complaint pending in this Court (and of which the Court can take judicial notice), Erhart brought numerous specific violations of the law by BofI senior officers, including Tolla and Garrabrants, to the attention of the Company. After Erhart's good-faith whistleblower complaints were brushed aside by Tolla and Garrabrants, Erhart lodged his complaints with the OCC and SEC.

130. Section 806 of the Sarbanes-Oxley Act prohibits employers such as BofI from discharging, constructively discharging, demoting, threatening, harassing, or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders. In addition, an employer may not discharge or in any manner retaliate against employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders. If an employer takes retaliatory action against an employee because he or she engaged in any of these protected activities, the employee can file a complaint with the Secretary, United States Department of Labor, Occupational Safety and Health Administration ("OSHA").

131. Erhart filed a complaint with OSHA regarding the retaliation he was

46

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
054

Case 3:15-cv-02722-BHM-KSC Document 1 Filed 12/05/15 Page 50 of 58 Page

1    faced with after reporting allegedly unlawful activities at BofI to federal agencies and

2    regulators.

3          132.    On March 12, 2015, Defendant Bar-Adon met with Erhart and told

4    him he was acting as General Counsel to BofI's Audit Committee, comprised of

5    Defendants Grinberg (Chairman), Mosich, and Argalas. Thus, Grinberg, Mosich,

6    and Argalas had actual knowledge of Erhart's whistleblower complaints, and had

7    directed Bar-Adon to meet with Erhart regarding such activities.

8          133.    As noted by BofI in its 2015 Proxy Statement, the Audit Committee

9    "reports to the full Board at regular meetings concerning the activities of the

10    committee and actions taken by the committee since the last regular meeting."

11    Therefore, a reasonable inference is that BofI's Audit Committee (Grinberg, Mosich,

12    and Argalas) reported Erhart's complaints and whistleblowing activity to the full

13    Board at the next meeting it held subsequent to March 12, 2015. During fiscal year

14    2015, BofI's Board met eight times; as a result, the Board was meeting on average

15    approximately every six weeks. As a result, Defendants Allrich, Garrabrants, Burke,

16    Court, Ratinoff, and Dada received actual knowledge of Erhart's complaints and

17    whistleblowing activity shortly after March 2015.

18          134.    Despite having actual knowledge of Erhart's whistleblowing activity,

19    and despite knowing that Dodd-Frank, Sarbanes-Oxley, and other laws prohibit

20    retaliation against employees who report alleged wrongdoing, the Board authorized

21    and approved the firing of Erhart on June 9, 2015.

22          135.    All Board members thus face a substantial likelihood of liability for

23    breaching their fiduciary duties by causing the Company to violate the anti-retaliation

24    provisions of Sarbanes-Oxley and Dodd-Frank.

25          136.    Moreover, all Board members can reasonably be charged with actual

26    knowledge or reckless disregard of the unlawful activity alleged by Erhart during the

27    Relevant Period because the wrongdoing concerned the Company's core (and only)

28

<div align="center">47</div>

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

<div align="center">Exhibit A<br>055</div>

1    business — consumer and business banking products and services.

2    **C.    Additional Reasons Demonstrating Futility of Demand**

3    137.   The entire Board has demonstrated its inability to act in compliance

4    with their fiduciary obligations and/or to sue themselves and/or their fellow

5    directors and allies in the top ranks of the Company for the violations of law

6    complained of herein.  Every Board member has acted in violation of their fiduciary

7    duties to the Company's shareholders, as described herein.

8    138.   For example, in addition to Garrabrants, Defendants Allrich, Mosich,

9    Argalas, Garrabrants, Burke, Grinberg, Court, and Ratinoff approved and signed the

10   Company's SEC filings that contained false and misleading statements, including the

11   Forms 10-K dated September 3, 2013, August 28, 2014, and August 26, 2015.[1]

12   Therefore, no reasonable stockholder would reasonably believe that a majority of the

13   members of the Board would be able to independently and properly consider a

14   demand in good faith and, accordingly, demand is excused.

15   139.   Every member of the Board declined to inform themselves of the

16   misconduct complained of herein, even when they had a reasonable basis to believe

17   that further investigation was warranted, as is evidenced for example by the Board's

18   approval of the firing of Erhart just months after he filed whistleblower complaints

19   against the Company with the OCC and SEC and claimed whistleblower protection.

20   Thus, demand is excused.  Intentionally causing the Company to violate the anti-

21   retaliation protection of multiple federal laws amply demonstrates the Board's

22   disloyal and bad faith conduct.  Any conduct evidencing bad faith and a lack of

23   loyalty to the Company is outside the protection of the business judgment rule and

24   constitutes conduct that is non-indemnifiable.  Thus, demand is excused as to the

25   entire Board.

26   _____

27   [1] Defendant Dada, who joined the Board on January 22, 2015, only signed the
     false and misleading Form 10-K dated August 26, 2015.

28                                         48

     VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
056

1        140.   Defendants Grinberg, Mosich, and Argalas are members of the Audit

2   Committee and therefore had a clear duty to be kept informed about the Company's

3   accounting procedures, and yet just as clearly they disregarded such duties.

4   Defendants Grinberg, Mosich, and Argalas have violated the terms of the Audit

5   Committee Charter, which, among other things, required Defendants Grinberg,

6   Mosich, and Argalas to "[r]eview the Company's annual audited financial statements

7   with management, including a review of major issues regarding accounting and

8   auditing principles and practices, and evaluate the adequacy and effectiveness of

9   internal controls that could significantly affect the Company's financial statements,

10  as well as the adequacy and effectiveness of the Company's disclosure controls and

11  procedures and management's reports thereon."   As such, Defendants Grinberg,

12  Mosich, and Argalas are incapable of disinterestedly and independently considering a

13  demand to commence and vigorously prosecute this action.

14       141.   Although the Company has been and will continue to be exposed to

15  significant losses due to the Individual Defendants' wrongdoing, the Board has not

16  filed any lawsuits against any directors or officers who were responsible for the

17  losses.   Thus, the Director Defendants are breaching their fiduciary duties to the

18  Company and face a substantial likelihood of liability for their breaches.   Indeed, the

19  Director Defendants are more interested in protecting themselves than they are in

20  protecting the Company by bringing this action. Thus, demand on the Board is

21  futile.

22                                               **COUNT I**

23                     **For Breaches of Fiduciary Duties**
                   **Against All Defendants**

24       142.   Plaintiff incorporates by reference and re-alleges each and every

25  allegation set forth above, as though fully set forth herein.

26       143.   Each Individual Defendant owed to the Company the duty to exercise

27  candor, good faith, and loyalty in the management and administration of BofI's

28                                      49

1   business and affairs, particularly with respect to issues regarding the Company's

2   compliance with laws.

3         144.   Each of the Individual Defendants violated and breached his or her

4   fiduciary duties of candor, good faith, and loyalty.

5         145.   The Individual Defendants' conduct set forth herein was due to their

6   intentional, reckless, or negligent breach of the fiduciary duties they owed to the

7   Company, as alleged herein.  The Individual Defendants intentionally, recklessly, or

8   negligently breached or disregarded their fiduciary duties to protect the rights and

9   interests of BofI.

10        146.   In breach of their fiduciary duties owed to BofI, the Individual

11   Defendants willfully participated in misrepresentation of the Company's financial

12   condition, failed to correct the Company's public statements, and failed to properly

13   oversee BofI's business, rendering them personally liable to the Company for

14   breaching their fiduciary duties.

15        147.   The Individual Defendants had actual or constructive knowledge that

16   they had caused the Company to improperly misrepresent its financial condition and

17   they failed to correct the Company's public statements.  Defendants had actual

18   knowledge of the misrepresentations and omissions of the material facts set forth

19   herein, or acted with reckless disregard for the truth, in that they failed to ascertain

20   and to disclose such facts, even though such facts were available to them.  Such

21   material misrepresentations and omissions were committed knowingly or recklessly.

22        148.   These actions were not a good-faith exercise of prudent business

23   judgment to protect and promote the Company's corporate interests.

24        149.   As a direct and proximate result of the Individual Defendants' breaches

25   of their fiduciary obligations, BofI has sustained and continues to sustain significant

26   damages.  As a result of the misconduct alleged herein, the Individual Defendants

27   are liable to the Company.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
058

## COUNT II
### For Abuse of Control
### Against All Defendants

150.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence BofI, for which they are legally responsible.

152.   As a direct and proximate result of the Individual Defendants' abuse of control, BofI has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, BofI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT III
### For Unjust Enrichment
### Against All Defendants

153.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, BofI.

155.   During the Relevant Period, the Individual Defendants either received bonuses, stock options, or similar compensation from BofI that was tied to the financial performance of BofI or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

156.   Plaintiff, as shareholder and representative of BofI, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct

51

Exhibit A
059

1   and breach of their fiduciary duties.

2                              **COUNT IV**
3           **For Breach of the Duty of Honest Services**
     **Against Defendants Garrabrants, Micheletti, Bar-Adon, and Tolla**

4        157.   Plaintiff incorporates by reference and realleges each and every
5   allegation contained above, as though fully set forth herein.

6        158.   This claim is brought derivatively on behalf of the Company against
7   Defendants Garrabrants, Micheletti, Bar-Adon, and Tolla for breach of their
8   undivided duty of loyalty to their employer.

9        159.   Garrabrants, Micheletti, Bar-Adon, and Tolla were employees of the
10  Company during the Relevant Period.

11       160.   Garrabrants, Micheletti, Bar-Adon, and Tolla breached their duty of
12  loyalty to the Company by not acting solely in the Company's interests in performing
13  their employment duties.

14       161.   Those breaches of duty consisted of the conduct alleged in this
15  complaint including, without limitation, their conduct in causing the Company to
16  issue false statements regarding its operations and financial results, misstate the fact
17  that the Company maintained adequate internal controls, fire whistleblower Erhart
18  in violation of the Dodd-Frank and Sarbanes-Oxley laws, and cause the Company to
19  make other false and misleading statements during the Relevant Period.  Defendants
20  benefitted from their wrongdoing because they were allowed to retain their jobs in
21  exchange for their unlawful conduct and because they received compensation that
22  was directly tied to the Company's financial performance, which was greater than it
23  would have been absent the Defendants' wrongful conduct.

24       162.   The Company was harmed by these Defendants' breaches of the
25  undivided duty of loyalty.

26       163.   By reason of the foregoing, the Company was harmed and will
27  continue to suffer harm as described in greater detail above.

28                                 52

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
060

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and the Company and against all Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of BofI and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breaches of their fiduciary duties to BofI;

C.     Determining and awarding to BofI the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.     Directing BofI and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BofI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

(1)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(2)     a provision to permit the shareholders of BofI to nominate at least two candidates for election to the Board;

(3)     a proposal to strengthen the Board's supervision of the Company's CEO;

(4)     a provision to appropriately test and then strengthen the internal audit and control functions; and

(5)     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

53

Exhibit A
061

1     E.    Awarding BofI restitution from the Individual Defendants, and each of

2 them;

3     F.    Awarding Plaintiff the costs and disbursements of this action, including

4 reasonable attorneys' and experts' fees, costs, and expenses; and

5     G.    Granting such other and further relief as the Court may deem just and

6 proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  December 3, 2015         Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (175783)
Albert Y. Chang (296065)
Yury A. Kolesnikov (271173)

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:  (858) 914-2001
Facsimile:  (858) 914-2002

*Attorneys for Plaintiff*

54

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit A
062

**VERIFICATION**

I, Andrew Calcaterra, verify that I am a shareholder of Nominal Defendant BofI

Holding, Inc., and that I have continuously owned BofI stock since January 14, 2013.  I

have reviewed the allegations in this Verified Shareholder Derivative Complaint (the

"Complaint").  As to those allegations of which I have personal knowledge, I believe

them to be true; as to those allegations of which I lack personal knowledge, I rely upon

my counsel and counsel's investigation, and believe them to be true.  Having received a

copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct.  Executed on _____November 23rd_____, 2015, at Rochester,

Michigan.


_____

_Andrew Calcaterra_

Andrew Calcaterra

# EXHIBIT B

# EXHIBIT B



Exhibit B
064

Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID DEYOUNG, DERIVATIVELY AND ON BEHALF OF BOFI HOLDING, INC., | CASE No.: '16CV0163 WQHJMA |
| Plaintiff, | |
| vs. | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR: |
| GREGORY GARRABRANTS, ANDRE J. MICHELETTI, ESHEL BAR-ADON, JOHN C. TOLLA, THEODORE C. ALLRICH, JOHN GARY BURKE, NICHOLAS A. MOSICH, PAUL J. GRINBERG, JAMES S. ARGALAS, JAMES J. COURT, EDWARD J. RATINOFF, AND UZAIR DADA, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| And | |
| BOFI HOLDING, INC. | |
| Nominal Defendant. | |

1
Verified Shareholder Derivative Complaint

1

2

3

## <u>INTRODUCTION</u>

Plaintiff David DeYoung, ("Plaintiff"), by his undersigned attorneys,

4

derivatively and on behalf of Nominal Defendant Bofi Holding, Inc. ("BofI" or the

5

"Company"), submits this Verified Shareholder Derivative Complaint against

6

7

members of BofI's Board of Directors (the "Board") Gregory Garrabrants, Andre J.

8

Micheletti, Eshel Bar-Adon, John C. Tolla, Theodore C. Allrich, John Gary Burke,

9

Nicholas A. Mosich, Paul J. Grinberg, James S. Argalas, James J. Court, Edward J.

10

11

Ratinoff, and Uzair Dada, (collectively, "Defendants") for breaches of their

12

fiduciary duties as directors and/or officers of BofI, gross mismanagement, abuse of

13

control, and unjust enrichment for her complaint against Individual Defendants,

14

15

alleges the following based upon personal knowledge as to himself and his own

16

acts, and information and belief as to all other matters, based upon, *inter alia*, the

17

investigation conducted by and through his attorneys, which included, among other

18

19

things, a review of the Defendants' public documents, conference calls and

20

announcements made by Defendants, United States Securities and Exchange

21

Commission ("SEC") filings, wire and press releases published by and regarding

22

23

BofI, legal filings, news reports, securities analysts' reports and advisories about

24

the Company, and information readily obtainable on the Internet. Plaintiff believes

25

that substantial evidentiary support will exist for the allegations set forth herein

26

27

after a reasonable opportunity for discovery.

28

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action which seeks to remedy wrongdoing committed by Defendants between February 6, 2013 and the present (the "Relevant Period").

2.     BofI is the holding company of BofI Federal Bank which is a nationwide bank that provides consumer and business banking products through the Internet such as financing for single and multifamily residential properties, small-to-medium size businesses in target sectors, and selected specialty finance receivables.

3.     On or about October 13, 2015, a former internal auditor at BofI, Matt Erhart, filed a whistleblower complaint against BofI in federal court (the "Whistleblower Action"), alleging that during his time at BofI beginning in September 2013, he had uncovered numerous instances where BofI had: (i) violated federal and state law; (ii) failed in many respects to comply with regulations; (iii) failed make proper disclosures; and (iv) failed to comply with internal control procedures.

4.     When the news of the Whistleblower Action was revealed, BofI's stock declined $42.87 per share, or 30.2%, to close at $99.13 on October 14, 2015.

5.     Despite being made aware of its gross mismanagement, BofI failed to take corrective action or disclose this information to its investors. Throughout the Relevant Period, Defendants intentionally and/or recklessly caused BofI to issue

materially false and misleading statements and failed to disclose material adverse

facts regarding the Company's business, operations, performance, and prospects.

Particularly, Defendants caused BofI to make false and/or misleading statements

and/or failed to disclose that: (i) the Company's internal controls were commonly

disregarded; (ii) some of BofI's borrowers were foreign nationals who should have

been off-limits under federal anti-money-laundering laws; (iii) many BofI accounts

lacked required tax identification numbers; (iv) BofI violated the anti-retaliation

laws contained in the Sarbanes-Oxley Act of 2002 ("SOX") and the Dodd-Frank

Wall Street Reform and Consumer Protection Act ("Dodd-Frank") by the Board

causing the BofI to fire an internal auditor who raised issues to senior management

and to federal regulators; and (v) as a result of the above, the Company's statements

regarding its internal controls and other financial statements were materially false

and misleading at all relevant times.

6.       During the Relevant Period, while the price of BofI stock was

artificially inflated, a majority of the Board engaged in insider sales, reaping

millions upon millions of dollars in net proceeds.

7.       The Company has been substantially damaged as a result of

Defendants' knowing breaches of fiduciary duty and other misconduct.

## **JURISDICTION AND VENUE**

8.       Subject-matter jurisdiction exists under 28 U.S.C. § 1332 because

there is complete diversity between plaintiff and defendants and because the

amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.     Venue is proper in the Southern District of California under 28 U.S.C. §§ 1391 and 1401 because BofI maintains its principal executive offices in this District and because a substantial portion of the acts and conduct complained of herein — including the dissemination of materially false and misleading information to the investing public — occurred in this District.

10.    Each defendant has minimum contacts with this District, and they have entered into contracts in this District, have commonly traveled to this District on BofI's business, or have authorized acts and actions that have had a sufficient impact on this District or on BofI's shareholders and investors residing in this District to justify the exercise of jurisdiction over Defendants.

## **PARTIES**

11.    Plaintiff is a current shareholder of BofI. Plaintiff has been a shareholder of BofI common stock during the Relevant period and has continuously held BofI common stock at all relevant times.  Plaintiff is a resident of Utah.

12.    BofI, a nominal defendant, is a Delaware company headquartered and operating at 4350 La Jolla Village Drive, Suite 140, San Diego, California 92122. BofI is a publicly traded company with its shares trading on the NASDAQ under the symbol "BOFI." At all material times to this action, BOFI Holding, Inc., an

entity d/b/a/ "BOFI Federal Bank" and Bank of the Internet," was a publicly traded

company. BofI is a citizen of California and Delaware.

13.    Defendant Gregory Garrabrants ("Garrabrants"), at all relevant

times, has served as BofI's President, Chief Executive Officer, and Director.

Garrabrants is a citizen of California.

14.    Defendant Andrew J. Micheletti ("Micheletti"), at all relevant times,

has served as Executive Vice President and Chief Financial Officer of BofI.

Micheletti is a citizen of California.

15.    Defendant Eshel Bar-Adon ("Bar-Adon") is the Company's Executive

Vice-President and Chief Legal Officer. Bar-Adon is a citizen of California.

16.    Defendant John C. Tolla ("Tolla") has been the Company's Chief

Governance Risk and Compliance Officer since December 2013. Tolla is a citizen

of California.

17.    Defendant Paul J. Grinberg ("Grinberg"), at all relevant times, has

served as a member of the Board and serves as a member of the Compensation

Committee. Grinberg is a citizen of California.

18.    Defendant Theodore C. Allrich ("Allrich"), at all relevant times, has

served as Chairman of the Board of Directors  and served as Vice Chairman of the

Board of Directors from 1999 to 2009. Allrich sits on the Compensation Committee

of the Board. Allrich is a citizen of California.

19.     Defendant John Gary Burke ("Burke"), in all relevant times, has served as a member of the Board and is a member of the Compensation Committee and the Chairman of the Internal Assets Review Committee ("IAR Committee"). Upon information and belief, Burke is a citizen of Ohio.

20.     Defendant Nicholas A. Mosich ("Mosich"), at all relevant times, has served as Vice Chairman of the Board of Directors and as a member of the Board of Directors since May 2009. Mosich is a citizen of California.

21.     Defendant James S. Argalas ("Argalas"), at all relevant times, has served as a member of the Board of Directors. Argalas is a member of the Audit Committee and as a member of the Internal Asset Review Committee.

22.      Defendant James J. Court ("Court"), at all relevant times, has served as a member of the Board. Court is a citizen of California.

23.     Defendant Edward J. Ratinoff ("Ratinoff"), at all relevant times, has served as a member of the Board and as a member of the Nominating Committee. Ratinoff is a citizen of California.

24.     Defendant Uzair Dada ("Dada") has served as a member of the Board since January 2015. Dada is a citizen of California. According to the Company's 2015 Proxy Statement, during the 2015 fiscal year, Defendant Dada received as compensation from the Company:  $18,000 in cash and $67,061 in stock awards for his service as a non-employee Director.

7
Verified Shareholder Derivative Complaint

Case 3:16-cv-00163-WQH-JMA Document 1 Filed 01/22/16 Page 8 of 69 Page

25.     Defendants referenced in paragraphs 13 to 24 are sometimes referred to herein, collectively as "Defendants."

26.     Because of their positions at BofI, possessed the power and authority to control the contents of BofI's reports to the U.S. Securities and Exchange Commission ("SEC"), press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Defendants caused the Company to make specific false and misleading statements and/or reviewed and approved the Company's reports and press releases alleged herein to be misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## **DEFENDANTS' DUTIES**

27.     By reason of their positions as officers, directors and/or fiduciaries of BofI and because of their ability to control the business and corporate affairs of BofI, owed BofI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BofI in a fair, just, honest, and equitable manner.  Defendants were and

8
Verified Shareholder Derivative Complaint

are required to act in furtherance of the best interests of BofI and its shareholders so as to benefit all shareholders equally.

28.    Each director and officer of the Company owes to BofI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

29.    Because of their positions of control and authority as directors and/or officers of BofI, Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.    To discharge their duties, the officers and directors of BofI were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

31.    Defendants, by virtue of their positions as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  Defendants were required to, among other things: (i) ensure BofI operated in a diligent, honest, and prudent manner in accordance with its bylaws, charter, and the laws and regulations of Delaware and the United States; (ii) conduct the Company's affairs in an efficient, business-like manner so as to make it possible to provide the highest quality performance of BofI's business, to

Exhibit B
073

avoid wasting BofI's assets and to maximize the value of BofI's stock; (iii) to fully inform themselves as to how BofI conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; (iv) to establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and internal affairs and to periodically investigate, or cause independent investigation to be made of, said reports and records; (v) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that BofI's operations and financial statements comply with all laws; (vi) exercise reasonable control and supervision over public statements made by BofI's officers and employees and any other reports on information made by BofI was required by law to disseminate; and (vii) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of BofI and to make full and accurate disclosures of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

32. Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BofI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a

risk of serious injury to the Company. Defendants' conduct has been ratified by Defendants who collectively comprised the BofI's Board at all relevant times.

33. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and traded on NASDAQ, Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information, and had a duty to correct such dissemination of inaccurate and untruthful information. Accordingly, Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws by causing BofI to make misrepresentations and omissions during the Relevant Period.

34. To discharge their duties, the officers and directors of BofI were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of BofI were required to, among other things: (i) refrain from acting upon material inside corporate information to benefit themselves; (ii) ensure that the Company complied with its legal obligations and requirements, (iii) including acting only within the scope of its legal authority and disseminating

11
Verified Shareholder Derivative Complaint

truthful and accurate statements to the investing public; (iv) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; (v) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results; (vi) remain informed as to how BofI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and (vii) ensure that BofI was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

35.    Defendants further owed to BofI and the shareholders the duty of loyalty requiring that each favor BofI's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

36.    BofI was required to abide with Generally Accepted Accounting Principles ("GAAP") when issuing its financial statements. GAAP is a common set

of accounting standards and procedures recognized by accounting professionals and used to compile financial statements.

37.    The accounting profession recognizes GAAP is recognized as the conventions, rules, and procedures which are necessary to define accepted accounting practices at a particular time. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that do not follow and are in compliance with GAAP are presumed to be misleading and inaccurate, despite other disclosures. Regulation S-X mandates that interim financial statements must comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures pursuant to 17 C.F.R. § 210.10-01(a).

38.    During the Relevant Period, BofI filed several annual reports with the SEC on Form 10-K on September 4, 2013, August 28, 2014, and August 26, 2015. Each 10-K stated that its financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America."

39.    In actually, Defendants failed to endure that BofI followed GAAP during the Relevant Period.

## **CONTOL, ACCESS, AND AUTHORITY**

40.    Because of their advisory, executive, managerial, and directorial positions with BofI, Defendants had access to adverse, nonpublic information about the financial condition, operations, and improper representations of BofI.

41.     Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by BofI.

42.     Defendants was the agent of each of the other Defendants and of BofI, and was at all times acting within the course and scope of such agency.

## BREACHES OF FIDUCIARY DUTIES

43.     By virtue of his or her position as a director and/or officer, Defendants owed to BofI and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of BofI, as well as in the use and preservation of BofI's property and assets. Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BofI, the absence of good faith on their part, or a reckless disregard for their duties to BofI and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to BofI.

44.     Defendants each breached their duties of loyalty and good faith by causing the Company to make false and/or misleading statements and/or failing to disclose that: (i) the Company was doing business with foreign nationals who should have been off-limits under federal anti-money-laundering laws; (ii) the Company had as many customer accounts without tax identification numbers,

14
Verified Shareholder Derivative Complaint

contrary to BofI's representations to its primary regulator, the OCC; (iii) as a result, the Company's revenue and financial results were overstated; (iv) the Company's financial statements were not prepared in accordance with GAAP; (v) BofI lacked adequate internal and financial controls; and (vi) as a results of the foregoing, BofI's financial statements were materially false and misleading at all relevant times.

45.    As a result of Defendants' actions and course of conduct, BofI is now the subject of class action lawsuits that allege violations of federal securities laws, and a whistleblower lawsuit alleging violations of federal law. As a result, BofI has expended, and will continue to expend, significant sums of money to rectify Defendants' wrongdoing.

## DEFENDANTS' MISCONDUCT

46.    BofI is the holding company for BofI Federal Bank, a nationwide bank that provides financing for single and multifamily residential properties, small-to-medium size businesses in target sectors, and selected specialty finance receivables. With approximately $6.3 billion in assets, BofI Federal Bank provides consumer and business banking products through its low-cost distribution channels and affinity partners.

47.    As a federally-chartered savings and loan association, BofI is in a highly regulated field. Among others, BofI is regulated by the Office of the Comptroller of the Currency ("OCC"), the Financial Industry Regulatory Authority

("FINRA"), the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the SEC, and the Consumer Financial Protection Bureau ("CFPB").

48.  BofI is subject to a variety of statues including, without limitation, the Bank Secrecy Act of 1970 ("BSA"), the USA PATRIOT Act, including the Know Your Customer Rule ("KYC"), the Dodd-Frank Act, and SOX, the Securities Act of 1933, and the Exchange Act.

49.  BofI Federal Bank's most important business is making mortgages to high-net-worth individuals for the purchase of expensive properties through BofI Federal Bank's Bank of Internet brand.

50.  BofI is headquartered in San Diego, California, and its shares trade on the NASDAQ Global Select Market under the symbol "BOFI."

51.  On February 6, 2013, Defendants caused BofI to file a Form 10-Q with the SEC for the quarter ending December 31, 2012 (the 2Q13 10-Q"). The 2Q13 10-Q was reviewed by the Board and signed by Defendants Garrabrants and Micheletti. The 2Q13 10-Q contained SOX certifications signed by Defendants Garrabrants and Micheletti stating that the financial information contained in the 4Q12 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The 2Q13 10-Q represented the BofI's financial results for the quarter:

Verified Shareholder Derivative Complaint

## BofI HOLDING, INC. AND SUBSIDIARY
## SELECTED CONSOLIDATED FINANCIAL INFORMATION

| | At or for the Three Months Ended December 31, | | At or for the Six Months Ended December 31, | |
|---|---|---|---|---|
| *(Dollars in thousands, except per share data)* | **2012** | **2011** | **2012** | **2011** |
| **Selected Income Statement Data:** | | | | |
| Interest and dividend income | $ 33,567 | $ 28,616 | $ 64,556 | $ 56,381 |
| Interest expense | 8,631 | 9,530 | 17,135 | 19,118 |
| Net interest income | 24,936 | 19,086 | 47,421 | 37,263 |
| Provision for loan losses | 1,950 | 1,600 | 4,500 | 3,963 |
| Net interest income after provision for loan losses | 22,986 | 17,486 | 42,921 | 33,300 |
| Non-interest income | 6,249 | 2,986 | 13,010 | 7,556 |
| Non-interest expense | 12,781 | 9,204 | 24,313 | 18,756 |
| Income before income tax expense | 16,454 | 11,268 | 31,618 | 22,100 |
| Income tax expense | 6,686 | 4,608 | 12,861 | 8,907 |
| Net income | $ 9,768 | $ 6,660 | $ 18,757 | $ 13,193 |
| Net income attributable to common stock | $ 9,436 | $ 6,280 | $ 18,348 | $ 12,687 |
| **Per Share Data:** | | | | |
| Net income: | | | | |
| Basic | $ 0.71 | $ 0.56 | $ 1.44 | $ 1.15 |
| Diluted | $ 0.70 | $ 0.54 | $ 1.37 | $ 1.14 |
| Book value per common share | $ 17.08 | $ 14.80 | $ 17.08 | $ 14.80 |

Verified Shareholder Derivative Complaint

Exhibit B
081

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Tangible book value per common share | $ | 17.08 | $ | 14.80 | $ | 17.08 | $ | 14.80 |
| **Weighted average number of shares outstanding:** | | | | | | | | |
| Basic | | 13,224,612 | | 11,174,947 | | 12,707,837 | | 11,036,046 |
| Diluted | | 13,824,440 | | 12,304,628 | | 13,538,503 | | 11,415,793 |
| Common shares outstanding at end of period | | 12,824,195 | | 11,419,584 | | 12,824,195 | | 11,419,584 |
| Common shares issued at end of period | | 13,665,957 | | 12,162,604 | | 13,665,957 | | 12,162,604 |
| **Performance Ratios and Other Data:** | | | | | | | | |
| Loan originations for investment | $ | 331,999 | $ | 132,153 | $ | 611,696 | $ | 384,779 |
| Loan originations for sale | | 280,569 | | 227,810 | | 535,365 | | 318,179 |
| Loan purchases | | — | | — | | 1,541 | | — |
| Return on average assets | | 1.45% | | 1.23% | | 1.45% | | 1.26% |
| Return on average common stockholders' equity | | 17.32% | | 15.86% | | 17.85% | | 16.55% |
| Interest rate spread[1] | | 3.69% | | 3.44% | | 3.63% | | 3.47% |
| Net interest margin[2] | | 3.81% | | 3.60% | | 3.76% | | 3.62% |
| Efficiency ratio | | 40.98% | | 41.70% | | 40.23% | | 41.85% |
| **Capital Ratios:** | | | | | | | | |
| Equity to assets at end of period | | 8.44% | | 8.71% | | 8.44% | | 8.71% |
| Tier 1 leverage (core) capital to adjusted tangible assets[3] | | 8.52% | | 8.27% | | 8.52% | | 8.27% |
| Tier 1 risk-based | | 13.95% | | 13.19% | | 13.95% | | 13.19% |

18

Verified Shareholder Derivative Complaint

| | | | | |
|---|---|---|---|---|
| capital ratio[3] | | | | |
| Total risk-based capital ratio[3] | 14.60% | 13.77% | 14.60% | 13.77% |
| Tangible capital to tangible assets[3] | 8.52% | 8.27% | 8.52% | 8.27% |
| ***Asset Quality Ratios:*** | | | | |
| Net annualized charge-offs to average loans outstanding | 0.13% | 0.39% | 0.28% | 0.41% |
| Non-performing loans to total loans | 0.95% | 0.76% | 0.95% | 0.76% |
| Non-performing assets to total assets | 0.79% | 0.64% | 0.79% | 0.64% |
| Allowance for loan losses to total loans at end of period | 0.52% | 0.53% | 0.52% | 0.53% |
| Allowance for loan losses to non-performing loans | 54.92% | 68.79% | 54.92% | 68.79% |

52.    The 2Q13 10-Q stated the following with respect to the quarter's
financial results:

**RESULTS OF OPERATIONS**
**Comparison of the Three and Six Months Ended December 31,**
**2012 and December 31, 2011**

For the three months ended December 31, 2012, we had net income of $9.8 million compared to net income of $6.7 million for the three months ended December 31, 2011. Net income attributable to common stockholders was $9.4 million or $0.70 per diluted share compared to net income attributable to common shareholders of $6.3 million or $0.54 per diluted share for the three months ended December 31, 2012 and 2011, respectively. For the six months ended December 31, 2012, we had net income of $18.8 million compared to

net income of $13.2 million for the six months ended December 31, 2011. Net income attributable to common stockholders was $18.3 million or $1.37 per diluted share compared to net income attributable to common shareholders of $12.7 million or $1.14 per diluted share for the six months ended December 31, 2012 and 2011, respectively.

Other key comparisons between our operating results for the three and six months ended December 31, 2012 and 2011 are:

- Net interest income increased $5.9 million and $10.2 million in the quarter and six months ended December 31, 2012 due to a 23.4% and 22.7%, increase in average earning assets primarily from the growth in our loan portfolio in those respective periods. Our net interest margin increased 21 basis points and 14 basis points in the quarter and six months ended December 31, 2012 compared to December 31, 2011. The overall rate on interest earning assets was lower by 27 and 37 basis points in the three and six month periods ended December 31, 2012 compared to December 31,2011, primarily because loan rates have been pushed lower by the economy and competition. This reduction on the asset side was more than offset by a 52 and 53 basis point reduction in rates paid on interest bearing liabilities for the three and six months ending December 31, 2012 compared to December 31, 2011. The primarily reduction was due to a decrease in the rates paid on time deposits of 57 and 52 basis points , respectively, as we allowed the higher rate time deposits to roll of the books.

- Non-interest income increased $3.3 million and $5.5 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011. The increase in non-interest income for the quarter was primarily the result of a $2.5 million increase in mortgage banking income, a $448,000 increase in prepayment penalty income and a $507,000 increase in banking service fees. The increase in non-interest income for the six months ended December 31, 2012 compared to December 31, 2011 was primarily the result of a $4.2 million increase in mortgage banking income, a $589,000 increase in prepayment penalty income and a $756,000 increase in banking service fees.

20

Verified Shareholder Derivative Complaint

- Non-interest expense increased $3.6 million and $5.6 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011. For the three months ended December 31, 2012 compared to the three months ended December 31, 2011 salaries and compensation was up $2.0 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank. Advertising and promotions were up $510,000 mainly due to the cost of lead generation in the mortgage area. Other general and administration expenses were $689, 000 higher primarily due to an increase of $258,000 in loan related expenses, an increase of $144,000 related to software, licenses and associated costs, an increase of $72,000 in expenses related travel, and an increase of $53,000 in losses on deposit accounts. For the six months ended December 31, 2012 compared to the six months ended December 31, 2011 salaries and compensation was up $3.6 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank. Advertising and promotions were up $846,000 mainly due to the cost of lead generation in the mortgage area. Other general and administration expenses were $1.4 million higher primarily due to an increase of $708,000 in loan related expenses, an increase of $198,000 related to software, licenses and associated costs, an increase of $77,000 in expenses related travel, and an increase of $57,000 in losses on deposit accounts.

53.     The 2/6/1310-Q also contained the following:

**FINANCIAL CONDITION**
**Balance Sheet Analysis**
      Our total assets increased $487.5 million, or 20.4%, to $2,874.3 million, as of December 31, 2012, up from $2,386.8 million at June 30, 2012. The increase in total assets was primarily due to an increase of $434.7 million in net loans held for investment. Total liabilities increased a total of $451.5 million, primarily due to an increase in deposits of $353.2 million and an increase in borrowings of $105.0 million from the Federal Home Loan Bank of San Francisco (the "FHLB"). Our deferred income taxes increased $2.0 million to $17.0 million primarily due to the impairment in our securities portfolio, loan loss provision, and state taxes.

**Loans**

Net loans held for investment increased 25.3% to $2,155.3 million at December 31, 2012 from $1,720.6 million at June 30, 2012. The increase in the loan portfolio was due to loan originations and purchases of $613.2 million, offset by loan repayments of $215.1 million, net transfers from our held for sale portfolio of $42.2 million and a net increase in the allowance of $1.8 million during the six months ended December 31, 2012.

The following table sets forth the composition of the loan portfolio as of the dates indicated:

| (Dollars in thousands) | Amount | Percent | Amount | Percent |
|---|---|---|---|---|
| Residential real estate loans: | | | | |
| Single family (one to four units) | $ 1,215,744 | 55.6 | $ 863,624 | 49.6 |
| Home equity | 25,742 | 1.2 | 29,167 | 1.7 |
| Multifamily (five units or more) | 766,247 | 35.0 | 687,661 | 39.5 |
| Commercial real estate | 28,681 | 1.3 | 35,174 | 2.0 |
| Consumer—Recreational vehicle | 21,494 | 1.0 | 24,324 | 1.4 |
| Commercial secured and other | 128,267 | 5.9 | 100,549 | 5.8 |
| Total loans held for investment | $ 2,186,175 | 100.0 | $ 1,740,499 | 100.0 |
| Allowance for loan losses | (11,449) | | (9,636) | |
| Unamortized premiums/discounts, net of deferred loan fees | (19,420) | | (10,300) | |
| Net loans held for investment | $ 2,155,306 | | $ 1,720,563 | |

22
Verified Shareholder Derivative Complaint

Exhibit B
086

54.     On May 8, 2013, Defendants caused BofI to file a Form 10-Q with the

SEC for the period ending March 31, 2013 (the 3Q13 10-Q"). The  3Q13 10-Q was

approved by the Board and signed by Defendants Garrabrants and Micheletti. The

3Q13 10-Q also contained SOX certifications signed by Defendants Garrabrants

and Micheletti stating that the financial information contained in the 3Q13 10-Q

was accurate and disclosed any material changes to the Company's internal control

over financial reporting.

55.     The  3Q13 10-Q stated in relevant part:

For the three months ended March 31, 2013, we had net income of
$10.4 million compared to net income of $7.7 million for the three
months ended March 31, 2012. Net income attributable to common
stockholders was $10.1 million or $0.74 per diluted share compared to
net income attributable to common shareholders of $7.3 million or
$0.58 per diluted share for the three months ended March 31, 2013
and 2012, respectively. For the nine months ended March 31, 2013,
we had net income of $29.2 million compared to net income of $20.9
million for the nine months ended March 31, 2012. Net income
attributable to common stockholders was $28.4 million or $2.12 per
diluted share compared to net income attributable to common
shareholders of $20.0 million or $1.68 per diluted share for the nine
months ended March 31, 2013 and 2012, respectively.

*     *     *

Net interest income increased $5.9 million and $16.0 million in the
quarter and nine months ended March 31, 2013 due to a 28.3% and
24.6%, increase in average earning assets primarily from the growth in
our loan portfolio in those respective periods.

*     *     *

The Company's management, with the participation of its Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures, pursuant to Exchange Act Rule 13a-15(e). Based upon that evaluation, our Chief Executive Officer along with our Chief Financial Officer concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures were effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

There were no changes in the Company's internal control over financial reporting that occurred during the quarter ended March 31, 2013 that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting

56.     On September 4, 2013, BofI filed an annual Form 10-K with the SEC providing the Company's financial and operating results for the fiscal year ended June 30, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, and Ratinoff. The 2013 10-K contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

57.     The 2013 10-K, the Company stated, in part:

REGULATION OF BOFI FEDERAL BANK

Verified Shareholder Derivative Complaint
Exhibit B
088

General.  As a federally-chartered savings and loan association whose
deposit accounts are insured by the Federal Deposit Insurance
Corporation ("FDIC"), BofI Federal Bank is subject to extensive
regulation by the FDIC and . . . the [Office of the Comptroller of the
Currency].  Under the Dodd-Frank Act, the examination, regulation
and supervision of savings associations, such as BofI Federal Bank,
were transferred from the OTS to the OCC, the federal regulator of
national banks under the National Bank Act.  The following
discussion summarizes some of the principal areas of regulation
applicable to the Bank and its operations.

* * *

Anti-Money Laundering and Customer Identification.  The U.S.
government enacted the Uniting and Strengthening America by
Providing Appropriate Tools Required to Intercept and Obstruct
Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in
response to the terrorist events of September 11, 2001.  The USA
Patriot Act gives the federal government broad powers to address
terrorist threats through enhanced domestic security measures,
expanded surveillance powers, increased information sharing, and
broadened anti-money laundering requirements.  In February 2010,
Congress re-enacted certain expiring provisions of the USA Patriot
Act.

58.    The 2013 10-K contained BofI's financials for the quarter, including

BofI  reporting net income of $11.13 million, or $0.78 per diluted share, on net

revenue of $35.87 million, compared to net income of $8.57 million, or $0.64 per

diluted share, on net revenue of $26.55 million for the same period in the prior year.

For fiscal year 2013, the Company reported net income of $40.29 million, or $2.89

per diluted share, on net revenue of $129.34 million, compared to net income of

$29.48 million, or $2.33 per diluted share, on net revenue of $95.56 million for

fiscal year 2012.

25
Verified Shareholder Derivative Complaint

Exhibit B
089

59.    Matt Erhart ("Erhart"), a former FINRA regulator, on or about September 23, 2013, began working for BofI as an internal auditor, performing audits of a variety of aspects of BofI's operations.

60.    On November 5, 2013, Defendants caused BofI to file a Form 10-Q with the SEC for the quarter ending September 30, 2013 (the "1Q14 10-Q"). The 1Q14 10-Q was approved by the Board and signed by Defendants Garrabrants and Micheletti. The 1Q14 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61.    The 1Q14 10-Q reported that BofI had a net income of $12.18 million, or  $0.85 per diluted share, on net revenue of $35.09 million, compared to net income of $8.99 million, or $0.67 per diluted share, on net revenue of $29.25 million for the same period in the prior year.

62.    On December 4, 2013, BofI filed Form 8-K with the SEC, signed by Defendant Micheletti, containing an Investor Presentation concerning the Company's first quarter of 2014 financial and operating projections (the "1Q14 Investor Presentation"). The 1Q14 Investor Presentation specified that if investors had questions they should contact Defendant Garrabrants and stated in relevant part:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial".;
- Bofi is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because [BofI's] Costs are Lower";
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

63.  On or about December 19, 2013, Erhart finalized his internal audit of BofI's Structured Settlements and Lottery practice, pursuant to which BofI, through its subsidiary Anfed Bank, has a team that calls individuals receiving structured settlements in litigation or lottery payments with the goal of purchasing those income streams in return for a lump sum. Erhart found that during the internal audit was that BofI's callers were not notifying the individuals they called that the calls were being recorded, in violation of California Penal Code § 632.

64.  On or about December 19, 2013, Erhart and his manager Jonathan Ball ("Ball") were asked by Defendant Bar-Adon, BofI's Chief Legal Officer and Executive Vice President, to meet in order to discuss the audit of the Structured Settlements and Lottery line of business.  In this line of business, BofI, through its subsidiary Anfed Bank, purchased structured settlements from plaintiffs in litigation, and lottery payments from winners of the lottery. Defendant Bar-Adon told employees to remove evidence of the violation of  California Penal Code §632 from the audit of the Structured Settlements and Lottery. Ball informed Defendants Bar-Adon that an internal auditor was not permitted to do that, Defendant Bar-Adon

27
Verified Shareholder Derivative Complaint

instructed Erhart to mark the entire report "Attorney Client Privileged," stating that

the findings could be discoverable in class action litigation against BofI and this

would prevent that problem. In addition, Defendant Bar-Adon instructed Erhart not

to speak to any employee in the Structured Settlements and Lottery Department.

65.     On the same day, Defendant Tolla instructed Erhart never to state in an

audit report that BofI violated a federal or state law.

66.     In or about January 2014, Thomas Constantine ("Constantine"), BofI's

Chief Credit Officer, met with Erhart, Ball, and a few others. At the meeting

Constantine stated he was not responsible for any of BofI's numbers after they are

turned over to Defendant Micheletti, the CFO. Constantine emphasized that he

could and would not vouch for the accuracy of the numbers once the CFO had

them, basically calling into question the accuracy of such numbers and Defendant

Micheletti changing the numbers after they are received.

67.     On February 5, 2014, Defendants caused BofI to file a Form 10-Q with

the SEC for the period ending December 31, 2013 (the 2Q14 10-Q"). The 2Q14 10-

Q was approved by the Board and signed by Defendants Garrabrants and

Micheletti. The 2Q14 10-Q also contained SOX certifications signed by Defendants

Garrabrants and Micheletti stating that the financial information contained in the

2Q14 10-Q was accurate and disclosed any material changes to the Company's

internal control over financial reporting. The 2Q14 10-Q reported BofI's net

income of $13.15 million, or $0.91 per diluted share, on net revenue of $38.37

28

Verified Shareholder Derivative Complaint

million, compared to net income of $9.77 million, or $0.70 per diluted share, on net revenue of $31.19 million for the same period in the prior year.

68. On February 6, 2014, Defendants caused BofI to file a Form 8-K with the SEC containing BofI's 2Q14 Investor Presentation with financial and operating projections (the "2Q14 Investor Presentation"). The 2Q14 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower"; and
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

69. On May 6, 2014, Defendants caused BofI to file a Form 10-Q with the SEC for the period ending March 31, 2014 (the "3Q14 10-Q"). The 3Q14 10-Q was approved by the Board and signed by Defendants Garrabrants and Micheletti. The 2Q14 10-Q also contained SOX certifications signed by Defendants Garrabrants and Micheletti stating that the financial information contained in the 3Q14 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 3Q14 10-Q reported net income of $14.61 million, or $1.00 per diluted share, on net revenue of $40.88 million, compared to net income

of \$10.40 million, or \$0.74 per diluted share, on net revenue of \$33.04 million for the same period in the prior year.

      70.    On May 7, 2014, Defendants caused BofI to file a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 3Q14 financial and operating projections (the "3Q14 Investor Presentation"). The 3Q14 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower"; and
- BofI's Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

      71.    On August 7, 2014, Defendants caused BofI to issue a press release and filed a Form 8-K with the SEC to announce BofI's financial and operating results for the fourth quarter and fiscal year ended June 30, 2014 (the "2014 Form 8-K"). The 2014 Form 8-K, and press release, were prepared by Defendants Garrabrants and Micheletti and signed by Defendant Micheletti. For the fourth quarter, BofI reported net income of \$16.01 million, or \$1.09 per diluted share, on net revenue of \$45.22 million, compared to net income of \$11.13 million, or \$0.78 per diluted share, on net revenue of \$35.87 million for the same period in the prior year. For fiscal year 2014, the Company reported net income of \$55.96 million, or \$3.85 per diluted share, on net revenue of \$159.55 million, compared to net income

Verified Shareholder Derivative Complaint
Exhibit B
094

of \$40.29 million, or \$2.89 per diluted share, on net revenue of \$129.34 million for fiscal year 2013.

72. On August 28, 2014, Defendants caused BofI to file its annual report on Form 10-K with the SEC providing the Company's financial and operating results for the fiscal year ended June 30, 2014(the "2014 10-K"). The 2014 10-K was signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, and Ratinoff, and it contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

73. In the 2014 10-K, the Company stated, in part:

REGULATION OF BOFI FEDERAL BANK

General. As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC. Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act. The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

* * *

Anti-Money Laundering and Customer Identification. The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001. The USA Patriot Act gives the federal government broad powers to address

Verified Shareholder Derivative Complaint

terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements. In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

74.     On September 3, 2014, Defendants caused BofI to file a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 4Q14 financial and operating projections (the "4Q14 Investor Presentation"). The Q4 2014 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower"; and
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production"

75.     On November 4, 2014, Defendants cause BofI to file a Form 10-Q with the SEC for the period ending September 30, 2014 (the "1Q15 10-Q"). The 1Q15 10-Q was approved by the Board and signed by Defendants Garrabrants and Micheletti. The 1Q15 10-Q also contained SOX certifications signed by Defendants Garrabrants and Micheletti stating that the financial information contained in the 1Q15 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 1Q15 10-Q reported that for the quarter BofI had  net income of $17.84 million, or $1.20 per diluted share, on net

revenue of $50.12 million, compared to net income of $12.18 million, or $0.85 per

diluted share, on net revenue of $35.09 million for the same period in the prior year.

76.    On November 17, 2014, Defendants caused BofI to file a Form 8-K

with the SEC containing an Investor Presentation concerning the Company's 1Q15

financial and operating projections (the "1Q15 Investor Presentation"). The 1Q15

2015 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower";
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

77.    On or about November 21, 2014, Erhart sent an email to BofI's Chief

Risk Officer, Thomas Williams, in preparation for the upcoming Enterprise Risk

Management ("ERM") audit. Erhart asked whether Williams thought BofI had a

deposit concentration risk. Erhart was concerned and reported that a mere four

customers accounted for approximately 25% of total deposits, and nine customers

accounted for approximately 40% of total deposits.  This is problematic because

when a large percentage of deposits are derived from a few depositors, sudden

withdrawals can pose a serious challenge to a Bank's ability to stay afloat and

maintain its regulatory compliance.

33
Verified Shareholder Derivative Complaint
Exhibit B
097

78.    On or about December 12, 2014, the SEC served a subpoena on BofI, requesting account-identifying information for an investment advisory firm identified as ETIA LLC ("ETIA").

79.    On or about December 18, 2014, Defendants caused BofI to respond to the SEC that it did not have any information regarding ETIA.

80.    In or about early January 2015, Erhart learned of the SEC subpoena, and knew that BofI did have a loan file containing information regarding ETIA. Erhart further learned that a file had been created in response to the SEC subpoena, containing the information regarding ETIA. Erhart learned from a BofI employee that she had informed the Bank's legal department of the existence of the file on or about December 17, 2014, before BofI sent its response to the SEC denying the existence of any such files.

81.    On or about January 15, 2015, the OCC, BofI's principal regulator, requested information on Bank accounts with no Tax Identification Numbers ("TINs").  BofI's responses to the OCC was that there were no accounts without TINs. This was untrue as Erhart had viewed a spreadsheet in the BSA ("Bank Secrecy Act") folder disclosing approximately 150-200 accounts where the borrowers did not have a TIN.

82.    In or about January 2015, Erhart conducted a Loan Origination Audit. During the Loan Origination Audit, Erhart discovered that BofI was making substantial loans to foreign nationals including Politically Exposed Persons

34

("PEPs") in potential violation of BSA/Know Your Customer rules. Erhart was able to uncover readily information that many of the borrowers were criminals and other suspicious persons who put the Bank at high risk for violating the BSA's Anti-Money Laundering Rules ("AML Rules"), as well as exposing BofI to reputational risk. The purpose of the AML Rules is to help detect and report suspicious activity including the predicate acts to money laundering and terrorist financing. The PEPs included very high-level foreign officials from major oil-producing countries and war zones.

83. On January 29, 2015, Defendants caused BofI to file a Form 10-Q with the SEC for the period ending December 31, 2014 (the 2Q15 10-Q"). The 2Q15 10-Q was approved by the Board and signed by Defendants Garrabrants and Micheletti. The 2Q15 10-Q also contained SOX certifications signed by Defendants Garrabrants and Micheletti stating that the financial information contained in the 2Q15 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 2Q15 10-Q reported BofI had net income of $19.37 million, or $1.26 per diluted share, on net revenue of $54.81 million, compared to net income of $13.15 million, or $0.91 per diluted share, on net revenue of $38.37 million for the same period in the prior year.

84. In or about February 2015, Erhart submitted two whistleblower tips to the SEC, one concerning the ETIA subpoena, and another regarding a suspicious loan customer.

85.     In or about February 2015, the OCC requested that BofI disclose all correspondence with federal and state banking agencies and law enforcement, including any and all subpoenas, criminal or otherwise.  BofI responded that it had not received any such documents for the review period in question.  BofI, however, had a BSA spreadsheet Erhart had previously seen that identified many subpoenas, including from law enforcement agencies, grand juries, and even from the U.S. Department of the Treasury, of which OCC is a part. Erhart knew that BofI had been served with subpoenas.

86.     On March 2, 2015, Defendants caused BofI to file Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2Q15 financial and operating projections (the "2Q15 Investor Presentation").  The 2Q15 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower";
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

87.     On April 30, 2015, Defendants caused BofI to file a Form 10-Q with the SEC for the period ending March 31, 2015 (the 3Q15 10-Q"). The 3Q15 10-Q was approved by the Board, including Defendant Dad who had recently joined the

36
Verified Shareholder Derivative Complaint

Board effective January 22, 2105, and signed by Defendants Garrabrants and

Micheletti. The 1Q15 10-Q also contained SOX certifications signed by Defendants

Garrabrants and Micheletti stating that the financial information contained in the

1Q15 10-Q was accurate and disclosed any material changes to the Company's

internal control over financial reporting. The 3Q15 10-Q reported BofI reported net

income of $21.07 million, or $1.35 per diluted share, on net revenue of $59.03

million, compared to net income of $14.61 million, or $1.00 per diluted share, on

net revenue of $40.88 million for the same period in the prior year.

88.    On May 6, 2015, Defendants caused BofI to file a Form 8-K with the

SEC containing an Investor Presentation concerning the Company's 3Q15 financial

and operating projections (the "3Q15 Investor Presentation"). The 3Q15 Investor

Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower"; and
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production:";

89.    On July 30, 2015, Defendants caused BofI to issue a press release and

file a Form 8-K with the SEC announcing BofI's financial and operating results for

the quarter and fiscal year ending June 30, 2015 (the "2015 Form 8-K").  For the

quarter, the Company reported net income of $24.40 million, or $1.54 per diluted

share, on net revenue of $65.57 million, compared to net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million for the same period in the prior year. For fiscal year 2015, BofI reported net income of $82.68 million, or $5.37 per diluted share, on net revenue of $229.54 million, compared to net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million for fiscal year 2014.

90.     On August 10, 2015, Defendants caused BofI to file a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 4Q15 financial and operating projections (the "4Q15 Investor Presentation"). The 4Q15 Investor Presentation contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- BofI's "Business Model is More Profitable Because Our Costs are Lower"; and
- BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production";

91.     On August 22, 2015, Peter Eavis of the *The New York Times* published an article, titled "An Internet Mortgage Provider Reaps the Rewards of Lending Boldly," about BofI's robust growth during Defendant Garrabrants' time as CEO. The article stated, in relevant part:

As the leader of Bank of Internet USA, based in San Diego, Mr. Garrabrants has been issuing big mortgages to high earners whom other lenders might not necessarily welcome with open arms. But because its

financial performance has, in many ways, been spectacular, Bank of Internet has been turning heads - and setting off alarm bells as well. **The bank has made loans to people who were later found to have run afoul of the law**, and Mr. Garrabrants has had to reassure investors that the bank has good relations with regulators.

Bank of Internet's loans have increased fivefold, to nearly $5 billion, over the last five years - an almost unheard-of rate of growth for these tepid times in banking. Its losses from bad loans are practically nonexistent, and profits are surging, in part because it charges a much higher interest rate than the bigger banks operating in the same market.

"I am passionate about what we do here, and I believe in it," Mr. Garrabrants said in one of several telephone interviews in recent weeks. "We are proud of what we are doing here. We try to really run a good, ethical shop, and I want people to know that."

[Some investors] contend that the bank is attracting people who simply can't get cheaper loans - borrowers who may be more risky. **Bank of Internet also makes large mortgages to wealthy foreigners, a practice that requires meticulous controls to comply with federal regulations aimed at stopping money laundering**. The bank's critics wonder whether its compliance department is up to the task, though Mr. Garrabrants vigorously defended its practices. They also take issue with the bank's funding, contending that the lender is too dependent on customer deposits that could evaporate if turbulence returns to the banking world.

\*     \*     \*

Mr. Garrabrants, who has also worked at Goldman Sachs and McKinsey & Company, says the critics are spreading disinformation - and losing money - as they bet against his firm's soaring stock.

"Here's the problem for them: They are going into an earnings juggernaut that has none of the things that they're talking about," Mr. Garrabrants said. And he says the bank is as judicious as any other lender in picking its borrowers. "It's about being thoughtful about what risks you take and watching them and being careful," he said, adding that Bank of Internet's deposits are a reliable source of funding.

\*     \*     \*

39
Verified Shareholder Derivative Complaint

*Still, Bank of Internet has lent money to some unsavory characters*. For example, in 2012 it issued a $5 million mortgage to Purna Chandra Aramalla on a house in Sands Point, an affluent section of Long Island, according to local property records. In 2013, federal law enforcement authorities in New York charged Mr. Aramalla with Medicare and Medicaid fraud.  In March, he was sentenced to three years in prison.

In mid-2014, Bank of Internet lent $1.05 million to Frederic Elm for a house in Fort Lauderdale, Fla., property records show. In January, the Securities and Exchange Commission accused Mr. Elm of running a "Ponzi-like" scheme that had raised $17 million since November 2013. Mr. Elm partly settled with the agency in June.

And in 2012, Bank of Internet issued a $1.26 million mortgage to Deepal Wannakuwatte, a Sacramento businessman who received a 20-year prison sentence last year for operating, for more than 10 years, what the F.B.I. called a Ponzi scheme.

*        *        *

*Then there are questions about Bank of Internet's marketing of itself as a lender to "foreign nationals."  It does not disclose exactly what proportion of its loans are made to foreigners.* When asked, Mr. Garrabrants said it was "nowhere near the majority." *Banks that do this sort of lending can expect extra scrutiny from federal regulatory agencies, which have punished banks for not properly applying bank secrecy and anti-money-laundering laws when vetting their international customers.*

In recent months there has been unrest in the division of Bank of Internet that deals with regulatory compliance.  *Earlier this year, a senior internal auditor, Jonathan Ball, and another employee in the division, Matt Erhart, left the bank. Mr. Ball did not respond to requests for comment.  Mr. Erhart's lawyer, Carol L. Gillam, said that she had communicated with regulators, including the Office of the Comptroller of the Currency, the bank's primary regulator.  She declined to provide details.*

Regulators have not publicly warned or penalized the bank for its lending to foreign nationals, and Mr. Garrabrants often sounds exasperated when defending that business. In his view, short-sellers had sought to stir up

concerns about those loans to try to persuade regulators to stop Bank of
Internet from acquiring parts of H&R Block's banking unit.  The deal
was concluded this month.

(Emphasis added).

92.    On August 26, 2015, Defendants caused BofI to file an annual report
on Form 10-K with the SEC providing the Company's financial and operating
results for the fiscal year ended June 30, 2015 (the "2015 10-K").  In the 2015 10-
K, the Company stated, in part:

REGULATION OF BOFI FEDERAL BANK

General. As a federally-chartered savings and loan association whose
deposit accounts are insured by FDIC, BofI Federal Bank is subject to
extensive regulation by the FDIC and, as of the Transfer Date, the
OCC.  Under the Dodd-Frank Act, the examination, regulation and
supervision of savings associations, such as BofI Federal Bank, were
transferred from the OTS to the OCC, the federal regulator of national
banks under the National Bank Act.  The following discussion
summarizes some of the principal areas of regulation applicable to the
Bank and its operations.

* * *

Anti-Money Laundering and Customer Identification.  The U.S.
government enacted the Uniting and Strengthening America by
Providing Appropriate Tools Required to Intercept and Obstruct
Terrorism Act of 2001 ("USA PATRIOT Act") on October 26, 2001
in response to the terrorist events of September 11, 2001.  The USA
PATRIOT Act gives the federal government broad powers to address
terrorist threats through enhanced domestic security measures,
expanded surveillance powers, increased information sharing, and
broadened anti-money laundering requirements.  In February 2010,
Congress re-enacted certain expiring provisions of the USA
PATRIOT Act.

41
Verified Shareholder Derivative Complaint

93.     The 2015 10-K was signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Dada, Grinberg, and Ratinoff, and it contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

94.     BofI filed a Proxy Statement on September 4, 2015 (the "2015 Proxy"). In the 2015 Proxy, the Board along with the Audit, Nominating and Compensation Committees, along with the four risk committees (the Credit, the Internal Assets Review, the Operations and Technology, and the ALCO committees), provide enterprise-wide oversight of the BofI's management and handling of risk.

95.     These committees report regularly to the Board on risk-related matters and provide the Board with insight about BofI's management of strategic, credit, interest rate, financial reporting, technology, liquidity, compliance, operational, and reputational risks.

96.     In addition, at meetings of the Board and its committees, directors receive regular updates and reports from management regarding risk management practices, including credit quality, financial reporting, internal controls, compliance, legal matters, asset liability, and liquidity management, among others. Furthermore,

42
Verified Shareholder Derivative Complaint

current risk management issues are discussed regularly with the Board and its
committees.

97.    BofI's 2015 Proxy states:

> Our Board is actively involved in oversight and review of the
> Company's risk management efforts either directly or through its
> standing committees. The Company's management is responsible for
> assessing and managing risk and communicating risks to the Board.
> The Enterprise Risk Management ("ERM") program, led by certain
> officers of the Company, including Mr. Garrabrants, our President and
> Chief Executive Officer, with oversight from the Board, identifies and
> evaluates key business risks within the financial, operational,
> regulatory and strategic arenas and to develop risk monitoring
> processes and response strategies to transfer, avoid, reduce or accept
> individual risks as appropriate. The ERM program assists
> management in determining appropriate risk tolerance levels which
> balance risk mitigation with opportunities to create stockholder value.
> ERM program leaders make regular reports to the Board regarding the
> ERM program's risk identification, management and mitigation
> strategy recommendations.
>
> While the Board has retained the responsibility for general oversight
> of risks and of our ERM program, the Board's standing committees
> support the Board by regularly addressing various risks in their
> respective areas of oversight. Specifically, the Audit Committee
> primarily oversees those risks that may directly or indirectly impact
> our financial statements, including the areas of financial reporting,
> internal controls and compliance with public reporting requirements,
> while the Compensation Committee assists the Board in fulfilling its
> risk management oversight responsibilities associated with risks
> arising from employee compensation policies and practices. Each
> standing committee provides reports to the full Board at regular
> meetings concerning the activities of the committee and actions taken
> by the committee since the last regular meeting.

98.    The statements referenced in paragraphs 46-97 were materially false
and misleading because Defendants falsely stated and/or failed to disclose material

Verified Shareholder Derivative Complaint

adverse facts about the Company's business, operations, prospects, and performance. Specifically, during the Relevant Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) BofI's internal controls were frequently disregarded; (ii) BofI was making risky and potentially illegal loans to Politically Exposed Persons; (iii) many BofI accounts lacked required tax identification numbers; (iv) BofI violated the California penal code and hid such fact in its public filings; (v) BofI took unnecessary regulatory risks in making loans to foreign investors and in its high deposit concentration; (vi) BofI failed to provide timely and accurate responses to regulators; (vii) BofI fired a whistleblower internal auditor who raised the foregoing issues to management and to federal regulators; and (viii) as a result of the above, the Company's statements regarding its internal controls and other financial statements were materially false and misleading at all relevant times.

## **THE TRUTH EMERGES**

99. After the market closed on October 13, 2015, *The New York Times* published the article titled "Ex-Auditor Sues Bank of Internet" reporting that Erhart filed a lawsuit against BofI for violating federal laws designed to protect whistleblowers. The Whistleblower Action alleged, *inter alia*, that:

- BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

44
Verified Shareholder Derivative Complaint

- Erhart had seen a spreadsheet that contained as many as 200 accounts without tax identification numbers, contrary to BofI's representations to the OCC, its primary regulator;

- BofI at times failed to provide full and timely information to regulators; and

- Erhart was fired after he revealed wrongdoing at BofI to management and federal regulators.

100.   On this news, the prices of shares of BofI stock fell $42.87, or 30.2%, to close at $99.13 per share on October 14, 2015.

## DAMAGES TO BOFI

101.   BofI has been, and will continue to be, severally damages and injured by Defendants' misconduct.

102.   As a direct and proximate result of Defendants' conduct, BofI has expended and will continue to expend significant sums of money.

103.   Such expenditures include, but are not limited to, legal fees associated with the class action lawsuit filed against the Company and certain Defendants for violations of the federal securities laws, defense of the Whistleblower Action, and amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations.

104.   Such costs include, but are not limited to, compensation and benefits paid to Defendants who breached their fiduciary duties to BofI.

105.  As a direct and proximate result of Defendants' conduct, BofI has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the misconduct done and misrepresentations made by Defendants and caused to be made by the Company by Defendants.

## DERIVATIVE ALLEGATIONS

106.  Plaintiff brings this action derivatively and for the benefit of BofI to redress injuries suffered, and to be suffered, as a result of Defendants' breaches of their fiduciary duties as directors and/or officers of BofI, gross mismanagement, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof.

107.  BofI is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

108.  Plaintiff is, and at all relevant times has been, a BofI shareholder. Plaintiff will adequately and fairly represent the interests of BofI in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

109.  Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. Defendants caused the Company to conceal the true facts as alleged herein.

110.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment, failure to manage regulatory compliance and internal corporate controls; (ii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, internal controls, and bonuses provided to employees; and (iii) to artificially inflate the Company's stock price.

111.   Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently to conceal material facts, misrepresent its financial results, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, Defendants who are directors and/or officers of BofI were  direct, necessary, and substantial participants in  the  conspiracy,  common  enterprise,  and/or  common  course  of  conduct complained of herein.

112.   Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of Defendants acted with  knowledge  of  the  primary  wrongdoing,  substantially  assisted  the accomplishment of that wrongdoing, and was aware of his overall contribution to, and furtherance of, the wrongdoing.

113.   At all times relevant hereto, Defendants were the agent of each other and of BofI, and was at all times acting within the course and scope of such agency.

## DEMAND FUTILITY ALLEGATIONS

114.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

115.   A pre-suit demand on the BofI's Board is futile and, therefore, excused.  At the time of filing of this action, the Board consisted of the following nine Defendants: Garrabrants, Allrich, Burke, Mosich, Grinberg, Argalas, Court, Ratinoff, and Dada,  (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to five of the nine directors that were on the Board at the time this action was commenced.

116.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme and the false and misleading statements and omissions of material facts, which render them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

117.   In complete abdication of their fiduciary duties, the Directors either participated in or were recklessly unaware of materially false and misleading statements contained in the Company's public filings.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.

48
Verified Shareholder Derivative Complaint

While investors were duped into believing the fraud perpetrated by Defendants, a majority of the Directors sold millions upon millions of dollars' worth of Company stock at artificially inflated prices based on inside material information. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

118. The entire Board faces a substantial likelihood of liability for retaliating against Erhart as a Whistleblower in violation of SOX. Section 806 of the Sarbanes-Oxley Act prohibits employers such as BofI from discharging, constructively discharging, demoting, threatening, harassing, or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders. In addition, an employer may not discharge or in any manner retaliate against employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders. If an employer takes retaliatory action against an employee because he or she engaged in any of these protected

activities, the employee can file a complaint with the Secretary, United States Department of Labor, Occupational Safety and Health Administration ("OSHA").

119.   Erhart filed a complaint with OSHA in regards to the retaliation he faced after reporting the allegedly unlawful activities at BofI to federal agencies and regulators.

120.   On March 12, 2015, Defendant Bar-Adon met with Erhart and told

121.   him he was acting as General Counsel to BofI's Audit Committee, comprised of Defendants Grinberg (Chairman), Mosich, and Argalas. Thus, Grinberg, Mosich, and Argalas had actual knowledge of Erhart's whistleblower complaints, and had directed Bar-Adon to meet with Erhart regarding such activities.

122.   As noted by BofI in its 2015 Proxy Statement, the Audit Committee "reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting." Therefore, a reasonable inference is that BofI's Audit Committee (Grinberg, Mosich, and Argalas) reported Erhart's complaints and whistleblowing activity to the full Board at the next meeting it held subsequent to March 12, 2015. During fiscal year 2015, BofI's Board met eight times; as a result, the Board was meeting on average approximately every six weeks. As a result, Defendants Allrich, Garrabrants, Burke, Court, Ratinoff, and Dada received actual knowledge of Erhart's complaints and whistleblowing activity shortly after March 2015.

123.   Despite having actual knowledge of Erhart's whistleblowing activity, and despite knowing that Dodd-Frank, Sarbanes-Oxley, and other laws prohibit retaliation against employees who report alleged wrongdoing, the Board authorized and approved the firing of Erhart on June 9, 2015. All Board members thus face a substantial likelihood of liability for breaching their fiduciary duties by causing the Company to violate the anti-retaliation provisions of Sarbanes-Oxley and Dodd-Frank.

124.   Moreover, all Board members can reasonably be charged with actual knowledge or reckless disregard of the unlawful activity alleged by Erhart during the Relevant Period because the wrongdoing concerned the Company's core (and only) business – consumer and business banking products and services.

125.   Demand on Defendant Garrabrants is futile because he is BofI's President and Chief Executive Officer, and is thus a non-independent director. By its own admittance, the 2015 Proxy stated "Mr. Garrabrants is not an independent director because he is our President and Chief Executive Officer." Defendant Garrabrants was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings that he signed.  His millions of dollars in stock holdings, worth $40 million, reveals his interest in keeping the Company's stock price as high as possible. Moreover, Defendant Garrabrants is a defendant in the securities fraud class action lawsuit. Finally, Defendant Garrabrants conducted little, if any, oversight of the

51
Verified Shareholder Derivative Complaint

Exhibit B
115

Company's internal controls over public reporting of financial statements and of the

Company's engagement in the scheme to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and

engagement in the scheme, and consciously disregarded his duties to protect

corporate assets. Accordingly, for these reasons, too, Defendant Garrabrants

breached his fiduciary duties, faces a substantial likelihood of liability, is not

independent or disinterested, and thus demand upon him is futile and, therefore,

excused.

126. Demand on Defendant Ginsberg is futile as he has served as a

compensated Company Director throughout the Relevant Period. His insider sales

before the fraud was exposed, which yielded over 1.5 million dollars in proceeds,

demonstrates his motive in facilitating the fraud. His Company stock holding –

worth $1.66 million – reveals his interest in keeping the Company stock price as

high as possible. Defendant Ginsberg was ultimately responsible for the false and

misleading statements and omissions that were made in the SEC filings that he

signed. Defendant Ginsberg conducted little, if any, oversight of the Company's

internal controls over public reporting of financial statements and of the Company's

engagement in the scheme to make false and misleading statements, consciously

disregarded his duties to monitor such controls over reporting and engagement in

the scheme, and consciously disregarded his duties to protect corporate assets.

Thus, for these reasons, too, Defendant Ginsberg breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127. Demand on Defendant Allrich is futile as he has served as a compensated Company Director and Chairman of the Board of Directors throughout the Relevant Period. The large amount of Company stock that he owns – worth $4.75 million – reveals his interest in keeping the Company stock price as high as possible. His insider sales before the fraud was exposed, which yielded over a million dollars in proceeds, demonstrates his motive in facilitating the fraud. Defendant Allrich was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. Finally, Defendant Allrich, as Chairman of the ALCO Committee, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Allrich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128. Demand on Defendant Burke is futile as he has served as a compensated Company Director throughout the Relevant Period. The large amount

Exhibit B
117

of Company stock that he owns – worth $41.46 million – reveals his interest in keeping the Company stock price as high as possible. His insider sales before the fraud was exposed, which yielded $855, 571 in proceeds, demonstrates his motive in facilitating the fraud. Defendant Burke was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. Defendant Burke is a member of the Compensation Committee and the IAR Committee. As a member of each of these Committees, Defendant Burke conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Burke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129. Demand on Defendant Court is futile as he has served as a compensated Company Director throughout the Relevant Period. His insider sales before the fraud was exposed, which yielded $268,498 in proceeds, demonstrates his motive in facilitating the fraud. Defendant Court was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. As a member of the Audit Committee and of the IAR

Committee, Defendant Court conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Court breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130. Demand on Defendant Ratinoff is futile as he has served as a compensated Company Director throughout the Relevant Period. His insider sales before the fraud was exposed, which yielded $397,506 in proceeds, demonstrates his motive in facilitating the fraud. Defendant Ratinoff was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. As Chairman of the Credit Committee and as member of the Nominating Committee, Defendant Ratinoff conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Ratinoff breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131. Demand on Defendant Mosich is futile as he has served as a compensated Company Director and Vice Chairman of the Board of Directors throughout the Relevant Period. The large amount of Company stock that he owns – worth $2.14 million – reveals his interest in keeping the Company stock price as high as possible. Defendant Mosich was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. Defendant Mosich, as a member of the Audit Committee and ALCO Committee, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Mosich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132. Demand on Defendant Argalas is futile as he has served as a compensated Company Director throughout the Relevant Period. The large amount of Company stock that he owns – worth $803,000 – reveals his interest in keeping the Company stock price as high as possible. Defendant Argalas was ultimately

responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. Defendant Argalas, as a member of the Audit Committee and of the IAR Committee, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Argalas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.    Demand on Defendant Dada is futile follow as he has served as a compensated Company Director since January 2015. Defendant Dada was ultimately responsible for the false and misleading statements and omissions that were made in the SEC filings that he signed. Defendant Dada conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Dada breached his fiduciary duties, faces a substantial likelihood of liability, is not

independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.   Demand on the Board is futile follow as the Compensation Committee determines, in conjunction with the Board, the reasonableness of the compensation paid to Board members, as well as the CEO and officers.  Demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  The Board is especially beholden to Defendant Garrabrants, who made and/or was responsible for causing the Company's misconduct and for making the false and misleading statements of material fact alleged herein and for failing to correct those false and misleading statements.

135.   The Directors have longstanding business and personal relationships with each other and Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question Defendants' conduct. Thus, any demand on the Directors would be futile.

136.   BofI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful

Verified Shareholder Derivative Complaint

Exhibit B
122

conduct to attempt to recover for BofI any part of the damages BofI suffered and

will continue to suffer thereby.  Thus, any demand on the Directors would be futile.

137.   Defendants' conduct described herein and summarized above could

not have been the product of legitimate business judgments as it was based on bad

faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors

can claim exculpation from their violations of duty pursuant to the Company's

charter (to the extent such a provision exists).  As a majority of the Directors face a

substantial likelihood of liability, they are self-interested in the transactions

challenged herein and cannot be presumed to be capable of exercising independent

and disinterested judgment about whether to pursue this action on behalf of the

shareholders of the Company.  Accordingly, demand is excused as being futile.

138.   The acts complained of herein constitute violations of fiduciary duties

owed by BofI's officers and directors, and these acts are incapable of ratification.

139.   The Directors may also be protected against personal liability for their

acts of mismanagement and breaches of fiduciary duty alleged herein by directors'

and officers' liability insurance if they caused the Company to purchase it for their

protection with corporate funds, i.e., monies belonging to the stockholders of BofI.

If there is a directors' and officers' liability insurance policy covering the Directors,

it may contain provisions that eliminate coverage for any action brought directly by

the Company against the Directors, known as, *inter alia*, the "insured-versus-

insured exclusion."  As a result, if the Directors were to sue themselves or certain of

the officers of BofI, there would be no directors' and officers' insurance protection.

Accordingly, the Directors cannot be expected to bring such a suit.  On the other

hand, if the suit is brought derivatively, as this action is brought, such insurance

coverage, if such an insurance policy exists, will provide a basis for the Company

to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore,

excused.

140.  If there is no directors' and officers' liability insurance, then the

Directors will not cause BofI to sue Defendants named herein, since, if they did,

they would face a large uninsured individual liability. Accordingly, demand is futile

in that event, as well.

141.  Thus, for all of the reasons set forth above, all of the Directors, and, if

not all of them, certainly at least five of the Directors, cannot consider a demand

with disinterestedness and independence. Consequently, a demand upon the Board

is excused as futile.

## FIRST COUNT
### Against Defendants for Breach of Fiduciary Duties

142.  Plaintiff incorporates by reference and re-alleges each and every

allegation set forth above, as though fully set forth herein.

143.  Defendants owed BofI fiduciary obligations. By reason of their

fiduciary relationships, Defendants owed to the Company the duty to exercise

candor, good faith, and loyalty in the management and administration of BofI's business and affairs.

144. Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

145. Defendants' conduct set forth herein was due to their intentional, reckless, or grossly negligent breach of the fiduciary duties they owed to the Company, as alleged herein. By engaging in the improper activity detailed herein, Defendants intentionally, recklessly, or with gross negligence, breached or disregarded their fiduciary duties to protect the rights and interests of BofI.

146. In breach of their fiduciary duties owed to BofI, Defendants willfully engaged in misconduct and participated in misrepresentation of the Company's business operations and prospects and failed to correct the Company's public statements, rendering them personally liable to the Company for breaching their fiduciary duties.

147. In further breach of their fiduciary duties owed to BofI, Defendants willfully engaged in misconduct -- and certain of them engaged in insider selling of Company stock on material non-public information -- and participated in the Company's failure to maintain adequate internal controls and comply with regulatory requirements, and federal and state law, rendering them personally liable to the Company for breaching their fiduciary duties.

148.   Defendants had actual or constructive knowledge that they had engaged in misconduct and caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were made, and were subsequently not corrected, knowingly or recklessly and for the purpose and effect of artificially inflating the price of BofI's securities.

149.   Defendants failed in their duty of oversight and compliance with regulations and federal and state laws.  Defendants further failed in their duty to correct errors, misstatements and omissions when it became known to them.  These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

150.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them, and failed to correct such misrepresentations and omissions.  Such material misrepresentations and/or omissions were caused to be made knowingly or recklessly.  Such failure to correct the material

misrepresentations and/or omissions was caused to be done knowingly or recklessly.

151.    As a direct and proximate result of Defendants' breaches of their fiduciary obligations, BofI has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

152.    Plaintiff, on behalf of BofI, has no adequate remedy at law.

## SECOND COUNT
### Against Defendants for Abuse of Control

153.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence BofI, for which they are legally responsible.

155.    As a direct and proximate result of Defendants' abuse of control, BofI has sustained significant damages. As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, BofI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

156.    Plaintiff, on behalf of BofI, has no adequate remedy at law.

Verified Shareholder Derivative Complaint

## THIRD CLAIM
### Against Defendants for Gross Mismanagement

157.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.   By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of BofI in a manner consistent with the operations of a publicly-held banking entity and with federal and state law.

159.   As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, BofI has sustained and will continue to sustain significant damages.

160.   As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

161.   Plaintiff, on behalf of BofI, has no adequate remedy at law.

## FOURTH COUNT
### Against Defendants for Unjust Enrichment

162.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163.   By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, BofI.

164.   Defendants either received bonuses, stock options, or similar compensation from BofI that was tied to the financial performance or artificially inflated valuation of BofI or received compensation that was unjust in light of Defendants' bad faith conduct.

165.   Plaintiff, as a shareholder and a representative of BofI, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, proceeds from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

166.   Plaintiff, on behalf of BofI, has no adequate remedy at law.

## FIFTH COUNT
### Against Defendants Garrabrants, Micheletti, Bar-Adon, and Tolla for Breach of Duty of Honest Services

167.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.   This claim is brought derivatively on behalf of the Company against Defendants Garrabrants, Micheletti, Bar-Adon, and Tolla for breach of their undivided duty of loyalty to their employer.

169.   Garrabrants, Micheletti, Bar-Adon, and Tolla were employees of BofI during the Relevant Period.

170. Garrabrants, Micheletti, Bar-Adon, and Tolla breached their duty of loyalty to BofI by not acting solely in the Company's interests in performing their employment duties.

171. Those breaches of duty consisted of the conduct alleged in this complaint including, without limitation, their conduct in causing the Company to issue false statements regarding its operations and financial results, misstate the fact that the Company maintained adequate internal controls, fire whistleblower Erhart in violation of the Dodd-Frank and Sarbanes-Oxley laws, and cause the Company to make other false and misleading statements during the Relevant Period. Defendants benefitted from their wrongdoing because they were allowed to retain their jobs in exchange for their unlawful conduct and because they received compensation that was directly tied to the Company's financial performance, which was greater than it would have been absent the Defendants' wrongful conduct.

172. BofI was harmed by these Defendants' breaches of the undivided duty of loyalty.

173. By reason of the foregoing, the Company was harmed and will continue to suffer harm as described in greater detail above.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of

BofI, and that Plaintiff is an adequate representative of the Company;

(b)  Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to BofI;

(c)  Determining and awarding to BofI the damages sustained by it as a result of the violations set forth above from each of Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)  Directing BofI and Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BofI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of BofI to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)  Awarding BofI restitution from Defendants, and each of them;

67
Verified Shareholder Derivative Complaint

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated : January 22, 2016        **THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

68
Verified Shareholder Derivative Complaint

VERIFICATION


I, David DeYoung, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___21ˢᵗ___ day of January, 2016


_____
David DeYoung

# EXHIBIT C



# EXHIBIT C

Exhibit C
134

1 | THE SHUMAN LAW FIRM
Kip B. Shuman
2 | 1 Montgomery Street, #1800
San Francisco, CA 94104
3 | Tel: (303) 861-3003
4 | Fax: (303) 536-7849
Email: kip@shumanlawfirm.com
5

6 | *Attorney for Plaintiff*

7 | [Additional Counsel Listed Below]
8

9 | UNITED STATES DISTRICT COURT

10 | SOUTHERN DISTRICT OF CALIFORNIA

11

12 | ZHANG YONG, derivatively on behalf )   Case No.   **'16 CV 0241 BEN WVG**
13 | of BOFI HOLDING, INC.,   )
  )   (Derivative Action)
14 |               Plaintiff, )
15 |           vs.   )   **VERIFIED SHAREHOLDER**
  )   **DERIVATIVE COMPLAINT**
16 | GREGORY GARRABRANTS, )
17 | ANDREW J. MICHELETTI, )   DEMAND FOR JURY TRIAL
THEODORE C. ALLRICH, )
18 | NICHOLAS A. MOSICH, JAMES S. )
19 | ARGALAS, JOHN GARY BURKE, )
PAUL J. GRINBERG, JAMES J. )
20 | COURT, EDWARD J. RATINOFF, )
21 | ESHEL BAR-ADON, JOHN C. )
TOLLA, and UZAIR DADA, )
22 |   )
23 |             Defendants, )
  )
24 |           -and- )
25 |   )
BOFI HOLDING, INC., )
26 | a Delaware corporation, )
27 |   )
        Nominal Defendant. )
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit C
135

Plaintiff Zhang Yong ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") derivatively on behalf of BofI Holding, Inc. (hereafter "BofI," the "Bank," the "Bank of Internet," or the "Company") against certain members of BofI's Board of Directors (the "Board") and senior executive officers (collectively, the "Individual Defendants") for breaches of their fiduciary duties, gross mismanagement, abuse of control, and unjust enrichment from approximately July 2012 to the present (the "Relevant Period").

Plaintiff makes the following allegations, except as to allegations pertaining to Plaintiff (which are based on personal knowledge), based on his investigation and the investigation of his counsel, including a review of legal and regulatory filings, press releases, media reports about BofI, the allegations in the whistleblower complaint filed on October 13, 2015 by Charles M. Erhart in *Erhart v. BOFI Holding, Inc.*, Case No. 15-cv-2287-BAS (NLS) (S.D. Cal.), and other public statements issued by BofI. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. According to its public filings, BofI operates as the holding company for BofI Federal Bank, a provider of consumer and business banking products through the Internet in the United States. BofI Federal Bank's deposit products include consumer and business checking, demand, savings, and time deposit accounts. Its loan portfolio comprises residential single family and multifamily mortgage loans; commercial real estate secured and commercial lending products; specialty finance factoring products; and consumer lending products consisting of prime loans to purchase new and used recreational vehicles and automobiles, as well as deposit-related overdraft lines of credit.

1

Exhibit C
136

2.      BofI Federal Bank's most significant business is making mortgages to high-net-worth individuals for the purchase of expensive properties through BofI Federal Bank's Bank of Internet USA ("Bank of Internet") brand.

3.      The Company was incorporated in 1999. BofI is headquartered in San Diego, California, and its shares trade on the NASDAQ under the ticker symbol "BOFI."

4.      Throughout the Relevant Period, the Individual Defendants caused the Company to make false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, prospects, and performance. Specifically, during the Relevant Period, Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that:

(a)     the Company's internal controls were frequently disregarded;

(b)     BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

(c)     many BofI accounts lacked required tax identification numbers;

(d)     in violation of the anti-retaliation laws contained in the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or "SOX") and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), the Board caused the Company to fire an internal auditor who raised the foregoing issues to senior management and to federal regulators; and

(e)     as a result of the above, the Company's statements regarding BofI's internal controls and other financial statements were materially false and misleading at all relevant times.

5.      On October 13, 2015, after the close of trading, *The New York Times* reported that Matt Erhart ("Erhart"), a former internal auditor at the Bank of

2

Internet, had filed a lawsuit against the Company for violating federal laws designed to protect whistleblowers (the "*Erhart* Complaint"). The *Erhart* Complaint alleged, *inter alia*, that:

- Erhart was instructed by senior officers at BofI, including Defendant Tolla, to refrain from putting anything in writing regarding the Company's violations of laws, including California Penal Code § 632; *Erhart* Complaint at ¶§9-16.

- Erhart was instructed by senior officers at BofI, including Defendant Tolla, to label anything he did in his audit function which might be incriminating to the Company as "attorney client work product/communication" in order to shield such documents from later production in future "class action" litigation; *Id.* at ¶16.

- BofI had not been making timely deposits to employees' 401(k) accounts for employee elective deferrals; *Id.* at ¶18.

- BofI at times failed to provide full and timely information to regulators; *Id.* at ¶¶26-34 and

- Erhart was fired after he revealed wrongdoing at BofI to management and federal regulators. *Id.* at ¶70.

6.     On this news, shares of BofI fell $42.87, or 30.2%, to close at $99.13 on October 14, 2015.

7.     As a result of Defendants' wrongful acts and omissions, the Company has been named as a defendant in at least two securities class action lawsuits filed in this Court and has suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     Subject-matter jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity between plaintiff and defendants and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.     Venue is proper in the Southern District of California under 28 U.S.C. §§ 1391 and 1401 because BofI maintains its principal executive offices in

3

Exhibit C
138

this District and because a substantial portion of the acts and conduct complained of herein — including the dissemination of materially false and misleading information to the investing public — occurred in this District.

10.    Each defendant has minimum contacts with this District, as they have entered into contracts in this District, or have frequently traveled here, on BofI's business, or have authorized acts and actions that have had a sufficient impact in this District or on BofI's shareholders and investors residing here to justify the exercise of jurisdiction over them.

## PARTIES

### I.    Plaintiff

11.    Plaintiff Zhang Yong is a current shareholder of BofI.   Plaintiff purchased BofI stock on July 16, 2012, and has continuously held his BofI stock since that time.  Plaintiff is a citizen of the People's Republic of China.

### II.    Nominal Defendant

12.    Nominal Defendant BofI is a Delaware company headquartered and operating at 4350 La Jolla Village Drive, Suite 140, San Diego, California 92122. BofI's shares trade on the NASDAQ under the ticker symbol "BOFI." At all material times to this action, Defendant BOFI Holding, Inc., an entity d/b/a/ "BOFI Federal Bank" and "Bank of the Internet," was a publicly traded company. BofI is a citizen of California and Delaware.

### III.    The Individual Defendants

13.    Defendant Gregory Garrabrants ("Garrabrants") has served at all relevant times as the Company's President, Director, and Chief Executive Officer ("CEO").  BofI's most recent Proxy Statement, Form DEF 14A, filed with the SEC on September 4, 2015 (the "2015 Proxy") provides the following information for defendant Garrabrants:

> Mr. Garrabrants, age 43, has served as President and Chief Executive Officer since October 2007 and as a member of the Board of Directors

4

Exhibit O
139

since March 2008. Mr. Garrabrants is a member of the Credit Committee, the ALCO Committee, and the Operations and Technology Committee of the Board of Directors of the Bank.

Mr. Garrabrants brings to the Board more than 18 years of experience in financial services, including service as our CEO since 2007. Mr. Garrabrants also possesses particular strengths with respect to leadership and management skills. Prior to joining BofI Federal Bank, Mr. Garrabrants was a senior vice president and the head of corporate business development at the nation's seventh largest thrift focusing on entry into new business segments, mergers and acquisitions, joint ventures and strategic alliances. Before his senior executive roles at banking institutions, Mr. Garrabrants served the financial services industry as an investment banker, management consultant and attorney for over 15 years. He was an investment banker at Goldman Sachs specializing in advising management and directors on issues such as strategic planning, capital and liquidity management, balance sheet management, asset/liability management, and enhancement of shareholder value. Prior to Goldman Sachs, Mr. Garrabrants served as a management consultant at McKinsey & Company. At McKinsey, Mr. Garrabrants led teams that worked with senior management of money center banks, non-bank financial services companies, insurance companies and asset managers on strategy development, sales force effectiveness, risk management, organizational design and corporate restructuring. Prior to McKinsey, Mr. Garrabrants worked as a summer associate at Skadden, Arps, Slate, Meagher & Flom, Munger, Tolles & Olson, and Morrison & Foerster focusing on corporate and securities law and clerked for the Honorable Steven V. Wilson of the United States District Court for the Central District of California. Prior to graduate school, he began his career at Deloitte Consulting in the financial advisory services and litigation support practices. Mr. Garrabrants earned his Juris Doctorate, magna cum laude, from the Northwestern University School of Law and his Masters of Business Administration, with the highest distinctions, from the Kellogg Graduate School of Management at Northwestern University. He has a Bachelor of Science degree in Industrial and Systems Engineering and a minor in Economics from the University of Southern California where he graduated with high honors. He is a Chartered Financial Analyst and member of the California Bar.

Upon information and belief, Garrabrants is a citizen of California.

14.     Defendant Andrew J. Micheletti ("Micheletti") has served at all

5

Exhibit C
140

relevant times as the Company's Executive Vice President and Chief Financial Officer ("CFO"). Upon information and belief, Micheletti is a citizen of California.

15. Defendant Theodore C. Allrich ("Allrich") has served as Chairman of the Board since October 2009 and served as Vice Chairman of the Board from 1999 to 2009. Allrich also serves as a member of the Compensation Committee of the Board. According to BofI's 2015 Proxy:

> Mr. Allrich, age 69, has served as Chairman of the Board of Directors since October 2009 and served as Vice Chairman of the Board of Directors from 1999 to 2009. Mr. Allrich also serves on the Compensation Committee and Nominating Committee of the Board of Directors of the Company and as Chairman of the Asset and Liability Committee of the Board of Directors of the Bank ("ALCO Committee").

> Mr. Allrich brings to the Board his extensive knowledge of the financial services industry as the founder of *The Online Investor* (http://www.theonlineinvestor.com), a financial educational website based on his book of the same name. He served as an investment advisor with his own firm, Allrich Investment Management, from June 1991 to June 2003. Prior to starting his own firm, Mr. Allrich spent 20 years with various Wall Street brokerage firms, where he was involved with investment banking, fixed income sales and management, specializing in mortgage-backed securities, institutional equity sales and trading. His last position with a brokerage firm was in 1990 as the regional manager for high grade fixed income investments with Drexel Burnham Lambert in San Francisco. Mr. Allrich holds a Bachelor of Arts degree from the University of California at Davis and a Master of Business Administration degree in Finance from Stanford University.

Upon information and belief, Allrich is a citizen of California.

16. Defendant Nicholas A. Mosich ("Mosich") has served as Vice Chairman of the Board since October 2010 and as a member of the Board since May 2009. According to BofI's 2015 Proxy:

6

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit O
141

Mr. Mosich, age 60, has served as Vice Chairman of the Board of Directors since October 2010 and as a member of the Board of Directors since May 2009. Mr. Mosich also serves as a member of the Audit Committee of the Board of Directors of the Company and the Bank, as a member of the ALCO, the Credit, and the Operations and Technology Committees of the Board of Directors of the Bank.

Mr. Mosich brings to the Board extensive knowledge of the real estate development and investment banking industries acquired through his career as a Managing Member of Ion Capital Partners, LLC/Arroyo Vista Partners, LLC, both discretionary investment funds that acquire land for residential development projects in California. Mr. Mosich also bring 27 years of capital markets and business management experience, most recently as an Executive Vice President and Board Member of the The Seidler Companies Incorporated, a NYSE member firm ("Seidler"). While at Seidler, Mr. Mosich was responsible for overseeing its Private Client Service operations and Investment Banking Operations. He was a Managing Director of Seidler's Community Bank Group, active in mergers and acquisitions, raising public and private capital for emerging growth banks including an active role as a co-manager of the BOFI initial public offering. In January of 2001, he merged his predecessor firm, Hagerty Stewart & Associates, Inc., into Seidler. Previously, Mr. Mosich was a partner at McGoodwin James & Company, a venture capital firm headquartered in Costa Mesa. At McGoodwin, he was active in funding later stage venture companies and making private investments in public companies. Mr. Mosich completed his undergraduate degree (cum laude) at the University of Michigan and received a Masters of Business Administration degree from Stanford University.

Upon information and belief, Mosich is a citizen of California.

17. Defendant James S. Argalas ("Argalas") has served as a member of the Board since August 19, 2011. He has served as a member of the Company's Internal Asset Review Committee. According to BofI's 2015 Proxy:

Mr. Argalas age 44, has served as a member of the Board of Directors since August 2011 and serves as a member of the Audit Committee of the Board of Directors of the Company and the Bank and as a member of the IAR Committee.

7

Mr. Argalas brings to the Board extensive experience in the financial
and investment sectors. He founded Presidio Union, LLC, a company
that specializes in providing financial analysis and corporate advisory
services to early stage growth companies and their investors, taking an
active role in developing ventures that have the potential to create
significant stockholder value. Prior to founding Presidio Union,
Mr. Argalas was a Principal at Watershed Asset Management and NM
Rothschild, where he was responsible for investments in distressed
credit, liquidations, real estate, special situations, and debt and equity
investments in Asia-Pacific. Prior to joining Watershed, Mr. Argalas
was an Associate Principal with McKinsey & Company and an
Associate at Goldman Sachs. Mr. Argalas has a Master of Business
Administration degree from Kellogg Graduate School of Management
(Northwestern University) with majors in Finance, Entrepreneurship
and International Business; in addition, Mr. Argalas holds a Bachelor
of Science degree in Engineering from the University of Michigan,
and a Bachelor of Science degree in Foreign Service from
Georgetown University.

Upon information and belief, Argalas is a citizen of California.

18.     Defendant John Gary Burke ("Burke") has served as a member of
the Board since October 2005 and is a member of the Compensation Committee
of the Board of Directors of the Company and the Chairman of the Internal Assets
Review Committee of the Board of Directors of the Bank ("IAR Committee").
According to BofI's 2015 Proxy:

Mr. Burke, age 70, has served as a member of the Board of Directors
since October 2005 and is a member of the Compensation Committee
of the Board of Directors of the Company and the Chairman of the
Internal Assets Review Committee of the Board of Directors of the
Bank ("IAR Committee"). Mr. Burke brings extensive leadership and
business management skills as President and sole stockholder of
Truck World, Inc., a wholesale and retail petroleum marketing
company, based in the Youngstown, Ohio area. Truck World, Inc. is a
retail jobber for Shell Oil and Marathon Ashland Petroleum. Since
founding the company in 1972, Mr. Burke has built, developed,
opened and operated convenience stores and truck stops. Additionally,
in 1980, Mr. Burke acquired and operated four pipeline terminals on

8

the Buckeye Pipeline System and became involved with various
aspects of distribution, including scheduling, trading and hedging.
Mr. Burke served as a director of the Ohio Petroleum Marketing
Association for nine years during this time. Mr. Burke is also
President and sole stockholder of J. Gary Burke Corporation, a real
estate holding company that owns and manages properties in various
states. Most recently, J. Gary Burke Corporation processed the
entitlements and developed the site improvements for a 40-acre
industrial park in Otay Mesa, California. Before serving in the United
States Navy as a Naval Aviator from 1968 to 1971, Mr. Burke earned
his BSME degree from the University of Miami, Florida.

Upon information and belief, Burke is a citizen of Ohio.

19. Defendant Paul J. Grinberg ("Grinberg") has served as a member of
the Board since April 2004. Grinberg also serves as a member of the
Compensation Committee of the Board. According to BofI's 2015 Proxy:

Mr. Grinberg, age 54, has served as a member of the Board of
Directors since April 2004 and serves as Chairman of the
Compensation Committee of the Board of the Directors of the
Company, Chairman of the Audit Committee of the Board of
Directors of the Company and the Bank and is a member of the
Nominating Committee of the Board of Directors of the Company.

Mr. Grinberg brings to the Board extensive accounting and financial
reporting expertise in the financial services industry. Mr. Grinberg has
been an executive with Encore Capital Group (Nasdaq: ECPG), an
international specialty finance company with operations in eight
countries, since September 2004, currently serving as Group
Executive, International and Corporate Development, overseeing
Encore's European and Latin American operations along with
corporate development responsibilities, and formerly serving as
Executive Vice President and Chief Financial Officer. Prior to joining
Encore, Mr. Grinberg served as President of Brio Consulting Group, a
company he founded that provided financial strategy and consulting
services to private equity and venture-backed companies. Before that,
Mr. Grinberg served as Chief Financial Officer of Stellcom, Inc., a
systems integration firm focused on providing mobile and wireless
engineering solutions to Fortune 1000 companies, and as Executive

9

Exhibit C
144

Vice President and Chief Financial Officer of TeleSpectrum Worldwide, Inc., a publicly traded company that provided outsourced call center solutions to Fortune 500 companies. Mr. Grinberg began his career at Deloitte & Touche LLP, ultimately becoming a partner in the firm's Merger and Acquisition Services Group. Mr. Grinberg earned a MBA (graduating Beta Gamma Sigma) from Columbia University and a bachelor's degree in accounting (graduating magna cum laude) from Yeshiva University.

Upon information and belief, Grinberg is a citizen of California.

20.     Defendant James J. Court ("Court") has served as a member of the Board since April 2011. According to BofI's 2015 Proxy:

Mr. Court, age 53, has served as a member of the Board of Directors since April 2011 and serves as Chairman of the Operations and Technology Committee and as a member of the IAR Committee of the Board of Directors of the Bank.

Mr. Court brings to the Board an extensive knowledge of the financial services and information technology industries. Mr. Court's prior experience, qualifications and attributes include his current position as Chairman and President of First American's Property & Casualty Insurance Group (''First American''). Mr. Court joined First American in 1999 and has previously served in senior management roles including Chief Operating Officer and Chief Information Officer; his responsibilities at First American include overseeing all three Property & Casualty operating units. Prior to joining First American, Mr. Court held information technology and operations positions at MGE UPS Systems and Printronix, Inc. Further, Mr. Court has led successful business and technology transformations in both the financial services and manufacturing sectors. Mr. Court holds a Master of Business Administration degree from the Graziadio School of Business and Management at Pepperdine University, a Bachelor of Science degree in Information Systems from the University of Redlands, and an Associate degree in Electronic Engineering Technology.

Upon information and belief, Court is a citizen of California.

21.     Defendant Edward J. Ratinoff ("Ratinoff") has served as a member of the Board and as a member of the Nominating Committee since 2010.

10

Exhibit O
145

According to BofI's 2015 Proxy:

> Mr. Ratinoff, age 50, has served as a member of the Board of
> Directors since April 2010 and serves as Chairman of the Credit
> Committee of the Board of Directors of the Bank and as a member of
> the Nominating Committee of the Board of Directors of the Company.
>
> Mr. Ratinoff brings to the Board extensive experience in the real
> estate investment and real estate development industries. Mr. Ratinoff
> served as Managing Director and Head of Acquisitions for Phoenix
> Realty Group, an institutional real estate investment firm focused on
> opportunistic multifamily investments. Mr. Ratinoff oversaw the
> investment program for two fund vehicles totaling approximately
> $400 million in equity, directed acquisition teams in Los Angeles and
> New York, and was a member of the firm's investment committee.
> Prior to joining Phoenix Realty Group, Mr. Ratinoff held the position
> of Managing Director and west coast head for the J.E. Robert
> Companies. In this role, Mr. Ratinoff was responsible for all equity
> and debt transactions throughout the western US for the real estate
> investment funds sponsored by the firm and was a member of the
> investment committees for both JER Partners and JER Investors Trust.
> Mr. Ratinoff was also responsible for directing JER's multifamily
> investment strategy in the US, acquiring 2,300 apartment units in
> Seattle, Atlanta and Detroit. During his tenure, Mr. Ratinoff led the
> acquisition of approximately $1.0 billion in assets representing
> multiple real estate sectors and geographies. Prior to joining JER,
> Mr. Ratinoff served as Principal with Fowler Flanagan Partners,
> where he either led or participated in the acquisition, financing and
> renovation of approximately 3,000 apartment units in California,
> Seattle, Arizona, Texas and Missouri. Mr. Ratinoff also held senior
> positions focusing on real estate investment banking with McDonald
> Investments, Chase Securities and BT Alex. Brown, executing public
> and private capital markets transactions for west coast-based real
> estate companies. Mr. Ratinoff received a Bachelor of Arts degree in
> Architecture and City Planning from the University of California,
> Berkeley, and an MBA from the J.L. Kellogg Graduate School of
> Management at Northwestern University. Mr. Ratinoff has served as a
> member of the board of directors of MPG Office Trust, Inc. and its
> successor entity Brookfield DTLA since February 2011.

Upon information and belief, Ratinoff is a citizen of California.

11

Exhibit Q
146

22.    Defendant Eshel Bar-Adon ("Bar-Adon") is an officer of the Company, holding the titles of Executive Vice President and Chief Legal Officer. Upon information and belief, Bar-Adon is a citizen of California.

23.    Defendant John C. Tolla ("Tolla") is an officer of BofI who has served as Chief Governance Risk and Compliance Officer at BofI since December 2013.  Upon information and belief, Tolla is a citizen of California.

24.    Defendant Uzair Dada ("Dada") has served as a member of the Board since January 22, 2015.

> Mr. Dada, age 47, has served as a member of the Board of Directors since January 2015 and serves on the Operations and Technology Committee of the Board of Directors of the Bank.
>
> Mr. Dada brings to the Board a strong business and financial background focused on technology and marketing. He is the Founder and CEO of Iron Horse Interactive (IHI), an award-winning marketing technology and services company serving an array of Fortune 500 companies. Under Mr. Dada's leadership, IHI has introduced a suite of proprietary demand generation solutions and technologies that are widely recognized for their innovation. Mr. Dada led the IHI team to develop atEvent – a first-of-its-kind mobile event solution with full integration – into one of the most widely used marketing automation and CRM platforms. Mr. Dada is a graduate of UC Berkeley and the Kellogg School of Business at Northwestern University.

Upon information and belief, Dada is a citizen of California.

25.    The Defendants referenced in ¶¶ 13–24 are referred to herein, collectively, as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BofI's reports to the U.S. Securities and Exchange Commission ("SEC"), press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants caused the Company to make specific false and misleading statements and/or reviewed and approved the Company's reports and press releases alleged

12

herein to be misleading prior to, or shortly after their issuance, and had the ability
and opportunity to prevent their issuance or cause them to be corrected. Because
of their positions and access to material non-public information available to them,
the Individual Defendants knew that the adverse facts specified herein had not
been disclosed to, and were being concealed from, the public, and that the
positive representations which were being made were then materially false and/or
misleading.

26. BofI and the Individual Defendants are collectively referred to herein
as the "Defendants."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

27. By reason of their positions as officers and/or directors of the
Company and because of their ability to control the business and corporate affairs
of the Company, the Individual Defendants owed the Company and its
shareholders the fiduciary obligations of good faith, loyalty and candor, and were
and are required to use their utmost ability to control and manage the Company in
a fair, just, honest and equitable manner. The Individual Defendants were and are
required to act in furtherance of the best interests of the Company and its
shareholders so as to benefit all shareholders equally and not in furtherance of
their personal interest or benefit. Each director and officer of the Company owes
to the Company and its shareholders the fiduciary duty to exercise good faith and
diligence in the administration of the affairs of the Company and in the use and
preservation of its property and assets, and the highest obligations of fair dealing.

28. To discharge their duties, the officers and directors of the Company
were required to exercise reasonable and prudent supervision over the
management, policies, practices and controls of the Company. By virtue of such
duties, the Individual Defendants were required to, among other things:

(a) exercise good faith to ensure that the affairs of the

13

Company were conducted in an efficient, businesslike manner so as
to make it possible to provide the highest quality performance of its
business;

(b)     exercise good faith to ensure that the Company was
operated in a diligent, honest and prudent manner and complied with
all applicable federal and state laws, rules, regulations and
requirements, and all contractual obligations, including acting only
within the scope of its legal authority;

(c)     refrain from wasting BofI's assets;

(d)     refrain from unduly benefiting themselves and other
Company insiders at the expense of the Company; and

(e)     properly disclose all material information regarding the
Company, required by applicable state and federal laws and/or their
relevant duties, to BofI's shareholders.

**The Board's Role in Risk Oversight**

29.     BofI's 2015 Proxy describes, in detail, the role every Board member
is required to undertake with respect to Risk Oversight at the Company. These
duties are clear and each Board member would have been required to have read
these duties, given the importance of Proxy Statements. This conclusion is
buttressed by the fact that each Audit Committee member signed the 2015 Proxy.
These duties are as follows:

> The Board of Directors, together with the Audit Committee, the
> Nominating, and the Compensation Committee as well as four risk
> committees, which are the Credit, the IAR, the Operations and
> Technology and the ALCO committees, coordinate with each other to
> provide enterprise-wide oversight of our management and handling of
> risk. These committees report regularly to the Board of Directors on
> risk-related matters and provide the Board of Directors with insight
> about our management of strategic, credit, interest rate, financial
> reporting, technology, liquidity, compliance, operational and

14

Exhibit C
149

reputational risks. In addition, at meetings of the Board of Directors and its committees, directors receive regular updates and reports from management regarding risk management practices, including credit quality, financial reporting, internal controls, compliance, legal matters, asset liability and liquidity management, among others. Furthermore, current risk management issues are discussed regularly with the Board of Directors and its committees.

Our Board is actively involved in oversight and review of the Company's risk management efforts either directly or through its standing committees. The Company's management is responsible for assessing and managing risk and communicating risks to the Board. The Enterprise Risk Management ("ERM") program, led by certain officers of the Company, including Mr. Garrabrants, our President and Chief Executive Officer, with oversight from the Board, identifies and evaluates key business risks within the financial, operational, regulatory and strategic arenas and to develop risk monitoring processes and response strategies to transfer, avoid, reduce or accept individual risks as appropriate. The ERM program assists management in determining appropriate risk tolerance levels which balance risk mitigation with opportunities to create stockholder value. ERM program leaders make regular reports to the Board regarding the ERM program's risk identification, management and mitigation strategy recommendations.

While the Board has retained the responsibility for general oversight of risks and of our ERM program, the Board's standing committees support the Board by regularly addressing various risks in their respective areas of oversight. Specifically, the Audit Committee primarily oversees those risks that may directly or indirectly impact our financial statements, including the areas of financial reporting, internal controls and compliance with public reporting requirements, while the Compensation Committee assists the Board in fulfilling its risk management oversight responsibilities associated with risks arising from employee compensation policies and practices. Each standing committee provides reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting.

**Compliance with the Generally Accepted Accounting Principles**

30.    In issuing its financial statements, BofI was required to comply with

15

Generally Accepted Accounting Principles ("GAAP") — a common set of accounting principles, standards, and procedures recognized by the accounting profession and used to compile financial statements.

31.     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, per 17 C.F.R. § 210.10- 01(a).

32.     During the Relevant Period, BofI stated in its annual reports on Forms 10-K dated September 4, 2013, August 28, 2014, and August 26, 2015 that its financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America."

33.     In reality, however, the Individual Defendants failed to ensure that BofI adhered to GAAP during the Relevant Period.

## BREACHES OF FIDUCIARY DUTIES

34.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to BofI and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of BofI, as well as in the use and preservation of BofI's property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BofI, the absence of good faith on their part, or a reckless disregard for their duties to BofI and its shareholders that

16

Exhibit C
151

the Individual Defendants were aware or should have been aware posed a risk of serious injury to BofI.

35. The Individual Defendants each breached their duties of loyalty and good faith by causing the Company to make false and/or misleading statements and/or failing to disclose that:

(a) the Company was doing business with foreign nationals who should have been off-limits under federal anti-money-laundering laws;

(b) the Company had as many as 200 customer accounts without tax identification numbers, contrary to BofI's representations to the OCC, its primary regulator;

(c) as a result, the Company's revenue and financial results were overstated;

(d) the Company's financial statements were not prepared in accordance with GAAP;

(e) the Company lacked adequate internal and financial controls; and

(f) as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.

36. In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of federal securities laws, and a whistleblower lawsuit alleging violations of federal law. As a result, BofI has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**SUBSTANTIVE ALLEGATIONS**

37. BofI Holding, Inc. (NASDAQ: BOFI) is the holding company for BofI Federal Bank, a nationwide bank that provides financing for single and

17

multifamily residential properties, small-to-medium size businesses in target sectors, and selected specialty finance receivables. With approximately $6.3 billion in assets, BofI Federal Bank provides consumer and business banking products through its low-cost distribution channels and affinity partners. BofI Holding, Inc.'s common stock is listed on the NASDAQ Global Select Market under the ticker symbol BOFI and is a component of the Russell 2000® Index and the S&P SmallCap 600® Index.

38.     BofI operates in a highly-regulated field. It is regulated by, among others, the OCC, the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the SEC, the Financial Industry Regulatory Authority ("FINRA"), and the Consumer Financial Protection Bureau ("CFPB"). BofI is subject to a variety of statutory schemes including, without limitation, the Bank Secrecy Act of 1970 ("BSA"), the USA Patriot Act, including the Know Your Customer Rule ("KYC"), Dodd-Frank Act, Sarbanes-Oxley, the Securities Act of 1933, and the Exchange Act.

39.     BofI Federal Bank's most significant business is making mortgages to high-net-worth individuals for the purchase of expensive properties through BofI Federal Bank's Bank of Internet brand.

40.     The Company was incorporated in 1999 and is headquartered in San Diego, California.

## I.     The Individual Defendants' Role in Overseeing Risk Management at BofI

41.     According to BofI's 2015 Proxy Statement, the Board, together with the Audit Committee, the Nominating Committee, and the Compensation Committee, as well as four risk committees (which are the Credit, the IAR, the Operations and Technology, and the ALCO committees), to provide enterprise-wide oversight of the Company's management and handling of risk.

42.     These committees report regularly to the Board on risk-related

18

Exhibit C
153

matters and provide the Board with insight about BofI's management of strategic, credit, interest rate, financial reporting, technology, liquidity, compliance, operational, and reputational risks.

43. In addition, at meetings of the Board and its committees, directors receive regular updates and reports from management regarding risk management practices, including credit quality, financial reporting, internal controls, compliance, legal matters, asset liability, and liquidity management, among others. Furthermore, current risk management issues are discussed regularly with the Board and its committees.

44. BofI's 2015 Proxy Statement represented that: "Our Board is actively involved in oversight and review of the Company's risk management efforts either directly or through its standing committees. The Company's management is responsible for assessing and managing risk and communicating risks to the Board. The Enterprise Risk Management ("ERM") program, led by certain officers of the Company, including Mr. Garrabrants, our President and Chief Executive Officer, with oversight from the Board, identifies and evaluates key business risks within the financial, operational, regulatory and strategic arenas and to develop risk monitoring processes and response strategies to transfer, avoid, reduce or accept individual risks as appropriate. The ERM program assists management in determining appropriate risk tolerance levels which balance risk mitigation with opportunities to create stockholder value. ERM program leaders make regular reports to the Board regarding the ERM program's risk identification, management and mitigation strategy recommendations. While the Board has retained the responsibility for general oversight of risks and of our ERM program, the Board's standing committees support the Board by regularly addressing various risks in their respective areas of oversight. Specifically, the Audit Committee primarily oversees those risks

19

Exhibit C
154

that may directly or indirectly impact our financial statements, including the areas of financial reporting, internal controls and compliance with public reporting requirements, while the Compensation Committee assists the Board in fulfilling its risk management oversight responsibilities associated with risks arising from employee compensation policies and practices. Each standing committee provides reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting."

**II.     The Individual Defendants Cause the Company to Issue False and Misleading Statements**

45.     On February 6, 2013, the Individual Defendants caused BofI to file a Form 10-Q with the SEC, disclosing BofI's financial results for the quarter ending December 31, 2012.  The Quarterly Report was reviewed and approved by the Board, and signed by Defendants Garrabrants and Micheletti, and represented the following to be BofI's financial results for the quarter:

///

///

### BOFI HOLDING, INC. AND SUBSIDIARY
### SELECTED CONSOLIDATED FINANCIAL INFORMATION

| (Dollars in thousands, except per share data) | At or for the Three Months Ended December 31, | | At or for the Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| **Selected Income Statement Data:** | | | | |
| Interest and dividend income | $ 33,567 | $ 28,616 | $ 64,556 | $ 56,381 |
| Interest expense | 8,631 | 9,530 | 17,135 | 19,118 |

20

Exhibit C
155

| | | | | |
|---|---|---|---|---|
| Net interest income | 24,936 | 19,086 | 47,421 | 37,263 |
| Provision for loan losses | 1,950 | 1,600 | 4,500 | 3,963 |
| Net interest income after provision for loan losses | 22,986 | 17,486 | 42,921 | 33,300 |
| Non-interest income | 6,249 | 2,986 | 13,010 | 7,556 |
| Non-interest expense | 12,781 | 9,204 | 24,313 | 18,756 |
| Income before income tax expense | 16,454 | 11,268 | 31,618 | 22,100 |
| Income tax expense | 6,686 | 4,608 | 12,861 | 8,907 |
| Net income | $ 9,768 | $ 6,660 | $ 18,757 | $ 13,193 |
| Net income attributable to common stock | $ 9,436 | $ 6,280 | $ 18,348 | $ 12,687 |
| **Per Share Data:** | | | | |
| Net income: | | | | |
| Basic | $ 0.71 | $ 0.56 | $ 1.44 | $ 1.15 |
| Diluted | $ 0.70 | $ 0.54 | $ 1.37 | $ 1.14 |
| Book value per common share | $ 17.08 | $ 14.80 | $ 17.08 | $ 14.80 |
| Tangible book value per common share | $ 17.08 | $ 14.80 | $ 17.08 | $ 14.80 |
| **Weighted average number of shares outstanding:** | | | | |
| Basic | 13,224,612 | 11,174,947 | 12,707,837 | 11,036,046 |
| Diluted | 13,824,440 | 12,304,628 | 13,538,503 | 11,415,793 |
| Common shares outstanding at end of period | 12,824,195 | 11,419,584 | 12,824,195 | 11,419,584 |
| Common shares issued at end of period | 13,665,957 | 12,162,604 | 13,665,957 | 12,162,604 |

21

***Performance Ratios and Other Data:***

| | | | | |
|---|---|---|---|---|
| Loan originations for investment | $ 331,999 | $ 132,153 | $ 611,696 | $ 384,779 |
| Loan originations for sale | 280,569 | 227,810 | 535,365 | 318,179 |
| Loan purchases | — | — | 1,541 | — |
| Return on average assets | 1.45% | 1.23% | 1.45% | 1.26% |
| Return on average common stockholders' equity | 17.32% | 15.86% | 17.85% | 16.55% |
| Interest rate spread[1] | 3.69% | 3.44% | 3.63% | 3.47% |
| Net interest margin[2] | 3.81% | 3.60% | 3.76% | 3.62% |
| Efficiency ratio | 40.98% | 41.70% | 40.23% | 41.85% |
| ***Capital Ratios:*** | | | | |
| Equity to assets at end of period | 8.44% | 8.71% | 8.44% | 8.71% |
| Tier 1 leverage (core) capital to adjusted tangible assets[3] | 8.52% | 8.27% | 8.52% | 8.27% |
| Tier 1 risk-based capital ratio[3] | 13.95% | 13.19% | 13.95% | 13.19% |
| Total risk-based capital ratio[3] | 14.60% | 13.77% | 14.60% | 13.77% |
| Tangible capital to tangible assets[3] | 8.52% | 8.27% | 8.52% | 8.27% |
| ***Asset Quality Ratios:*** | | | | |
| Net annualized charge-offs to average loans outstanding | 0.13% | 0.39% | 0.28% | 0.41% |
| Non-performing loans to total loans | 0.95% | 0.76% | 0.95% | 0.76% |
| Non-performing assets to total assets | 0.79% | 0.64% | 0.79% | 0.64% |
| Allowance for loan losses to total loans at | 0.52% | 0.53% | 0.52% | 0.53% |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit O
157

| | end of period | | | | |
|---|---|---|---|---|---|
| | Allowance for loan losses to non-performing loans | 54.92% | 68.79% | 54.92% | 68.79% |

46.     The Form 10-Q also stated the following with respect to the quarter's financial results:

**"RESULTS OF OPERATIONS**
**Comparison of the Three and Six Months Ended December 31, 2012**
**and December 31, 2011**

For the three months ended December 31, 2012, we had net income of $9.8 million compared to net income of $6.7 million for the three months ended December 31, 2011.  Net income attributable to common stockholders was $9.4 million or $0.70 per diluted share compared to net income attributable to common shareholders of $6.3 million or $0.54 per diluted share for the three months ended

December 31, 2012 and 2011, respectively.  For the six months ended December 31, 2012, we had net income of $18.8 million compared to net income of $13.2 million for the six months ended December 31, 2011.   Net income attributable to common stockholders was $18.3 million or $1.37 per diluted share compared to net income attributable to common shareholders of $12.7 million or $1.14 per diluted share for the six months ended December 31, 2012 and 2011, respectively.

Other key comparisons between our operating results for the three and six months ended December 31, 2012 and 2011 are:

• Net interest income increased $5.9 million and $10.2 million in the quarter and six months ended December 31, 2012 due to a 23.4% and 22.7%, increase in average earning assets primarily from the growth in our loan portfolio in those respective periods.  Our net interest margin increased 21 basis points and 14 basis points in the quarter and six months ended December 31, 2012 compared to December 31, 2011.  The overall rate on interest earning assets was lower by 27 and 37 basis points in the three and six month periods ended December 31, 2012 compared to December 31, 2011, primarily because loan rates have been pushed lower by the

23

Exhibit O
158

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28  

economy and competition. This reduction on the asset side was more than offset by a 52 and 53 basis point reduction in rates paid on interest bearing liabilities for the three and six months ending December 31, 2012 compared to December 31, 2011. The primarily reduction was due to a decrease in the rates paid on time deposits of 57 and 52 basis points , respectively, as we allowed the higher rate time deposits to roll of the books.

- Non-interest income increased $3.3 million and $5.5 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011. The increase in non-interest income for the quarter was primarily the result of a $2.5 million increase in mortgage banking income, a $448,000 increase in prepayment penalty income and a $507,000 increase in banking service fees. The increase in non-interest income for the six months ended December 31, 2012 compared to December 31, 2011 was primarily the result of a $4.2 million increase in mortgage banking income, a $589,000 increase in prepayment penalty income and a $756,000 increase in banking service fees.

- Non-interest expense increased $3.6 million and $5.6 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011. For the three months ended December 31, 2012 compared to the three months ended December 31, 2011 salaries and compensation was up $2.0 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank. Advertising and promotions were up $510,000 mainly due to the cost of lead generation in the mortgage area. Other general and administration expenses were $689, 000 higher primarily due to an increase of $258,000 in loan related expenses, an increase of $144,000 related to software, licenses and associated costs, an increase of $72,000 in expenses related travel, and an increase of $53,000 in losses on deposit accounts. For the six months ended December 31, 2012 compared to the six months ended December 31, 2011 salaries and compensation was up $3.6 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank. Advertising and

24

promotions were up $846,000 mainly due to the cost of lead generation in the mortgage area. Other general and administration expenses were $1.4 million higher primarily due to an increase of $708,000 in loan related expenses, an increase of $198,000 related to software, licenses and associated costs, an increase of $77,000 in expenses related travel, and an increase of $57,000 in losses on deposit accounts."

47.    The Form 10-Q filed on February 6, 2013 contained the following disclosure: "During fiscal year 2011, the Bank changed its growth strategy to originate more mortgage loans rather than purchasing loans." With respect to its loans and other assets held as of the end of the quarter which closed on December 31, 2012, the Form 10-Q represented the following:

**"FINANCIAL CONDITION**
**Balance Sheet Analysis**

Our total assets increased $487.5 million, or 20.4%, to $2,874.3 million, as of December 31, 2012, up from $2,386.8 million at June 30, 2012. The increase in total assets was primarily due to an increase of $434.7 million in net loans held for investment. Total liabilities increased a total of $451.5 million, primarily due to an increase in deposits of $353.2 million and an increase in borrowings of $105.0 million from the Federal Home Loan Bank of San Francisco (the "FHLB"). Our deferred income taxes increased $2.0 million to $17.0 million primarily due to the impairment in our securities portfolio, loan loss provision, and state taxes.

**Loans**

Net loans held for investment increased 25.3% to $2,155.3 million at December 31, 2012 from $1,720.6 million at June 30, 2012. The increase in the loan portfolio was due to loan originations and purchases of $613.2 million, offset by loan repayments of $215.1 million, net transfers from our held for sale portfolio of $42.2 million and a net increase in the allowance of $1.8 million during the six months ended December 31, 2012.

The following table sets forth the composition of the loan portfolio as of the dates indicated:

25

| (Dollars in thousands) | December 31, 2012 | | June 30, 2012 | |
|---|---|---|---|---|
| | Amount | Percent | Amount | Percent |
| Residential real estate loans: | | | | |
|     Single family (one to four units) | $1,215,744 | 55.6% | $ 863,624 | 49.6% |
|     Home equity | 25,742 | 1.2% | 29,167 | 1.7% |
|     Multifamily (five units or more) | 766,247 | 35.0% | 687,661 | 39.5% |
| Commercial real estate | 28,681 | 1.3% | 35,174 | 2.0% |
| Consumer—Recreational vehicle | 21,494 | 1.0% | 24,324 | 1.4% |
| Commercial secured and other | 128,267 | 5.9% | 100,549 | 5.8% |
| Total loans held for investment | $2,186,175 | 100.0% | $1,740,499 | 100.0% |
| Allowance for loan losses | (11,449) | | (9,636) | |
| Unamortized premiums/discounts, net of deferred loan fees | (19,420) | | (10,300) | |
| Net loans held for investment | $2,155,306 | | $1,720,563 | |

48.    The February 6, 2013 Form 10-Q also contained Sarbanes-Oxley Section 302 certifications signed by defendants Garrabrants and Micheletti which stated the following:

"I have reviewed this quarterly report on Form 10-Q of BofI Holding, Inc. (the "registrant");

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report;

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined

26

Exhibit O
161

in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over
financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d -
15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused
such disclosure controls and procedures to be designed under our
supervision, to ensure that material information relating to the
registrant, including its consolidated subsidiaries, is made known to
us by others within those entities, particularly during the period in
which this report is being prepared;

(b)     Designed such internal control over financial reporting or, or
caused such internal control over financial reporting to be designed
under our supervision, to provide reasonable assurance regarding the
reliability of financial reporting and the preparation of financial
statements for external purposes in accordance with generally
accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure
controls and procedures, and presented in this report our conclusions
about the effectiveness of the disclosure controls and procedures, as
of the end of the period covered by this report based on such
evaluation; and

(d)     Disclosed in this report any change in the registrant's internal
control over financial reporting that occurred during the registrant's
most recent fiscal quarter (the registrant's fourth fiscal quarter in the
case of an annual report) that has materially affected, or is
reasonably likely to materially affect, the registrant's internal control
over financial reporting.

"The registrant's other certifying officer and I have disclosed, based on our

27

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit O
162

1  most recent evaluation of internal control over financial reporting, to the
2  registrant's auditors and the audit committee of registrant's board of
3  directors (or persons performing the equivalent functions):

4  (a)  All significant deficiencies and material weaknesses in the design or
5       operation of internal control over financial reporting which are
6       reasonably likely to adversely affect the registrant's ability to record,
7       process, summarize and report financial information; and

8  (b)  Any fraud, whether or not material, that involves management or
9       other employees who have a significant role in the registrant's
10      internal controls over financial reporting."

11  49.  The February 6, 2013 Form 10-Q also contained Sarbanes-Oxley
12  Section 906 certifications signed by defendants Garrabrants and Micheletti which
13  stated that Garrabrants and Micheletti had reviewed the Form 10-Q and that "the
14  information contained in the Report fairly presents, in all material respects, the
15  financial condition and results of operations of the Company as of the dates and
16  for the periods presented in the financial statements included in such Report."

17  50.  On May 8, 2013, the Individual Defendants caused BofI to file a
18  Form 10-Q with the SEC, disclosing BofI's financial results for the quarter ending
19  March 31, 2013.  The Quarterly Report was reviewed and approved by the Board,
20  and signed by defendants Garrabrants and Micheletti, and represented the
21  following to be BOFI's financial results for the quarter:

22  "For the three months ended March 31, 2013, we had net income of $10.4
23  million compared to net income of $7.7 million for the three months
    ended March 31, 2012. Net income attributable to common stockholders was
24  $10.1 million or $0.74 per diluted share compared to net income
    attributable to common shareholders of $7.3 million or $0.58 per diluted
25  share for the three months ended March 31, 2013 and 2012, respectively.
26  For the nine months ended March 31, 2013, we had net income of $29.2
    million compared to net income of $20.9 million for the nine months ended
27  March 31, 2012. Net income attributable to common stockholders was
28

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit C
163

$28.4 million or $2.12 per diluted share compared to net income attributable to common shareholders of $20.0 million or $1.68 per diluted share for the nine months ended March 31, 2013 and 2012, respectively."

51.     The May 8, 2013 Form 10-Q also stated:  "Net interest income increased $5.9 million and $16.0 million in the quarter and nine months ended March 31, 2013 due to a 28.3% and 24.6%, increase in average earning assets primarily from the growth in our loan portfolio in those respective periods."

52.     The May 8, 2013 Form 10-Q contained certifications signed by defendants Garrabrants and Micheletti under Sections 302 and 906 of Sarbanes-Oxley which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (referenced *supra*).

53.     In addition to these SOX certifications by Garrabrants and Micheletti, the May 8, 2013 Form 10-Q specifically stated, at p. 63:

> "The Company's management, with the participation of its Chief Executive Officer [Garrabrants] and Chief Financial Officer [Micheletti], conducted an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures, pursuant to Exchange Act Rule 13a-15(e). Based upon that evaluation, our Chief Executive Officer along with our Chief Financial Officer concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures were effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.  There were no changes in the Company's internal control over financial reporting that occurred during the quarter ended March 31, 2013 that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting."

54.     On September 4, 2013, BofI filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2013 (the "2013 Form 10-K").  The Form 10-K Annual Report was prepared and signed by Defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, and Ratinoff.

29

Exhibit C
164

55.     For the quarter, the Company reported net income of $11.13 million, or $0.78 per diluted share, on net revenue of $35.87 million, compared to net income of $8.57 million, or $0.64 per diluted share, on net revenue of $26.55 million for the same period in the prior year. For fiscal year 2013, the Company reported net income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million, compared to net income of $29.48 million, or $2.33 per diluted share, on net revenue of $95.56 million for fiscal year 2012.

56.     Among other things, the 2013 Form 10-K described that the BofI Federal Bank was subject to extensive federal regulation, as follows:

**REGULATION OF BOFI FEDERAL BANK**

***General***.    As a federally-chartered savings and loan association whose deposit accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"), BofI Federal Bank is subject to extensive regulation by the FDIC and . . . the [Office of the Comptroller of the Currency].   Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.   The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

\* \* \*

***Anti-Money Laundering and Customer Identification***.   The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.   The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti- money laundering requirements.   In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

30

Exhibit C
165

57.    The 2013 Form 10-K contained signed certifications pursuant to SOX by Individual defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

58.    According to his whistleblower complaint, beginning on or about September 23, 2013, Matt Erhart, a former FINRA regulator, began working for BofI as an internal auditor, performing audits of a wide variety of aspects of BofI's operations.

59.    On November 5, 2013, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "2014Q1 Form 10-Q").  The Form 10-Q Quarterly Report was reviewed and approved by the Board, and prepared and signed by Defendants Garrabrants and Micheletti.  For the quarter, the Company reported net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million, compared to net income of $8.99 million, or $0.67 per diluted share, on net revenue of $29.25 million for the same period in the prior year.

60.    The 2014Q1 Form 10-Q contained signed certifications pursuant to SOX by defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the 2014Q1 Form 10-Q was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

61.    On December 4, 2013, BofI filed a Form 8-K with the SEC, signed

31

Exhibit 1
166

by defendant Micheletti, containing as an attachment an Investor Presentation concerning the Company's Q1 2014 financial and operating results (the "2014Q1 Investor Presentation") which indicated it was presented by Defendant Garrabrants and that investors should contact Garrabrants for more information. Among other things, the 2014Q1 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and
- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

62.    According to Erhart's whistleblower complaint, on December 19, 2013, Erhart completed an internal audit of BofI's Structured Settlements and Lottery practice, pursuant to which BofI, through its subsidiary Anfed Bank, has a team that calls individuals receiving structured settlements in litigation or lottery payments with the goal of purchasing those income streams in return for a lump sum. Erhart alleged that he discovered during this audit that BofI's callers were not notifying the individuals they called that the calls were being recorded, in violation of California Penal Code § 632.

63.    According to Erhart's whistleblower complaint, on December 19, 2013, Erhart and his manager, Jonathan Ball ("Ball") were summoned to a meeting with Defendant Bar-Adon, BofI's Chief Legal Officer. Erhart alleges that Defendant Bar-Adon instructed both employees to remove evidence of the violation of California Penal Code § 632 from the Structured Settlements and Lottery audit. Moreover, Erhart alleges that when Ball informed him that an

32

1    internal auditor could not do that, Defendant Bar-Adon instructed Erhart to mark
2    the entire report "Attorney Client Privileged," stating that the finding could be
3    discoverable in class action litigation against BofI and that the Company wanted
4    to prevent that.  In addition, Erhart alleges that defendant Bar-Adon instructed
5    Erhart not to speak to any employee in the Structured Settlements and Lottery
6    Department with whom he was friendly.

7         64.    On the same day, Erhart alleges that defendant Tolla, Senior Vice
8    President, instructed Erhart to never state in an audit report that BofI had violated
9    a federal or state law.

10        65.    Erhart also alleges that during January 2014, Thomas Constantine,
11   BofI's Chief Credit Officer, told Erhart, Ball, and others at a meeting that he
12   could not be responsible for any of BofI's numbers after they are turned over to
13   the Chief Financial Officer, defendant Micheletti.  Erhart alleges that Constantine
14   reiterated that he could not and would not vouch for the accuracy of the numbers
15   once they had been delivered to Defendant Micheletti. Erhart understood this
16   comment to mean that Constantine believed that Defendant Micheletti changed
17   the numbers after he received them.

18        66.    On February 5, 2014, BofI filed a quarterly report on Form 10-Q
19   with the SEC announcing the Company's financial and operating results for the
20   quarter ended December 31, 2013 (the "2014Q2 Form 10-Q").  The Form 10-Q
21   was prepared and signed by defendants Garrabrants and Micheletti, and reviewed
22   and approved by BofI's Board.  For the quarter, the Company reported net
23   income of $13.15 million, or $0.91 per diluted share, on net revenue of $38.37
24   million, compared to net income of $9.77 million, or $0.70 per diluted share, on
25   net revenue of $31.19 million for the same period in the prior year.

26        67.    The 2014Q2 Form 10-Q contained signed certifications pursuant to
27   SOX by the defendants Garrabrants and Micheletti which were identical to the
28

<div align="center">33</div>

certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form
10-Q (quoted *supra*), certifying that the financial information contained in the
2014Q2 Form 10-Q was accurate and disclosed any material changes to the
Company's internal control over financial reporting.

68.    On February 6, 2014, BofI filed Form 8-K with the SEC containing
an Investor Presentation concerning the Company's 2014Q2 financial and
operating results (the "2014Q2 Investor Presentation").  The Form 8-K and the
2014Q2 Investor Presentation were prepared and signed by Defendant Micheletti
and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and
- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

69.    On May 6, 2014, BofI filed a quarterly report on Form 10-Q with the
SEC announcing the Company's financial and operating results for the quarter
ended March 31, 2014 (the "2014Q3 Form 10-Q").  The Form 10-Q was
reviewed and approved by the Board, and prepared and signed by defendants
Garrabrants and Micheletti.  For the quarter, the Company reported net income of
$14.61 million, or $1.00 per diluted share, on net revenue of $40.88 million,
compared to net income of $10.40 million, or $0.74 per diluted share, on net
revenue of $33.04 million for the same period in the prior year.

70.    The 2014Q3 Form 10-Q contained signed certifications pursuant to
SOX by defendants Garrabrants and Micheletti which were identical to the
certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form

10-Q (quoted *supra*), certifying that the financial information contained in the 2014Q3 Form 10-Q was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

71.    On May 7, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's third quarter 2014 financial and operating results (the "2014 Q3 Investor Presentation").  The Form 8-K and the 2014 Q3 Investor Presentation were prepared and signed by defendant Micheletti, and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and
- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

72.    On August 7, 2014, BofI issued a press release and filed a Form 8-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2014 (the "2014 Form 8-K").  The Form 8-K and the accompanying press release were prepared by defendants Garrabrants and Micheletti, and signed by Micheletti.  For the quarter, the Company reported net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million, compared to net income of $11.13 million, or $0.78 per diluted share, on net revenue of $35.87 million for the same period in the prior year. For fiscal year 2014, the Company reported net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million, compared to net income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million for fiscal

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit C
170

year 2013.

73.    On August 28, 2014, BofI filed an annual report on Form 10-K with the SEC (the "2014 Form 10-K").  The Form 10-K Annual Report was prepared and signed by defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, and Ratinoff.   The 2014 Form 10-K reiterated the financial and operating results previously announced in the 2014 Form 8-K.

74.    Among other things, the 2014 Form 10-K described that the BofI Federal Bank was subject to extensive federal regulation, as follows:

**REGULATION OF BOFI FEDERAL BANK**

*General*.   As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC.   Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.   The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

*   *   *

*Anti-Money Laundering and Customer Identification*.   The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.   The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti- money laundering requirements.   In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

75.    The 2014 Form 10-K contained signed certifications pursuant to SOX by defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form

36

Exhibit O
171

10-Q (quoted *supra*), certifying that the financial information contained in the 2014 Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

76.     On September 3, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2014 Q4 financial and operating results (the "2014 Q4 Investor Presentation"). The Form 8-K and the 2014 Q4 Investor Presentation were prepared and signed by defendant Micheletti, and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and
- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

77.     On November 4, 2014, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "2015 Q1 Form 10-Q"). The Form 10-Q Quarterly Report was reviewed and approved by the Board, and prepared and signed by defendants Garrabrants and Micheletti. For the quarter, the Company reported net income of $17.84 million, or $1.20 per diluted share, on net revenue of $50.12 million, compared to net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million for the same period in the prior year.

78.     The 2015 Q1 Form 10-Q contained signed certifications pursuant to SOX by defendants Garrabrants and Micheletti which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form

Exhibit O
172

10-Q (quoted *supra*), certifying that the financial information contained in the 2015 Q1 Form 10-Q was accurate and disclosed that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

79.    On November 17, 2014, BofI filed a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2015 Q1 financial and operating results (the "2015 Q1 Investor Presentation").  Among other things, the 2015 Q1 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and
- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

80.    On or about November 21, 2014, Erhart alleges that he sent an e-mail to BofI's Chief Risk Officer, Thomas Williams, in preparation for the upcoming Enterprise Risk Management ("ERM") audit.  In this email, Erhart asked whether Williams thought BofI had a deposit concentration risk.  Erhart was concerned and reported that a mere four customers accounted for approximately 25% of total deposits, and nine customers accounted for approximately 40% of total deposits.

81.    On or about December 12, 2014, the SEC served a subpoena on BofI, requesting account-identifying information for a certain investment advisory firm with the initials ETIA LLC ("ETIA").

82.    On or about December 18, 2014, BofI responded to the SEC that it did not have any information regarding ETIA.

38

Exhibit C
173

83.    During January 2015, Erhart alleges that he became aware of the
SEC subpoena, and knew that BofI did indeed have a loan file containing
information regarding ETIA.  Erhart further learned that a file had been created in
response to the SEC subpoena, containing the information regarding ETIA.
Erhart learned from a BofI employee that she had informed the Bank's legal
department of the existence of the file on or about December 17, 2014, ***before*** the
Bank sent its response to the SEC denying the existence of any such files.

84.    Also during January 15, 2015, BofI's principal regulator, the OCC,
requested information on bank accounts at BofI with no Tax Identification
Numbers ("TINs").  BofI responded to the OCC that there were no accounts
without TINs.  Erhart had viewed a spreadsheet in the BSA folder disclosing
approximately 150–200 accounts where the borrowers did not have a TIN.

85.    Also during January 2015, Erhart alleges that he conducted a Loan
Origination Audit.  During the Loan Origination Audit, Erhart discovered that
BofI was making substantial loans to foreign nationals including Politically
Exposed Persons ("PEPs") in potential violation of BSA/KYC rules. Erhart was
able to readily uncover information that many of the borrowers were criminals
and other suspicious persons who put the Bank at high risk for violating the
BSA's Anti-Money Laundering Rules ("AML Rules"), as well as exposing BofI
to reputational risk.  The purpose of the AML Rules is to help detect and report
suspicious activity including the predicate acts to money laundering and terrorist
financing.  The PEPs included very high-level foreign officials from major oil-
producing countries and war zones.

86.    On January 29, 2015, BofI filed a quarterly report on Form 10-Q
with the SEC announcing the Company's financial and operating results for the
quarter ended December 31, 2014 (the "15Q2 Form 10-Q").  The Form 10-Q
Quarterly Report was reviewed and approved by the Board, and prepared and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit C
174

signed by defendants Garrabrants and Micheletti.  For the quarter, the Company reported net income of $19.37 million, or $1.26 per diluted share, on net revenue  of $54.81 million, compared to net income of $13.15 million, or $0.91 per diluted share, on net revenue of $38.37 million for the same period in the prior year.

87.    The 15Q2 Form 10-Q contained signed certifications pursuant to SOX by defendants Garrabrants and Micheletti, stating that the financial information contained in the 15Q2 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

88.    In or about February 2015, the OCC requested that BofI disclose all correspondence with federal and state banking agencies and law enforcement, including any and all subpoenas, criminal or otherwise.  BofI responded that it had not received any such documents for the review period in question. However, Erhart alleges that the Bank had a BSA spreadsheet Erhart had seen that identified many subpoenas, including from law enforcement agencies, grand juries, and even from the U.S. Department of the Treasury, of which OCC is a part.  Erhart also knew that the Bank indeed had been served with subpoenas.

89.    On March 2, 2015, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2015 Q2 financial and operating results (the "2015 Q2 Investor Presentation").  The Form 8-K was signed by defendant Micheletti, and the 2015 Q2 Investor Presentation was prepared by defendants Micheletti and Garrabrants, and presented by defendant Garrabrants. Among other things, the 2015 Q2 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

40

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

90. On April 30, 2015, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "2015 Q3 Form 10-Q"). The Form 10-Q Quarterly Report was reviewed and approved by the Board, including defendant Dada (who had joined the Board effective January 22, 2015), and prepared and signed by defendants Garrabrants and Micheletti. For the quarter, the Company reported net income of $21.07 million, or $1.35 per diluted share, on net revenue of $59.03 million, compared to net income of $14.61 million, or $1.00 per diluted share, on net revenue of $40.88 million for the same period in the prior year.

91. The 2015 Q3 Form 10-Q contained signed certifications pursuant to SOX by defendants Garrabrants and Micheletti, stating that the financial information contained in the 2015 Q3 Form 10-Q was accurate and disclosed that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

92. On May 6, 2015, BofI filed Form 8-K with the SEC, signed by defendant Micheletti, containing an Investor Presentation concerning the Company's 2015 Q3 financial and operating results (the "2015 Q3 Investor Presentation"). The 2015 Q3 Investor Presentation was prepared by defendants Garrabrants and Micheletti and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

41

Exhibit C
176

- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and
- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

93.     On July 30, 2015, BofI issued a press release and filed a Form 8-K with the SEC, prepared by defendants Garrabrants and Micheletti, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2015 (the "2015 Form 8-K").  For the quarter, the Company reported net income of $24.40 million, or $1.54 per diluted share, on net revenue of $65.57 million, compared to net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million for the same period in the prior year.  For fiscal year 2015, the Company reported net income of $82.68 million, or $5.37 per diluted share, on net revenue of $229.54 million, compared to net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million for fiscal year 2014.

94.     On August 10, 2015, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2015 Q4 financial and operating results (the "2015 Q4 Investor Presentation").  The Form 8-K and the 2015 Q4 Investor Presentation were prepared by defendants Garrabrants and Micheletti and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";
- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";
- BofI is "a Top Quartile Performer Versus Bank Peer Group";
- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and
- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

42

Exhibit C
177

95. On August 22, 2015, *The New York Times* published an article concerning BofI's strong growth during defendant Garrabrants's tenure as CEO. The article was entitled "An Internet Mortgage Provider Reaps the Rewards of Lending Boldly" and stated, in relevant part:

> As the leader of Bank of Internet USA, based in San Diego, Mr. Garrabrants has been issuing big mortgages to high earners whom other lenders might not necessarily welcome with open arms. But because its financial performance has, in many ways, been spectacular, Bank of Internet has been turning heads — and setting off alarm bells as well. ***The bank has made loans to people who were later found to have run afoul of the law***, and Mr. Garrabrants has had to reassure investors that the bank has good relations with regulators.
>
> Bank of Internet's loans have increased fivefold, to nearly $5 billion, over the last five years — an almost unheard-of rate of growth for these tepid times in banking. Its losses from bad loans are practically nonexistent, and profits are surging, in part because it charges a much higher interest rate than the bigger banks operating in the same market.
>
> \* \* \*
>
> [Some investors] contend that the bank is attracting people who simply can't get cheaper loans — borrowers who may be more risky. ***Bank of Internet also makes large mortgages to wealthy foreigners, a practice that requires meticulous controls to comply with federal regulations aimed at stopping money laundering.*** The bank's critics wonder whether its compliance department is up to the task, though Mr. Garrabrants vigorously defended its practices. They also take issue with the bank's funding, contending that the lender is too dependent on customer deposits that could evaporate if turbulence returns to the banking world.
>
> \* \* \*
>
> Mr. Garrabrants, who has also worked at Goldman Sachs and McKinsey & Company, says the critics are spreading disinformation — and losing money — as they bet against his firm's soaring stock.

43

"Here's the problem for them:  They are going into an earnings juggernaut that has none of the things that they're talking about," Mr. Garrabrants said.  And he says the bank is as judicious as any other lender in picking its borrowers.  "It's about being thoughtful about what risks you take and watching them and being careful," he said, adding that Bank of Internet's deposits are a reliable source of funding.

* * *

Still**, Bank of Internet has lent money to some unsavory characters**.  For example, in 2012 it issued a $5 million mortgage to Purna Chandra Aramalla on a house in Sands Point, an affluent section of Long Island, according to local property records.  In 2013, federal law enforcement authorities in New York charged Mr. Aramalla with Medicare and Medicaid fraud.  In March, he was sentenced to three years in prison.

In mid-2014, Bank of Internet lent $1.05 million to Frederick Elm for a house in Fort Lauderdale, Fla., property records show.  In January, the Securities and Exchange Commission accused Mr. Elm of running a "Ponzi-like" scheme that had raised $17 million since November 2013.  Mr. Elm partly settled with the agency in June.

And in 2012, Bank of Internet issued a $1.26 million mortgage to Deepal Wannakuwatte, a Sacramento businessman who received a 20-year prison sentence last year for operating, for more than 10 years, what the F.B.I. called a Ponzi scheme.

* * *

**Then there are questions about Bank of Internet's marketing of itself as a lender to "foreign nationals."  It does not disclose exactly what proportion of its loans are made to foreigners**.  When asked, Mr. Garrabrants said it was "nowhere near the majority."  **Banks that do this sort of lending can expect extra scrutiny from federal regulatory agencies, which have punished banks for not properly applying bank secrecy and anti-money-laundering laws when vetting their international customers.**

In recent months there has been unrest in the division of Bank of Internet that deals with regulatory compliance.  **Earlier this year, a senior internal auditor, Jonathan Ball, and another employee in**

44

Exhibit C
179

*the division, Matt Erhart, left the bank. Mr. Ball did not respond to requests for comment. Mr. Erhart's lawyer, Carol L. Gillam, said that she had communicated with regulators, including the Office of the Comptroller of the Currency, the bank's primary regulator. She declined to provide details*.

Regulators have not publicly warned or penalized the bank for its lending to foreign nationals, and Mr. Garrabrants often sounds exasperated when defending that business. In his view, short-sellers had sought to stir up concerns about those loans to try to persuade regulators to stop Bank of Internet from acquiring parts of H&R Block's banking unit. The deal was concluded this month.

[Emphases added.]

96.     On August 26, 2015, BofI filed an annual report on Form 10-K with the SEC (the "2015 Form 10-K"). The Form 10-K Annual Report was prepared and signed by defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, Dada, and Ratinoff. The 2015 Form 10-K reiterated the financial and operating results previously announced in the 2015 Form 8-K.

97.     Among other things, the 2015 Form 10-K described that the BofI Federal Bank was subject to extensive federal regulation, as follows:

**REGULATION OF BOFI FEDERAL BANK**

*General*.    As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC. Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act. The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

\* \* \*

*Anti-Money Laundering and Customer Identification*. The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001. The USA

45

Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements. In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

98. The 2015 Form 10-K contained signed certifications pursuant to SOX which were signed by defendants Garrabrants and Micheletti, stating that the financial information contained in the 2015 Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

99. The statements referenced above which were taken from BofI's public SEC filings were materially false and misleading because the Individual Defendants caused the Company to fail to disclose material adverse facts about the Company's business, operations, prospects, and performance. Specifically, during the Relevant Period, the Individual Defendants made and/or caused the Company to make false and/or misleading statements and/or failed to disclose that: (a) the Company's internal controls were frequently disregarded; (b) BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws; (c) many BofI accounts lacked required tax identification numbers; (d) BofI fired an internal auditor who raised the foregoing issues to management and to federal regulators; and (e) as a result of the above, the Company's statements regarding its internal controls and other financial statements were materially false and misleading at all relevant times.

## III. The Emergence of the Truth

100. On October 13, 2015, after the close of trading on the stock market, *The New York Times* reported that Erhart, a former internal auditor at BofI, had filed a lawsuit in this Court against the Company for violating federal laws

46

Exhibit C
181

designed to protect whistleblowers.  The *Erhart* Complaint alleged, *inter alia*, that:

- Bank of Internet's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;
- Erhart had seen a spreadsheet that contained as many as 200 accounts without tax identification numbers, contrary to Bank of Internet's representations to the OCC, its primary regulator;
- Bank of Internet at times failed to provide full and timely information to regulators; and
- Erhart was fired after he revealed wrongdoing at Bank of Internet to management and federal regulators.

101.    On this news, shares of BofI fell $42.87, or 30.2%, to close at $99.13 on October 14, 2015.

102.    As a result of the Individual Defendants' wrongful acts and omissions, the Company has suffered significant losses and damages.

## DAMAGES TO BOFI

103.    BofI has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

104.    As a direct and proximate result of the Individual Defendants' conduct, BofI has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    legal fees, investigative fees and any potential settlements associated with the putative class action lawsuits filed against the Company for violations of the federal securities laws and for violation of the anti-retaliation provisions of the Dodd-Frank Act and SOX by Mr. Erhart;

(b)    loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

47

(c) amounts paid to outside lawyers, accountants, and investigators in connection with BofI's internal investigation; and

(d) loss of revenues and profits due to any subsequent restatements.

## DERIVATIVE ALLEGATIONS

105. Plaintiff brings this action for the benefit of BofI to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

106. BofI is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

107. Plaintiff is and has been a BofI shareholder during the entire Relevant Period because he has continuously owned BofI common stock since July 16, 2012. Plaintiff will adequately and fairly represent the interests of BofI in enforcing and prosecuting its rights.

108. BofI's Board at the time this action was initiated consisted of the following nine directors: Theodore C. Allrich, Nicholas A. Mosich, James S. Argalas, Gregory Garrabrants, John G. Burke, Paul J. Grinberg, James J. Court, Edward J. Ratinoff, and Uzair Dada. Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because, for the reasons set forth below, such demand would be a futile and useless act.

109. Where the board consists of nine directors, plaintiff need only show that five of the directors lack independence or face a substantial likelihood of liability to establish that a demand on the board would be futile. As shown below, the demand in this case would be futile because at least five of the Director Defendants lack independence and/or face a substantial likelihood of liability.

48

## I.    Demand Is Futile Because a Majority of the Director Defendants Lacks Independence and Faces a Substantial Likelihood of Liability

### A.    Garrabrants Lacks Independence

110.   Demand is futile as to Garrabrants because he lacks independence. As admitted by BofI in its 2015 Proxy Statement: "Mr. Garrabrants is not an independent director because he is our President and Chief Executive Officer." This decision as to Garrabrants's lack of independence was made by the Board itself.

111.   Garrabrants is also interested in this litigation for purposes of demand futility because he faces a substantial likelihood of liability for his individual misconduct.   Garrabrants is a named defendant in the currently-pending federal class actions, alleging that he violated § 10(b) of the Exchange Act and Rule 10b-5 when he disseminated or approved the false and misleading statements set forth above.

112.   If Garrabrants pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws.   As such, Garrabrants is fatally conflicted and, therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims.  Thus, demand is futile.

113.   Additionally, Garrabrants is interested because he prepared, signed, or caused the Company to issue many of the false and misleading statements.  In fact, Garrabrants signed the Company's SEC filings that contained false and misleading statements, including the Forms 10-K dated September 3, 2013, August 28, 2014, and August 26, 2015, and the Forms 10-Q dated November 5, 2013, February 5, 2014, May 6, 2014, November 4, 2014, January 29, 2015, and April 30, 2015.  Moreover, in conjunction with the filing of each of the above Forms 10-K and Forms 10-Q, Garrabrants signed certifications as required by SOX that, *inter alia*:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit C
184

(a) affirmed that he was "responsible for establishing and maintaining disclosure controls and procedures … and internal control over financial reporting" for BofI;

(b) certified that he has disclosed to BofI's auditors and the audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [BofI's] ability to record, process, summarize and report financial information," and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [BofI's] internal controls over financial reporting"; and

(c) certified that, to the best of his knowledge: (i) the Annual and Quarterly Reports did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (ii) "the financial statements, and other financial information included in [each] report, fairly present in all material respects the financial condition, results of operations and cash flows of [BofI]"; and (iii) the information contained in the Forms 10-K and Forms 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

The above representations were false and misleading (and thereby violated SOX) because, as noted above, during the Relevant Period, the Company's internal controls were frequently disregarded, and the Company's statements regarding its

50

internal controls and other financial statements were materially false and misleading.

114.   Garrabrants also participated in conference calls with analysts and investors during the Relevant Period.  Garrabrants therefore faces a substantial likelihood of liability for breaching his fiduciary duties.   Consequently, Garrabrants cannot disinterestedly consider a demand.

**B.    The Entire Board Faces a Substantial Likelihood of Liability for Retaliating Against Whistleblower Erhart in Violation of the Sarbanes-Oxley Act**

115.   As alleged in detail by BofI former audit employee Erhart in a whistleblower complaint pending in this Court (and of which the Court can take judicial notice), Erhart brought numerous specific violations of the law by BofI senior officers, including Tolla and Garrabrants, to the attention of the Company. After Erhart's good-faith whistleblower complaints were brushed aside by Tolla and Garrabrants, Erhart lodged his complaints with the OCC and SEC.

116.   Section 806 of the Sarbanes-Oxley Act prohibits employers such as BofI from discharging, constructively discharging, demoting, threatening, harassing, or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders. In addition, an employer may not discharge or in any manner retaliate against employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders.  If an employer takes retaliatory action against an employee because

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit C
186

he or she engaged in any of these protected activities, the employee can file a complaint with the Secretary, United States Department of Labor, Occupational Safety and Health Administration ("OSHA").

117. Erhart filed a complaint with OSHA regarding the retaliation he was faced with after reporting allegedly unlawful activities at BofI to federal agencies and regulators.

118. On March 12, 2015, defendant Bar-Adon met with Erhart and told him he was acting as General Counsel to BofI's Audit Committee, comprised of defendants Grinberg (Chairman), Mosich, and Argalas. Thus, Grinberg, Mosich, and Argalas had ***actual knowledge*** of Erhart's whistleblower complaints, and directed Bar-Adon to meet with Erhart regarding such activities, the culmination of these meetings ending in Mr. Erhart's termination.

119. As noted by BofI in its 2015 Proxy Statement, the Audit Committee "reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting." Therefore, a reasonable inference is that BofI's Audit Committee (Grinberg, Mosich, and Argalas) reported Erhart's complaints and whistleblowing activity to the full Board at the next meeting it held subsequent to March 12, 2015. During fiscal year 2015, BofI's Board met eight times; as a result, the Board was meeting on average approximately every six weeks. As a result, defendants Allrich, Garrabrants, Burke, Court, Ratinoff, and Dada received actual knowledge of Erhart's complaints and whistleblowing activity shortly after March 2015.

120. Despite having actual knowledge of Erhart's whistleblowing activity, and despite knowing that Dodd-Frank, Sarbanes-Oxley, and other laws prohibit retaliation against employees who report alleged wrongdoing, the Board authorized and approved the firing of Erhart on June 9, 2015.

121. All Board members thus face a substantial likelihood of liability for

52

breaching their fiduciary duties by causing the Company to violate the anti-retaliation provisions of Sarbanes-Oxley and Dodd-Frank.

122.   Moreover, all Board members can reasonably be charged with actual knowledge or reckless disregard of the unlawful activity alleged by Erhart during the Relevant Period because the wrongdoing concerned the Company's core (and only) business — consumer and business banking products and services.

## C.   Additional Reasons Demonstrating Futility of Demand

123.   The entire Board has demonstrated its inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein.   Every Board member has acted in violation of their fiduciary duties to the Company's shareholders, as described herein.

124.   For example, in addition to Garrabrants, defendants Allrich, Mosich, Argalas, Garrabrants, Burke, Grinberg, Court, and Ratinoff approved and signed the Company's SEC filings that contained false and misleading statements, including the Forms 10-K dated September 3, 2013, August 28, 2014, and August 26, 2015.[1]   Therefore, no reasonable stockholder would reasonably believe that a majority of the members of the Board would be able to independently and properly consider a demand in good faith and, accordingly, demand is excused.

125.   Every member of the Board declined to inform themselves of the misconduct complained of herein, even when they had a reasonable basis to believe that further investigation was warranted, as is evidenced for example by the Board's approval of the firing of Erhart just months after he filed whistleblower complaints against the Company with the OCC and SEC and claimed whistleblower protection.   Thus, demand is excused.   Intentionally

---

[1] Defendant Dada, who joined the Board on January 22, 2015, only signed the false and misleading Form 10-K dated August 26, 2015.

53

Exhibit C
188

1   causing the Company to violate the anti-retaliation protection of multiple federal

2   laws amply demonstrates the Board's disloyal and bad faith conduct.   Any

3   conduct evidencing bad faith and a lack of loyalty to the Company is outside the

4   protection of the business judgment rule and constitutes conduct that is non-

5   indemnifiable.  Thus, demand is excused as to the entire Board.

6       126.   Defendants Grinberg, Mosich, and Argalas are members of the Audit

7   Committee and therefore had a clear duty to be kept informed about the

8   Company's accounting procedures, and yet just as clearly they disregarded such

9   duties. defendants Grinberg, Mosich, and Argalas have violated the terms of the

10   Audit Committee Charter, which, among other things, required defendants

11   Grinberg, Mosich, and Argalas to "[r]eview the Company's annual audited

12   financial statements with management, including a review of major issues

13   regarding accounting and auditing principles and practices, and evaluate the

14   adequacy and effectiveness of internal controls that could significantly affect the

15   Company's financial statements, as well as the adequacy and effectiveness of the

16   Company's disclosure controls and procedures and management's reports

17   thereon."   As such, defendants Grinberg, Mosich, and Argalas are incapable of

18   disinterestedly and independently considering a demand to commence and

19   vigorously prosecute this action.

20       127.   Although the Company has been and will continue to be exposed to

21   significant losses due to the Individual Defendants' wrongdoing, the Board has

22   not filed any lawsuits against any directors or officers who were responsible for

23   the losses.  Thus, the Director Defendants are breaching their fiduciary duties to

24   the Company and face a substantial likelihood of liability for their breaches.

25   Indeed, the Director Defendants are more interested in protecting themselves than

26   they are in protecting the Company by bringing this action. Thus, demand on the

27   Board is futile.

28

54

## COUNT I
### For Breaches of Fiduciary Duties
### Against All Individual Defendants

128.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

129.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of BofI's business and affairs, particularly with respect to issues regarding the Company's compliance with laws.

130.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, and loyalty.

131.   The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of BofI.

132.   In breach of their fiduciary duties owed to BofI, the Individual Defendants willfully participated in misrepresentation of the Company's financial condition, failed to correct the Company's public statements, and failed to properly oversee BofI's business, rendering them personally liable to the Company for breaching their fiduciary duties.

133.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misrepresentations and omissions of the material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such  material  misrepresentations  and  omissions  were  committed

55

Exhibit C
190

Case 3:15-cv-02722-GPC-KSC  Document 22-2  Filed 08/19/16  PageID.313  Page 57 of 61 Page
194 of 268
Case 3:16-cv-00241-BEN-WVG  Document 1  Filed 01/29/16  Page 57 of 61

1  knowingly or recklessly.

2  134.  These actions were not a good-faith exercise of prudent business

3  judgment to protect and promote the Company's corporate interests.

4  135.  As a direct and proximate result of the Individual Defendants'

5  breaches of their fiduciary obligations, BofI has sustained and continues to

6  sustain significant damages.  As a result of the misconduct alleged herein, the

7  Individual Defendants are liable to the Company.

8  ## COUNT II
## For Abuse of Control
9  ## Against All Individual Defendants

10  136.  Plaintiff incorporates by reference and re-alleges each and every

11  allegation set forth above, as though fully set forth herein.

12  137.  The Individual Defendants' misconduct alleged herein constituted an

13  abuse of their ability to control and influence BofI, for which they are legally

14  responsible.

15  138.  As a direct and proximate result of the Individual Defendants' abuse

16  of control, BofI has sustained significant damages.  As a direct and proximate

17  result of the Individual Defendants' breaches of their fiduciary obligations of

18  candor, good faith, and loyalty, BofI has sustained and continues to sustain

19  significant damages.  As a result of the misconduct alleged herein, the Individual

20  Defendants are liable to the Company.

21  ## COUNT III
## For Unjust Enrichment
22  ## Against All Individual Defendants

23  139.  Plaintiff incorporates by reference and re-alleges each and every

24  allegation set forth above, as though fully set forth herein.

25  140.  By their wrongful acts and omissions, the Individual Defendants

26  were unjustly enriched at the expense of, and to the detriment of, BofI.

27  141.  During the Relevant Period, the Individual Defendants either

28
56

1  received bonuses, stock options, or similar compensation from BofI that was tied

2  to the financial performance of BofI or received compensation that was unjust in

3  light of the Individual Defendants' bad faith conduct.

4      142.  Plaintiff, as shareholder and representative of BofI, seeks restitution

5  from the Individual Defendants and seeks an order from this Court disgorging all

6  profits, benefits, and other compensation, including any performance-based

7  compensation, obtained by the Individual Defendants due to their wrongful

8  conduct and breach of their fiduciary duties.

9  <center>**PRAYER FOR RELIEF**</center>

10      WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and the

11  Company and against all Individual Defendants as follows:

12      A.  Declaring that Plaintiff may maintain this action on behalf of BofI

13  and that Plaintiff is an adequate representative of the Company;

14      B.  Declaring that the Individual Defendants have breached and/or aided

15  and abetted the breaches of their fiduciary duties to BofI;

16      C.  Determining and awarding to BofI the damages sustained by it as a

17  result of the violations set forth above from each of the Individual Defendants,

18  jointly and severally, together with pre-judgment and post-judgment interest

19  thereon;

20      D.  Directing BofI and the Individual Defendants to take all necessary

21  actions to reform and improve its corporate governance and internal procedures to

22  comply with applicable laws and to protect BofI and its shareholders from a

23  repeat of the damaging events described herein, including, but not limited to,

24  putting forward for shareholder vote the following resolutions for amendments to

25  the Company's Bylaws or Articles of Incorporation and the following actions as

26  may be necessary to ensure proper corporate governance policies:

27      (1)  a proposal to strengthen the Board's supervision of operations

28  <center>57</center>

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

<center>Exhibit O
192</center>

and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

        (2)    a provision to permit the shareholders of BofI to nominate at least two candidates for election to the Board;

        (3)    a proposal to strengthen the Board's supervision of the Company's CEO;

        (4)    a provision to appropriately test and then strengthen the internal audit and control functions; and

        (5)    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    E.    Awarding BofI restitution from the Individual Defendants, and each of them;

    F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    G.    Granting such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

    Plaintiff demands a trial by jury on all issues so triable.

Dated:  January 29, 2016        Respectfully submitted,

                        THE SHUMAN LAW FIRM
                        Kip B. Shuman (CA Bar No. 145842)

                              *s/ Kip B. Shuman*
                              Kip B. Shuman

                        1 Montgomery Street, #1800
                        San Francisco, CA 94104

58

Exhibit C
193

Tel: (303) 861-3003
Fax: (303) 536-7849
Email: kip@shumanlawfirm.com


THE SHUMAN LAW FIRM
Rusty E. Glenn (*pro hac vice to be
submitted*)
600 17th Street, Suite 2800 South
Denver, CO 80202
Tel: 303.861.3003
Fax: 303.536.7849
Email: rusty@shumanlawfirm.com

*Attorneys for Plaintiff*

59

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exhibit C
194

# B OF I HOLDING, INC. VERIFICATION

I, Zhang Yong, hereby verify under the penalty of perjury that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief based on the investigation of my counsel.

Date: __1/26/2016_____

_____
Zhang Yong

Exhibit C
195

# EXHIBIT D



**EXHIBIT D**

Exhibit D

1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   TRAVIS E. DOWNS III (148274)
    BENNY C. GOODMAN III (211302)
3   ERIK W. LUEDEKE (249211)
    655 West Broadway, Suite 1900
4   San Diego, CA  92101
    Telephone:  619/231-1058
5   619/231-7423 (fax)

6   Attorneys for Plaintiff

7

8                  UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10  LABORERS PENSION TRUST FUND )  Case No.  '16CV0259 BTM RBB
    OF NORTHERN NEVADA,         )
11  Derivatively on Behalf of BOFI )  VERIFIED SHAREHOLDER
    HOLDING, INC.,              )  DERIVATIVE COMPLAINT FOR
12                              )  BREACH OF FIDUCIARY DUTY,
                Plaintiff,      )  CORPORATE WASTE AND JUST
13                              )  ENRICHMENT
        vs.                     )
14                              )
    THEODORE C. ALLRICH,        )
15  NICHOLAS A. MOSICH, JAMES S. )
    ARGALAS, JOHN GARY BURKE,   )
16  PAUL J. GRINBERG, UZAIR DADA, )
    JAMES J. COURT, EDWARD J.   )
17  RATINOFF, GREGORY           )
    GARRABRANTS, ANDREW J.      )
18  MICHELETTI, ESHEL BAR-ADON, )
    JOHN C. TOLLA and DERRICK K. )
19  WALSH,                      )
                                )
20              Defendants,     )
                                )
21      – and –                 )
                                )
22  BOFI HOLDING, INC., a Delaware )
    corporation,                )
23                              )
                Nominal Party.  )  DEMAND FOR JURY TRIAL
24  _____ )

25

26

27

28

Exhibit D
197

**BRIEF OVERVIEW OF THE ACTION**

1.     This is a shareholder derivative action on behalf of nominal defendant BofI Holding, Inc. ("BofI" or the "Company") for breach of fiduciary duty, corporate waste and unjust enrichment.  Defendants are BofI's directors – Theodore C. Allrich, James S. Argalas, John Gary Burke, James J. Court, Uzair Dada, Paul J. Grinberg, Nicholas A. Mosich and Edward J. Ratinoff – and its top officers – Gregory Garrabrants, Andrew J. Micheletti, Eshel Bar-Adon, John C. Tolla and Derrick K. Walsh (together, "defendants").

2.     BofI is the holding company for BofI Federal Bank, a diversified financial services company that provides consumer and business banking products primarily through its branchless, low-cost distribution channels.  While under the stewardship of defendants, the Company embarked upon a public-relations campaign designed to artificially inflate the trading price of BofI's shares and its market capitalization.  More specifically, between at least September 4, 2013 to October 13, 2015, defendants caused BofI to make false and/or misleading statements and/or fail to disclose material adverse facts about the Company's business, operations, prospects and performance.  For example, defendants caused BofI to misrepresent and/or fail to disclose that: (i) BofI's internal controls were frequently disregarded; (ii) BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws; (iii) many BofI accounts lacked required tax identification numbers; (iv) in violation of the anti-retaliation laws contained in the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act" or "SOX") and the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), the Board caused the Company to fire an internal auditor who raised the foregoing issues with senior management and federal regulators; and (v) as a result of the above, the Company's statements regarding BofI's internal controls and other financial statements were materially false and misleading at all relevant times.

1    3.    Propelled by these false statements, the trading price of BofI shares

2    soared to over $142.00 per share.  While BofI's shares traded at artificially inflated

3    prices, defendants Allrich, Burke, Court, Grinberg, Micheletti and Ratinoff

4    collectively sold 84,063 shares of their personal BofI stock for unlawful insider

5    trading proceeds of more than $8.2 million.

6    4.    Defendants' scheme continued unabated until mid-October 2015.  Then,

7    on October 13, 2015, *The New York Times* published an article reporting that Matt

8    Erhart ("Erhart"), a former internal auditor at BofI, had filed a lawsuit against the

9    Company for violating the federal whistleblower laws.  More specifically, *The New*

10    *York Times* reported that Erhart's complaint alleged, among other things, that:

11    (i) BofI's borrowers included foreign nationals who should have been off-limits under

12    federal anti-money-laundering laws; (ii) Erhart had seen a spreadsheet that contained

13    as many as 200 accounts without tax identification numbers, contrary to BofI's

14    representations to the Office of the Comptroller of the Currency ("OCC"), its primary

15    regulator; (iii) BofI at times failed to provide full and timely information to regulators;

16    and (iv) BofI wrongfully terminated Erhart after he revealed wrongdoing at BofI to

17    management and federal regulators.

18    5.    On this news, the trading price of BofI shares collapsed, falling $42.87

19    per share, or 30%, to $99.13 per share, instantly wiping out more than $674 million in

20    market capitalization.  Worse yet, the Company has been named as a primary

21    defendant in a costly and expensive-to-defend class action lawsuit brought by BofI

22    shareholders for alleged violations of the federal securities laws.

23    6.    Nevertheless, the BofI Board of Directors ("Board") has not taken any

24    legal action against the directors and officers responsible for this debacle.  Nor will

25    they, because each of the defendants is interested in the outcome of any such legal

26    action.  Accordingly, by this action, plaintiff seeks to vindicate BofI's interests against

27    its wayward fiduciaries.

28

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction under 28 U.S.C. §1332(a)(1).  Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

8.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper in this Court under 28 U.S.C. §1391(b) because: (i) BofI maintains its principal place of business in this District; (ii) one or more of the defendants either reside(s) in or maintain(s) executive offices in this District; and (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' participation in the wrongful acts detailed herein, occurred in this District.

**THE PARTIES**

**Plaintiff**

10.     Plaintiff Laborers Pension Trust Fund of Northern Nevada ("Laborers") is and has been a shareholder of BofI since at least December 2012.  Laborers is a citizen of the State of Nevada.

**Nominal Defendant**

11.     Nominal defendant BofI is a Delaware corporation with its principal executive offices located at 4350 La Jolla Village Drive, Suite 140, San Diego, California 92122.  BofI is a citizen of the States of California and Delaware.

**Defendants**

12.     Defendant Theodore C. Allrich ("Allrich") has been a director of BofI since 1999.  He also has served on the Compensation and Nominating Committees of

1  the BofI Board.  During the relevant period, Allrich sold 11,319 shares of his personal

2  BofI stock for $1,119,607 in unlawful insider trading proceeds.  Allrich is a citizen of

3  the State of California.

4       13.    Defendant Nicholas A. Mosich ("Mosich") has been a director of BofI

5  since 2009.  He also has served on the Audit Committee of the BofI Board.  Mosich is

6  a citizen of the State of California.

7       14.    Defendant James S. Argalas ("Argalas") has been a director of BofI since

8  August 2011.  He also has served on the Audit Committee of the BofI Board.  Argalas

9  is a citizen of the State of California.

10       15.    Defendant John Gary Burke ("Burke") has been a director of BofI since

11  2005.  He also has served on the Compensation Committee of the BofI Board.  During

12  the relevant period, Burke sold 10,901 shares of his personal BofI stock for $855,572

13  in unlawful insider trading proceeds.  On information and belief, Burke is a citizen of

14  the States of California or Ohio.

15       16.    Defendant Paul J. Grinberg ("Grinberg") has been a director of BofI

16  since April 2004.  He also has served on the Audit, Compensation and Nominating

17  Committees of the BofI Board.  Grinberg is a citizen of the State of California.

18       17.    Defendant Uzair Dada ("Dada") has been a director of BofI since January

19  22, 2015.  Dada is a citizen of the State of California.

20       18.    Defendant James J. Court ("Court") has been a director of BofI since

21  April 2011.  During the relevant period, Court sold 2,851 shares of his personal BofI

22  stock for $268,498 in unlawful insider trading proceeds.  Court is a citizen of the State

23  of California.

24       19.    Defendant Edward J. Ratinoff ("Ratinoff") has been a director of BofI

25  since 2010.  He also has served on the Nominating Committee of the BofI Board.

26  During the relevant period, Ratinoff sold 3,988 shares of his personal BofI stock for

27  $397,504 in unlawful insider trading proceeds.  Ratinoff is a citizen of the State of

28  California.

20.     Defendant Gregory Garrabrants ("Garrabrants") has been a director of BofI since March 2008.  He also has been BofI's Chief Executive Officer ("CEO") and President since October 2007.  Garrabrants is a citizen of the State of California.

21.     Defendant Andrew J. Micheletti ("Micheletti") has been BofI's Chief Financial Officer ("CFO") and Executive Vice President since April 2001.  During the relevant period, Micheletti sold 19,000 shares of his personal BofI stock for $2,481,400 in unlawful insider trading proceeds.  Micheletti is a citizen of the State of California.

22.     Defendant Eshel Bar-Adon ("Bar-Adon") has been BofI's Chief Legal Officer and Executive Vice President since January 2011.  Bar-Adon is a citizen of the State of California.

23.     Defendant John C. Tolla ("Tolla") has been BofI's Chief Governance Risk and Compliance Officer since December 2013.  Tolla is a citizen of the State of California.

24.     Defendant Derrick K. Walsh ("Walsh") has been BofI's Chief Accounting Officer and Senior Vice President since February 27, 2015.  Prior to that, Walsh served as BofI's First Vice President, Financial Reporting, from July 8, 2013 until February 27, 2015.  Walsh is a citizen of the State of California.

### THE FIDUCIARY DUTIES OF
### BOFI'S OFFICERS AND DIRECTORS

25.     By reason of their positions as officers, directors and/or fiduciaries of BofI and because of their ability to control the business and corporate affairs of BofI, defendants owe BofI and its shareholders a fiduciary duty of loyalty and are required to use their utmost ability to control and manage BofI in an honest and lawful manner. Defendants are required to act in furtherance of the best interests of BofI and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

26.    Each officer and director of the Company owes to BofI and its shareholders the fiduciary duty to exercise good faith in the administration of the affairs of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.  Each officer and director of BofI had the duty and obligation to ensure the Company operated in compliance with all applicable laws and regulations, including, but not limited to, the federal securities laws.

27.    By reason of their positions as BofI's officers and directors and because of their ability to control BofI's business and corporate affairs, the defendants owed BofI and its shareholders fiduciary obligations of trust, loyalty, good faith and due care and were required to use their utmost ability to control and manage BofI in a fair, just, honest and equitable manner.  Defendants were required to act in furtherance of the best interests of BofI and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28.    Each defendant, as a director and/or officer of BofI, owes to BofI and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of fair dealing, in the administration of BofI's affairs and in the use and preservation of its property and assets.

29.    Defendants, because of their positions of control and authority as directors and officers of BofI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.    To discharge their duties, the defendants, as BofI's officers and/or directors, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By

1    virtue of such duties, defendants were required to, among other things: (i) ensure that

2    BofI was operated in a diligent, honest and prudent manner in accordance with its

3    bylaws and charter, as well as the laws and regulations of Delaware and the United

4    States; (ii) conduct the affairs of the Company in an efficient, business-like manner so

5    as to make it possible to provide the highest quality performance of BofI's business, to

6    avoid wasting the Company's assets, and to maximize the value of the Company's

7    stock; (iii) fully inform themselves as to how BofI conducted its operations, and, upon

8    receipt of notice or information of imprudent or unsound conditions or practices, to

9    make reasonable inquiry in connection therewith, and to take steps to correct such

10   conditions or practices; (iv) establish and maintain systematic and accurate records

11   and reports of the business and internal affairs of BofI and procedures for the

12   reporting of the business and internal affairs and to periodically investigate, or cause

13   independent investigation to be made of, said reports and records; (v) maintain and

14   implement an adequate and functioning system of internal legal, financial and

15   management controls, such that BofI's operations and financial statements comply

16   with all laws; (vi) exercise reasonable control and supervision over the public

17   statements made by the Company's officers and employees and any other reports or

18   information that the Company was required by law to disseminate; and (vii) examine

19   and evaluate any reports of examinations, audits or other financial information

20   concerning the financial affairs of the Company and to make full and accurate

21   disclosure of all material facts concerning, *inter alia*, each of the subjects and duties

22   set forth above.

23          31.    Each defendant, by virtue of his position as a director or officer, owed to

24   the Company and to its shareholders the highest fiduciary duties of loyalty and good

25   faith and the exercise of due care and diligence in the management and administration

26   of the affairs of the Company, as well as in the use and preservation of its property

27   and assets.  Defendants' misconduct complained of herein involves a knowing and

28   culpable violation of their obligations as BofI's directors and officers, the absence of

1  good faith on their part, or a reckless disregard for their duties to the Company and its

2  shareholders that the defendants were aware or should have been aware posed a risk of

3  serious injury to the Company.  The conduct of defendants who were officers of the

4  Company has been ratified by the remaining defendants who collectively comprised

5  BofI's Board at all relevant times.

6        32.    As senior executive officers and directors of a publicly traded company

7  whose common stock was registered with the SEC pursuant to the Securities

8  Exchange Act of 1934 (the "Exchange Act") and traded on NASDAQ, defendants had

9  a duty to disseminate accurate and truthful information with respect to the Company's

10  financial condition and performance, growth, operations, financial statements,

11  business, products, management, earnings and present and future business prospects;

12  and to correct any previously issued statements that had become materially misleading

13  or untrue, so that the market price of the Company's common stock would be based

14  upon truthful and accurate information.  Defendants' conduct in causing the Company

15  to make misrepresentations and omissions during the relevant period violated these

16  specific requirements and obligations.  Accordingly, the defendants breached their

17  fiduciary duties, including their duties of good faith, candor and loyalty.

18        33.    Defendants were required to exercise reasonable and prudent supervision

19  over the management, policies, practices and internal controls of the Company.  By

20  virtue of such duties, defendants were required to, among other things: (i) ensure that

21  the Company complied with its legal obligations and requirements, including acting

22  only within the scope of legal authority and disseminating truthful and accurate

23  statements to the investing public; (ii) conduct the affairs of the Company in an

24  efficient, business-like manner so as to make it possible to provide the highest quality

25  performance of its business, to avoid wasting the Company's assets, and to maximize

26  the value of the Company's stock; (iii) properly and accurately guide investors and

27  analysts as to the true financial condition of the Company at any given time, including

28  making accurate statements about the Company's financial results and internal

1  controls; (iv) remain fully informed as to how BofI conducted its operations, and,

2  upon receipt of notice or information of imprudent or unsound conditions or practices,

3  make reasonable inquiry in connection therewith, and take steps to correct such

4  conditions or practices and make such disclosures as are necessary to comply with

5  securities laws; (v) ensure that BofI was operated in a diligent, honest and prudent

6  manner in compliance with all applicable laws, rules and regulations; and (vi) refrain

7  from breaching their duty of loyalty to the Company to benefit themselves at the

8  expense of the Company.

9      34.    At all times relevant hereto, the defendants were the agents of each other

10  and were at all times acting within the course and scope of such agency.

11     35.    The Audit Committee Charter of the BofI Board confirms the oversight

12  responsibility of the directors.  More specifically, the Audit Committee Charter

13  provides, in relevant part, as follows:

**I.      Purposes, Authority and Funding**

The Audit Committee (the "Committee") of the Board of Directors
(the "Board") of BofI Holding, Inc., a Delaware corporation (collectively
with its subsidiaries, the "Company"), is appointed by the Board for the
purpose of overseeing the Company's accounting and financial reporting
processes, overseeing the audits of the Company's financial statements,
and overseeing and monitoring the role of the Internal Audit function.  In
so doing, the Committee shall endeavor to maintain free and open
communication between the Company's directors, independent auditor
and financial management.

                    *        *        *

**III.     Duties and Responsibilities**

In fulfilling its purposes as stated in this Charter, the Committee
shall undertake the specific duties and responsibilities listed below and
such other duties and responsibilities as the Board shall from time to
time prescribe, and shall have all powers necessary and proper to fulfill
all such duties and responsibilities.  Subject to applicable Board and
stockholder approvals, the Committee shall:

**A.      Financial Statement and Disclosure Matters**

1.      Review available policies and procedures adopted by the
Company to fulfill its responsibilities regarding the fair and accurate
presentation of financial statements in accordance with generally
accepted accounting principles and applicable rules and regulations of

the Securities and Exchange Commission (SEC) and the Financial
Industry Regulatory Authority (FINRA) applicable to Nasdaq-listed
issuers;

    2.    Oversee the Company's accounting and financial reporting
processes;

    3.    Oversee audits of the Company's financial statements;

    4.    Review with the Company's independent auditor,
management and internal auditors any consultation with other
accountants about significant auditing or accounting matters for which
the independent auditor has identified a concern regarding such matters;

    5.    Review and discuss reports from the Company's
independent auditor regarding: (a) all critical accounting policies and
practices to be used by the Company; (b) all alternative treatments of
financial information within GAAP that have been discussed with
management, including ramifications of the use of such alternative
disclosures and treatments and the treatment preferred by the
independent auditor; and (c) other material written communications
between the independent auditor and management, such as any
management letter or schedule of unadjusted differences;

    6.    Confirm that the Company's principal executive officer and
principal financial officer are satisfying the certification requirements of
Sections 302 and 906 of the Sarbanes-Oxley Act; review disclosure
made to the Audit Committee by the CEO and CFO about significant
deficiencies and material weaknesses in the design or operation of
internal control over financial reporting and any fraud involving
management or other employees who have a role in the Company's
internal control over financial reporting;

    7.    Review and discuss with management and the Company's
independent auditor the Company's financial statements (including
disclosures made under "Management's Discussion and Analysis of
Financial Condition and Results of Operations") and earnings releases
(including any pro forma or adjusted non-GAAP information) prior to
the filing with the SEC of any report containing such financial
statements or earnings releases, provided that, the Committee need not
discuss in advance each specific earnings release or each instance in
which the Company may provide earnings guidance;

    8.    If deemed appropriate, recommend to the Board that the
Company's audited financial statements be included in its annual report
on Form 10-K for the last fiscal year and related disclosures required to
be included in the annual proxy statement;

<div align="center">*   *   *</div>

**C.    Matters Regarding Oversight of the Company's Internal
Audit Function**

    21.    Review the appointment of, and any replacement of, the
Company's senior internal auditing executive;

22.    Review the significant reports to management prepared by the Company's internal auditing department and management's responses;

23.    Review and approve any outsourcing of the internal audit function to include selection of vendor, fees paid, and areas to be audited;

**D.    Matters Regarding Oversight of Compliance Responsibilities**

24.    Obtain reports from the Company's management, senior internal auditing executive and independent auditor that the Company's subsidiaries and foreign affiliated entities are in compliance with applicable legal requirements, including the Foreign Corrupt Practices Act;

25.    Establish procedures for: (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

26.    Review reports prepared by Management concerning all related party transactions for potential conflict of interest situations on an ongoing basis and approve all such transactions (if such transactions are not approved by another independent body of the Board);

27.    Obtain from the Company's independent auditor assurance that it has informed the audit committee of any illegal acts in compliance with Section 10A of the Act;

28.    Review and address any concerns regarding potentially illegal actions raised by the Company's independent auditor pursuant to Section 10A(b) of the Act, and cause the Company to inform the SEC of any report issued by the Company's independent auditor to the Board regarding such conduct pursuant to Rule 10A-1 under the Act;

29    Consider the risk of management's ability to override the Company's internal controls.

36.    BofI's Code of Ethics, which was approved by the Board, required defendants Garrabrants and Micheletti, in their capacities as BofI's principal executive officer and principal financial officer, respectively, to conduct the Company's business in accordance with the highest ethical standards.  More specifically, the Code of Ethics provides, in relevant part, as follows:

BOFI HOLDING, INC. and BOFI FEDERAL BANK

CODE OF ETHICS

FOR
PRINCIPAL EXECUTIVE OFFICER,
PRINCIPAL FINANCIAL OFFICER,
PRINCIPAL ACCOUNTING OFFICER and
PERSONS PERFORMING SIMILAR FUNCTIONS

## I.   GENERAL POLICY STATEMENT

It is the policy of BofI Holding, Inc. and BofI Federal Bank (together, the "Company") that the Principal Executive Officer, Principal Financial Officer, Principal Accounting Officer or controller and/or persons performing similar functions ("Principal Officers") will conduct business in accordance with the highest ethical standards in order to merit and maintain the complete confidence and trust of its customers, shareholders and the public in general.  Principal Officers must conduct their personal affairs and manage their business transactions in a manner that does not result in adverse comments or criticism from the public or in any way damage the Company's reputation.  This policy addresses the requirements for conflicts of interest, full, fair and accurate disclosure of reports, compliance with applicable laws, an internal procedure for prompt reporting of violations to this code, and accountability for adherence to the code.  (See Item 406 of Regulation S-K, Item 406 of Regulation S-B, Sarbanes-Oxley Act.).

This Code of Ethics for Principal Officers is intended to supplement the provisions of the Company's Code of Conduct which is applicable to all Company officers and employees.

## II.   CODE OF ETHICS

A.   <u>Conflicts of Interest</u>.  It is the policy of the Company that all Principal Officers act in an honest and ethical manner, including the handling of actual or apparent conflicts of interest between personal and professional relationships.  The Company expects its Principal Officers to use good judgment and high ethical standards and to refrain from any form of illegal, dishonest or unethical conduct.  Additionally, Principal Officers may not personally, or cause anyone else to, influence, coerce, manipulate or mislead any accountant engaged in preparing an audit for the Company.

B.   <u>Full, Fair and Timely Disclosure</u>.  It is the policy of the Company that Principal Officers provide to shareholders and financial markets fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to the Securities Exchange Commission and other public communications, if applicable.  The Company realizes that only through such full, fair and timely disclosure can shareholders truly analyze the credibility of the Company.

C.   <u>Compliance with Applicable Governmental Laws and Regulations</u>.  Principal Officers must fully comply with the spirit and

intent of all applicable laws, regulations and corporate governance standards.

       D.    <u>Internal Reporting of Code Violations</u>.  The Company is committed to establishing procedures that will permit the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or accounting matters. The Principal Officers shall proactively promote ethical behavior, compliance with this Code of Ethics and compliance with the Code of Conduct.  The Company encourages Principal Officers and employees to talk to supervisors, managers, or other appropriate personnel when in doubt about the best course of action in a particular situation. Additionally, Principal Officers and other employees shall report violations of laws, rules, regulations or codes of business conduct to Mr. Paul Grinberg, Audit Committee Chairman, by telephone at (858) 309-6904, email at Paul.Grinberg@bofi.com.  The Company will not permit retaliation against any employee for reports of breaches of the Code of Ethics or the Code of Conduct made in good faith.

       E.    <u>Administration of the Code of Ethics</u>.   It is the responsibility of each Principal Officer to be familiar with the Company's Code of Ethics and the Code of Conduct.   The Audit Committee is expected to make every reasonable effort to ensure that the Principal Officers comply with the provisions of the Code of Ethics.

       Principal Officers who violate provisions of the Code of Ethics may be subject to discipline, up to and including, but not limited to, dismissal from employment.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.    In committing the wrongful acts complained of herein, defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of a common plan or design.  In addition to the wrongful conduct complained of herein giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their fiduciary duties.

38.    Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such action to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

39.     Based in La Jolla, California, BofI is the holding company for BofI Federal Bank, a nationwide bank that provides financing for single and multifamily residential properties, small-to-medium size businesses in target sectors, and selected specialty finance receivables.  Between at least September 4, 2013 and October 13, 2015, defendants caused BofI to embark upon an unlawful scheme designed to artificially inflate the trading price of the Company's shares and its market capitalization.

40.     Towards that end, on August 7, 2013, defendants caused BofI to announce its financial results for the fourth fiscal quarter and year ended June 30, 2013, in a Form 8-K filed with the SEC.  The Form 8-K was reviewed and approved by the Board.  For the quarter, the Company reported net income of $11.13 million, or $0.78 per diluted share, on net interest and non-interest income (together, "net revenue") of $35.87 million, compared to net income of $8.57 million, or $0.64 per diluted share, on net revenue of $26.55 million for the same period in the prior year. For fiscal year 2013, the Company reported net income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million, compared to net income of $29.48 million, or $2.33 per diluted share, on net revenue of $95.56 million for fiscal year 2012.  The August 7, 2013 Form 8-K further stated, in relevant part, as follows:

**BOFI Holding, Inc. Announces Record Fourth Quarter Net Income of $11.1 million**

*Q4 Diluted EPS Increases 21.9%; Full-Year Diluted EPS Increases 24.0%*

. . . BOFI Holding, Inc. ("BOFI"), parent company of BOFI Federal Bank (the "Bank"), today announced financial results for the fourth quarter and the fiscal year ended June 30, 2013.  Net income was a record $11,132,000, an increase of 30.0% over net income of $8,565,000 for the quarter ended June 30, 2012.  Earnings attributable to BofI's common stockholders were $11,055,000 or $0.78 per diluted share for the fourth quarter of fiscal 2013, an increase of 35.0% from $8,187,000 or $0.64 per diluted share for the fourth quarter of fiscal 2012.

Core earnings, which exclude the after-tax impact of gains and losses associated with our securities portfolio, increased 36.6% to $12,046,000 for the quarter ended June 30, 2013 compared to $8,817,000 for the quarter ended June 30, 2012.

\*    \*    \*

For the fiscal year ended June 30, 2013, net income was a record $40,291,000, an increase of 36.7% over net income of $29,476,000 for the fiscal year ended June 30, 2012. Earnings attributable to BOFI's common stockholders were $39,456,000 or $2.89 per diluted share for the fiscal year ended June 30, 2013, an increase of 39.9% from $28,205,000 or $2.33 per diluted share for the fiscal year ended June 30, 2012. Record earnings for the quarter and for the year ended June 30, 2013 were primarily the result of growth in both the Bank's loan portfolio and its fee income businesses.

"Although it is gratifying to report our sixth consecutive quarter of record earnings, I am most proud of our significant progress in diversifying our deposit base. We achieved significant growth in consumer and business checking account balances and successfully entered the prepaid sponsorship marketplace. In addition to significantly improving our deposit mix this fiscal year, we continue to diversify our lending businesses and develop new sources of fee income making our business more resilient to changes in market conditions," stated Mr. Greg Garrabrants, President and Chief Executive Officer. "Diluted earnings per share for the fiscal year ended June 30, 2013 grew 24.0% compared to fiscal 2012. The Company's return on average common stockholders' equity for fiscal 2013 increased to 17.57%, up from 16.95% for fiscal 2012 while also achieving 31.2% net loan growth and 29.5% asset growth during fiscal 2013. Our strong loan quality improved even more with net charge offs to average loans declining to 14 basis points for fiscal 2013, down from 35 basis points for fiscal 2012. Non-performing assets to total assets also decreased to 66 basis points at June 30, 2013, down from 77 basis points at June 30, 2012."

"Our Bank is well positioned for future growth with a robust loan pipeline including increased jumbo and multifamily mortgages as well as increased C & I loans when compared to the pipeline at the end of our March 31, 2013 quarter," continued Mr. Garrabrants. "To help fund our expected future growth, we anticipate the close of our announced acquisition of approximately $200 million in low-rate consumer deposits from the Principal Bank by the end of next quarter. Our Bank is also well positioned to deploy capital to grow our loan portfolio. The Bank's Tier 1 capital ratio was 8.63% at June 30, 2013 before considering $14.0 million in cash available at the holding company and before considering the approximately $43 million of common stock the holding company can issue 'at-the-market' through our ATM public offering commenced in March 2013."

**Other Highlights**:

- Total assets reached $3,090.8 million, up $703.9 million or 29.5% compared to June 30, 2012

- Loan portfolio grew by $536.4 million or 31.2% compared to June 30, 2012

- Loan originations increased by $743.1 million, up 53.2% compared to the year ended June 30, 2012

- Deposits grew by $476.9 million, or 29.5% compared to June 30, 2012

- Asset quality remains strong with total non-performing assets of 0.66% of total assets and non-performing loans equal to 0.80% of total loans at June 30, 2013

- Tangible book value increased to $19.16 per share, up $3.34 per share compared to June 30, 2012

41.     On September 4, 2013, defendants caused BofI to file its Annual Report on SEC Form 10-K for the fourth fiscal quarter and year ended June 30, 2013.  The Annual Report was reviewed and approved by the Board, signed by defendants Allrich, Argalas, Grinberg, Burke, Court, Garrabrants, Micheletti, Mosich and Ratinoff, and reiterated the Company's fourth fiscal quarter and year-end financial results reported on August 7, 2013.

42.     As to the regulatory environment surrounding BofI's business and operations, the Form 10-K stated, in relevant part, as follows:

**REGULATION OF BOFI FEDERAL BANK**

*General*.  As a federally-chartered savings and loan association whose deposit accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"), BofI Federal Bank is subject to extensive regulation by the FDIC and . . . the OCC.  Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.  The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

\*          \*          \*

*Anti-Money Laundering and Customer Identification*.  The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.  The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-

money laundering requirements. In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

43.    In addition, the Form 10-K included certifications pursuant to SOX signed by defendants Garrabrants and Micheletti certifying that the financial information contained in the 2013 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

44.    On or about September 23, 2013, Erhart, a former FINRA regulator, began working for BofI as an internal auditor, performing audits of a variety of aspects of BofI's operations.

45.    On November 5, 2013, defendants caused BofI to announce its financial results for the first quarter of fiscal 2014, ended September 30, 2013, in a Form 8-K filed with the SEC. The Form 8-K was reviewed and approved by the Board. For the quarter, the Company reported net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million, compared to net income of $8.99 million, or $0.67 per diluted share, on net revenue of $29.25 million for the same period in the prior year. The November 5, 2013 Form 8-K further stated, in relevant part, as follows:

### BofI Holding, Inc. Announces Record First Quarter Net Income, Up 35.5%

#### *Diluted EPS increases 26.9%; Assets Reach $3,284 Million*

. . . BofI Holding, Inc. ("BofI"), parent company of BofI Federal Bank (the "Bank"), today announced financial results for the first fiscal quarter ended September 30, 2013. Net income was a record $12.2 million, an increase of 35.5% over net income of $9.0 million for the quarter ended September 30, 2012. Earnings attributable to BofI's common stockholders were $12.1 million or $0.85 per diluted share for the first quarter of fiscal 2014, an increase of 26.9% from $8.9 million or $0.67 per diluted share for the first quarter ended September 30, 2012.

Core earnings, which exclude the after-tax impact of gains and losses associated with our securities portfolio, increased 31.4% to $12.0 million for the quarter ended September 30, 2013 compared to $9.2 million for the quarter ended September 30, 2012.

*         *         *

- 7 -

"We are pleased to report record earnings for the seventh consecutive quarter and continued best-in-class earnings per share growth driven by margin expansion, asset growth and steady non-interest income. Our single family, multifamily and commercial lending groups delivered healthy origination volumes this quarter and we ended the quarter with loan pipelines that are at or near record levels. Although mortgage banking revenue declined this quarter, our non-interest income held up well demonstrating the diversity and resiliency of our sources of non-interest income. We have an exciting pipeline of new prepaid sponsorship opportunities under contract or in advanced discussions. We recently crossed over the half a billion dollar mark in business deposits and, this quarter we completed our acquisition of approximately $173 million in deposits from Principal Bank including $142 million in checking, savings and money market accounts and $31 million in time deposit accounts, further bolstering our growing deposit base," stated Mr. Greg Garrabrants, President and Chief Executive Officer. "Diluted earnings per share for the quarter ended September 30, 2013 grew 26.9% compared to the first fiscal quarter last year. The Company's net interest margin increased 16 bps to 3.86% for the quarter ended September 30, 2013 over the prior year first quarter. Our strong loan quality continued its impressive improvement with annualized net charge offs to average loans declining to 2 basis points for the first quarter of fiscal 2014, down from 42 basis points for the first quarter of fiscal 2013. Non-performing assets to total assets also continued to decrease, coming from 82 basis points at September 30, 2012 down to 55 basis points at September 30, 2013."

**Other Highlights**:

- Total assets reached $3,284.2 million, up $666.9 million or 25.5% compared to September 30, 2012

- Loan portfolio grew by $520.0 million or 27.2% compared to September 30, 2012

- Loan originations for the three months ended September 30, 2013 were $657.4 million, up 23.0% compared to the quarter ended September 30, 2012

- Deposits grew by $340.0 million, or 18.3% compared to September 30, 2012

- Asset quality remains strong with total non-performing assets of 0.55% of total assets and non-performing loans equal to 0.63% of total loans at September 30, 2013

- Tangible book value increased to $20.11 per share, up $3.75 per share compared to September 30, 2012

46.     On November 5, 2013, defendants caused BofI to file its quarterly report on Form 10-Q with the SEC for the first quarter of fiscal 2014. The Form 10-Q was reviewed and approved by the Board, signed by defendants Garrabrants and

1    Micheletti, and reiterated the Company's first quarter fiscal 2014 financial results

2    reported on November 5, 2013.  In addition, the Form 10-Q included certifications

3    pursuant to SOX signed by defendants Garrabrants and Micheletti, certifying that the

4    financial information contained in the Form 10-Q was accurate and disclosed any

5    material changes to the Company's internal control over financial reporting.

6         47.    On December 4, 2013, defendants caused BofI to file a Form 8-K with

7    the SEC that included an investor presentation on the Company's first quarter fiscal

8    2014 financial results ("FY1Q14 Investor Presentation").  The FY1Q14 Investor

9    Presentation stated, in relevant part, as follows:

- "BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial . . .";

- ". . . and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- "BofI is a Top Quartile Performer Versus Bank Peer Group";

- "Our Business Model is More Profitable Because Our Costs are Lower"; and

- "Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

17        48.    On or about December 19, 2013, Erhart sent a request for an exit meeting

18   for the Structured Settlement and Lottery audit he was completing.  One of Erhart's

19   findings in the audit was that BofI's callers were not notifying people they called that

20   the calls were being recorded, a violation of California Penal Code §632.  Soon after

21   Erhart requested the exit meeting he and his manager Jonathan Ball ("Ball") were

22   summoned to a meeting with defendant Bar-Adon, BofI's Chief Legal Officer.

23   Defendant Bar-Adon instructed both employees to remove evidence of the violation of

24   California Penal Code §632 from the Structured Settlements and Lottery audit.  When

25   Ball informed him that Internal Audit could not do that, defendant Bar-Adon

26   instructed Erhart to mark the entire report "Attorney Client Privileged," stating that

27   the finding could be discoverable in class action litigation against BofI.  In addition,

28

1   defendant Bar-Adon instructed Erhart not to speak to any employee in the Structured

2   Settlements and Lottery department with whom he was friendly.

3        49.    On the same day, defendant Tolla, BofI's Senior Vice President,

4   instructed Erhart to never state in an audit report that BofI had violated a federal or

5   state law.

6        50.    In or about January 2014, Thomas Constantine, BofI's Chief Credit

7   Officer, told Erhart, Ball and others at a meeting that he was not responsible for any of

8   BofI's numbers after they were turned over to the CFO, defendant Micheletti.  He

9   reiterated that he could not and would not vouch for the accuracy of the numbers once

10  the CFO had them.

11       51.    On February 5, 2014, defendants caused BofI to announce its financial

12  results for the second quarter of fiscal 2014, ended December 31, 2013, in a Form 8-K

13  filed with the SEC.  The Form 8-K was reviewed and approved by the Board.  For the

14  quarter, the Company reported net income of $13.15 million, or $0.91 per diluted

15  share, on net revenue of $38.37 million, compared to net income of $9.77 million, or

16  $0.70 per diluted share, on net revenue of $31.19 million for the same period in the

17  prior year.  The February 5, 2014 Form 8-K further stated, in relevant part, as follows:

18   **BofI Holding, Inc. Announces Record Second Quarter
     Net Income, Up 34.7%**

19   ***Diluted EPS Increases 30.0%; Assets Increase to $3,568 Million***

20       . . . BofI Holding, Inc. ("BofI"), parent company of BofI Federal
     Bank (the "Bank"), today announced financial results for the second

21   fiscal quarter ended December 31, 2013.  Net income was a record $13.2
     million, an increase of 34.7% over net income of $9.8 million for the

22   quarter ended December 31, 2012.  Earnings attributable to BofI's
     common stockholders were $13.1 million or $0.91 per diluted share for

23   the second quarter of fiscal 2014, an increase of 38.6% from $9.4 million
     or $0.70 per diluted share for the second quarter ended December 31,

24   2012.

25       Core earnings, which exclude the after-tax impact of gains and
     losses associated with our securities portfolio, increased 36.8% to $13.8

26   million for the quarter ended December 31, 2013 compared to $10.1
     million for the quarter ended December 31, 2012.

27

28                        *       *       *

                          - 20 -

"Year over year our diluted earnings per share increased 30% for the quarter ended December 31, 2013, the eighth consecutive quarter of record earnings," noted Mr. Greg Garrabrants, President and Chief Executive Officer. "Our continued success is based on the strength and diversity of our deposit, lending and fee income businesses. This quarter our net interest margin reached 4.01% as our cost of funds continues to decline due to growth in core deposits and declines in higher-cost CDs and borrowings. Our strong asset quality became stronger as annualized net charge offs to average loans declined to 5 basis points for the second quarter of fiscal 2014, down from 13 basis points for the second quarter of fiscal 2013. Non-performing assets to total assets decreased to 49 basis points, down from 79 basis points at December 31, 2012 and down from 55 basis points at September 30, 2013. Our Bank's Tier 1 Leverage Ratio was 9.01% at December 31, 2013, up 51 basis points from the ratio at September 30, 2013 as a result of contributions to capital from quarterly earnings and our at-the-market issuance of $17.3 million of BOFI common stock at a weighted average price of $73.12 per share before commissions. We believe our Bank is well positioned for continued success in 2014."

**Other Highlights**:

- Total assets reached $3,568.3 million, up $694.0 million or 24.1% compared to December 31, 2012

- Loan portfolio grew by $622.0 million or 28.9% compared to December 31, 2012

- Loan originations for the three months ended December 31, 2013 were $787.6 million, up 28.6% compared to the quarter ended December 31, 2012

- Deposits grew by $434.8 million, or 22.1% compared to December 31, 2012

- Asset quality remains strong with total non-performing assets of 0.49% of total assets and non-performing loans equal to 0.58% of total loans at December 31, 2013

- Tangible book value increased to $21.82 per share, up $4.74 per share compared to December 31, 2012

- No material impact expected on the securities portfolio from implementation of the Volcker Rule

52.  On February 5, 2014, defendants caused BofI to file its quarterly report on Form 10-Q with the SEC for the second quarter of fiscal 2014. The Form 10-Q was reviewed and approved by the Board, signed by defendants Garrabrants and Micheletti, and reiterated the Company's second quarter fiscal 2014 financial results reported on February 5, 2014. In addition, the Form 10-Q included certifications

1   pursuant to SOX signed by defendants Garrabrants and Micheletti certifying that the

2   financial information contained in the Form 10-Q was accurate and disclosed any

3   material changes to the Company's internal control over financial reporting.

4          53.    On February 6, 2014, defendants caused BofI to file a Form 8-K with the

5   SEC that included an investor presentation on the Company's second quarter fiscal

6   2014 financial results ("FY2Q14 Investor Presentation"). The FY2Q14 Investor

7   Presentation stated, in relevant part, as follows:

- "BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial . . .";

- ". . . and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- "BofI is a Top Quartile Performer Versus Bank Peer Group";

- "Our Business Model is More Profitable Because Our Costs are Lower"; and

- "Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

15          54.    On May 6, 2014, defendants caused BofI to announce its financial results

16   for the third quarter of fiscal 2014, ended March 31, 2014, in a Form 8-K filed with

17   the SEC. The Form 8-K was reviewed and approved by the Board. For the quarter,

18   the Company reported net income of $14.61 million, or $1.00 per diluted share, on net

19   revenue of $40.88 million, compared to net income of $10.40 million, or $0.74 per

20   diluted share, on net revenue of $33.04 million for the same period in the prior year.

21   The May 6, 2014 Form 8-K further stated, in relevant part, as follows:

### BofI Holding, Inc. Announces Record Third Quarter Net Income, Up 40.5%

### *Loan Portfolio Up 41.3%*

. . . BofI Holding, Inc. ("BofI"), parent company of BofI Federal Bank (the "Bank"), today announced financial results for the third fiscal quarter ended March 31, 2014. Net income was a record $14.6 million, an increase of 40.5% over net income of $10.4 million for the quarter ended March 31, 2013. Earnings attributable to BofI's common stockholders were $14.5 million or $1.00 per diluted share for the third quarter of fiscal 2014, an increase of 44.6% from $10.1 million or $0.74 per diluted share for the third quarter ended March 31, 2013.

Core earnings, a non-GAAP measure which excludes the after-tax impact of gains and losses associated with our securities portfolio, increased 47.1% to $15.0 million for the quarter ended March 31, 2014 compared to $10.2 million for the quarter ended March 31, 2013.

\*　　\*　　\*

"We posted our ninth consecutive quarter of record earnings and we made major steps this quarter towards accomplishing several of our long-term goals," noted Mr. Greg Garrabrants, President and Chief Executive Officer, and he continued. "First, our record earnings this quarter were the result of our efforts to expand organic loan growth and to diversify our lending through selected C&I loan types. Second, on April 10th we made a major step toward our goal to significantly expand our prepaid card sponsorship by announcing a definitive agreement with H&R Block, the world's largest consumer tax services provider, to acquire deposits and to provide H&R Block-branded financial services products including the Emerald Prepaid MasterCard, one of the top prepaid card programs in the nation. After approval by our regulators, the agreement to provide H&R Block branded services could increase revenue $26 to $28 million per year from all products planned to be offered in the agreements. Third, our efficiency ratio this quarter decreased to 35.1%, close to our long-term target of 35%, and helped us increase our return on average equity to 17.9% for three months ended March 31, 2014. As we invest in our people and infrastructure to prepare for our continued growth our efficiency ratio may increase from time to time, but our goal of creating greater scale economies in our business remains clear. Finally, net annualized charge-offs to average loans outstanding for the nine months ended March 31, 2014 was six basis points, on track for the lowest annual level since fiscal year ended June 30, 2008."

**Other Highlights**:

- Total assets reached $3,850.8 million, up $889.2 million or 30.0% compared to March 31, 2013

- Loan portfolio grew by $906.1 million or 41.3% compared to March 31, 2013

- Loan originations for the three months ended March 31, 2014 were $696 million, up 55.9% compared to the quarter ended March 31, 2013

- Deposits grew by $730 million, or 34.7% compared to March 31, 2013

- Asset quality remains strong with total non-performing assets of 0.50% of total assets and non-performing loans equal to 0.60% of total loans at March 31, 2014

- Tangible book value increased to $23.51 per share, up $5.34 per share compared to March 31, 2013

55.     On May 6, 2014, defendants caused BofI to file its quarterly report on Form 10-Q with the SEC for the third quarter of fiscal 2014.  The Form 10-Q was reviewed and approved by the Board, signed by defendants Garrabrants and Micheletti, and reiterated the Company's third quarter fiscal 2014 financial results reported on May 6, 2014.  In addition, the Form 10-Q included certifications pursuant to SOX signed by defendants Garrabrants and Micheletti certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

56.     On May 7, 2014, defendants caused BofI to file a Form 8-K with the SEC that included an investor presentation on the Company's third quarter fiscal 2014 financial results ("FY3Q14 Investor Presentation").   The FY3Q14 Investor Presentation stated, in relevant part, as follows:

- "BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial . . .";

- ". . . and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- "BofI is a Top Quartile Performer Versus Bank Peer Group";

- "Our Business Model is More Profitable Because Our Costs are Lower"; and

- "Our Asset Growth has been driven by Strong and Profitable Organic Loan Production."

57.     On August 7, 2014, defendants caused BofI to announce its financial results for the fourth fiscal quarter and year ended June 30, 2014, in a Form 8-K filed with the SEC.  The Form 8-K was reviewed and approved by the Board.  For the quarter, the Company reported net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million, compared to net income of $ 11.13 million, or $0.78 per diluted share, on net revenue of $35.87 million for the same period in the prior year.  For fiscal year 2014, the Company reported net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million, compared to net income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million for

1  fiscal year 2013.  The August 7, 2014 Form 8-K further stated, in relevant part, as

2  follows:

### BofI Holding, Inc. Announces Record Fourth Quarter Net Income of $16.0 million

*Q4 Diluted EPS Increases 39.7%; Full-Year Diluted EPS Increases 33.2%*

. . . BofI Holding, Inc. ("BofI"), parent company of BofI Federal Bank (the "Bank"), today announced financial results for the fourth quarter and the fiscal year ended June 30, 2014.  Net income was a record $16.0 million, an increase of 43.8% over net income of $11.1 million for the quarter ended June 30, 2013.  Earnings attributable to BofI's common stockholders were $15.9 million or $1.09 per diluted share for the fourth quarter of fiscal 2014, an increase of 44.1% from $11.1 million or $0.78 per diluted share for the fourth quarter of fiscal 2013.

Core earnings, a non-GAAP measure which excludes the after-tax impact of gains and losses associated with the Bank's securities portfolio, increased 33.7% to $16.1 million for the quarter ended June 30, 2014 compared to $12.0 million for the quarter ended June 30, 2013.

\*       \*       \*

For the fiscal year ended June 30, 2014, net income was a record $56.0 million, an increase of 38.9% over net income of $40.3 million for the fiscal year ended June 30, 2013.  Earnings attributable to BofI's common stockholders were $55.6 million or $3.85 per diluted share for the fiscal year ended June 30, 2014, an increase of 41.0% from $39.5 million or $2.89 per diluted share for the fiscal year ended June 30, 2013. Record earnings for the quarter and for the year ended June 30, 2014 were primarily the result of growth in the Bank's loan portfolio.

"Our loan portfolio originations increased 146% and 118% year-over-year for the fourth quarter and the fiscal year, respectively, generating higher net interest income and resulting in our tenth consecutive quarter of record net income," stated Mr. Greg Garrabrants, President and Chief Executive Officer.  Mr. Garrabrants continued, "Our portfolio loan growth is organic and reflects balanced growth in our single and multifamily mortgage and C&I lending products.   We achieved our loan growth without reducing our credit standards while improving our net interest margin.  Our diluted earnings per share increased 33.2% for the fiscal year ended June 30, 2014 and our return on equity and efficiency ratio improved to 17.9% and 37.6%, respectively, reflecting positive operating leverage in our highly efficient business model.  We also improved our loan quality as net charge offs to average loans decreased to 4 basis points for fiscal 2014, down from 14 basis points for fiscal 2013.  Non-performing assets to total assets also decreased to 46 basis points at June 30, 2014, down from 66 basis points at June 30, 2013.  Our bank is well positioned for continued growth as we recently opened another $50 million 'at-the-market' common stock

public offering which we will deploy as necessary. The Bank's Tier 1 capital ratio was 8.66% at June 30, 2014 up from 8.63% at June 30, 2013."

**Other Highlights**:

- Total assets reached $4,403.0 million, up $1,312.2 million or 42.5% compared to June 30, 2013

- Loan portfolio grew by $1,275.9 million or 56.5% compared to June 30, 2013

- Loan originations increased by $898.9 million, up 42.0% compared to the year ended June 30, 2013

- Deposits grew by $949.5 million, or 45.4% compared to June 30, 2013

- Net interest margin increased 16 bps to 3.95% compared to 3.79% for the year ended June 30, 2013

- Asset quality remains strong with total non-performing assets of 0.46% of total assets and non-performing loans equal to 0.57% of total loans at June 30, 2014

- Tangible book value increased to $25.27 per share, up $6.11 per share compared to June 30, 2013

58. On August 28, 2014, defendants caused BofI to file its Annual Report on Form 10-K with the SEC for the fourth fiscal quarter and year ended June 30, 2014. The Annual Report was reviewed and approved by the Board, signed by defendants Allrich, Argalas, Grinberg, Burke, Court, Garrabrants, Micheletti, Mosich and Ratinoff, and reiterated the Company's fourth fiscal quarter and year-end financial results reported on August 7, 2014.

59. As to the regulatory environment surrounding BofI's business and operations, the Form 10-K stated, in relevant part, as follows:

**REGULATION OF BOFI FEDERAL BANK**

*General*. As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC. Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act. The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

\*   \*   \*

***Anti-Money Laundering and Customer Identification***. The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001. The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements. In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

60.   In addition, the Form 10-K included certifications pursuant to SOX signed by defendants Garrabrants and Micheletti certifying that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61.   On September 3, 2014, defendants caused BofI to file a Form 8-K with the SEC that included an investor presentation on the Company's fiscal fourth quarter 2014 financial results ("FY4Q14 Investor Presentation"). The FY4Q14 Investor Presentation stated, in relevant part, as follows:

- "BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial . . .";

- ". . . and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- "BofI is a Top Quartile Performer Versus Bank Peer Group";

- "Our Business Model is More Profitable Because Our Costs are Lower"; and

- "Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

62.   On November 4, 2014, defendants caused BofI to announce its financial results for the first fiscal quarter ended September 30, 2014, in a Form 8-K filed with the SEC. The Form 8-K was reviewed and approved by the Board. For the quarter, the Company reported net income of $17.84 million, or $1.20 per diluted share, on net revenue of $50.12 million, compared to net income of $12.18 million, or $0.85 per

diluted share, on net revenue of $35.09 million for the same period in the prior year.

The November 4, 2014 Form 8-K further stated, in relevant part, as follows:

### BofI Holding, Inc. Announces Record First Quarter Net Income, Up 46.5%

. . . BofI Holding, Inc. ("BofI"), parent company of BofI Federal Bank (the "Bank"), today announced financial results for the first fiscal quarter ended September 30, 2014. Net income was a record $17.8 million, an increase of 46.5% over net income of $12.2 million for the quarter ended September 30, 2013. Earnings attributable to BofI's common stockholders were $17.8 million or $1.20 per diluted share for the first quarter of fiscal 2015, an increase of 46.8% from $12.1 million or $0.85 per diluted share for the first quarter ended September 30, 2013.

Core earnings, a non-GAAP measure which excludes the after-tax impact of gains and losses associated with our securities portfolio, increased 53.7% to $18.5 million for the quarter ended September 30, 2014 compared to $12.0 million for the quarter ended September 30, 2013.

*       *       *

"Robust loan growth, strong margins and continued operational efficiencies are reflected in our eleventh consecutive quarter of record results," noted Mr. Greg Garrabrants, President and Chief Executive Officer. "Our strong organic loan growth across single family jumbo mortgage, multifamily and C&I lending reflects the diversity of our asset generation capabilities and resulted in loan originations of over $1.0 billion for the quarter. Strong loan growth was achieved while maintaining high quality credit standards, as reflected in our 4 basis points of net charge-offs and 52 basis point non-performing asset ratio. Checking and savings deposits grew 91% year over year as we made further progress in shifting our funding mix towards core deposits. The continued success of our business banking group, which accounted for $1.7 billion of total deposits at September 30, 2014, positions us well to fund our future growth."

**Other Highlights**:

- Total assets reached $4,824.9 million, up $1,540.7 million or 46.9% compared to September 30, 2013

- Loan portfolio grew by $1,526.2 million or 62.7% compared to September 30, 2013

- Loan originations for the three months ended September 30, 2014 were $1,004.7 million, up 52.8% compared to the quarter ended September 30, 2013

- Deposits grew by $1,068.8 million, or 48.7% compared to September 30, 2013

- 28 -

1          •     Asset quality remains strong with total non-performing assets of
                 0.52% of total assets and non-performing loans equal to 0.62% of
2                total loans at September 30, 2014

3          •     Tangible book value increased to $27.52 per share, up $7.41 per
                 share compared to September 30, 2013
4
           63.     On November 4, 2014, defendants caused BofI to file its quarterly report
5
   on Form 10-Q with the SEC for the first quarter of fiscal 2015. The Form 10-Q was
6
   reviewed and approved by the Board, signed by defendants Garrabrants and
7
   Micheletti, and reiterated the Company's first quarter fiscal 2015 financial results
8
   reported on November 4, 2014. In addition, the Form 10-Q included certifications
9
   pursuant to SOX signed by defendants Garrabrants and Micheletti certifying that the
10
   financial information contained in the Form 10-Q was accurate and disclosed any
11
   material changes to the Company's internal control over financial reporting.
12
           64.     On November 17, 2014, defendants caused BofI to file a Form 8-K with
13
   the SEC that included an investor presentation on the Company's first quarter fiscal
14
   2015 financial results ("FY1Q15 Investor Presentation"). The FY1Q15 Investor
15
   Presentation stated, in relevant part, as follows:
16
           •     "BofI is Consistently Ranked among the Best of the Biggest Thrifts by
17               SNL Financial . . .";

18         •     ". . . and is also a Top Performer among the Broader Universe of All
                 Public Banks and Thrifts";
19
           •     "BofI is a Top Quartile Performer Versus Bank Peer Group";
20
           •     "Our Business Model is More Profitable Because Our Costs are Lower";
21               and

22         •     "Our Asset Growth has been Driven by Strong and Profitable Organic
                 Loan Production."
23
           65.     On or about November 21, 2014, Erhart sent an email to BofI's Chief
24
   Risk Officer, Thomas Williams ("Williams"), in preparation for an upcoming
25
   Enterprise Risk Management audit. Erhart asked whether Williams thought BofI had
26
   a deposit concentration risk. Erhart was concerned and reported that a mere four
27

28

customers accounted for approximately 25% of total deposits, and nine customers accounted for approximately 40% of total deposits.

66.     On or about December 12, 2014, the SEC served a subpoena on BofI requesting account-identifying information for a certain investment advisory firm with the initials ETIA LLC ("ETIA").  On or about December 18, 2014, BofI responded to the SEC that it did not have any information regarding ETIA.

67.     In or about early January 2015, Erhart became aware of the SEC subpoena and knew that BofI did indeed have a loan file containing information regarding ETIA.  Erhart further learned that a file had been created in response to the SEC subpoena containing the information regarding ETIA.  Erhart learned from a BofI employee that she had informed BofI's legal department of the existence of the file on or about December 17, 2014, before BofI sent its response to the SEC denying the existence of any such file.

68.     On or about January 15, 2015, BofI's principal regulator, the OCC, requested information on bank accounts with no tax identification numbers ("TINs").  BofI responded to the OCC that there were no accounts without TINs.  Erhart had viewed a spreadsheet in the Bank Secrecy Act ("BSA") folder disclosing approximately 150-200 accounts where the borrowers did not have TINs.

69.     In or about January 2015, Erhart conducted a Loan Origination audit.  During the Loan Origination audit, Erhart discovered that BofI was making substantial loans to foreign nationals, including "Politically Exposed Persons," in potential violation of the BSA's "Know-Your-Customer" rules.  Erhart was able to readily uncover information that many of the borrowers were criminals and/or other suspicious persons who put BofI at high risk for violating the BSA's anti-money-laundering rules, as well as exposing BofI to reputational risk.  The purpose of the anti-money-laundering rules is to help detect and report suspicious activity, including the predicate acts to money laundering and terrorist financing.  The Politically

1  Exposed Persons list included very high-level foreign officials from major oil-

2  producing countries and war zones.

3      70.     On January 29, 2015, defendants caused BofI to announce its financial

4  results for the second fiscal quarter ended December 31, 2014, in a Form 8-K filed

5  with the SEC.  The Form 8-K was reviewed and approved by the Board.  For the

6  quarter, the Company reported net income of $19.37 million, or $1.26 per diluted

7  share, on net revenue of $54.81 million, compared to net income of $13.15 million, or

8  $0.91 per diluted share, on net revenue of $38.37 million for the same period in the

9  prior year.  The January 29, 2015 Form 8-K further stated, in relevant part, as follows:

### BofI Holding, Inc. Announces Record Second Quarter Net Income, Up 47.3%

. . . BofI Holding, Inc. ("BofI"), parent company of BofI Federal Bank (the "Bank"), today announced financial results for the second fiscal quarter ended December 31, 2014.  Net income was a record $19.4 million, an increase of 47.3% over net income of $13.2 million for the quarter ended December 31, 2013.  Earnings attributable to BofI's common stockholders were $19.3 million or $1.26 per diluted share for the second quarter of fiscal 2015, an increase of 47.5% from $13.1 million or $0.91 per diluted share for the second quarter ended December 31, 2013.

Core earnings, a non-GAAP measure which excludes the after-tax impact of gains and losses associated with our securities portfolio, increased 40.6% to $19.4 million for the quarter ended December 31, 2014 compared to $13.8 million for the quarter ended December 31, 2013.

*       *       *

"We experienced another quarter of record earnings reaching a 19.1% return on equity and 34.6% efficiency ratio," noted Mr. Greg Garrabrants, President and Chief Executive Officer.  Mr. Garrabrants continued, "Although loan production was significantly outpaced by deposit generation this quarter, our loan production still generated strong asset and net interest income growth.  Our loan pipelines are robust and we remain optimistic about our ability to generate consumer and business deposits to fund this pipeline.  Over the last year, we made significant progress growing deposits, increasing total deposits by 67% compared to the same period a year ago while reducing our funding costs by 15 basis points.  We continue to invest in our technology and our people to ensure that we provide excellent customer service and a differentiated digital experience to our customers."

**Other Highlights**:

- Total assets reached $5,194.7 million, up $1,626.4 million or 45.6% compared to December 31, 2013

- Loan portfolio grew by $1,526.3 million or 55.0% compared to December 31, 2013

- Loan originations for the three months ended December 31, 2014 were $1,078.9 million, up 37.0% compared to the quarter ended December 31, 2013

- Deposits grew by $1,602.3 million, or 66.7% compared to December 31, 2013

- Asset quality remains strong with total non-performing assets of 0.69% of total assets and non-performing loans equal to 0.80% of total loans at December 31, 2014

- Tangible book value increased to $29.58 per share, up $7.76 per share compared to December 31, 2013

71.     On January 29, 2015, defendants caused BofI to file its quarterly report on Form 10-Q with the SEC for the second quarter of fiscal 2015. The Form 10-Q was reviewed and approved by the Board, signed by defendants Garrabrants and Micheletti, and reiterated the Company's second quarter fiscal 2015 financial results reported on January 29, 2015. In addition, the Form 10-Q included certifications pursuant to SOX signed by defendants Garrabrants and Micheletti certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

72.     In or about February 2015, the OCC requested that BofI disclose all correspondence with federal and state banking agencies and law enforcement, including any and all subpoenas, criminal or otherwise. BofI responded that it had not received any such documents for the review period in question. However, BofI had a BSA spreadsheet Erhart had seen that identified many subpoenas, including from law enforcement agencies, grand juries and even from the U.S. Department of the Treasury, of which OCC is a part. Erhart also knew that BofI had indeed been served with subpoenas.

73.     On March 2, 2015, defendants caused BofI to file a Form 8-K with the
SEC that included an investor presentation on the Company's second quarter fiscal
2015 financial results ("FY2Q15 Investor Presentation").   The FY2Q15 Investor
Presentation stated, in relevant part, as follows:

- "BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial . . .";

- "BofI is a Top Quartile Performer Versus Bank Peer Group";

- "Our Business Model is More Profitable Because Our Costs are Lower"; and

- "Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

74.     On April 30, 2015, defendants caused BofI to announce its financial
results for the third fiscal quarter ended March 31, 2015, in a Form 8-K filed with the
SEC.  The Form 8-K was reviewed and approved by the Board.  For the quarter, the
Company reported net income of $21.07 million, or $1.35 per diluted share, on net
revenue of $59.03 million, compared to net income of $14.61 million, or $1.00 per
diluted share, on net revenue of $40.88 million for the same period in the prior year.
The April 30, 2015 Form 8-K further stated, in relevant part, as follows:

**BofI Holding, Inc. Announces Record Third Quarter
Net Income, Up 44.2%**

. . . BofI Holding, Inc. ("BofI"), parent company of BofI Federal
Bank (the "Bank"), today announced financial results for the third fiscal
quarter ended March 31, 2015.  Net income was a record $21.1 million,
an increase of 44.2% over net income of $14.6 million for the quarter
ended March 31, 2014.    Earnings attributable to BofI's common
stockholders were $21.0 million or $1.35 per diluted share for the third
quarter of fiscal 2015, an increase of 44.5% from $14.5 million or $1.00
per diluted share for the third quarter ended March 31, 2014.

Core earnings, a non-GAAP measure which excludes the after-tax
impact of gains and losses associated with our securities portfolio,
increased 43.8% to $21.6 million for the quarter ended March 31, 2015
compared to $15.0 million for the quarter ended March 31, 2014.

*       *       *

"Strong loan growth, continued efficiency improvements and a
stable net interest margin resulted in another quarter of record earnings,"
stated Greg Garrabrants, President and Chief Executive Officer.  Mr.

Garrabrants continued, "Our deposit growth outpaced loan growth for a second consecutive quarter, with checking and savings account balances increasing by approximately 80% year-over-year and business banking deposits increasing to over half of our deposit base. This quarter marked our thirteenth consecutive quarter of record earnings. Looking forward, we believe our prospects for continued earnings growth are strong based on our near record loan pipeline, our opportunities to expand our business and consumer deposit base and our continued diversification and expansion of our lending and fee income businesses. Additionally, our announced transaction with H&R Block, that is pending regulatory approval, is expected to provide significant additional fee income, low cost deposits, and product distribution opportunities."

**Other Highlights**:

- Total assets reached $5,528.5 million, up $1,677.7 million or 43.6% compared to March 31, 2014

- Loan portfolio grew by $1,539.9 million or 49.7% compared to March 31, 2014

- Loan originations for the three months ended March 31, 2015 were $1,058.2 million, up 52.0% compared to the quarter ended March 31, 2014

- Deposits grew by $1,535.8 million, or 54.2% compared to March 31, 2014

- Asset quality remains strong with total non-performing assets of 0.65% of total assets and non-performing loans equal to 0.72% of total loans at March 31, 2015

- Return on average common stockholders' equity was 17.86% compared to 17.94% for the three months ended March 31, 2014

- Tangible book value increased to $32.03 per share, up $8.52 per share compared to March 31, 2014

75.     On April 30, 2015, defendants caused BofI to file its quarterly report on Form 10-Q with the SEC for the third quarter of fiscal 2015. The Form 10-Q was reviewed and approved by the Board, signed by defendants Garrabrants and Micheletti, and reiterated the Company's third quarter fiscal 2015 financial results reported on April 30, 2015. In addition, the Form 10-Q included certifications pursuant to SOX signed by defendants Garrabrants and Micheletti certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

76.     On May 6, 2015, defendants caused BofI to file a Form 8-K with the SEC
that included an investor presentation on the Company's third quarter fiscal 2015
financial results ("FY3Q15 Investor Presentation").     The FY3Q15 Investor
Presentation stated, in relevant part, as follows:

- "BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial . . .";

- ". . . and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- "BofI is a Top Quartile Performer Versus Bank Peer Group"; and

- "Our Business Model is More Profitable Because Our Costs are Lower."

77.     On July 30, 2015, defendants caused BofI to announce its financial
results for the fourth fiscal quarter and year ended June 30, 2015, in a Form 8-K filed
with the SEC.  The Form 8-K was reviewed and approved by the Board.  For the
fourth quarter, the Company reported net income of $24.40 million, or $1.54 per
diluted share, on net revenue of $65.57 million, compared to net income of $16.01
million, or $1.09 per diluted share, on net revenue of $45.22 million for the same
period in the prior year.  For fiscal year 2015, the Company reported net income of
$82.68 million, or $5.37 per diluted share, on net revenue of $229.54 million,
compared to net income of $55.96 million, or $3.85 per diluted share, on net revenue
of $159.55 million for fiscal year 2014.  The July 30, 2015 Form 8-K further stated, in
relevant part, as follows:

**BofI Holding, Inc. Announces Record Fourth Quarter
Net Income of $24.4 million**

***Q4 Diluted EPS Increases 41.3%; Full-Year Diluted EPS Increases
39.5%***

. . . BofI Holding, Inc. ("BofI"), parent company of BofI Federal
Bank (the "Bank"), today announced financial results for the fourth
quarter and the fiscal year ended June 30, 2015.  Net income was a
record $24.4 million, an increase of 52.4% over net income of $16.0
million for the quarter ended June 30, 2014.  Earnings attributable to
BofI's common stockholders were $24.3 million or $1.54 per diluted
share for the fourth quarter of fiscal 2015, an increase of 52.6% from
$15.9 million or $1.09 per diluted share for the fourth quarter of fiscal
2014.

- 35 -

1                                   *     *     *

2          For the fiscal year ended June 30, 2015, net income was a record
3   $82.7 million, an increase of 47.8% over net income of $56.0 million for
    the fiscal year ended June 30, 2014.  Earnings attributable to BofI's
    common stockholders were $82.4 million or $5.37 per diluted share for
4   the fiscal year ended June 30, 2015, an increase of 48.0% from $55.6
5   million or $3.85 per diluted share for the fiscal year ended June 30, 2014.
    Record earnings for the quarter and for the year ended June 30, 2015
6   were primarily the result of growth in the Bank's loan portfolio.

7          "We achieved our fourteenth consecutive quarter of record
    earnings through strong loan originations, fee income growth, and
8   disciplined expense management," stated Greg Garrabrants, President
    and Chief Executive Officer.  "Continued growth in our jumbo single
9   family mortgage portfolio, record production from our C&I lending
    group and strong deposit growth were contributing factors to our
10  increased net interest income this quarter.  We further diversified our
    funding mix, with checking and savings accounts increasing to
11  approximately 82% of our total deposits at June 30, 2015 compared to
    74% a year ago.  Our net interest margin increased to 3.97% this quarter
12  including the one-time divided received from the FHLB and would have
    been 3.85% without the one-time dividend, equal to last quarter and
13  within our target range.  Lastly, our efficiency ratio improved to 31.65%
    this quarter, or 32.47% without the one-time dividend, as our cost
14  management program's focus shifted to vendor cost reduction and
    productivity improvement."

15  **Other Highlights**:

16  •     Total assets reached $5,823.7 million, up $1,420.7 million or
          32.3% compared to June 30, 2014
17
18  •     Loan portfolio grew by $1,395.8 million or 39.5% compared to
          June 30, 2014

19  •     Loan originations increased by $1,281.4 million, up 42.2%
          compared to the year ended June 30, 2014
20
21  •     Deposits grew by $1,410.4 million, or 46.4% compared to
          June 30, 2014

22  •     Net interest margin remained relatively steady with a slight
          decrease of 3 bps to 3.92% compared to 3.95% for the year ended
23        June 30, 2014

24  •     Asset quality continues to be strong with total non-performing
          assets of 0.55% of total assets and non-performing loans equal to
25        0.62% of total loans at June 30, 2015

26  •     Tangible book value increased to $33.92 per share, up $8.65 per
          share compared to June 30, 2014

27

28

1       78.     On August 10, 2015, defendants caused BofI to file a Form 8-K with the

2 SEC that included an investor presentation on the Company's fourth quarter fiscal

3 2015 financial results ("FY4Q15 Investor Presentation"). The FY4Q15 Investor

4 Presentation stated, in relevant part, as follows:

5     •    "BofI is Consistently Ranked among the Best of the Biggest Thrifts by
           SNL Financial . . .",

6

7     •    ". . . and is also a Top Performer among the Broader Universe of All
           Public Banks and Thrifts";

8     •    "BofI is a Top Quartile Performer Versus Bank Peer Group";

9     •    "Our Business Model is More Profitable Because Our Costs are Lower";
           and

10

11     •    "Our Asset Growth has been Driven by Strong and Profitable Organic
           Loan Production."

12       79.     On August 22, 2015, *The New York Times* published an article on BofI

13 entitled "An Internet Mortgage Provider Reaps the Rewards of Lending Boldly." The

14 article stated, in relevant part, as follows:

15     As the leader of Bank of Internet USA, based in San Diego, Mr.
Garrabrants has been issuing big mortgages to high earners whom other

16 lenders might not necessarily welcome with open arms. But because its
financial performance has, in many ways, been spectacular, ***Bank of***

17 ***Internet has been turning heads – and setting off alarm bells as well.***
***The bank has made loans to people who were later found to have run***

18 ***afoul of the law, and Mr. Garrabrants has had to reassure investors***
***that the bank has good relations with regulators***.

19

20     Bank of Internet's loans have increased fivefold, to nearly $5
billion, over the last five years – an almost unheard-of rate of growth for

21 these tepid times in banking. Its losses from bad loans are practically
nonexistent, and profits are surging, in part because it charges a much

22 higher interest rate than the bigger banks operating in the same market.

23     "I am passionate about what we do here, and I believe in it," Mr.
Garrabrants said in one of several telephone interviews in recent weeks.

24 "We are proud of what we are doing here. ***We try to really run a good,***
***ethical shop, and I want people to know that***."

25                         *      *      *

26

27     [Some investors] contend that the bank is attracting people who
simply can't get cheaper loans – borrowers who may be more risky.

28 ***Bank of Internet also makes large mortgages to wealthy foreigners, a***

- 37 -

1    *practice that requires meticulous controls to comply with federal
     regulations aimed at stopping money laundering.  The bank's critics
2    wonder whether its compliance department is up to the task, though
     Mr. Garrabrants vigorously defended its practices.*  They also take issue
3    with the bank's funding, contending that the lender is too dependent on
     customer deposits that could evaporate if turbulence returns to the
4    banking world.

5                                  *        *        *

6            Mr. Garrabrants, who has also worked at Goldman Sachs and
     McKinsey & Company, says the critics are spreading disinformation –
7    and losing money – as they bet against his firm's soaring stock.

8            "Here's the problem for them: They are going into an earnings
     juggernaut that has none of the things that they're talking about," Mr.
9    Garrabrants said.  And *he says the bank is as judicious as any other
     lender in picking its borrowers*.  "It's about being thoughtful about what
10   risks you take and watching them and being careful," he said, adding that
     Bank of Internet's deposits are a reliable source of funding.

11
                                   *        *        *
12
             Still, *Bank of Internet has lent money to some unsavory
13   characters*.  For example, in 2012 it issued a $5 million mortgage to
     Puma Chandra Aramalla on a house in Sands Point, an affluent section
14   of Long Island, according to local property records.  In 2013, federal law
     enforcement authorities in New York charged Mr. Aramalla with
15   Medicare and Medicaid fraud.  In March, he was sentenced to three years
     in prison.
16
             In mid-2014, Bank of Internet lent $1.05 million to Frederic Elm
17   for a house in Fort Lauderdale, Fla., property records show.  In January,
     the Securities and Exchange Commission accused Mr. Elm of running a
18   "Ponzi-like" scheme that had raised $17 million since November 2013.
     Mr. Elm partly settled with the agency in June.
19
             And in 2012, Bank of Internet issued a $ 1.26 million mortgage to
20   Deepal Wannakuwatte, a Sacramento businessman who received a 20-
     year prison sentence last year for operating, for more than 10 years, what
21   the F.B.I. called a Ponzi scheme.

22           Mr. Garrabrants defended his practices in an email.  "*It is unfair
     to characterize our borrowers' profiles as different than other banks
23   that serve high-net-worth* customers," he said.  "You would easily be
     able to find lawsuits and an occasional legal issue if you scanned First
24   Republic or another bank with high-net-worth borrowers as well."

25                                 *        *        *

26           *Then there are questions about Bank of Internet's marketing of
     itself as a lender to "foreign nationals."  It does not disclose exactly
27   what proportion of its loans are made to foreigners*.  When asked,
     Mr. Garrabrants said it was "nowhere near the majority."  Banks that do
28   this sort of lending can expect extra scrutiny from federal regulatory

agencies, which have punished banks for not properly applying bank secrecy and anti-money-laundering laws when vetting their international customers.

In recent months there has been unrest in the division of Bank of Internet that deals with regulatory compliance. ***Earlier this year, a senior internal auditor, Jonathan Ball, and another employee in the division, Matt Erhart, left the bank. Mr. Ball did not respond to requests for comment. Mr. Erhart's lawyer, Carol L. Gillam, said that she had communicated with regulators, including the Office of the Comptroller of the Currency, the bank's primary regulator. She declined to provide details***.

Regulators have not publicly warned or penalized the bank for its lending to foreign nationals, and Mr. Garrabrants often sounds exasperated when defending that business. In his view, short-sellers had sought to stir up concerns about those loans to try to persuade regulators to stop Bank of Internet from acquiring parts of H&R Block's banking unit. The deal was concluded this month.

***And, according to Mr. Garrabrants, regulators have inspected Bank of Internet's processes for vetting loans to foreigners – and given the bank positive feedback. "We've had full regulatory review of that process and specific compliments on it***," he said, noting that the review took place after the two internal auditors left. "***It is beyond a nonissue***." The Office of the Comptroller of the Currency declined to comment on Bank of Internet or any interactions with the bank.

80.     On August 26, 2015, defendants caused BofI to file with the SEC its Annual Report on Form 10-K for the fourth fiscal quarter and year ended June 30, 2015. The Annual Report was reviewed and approved by the Board, signed by defendants Allrich, Argalas, Grinberg, Burke, Court, Dada, Garrabrants, Micheletti, Mosich, Ratinoff and Walsh, and reiterated the Company's fourth fiscal quarter and year-end financial results reported on July 30, 2015.

81.     As to the regulatory environment surrounding BofI's business and operations, the Form 10-K stated, in relevant part, as follows:

**REGULATION OF BOFI FEDERAL BANK**

***General***.  As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC. Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act. The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

        \*       \*       \*

    ***Anti-Money Laundering and Customer Identification***.  The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.  The USA PATRIOT Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements.  In February 2010, Congress re-enacted certain expiring provisions of the USA PATRIOT Act.

82.    In addition, the Form 10-K included certifications pursuant to SOX signed by defendants Garrabrants and Micheletti certifying that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

83.    Propelled by defendants' false and misleading earnings releases and SEC filings, the trading price of BofI shares skyrocketed to over $142.00 per share.  While BofI shares traded at artificially inflated prices, defendants Allrich, Burke, Court, Grinberg, Micheletti and Ratinoff, in breach of their fiduciary duties, sold 84,063 shares of their personal BofI stock for unlawful insider trading proceeds of more than $8.2 million.

84.    In truth, defendants' statements in ¶¶40-43, 45-47, 51-64, 70-71, 73-78 and 80-82 above were materially false and misleading when made and/or failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (i) BofI's internal controls were frequently disregarded; (ii) BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws; (iii) many BofI accounts lacked required TINs; (iv) in violation of the anti-retaliation laws contained in SOX and the Dodd-Frank Act, the Board caused the Company to fire Erhart, the internal auditor who raised the foregoing issues with senior management and federal regulators; and (v) as a result of the above, the Company's statements regarding BofI's internal

1    controls and other financial statements were materially false and misleading at all

2    relevant times.

3         85.    Defendants' scheme continued unabated until mid-October 2015.  Then,

4    on October 13, 2015, *The New York Times* published an article reporting that Erhart

5    had filed a lawsuit against the Company for, among other things, violating the federal

6    whistleblower laws.  More specifically, *The New York Times* reported that Erhart's

7    complaint alleged, among other things, that:  (i) BofI's borrowers included foreign

8    nationals who should have been off-limits under federal anti-money-laundering laws;

9    (ii) Erhart had seen a spreadsheet that contained as many as 200 accounts without

10   TINs, contrary to BofI's representations to the OCC, its primary regulator; (iii) BofI

11   times failed to provide full and timely information to regulators; and (iv) BofI

12   wrongful terminated Erhart after he revealed wrongdoing at BofI to management and

13   federal regulators.

14        86.    On this news, the trading price of BofI shares collapsed, falling $42.87

15   per share, or 30%, to $99.13 per share, instantly wiping out more than $674 million in

16   market capitalization.  Worse yet, the Company has been named as a primary

17   defendant in a costly and expensive-to-defend class action lawsuit brought by BofI

18   shareholders for alleged violations of the federal securities laws.

19                          **DAMAGE TO BOFI**

20        87.    As a direct and proximate result of defendants' misconduct, BofI has

21   been severely damaged and injured.  Moreover, defendants' faithless acts and/or

22   omissions have irreparably damaged BofI's credibility, corporate image and goodwill.

23   For at least the foreseeable future, BofI will suffer from what is known as the "liar's

24   discount," a term applied to the stocks of companies who have been implicated in

25   improper behavior and have misled the investing public, such that BofI's ability to

26   raise equity capital or debt on favorable terms in the future is now impaired.  Further,

27   as a direct and proximate result of defendants' misconduct, BofI has been named a

28

1 │ defendant in class action lawsuits for violations of the federal securities laws. *See,*
2 │ *e.g., Golden v. BofI Holding, Inc.*, No. 3:15-cv-02324-GPC-KSC (S.D. Cal.).

3 │ <center>**DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**</center>

4 │    88.    Defendants, by virtue of their positions as directors and/or officers, owed
5 │ to BofI and to its shareholders the fiduciary duties of loyalty and good faith and the
6 │ exercise of due care and diligence in the management and administration of the affairs
7 │ of BofI, as well as in the use and preservation of BofI's property and assets.  The
8 │ conduct of defendants complained of herein involves a knowing and culpable
9 │ violation of their obligations as directors and/or officers of BofI, the absence of good
10 │ faith on their part, or a reckless disregard for their duties to BofI and its shareholders
11 │ that defendants were aware or should have been aware posed a risk of serious injury to
12 │ BofI.

13 │    89.    Defendants each breached their duties of loyalty and good faith by
14 │ causing the Company to make false and/or misleading statements and/or failing to
15 │ disclose that: (i) the Company was doing business with foreign nationals who should
16 │ have been off-limits under federal anti-money-laundering laws; (ii) the Company had
17 │ as many as 200 customer accounts without TINs, contrary to BofI's representations to
18 │ the OCC, its primary regulator; (iii) as a result, the Company's revenue and financial
19 │ results were overstated; (iv) the Company's financial statements were not prepared in
20 │ accordance with GAAP; (v) the Company lacked adequate internal and financial
21 │ controls; and (vi) as a result of the foregoing, the Company's financial statements
22 │ were materially false or misleading at all relevant times.

23 │    90.    In addition, as a result of defendants' actions and course of conduct, the
24 │ Company is now the subject of class action lawsuits that allege violations of federal
25 │ securities laws, and a whistleblower lawsuit alleging violations of federal law.  As a
26 │ result, BofI has expended, and will continue to expend, significant sums of money to
27 │ rectify defendants' wrongdoing.

28 │

<center>- 42 -</center>

<center>**DERIVATIVE ALLEGATIONS**</center>

91. Plaintiff incorporates ¶¶1-90.

92. Plaintiff brings this action derivatively on behalf of BofI to redress injuries suffered, and to be suffered, by BofI as a result of defendants' breaches of fiduciary duty, corporate waste and unjust enrichment.

93. Plaintiff will adequately and fairly represent the interests of BofI in enforcing and prosecuting its rights.

94. Defendants Allrich, Argalas, Grinberg, Burke, Court, Dada, Mosich and Ratinoff breached their fiduciary duty of loyalty (and candor and good faith) and engaged in unlawful conduct. Accordingly, a pre-suit demand on the BofI Board to commence, let alone vigorously prosecute, this action is a useless and futile act, and is therefore excused.

95. First, the members of BofI's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

96. Second, the BofI Board participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from BofI's shareholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or board meetings, each of the defendants knew the adverse non-public information regarding BofI's business and financial condition. Pursuant to their specific duties as Board members, the members of the BofI Board

<center>Exhibit D- 3 -
240</center>

1   are charged with the management of the Company and to conduct its business affairs.

2   Defendants Allrich, Argalas, Grinberg, Burke, Court, Dada, Mosich and Ratinoff

3   breached their fiduciary duty of loyalty (and candor and good faith) owed to BofI and

4   its shareholders in that they caused false and misleading statements about BofI's

5   business and financial conditions to be made to BofI shareholders.  Thus, the BofI

6   Board cannot exercise independent objective judgment in deciding whether to bring

7   this action or whether to vigorously prosecute this action because each of its members

8   participated personally in the wrongdoing or are dependent upon other defendants

9   who did.

10       97.    Third, the acts complained of constitute violations of the fiduciary duty

11  of loyalty (and candor and good faith) owed by BofI's directors and these acts are

12  incapable of ratification.

13       98.    Fourth, the members of BofI's Board have benefited, and will continue to

14  benefit, from the wrongdoing herein alleged and have engaged in such conduct to

15  preserve their positions of control and the perquisites derived thereof, and are

16  incapable of exercising independent objective judgment in deciding whether to bring

17  this action.

18       99.    Fifth, any suit by the directors of BofI to remedy these wrongs would

19  likely further expose the liability of defendants under the federal securities laws,

20  which could result in additional civil and/or criminal actions being filed against one or

21  more of the defendants, thus, they are hopelessly conflicted in making any supposedly

22  independent determination whether to sue themselves.

23       100.   Sixth, BofI has been and will continue to be exposed to significant losses

24  due to the wrongdoing complained of herein, yet the BofI Board has not filed any

25  lawsuits against defendants or others who were responsible for that wrongful conduct

26  to attempt to recover for BofI any part of the damages BofI suffered and will suffer

27  thereby.

28

1      101.   Seventh, while in possession of adverse material non-public information

2 regarding BofI's business, financial condition and operations, defendants Allrich,

3 Burke, Court, Grinberg, Micheletti and Ratinoff collectively sold their personal BofI

4 shares for more than $8.2 million in unlawful insider trading proceeds. These

5 defendants profited from the misconduct particularized herein. Consequently, they are

6 not disinterested in the outcome of this litigation and a pre-suit demand is excused.

7      102.   Eighth, defendants Argalas, Grinberg and Mosich served as members of

8 the Audit Committee. As such, these defendants were responsible for reviewing the

9 adequacy of BofI's internal controls, reviewing the integrity of BofI's financial results

10 and financial statements, and reviewing BofI's earnings press releases. Nonetheless,

11 defendants Argalas, Grinberg and Mosich breached their fiduciary duties, along with

12 the entire BofI Board, by causing BofI to make false and misleading statements to

13 shareholders in the Company's earnings releases and SEC filings, as well as by failing

14 to ensure that adequate internal controls were in place at the Company's operations.

15 As a result, defendants Argalas, Grinberg and Mosich are not disinterested and face a

16 substantial likelihood of liability that renders a pre-suit demand upon them futile.

17      103.   Ninth, defendants Garrabrants and Micheletti are employed full time by

18 the Company, and have received and will continue to receive substantial monetary

19 compensation as a result of that employment. Defendants Garrabrants and Micheletti

20 will act to preserve and not threaten their positions of control and the perquisites

21 thereof, and are therefore incapable of exercising independent objective judgment in

22 deciding whether to bring this action.

23      104.   Tenth, demand is excused because the conduct alleged herein, including

24 the issuance of false and misleading statements to shareholders, was not the product of

25 a valid exercise of business judgment. Defendants' misconduct alleged herein,

26 including the issuance of false and misleading statements to shareholders, was so

27 egregious on its face that Board approval cannot meet the test of business judgment,

28

1   and a substantial likelihood of director liability for breach of fiduciary duty therefore
2   exists.

### DEMAND IS FUTILE BECAUSE A MAJORITY OF THE DIRECTOR DEFENDANTS LACK INDEPENDENCE AND FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

**Garrabrants Lacks Independence**

6      105.   Demand is futile as to Garrabrants because he lacks independence.  As
7   admitted by BofI in its 2015 Proxy Statement:  "Mr. Garrabrants is not an independent
8   director because he is our President and Chief Executive Officer."  This decision as to
9   Garrabrants' lack of independence was made by the BofI Board itself.

10     106.   Defendant Garrabrants is also interested in this litigation for purposes of
11  demand futility because he faces a substantial likelihood of liability for his individual
12  misconduct.  Garrabrants is a named defendant in the currently pending federal class
13  actions, alleging that he violated §10(b) of the Exchange Act and Rule 10b-5 when he
14  disseminated or approved the false and misleading statements set forth above.

15     107.   If Garrabrants pursued these derivative claims, then that would expose
16  his own misconduct in the class action for violations of the federal securities laws.  As
17  such, Garrabrants is fatally conflicted and, therefore, unable to render a disinterested
18  decision as to whether the Company should pursue these derivative claims.  Thus,
19  demand is futile.

20     108.   Additionally, Garrabrants is interested because he prepared, signed or
21  caused the Company to issue many of the false and misleading statements.  In fact,
22  Garrabrants signed the Company's SEC filings that contained false and misleading
23  statements, including the Forms 10-K dated September 4, 2013, August 28, 2014 and
24  August 26, 2015, and the Forms 10-Q dated November 5, 2013, February 5, 2014,
25  May 6, 2014, November 4, 2014, January 29, 2015 and April 30, 2015.

26     109.   Moreover, in conjunction with the filing of each of the above Forms 10-K
27  and Forms 10-Q, Garrabrants signed certifications as required by SOX that, *inter alia*:

28

(a)     affirmed that he was "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" for BofI;

(b)     certified that he had disclosed to BofI's auditors and the audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [BofI's] ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [BofI's] internal controls over financial reporting"; and

(c)     certified that, to the best of his knowledge:

(i)     the Forms 10-K and Forms 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading";

(ii)     "the financial statements, and other financial information included in [each] report, fairly present in all material respects the financial condition, results of operations and cash flows of [BofI]"; and

(iii)     the information contained in the Forms 10-K and Forms 10-Q "fairly present[s], in all material respects, the financial condition [and] results of operations" of the Company.

110.   The above representations were false and misleading (and thereby violated SOX) because, as noted above, during the relevant period, the Company's internal controls were frequently disregarded, and the Company's statements regarding its internal controls and other financial statements were materially false and misleading.

111.   Garrabrants also participated in conference calls with analysts and investors during the relevant period.   Garrabrants therefore faces a substantial

1  likelihood of liability for breaching his fiduciary duties.  Consequently, Garrabrants

2  cannot disinterestedly consider a demand.

3  **The Entire Board Faces a Substantial Likelihood
of Liability for Retaliating Against Whistleblower**

4  **Erhart in Violation of the Sarbanes-Oxley Act**

5  112.  As alleged in detail by BofI's former audit employee Erhart in a

6  whistleblower complaint pending in this Court (and of which the Court can take

7  judicial notice), Erhart brought numerous specific violations of the law by BofI senior

8  officers, including Tolla and Garrabrants, to the attention of the Company.  After

9  Erhart's good-faith whistleblower complaints were brushed aside by Tolla and

10  Garrabrants, Erhart lodged his complaints with the OCC and SEC.

11  113.  Section 806 of the Sarbanes-Oxley Act prohibits employers such as BofI

12  from discharging, constructively discharging, demoting, threatening, harassing, or in

13  any manner discriminating or retaliating against any employee because he or she

14  provided information, caused information to be provided, or assisted in an

15  investigation by a federal regulatory or law enforcement agency, or an internal

16  investigation by the company relating to alleged mail fraud, wire fraud, bank fraud,

17  securities fraud, violations of SEC rules and regulations, or violations of federal law

18  relating to fraud against shareholders.  In addition, an employer may not discharge or

19  in any manner retaliate against an employee because he or she filed, caused to be

20  filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire

21  fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or

22  violations of federal law relating to fraud against shareholders.  If an employer takes

23  retaliatory action against an employee because he or she engaged in any of these

24  protected activities, the employee can file a complaint with the Secretary, United

25  States Department of Labor, Occupational Safety and Health Administration

26  ("OSHA").

27  114.  Erhart filed a complaint with OSHA regarding the retaliation he faced

28  after reporting allegedly unlawful activities at BofI to federal agencies and regulators.

115.   On March 12, 2015, defendant Bar-Adon met with Erhart and told him he was acting as General Counsel to BofI's Audit Committee, comprised of defendants Grinberg (Chairman), Mosich and Argalas.  Thus, Grinberg, Mosich and Argalas had actual knowledge of Erhart's whistleblower complaints, and had directed Bar-Adon to meet with Erhart regarding such activities.

116.   As noted by BofI in its 2015 Proxy Statement, the Audit Committee "reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting." Therefore, a reasonable inference is that BofI's Audit Committee (Grinberg, Mosich and Argalas) reported Erhart's complaints and whistleblowing activity to the full Board at the next meeting it held subsequent to March 12, 2015.  During fiscal year 2015, BofI's Board met eight times; as a result, the Board was meeting on average approximately every six weeks.  As a result, defendants Allrich, Garrabrants, Burke, Court, Ratinoff and Dada received actual knowledge of Erhart's complaints and whistleblowing activity shortly after March 2015.

117.   Despite having actual knowledge of Erhart's whistleblowing activity, and despite knowing that the Dodd-Frank Act, the Sarbanes-Oxley Act and other laws prohibit retaliation against employees who report alleged wrongdoing, the Board authorized and approved the firing of Erhart on June 9, 2015.

118.   All Board members thus face a substantial likelihood of liability for breaching their fiduciary duties by causing the Company to violate the anti-retaliation provisions of the Sarbanes-Oxley Act and Dodd-Frank Act.

119.   Moreover, all Board members can reasonably be charged with actual knowledge or reckless disregard of the unlawful activity alleged by Erhart during the relevant period because the wrongdoing concerned the Company's core (and only) business – consumer and business banking products and services.

**Additional Reasons Demonstrating Futility of Demand**

120.   The entire Board has demonstrated its inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein. Every Board member has acted in violation of their fiduciary duties to the Company's shareholders, as described herein.

121.   For example, in addition to Garrabrants, defendants Allrich, Mosich, Argalas, Burke, Grinberg, Court, Dada, Walsh and Ratinoff approved and signed the Company's SEC filings that contained false and misleading statements, including one or more of the Forms 10-K dated September 4, 2013, August 28, 2014 and August 26, 2015.  Therefore, no reasonable stockholder would reasonably believe that a majority of the members of the Board would be able to independently and properly consider a demand in good faith and, accordingly, demand is excused.

122.   Each member of the Board declined to inform himself of the misconduct complained of herein, even when he had a reasonable basis to believe that further investigation was warranted, as is evidenced for example by the Board's approval of the firing of Erhart just months after he filed whistleblower complaints against the Company with the OCC and SEC and claimed whistleblower protection, Thus, demand is excused.  Intentionally causing the Company to violate the anti- retaliation protections of multiple federal laws amply demonstrates the Board's disloyal and bad faith conduct.  Any conduct evidencing bad faith and a lack of loyalty to the Company is outside the protection of the business judgment rule and constitutes conduct that is non-indemnifiable.  Thus, demand is excused as to the entire Board.

123.   Defendants Grinberg, Mosich and Argalas are members of the Audit Committee and therefore had a clear duty to be kept informed about the Company's accounting procedures, and yet just as clearly they disregarded such duties. Defendants Grinberg, Mosich and Argalas have violated the terms of the Audit Committee Charter, which, among other things, required defendants Grinberg, Mosich

1   and Argalas to "[r]eview the Company's annual audited financial statements with

2   management, including a review of major issues regarding accounting and auditing

3   principles and practices, and evaluate the adequacy and effectiveness of internal

4   control over financial reporting, as well as the adequacy and effectiveness of the

5   Company's disclosure controls and procedures and management's reports thereon."

6   As such, defendants Grinberg, Mosich and Argalas are incapable of disinterestedly

7   and independently considering a demand to commence and vigorously prosecute this

8   action.

9       124.   Plaintiff has not made any demand on shareholders of BofI to institute

10  this action since such demand would be a futile and useless act for the following

11  reasons:

12          (a)    BofI is a publicly traded company with more than 15.7 million

13  shares outstanding, and hundreds or thousands of shareholders;

14          (b)    Making demand on such a number of shareholders would be

15  impossible for plaintiff who has no way of finding out the names, addresses or phone

16  numbers of shareholders; and

17          (c)    Making demand on all shareholders would force plaintiff to incur

18  huge expenses, assuming all shareholders could be individually identified.

19                          **COUNT I**

20          **Against All Defendants for Breach of Fiduciary Duty**

21      125.   Plaintiff incorporates ¶¶1-124.

22      126.   By their wrongful acts and omissions, defendants breached their fiduciary

23  duties owed to BofI and its shareholders.  More specifically, defendants owe BofI and

24  its shareholders fiduciary duties, including the fiduciary duty of loyalty (and candor

25  and good faith).

26      127.   Here, defendants violated those fiduciary duties, including their fiduciary

27  duty of loyalty (candor and good faith), by, among other things, making false

28  statements and/or failing to disclose adverse, material non-public information

1    regarding BofI's business, financial condition and compliance policies and procedures

2    in the Company's SEC filings and press releases.

3         128.   As a result of defendants' fiduciary failure, BofI has been damaged.

4         129.   Plaintiff, on behalf of BofI, has no adequate remedy at law.

5                           **COUNT II**

6          **Against All Defendants for Corporate Waste**

7         130.   Plaintiff incorporates ¶¶1-124.

8         131.   By their wrongful acts and omissions, defendants wasted valuable

9    corporate assets by, among other things, causing BofI to pay improper compensation,

10    bonuses and other benefits to certain BofI executives who breached their fiduciary

11    duties owed to BofI and its shareholders.  BofI received no benefit from these

12    improper payments.  As a result, defendants damaged BofI and are liable to the

13    Company for corporate waste.

14         132.   Plaintiff, on behalf of BofI, has no adequate remedy at law.

15                          **COUNT III**

16          **Against All Defendants for Unjust Enrichment**

17         133.   Plaintiff incorporates ¶¶1-124.

18         134.   By their wrongful acts and omissions, defendants were unjustly enriched

19    at the expense of and to the detriment of BofI.

20         135.   All the payments and benefits provided to defendants were at the expense

21    of BofI.  The Company received no benefit from these payments.

22         136.   Plaintiff, on behalf of BofI, seeks restitution from defendants, and each of

23    them, and seeks an order of this Court disgorging all profits, benefits, and other

24    compensation obtained by these defendants, and each of them, from their wrongful

25    conduct and fiduciary breaches.

26         137.   Plaintiff, on behalf of BofI, has no adequate remedy at law.

27

28

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that defendants do not participate therein or benefit thereby;

B.    Directing all defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees and insider sales proceeds, and imposing a constructive trust thereon;

C.    Directing BofI to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, the federal securities laws and state corporation laws regarding fiduciary duties;

D.    Awarding punitive damages;

E.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 2, 2016                ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                       TRAVIS E. DOWNS III
                                       BENNY C. GOODMAN III
                                       ERIK W. LUEDEKE


                                       _s/Travis Downs III_
                                       TRAVIS E. DOWNS III

- 53 -

1

2    655 West Broadway, Suite 1900
     San Diego, CA  92101-8498
3    Telephone:  619/231-1058
     619/231-7423 (fax)

4    Attorneys for Plaintiff

5    I:\Admin\CptDraft\Derivative\CPT BofI.docx

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, James G. Mace, on behalf of the Laborers Pension Trust Fund of Northern Nevada, hereby

verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint for

Breach of Fiduciary Duty, Corporate Waste and Unjust Enrichment ("Complaint"), and that the fund

authorized the filing of the Complaint and that the foregoing is true and correct to the best of my

knowledge, information and belief.

Executed this 15 day of ___January___, 2016.

LABORERS PENSION TRUST FUND
OF NORTHERN NEVADA

By: _____
James G. Mace, Administrator

# EXHIBIT E

# EXHIBIT E

Exhibit E
253

# BOTTINI & BOTTINI, INC.

## FIRM RESUME

Bottini & Bottini, Inc. specializes in representing shareholders, whistleblowers, and consumers in high-stakes cases across the United States. The firm is highly experienced in the complex areas of antitrust class action litigation, securities class actions, shareholder derivative litigation, *qui tam* litigation on behalf of whistleblowers under the False Claims Act, and class actions under the Employee Retirement Income Security Act of 1974 ("ERISA").

The attorneys at Bottini & Bottini, Inc. have represented shareholders as lead counsel, co-lead counsel, or played a significant role in numerous high-profile cases in state and federal courts across the country. The firm's representative matters and the biographies of the firm's professionals are set forth below.

## Representative Matters

- *In re DRAM Antitrust Litigation*, MDL No. 1486 (N.D. Cal.). Mr. Bottini's prior firm, Wolf Haldenstein Adler Freeman & Herz LLP, served as Co-Lead Counsel for the Class, and Mr. Bottini was one of two lead partners for his firm on the case. After five years of litigation, $325,997,000 in settlements was obtained for the Class from nine defendants in one of the largest and most complex civil antitrust class actions in the country. Mr. Bottini was involved in all aspects of the case from the filing of the first complaint in 2002 to the final approval of the settlements which occurred in August 2007. Mr. Bottini was part of the trial team that was set to try the case against the two remaining defendants – Mosel Vitelic, Inc. and Nanya – when separate settlements with these last two defendants were reached on March 21, 2007, the day before oral argument was to be conducted on the motions *in limine* for trial. On August 15, 2007, the Honorable Phyllis J. Hamilton granted final approval to the settlements, stating:

  > I think I can conclude on the basis with my five years with you all, watching this litigation progress and seeing it wind to a conclusion, that the results are exceptional. The percentages, as you have outlined them, do put this [case] in one of the upper categories of results of this kind of [antitrust] class action. I am aware of the complexity . . . I thought that you all did an exceptionally good job of bringing to me only those matters that really required the Court's attention. You did an exceptionally good job at organizing and managing the case, assisting me in management of the case. There was excellent coordination between all the various different plaintiffs' counsel with your group and the other groups that are part of this litigation. . . . So my conclusion is the case was well litigated by both sides, well managed as well by both sides.

Bottini & Bottini, Inc. Firm Resume
Page 2

- *Intel x86 Microprocessor Cases*, JCCP Case No. 4443 (Cal. Super. Ct., County of Santa Clara).  In this complex class action antitrust case, the California Judicial Council coordinated the cases in Santa Clara before the Honorable Jack Komar.  By order dated May 15, 2007, Judge Komar issued an order denying defendants' demurrer to the complaint in its entirety.  During the several years the case has been pending, Judge Komar retired and the case is currently pending before Judge Kirwan.  Plaintiffs filed a motion for class certification on July 24, 2015.  The case is ongoing.

- *Cook v. McCullough*, No. 11 C 9119 (N.D. Ill.).  Bottini & Bottini, Inc. was lead counsel for the plaintiff in this shareholder derivative action on behalf of Career Education Corporation against its officers and directors.  By order dated August 13, 2012, the court denied Defendants' motion to dismiss on demand futility grounds.  *See* 2012 U.S. Dist. LEXIS 114621 (N.D. Ill. Aug. 13, 2012).  Bottini & Bottini, Inc. settled the case on October 25, 2013 for a cash payment of $20 million and significant corporate governance reforms at Career Education.

- *Robinson v. Audience*, No. 12-cv-232227 (Santa Clara, California Superior Court).  Bottini & Bottini is one of the counsel for plaintiffs in this securities class action alleging claims for strict liability under the Securities Act of 1933, arising out of an allegedly false and misleading Registration Statement and Prospectus for Audience's IPO.  By order dated September 3, 2013, Judge Kleinberg denied defendants' demurrer, denied defendants' motion to stay, and granted plaintiffs' motion to compel.  Plaintiffs moved for class certification, which motion was granted by Order dated Jan. 16, 2015. Recently, the case settled for $6,050,000.  By Order dated December 11, 2015, the Court granted preliminary approval to the settlement.

- *Wiley v. Envivio, et al.*, No. CIV517185 (San Mateo, California Superior Court).  Bottini & Bottini is one of the counsel for plaintiffs in this securities class action which asserts claims under the 1933 Act relating to Envivio's IPO.  In March 2014, Judge Marie Seth Weiner overruled defendants' demurrer, and subsequently granted plaintiffs' motion for class certification. Bottini & Bottini, Inc. assisted in procuring a settlement involving an $8.5 million cash payment which was approved by Judge Weiner on June 22, 2015.

- *Kaplan v. Fidelity National Home Warranty Co.*, No. 37-2008-00087962-CU-BT-CTL (Cal. Super. Ct., County of San Diego).  Bottini & Bottini, Inc. is Lead Counsel for the class in this consumer class action challenging defendant's conduct with respect to home warranty plans sold to consumers. By Order dated November 1, 2010, the Court certified the case as a class action.  Bottini & Bottini is presently preparing the case for trial.

- *Guzman v. Bridgepoint Education, Inc.*, Case No. 11-cv-0069-BAS (S.D. Cal.). Bottini & Bottini, Inc. is Lead Counsel for the plaintiffs in this consumer class action brought on behalf of former students of Ashford University, a school

Bottini & Bottini, Inc. Firm Resume
Page 3

owned and operated by Bridgepoint Education.  By Order dated May 30, 2012, the Court denied in substantial part defendants' motion to dismiss.  *See* 2012 WL 1944822.

- *Snellink v. Gulf Resources, Inc.*, No. 11-cv-03722-ODW (C.D. Cal.).  Bottini & Bottini, Inc. is co-lead counsel for the plaintiffs in this securities-fraud class action brought under the federal securities laws.  By order dated May 15, 2012, the court denied Defendants' motion to dismiss.  *See* 2012 U.S. Dist. LEXIS 67839 (C.D. Cal. May 15, 2012).  Bottini & Bottini, Inc. procured a settlement involving a $2.125 million cash payment which was approved by the Honorable Otis D. Wright II on January 18, 2014.

- *In re Brocade Communications Systems, Inc. Derivative Litigation*, No. 1:05cv41683 (Cal. Super. Ct., County of Santa Clara).  Mr. Bottini was Co-Lead Counsel in one of the highest-profile cases in the country challenging the award of backdated stock options by executive officers of Brocade.   The case was filed in May 2005 and, on August 8, 2008, Mr. Bottini was retained as co-counsel to Brocade by the Special Litigation Committee of the Board of Directors of Brocade to help litigate the company's claims against ten former officers and directors of the company.  An amended complaint was filed in federal court in San Francisco, and the case, *In re Brocade Communications Systems, Inc.*, No. 05-cv-2233 (N.D. Cal.), proceeded before the Honorable Charles R. Breyer in the United States District Court for the Northern District of California.  After litigation of the case for over five years, over $24 million was recovered for Brocade through the litigation.

- *Diaz v. First American Home Buyers Protection Corp.*, Case No. 13cv1585 BAS (JLB) (S.D. Cal.).  Bottini & Bottini is Co-Lead Counsel for the plaintiffs in this consumer class action case challenging the marketing and sale of home warranty plans by Defendant First American.  After the case was dismissed by the district court, Plaintiffs appealed and obtained reversal by the Ninth Circuit Court of Appeals.  *See Diaz v. First American Home Buyers Protection Corp.*, 732 F.3d 948 (9th Cir. 2013) (holding that an unaccepted offer of judgment pursuant to F.R.C.P. 68 for full amount of plaintiff's damages does not moot a plaintiff's case; 9th Circuit refused to follow other circuits which had held to the contrary).  The case has been remanded to the district court and Plaintiffs are continuing to litigate the case.

- *In re General Growth Properties, Inc. ERISA Litigation*, No. 08 C 6791 (N.D. Ill.).  Mr. Bottini and Mr. Chang were members of Plaintiffs' Executive Committee in this class action under ERISA seeking recovery of losses to General Growth Properties, Inc.'s employee retirement savings plans. Notwithstanding General Growth's filing for bankruptcy court protection, the Honorable James B. Zagel approved a settlement of $5.75 million on December 9, 2010.

Bottini & Bottini, Inc. Firm Resume
Page 4

- *Great Pacific Securities v. Barclays, et al.*, No. SACV 14-01210 (C.D. Cal.). Bottini & Bottini is Co-Lead Counsel for plaintiff in this class action lawsuit, which is brought under California law and which seeks to recover losses suffered by Barclays' customers whose trades were submitted for execution on Barclays' LX dark pool exchange. The case was transferred to the Southern District of New York in 2014, but in 2015 was transferred back to the Central District of California, where it is pending.

- *Schuh v. HCA Holdings, Inc.*, No. 3:11-cv-01033 (M.D. Tenn.). Bottini & Bottini is one of the counsel for the plaintiffs in this securities class action lawsuit seeking damages under the Securities Act of 1933 relating to HCA's IPO. By order dated May 28, 2013, the Court denied defendants' motion to dismiss. *See Schuh v. HCA Holdings, Inc.*, 947 F.Supp.2d 882 (M.D. Tenn. 2013). By order dated September 22, 2014, the Court granted Plaintiffs' motion for class certification. *See* Fed. Sec. L. Rep. (CCH) ¶98,187; 2014 WL 4716231 (M.D. Tenn.). In November 2014, the case settled for $215 million.

- *Karlin v. Alcatel*, No. SA CV 00-0214-DOC (C.D. Cal.). Mr. Bottini represented investors who received a tender offer for their shares from Alcatel S.A., a French telecommunications company. Mr. Bottini was the lead partner at his firm, Wolf Haldenstein Adler Freeman & Herz LLP, which served as Co-Lead Counsel for the Class. The case settled for $10.5 million on the eve of trial. *See* 2001 WL 1301216 (C.D. Cal. Aug. 13, 2001) (denying defendants' motion for summary judgment).

- *In re Novastar Home Mortgage, Inc. Mortgage Lending Practices Litigation*, No. CV05-1677, MDL Docket No. 1677 (S.D. Ga.). Mr. Bottini was one of the lead attorneys in this class action litigation under the Real Estate Settlement Procedures Act of 1974 ("RESPA"). After three years of litigation, Chief Judge William T. Moore entered a Final Judgment on September 18, 2007 approving a nationwide class action settlement of Plaintiffs' RESPA claims in which approximately $20 million in cash payments were made available to class members.

- *Reyes v. Zynga*, Inc., Case No. CGC-12-522876 (San Francisco Superior Court). Bottini & Bottini was co-lead counsel in this class action alleging violations of the Securities Act of 1933 on behalf of a class of investors who bought Zynga stock in the company's Secondary Offering, which closed on April 3, 2012. Bottini & Bottini successfully had the case remanded to state court after being removed to federal court by defendants (*see* 2013 WL 5529754). In addition, by Order dated August 26, 2013, the Court denied defendants' demurrer on subject matter grounds and held that plaintiffs could bring their '33 Act federal claims in state court and that SLUSA did not eliminate concurrent jurisdiction in state and federal court for '33 Act claims. By order dated September 29, 2014, the Court denied defendants' demurrer as to the sufficiency of the complaint's allegations and denied defendants' motion to stay the action.

Bottini & Bottini, Inc. Firm Resume
Page 5

- *Ferguson v. Corinthian Colleges, Inc.*, No. 11-cv-0127-DOC (AJWx) (C.D. Cal.). By order dated April 15, 2011, the Honorable David O. Carter appointed Mr. Bottini's prior firm, Chapin Fitzgerald & Bottini LLP, as Lead Counsel for the plaintiffs in this consumer class action challenging the enrollment practices at one of the country's largest for-profit online colleges. Bottini & Bottini Inc. is now lead counsel in the case. In later 2011 and early 2012, Judge Carter denied defendants' motion to compel arbitration as to plaintiffs' statutory claims for injunctive relief and then, after defendants appealed that portion of the order to the Ninth Circuit, denied defendants' motion to stay the case pending interlocutory appeal. *See* 2012 U.S. Dist. LEXIS 1358 (C.D. Cal. Jan. 5, 2012). The case was subsequently ordered to arbitration after the Ninth Circuit held that the arbitration agreement was enforceable.

- *In re SunPower Corp. Shareholder Derivative Litigation*, Master File No. C-09-05731 (N.D. Cal.). Bottini & Bottini is Co-Lead Counsel in this shareholder derivative litigation pending in San Francisco, which involves alleged accounting fraud and the restatement of the financial statements of SunPower Corporation. In October 2013, the case was settled in exchange for Sunpower's agreement to enact significant corporate governance reforms. By order dated August 22, 2014, the Court granted final approval to the settlement.

- *In re Pacific Capital Bancorp Derivative Litigation*, No. CIVRS1340306 (Cal. Super. Ct., County of Santa Barbara). Mr. Bottini and his prior firm, Chapin Fitzgerald Sullivan & Bottini LLP, were Lead Counsel in this shareholder derivative action which alleged breaches of fiduciary duties by certain officers and directors of Pacific Capital Bancorp. By Order dated October 8, 2010, the Court denied defendants' demurrer and held that Lead Plaintiff had adequately alleged demand futility under California law. After two years of litigation, in which over a million pages of documents were produced and reviewed and certain legal issues were litigated in the court of appeal, a substantial settlement was reached in which significant corporate governance changes were made to the Company, including changes to provide greater Board independence and accountability, strict internal financial controls, significant and substantial revisions to PCBC's credit policies (including the establishment of a new Credit Administration Group, the restriction of lending authority to specified senior loan officers, and enhanced new appraisal guidelines), new requirements obligating any individual desiring to serve on PCBC's board to own a minimum amount of stock in the Company, annual review of the Company's Code of Ethics, a new corporate governance training program for PCBC directors, new procedures to handle internal and external complaints from whistleblowers, annual review of all committee charters, and a vigorous insider trading policy. By Order dated January 19, 2012, the Court granted final approval of the settlement and entered a final judgment.

Bottini & Bottini, Inc. Firm Resume
Page 6

- *In re Herald, Primeo, and Thema Funds Securities Litigation*, No. 09 Civ.
  0289 (RMB) (S.D.N.Y.).  Bottini & Bottini, Inc. is Lead Counsel for the Thema
  Fund plaintiffs in this securities-fraud class action case under the PSLRA.
  The action is brought on behalf of all persons who invested in three Madoff
  "feeder funds" controlled by Bank Medici – the Herald, Primeo, and Thema
  funds.   After a partial $62.5 million settlement was obtained from one of
  numerous defendants, the Court dismissed the case on forum non conveniens
  grounds and denied preliminarily approval of the settlement.   Plaintiffs
  appealed to the Second Circuit, which affirmed the dismissal.

- *In re Level 3 Communications, Inc. Securities Litigation*, No. 09-cv-00200-
  PAB-CBS (D. Colo.).  Mr. Bottini and his prior firm, Johnson Bottini LLP,
  were Co-Lead Counsel in this securities-fraud class action asserting claims
  under Section 10(b) of the Securities Exchange Act of 1934.

- *In re UCBH Holdings, Inc. Deriv. Litig.,* No. CGC-09-492237 (San Francisco
  Superior Court).  Mr. Bottini and his prior firm, Johnson Bottini LLP, were
  Lead Counsel in this shareholder derivative action.   After the company
  declared bankruptcy, the Trustee asserted the claims contained in the lawsuit
  and eventually recovered $4 million from the defendants.

- *In re Arena Resources, Inc. Shareholder Litigation*, No. CV10-01069 (Nev.
  Dist. Ct., County of Washoe).  Mr. Bottini and his firm (Johnson Bottini LLP)
  served as one of the counsel for Plaintiffs in this shareholder class action
  challenging the acquisition of Arena Resources by SandRidge Energy, Inc.  As
  a result of the prosecution of the action, SandRidge raised the cash portion of
  the merger consideration by $2.00 per share, reduced the duration of the
  matching rights period, amended the terms of the non-solicitation clause in
  favor of Arena, reduced the amount of termination fees payable by a party
  from $50 million to $39 million, made additional material financial
  disclosures to Arena's shareholders and extended the date of the shareholder
  meeting to vote on the merger.

- *Bamboo Partners LLC v. The Robert Mondavi Corp.*, No. 26-27170 (Cal.
  Super. Ct., County of Napa).  Mr. Bottini represented the plaintiff common
  shareholders of the Mondavi Corporation in connection with the acquisition
  of the company by Constellation Brands, Inc.  Mondavi had a dual-class stock
  structure pursuant to which the common shareholders owned Class A shares
  and the Mondavi family members owned Class B shares.  Plaintiffs alleged
  that the insider Class B Mondavi family members improperly received more
  consideration for their shares than the common Class A public shareholders.
  The case was settled when defendants agreed to pay an additional $10.8
  million to the Class A shareholder plaintiffs.

- *In re Dole Shareholder Litigation*, No. B281969 (Cal. Super. Ct., County of
  Los Angeles).  In this mergers & acquisitions, going-private class action case,
  Mr. Bottini was one of two lead partners from his firm at the time (Wolf

Bottini & Bottini, Inc. Firm Resume
Page 7

Haldenstein Adler Freeman & Herz LLP), which served as Co-Lead Counsel
for the plaintiffs and was involved in all aspects of the litigation.  A $172
million settlement was obtained for the Class when the tender offer price was
increased by $4 per share.

- *In re Mentor Corp. Shareholder Litigation*, No. 1304537 (Superior Court for
  the State of California, County of Santa Barbara).  Mr. Bottini's prior firm,
  Johnson Bottini, LLP was appointed Co-Lead Counsel (along with Robbins
  Geller Rudman & Dowd LLP) in this shareholder class action case which
  challenged the fairness of the tender offer submitted by Johnson & Johnson
  for all the public shares of Mentor Corporation.

- *In re Sepracor, Inc. Shareholders Litigation*, C.A. No. 4871-VCS (Del. Ch.).
  Mr. Bottini and his prior firm, Johnson Bottini, LLP, served as Co-Lead
  Counsel in this shareholder class action challenging a $2.6 billion tender offer
  for all the outstanding shares of Sepracor, Inc. by Dainippon Sumitomo
  Pharma Co., Ltd. of Japan.  After moving for a preliminary injunction and
  obtaining expedited discovery, the case was settled by defendants agreeing to
  disclose substantial additional disclosures to Sepracor's shareholders
  regarding the financial analyses performed by Sepracor's investment bankers.
  The additional disclosures were filed via an Amendment No. 2 to the Schedule
  14D-9 filed on October 2, 2009.

- *In re Heritage Bond Litigation*, No. 02-MDL-1475-DT (C.D. Cal.).  In this
  class action bondholder litigation, which was ordered consolidated in Los
  Angeles by the Panel on Multidistrict Litigation, Mr. Bottini represented the
  outside director defendants.  After obtaining dismissal of most of the claims
  against the outside directors, Mr. Bottini obtained dismissal of the remaining
  claims against the outside directors for a combined payment of $102,500.
  The other defendants not represented by Mr. Bottini paid $27 million to settle
  the case.  *See* 2005 U.S. Dist. LEXIS 13627 (C.D. Cal. June 10, 2005).

- *In re Dell, Inc. Derivative Litigation*, No. 06-cv-0839 (W.D. Tex.).  By order
  dated March 1, 2007, the Honorable Sam Sparks appointed Mr. Bottini's prior
  firm, Johnson Bottini, LLP, Co-Lead Counsel in this shareholder derivative
  action. After approximately two years of litigation, the case settled while on
  appeal.

- *In re Sunterra Corp. Shareholder Litigation*, No. A525433 (Nev. Dist. Ct.,
  County of Clark).  Mr. Bottini was Co-Lead Counsel in this shareholder action
  which challenged the fairness and disclosures made in SEC filings pertaining
  to a buyout offer for the company and certain actions by present and former
  officers and directors of Sunterra.  The case was settled in 2007 when
  Sunterra agreed to file a supplemental filing with the United States Securities
  and Exchange Commission providing additional material information
  pertaining to the tender offer.

Bottini & Bottini, Inc. Firm Resume
Page 8

- *Deane v. Tombros* (*In re NPS Pharmaceuticals Securities Litigation*), No. 60913838 (Utah Dist. Ct., Salt Lake City).  Mr. Bottini and his firm, Johnson Bottini LLP, were Lead Counsel in this shareholder derivative action filed against current and former officers and directors of NPS Pharmaceuticals, Inc.  This matter was settled on terms that require the implementation of significant corporate therapeutic changes.

- *In re American Express ERISA Litigation*, No. 08 Civ. 10834 (JGK) (S.D.N.Y.).  In this class action brought under ERISA, Mr. Bottini is one of the lawyers representing the plaintiffs, who seek damages to the plan and plan participants due to breaches of fiduciary duties by the defendants.

- *In re PFF Bancorp, Inc. ERISA Litigation*, Master File No. 08-cv-1093 (C.D. Cal.).  Mr. Bottini was one of the attorneys for plaintiffs in this ERISA class action, which settled for $3 million, plus the allowance of a $400,000 bankruptcy claim, after the company declared bankruptcy.

- *In re Heelys Inc. Derivative Litigation*, No. 07-cv-1682 (N.D. Tex.).  Mr. Bottini's prior firm, Johnson Bottini, LLP, was Co-Lead Counsel in this shareholder derivative action filed against current and former officers and directors of Heelys Inc.  After more than a year of litigation and multiple mediations, this matter was settled in 2010 on terms that required the implementation of significant corporate therapeutic changes.

## Biographies of Attorneys

Francis A. Bottini, Jr.

Mr. Bottini practices in the areas of securities class actions, mergers & acquisitions, antitrust, consumer class actions, shareholder derivative litigation, and ERISA class action litigation.  Prior to forming Bottini & Bottini, Inc., Mr. Bottini was a partner at several firms, including Chapin Fitzgerald & Bottini LLP, Johnson Bottini, LLP, and Wolf Haldenstein Adler Freeman & Herz LLP.  Mr. Bottini has successfully achieved several multi-million dollar recoveries in securities, consumer, and antitrust class action cases throughout the country.  Mr. Bottini served as an Adjunct Professor of Business Law at the University of San Diego from 1995 to 1997.

Mr. Bottini is a 1991 graduate of St. Louis University (B.A. *magna cum laude*), and the University of San Diego School of Law (J.D. *cum laude* 1994), where he was the Lead Articles Editor of the San Diego Law Review and received the American Jurisprudence Award in Property.  Mr. Bottini is admitted to practice before the United States Supreme Court, all California state and federal courts, the United States Court of Appeals for the Second, Seventh, and Ninth Circuits,  the United States District Court for Colorado, and the United States District Court for the Northern District of Illinois. He is AV-rated by Martindale-Hubbell.

Bottini & Bottini, Inc. Firm Resume
Page 9

Mr. Bottini practices in the areas of securities litigation (including securities-fraud litigation under the PSLRA and Sarbanes-Oxley Act, mergers & acquisitions, and proxy litigation), antitrust, ERISA, consumer, and employment class action litigation. The following are some examples of Mr. Bottini's reported cases:

- *Diaz v. First American Home Buyers Protection Corp.*, 732 F.3d 948 (9th Cir. 2013) (holding that an unaccepted offer of judgment pursuant to F.R.C.P. 68 for full amount of plaintiff's damages does not moot a plaintiff's case; 9th Circuit refused to follow other circuits which had held to the contrary).

- *Reyes v. Zynga, Inc.,* No. 12–05065 JSW, 2013 WL 5529754 (N.D. Cal. Jan. 23, 2013) (granting plaintiff's motion to remand claims brought under the Securities Act of 1933 to state court).

- *Cook v. McCullough*, No. 11 C 9119, 2012, U.S. Dist. LEXIS 114621, 2012 WL 3488442 (N.D. Ill. August 13, 2012) (denying motion to dismiss in shareholder derivative action brought on behalf of Career Education Corporation against its officers and directors for breach of fiduciary duty);

- *Snellink v. Gulf Resources, Inc.*, No. 11-cv-03722-ODW, 2012 U.S. Dist. LEXIS 67839 (C.D. Cal. May 15, 2012) (denying motion to dismiss in securities-fraud class action complaint);

- *Smith v. Apollo Group, Inc.*, No. CV-11-0722-PHX-PGR, 2012 U.S. Dist. LEXIS 3672 (D. Ariz. Jan. 11, 2012) (denying defendants' motion to stay shareholder derivative case pending completion of an internal investigation by a Special Committee of the Board of Directors and also denying a stay of the case until resolution of a related securities-fraud class action case);

- *Ferguson v. Corinthian Colleges, Inc.*, No. SACV 11-0127 DOC (AJWx), 2012 U.S. Dist. LEXIS 1358 (C.D. Cal. Jan. 5, 2012) (denying defendants' motion to stay case pending interlocutory appeal of order denying motion to compel arbitration as to plaintiffs' claims for injunctive relief under California Business & Professions Code §17200 *et seq.*); 2011 U.S. Dist. LEXIS 119261 (C.D. Cal. Oct. 6, 2011) (denying in part a motion to compel arbitration);

- *Rosendahl v. Bridgepoint Education, Inc.*, No. 11cv0061 WQH (WVG), 2011 U.S. Dist. LEXIS 119735 (S.D. Cal. Oct. 17, 2011) (denying in part motion to dismiss consumer class action complaint alleging fraud and misrepresentation by for-profit college);

- *In re Coventry Healthcare, Inc. Securities Litigation*, No. 09-CV-2661-AW, 2011 U.S. Dist. LEXIS 34891 (D. Md. Mar. 31, 2011), *reh'g denied, Boyd v. Coventry Healthcare, Inc.*, 2011 U.S. Dist. LEXIS 135000 (D. Md. Nov. 18, 2011) (denying motion to dismiss in ERISA class action case);

Bottini & Bottini, Inc. Firm Resume
Page 10

- *Harrison v. XTO Energy, Inc.*, 705 F. Supp. 2d 572 (N.D. Tex. 2010) (denying defendants' motion to dismiss or stay action under Colorado River abstention doctrine);

- *In re Extreme Networks, Inc. Shareholder Derivative Litigation*, No. C-07-02268-RMW, 2009 U.S. Dist. LEXIS 111445 (N.D. Cal. Nov. 17, 2009), reconsideration denied by, 2010 U.S. Dist. LEXIS 32685 (N.D. Cal. Apr. 2, 2010) (denying motion to dismiss and upholding shareholder derivative complaint, finding that plaintiff had adequately alleged demand futility under Federal Rule of Civil Procedure 23.1);

- *In re Brocade Communications Systems, Inc. Derivative Litigation*, 615 F. Supp. 2d 1018 (N.D. Cal. 2009) (denying in part and granting in part motion to dismiss in shareholder derivative action, after Mr. Bottini was retained by the Company's Special Litigation Committee and an amended complaint was filed on behalf of the Company);

- *In re Dynamic Random Access Memory Antitrust Litigation*, No. M 02-1486, 2006 U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006) (granting motion for class certification in direct purchaser antitrust class action involving DRAM computer memory);

- *Karlin v. Alcatel*, No. SA CV 00-0214-DOC, 2001 WL 1301216 (C.D. Cal. Aug. 13, 2001) (denying defendants' motion for summary judgment);

- *In re Imperial Credit Industries, Inc. Securities Litigation*, No. CV 98-8842 SVW, 2000 WL 1049320 (C.D. Cal. Feb. 22, 2000) (denying defendants' motion to dismiss in a securities-fraud action under Section 10(b) of the Securities Exchange Act of 1934); and

- *In re USA Talks.com Securities Litigation*, No. 99-CV-0162-L(JA), 2000 WL 1887516 (S.D. Cal. Sept. 14, 2000) (denying defendants' motion to dismiss in 10b-5 case).

On April 18-20, 2005, Mr. Bottini gave a presentation on Securities Class Action Litigation at the 2nd Annual CFO Forum in Seoul, South Korea.

Albert Y. Chang

Mr. Chang specializes in representing whistleblowers in *qui tam* cases and shareholders in class actions and derivative litigation. He has substantial experience in handling appeals.

Before joining Bottini & Bottini, Inc., Mr. Chang had over ten years of experience in federal litigation. He served as a judicial law clerk to United States District Judge Suzanne B. Conlon for the Northern District of Illinois and to United States District Judge Roger T. Benitez for the Southern District of California.

Bottini & Bottini, Inc. Firm Resume
Page 11

  In addition to his judicial clerkships, Mr. Chang litigated complex cases on behalf of both plaintiffs and defendants. He prosecuted securities and ERISA class actions on behalf of shareholders. He also defended executives, energy companies, insurers, and trade associations for six years at the New York office of Dewey & LeBoeuf LLP, where he focused on litigating high-stakes cases and conducting corporate internal investigations.

  A member of the New York and California bars, Mr. Chang is admitted to practice in numerous federal trial and appellate courts. He is a graduate of Beloit College (B.A. 1997) and Indiana University School of Law-Bloomington (J.D. 2001). He is fluent in Cantonese and Mandarin.

Nina M. Bottini

  Nina M. Bottini is a 2001 graduate of Heinrich-Heine-University School of Law, Dusseldorf, Germany, and received an LL.M. degree (Masters in Comparative Law) from California Western School of Law in 2006. Ms. Bottini specializes in securities class action litigation, ERISA class action litigation, antitrust, securities, and shareholder derivative actions.

  Her representative cases include *In re DRAM Antitrust Litigation*, MDL No. 1486 (N.D. Cal.), and *In re Brocade Communications Systems, Inc. Derivative Litigation*, No. 1:05cv41683 (Cal. Super. Ct., County of Santa Clara).

Yury A. Kolesnikov

  Mr. Kolesnikov practices complex shareholder class action and derivative litigation. He has had extensive exposure to federal practice and procedure.

  Prior to joining Bottini & Bottini, Inc., Mr. Kolesnikov completed three federal clerkships. From 2009 until 2010, he served as a judicial law clerk to the Honorable Irma E. Gonzalez, Chief Judge of the United States District Court for the Southern District of California. Mr. Kolesnikov next served as a judicial law clerk to the Honorable David R. Thompson of the United States Court of Appeals for the Ninth Circuit from 2010 until 2011. Afterward, Mr. Kolesnikov again clerked for the Honorable Irma E. Gonzalez, followed by a clerkship with the Honorable Roger T. Benitez of the United States District Court for the Southern District of California. In addition, from August 2008 until November 2008, Mr. Kolesnikov served as a judicial extern to the Honorable Consuelo M. Callahan of the United States Court of Appeals for the Ninth Circuit.

  Mr. Kolesnikov is a 2009 graduate of the University of the Pacific, McGeorge School of Law, where he graduated number one in his class, was awarded the Order of the Coif, and was a member of the Roger J. Traynor Honor Society. He was the Chief Articles Editor of the McGeorge Law Review and a participant in two international moot court competitions. From August 2008 until April 2009, Mr. Kolesnikov served as a research assistant to the Associate Justice Anthony M. Kennedy for a course Justice

Bottini & Bottini, Inc. Firm Resume
Page 12

Kennedy annually teaches in Salzburg, Austria titled "Fundamental Rights in Europe &
United States."

<u>Anne Bottini Beste</u>

Ms. Beste is of counsel to Bottini & Bottini, Inc.  She practices complex civil
litigation. She is a 1992 graduate of Northwestern University School of Law. She
received her undergraduate degree in 1989 from Boston College, where she was Phi Beta
Kappa and graduated *magna cum laude* with a B.A. in Economics. From 1996 to 2001,
Ms. Beste practiced complex civil litigation at Swidler Berlin Shereff Freidman, LLP in
Washington, D.C. Her practice included employment litigation, environmental
litigation, and trade secret litigation. Ms. Beste is admitted to practice in Washington,
D.C., Missouri, and Illinois.

<u>Stephanie M. Ammirati</u>

Ms. Ammirati is a paralegal specializing in complex civil litigation, consumer
class actions, and shareholder derivative litigation.  Before joining the firm in 2010, Ms.
Ammirati developed a legal career as an attorney in both private practice and
government service.  She is a member of the Washington State Bar Association as well
as the Idaho State Bar, and has an extensive range of experience in civil litigation.

Between 2006 and 2010 Ms. Ammirati served as a Deputy Attorney General at
the Office of the Attorney General for the State of Idaho.  Before her appointment as a
Deputy Attorney General, Ms. Ammirati had nine years of experience in civil litigation
while in private practice in Seattle.  Additionally, she devoted time to volunteer work in
the community by serving as a Court-Appointed Special Advocate (CASA) for many
years.  She also assisted domestic violence victims by providing pro bono legal services
at the New Beginnings Family Law Clinic, and was a Board of Trustees Member of the
FRIENDS of CASA.

Ms. Ammirati received her Juris Doctor from Loyola Law School where she
graduated on the Dean's List and was the recipient of the Wiley W. Manuel Award for
Pro Bono Legal Services.  While in law school, she developed her legal skills through
Loyola's externship programs, performing clinical work at the Civil Appellate Division of
the Los Angeles City Attorney's Office, the Maynard Toll Pro Se Counseling Center, and
the Alliance for Children's Rights.  Ms. Ammirati received her Bachelor of Arts degree
from Pepperdine University where she graduated *summa cum laude* and was awarded
Valedictorian of her class.