UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>BofI HOLDING, INC.<br>SHAREHOLDER LITIGATION | Case No. 3:15-CV-02722-GPC-KSC<br><br>**ORDER:**<br><br>**(1) GRANTING DEFENDANTS'<br>MOTION TO DISMISS**<br>[Dkt. No. 41]<br><br>**(2) GRANTING DEFENDANTS'<br>MOTION TO SEAL**<br>[Dkt. No. 48]<br><br>**(3) GRANTING PLAINTIFFS'<br>MOTIONS TO SEAL**<br>[Dkt. Nos. 42 & 50] |

Before the Court is Defendants'[1] motion to dismiss the Consolidated Verified Shareholder Derivative Complaint[2] (the "CSC"), Dkt. Nos. 36 & 38, filed by BofI shareholders Andrew Calcaterra, Robylee Doherty, and Zhang Yong.  Dkt. No. 41.  The

---

[1] Theodore C. Allrich, James S. Argalas, Eshel Bar-Adon, John Gary Burke, James J. Court, Uzair Dada, Gregory Garrabrants, Paul J. Grinberg, Andrew J. Micheletti, Nicholas A. Mosich, Edward J. Ratinoff, John C. Tolla, and Derrick K. Walsh.

[2] Parts of the Consolidated Verified Shareholder Derivative Complaint have been filed under seal.  *See* September 6, 2016 Order Granting Plaintiffs' Motion to File Under Seal Portions of the Verified Consolidated Shareholder Derivative Complaint.  Dkt. No. 37.

motion has been fully briefed.  *See* Dkt. Nos. 43 & 47.  The parties' various motions to file documents, submitted with their briefs, under seal are also before the Court.  *See* Dkt. Nos. 42, 48, & 50.

The facts of this case are familiar to the Court.  The events and allegations that precipitated this shareholder litigation dispute are similar in kind and in substance to those that underlay In re: BofI Holding, Inc. Sec. Litig., No. 3:15-cv-02324-GPC-KSC (S.D. Cal.) (filed Oct. 10, 2015), a related class action securities fraud suit.[3] Notwithstanding these parallels, however, the nature of this suit is distinct.  The instant matter is a shareholder derivative suit, brought by stockholders of BofI Holding, Inc., on behalf of the company, against all nine members of BofI's Board of Directors[4] and various other company officers.  Through this suit, Plaintiffs seek to protect BofI and to recover against the directors and officers who have allegedly caused damage to the company.  *See* Response, Dkt. No. 43 at 11.  Defendants, in response, argue that Plaintiffs lack standing to bring this shareholder derivative suit because they have failed to plead demand futility as to a majority of BofI's Board of Directors.  *See* MTD, Dkt. No. 41-1 at 6-7.

There is no dispute that Plaintiffs did not make a demand upon the Board, requesting that the Board respond to the misconduct alleged herein, before filing the present suit.  CSC ¶ 142.  Thus, the key issue for this Court is whether or not Plaintiffs' failure to make a demand on the Board is rightfully excused under the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 23.1(b)(3).

---

[3] *See* Defs.' Mot. to Dismiss ("MTD"), Dkt. No. 41-1 at 6 ("This derivative action "piggy-backs on both the "whistleblower" employment lawsuit filed by Mr. Erhart [Erhart v. BofI Holding, Inc., 3:15-cv-02287-BAS-NLS] and a securities class action lawsuit filed by investors in the wake of a drop in BofI's stock price following the filing of the purported whistleblower lawsuit."); *see also* Pls.' Resp. ("Response"), Dkt. No. 43 at 9-10 (citing to Erhart's whistleblower action and the securities fraud class action in their statement of the case).

[4] The members of the Board of Directors are: Allrich, Argalas, Burke, Court, Dada, Garrabrants, Grinberg, Mosich, and Ratinoff.  MTD, Dkt. No. 41-1 at 6.  Dada, who joined the Board on January 22, 2015, is the only Director Defendant who did not serve on the Board throughout the relevant period.

## **BACKGROUND**

Nominal Defendant BofI Holding, Inc. ("BofI"), through BofI Federal Bank, provides online consumer and business banking products.  CSC ¶¶ 2, 14.  Its deposit products include consumer and business checking, demand, savings and time deposit accounts, and its loan portfolio primarily consists of residential single family and multifamily mortgage loans, commercial real estate secures and commercial lending products, finance factoring products, and other consumer lending products.  *Id.* ¶ 2.  Of chief importance to BofI Federal Bank is its practice of providing mortgages to high-net-worth individuals for the purchase of high-end properties.  *Id.* ¶ 3.

A nine-member Board of Directors ("the Board") manages BofI.  *See id.* ¶ 29. Those individuals include: Theodore C. Allrich, Chairman of the Board and a member of the Board's Compensation Committee; James S. Argalas, member of the Board's Audit Committee and member of the Company's Internal Asset Review Committee; John Gary Burke, member of the Board's Compensation Committee and Chairman of the Internal Assets Review Committee of the Board; James J. Court; Uzair Dada; Gregory Garrabrants, BofI's CEO, President, and Director; Paul J. Grinberg, member of the Board's Compensation Committee and member of the Board's Audit Committee; Nicholas A. Mosich, Vice President of the Board and member of the Board's Audit Committee; and Edward J. Ratinoff, member of the Nominating Committee.  *Id.* ¶¶ 15, 17, 18, 19, 20, 21, 22, 23, 26.  Every member of the Board is named as a Defendant (hereafter referred to as the "Director Defendants").  *Id.* ¶ 29.  The other named Defendants are Eshel Bar-Adon, Executive Vice President and Chief Legal Officer of BofI; Andrew J. Micheletti, Executive Vice President and Chief Financial Officer, John C. Tolla, Chief Governance and Compliance Officer; and Derrick K. Walsh, Chief Accounting Officer and Senior Vice President.  *Id.* ¶¶ 16, 24, 25, 27.

In October 2015, Charles Matthew Erhart, a former BofI internal auditor who allegedly raised compliance issues to senior management and federal regulators, *id.* ¶ 5, filed a whistleblower action against BofI.  *See* Erhart v. BofI Holding, Inc., Case No. 15-

cv-2287-BAS-NLS (S.D. Cal.) (filed Oct. 13, 2015).  The whistleblower complaint alleged widespread wrongdoing at BofI.  For example, Erhart alleged that senior officers at the company had instructed him to "refrain from putting anything in writing regarding the Company's violations of laws" and to "label anything he did in his audit function which might be incriminating as "attorney work product/communication."  CSC ¶ 5. Other allegations faulted BofI for borrowing to foreign nationals "who should have been off-limits under anti-money laundering laws," for keeping accounts without tax identification numbers "contrary to BofI's representations to the Office of the Comptroller of the Currency ("OCC")," and for otherwise failing to provide "full and timely information to regulators."  *Id.*

The revelation of these and other allegations included in Erhart's complaint caused BofI's shares to fall by 30.2%, or by $42.87, to $99.13 by the close of business on October 14, 2015.  *Id.* ¶ 6.  As mentioned above, the accusations aired in the complaint have also led to a class action lawsuit for securities fraud.  *See* In re BofI Holding, Inc. Sec. Litig., 3:15-cv-02324-GPC-KSC (S.D. Cal.) (filed October 15, 2015).

In response to these and other allegations, Plaintiffs, all of whom held BofI stock during the relevant period, brought this derivative action.[5]  They allege that from February 6, 2013 to the present, BofI's officers engaged in misconduct by causing BofI to issue false or misleading statements about the company's condition and/or by failing to disclose that: (1) BofI's internal controls were inadequate and "frequently disregarded"; (2) that BofI's portfolio contains loans to foreign nationals who are off-limits because of federal anti-money laundering laws; (3) that many of BofI's accounts lacked tax identification numbers; and (4) that Defendants violated the anti-retaliation laws of the Sarbanes-Oxley Act of 2002 ("SOX") and the Dodd-Frank Wall Street Reform and

---

[5] Plaintiffs filed their initial complaint on December 3, 2015 and their first amended complaint (i.e., the CSC), which contain the same causes of action, on August 26, 2016.

Consumer Protection Act ("Dodd-Frank Act") by allegedly firing Erhart in retaliation for his whistleblowing. *See* CSC ¶¶ 1, 5, 11, 12, 13.

Based on these representations of wrongdoing, Plaintiffs assert three claims against all the Defendants, namely, (1) breach of fiduciary duties, (2) abuse of control, (3) unjust enrichment, and one claim, (4) breach of duty of honest services, against Defendants Garrabrants, Micheletti, Bar-Adon, Tolla, and Walsh only. *Id.* ¶¶ 61-64.

## DEMAND FUTILITY ALLEGATIONS

As stated previously, Plaintiffs did not make a demand on BofI's Board of Directors before filing suit, urging them to institute this action against the individual Defendants. CSC ¶ 143. Plaintiffs allege that making such a demand would have been futile because a majority of the Board of Directors lacks independence or faces a substantial likelihood of liability for their misconduct, thus rendering them incapable of fairly considering a demand. *See id.*

**A. General Board Allegations**

The following are demand futility allegations lodged against the Board of Directors as a whole.

**1. Dismissal of Erhart**

The CSC avers that the entire Board is compromised, and therefore was unable to impartially consider a demand at the time of filing the complaint, because they all face a substantial likelihood of liability for retaliating against Erhart in violation of SOX. *Id.* ¶¶ 149-59. Plaintiffs contend that the entire Board is responsible for violating SOX because it authorized and approved the firing of Erhart on June 9, 2015 with full knowledge of Erhart's protected status as a whistleblower. *Id.* ¶ 157. "All Board members thus face a substantial likelihood of liability for breaching their fiduciary duties by causing the Company to violate the anti-retaliation provisions of Sarbanes-Oxley, Dodd-Frank, and other laws." *Id.* ¶ 158. In addition, Plaintiffs argue, the Board also

faces a substantial likelihood of liability for failing to act in the face of the unlawful activities alleged by Erhart.  *Id.* ¶ 159.

Paragraphs 149 through 158 of the CSC discuss the circumstances leading to the alleged termination of Erhart, and together they narrate the following sequence of events.

Erhart, "in the course of performing his duties as BofI's Staff Internal Auditor," realized and reported that certain BofI senior officers, including Director Defendant Garrabrants, Defendant Bar-Adon, and Defendant Tolla, had violated securities and other laws.[6]  CSC ¶¶ 77, 149.  At some point, he informed those three officers of his "good-faith whistleblower complaint," but Garrabrants, Bar-Adon, and Tolla each "brushed aside" his concerns.  *Id.* ¶¶ 149-50.  As a result, Erhart "lodged his complaints with the OCC and SEC."  *Id.* ¶ 150.  He also filed a complaint with OSHA recounting the unlawful activities he had witnessed and the retaliation he was facing for having spoken out.  *See id.* ¶ 151.

Simultaneously, news of Erhart's allegations and audit findings were climbing through the company's chain of command.  In mid-December 2014, Jonathan Ball, the Vice President of Internal Audit (*id.* ¶ 61), drafted an evaluation of Erhart's job performance.  *Id.* ¶ 152.  That performance was later revised by Tolla, who "downgraded Erhart's performance in retaliation for his whistleblowing activities."  *Id.*  Ball, who was troubled by Tolla's actions, "directly advised the Audit Committee about Tolla's downgrading of Erhart's performance evaluation."  *Id.*  Allegedly, however, the Audit Committee did not correct Tolla's conduct and, in fact, approved of it.  *Id.*  ("Upon

---

[6] *See* CSC ¶ 84 (describing how Tolla instructed Erhart to "never state in an audit report that BofI had violated a federal or state law"); *id.* ¶¶ 132-33 (stating that Garrabrants "was depositing third-party checks for structured settlement annuity payments into a personal account, including nearly $100,000 in checks made payable to third parties" and that he was "the signatory of a BofI consumer account opened in the name of his brother, Steven Garrabrants, with a balance of approximately $4 million" who was a "former minor league baseball player who signed . . . in 2003 for $50,000 per year and became a free agent in 2007"); *id.* ¶ 83 (describing how Bar-Adon instructed Erhart to "remove evidence of the violation of California Penal Code § 632 from the Structured Settlement and Lottery audit" or to otherwise mark the "entire report 'Attorney Client Privileged'").

information and belief, the Audit Committee ratified and approved the retaliation against Erhart by failing to instruct Tolla to restore Erhart's performance grade to the level determined by Ball.")

Months later, on March 12, 2015, Erhart was approached by Bar-Adon who said that he sought to speak with Erhart in his capacity as "General Counsel to the Audit Committee." *Id.* ¶ 153. Based upon this encounter, Plaintiffs allege that the Audit Committee had "directed Bar-Adon to meet with Erhart regarding such activities" and, therefore, "had actual knowledge of Erhart's whistleblowing complaints." *Id.*

Thereafter, the Audit Committee met in San Diego for a formal meeting on April 27, 2015. *Id.* ¶ 155. Grinberg, Argalas, and Mosich, the three Audit Committee members, were all present at the meeting, along with Micheletti, Bar-Adon, Tolla, Tony de la Mora, Interim FVP of Internal Audit, and other company auditors. *Id.* At the meeting, Plaintiffs allege that Grinberg presented to the Audit Committee all complaints received by him as Chair of the Audit Committee. *Id.* They further allege that "[u]pon information and belief, Grinberg advised the other Audit Committee members about Erhart's complaints." *Id.*

A number of weeks later, on May 21, 2015, the entire Board of Directors convened, with all nine members present. *Id.* ¶ 156. According to BofI's 2015 proxy statement, the Audit Committee "reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting." *Id.* ¶ 154. Plaintiffs allege that on May 21, 2015 Grinberg "presented a report to the full Board from the Audit Committee, which report upon information and belief included all details regarding Erhart's complaints and the fact that Erhart had claimed whistleblower protection. The Board also met in Executive Session to discuss Erhart's complaints and other matters." *Id.* ¶ 156.

Plaintiffs go on to state that three weeks after the May 21, 2015 Board meeting, and in spite of having "actual knowledge of Erhart's whistleblowing activity, and despite knowing that Dodd-Frank, Sarbanes-Oxley, and other laws prohibit retaliation against

employees who report alleged wrongdoing, the Board authorized and approved the firing of Erhart on June 9, 2015." *Id.* ¶ 157

### 2. False and Misleading Statements

Plaintiffs further argue that: (1) "no reasonable stockholder would reasonably believe that a majority of the members of the Board would be able to independently and properly consider a demand in good faith" because the Board violated their fiduciary obligations by approving and signing the company's SEC filings containing false and misleading statements. *Id.* ¶ 161. Specifically, the CSC avers that the entire Board wrongly approved and signed the Form 10-Ks dated September 4, 2013, August 28, 2014, and August 26, 2015, all of which contained false and misleading statements about BofI's compliance with securities and other laws.[7] *See id.*

### 3. Compensation & Participation in Mortgage-lending Program

The CSC also alleges that the Director Defendants are interested for purposes of demand futility because they "are more interested in protecting themselves than they are in protecting the Company by bringing this action." *Id.* ¶ 164.

In support of this allegation, Plaintiffs offer each Board member's compensation for fiscal year 2015: Garrabrants, $6,310,485; Allrich, $514,598; Argalas, $188,210; Court, $188,210; Dada, $85,061; Grinberg, $281,133; Mosich, $253,970; and Ratinoff, $188,210. *Id.* In further support of this position, the CSC contends that the independence of Allrich, Argalas, Burke, Garrabrants, Grinberg, and Mosich is further compromised by the fact that each obtained a mortgage on their primary residence at below market interest rates through participation in BofI's mortgage-lending program, which is made available to BofI's directors, officers, and employees. *Id.* ¶ 165. "As such, Allrich, Argalas, Burke, Garrabrants, Grinberg, and Mosich are more interested in

---

[7] Defendant Dada only signed the August 26, 2015 Form 10-K as he was the most recent addition to the Board.

maintaining their lucrative positions at BofI than they are in protecting BofI by bringing this action." *Id.*

### B. Individual Board Member Allegations

Also in furtherance of pleading demand futility, the CSC lodges a variety of individual demand futility allegations against specific Board members based upon their roles or conduct at BofI.

### 1. Garrabrants

The CSC's demand futility allegations contend that Garrabrants, notwithstanding any allegations attributed to the Board, independently lacks independence. *Id.* ¶ 144.

Garrabrants, Plaintiffs argue, lacks independence because he "prepared, signed, or caused the Company to issue many of the false and misleading statements" that Plaintiffs cite in the CSC. *Id.* In particular, Plaintiffs note that Garrabrants signed the company's SEC filings, all of which allegedly contained false and misleading statements, including: the Forms 10-K dated September 3, 2013, August 28, 2014, and August 26, 2015, and the Forms 10-Q dated November 5, 2013, February 5, 2014, May 6, 2014, November 4, 2014, January 29, 2015, and April 30, 2015. *Id.* ¶ 147.

In addition, Plaintiffs allege that making demand upon Garrabrants would have been futile because he faces a substantial likelihood of liability for his misconduct. Garrabrants, they contend, is "a named defendant in the currently-pending federal class actions, alleging he violated § 10(b) of the Exchange Act and Rule 10b-5 when he disseminated or approved the false and misleading statements." *Id.* ¶ 145. Thus, because "pursu[ing] these derivative claims . . . would expose his own misconduct in the class action for violations of the federal securities laws . . . Garrabrants is fatally conflicted and, therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims." *Id.* ¶ 146.

Yet another fact demonstrating the likelihood that Garrabrants will face liability for his conduct, they argue, is the fact that "Garrabrants also participated in conference calls

with analysts and investors during the Relevant Period . . . [and] therefore faces a substantial likelihood of liability for breaching his fiduciary duties." *Id.* ¶ 148.

### 2. Audit Committee Members (Argalas, Grinberg, Mosich)

The CSC singles out Argalas, Grinberg, and Mosich as particularly lacking in independence or likely to face a substantial likelihood of liability because of their conduct and duties as Audit Committee members. Plaintiffs contend that the Audit Committee defendants "had a clear duty to be kept informed about the Company's accounting procedures," but failed to do so by reviewing and approving BofI's SEC filings that contained false and misleading statements. *Id.* ¶ 163.

### 3. Grinberg

Plaintiffs argue that Grinberg additionally lacked independence to consider a shareholder demand because he "breached his fiduciary duty by failing to disclose a related party transaction between BofI and his employer Encore Capital." *Id.* ¶ 166.

## LEGAL STANDARD

### A. Rule 23.1

A derivative shareholder's claim allows an individual stockholder to bring "suit to enforce a corporate cause of action against officers, directors, and third parties." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)). "Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Id.* (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)) (quotations omitted).

This derivative right, however, is not absolute. Before a shareholder can act on behalf of the corporation in this manner, he or she must demonstrate "that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." *Id.* at 95-96 (quoting *Ross*, 396 U.S. at 534). This precondition is codified at Federal Rule of Civil Procedure 23.1:

> The complaint must be verified and must: . . . (3) *state with particularity*: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) *the reasons for not obtaining the action or not making the effort*.

Fed. R. Civ. P. 23.1(b)(3) (emphasis added).  Rule 23.1 provides the pleading standard for measuring the factual detail present in a complaint, but does not provide the substantive rule for assessing what reasons are sufficient to excuse demand on the corporation.  *See Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014).  That rule is supplied by the law of the state of incorporation, *Kamen*, 500 U.S. at 109, which in this case is Delaware, BofI's state of incorporation, *see* CSC ¶ 14.

**B. Demand Futility Under Delaware Law**

In order to show demand futility under Delaware law, a shareholder must satisfy one of two tests.  *Rosenbloom*, 765 F.3d at 1149-50.  The *Aronson* test applies when a shareholder challenges a decision made, or a transaction entered into, by the corporation's board of directors.  *See Rales v. Blasband*, 634 A.2d 927, 932-33 (Del. 1993).  To satisfy the *Aronson* test a shareholder must allege particularized facts giving rise to a reasonable doubt that, at the time the suit was filed, (1) the directors were disinterested and independent or (2) the underlying transaction was the product of a valid exercise of business judgment.  *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999) (citing *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).

Alternatively, if the shareholder does not challenge a board decision, but board inaction, for instance, then the *Rales* test applies.  *Rosenbloom*, 765 F.3d at 1150.  The *Rales* test requires a stockholder to put forth particularized factual allegations that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to demand."  *Rales*, 634 A.2d at 934.  Stated differently, the *Rales* test

requires the shareholder to satisfy the first prong of the *Aronson* test.  *In re Bidz.com Deriv. Litig.*, 773 F. Supp. 2d 844, 852 (C.D. Cal. 2011).

### 1. Particularity Requirement

Delaware Rule 23.1, like is federal counterpart, requires a shareholder to plead facts with particularity, which is a more stringent standard than that required by ordinary notice pleading.  *See Brehm*, 746 A.2d at 255 ("[t]hose pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings").  The rationale behind Rule 23.1's heightened pleading standard, the Delaware Supreme Court has noted, is two-fold:

> *Aronson* and its progeny is designed to create a balanced environment which will: (1) on the one hand, deter costly, baseless suits by creating a screening mechanism to eliminate claims where there is only a suspicion expressed solely in conclusory terms; and (2) on the other hand, permit suit by a stockholder who is able to articulate particularized facts showing that there is reasonable doubt either that (a) a majority of the board is independent for purposes of responding to the demand, or (b) the underlying transaction is protected by the business judgment rule.

*Id.* at 255 (citing *Grimes v. Donald*, 673 A.2d 1207, 1216-17 (Del. 1996)).  Cast in this light, Delaware's particularity requirement is seen not just as a rigid procedural requirement but as a substantive rule of Delaware law that requires plaintiffs to make a strong, threshold showing that making a pre-suit demand would have been futile.  *See In re Sonus Networks, Inc., S'holder Deriv. Litig.*, 499 F.3d 47, 66 (1st Cir. 2007) (applying Delaware law on demand futility).

Accordingly, when assessing a motion to dismiss for failure to comply with the requirements of Federal Rule 23.1 and Delaware law, a court should credit a plaintiff with "all reasonable factual inferences that logically flow from the particularized facts alleged." *Rosenbloom*, 765 F.3d at 1148.  A court should not, however, take as true "conclusory allegations of facts or law not supported by allegations of specific fact." *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1079 (C.D. Cal. 2008) (quoting *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991)) (internal quotations omitted).

"Conclusory allegations" are those that add "no, or only *de minimis*, substance to the Court's demand-futility inquiry." *See Khanna v. McMinn*, 2006 WL 1388744, *14 (Del. Ch. May 9, 2006). By contrast, particularized facts are "substantive allegations that are by themselves insufficient but, when viewed *in toto*, may push the analysis over the threshold of "reasonable doubt" and thereby excuse [ ] demand." *Id.*

## DISCUSSION

Before reaching the merits of the case, the Court will first address Defendants' multiple requests for judicial notice, as those requests inform the scope of the Court's review on a motion to dismiss.

In support of their motion to dismiss, Defendants have requested that the Court take judicial notice of excerpts of 1) BofI's Schedule 14A Definitive Proxy Statement filed with the SEC; 2) the complaint in Erhart v. BofI Holding, Inc., Case No. 15-cv-2287-BAS-NLS (S.D. Cal); and 3) BofI's Certificate of Incorporation. Dkt. No. 41-2. In their reply brief, Defendants additionally ask the Court to notice 4) the minutes of the May 21, 2015 BofI Board meeting and 5) BofI's Form 8-K dated March 14, 2016. Dkt. No. 47-1.[8] Because the Court does not rely on the contents of the first, third, fourth, and fifth requests in its reasoning or in reaching its ultimate opinion, the Court **DENIES** those four requests as moot. But, for the reasons that follow, the Court **GRANTS** Defendants' request to take judicial notice of the complaint filed in Erhart's whistleblower action.

It is apodictic that a court may take judicial notice of facts outside the pleadings on a motion to dismiss. *See, e.g.*, *Mack v. Bay Beer Distribs.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). A court may consider matters that are: 1) authenticated documents that have been incorporated by the complaint or 2) facts subject to judicial notice. *Lee v. City*

---

[8] Plaintiffs filed a response to Defendant's second request for judicial notice that is not properly before the Court. *See* Dkt. No. 52.

*of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).  Here, Defendants have asked the Court to take judicial notice of Erhart's whistleblower complaint.  Plaintiffs' allegations rely heavily on the contents of Erhart's complaint and incorporate them throughout the CSC.  *See generally* CSC.  In fact, Plaintiffs even suggested, without arguing, that the Court could take judicial notice of Erhart's complaint.  *See id.* ¶ 149 ("As alleged in detail by Erhart in a whistleblower complaint pending in this District (and of which the Court can take judicial notice)").  Thus, because Erhart's complaint is incorporated throughout Plaintiffs' allegations, and because it is a matter of public record, capable of accurate and ready authentication, it is the proper subject of judicial notice.  *See, e.g.*, *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1051 n.3 (9th Cir. 2005) (taking judicial notice of a judicial docket).  Accordingly, the Court **GRANTS** Defendants' request to take judicial notice of Defendants' Exhibit B.  Dkt. No. 41-4 at 2.

## **Demand Futility**

Defendants move to dismiss the CSC because it fails to plead demand futility with particularity as required by Rule 23.1 and Delaware law.  In their opposition to Defendants' motion to dismiss, Plaintiffs advance three main theories of demand futility.  One, that it would have been futile to make a demand on the Board because the entire Board engaged in bad-faith conduct by firing Charles Matthew Erhart, an alleged whistleblower, in violation of the Sarbanes-Oxley Act and other laws protecting whistleblowers.  Response, Dkt. No. 43 at 15.  Two, that demand would have been futile because all of the Director Defendants face a substantial likelihood of liability for causing BofI to disseminate false or misleading statements.  *Id.* at 22.  And three, that demand would have been futile because a majority of the Board was conflicted because of their compensation and because a majority of them received a mortgage from BofI at below-

market rates.  For the following reasons, the Court rejects each of these arguments and concludes that Plaintiffs have failed to meet their demand futility burden.[9]

## I. Board's Dismissal of Erhart

### A. Whether *Aronson* or *Rales* Applies

The parties agree that Plaintiffs' allegation that the Board terminated Erhart is governed by the *Aronson* standard.  *See* MTD, Dkt. No. 41-1 at 16; *see also* Response, Dkt. No. 43 at 15.  Accordingly, in order for demand to be excused, Plaintiffs must have plead particularized facts giving rise to a reasonable doubt that the Board is independent and disinterested or that the decision to terminate Erhart was a valid exercise of business judgment.  Defendants contend that Plaintiffs' Erhart-related allegations fail under both the first and second prong of *Aronson*.  *See* MTD, Dkt. No. 41-1 at 17-20.  In their opposition, however, Plaintiffs only argue that the Board's decision to terminate Erhart satisfies *Aronson*'s second prong, addressing business judgment.  *See* Response, Dkt. No. 43 at 15-17.  The Court's analysis, therefore, will measure the sufficiency of Plaintiffs' allegations under the second prong of *Aronson*.[10]

/ / / /

/ / / /

---

[9] The Court's analysis focuses exclusively on these three arguments because they are the only demand futility allegations and argument directed at the Board as a whole.  Although Plaintiffs' complaint and opposition contain other arguments as to why certain Board members — namely, Garrabrants, Grinberg, Mosich, and Argalas — are conflicted for demand purposes, those arguments are insufficient to carry Plaintiffs' burden because they only individually address four of the nine board members.  In other words, because Plaintiffs do not lodge any specific demand futility allegations against Allrich, Court, Burke, Dada, or Ratinoff (with the exception of a minor compensation-related contention made as to Allrich), and because demand futility requires that Plaintiffs demonstrate that a majority of BofI's Board of Directors were not independent or disinterested, the Court's inquiry must necessarily focus on whether Plaintiffs' generalized Board allegations meet the demand futility standard.  *See Rosenbloom*, 765 F.3d at 1151 n.13 (observing that it is appropriate for courts to evaluate demand futility by looking at the "whole board rather than by going one by one through its ranks").

[10] Although the Court has chosen to address Plaintiffs' whistleblower-related demand futility allegations under the second prong of *Aronson*, because the Court ultimately concludes, *see infra*, that Plaintiffs have failed to plead sufficient particularized facts demonstrating that the Board fired Erhart, Plaintiffs' allegations would also fail under the first prong of *Aronson*.

### B. Business Judgment Protection under Delaware Law

Plaintiffs contend that their particularized pleadings raise a reasonable doubt that the Board's decision to fire Erhart was a valid exercise of business judgment. *See* Response, Dkt. No. 43 at 15-17. In making this argument, Plaintiffs rely on the fact that "board action that violates the law" is never protected by the business judgment rule and thus, always demonstrates demand futility. *See id.* at 15.

Delaware's business judgment rule embodies the "acknowledgement of the managerial prerogatives of Delaware directors" and the "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 472 A.2d at 812. Courts should not assume that a Board-approved transaction "is a wrong to the corporation." *Id.* at 814. In fact, "[a] hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be attributed to any rational business purpose." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (quotations omitted). It is, therefore, incumbent upon the shareholders challenging board action to rebut the presumption that a board transaction is the result of sound judgment. *See Aronson*, 472 A.2d at 812.

The business judgment rule is not, however, unqualified. *Maldonado v. Flynn*, 413 A.2d 1251, 1257 (Del. Ch. 1980), *overruled on other grounds by Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981). Notably, it does not protect fraudulent, illegal, or reckless decisions made by the board's directors. *Id.* This is because "it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully." *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007); *see also In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, *20 (Del. Ch. Oct. 12, 2011) ("Illegal corporate conduct is not loyal corporate conduct.") Accordingly, a board's decision to act illegally will always satisfy the demand futility

standard because such a decision does not enjoy business judgment protection, as it necessarily contravenes the board's duty of loyalty to the company.

### C. Demand Futility Analysis

In applying the second prong of *Aronson*, the key inquiry for the Court is whether or not Plaintiffs' particularized allegations give rise to a reasonable doubt that the Board fired Erhart and, therefore, acted illegally. Indeed, Defendants vehemently challenge the sufficiency of Plaintiffs' allegations supporting that very conclusion. They argue that Plaintiffs have not alleged any particularized facts showing that the Board discussed Erhart's employment, nevertheless that they actually voted to terminate Erhart. MTD, Dkt. No. 47 at 7-8, 17-18. Defendants also contest the reasonableness of inferring that the Board would involve itself in authorizing the termination of a low-level employee and thus urge the Court to dismiss the inference as implausible. *See id.* at 18-19.

The Court begins by observing that it disagrees with Defendants insofar as they insist that it is generally unreasonable to infer that the Director Defendants would have fired Erhart given his "low-level" position at the company. To the contrary, it seems more than reasonable to infer that the Board would have approved the dismissal of Erhart given that he had allegedly found and reported widespread wrongdoing and illegality occurring at the bank. The nature of Erhart's allegations suggest that the growth of BofI's loan portfolio (i.e., the essence if its business) was improperly propelled by lending to individuals who should not have received loans, that is, persons who are designated as off-limits by federal anti-money-laundering laws and persons without tax identification numbers. *See* CSC ¶¶ 108-09; *see also id.* ¶ 114 (quoting BofI's 2015 Q2 Investor Presentation as boasting that BofI's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."). Erhart's allegations, moreover, indicate that Garrabrants, BofI's CEO, and other high-ranking officers were direct participants in unlawful business and reporting practices. Thus, it does not strain credulity to believe that Erhart's conduct reached the boardroom given that he had questioned the legality of

1   BofI's primary source of business, directly implicated the company's CEO and other

2   managerial officers in instances of wrongdoing, and reported his doubts to regulators.

3        The Court likewise disagrees with Defendants' contention that the complaint fails

4   to plead particularized facts demonstrating that the Board had knowledge of Erhart's

5   complaint and audit findings.  The CSC alleges with particularity how Erhart's

6   complaints travelled up the corporate chain and into the boardroom.  According to the

7   complaint, Erhart, in his capacity as a Staff Internal Auditor, uncovered and witnessed

8   several alleged violations of the law committed by CEO Gregory Garrabrants, Eshel Bar-

9   Adon, and John Tolla, Erhart's manager.  *Id.* ¶ 149.  Erhart related his concerns to

10  Garrabrants, a board member, Bar-Adon, and Tolla, but they were "brushed aside."  *Id.*

11  The Audit Committee, comprised of three members of the Board, later became aware of

12  Erhart's complaints when his supervisor alerted the Committee to the downgrading of

13  Erhart's job performance.  That the Audit Committee was apprised of Erhart's allegations

14  was further reinforced by the fact that Bar-Adon "met with Erhart and told him he was

15  acting as General Counsel to the Audit Committee."  *Id.* ¶ 153.

16       These allegations, when viewed *in toto*, lead to the reasonable inference that

17  Garrabrants and the three Director Defendants on the Audit Committee were aware of

18  Erhart's whistleblowing activities and complaints.  These allegations are particularized

19  because they describe the "transaction specifics or individual board member

20  participation" that connects the dots between Erhart's alleged whistleblower activities

21  and how four of the Director Defendants became aware of them.  *See In re Computer*

22  *Scis. Deriv. Litig.*, 244 F.R.D. 580, 584 (C.D. Cal. 2007).

23       The Court also finds that that are sufficient particularized facts from which it can

24  reasonably infer that the entire Board had knowledge of Erhart's complaint and

25  whistleblowing activities.  Plaintiffs allege that at a Board meeting on May 21, 2015,

26  "Grinberg presented a report to the full Board from the Audit Committee, which report

27  *upon information and belief* included all details regarding Erhart's complaints and the

28  fact that Erhart had claimed whistleblower protection."  CSC ¶ 156 (emphasis added).

Defendants argue that because this allegation is conclusory, Plaintiffs have failed to show that the entire Board was even aware of Erhart's whistleblower complaint or audit findings. *See* MTD, Dkt. No. 41-1 at 17-18. The Court, however, finds that this allegation is sufficiently substantiated by the fact that, according to BofI's 2015 Proxy Statement, the Audit Committee "reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting." *Id.* ¶ 154. Thus, because BofI's own disclosures indicate that the Audit Committee reports to the full Board concerning all actions taken since the last Board meeting, the Court finds it reasonable to infer that the Audit Committee informed the Board about what it had learned about Erhart's audit findings, his complaints, and the downgrading of his job performance.

But even taking as true the allegation that the entire Board became aware of Erhart's complaint and whistleblowing activities on May 21, 2015, it is nonetheless unreasonable to infer, based on the particularized facts alleged, that the majority of the Board — much less the entire Board — collectively decided to fire Erhart. The only Erhart-related allegations attributed to the entire Board state the following:

1) "[t]he full Board met a few weeks later, on May 21, 2015"
2) "[a]ll nine members of the Board were present in person"
3) "Grinberg presented a report to the full Board from the Audit Committee . . . includ[ing] all details regarding Erhart's complaints and the fact that Erhart had claimed whistleblower protection."
4) "[t]he Board also met in Executive Session to discuss Erhart's complaints and other matters"
5) "less than three weeks later, despite having actual knowledge of Erhart's whistleblowing activity, and despite knowing that Dodd-Frank, Sarbanes-Oxley, and other laws prohibit retaliation against employees who report alleged wrongdoing, the Board authorized and approved the firing of Erhart on June 9, 2015."

CSC ¶¶ 156-57. The conclusion that the Board of Directors fired Erhart on June 9, 2015 does not "logically flow," *Rosenbloom*, 765 F.3d at 1148, from particularized facts demonstrating that the Board was aware of Erhart's complaint and whistleblowing activities. The CSC contains no particularized allegations detailing what occurred after

the Board allegedly learned of Erhart's whistleblowing activities.  They do no state what, if any, actions were taken by the Board, or point to any pattern of behavior occurring after May 21, 2015 that would indicate that the Board remained consciously inactive after learning of Erhart's findings or, to use Plaintiffs' words, that they "declined to inform themselves of the misconduct" alleged by Erhart, *see* CSC ¶ 162.  Rather, the CSC is completely silent as to what occurred after May 21, 2015 and how the Board responded to Erhart's allegations.  Such a paucity of particularized facts is not enough for the Court to reasonably infer that a majority of the Board, upon learning of Erhart's allegations, acted in bad faith by firing him.

Stated differently, it is not reasonable to infer that all nine members of the Board of Directors fired Erhart just because they had knowledge of his whistleblowing activities and allegations.  Unlike other cases, such as *Rosenbloom* (discussed in greater detail in *infra* Section IV), where the court found that the board's knowledge of illegal activities made it reasonable to infer that the Board participated in — or at the very least ratified — those illegal activities, here, Plaintiffs are asking the Court to infer that the Board's knowledge of Erhart's complaint necessarily made them act illegally, that is, by firing him.  Even assuming that the complaint pleads enough to conclude that Director Defendants Garrabrants, Grinberg, Mosich, and Argalas had motivation to fire Erhart, the complaint contains no specific allegations whatsoever as to Allrich, Court, Dada, Burke or Ratinoff (i.e., a majority of the Board of Directors).  Other than their knowledge that Erhart had filed a whistleblower complaint and accused the company of statutory violations, there is no evidence suggesting that these five board members were, or should be suspected as, active participants in any illegal decision to fire Erhart.  *See Jones ex rel. CSK Auto Corp. v. Jenkins*, 503 F. Supp. 2d 1325, 1334 (D. Ariz. 2007) (refusing to hold an Audit Committee liable for participating in the issuance of false financial statements because the complaint did not detail how the committee learned of the challenged transaction, who presented the information to them, when, and "*how the committee members' response or lack thereof rendered them active participants in . . .*

*wrongdoing.*") (emphasis added); *Desimone*, 924 A.2d at 939 (disregarding plaintiffs' allegation that the CEO was involved in granting illegal stock options because no particularized factual allegations supported the notion that the CEO was involved); *Yaw v. Talley*, 1994 WL 89019, *10 (Del. Ch. Mar. 2, 1994) (rejecting the contention that an alleged wrongdoer acted "with the complicity of the directors" because the statement lacked factual support in the complaint).  For instance, Plaintiffs have presented no evidence indicating that Allrich, Burke, Court, Dada, or Ratinoff had a reason to ignore or bury Erhart's audit findings.  They have also failed to present any evidence demonstrating that Allrich, Court, Dada, Burke or Ratinoff actually voted to terminate Erhart, ratified a decision to terminate Erhart, or remained consciously inactive with regards to Erhart's impending dismissal.  In other words, the CSC's complete failure to lodge allegations against Allrich, Court, Dada, Burke or Ratinoff and to offer particularized facts demonstrating that they participated, in bad faith, in the decision to fire Erhart is fatal to their demand futility argument.

Although the CSC's lack of allegations as to Allrich, Court, Dada, Burke and Ratinoff, alone, is sufficient to reject Plaintiffs' argument, the Court also finds that other reasons further counsel against accepting, as reasonable, the inference that the Board fired Erhart.  One, Erhart's complaint does not implicate the Board of Directors in the decision to fire him.  *See generally* Defs.' Exhibit B, Erhart Complaint, Dkt. No. 41-4.  Erhart's whistleblower complaint does not state, let alone suggest, that the Board of Directors had anything to do with his termination.  In fact, Erhart's complaint repeatedly describes BofI's upper management, not the Board of Directors, as the culprits of wrongdoing, and even suggests that upper management's misconduct was carried out in the Board of Directors' blind spot.  *See id.* at ¶ 25, ¶¶ 19-21, (alleging that the signatures of the board of directors were copied and pasted to approve a document that they had not reviewed).  Notably, Erhart's complaint also does not even mention Allrich, Court, Dada, Burke or Ratinoff (again, a majority of the Board), nevertheless implicate their participation in his dismissal in any way.  *See generally id*.  Two, the timeline presented

in Erhart's complaint casts further doubt on the reasonableness of Plaintiffs' conclusory assertion that the Board authorized Erhart's dismissal on June 9, 2015.  Although Erhart, in his complaint, states that he was fired on June 9, 2015, he also alleges that a BofI employee in compliance processed his termination paperwork on March 6, 2015, almost three months before Plaintiffs allege that the Board terminated Erhart.  *See id.* ¶ 70.  That Erhart's own timeline suggests that a decision to terminate Erhart had taken place months before the Board learned of Erhart's complaints and whistleblowing activities in May 2015, further belies Plaintiffs' argument that it is reasonable to infer that the Board dismissed Erhart on June 9, 2015.

Finally, it is also worth noting that it is conspicuous that Plaintiffs allege that the Board fired Erhart on June 9, 2015 when there is nothing in the complaint to suggest that the Board of Directors actually met on June 9, 2015 or that they sat in executive session to discuss Erhart's findings beforehand.  Delaware courts have oft-observed that Plaintiffs who file shareholder derivative suits should take advantage of 8 Del. C. § 220, "which permits a stockholder . . . to obtain in a summary proceeding an order permitting inspection of specific books and records," in order to file complaints that meet Delaware's particularized pleading standard.  *Rales*, 634 A.2d at 931 n.4; *see also Brehm*, 746 A.2d at 266-67.  Here, Plaintiffs followed such advice and filed a demand to inspect BofI's books and records.  *See* Dkt. No. 43 at 10.  Given Plaintiffs' "thorough pre-filing investigation," they have little excuse for not including details that would support the conclusion that the Board of Directors met, or otherwise communicated, on June 9, 2015 to fire Erhart.  *See Guttman v. Huang*, 823 A.2d 492, 507 (faulting plaintiffs for relying on a separately-filed federal complaint to implicate the Board of Directors, when they could have made a demand for books and records under 8 Del. C. § 220 to support their demand futility allegations).  Or, stated differently, given that Plaintiffs have made a books and record demand on Defendants, the Court finds it unreasonable, and circumspect, to accept as true conclusory allegations that the Board met or conferred

outside of board meetings, without meeting minutes, and with no paper trail of what was discussed.

In sum, Plaintiffs' conclusion that the Board fired Erhart on June 9, 2015 is not supported by substantive, particularized allegations that, when viewed *in toto*, demonstrate that the Director Defendants engaged in bad-faith and illegal conduct. It is not enough, as Plaintiffs suggest, that they have pled "the who, what, when, where, and how" of the Director Defendants' knowing violations of the law. *See* Response, Dkt. No. 43 at 20. As *Aronson* indicates, absent particularized allegations demonstrating that the defendants breached an underlying fiduciary duty (in this case the duty of loyalty) it is not enough to simply plead that the director defendants knowingly participated in illegal activities. *See Aronson*, 473 A.2d at 817. Here, other than learning of Erhart's whistleblower allegations, there is no evidence to suggest that a majority of the Director Defendants breached their duties of loyalty to the corporation by firing Erhart in violation of SOX and other laws. Plaintiffs do not discuss what occurred after May 21, 2015, and point to no facts, let alone particularized facts, from which the Court can reasonably infer that a majority of the Board responded to the news of Erhart by acting illegally and in bad faith by firing him. Accordingly, Plaintiffs' allegation that the Board fired Erhart is conclusory and is insufficient to plead demand futility.

## II.   Issuance of False and Misleading Statements

Plaintiffs alternatively argue that demand is futile because all of the Director Defendants face a substantial likelihood of liability for causing BofI to disseminate false and misleading statements regarding BofI's internal controls and risk management. *See* Response, Dkt. No. 43 at 22.

### A. Whether *Aronson* or *Rales* applies

Defendants argue that the *Rales* test applies to Plaintiffs' assertion that the Director Defendants face liability for disseminating false and misleading statements. *See* MTD, Dkt. No. 41-1 at 16. By contrast, Plaintiffs seem to suggest that the *Aronson* test would apply. *See* Response, Dkt. No. 43 at 25 n.16 (noting that certain precedent cited by

Defendants was distinguishable because the *Rales* test applied); *id.* at 22 (summarizing the demand futility inquiry as whether the Director Defendants face substantial liability for "*causing* BofI to issue materially false and misleading statements") (emphasis added).

Notwithstanding Plaintiffs' framing of the relevant analysis, however, the Court concludes that the *Rales* test should apply.  Plaintiffs are not challenging a decision made by the Board, but the Board's failure to correct SEC disclosures after they allegedly learned of Erhart's complaint and allegations on May 21, 2015.  *See Jones ex rel. CSK Auto Corp.*, 503 F. Supp. 2d at 1132 (applying *Rales* test to contention that the Board's audit committee had actively participated in publishing false financial statements); *see also In re Countrywide*, 554 F. Supp. 2d at 1080 n.39 (concluding that the *Rales* test applied where specific Board decisions were not directly challenged and where the "overwhelming majority" of the claims did not relate to a business decision).  Here, Plaintiffs have not pointed to any business decision made by the Board to purposefully omit material information in its regulatory disclosures.  As such, the *Rales* inquiry is the proper one.

That said, whether or not *Aronson* or *Rales* applies is not dispositive, here, because a finding that the Board of Directors faces a substantial likelihood of liability for publishing false or misleading statements would satisfy both tests.  *See Rosenbloom*, 765 F.3d at 1150 ("it does not matter whether *Aronson* or *Rales* applies.  Under either approach, demand is excused if Plaintiffs' particularized allegations create a reasonable doubt as to whether a majority of the board of directors faces a substantial likelihood of personal liability for breaching [their fiduciary duty].").  As such, the Court will analyze the sufficiency of Plaintiffs' allegations under the substantial likelihood of liability rubric.

### B. Substantial Likelihood of Liability For Violating Duty of Candor

In order to demonstrate that a board faces a substantial likelihood of liability sufficient to excuse demand, the shareholders must make a "threshold showing, through the allegation of particularized facts, that their claims have some merit."  *Rosenbloom*, 765 F.3d at 1149 (citing *Rales*, 634 A.2d at 934).  Here, the underlying claim is that the

24

Board breached their duty of candor by knowingly issuing false and misleading statements in its regulatory disclosures. *See* Response, Dkt. No. 43 at 22. Accordingly, Plaintiffs are required to show that their claim that the Board breached their duty of candor has some merit.

The duty of candor, derived from the fiduciary duties of care, loyalty and good faith, requires boards of directors to disclose all material facts when seeking stockholder action. *See Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998). "The essential inquiry in such an action is whether the alleged omission or misrepresentation is material" and "[m]ateriality is determined with respect to the shareholder action being sought." *Id.*

In cases where a board's allegedly misleading disclosures do not relate to a specific shareholder action, a shareholder plaintiff can demonstrate a breach of fiduciary duty by showing that the directors "*deliberately* misinformed shareholders about the business of the corporation, either directly or by a public statement." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 133 (Del. Ch. 2009) (emphasis in original). What a shareholder must prove in a suit against director defendants protected by an exculpatory provision is even more exacting. *See id.* at 124-25. Delaware law authorizes corporations to include clauses in their charters that limit director liability for breaches of fiduciary duty to only those acts or omissions that are made intentionally, in bad faith, or in knowing violation of the law. *See id.* Here, the parties do not dispute that the exculpatory provision in BofI's Certificate of Incorporation insulates the Director Defendants from non-intentional breaches of their fiduciary duties. *See* Response, Dkt. No. 43 at 29; MTD, Dkt. No. 41-1 at 20. Accordingly, "because the [D]irector [D]efendants are exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the [P]laintiff[s] plead[ ] a non-exculpated claim against the [D]irectors based on particularized facts." *In re Citigroup*, 964 A.2d at 124-25. Accordingly, for present purposes, in order to demonstrate demand futility, Plaintiffs must have sufficiently plead particularized factual allegations "support[ing] the inference that the disclosure violation was made in bad faith, knowingly or intentionally." *Id.*; *see*

1  *also In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1016 (N.D. Cal. 2015); *In re First Solar*

2  *Deriv. Litig.*, 2016 WL 3548758, *6 (D. Ariz. June 30, 2016).

3  **C. Demand futility analysis**

4  Plaintiffs argue that all of the Director Defendants face a substantial likelihood of

5  liability for causing BofI to disseminate false and misleading statements regarding BofI's

6  internal controls and risk management in violation of their duty of candor.  Response,

7  Dkt. No. 43 at 22.  In taking this position, they rely on the fact that (1) "this Court has

8  already upheld [BofI's false and misleading statements] as actionable under the

9  heightened pleading standard of the PSLRA [Private Securities Litigation Reform Act] in

10  the related securities-fraud class action" and (2) that the complaint alleges with great

11  detail the "involvement of a majority of the Board in causing BofI to issue materially

12  false and misleading statements." *Id.*  For the reasons stated below, however, the Court

13  finds neither of these arguments persuasive.

14  For one, the parallel that Plaintiffs draw between this shareholder demand suit and

15  the related securities litigation lawsuit brought against BofI is misplaced.  Plaintiffs rely

16  on *In re Countrywide* to demonstrate that where, as here, a shareholder derivative suit is

17  accompanied by a properly-plead securities fraud suit — that is, one that pleads with

18  particularity that the corporate defendant knowingly made a false and misleading

19  statement, *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)

20  — demand is excused.  *See* Response, Dkt. No. 43 at 22.  In *In re Countrywide*, however,

21  the court had found that the plaintiffs had demonstrated a strong inference of scienter, for

22  purposes of proving a securities violation, with respect to eleven of the thirteen board of

23  directors.  554 F. Supp. 2d at 1082.  It is, therefore, no surprise that the *In re Countrywide*

24  court would import their discussion of securities fraud scienter into its analysis of

25  demand futility, because it had already found that the plaintiffs had plead knowledge of

26  wrongdoing as to *a majority* of the board of directors.

27  Here, by contrast, this Court did not find that a strong inference of scienter

28  attached to a majority of BofI's board of directors for purposes of pleading a securities

fraud claim.  In fact, the Court only held that the plaintiffs had plead scienter with particularity as to Garrabrants.  *See In re: BofI Holding, Inc. Sec. Litig.*, 2016 WL 5390533, *12-14 (S.D. Cal. Sept. 27, 2016).  Accordingly, the securities fraud suit pending against BofI proves very little, here, because it only found that a single board member knowingly issued false and misleading statements, as opposed to a majority of them.  Thus, because the BofI securities fraud suit did not find that a strong inference of scienter attached to any of the eight remaining director defendants, the outcome of that suit has virtually no probative value in the demand futility context, except as to Garrabrants.  Accordingly, Plaintiffs' argument fails.

Two, contrary to what Plaintiffs argue, they have not plead "in great detail" that a majority of the Board was involved in the issuance of false or misleading statements.  Not only have Plaintiffs failed to identify any relevant disclosure that was false or misleading, but they have also failed to demonstrate that a majority of the Board of Directors made any misstatement knowingly, intentionally, or in bad faith.  *See In re Citigroup*, 964 A.2d at 124-25.

Plaintiffs argue that all of the Director Defendants approved and signed the Form 10-Ks dated September 4, 2013, August 28, 2014, and August 26, 2015, all of which allegedly contained false and misleading statements about BofI's condition, the adequacy of its internal controls and the risk of its investments.  *See* Response, Dkt. No. 43 at 23.  Plaintiffs, however, have not pointed to any evidence suggesting that Allrich, Burke, Court, Dada, or Ratinoff would have known that there were false and misleading statements contained in the 2013 or 2014 10-K.  *See* Defs.' Reply to Response, Dkt. No. 47 at 13 (pointing out that "BofI's Forms 10-K for 2013 and 2014 are irrelevant to this Court's demand futility analysis because they predate May 21, 2015, the date the Board allegedly became aware of Mr. Erhart's claims.").  Plaintiffs nonetheless suggest that all of the Director Defendants knew that they were making false and misleading statements in the 2013 and 2014 publications because Erhart's audit findings revealed that "BofI's

internal controls were frequently disregarded" during that time frame.  Response, Dkt. No. 43 at 23.

The Court rejects Plaintiffs' attempt to rely on the mere existence of wrongdoing occurring somewhere at the company as evidence of the Board's knowledge or complicity in that wrongdoing.  There is no evidence that any of that alleged wrongdoing "pierced the confines of the Boardroom," *see Gulbrandsen ex rel. Wells Fargo & Co. v. Stumpf*, 2013 WL 1942158, *6 (N.D. Cal. May 9, 2013), until the May 21, 2015 Board meeting, when Grinberg allegedly informed the Board about Erhart's whistleblower complaint and audit findings.  Moreover, Delaware courts have routinely rejected the notion that board members can be presumed substantially liable for misconduct occurring at the company absent particularized allegations evidencing that the Board knew about the illicit activities.  *See Guttman v. Huang*, 823 A.2d at 504; *In re Citigroup*, 964 A.2d at 134; *see also Jones ex rel. CSK Auto Corp.*, 503 F. Supp. 2d at 1334; *In re First Solar Deriv. Litig.*, 2016 WL 3548758, *10 (D. Ariz. June 30, 2016); *Gulbrandsen*, 2013 WL 1942158, at *6; *In re Verifone Holdings, Inc. S'holder Deriv. Litig.*, 2009 WL 1458233, *8 (N.D. Cal. May 29 2009) ("It is conclusory to state that the directors knew about the internal problems in accounting. . . [t]hese facts suggest at most that there were weaknesses in the accounting division . . . not that the directors were conscious of the fact that they were not doing their jobs.").  Thus, because Plaintiffs have not set forth any allegations demonstrating that the majority of the Board should have known about any wrongdoing before May 21, 2015, whether a majority of the Board faces liability associated with the issuance of false statements depends on whether a majority of the Board faces a substantial likelihood of liability based upon disclosures made in the 2015 Form 10-K.

The Court, however, cannot reasonably conclude that a majority of the Board faces a substantial likelihood of liability for making false or misleading statements in the 2015 Form 10-K because Plaintiffs have failed to identify, much less particularly plead, any false or misleading statement present in the 2015 Form 10-K.  *See In re Citigroup*, 964

A.2d at 133-34 (finding, in part, that plaintiffs failed to meet the factual particularity standard because they did not "allege with particularity which disclosures were misleading . . . what specifically the Company was obligated to disclose, and how the Company failed to do so."). The complaint discusses the alleged disclosures made in BofI's 2015 Form 10-K at ¶¶ 124-27. One of the alleged disclosures concerns BofI's acknowledgement that it was subject to extensive federal regulation. *See* CSC ¶ 125. Quoting the 2015 Form 10-K for the proposition that BofI is subject to federal regulation, however, does not demonstrate that BofI made a material false and misleading statement about the adequacy of BofI's internal controls or the risk of its investments. The other allegations concerning the contents of BofI's 2015 Form 10-K are similarly devoid of any actionable false or misleading statements. For instance, Plaintiffs also fail to identify any false or misleading statement by pleading that the 2015 Form 10-K cross-references the Form 8-K filed on July 30, 2015. *See* CSC ¶ 124. Because the only information identified by the CSC in the July 30, 2015 Form 8-K concerns the company's "financial and operating results," which include a description of net income, net revenue, and price per share, the Court cannot conclude that the 2015 Form 10-K contained a false or misleading statement about BofI's internal controls, regulatory compliance, or risk. *See id.* at ¶ 121. Finally, the Court concludes that it is also not sufficient, for demand futility purposes, to rely on SOX certifications signed by Defendants Garrabrants and Micheletti. While the SOX certifications are relevant insofar as they state that "the Company has disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting," they are not enough to plead demand futility because they were not signed by the majority of the Board. *See id.* ¶ 126. As such, the Court cannot conclude that a majority of the Board is likely to face a substantial likelihood of liability for violating their duty of candor.

Yet even if Plaintiffs had identified a statement in the 2015 Form 10-K that was rendered false or misleading by Erhart's audit findings, that would still not be enough because the CSC also lacks the particularized facts needed to reasonably infer that a

majority of the Board issued such statements knowingly, intentionally or in bad faith.  In order for a board member to face a substantial likelihood of liability for violating his duty of candor, he or she must have deliberately misinformed shareholders.  *See Citigroup*, 964 A.2d at 133.  But as the Court previously stated, the Court rejects the notion that a majority of the Board, and particularly Allrich, Burke, Court, Dada or Ratinoff, can be held liable for deliberately concealing material weaknesses in BofI's internal controls and risk procedures based solely upon the conclusory allegation that they fired Erhart or that they were aware of his allegations.

By way of comparison, in *In re Veeco Instruments, Inc. Sec. Litig.*, the plaintiffs successfully argued that the audit committee would face a substantial likelihood of liability for failing to investigate a whistleblower complaint by pointing to the fact that violations raised by the whistleblower continued to occur after they were brought to the committee's attention.  434 F. Supp. 2d 267, 277-78 (S.D.N.Y. 2006).  Such repeated violations, the court concluded, supported the inference that the committee permitted the additional violations to occur because a later violation suggests that the whistleblower reports had been disregarded.  *Id.* at 278.  Here, however, the complaint does not particularly allege that any of the violations that Erhart raised in his whistleblower complaint continued to occur after the Board became aware of his audit findings.  It also does not offer allegations suggesting that the Board failed to investigate Erhart's complaint or that they declined to inform themselves of the misconduct.  Accordingly, absent some indication that the Board did nothing about Erhart's audit findings after it learned of them, the Court cannot reasonably conclude that a majority of the Board knowingly and in bad faith made false and misleading statements in the 2015 Form 10-K, issued months after they learned of Erhart's audit findings.

In reaching this conclusion, the Court rejects Plaintiffs' reliance on *In re Countrywide* and *In re Cendant Corp. Deriv. Action Litig.*, 189 F.R.D. 117, 129 (D.N.J. 1999) for the proposition that it is proper to hold director defendants, who know of ongoing illegal conduct, liable for signing the company's false and misleading financial

statements.  *See* Response, Dkt. No. 43 at 24-25.  The plaintiffs in *In re Countrywide* and *In re Cendant* presented the court with substantial and probative evidence of the defendants' knowledge of illegal conduct.  *See In re Countrywide*, 554 F.Supp.2d at 1082 (finding that the board's audit committee and financial committee had made false and misleading statements with scienter because they were responsible for overseeing the company's risk exposure and financial performance of its loan portfolio and yet had done nothing in the face of increased delinquency and nonperformance in the company's riskiest loans); *see also In re Cendant*, 189 F.R.D. at 128 (concluding that because the director defendants directly benefitted from making false and misleading statements with regards to a merger, which led to lucrative compensation packages, fees, and stock options for the board, they were substantially likely to face liability for knowingly issuing such statements).  Here, by contrast, Plaintiffs have not presented the Court with any particularized allegations evincing that the majority of the Board of Directors knew of illegal conduct occurring at the time of the issuance of the 2015 Form 10-K.  Plaintiffs claim that the Board learned of Erhart's audit findings on May 21, 2015, but they do not, for instance, allege any facts demonstrating that a majority of the Board failed to investigate Erhart's audit findings or deliberately refused to act upon them, such that the Court can infer that they knowingly or intentionally misled the public about the company's condition months later.

In sum, Plaintiffs have not plead enough as to the Board as a whole for the Court to conclude that a majority of them face a substantial likelihood of liability for breaching their duty of candor by publishing false or misleading statements.  The complaint alleges that the Board learned of Erhart's whistleblower complaint and audit findings on May 21, 2015, but they do not identify any statement made in BofI's 2015 10-K, published in August 2015, that the Court could reasonably conclude was rendered false or misleading by Erhart's findings concerning BofI's internal controls and risk procedures.  Absent evidence that a disclosure violation actually occurred, the Court cannot conclude that the Board faces a substantial likelihood of liability.  Furthermore, even if Plaintiffs had

adequately identified misleading statements made in the 2015 Form10-K, they have still failed to demonstrate that any misstatements were made by a majority of the Board in bad faith.  There are no particularized allegations demonstrating that the majority of the Board deliberately turned a blind eye to Erhart's audit findings, failed to investigate them, or allowed the wrongdoing to continue.  As such, the Court cannot conclude that a majority of the Board is substantially likely to face liability for violating its duty of candor and for deliberately misinforming investors.

## III.   Other Demand Futility Arguments

Plaintiffs further argue that there is reason to doubt the Director Defendants' ability to impartially consider a demand because of their compensation packages and other job-related emoluments.  Response, Dkt. No. 43 at 32.

### A. Director Independence and Disinterestedness

To return to the basics, under the first prong of *Aronson*, a plaintiff can establish demand futility by showing that a majority of the board of directors are not disinterested and independent.  "Directorial 'interest' exists whenever divided loyalties are present, or where the director will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a 'materially detrimental impact' on a director but not the corporation or its stockholders."  *In re Computer Scis. Deriv. Litig.*, 244 F.R.D. at 586 (citing *Rales*, 634 A.2d at 936). Shareholders may also demonstrate that a director lacks independence by demonstrating that the director is "controlled" by another individual or entity.  *See In re Sagent Tech., Inc. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1088 (N.D. Cal. 2003).

> A director may also be considered "controlled" if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenge transaction objectively.

1     *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) (citations omitted).  When

2     making this inquiry, courts should be guided by "a kind of realism in analyzing the

3     human dynamics at play in a director's relationships."  *See Union de Empleados de*

4     *Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs. Inc. of Puerto Rico*, 704

5     F.3d 155, 164 (1st Cir. 2013).  As such, the proper inquiry is whether or not any given

6     compensation or emolument would make a director defendant "so personally or

7     financially beholden to an interested person, or an interested entity" such that "his or her

8     discretion [is] sterilized."  *Beam ex rel Martha Stewart Living Omnimedia, Inc. v.*

9     *Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

10        **B. Demand Futility Analysis**

11        The Court finds that Plaintiffs' compensation-related allegations are insufficient to

12     establish demand futility.  As Plaintiffs themselves concede, it is not enough, for demand

13     futility purposes, to rely on the amount that a director is compensated as evidence of

14     nonindependence.  *See In re Countrywide*, 554 F. Supp. 2d at 1078 ("While these

15     numbers [$358,966 to $538,824] may be substantial, the Court cannot conclude, without

16     more, that they are "so lavish that a mechanical application of the [presumption of

17     director independence] would be totally at variance with reality") (quoting *Grobow v.*

18     *Perot*, 526 A.2d 914, 923 n.12 (Del. Ch. 1987) *aff'd* 539 A.2d 180 (Del. 1988)).

19     Nonetheless, Plaintiffs argue that they have plead enough to question the board members'

20     independence because a majority of the Board (namely, Allrich, Argalas, Burke,

21     Garrabrants, Grinberg, and Mosich) not only received substantial compensation, but also

22     received mortgages on their primary residences at below-market rates.  *Id.* at 23.

23        Plaintiffs, however, have failed to adequately plead or explain how the receipt of a

24     single loan on a primary residence at below-market rates, is of such subjective materiality

25     to the Board members that a majority of them could not consider a shareholder demand.

26     For one, the benefit that the Board members received does not arise from the challenged

27     transaction, a fact that diminishes any inference of partiality.  *Rales*, 634 A.2d at 933.  By

28     way of example, in *Mizel v. Connelly*, the only case cited by Plaintiffs to support their

argument, the court found that a majority of the board of directors were interested because one board member directly benefitted from the transaction challenged by the shareholders.  1999 WL 550369 (Del. Ch. July 22, 1999).  The shareholders in *Mizel* brought suit against President Casinos, a corporation, for having bought a nearby resort at an excessive price.  *Id.* at *2.  Because one of President Casinos' director defendants was the sole owner of the purchased resort, the court concluded that that director could not have impartially considered a demand because he had a direct personal interest in the challenged transaction.  *Id*.  The court further concluded that because the remaining director defendants were beholden to that director, "who does possess such a self-interest, [ ] they c[ould not] consider the demand solely on the merits."  *Id.* at *3.

The instant matter could not be more different from the facts of *Mizel*.  There is no obvious connection between the conduct that the shareholders challenge (i.e., Erhart's dismissal and the violations he uncovered) and the fact that the board members can take advantage of a company-wide policy regarding loan rates.  Moreover, the emolument at issue, here, was taken advantage of only once, on each of the above-mentioned Director Defendants' primary residences, and contrary to what Plaintiffs' argue, there is no basis for reasonably concluding that a loan, a contract, would somehow be rescinded or modified just because the Director Defendants decided to consider the shareholders' demand.  As such, the Court rejects Plaintiffs' cursory conclusion that the board members would be "jeopardizing the mortgages on their primary residences" by considering a shareholder demand."  Response, Dkt. No. 43 at 33.

Put plainly, Plaintiffs have failed to plead facts upon which the Court can reasonably conclude that the Board members' judgment is impaired by the receipt of a single loan at below-market rates and their board-related compensation.  To satisfy the heightened pleading standard for demand futility, Plaintiffs must demonstrate via particularized facts that the majority of the Board of Directors are impartial.  Merely saying that the majority of the Board once took advantage of a company-wide program that provided them with a favorable mortgage on their primary residence, without

alleging how that seemingly one-time benefit would indefinitely disqualify certain Board members from exercising independent judgment, is not enough.  While the Court recognizes that certain employee benefits may be sufficiently material to raise an inference that board members are beholden to the company, the Court rejects Plaintiffs' argument that the receipt of a single mortgage at a below-market interest rate, without more, is one of them.  Accordingly, the Court concludes that Plaintiffs' compensation-related allegations fail to satisfy *Aronson*.[11]

## IV.     Summary and the *Rosenbloom* framework

In their opposition to Defendants' motion to dismiss, Plaintiffs rely heavily on the Ninth Circuit's decision in *Rosenbloom v. Pyott* to support the sufficiency of their demand futility allegations.  *See* Response, Dkt. No. 43 at 18-19.  *Rosenbloom* provides courts with guidance on how to review the adequacy of shareholder demand futility pleadings and, specifically, *Rosenbloom* instructs lower courts to (1) read the factual allegations as a whole, rather than in isolation; (2) credit the plaintiff's reasonable interpretations of the allegations rather than draw inferences in favor of the Defendants; and (3) not insist on a "smoking gun of Board knowledge."  765 F.3d at 1155-56.  Yet while Plaintiffs rely upon these three tenets to defend against the Defendants' motion to dismiss, the Court concludes that Plaintiffs' demand futility allegations are equally insufficient even when viewed within the *Rosenbloom* framework.

As identified above, each of Plaintiffs' demand futility arguments suffer from fatal flaws that cannot be cured by reading the factual allegations as a whole or by drawing reasonable inferences in favor of Plaintiffs, including reasonable inferences of Board knowledge.  First, the complaint offers no particularized facts demonstrating that the entire Board fired Erhart.  Plaintiffs would have the Court infer that the Board fired

---

[11] The Court notes that Plaintiffs also make specific arguments concerning the independence of Garrabrants and Grinberg.  However, because these arguments are not directed at a majority of the Board, it is not necessary for the Court to reach them as they are insufficient for demand-futility purposes.

Erhart just because they had knowledge of his allegations, but that conclusion does not follow from the particularized facts alleged.

Second, the complaint does not identify any false or misleading statement for which a majority of the Board could be held liable. Plaintiffs contend that the entire Board can be held responsible for the violations of law that Erhart uncovered, but Delaware law has made clear that the mere existence of wrongdoing or the mere fact that certain public statements were false or misleading, does not make a board liable absent evidence that the board was aware of the misconduct. Plaintiffs have alleged with sufficient particularity that the Board became aware of Erhart's allegations on May 21, 2015. They have not, however, identified any statement in the 2015 Form10-K that was rendered false or misleading by Erhart's audit findings or set forth any allegations demonstrating that the Board approved the disclosure knowing that it contained misinformation about the company's condition.

Third, Plaintiffs have not set forth enough particularized pleadings for the Court to infer that a majority of the Board is partial because of their board compensation and because they received a favorable mortgage on their primary residence. Plaintiffs contend that the Board members who participated in the Mortgage-lending Program would have been "jeopardizing the mortgages on their primary residences" if they were to have responded to Plaintiffs' demand allegations. Yet that conclusion strains credulity. Plaintiffs' demand futility allegations have nothing to do with the mortgage lending program and, moreover, there is no evidence to suggest that BofI raises the interest rates on such loans when an employee or board member departs.

And finally, the Court is also not convinced that there are sufficient parallels between the facts of *Rosenbloom* and the facts of the present case to warrant finding that Plaintiffs have adequately pled demand futility. The wrongdoing at issue in *Rosenbloom* was the alleged promotion of Botox for off-label purposes — meaning, for the care of symptoms other than the ones that the FDA approved the drug to treat. *Rosenbloom*, 765 F.3d at 1141. There was no question that Botox was being prescribed for off-label (i.e.,

illegal purposes) and, thus, the case's central dispute concerned whether the board was rightfully deemed responsible for the illegal use of its product.  Accordingly, for purposes of pleading demand futility, the *Rosenbloom* inquiry focused on whether the plaintiffs had adequately alleged scienter such that that the court could reasonably infer that the board participated or tacitly ratified the off-label scheme, thus making them incapable of impartially considering a shareholder demand.  *Id.* at 1151.

Ultimately, the Ninth Circuit held that plaintiffs had met their burden by pleading "a battery of particularized factual allegations" that raised red flags sufficient to "support an inference at this stage of the litigation that the Board knew of and did nothing about illegal activity." *Id.* at 1152.  Those red flags included: (1) the Board's decision to adopt strategic plans to maximize sales of the drug for off-label use before the FDA was slated to approve the drug for such uses; (2) that the Board closely and regularly monitored off-label Botox sales; (3) the Board's decision to fund organizations under their control that promoted off-label use of Botox; (4) Allergan's acquisition of a company that afforded Botox sales specialists access to physicians who would prescribe Botox for off-label purposes; (5) the Board's interest in Allergan's off-label sales programs that were spearheading the unlawful marketing; (6) the Board's receipt of data "directly linking Allergan's sales programs to fluctuations in off-label sales"; (7) the fact that the Board had received repeated FDA warnings about the illegal promotion of Botox; (8) the fact that "the illegal conduct in th[e] case involved one of the most important drugs at Allergan"; and (9) the fact that the illegal conduct persisted for over a decade and involved several divisions at Allergan.  *Id.* at 1152-54.

Here, however, we do not have a "battery of particularized allegations that strongly supported an inference . . . that the Board knew of *and did nothing about illegal activity*." *Rosenbloom*, 765 F.3d at 1152 (emphasis added).  All that Plaintiffs have alleged with particularity is that the Board became aware of Erhart's audit findings and whistleblower complaint on May 21, 2015.  Based on that allegation alone, Plaintiffs argue that the Court can infer that the Board fired Erhart, that the Board deliberately

disregarded or negligently did not investigate his audit findings, and that the Board knowingly misled the public to believe that the company was on sound legal footing when in fact it was aware that Erhart was correct when he reported that illegal activity was rampant at the bank.  But Plaintiffs have plead no facts demonstrating that the BofI Board did nothing about Erhart's audit findings, much less that they fired him.  Unlike the shareholders in *Rosenbloom*, Plaintiffs have not demonstrated that the alleged illegal conduct persisted for any meaningful time after the Board became aware of it, or that the Board failed to address such illegality despite receiving repeated warnings from regulators addressing such misconduct.  *See In re First Solar*, 2016 WL 3548758, at *13 (refusing to find that plaintiffs were entitled to demand under *Rosenbloom* because they did not allege enduring or pervasive misconduct or that that board was warned by government agencies about the alleged misconduct).  Absent such allegations, the Court can only speculate about how the Board reacted to Erhart's audit findings and his alleged whistleblower complaint and whether their reaction rendered them interested for demand futility purposes.

Perhaps the Board did fire Erhart.  Perhaps they have ignored all of his audit reports and misled the public as to BofI's regulatory compliance.  But the Court cannot reasonably infer any of these conclusions based on the particularized allegations contained in the complaint.  The only key fact that the complaint pleads with particularity is that the Board became aware of Erhart's whistleblower complaint on May 21, 2015.  What happened after May 21, 2015 is entirely unclear, and thus it would be improper for the Court to make any reasonable inferences about the Board's scienter or bad-faith reaction to Erhart's complaint.  Accordingly, the Court finds that Plaintiffs have failed to adequately demonstrate that they are entitled to demand futility.

## **MOTIONS TO SEAL**

The parties have filed various motions to seal documents submitted in support of their respective briefs.  Plaintiffs have moved to seal portions of their opposition brief, Dkt. No. 42; Defendants moved to seal an unredacted version of Board meeting minutes

from May 21, 2015 in support of their reply brief, Dkt. No. 48-1; and Plaintiffs moved to seal portions of their response to Defendants' request to seal and take judicial notice of the May 21, 2015 minutes, Dkt. No. 50-1.  For the following reasons, the Court **GRANTS** each of these motions to seal.

Courts have recognized a "general right to inspect and copy public records and documents, including judicial records and documents."  *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 597 & n. 7 (1978).  Nonetheless, access to judicial records is not absolute.  A narrow range of documents is not subject to the right of public access at all because the records have "traditionally been kept secret for important policy reasons."  *Times Mirror Co. v. United States,* 873 F.2d 1210, 1219 (9th Cir.1989).  A party seeking to seal a judicial record then bears the burden of overcoming this strong presumption by meeting the "compelling reasons" standard.  *Id.* at 1135.  That is, the party must "articulate[ ] compelling reasons supported by specific factual findings," *id.* (citing *San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1102-03 (9th Cir. 1999)), that outweigh the general history of access and the public policies favoring disclosure, such as the "public interest in understanding the judicial process," *id.* (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995)).  After considering these interests, if the court decides to seal certain judicial records, it must "base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Hagestad,* 49 F.3d at 1434 (citing *Valley Broadcasting Co. v. U.S. Dist. Ct.*, 798 F.2d 1289, 1295 (9th Cir. 1986)).

In common to all three motions to seal, here, is the confidentiality agreement entered into between Plaintiffs and BofI in connection with BofI's response to the shareholder inspection demand made upon the company.  *See* Dkt. Nos. 42-1, 48, 50-1.  On December 2, 2015, Plaintiff Calcaterra served BofI with a demand to inspect its books and records under Section 1601 of the California Corporations Code.  Plaintiff's demand sought to inspect BofI's Board meeting minutes from February 6, 2013 onward and any presentations or documents displayed at those meetings.  Dkt. No. 50-1 at 3.  As a

1  condition of complying with this shareholder demand, BofI requested that any documents

2  it produced remain confidential because they contain non-public, proprietary, or

3  commercially sensitive information about BofI.  *Id.*  To that end, the parties entered into a

4  confidentiality agreement on March 8, 2016, which designated all documents produced

5  from the shareholder demand as confidential.  *Id.*

6          Pursuant to this agreement, Plaintiffs moved to file portions of the CSC under seal.

7  *See* Dkt. No. 34-1.  On August 30, 2016, the Court granted said request, finding that

8  compelling reasons existed to seal the information subject to the confidentiality

9  agreement.  Dkt. No. 33.  In accordance with the Court's August 30, 2016 ruling, the

10  Court finds that similar compelling reasons exist, here, to grant the requested motions.

11  Each of the parties' motions requests that the Court seal documents, or information

12  obtained from documents, which are subject to the parties' confidentiality agreement.

13  *See* Dkt. Nos. 42-1, 50-1, and 48.  The scope of information subject to the confidentiality

14  agreement concerns proprietary business information shared between BofI and its

15  shareholders.  Because the Court finds that the disclosure of such information runs the

16  risk of harming BofI's competitive standing, the Court finds that there is a sufficient,

17  compelling basis for sealing those records and excerpts that are subject to the

18  confidentiality agreement.  Accordingly, the Court **GRANTS** Plaintiffs' motions to seal,

19  Dkt. Nos. 42-1 & 50-1, and Defendants' motion to seal, Dkt. No. 48.

20                                     <u>**CONCLUSION**</u>

21          The Court **GRANTS** Defendants' motions to dismiss.  The Court will reserve

22  ruling on whether or not the motion is granted with or without prejudice until after

23  hearing from the respective parties.  Given that the related shareholder litigation of

24  *Deyoung v. Micheletti et al.*, 3:16-cv-02723-GPC-KSC is ripe for decision on the merits,

25  the Court is inclined to find that providing the shareholders, here, with leave to amend

26  their demand futility allegations would be futile.  The Court therefore **ORDERS** that

27          / / / /

28          / / / /

Plaintiffs show cause why this case should not be dismissed with prejudice by **March 17, 2017**.  Defendants shall file a response by **March 31, 2017**.

   **IT IS SO ORDERED.**

Dated:  March 1, 2017

Hon. Gonzalo P. Curiel
United States District Judge