BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002

*Lead Counsel for Plaintiffs*

[Additional counsel listed on signature page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: BOFI HOLDING, INC. DERIVATIVE LITIGATION | ) ) ) |
| | ) ) |
| This document relates to: | ) ) ) |
| ALL ACTIONS. | ) ) ) |

Case No. 15cv2722 GPC (KSC)

**First Amended Consolidated Shareholder Derivative Complaint (Redacted)**

**Demand for Jury Trial**

**UNDER SEAL**

Plaintiffs Andrew Calcaterra and Zhang Yong (collectively, "Plaintiffs"), derivatively on behalf of BofI Holding, Inc. (hereafter "BofI," the "Bank," or the "Company"), respectfully submit this Consolidated Verified Shareholder Derivative Complaint against the members of BofI's Board of Directors (the "Board") (collectively, the "Individual Defendants") for breaches of their fiduciary duties, gross mismanagement, abuse of control, and unjust enrichment.  Plaintiffs make the following allegations, except as to allegations pertaining to Plaintiffs (which are based on personal knowledge), based on their investigation and the investigation of their counsel, including a review of:

(a)　legal and regulatory filings, press releases, and media reports about BofI;

(b)　the pleadings and other papers filed in (i) the suit and counter-suit between BofI Federal Bank and its former Staff Internal Auditor, Charles Matthew Erhart ("Erhart"), filed in this District and captioned *Erhart v. BofI Federal Bank*, No. 15cv2287 BAS (NLS) (S.D. Cal.), and *BofI Federal Bank v. Erhart*, No. 15cv2353 BAS (NLS) (S.D. Cal.) (the "Consolidated Whistleblower Action"); (ii) the consolidated securities-fraud class action against BofI and its officers, filed in this District and captioned *Houston Municipal Employees Pension System v. BofI Holding, Inc.*, 15cv2324 GPC (KSC) (S.D. Cal.) (the "Securities Class Action"); and (iii) the petition to compel arbitration filed by BofI Federal Bank against its former quality-control auditor, Veronica Golub, in the Superior Court of California, County of San Diego, captioned *BofI Federal Bank v. Golub*, No. 37-2016-00904902-CU-PA-NC (Cal. Super. Ct. Cnty. of San Diego);

(c)　documents produced by BofI in response to plaintiff Calcaterra's shareholder inspection demand under Section 1601 of the California Corporations Code and the common law; and

1

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

1          (d)   other public statements issued by BofI.

2   Plaintiffs believe that substantial additional evidentiary support will exist for the

3   allegations set forth herein after a reasonable opportunity for discovery.  In support

4   of these derivative claims, Plaintiffs allege as follows:

5                            **NATURE OF THE ACTION**

6          1.   This is a shareholder derivative action to remedy the wrongdoing

7   committed by BofI's directors and officers between February 6, 2013 and the

8   present (the "Relevant Period").

9          2.   Founded in 1999 and headquartered in San Diego, BofI operates as the

10   holding company for BofI Federal Bank, a provider of consumer and business

11   banking products through the Internet in the United States.  BofI Federal Bank's

12   products include consumer and business checking, demand, savings, and time

13   deposit accounts. Its loan portfolio comprises residential single family and

14   multifamily mortgage loans; commercial real estate secured and commercial lending

15   products; specialty finance factoring products; and consumer lending products

16   consisting of prime loans to purchase new and used recreational vehicles and

17   automobiles, as well as deposit-related overdraft lines of credit.

18          3.   BofI Federal Bank's most significant business is making mortgages to

19   high-net-worth individuals for the purchase of high-end properties through BofI

20   Federal Bank's Bank of Internet USA ("Bank of Internet") brand.

21          4.   Throughout the Relevant Period, the Individual Defendants caused

22   BofI, whose shares are traded on the NASDAQ under the ticker symbol "BOFI," to

23   make false and/or misleading statements, and failed to disclose material adverse facts

24   about the Company's business, operations, prospects, and performance.  Specifically,

25   during the Relevant Period, Defendants caused the Company to make false and/or

26   misleading statements and/or failed to disclose that:

27            (a)   the Company's internal controls were frequently disregarded;

28

(b)   BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

(c)   many BofI accounts lacked required tax identification numbers;

(d)   in violation of the anti-retaliation laws contained in the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), the Board caused the Company to fire an internal auditor who raised the foregoing issues to senior management and to federal regulators; and

(e)   as a result of the above, the Company's statements regarding BofI's internal controls and other financial statements were materially false and misleading at all relevant times.

5.   On October 13, 2015, after the close of trading, *The New York Times* reported that Mr. Erhart, who worked for approximately two years as an internal auditor at BofI Federal Bank, had filed a lawsuit against the bank for violating federal laws designed to protect whistleblowers (the "*Erhart* Complaint").   The *Erhart* Complaint alleged, *inter alia*, that:

- Mr. Erhart was instructed by senior officers at BofI, including defendant John C. Tolla ("Tolla"), BofI's Chief Governance Risk and Compliance Officer, to refrain from putting anything in writing regarding the Company's violations of laws;

- Mr. Erhart was instructed by senior officers at BofI, including Tolla, to label anything he did in his audit function which might be incriminating to the Company as "attorney client work product/communication" in order to shield such documents from later production;

- BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

- Mr. Erhart had seen a spreadsheet that contained as many as 200 accounts without tax identification numbers, contrary to BofI's representations to the Office of the Comptroller of the Currency ("OCC"), its primary regulator;

3

- BofI at times failed to provide full and timely information to regulators; and

- after Mr. Erhart revealed wrongdoing at BofI to management and federal regulators, his work performance evaluation was downgraded, and he was eventually fired.

6.    On this news, shares of BofI fell $42.87, or 30.2%, to close at $99.13 on October 14, 2015.

7.    In response to this news, the Individual Defendants caused BofI to issue a press release and Form 8-K filing with the SEC on October 15, 2015, in which BofI disparaged the whistleblower and stated that the whistleblower's allegations had no merit. *See* Form 8-K Current Report Dated October 15, 2015 (attached as **Exhibit 1** hereto).

8.    However, in the October 15, 2015 press release and Form 8-K, BofI admitted that the Audit Committee and full Board of Directors had been fully informed of the whistleblower's complaint and related details back in March 2015. The press release stated:

> "The Audit Committee and Board of Directors of BofI were fully informed by management of the events involving audit team members immediately after their occurrence in March 2015.  The Audit Committee then conducted interviews with internal audit personnel and held conversations with the Office of the Comptroller of the Currency," stated Paul Grinberg, Director and Chairman of the Audit Committee.  "An internal investigation was conducted, including an examination of forensic evidence, and the complaints of the former audit team member were found to be without merit," stated Eshel Bar-Adon, Executive Vice President and Chief Legal Officer.

9.    Significantly, for purposes of this shareholder derivative action, the Company's concession that the full Board of Directors was fully and immediately advised by management of all facts concerning the whistleblower's claims, and thereafter conducted an investigation, is an admission that the full Board knew that Mr. Erhart, the whistleblower, had engaged in protected activity under Sarbanes-Oxley, the Bank Secrecy Act, and the rules of the OCC — the Company's main

regulator.  The full Board also knew that it was illegal for the Company to fire Mr. Erhart in response for engaging in whistleblowing activity.

10.     Notwithstanding such knowledge, when it was brought to the Board's attention that Mr. Erhart had been fired by BofI shortly after reporting his good-faith concerns of unlawful conduct to the SEC and the OCC, the Board failed to take any conduct whatsoever to comply with SEC and OCC rules.  As set forth in more detail herein, there were several actions that the Board could have taken to comply with their fiduciary duties and ensure that BofI did not violate the anti-retaliation and other applicable provisions of Sarbanes-Oxley and the OCC, yet the Board took no action whatsoever in the face of a clear and unequivocal known duty to act.  As such, the entire Board acted in bad faith and in a disloyal manner.  Such conduct cannot be indemnified, and as a result the Board faces a substantial likelihood of liability and any demand on the Board would be a futile and useless act.

11.     As a result of the Individual Defendants' wrongful acts and omissions, the Company has been named as a defendant in the Securities Class Action and the Consolidated Whistleblower Action, and has suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     Subject-matter jurisdiction exists under 28 U.S.C. § 1332(a) because there is complete diversity between plaintiffs and defendants and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.     Venue is proper in the Southern District of California under 28 U.S.C. §§ 1391 and 1401 because BofI maintains its principal executive offices in this District and because a substantial portion of the acts and conduct complained of herein — including the dissemination of materially false and misleading information to the investing public — occurred in this District.

14.     Each defendant has minimum contacts with this District, as they have

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

entered into contracts in this District, or have frequently traveled here, on BofI's business, or have authorized acts and actions that have had a sufficient impact in this District or on BofI's shareholders and investors residing here to justify the exercise of jurisdiction over them.

**PARTIES**

**I.     Plaintiffs**

15.     Plaintiff Andrew Calcaterra is a current shareholder of BofI and has continuously held BofI stock since at least January 2013.  Plaintiff Calcaterra is a citizen of Michigan.

16.     Plaintiff Zhang Yong is a current shareholder of BofI and has continuously held BofI stock since at least July 2012.  Plaintiff Zhang is a citizen of the People's Republic of China.

**II.    Nominal Defendant**

17.     Nominal defendant BofI Holding, Inc. is a Delaware corporation headquartered and operating at 4350 La Jolla Village Drive, Suite 140, San Diego, California 92122.  BofI's shares trade on the NASDAQ under the ticker symbol "BOFI." At all material times to this action, BofI is a publicly-traded company.  BofI is a citizen of California and Delaware.

**III.   The Individual Defendants**

18.     Defendant Gregory Garrabrants ("Garrabrants") has served at all relevant times as the Company's President, Director, and Chief Executive Officer ("CEO").  Garrabrants is a citizen of California.

19.     Defendant Andrew J. Micheletti ("Micheletti") has served at all relevant times as the Company's Executive Vice President and Chief Financial Officer ("CFO").  Micheletti is a citizen of California.

20.     Defendant Theodore C. Allrich ("Allrich") served as Chairman of the Board from October 2009 until February 2017, when he resigned. Allrich also served

as a member of the Compensation Committee of the Board. Allrich is a citizen of California.

21.     Defendant Nicholas A. Mosich ("Mosich") has served as Vice Chairman of the Board since October 2010 and as a member of the Board since May 2009. Mosich is a member of the Board's Audit Committee during the entire Relevant Period. Mosich is a citizen of California.

22.     Defendant James S. Argalas ("Argalas") has served as a member of the Board since August 19, 2011. Argalas has served as a member of the Company's Internal Asset Review Committee. Argalas is also a member of the Board's Audit Committee during the entire Relevant Period. Argalas is a citizen of California.

23.     Defendant John Gary Burke ("Burke") has served as a member of the Board since October 2005 and is a member of the Compensation Committee of the Board and the Chairman of the Internal Assets Review Committee of the Board. Upon information and belief, Burke is a citizen of Ohio.

24.     Defendant Paul J. Grinberg ("Grinberg") has served as a member of the Board since April 2004. Grinberg is a member of the Board's Compensation Committee. Grinberg is also a member of the Board's Audit Committee during the entire Relevant Period. Following Allrich's resignation from the Board, Grinberg became the Chairman of the Board in February 2017. Grinberg is a citizen of California.

25.     Defendant James J. Court ("Court") has served as a member of the Board since April 2011. Court is a citizen of California.

26.     Defendant Edward J. Ratinoff ("Ratinoff") has served as a member of the Board and as a member of the Nominating Committee since 2010. Ratinoff is a citizen of California.

27.     Defendant Eshel Bar-Adon ("Bar-Adon") is an officer of the Company, holding the titles of Executive Vice President and Chief Legal Officer.

Bar-Adon is a citizen of California.

28. Defendant John C. Tolla is an officer of BofI who has served as Chief Governance Risk and Compliance Officer at BofI since December 2013. Tolla is a citizen of California.

29. Defendant Uzair Dada ("Dada") has served as a member of the Board since January 22, 2015. Dada is a citizen of California.

30. Defendant Derrick K. Walsh ("Walsh") is an officer of BofI and has served as its Chief Accounting Officer and Senior Vice President since February 2015. Walsh also served as BofI's First Vice President, Financial Reporting, from July 2013 until February 2015. Walsh is a citizen of California.

31. The defendants referenced in paragraphs 18 through 30 are sometimes referred to herein, collectively, as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BofI's reports to the U.S. Securities and Exchange Commission ("SEC"), press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants caused the Company to make specific false and misleading statements and/or reviewed and approved the Company's reports and press releases alleged herein to be misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

32. Defendants Mosich, Argalas, Garrabrants, Burke, Grinberg, Court, Ratinoff, and Dada are collectively referred to as the "Director Defendants."

33.     BofI and the Individual Defendants are collectively referred to herein as the "Defendants."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### I.     General Duties as Directors and Officers

34.     By reason of their positions as BofI's officers and directors and because of their ability to control BofI's business and corporate affairs, the Individual Defendants owed BofI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and manage BofI in a fair, just, honest, and equitable manner.   The Individual Defendants were required to act in furtherance of the best interests of BofI and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

35.     Each director and officer defendant owes to BofI and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of fair dealing, in the administration of BofI's affairs and in the use and preservation of its property and assets.

36.     The Individual Defendants, because of their positions of control and authority as directors and officers of BofI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.     To discharge their duties, the Individual Defendants, as BofI's officers and directors, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.   By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     ensure that BofI was operated in a diligent, honest, and prudent manner in accordance with its bylaws and charter, as well as the laws and regulations of Delaware and the United States;

9

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of BofI's business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    fully inform themselves as to how BofI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of BofI and procedures for the reporting of the business and internal affairs and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that BofI's operations and financial statements comply with all laws;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

38.    Each Individual Defendant, by virtue of his or her position as a director or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the

use and preservation of its property and assets. The Individual Defendants' misconduct complained of herein involves a knowing and culpable violation of their obligations as BofI's directors and officers, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised BofI's Board at all relevant times.

39.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and traded on NASDAQ, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' conduct in causing the Company to make misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations. Accordingly, the Individual Defendants breached their fiduciary duties including their duties of good faith, candor, and loyalty.

40.     At all relevant times, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

## II.     Compliance with the Generally Accepted Accounting Principles

41.     In issuing its financial statements, BofI was required to comply with Generally Accepted Accounting Principles ("GAAP") — a common set of accounting principles, standards, and procedures recognized by the accounting

profession and used to compile financial statements.

42.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.   Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, per 17 C.F.R. § 210.10-01(a).

43.    During the Relevant Period, BofI stated in its annual reports on Forms 10-K dated September 4, 2013, August 28, 2014, and August 26, 2015 that its financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America."

44.    In reality, however, the Individual Defendants failed to ensure that BofI adhered to GAAP during the Relevant Period.

III.    **The Duty of Reasonable and Prudent Supervision**

45.    The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance

of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls;

(d)   remain fully informed as to how BofI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(e)   ensure that BofI was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; and

(f)   refrain from breaching their duty of loyalty to the Company to benefit themselves at the expense of the Company.

## BREACHES OF FIDUCIARY DUTIES

46.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to BofI and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of BofI, as well as in the use and preservation of BofI's property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BofI, the absence of good faith on their part, or a reckless disregard for their duties to BofI and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to BofI.

47.   The Individual Defendants each breached their duties of loyalty and good faith by causing the Company to make false and/or misleading statements

and/or failing to disclose that:

(a)    the Company was doing business with foreign nationals who should have been off-limits under federal anti-money-laundering laws;

(b)    the Company had as many as 200 customer accounts without tax identification numbers, contrary to BofI's representations to the OCC, its primary regulator;

(c)    as a result, the Company's revenue and financial results were overstated;

(d)    the Company's financial statements were not prepared in accordance with GAAP;

(e)    the Company lacked adequate internal and financial controls; and

(f)    as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.

48.    In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of federal securities laws, and a whistleblower lawsuit alleging violations of federal law. As a result, BofI has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONTROL, ACCESS, AND AUTHORITY

49.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by BofI.

50.    Because of their advisory, executive, managerial, and directorial positions with BofI, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

representations of BofI.

51.    Each of the Individual Defendants was the agent of each of the other Defendants and of BofI, and was at all times acting within the course and scope of such agency.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.    During all relevant times, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that: (a) the Company was doing business with foreign nationals who should have been off-limits under federal anti-money-laundering laws; (b) the Company had as many as 200 customer accounts without tax identification numbers, contrary to BofI's representations to the OCC, its primary regulator; (c) as a result, the Company's revenue and financial results were overstated; (d) the Company's financial statements were not prepared in accordance with GAAP; (e) the Company lacked adequate internal and financial controls; and (f) as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

54.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, and unjust enrichment; and (b) disguise and misrepresent the Company's future financial results and prospects.

55.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to falsely represent that the Company had adequate internal controls in place, and by purposefully, recklessly, or negligently causing the Company to release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56.   Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

57.   BofI Holding, Inc. is the holding company for BofI Federal Bank, a nationwide bank that provides financing for single and multifamily residential properties, small-to-medium size businesses in target sectors, and selected specialty finance receivables.  With approximately $6.3 billion in assets, BofI Federal Bank provides consumer and business banking products through its low-cost distribution channels and affinity partners.   BofI common stock is listed on the NASDAQ Global Select Market and is a component of the Russell 2000® Index and the S&P SmallCap 600® Index.

58.   BofI operates in a highly-regulated field.  It is regulated by, among others, the OCC, the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the SEC, the Financial Industry Regulatory Authority ("FINRA"), and the Consumer Financial

Protection Bureau ("CFPB").  BofI is subject to a variety of statutory schemes including, without limitation, the Bank Secrecy Act of 1970 ("BSA"), the USA Patriot Act, including the Know Your Customer Rule ("KYC"), Dodd-Frank, Sarbanes-Oxley, the Securities Act of 1933, and the Exchange Act.

59.    BofI Federal Bank's most significant business is making mortgages to high-net-worth individuals for the purchase of expensive properties through BofI Federal Bank's Bank of Internet brand.

## I.    The Individual Defendants Were Charged with the Responsibilities of Overseeing Risk Management at BofI

60.    According to BofI's 2015 Proxy Statement, the Board, together with the Audit Committee, the Nominating Committee, and the Compensation Committee, as well as four risk committees (which are the Credit, the IAR, the Operations and Technology, and the ALCO committees), are to provide enterprise-wide oversight of the Company's management and handling of risk.

61.    These committees report regularly to the Board on risk-related matters and provide the Board with insight about BofI's management of strategic, credit, interest rate, financial reporting, technology, liquidity, compliance, operational, and reputational risks.  These risk-related matters include BofI's lending standards and practices, such as its compliance with federal laws and regulations and its dealings with special purpose entities and lending partners, as well as its disclosure of risk oversight.

62.    In addition, at meetings of the Board and its committees, directors receive regular updates and reports from management regarding risk management practices, including credit quality, financial reporting, internal controls, compliance, legal matters, asset liability, and liquidity management, among others.  Furthermore, current risk management issues are discussed regularly with the Board and its committees.

63.    BofI's 2015 Proxy Statement represented that:

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

Our Board is actively involved in oversight and review of the Company's risk management efforts either directly or through its standing committees.  The Company's management is responsible for assessing and managing risk and communicating risks to the Board.  The Enterprise Risk Management ("ERM") program, led by certain officers of the Company, including Mr. Garrabrants, our President and CEO, with oversight from the Board, identifies and evaluates key business risks within the financial, operational, regulatory and strategic arenas and to develop risk monitoring processes and response strategies to transfer, avoid, reduce or accept individual risks as appropriate.  The ERM program assists management in determining appropriate risk tolerance levels which balance risk mitigation with opportunities to create stockholder value.  ERM program leaders make regular reports to the Board regarding the ERM program's risk identification, management and mitigation strategy recommendations.

While the Board has retained the responsibility for general oversight of risks and of our ERM program, the Board's standing committees support the Board by regularly addressing various risks in their respective areas of oversight.   Specifically, the Audit Committee primarily oversees those risks that may directly or indirectly impact our financial statements, including the areas of financial reporting, internal controls and compliance with public reporting requirements, while the Compensation Committee assists the Board in fulfilling its risk management oversight responsibilities associated with risks arising from employee compensation policies and practices.  Each standing committee provides reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting.

## II.   The Individual Defendants Caused the Company to Issue False and Misleading Statements

64.   ██████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████   ████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

18



65.     On February 6, 2013, the Individual Defendants caused BofI to file a Form 10-Q with the SEC, disclosing BofI's financial results for the quarter ending December 31, 2012.  The Quarterly Report was reviewed and approved by the Board, and signed by Defendants Garrabrants and Micheletti, and represented the following to be BofI's financial results for the quarter:

### BOFI HOLDING, INC. AND SUBSIDIARY
### SELECTED CONSOLIDATED FINANCIAL INFORMATION

| (Dollars in thousands, except per share data) | At or for the Three Months Ended December 31, | | At or for the Six Months Ended December 31, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| *Selected Income Statement Data:* | | | | |
| Interest and dividend income | $ 33,567 | $ 28,616 | $ 64,556 | $ 56,381 |
| Interest expense | 8,631 | 9,530 | 17,135 | 19,118 |
| Net interest income | 24,936 | 19,086 | 47,421 | 37,263 |
| Provision for loan losses | 1,950 | 1,600 | 4,500 | 3,963 |
| Net interest income after provision for loan losses | 22,986 | 17,486 | 42,921 | 33,300 |
| Non-interest income | 6,249 | 2,986 | 13,010 | 7,556 |
| Non-interest expense | 12,781 | 9,204 | 24,313 | 18,756 |
| Income before income tax expense | 16,454 | 11,268 | 31,618 | 22,100 |
| Income tax expense | 6,686 | 4,608 | 12,861 | 8,907 |
| Net income | $ 9,768 | $ 6,660 | $ 18,757 | $ 13,193 |
| Net income attributable to common stock | $ 9,436 | $ 6,280 | $ 18,348 | $ 12,687 |
| *Per Share Data:* | | | | |

| | | | | |
|---|---|---|---|---|
| Net income: | | | | |
| Basic | $ 0.71 | $ 0.56 | $ 1.44 | $ 1.15 |
| Diluted | $ 0.70 | $ 0.54 | $ 1.37 | $ 1.14 |
| Book value per common share | $ 17.08 | $ 14.80 | $ 17.08 | $ 14.80 |
| Tangible book value per common share | $ 17.08 | $ 14.80 | $ 17.08 | $ 14.80 |
| **_Weighted average number of shares outstanding:_** | | | | |
| Basic | 13,224,612 | 11,174,947 | 12,707,837 | 11,036,046 |
| Diluted | 13,824,440 | 12,304,628 | 13,538,503 | 11,415,793 |
| Common shares outstanding at end of period | 12,824,195 | 11,419,584 | 12,824,195 | 11,419,584 |
| Common shares issued at end of period | 13,665,957 | 12,162,604 | 13,665,957 | 12,162,604 |
| **_Performance Ratios and Other Data:_** | | | | |
| Loan originations for investment | $ 331,999 | $ 132,153 | $ 611,696 | $ 384,779 |
| Loan originations for sale | 280,569 | 227,810 | 535,365 | 318,179 |
| Loan purchases | — | — | 1,541 | — |
| Return on average assets | 1.45% | 1.23% | 1.45% | 1.26% |
| Return on average common stockholders' equity | 17.32% | 15.86% | 17.85% | 16.55% |
| Interest rate spread[1] | 3.69% | 3.44% | 3.63% | 3.47% |
| Net interest margin[2] | 3.81% | 3.60% | 3.76% | 3.62% |
| Efficiency ratio | 40.98% | 41.70% | 40.23% | 41.85% |
| **_Capital Ratios:_** | | | | |
| Equity to assets at end of period | 8.44% | 8.71% | 8.44% | 8.71% |
| Tier 1 leverage (core) capital to adjusted tangible assets[3] | 8.52% | 8.27% | 8.52% | 8.27% |
| Tier 1 risk-based capital ratio[3] | 13.95% | 13.19% | 13.95% | 13.19% |
| Total risk-based capital ratio[3] | 14.60% | 13.77% | 14.60% | 13.77% |
| Tangible capital to tangible assets[3] | 8.52% | 8.27% | 8.52% | 8.27% |
| **_Asset Quality Ratios:_** | | | | |
| Net annualized charge-offs to average loans outstanding | 0.13% | 0.39% | 0.28% | 0.41% |
| Non-performing loans to total loans | 0.95% | 0.76% | 0.95% | 0.76% |
| Non-performing assets to total assets | 0.79% | 0.64% | 0.79% | 0.64% |
| Allowance for loan losses to total loans at end of period | 0.52% | 0.53% | 0.52% | 0.53% |
| Allowance for loan losses to non-performing loans | 54.92% | 68.79% | 54.92% | 68.79% |

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

66. The Form 10-Q also stated the following with respect to the quarter's financial results:

**RESULTS OF OPERATIONS**
**Comparison of the Three and Six Months Ended December 31, 2012 and December 31, 2011**
For the three months ended December 31, 2012, we had net income of $9.8 million compared to net income of $6.7 million for the three months ended December 31, 2011. Net income attributable to common stockholders was $9.4 million or $0.70 per diluted share compared to net income attributable to common shareholders of $6.3 million or $0.54 per diluted share for the three months ended December 31, 2012 and 2011, respectively. For the six months ended December 31, 2012, we had net income of $18.8 million compared to net income of $13.2 million for the six months ended December 31, 2011. Net income attributable to common stockholders was $18.3 million or $1.37 per diluted share compared to net income attributable to common shareholders of $12.7 million or $1.14 per diluted share for the six months ended December 31, 2012 and 2011, respectively.

Other key comparisons between our operating results for the three and six months ended December 31, 2012 and 2011 are:

- Net interest income increased $5.9 million and $10.2 million in the quarter and six months ended December 31, 2012 due to a 23.4% and 22.7%, increase in average earning assets primarily from the growth in our loan portfolio in those respective periods. Our net interest margin increased 21 basis points and 14 basis points in the quarter and six months ended December 31, 2012 compared to December 31, 2011. The overall rate on interest earning assets was lower by 27 and 37 basis points in the three and six month periods ended December 31, 2012 compared to December 31, 2011, primarily because loan rates have been pushed lower by the economy and competition. This reduction on the asset side was more than offset by a 52 and 53 basis point reduction in rates paid on interest bearing liabilities for the three and six months ending December 31, 2012 compared to December 31, 2011. The primarily reduction was due to a decrease in the rates paid on time deposits of 57 and 52 basis points, respectively, as we allowed the higher rate time deposits to roll of the books.

- Non-interest income increased $3.3 million and $5.5 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011. The increase in non-interest income for the quarter was primarily the result of a $2.5 million increase in mortgage banking income, a $448,000 increase in prepayment penalty income and a $507,000 increase in banking service fees. The increase in non-interest income for the six months ended December 31, 2012 compared to December 31, 2011 was primarily the result of a $4.2 million increase in mortgage banking income, a $589,000 increase in prepayment penalty income and a $756,000 increase in banking service fees.

- Non-interest expense increased $3.6 million and $5.6 million for the three and six months ended December 31, 2012 compared to the three and six months ended December 31, 2011. For the three months ended December 31, 2012 compared to the three months ended December 31, 2011 salaries and compensation was up $2.0 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank. Advertising and promotions were up $510,000 mainly due to the cost of lead generation in the mortgage area. Other general and administration expenses were $689,000 higher primarily due to an increase of $258,000 in loan related expenses, an increase of $144,000 related to software, licenses and associated costs, an increase of $72,000 in expenses related travel, and an increase of $53,000 in losses on deposit accounts. For the six months ended December 31, 2012 compared to the six months ended December 31, 2011 salaries and compensation was up $3.6 million primarily due to the overall increase in staff, mainly in our production areas to support the overall growth of the Bank. Advertising and promotions were up $846,000 mainly due to the cost of lead generation in the mortgage area. Other general and administration expenses were $1.4 million higher primarily due to an increase of $708,000 in loan related expenses, an increase of $198,000 related to software, licenses and associated costs, an increase of $77,000 in expenses related travel, and an increase of $57,000 in losses on deposit accounts.

67. The Form 10-Q filed on February 6, 2013 contained the following disclosure: "During fiscal year 2011, the Bank changed its growth strategy to

originate more mortgage loans rather than purchasing loans." With respect to its loans and other assets held as of the end of the quarter which closed on December 31, 2012, the Form 10-Q represented the following:

**FINANCIAL CONDITION**
**Balance Sheet Analysis**

Our total assets increased $487.5 million, or 20.4%, to $2,874.3 million, as of December 31, 2012, up from $2,386.8 million at June 30, 2012. The increase in total assets was primarily due to an increase of $434.7 million in net loans held for investment. Total liabilities increased a total of $451.5 million, primarily due to an increase in deposits of $353.2 million and an increase in borrowings of $105.0 million from the Federal Home Loan Bank of San Francisco (the "FHLB"). Our deferred income taxes increased $2.0 million to $17.0 million primarily due to the impairment in our securities portfolio, loan loss provision, and state taxes.

**Loans**

Net loans held for investment increased 25.3% to $2,155.3 million at December 31, 2012 from $1,720.6 million at June 30, 2012. The increase in the loan portfolio was due to loan originations and purchases of $613.2 million, offset by loan repayments of $215.1 million, net transfers from our held for sale portfolio of $42.2 million and a net increase in the allowance of $1.8 million during the six months ended December 31, 2012.

The following table sets forth the composition of the loan portfolio as of the dates indicated:

| (Dollars in thousands) | December 31, 2012 | | June 30, 2012 | |
|---|---|---|---|---|
| | Amount | Percent | Amount | Percent |
| Residential real estate loans: | | | | |
| Single family (one to four units) | $1,215,744 | 55.6% | $ 863,624 | 49.6% |
| Home equity | 25,742 | 1.2% | 29,167 | 1.7% |
| Multifamily (five units or more) | 766,247 | 35.0% | 687,661 | 39.5% |
| Commercial real estate | 28,681 | 1.3% | 35,174 | 2.0% |
| Consumer—Recreational vehicle | 21,494 | 1.0% | 24,324 | 1.4% |
| Commercial secured and other | 128,267 | 5.9% | 100,549 | 5.8% |
| Total loans held for investment | $2,186,175 | 100.0% | $1,740,499 | 100.0% |
| Allowance for loan losses | (11,449) | | (9,636) | |

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

| | | |
|---|---|---|
| Unamortized premiums/discounts, net of deferred loan fees | (19,420) | (10,300) |
| Net loans held for investment | $2,155,306 | $1,720,563 |

68. The February 6, 2013 Form 10-Q also contained Sarbanes-Oxley Section 302 certifications signed by defendants Garrabrants and Micheletti which stated the following:

I have reviewed this quarterly report on Form 10-Q of BofI Holding, Inc. (the "registrant");

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report;

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d -15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting or, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures, and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

69.     ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████ .

70.     ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial



71.     On May 8, 2013, the Individual Defendants caused BofI to file a Form 10-Q with the SEC, disclosing BofI's financial results for the quarter ending March 31, 2013.   The Quarterly Report was reviewed and approved by the Board, and signed by Defendants Garrabrants and Micheletti, and represented the following to be BofI's financial results for the quarter:

> For the three months ended March 31, 2013, we had net income of $10.4 million compared to net income of $7.7 million for the three months ended March 31, 2012. Net income attributable to common stockholders was $10.1 million or $0.74 per diluted share compared to net income attributable to common shareholders of $7.3 million or $0.58 per diluted share for the three months ended March 31, 2013 and 2012, respectively. For the nine months ended March 31, 2013, we had net income of $29.2 million compared to net income of $20.9 million for the nine months ended March 31, 2012. Net income attributable to common stockholders was $28.4 million or $2.12 per diluted share compared to net income attributable to common shareholders of $20.0 million or $1.68 per diluted share for the nine months ended March 31, 2013 and 2012, respectively.

72.     The May 8, 2013 Form 10-Q also stated: "Net interest income increased $5.9 million and $16.0 million in the quarter and nine months ended

March 31, 2013 due to a 28.3% and 24.6%, increase in average earning assets primarily from the growth in our loan portfolio in those respective periods."

73. ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████.

74.     In addition to these Sarbanes-Oxley certifications by Garrabrants and Micheletti, the May 8, 2013 Form 10-Q specifically stated, at page 63: "The Company's management, with the participation of its Chief Executive Officer [Garrabrants] and Chief Financial Officer [Micheletti], conducted an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures, pursuant to Exchange Act Rule 13a-15(e). Based upon that evaluation, our Chief Executive Officer along with our Chief Financial Officer concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures were effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.  There were no changes in the Company's internal control over financial reporting that occurred during the quarter ended March 31, 2013 that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting."

75. ████████████████████████████████████████████

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

76.     On September 4, 2013, BofI filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2013 (the "2013 Form 10-K").  The Form 10-K Annual Report was prepared and signed by defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, and Ratinoff.

77.     For the quarter, the Company reported net income of $11.13 million, or $0.78 per diluted share, on net revenue of $35.87 million, compared to net income of $8.57 million, or $0.64 per diluted share, on net revenue of $26.55 million for the same period in the prior year. For fiscal year 2013, the Company reported net income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million, compared to net income of $29.48 million, or $2.33 per diluted share, on net revenue of $95.56 million for fiscal year 2012.

78.     Among other things, the 2013 Form 10-K described that the BofI Federal Bank was subject to extensive federal regulation, as follows:

///

**REGULATION OF BOFI FEDERAL BANK**

*General*.  As a federally-chartered savings and loan association whose deposit accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"), BofI Federal Bank is subject to extensive regulation by the FDIC and . . . the [Office of the Comptroller of the Currency].  Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.  The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

\* \* \*

*Anti-Money Laundering and Customer Identification*.  The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.  The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements.  In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

79.    The 2013 Form 10-K contained certifications pursuant to Sarbanes-Oxley signed by defendants Garrabrants and Micheletti, which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

80.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████    ████████████████████████
████████████████████████████████████████████████



81.

82.     On November 5, 2013, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "2014Q1 Form 10-Q").  The Form 10-Q Quarterly Report was reviewed and approved by the Board, and prepared and signed by defendants Garrabrants and Micheletti.  For the quarter, the Company reported net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million, compared to net income of $8.99 million, or $0.67 per diluted share, on net revenue of $29.25 million for the same period in the prior year.

83. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████    ██████████████████
████████████████████████████████████████████
███████████

84.   On December 4, 2013, BofI filed a Form 8-K with the SEC, signed by defendant Micheletti, containing as an attachment an Investor Presentation concerning the Company's Q1 2014 financial and operating results (the "2014Q1 Investor Presentation") which indicated it was presented by defendant Garrabrants and that investors should contact Garrabrants for more information.  Among other things, the 2014Q1 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

85.   On or about December 19, 2013, Mr. Erhart completed an internal audit of BofI's Structured Settlements and Lottery practice, pursuant to which BofI, through its subsidiary Anfed Bank, has a team that calls individuals receiving structured settlements in litigation or lottery payments with the goal of purchasing

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

those income streams in return for a lump sum.  One of Mr. Erhart's major findings during the internal audit was that BofI's callers were not notifying the individuals they called that the calls were being recorded, in violation of California Penal Code § 632.  Defendant Garrabrants, BofI's CEO and Board member, was apparently made aware of Mr. Erhart's findings because Mr. Erhart received a telephone call from Garrabrants within 15 minutes after Mr. Erhart requested a standard meeting to conclude his audit.

86.     Less than two hours after Mr. Erhart sent the meeting request, he and his direct supervisor, VP Ball, were summoned to a meeting with defendant Bar-Adon, BofI's Chief Legal Officer.  Bar-Adon instructed both employees to remove evidence of the violation of California Penal Code § 632 from the Structured Settlements and Lottery audit.  When Ball informed him that an internal auditor could not do that, Bar-Adon instructed Mr. Erhart to mark the entire report "Attorney Client Privileged," stating that the finding could be discoverable in class action litigation against BofI and that the Company wanted to prevent that.  In addition, Bar-Adon instructed Mr. Erhart not to speak to any employee in the Structured Settlements and Lottery Department with whom he was friendly.

87.     On the same day, defendant Tolla instructed Mr. Erhart to never state in an audit report that BofI had violated a federal or state law.

88.     In or about January 2014, Thomas Constantine, BofI's Chief Credit Officer, told Mr. Erhart, Ball, and others at a meeting that he could not be responsible for any of BofI's numbers after they are turned over to the CFO, defendant Micheletti.  Constantine reiterated that he could not and would not vouch for the accuracy of the numbers once they had been delivered to defendant Micheletti.  Mr. Erhart understood this comment to mean that Constantine believed that Micheletti changed the numbers after he received them.

89.     ████████████████████████████████████████████████████

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

1  ██████████████████████████████████████████████████

2  ████████████████████████████████████    ████████████

3  ██████████████████████████████████████████████████

4  ██████████████████████████████████████████████████

5  ██████████████████████████████████████████████████

6  ██████████████████████████████████████████████████

7  ██████████████████████████████████████████████████

8  ██████████████████████████████████████████████████

9  ██████████████████████████████████████████████████

10  ██████████████████████████████████████████████████

11  ██████████████████████████████████████████████████

12  ██████████████████████████████████████████████████

13  ██████████████████████████████████████████████████

14  ████████████████

15  90.    On February 5, 2014, BofI filed a quarterly report on Form 10-Q with

16  the SEC announcing the Company's financial and operating results for the quarter

17  ended December 31, 2013 (the "2014Q2 Form 10-Q").   The Form 10-Q was

18  prepared and signed by defendants Garrabrants and Micheletti, and reviewed and

19  approved by BofI's Board.  For the quarter, the Company reported net income of

20  $13.15 million, or $0.91 per diluted share, on net revenue of $38.37 million,

21  compared to net income of $9.77 million, or $0.70 per diluted share, on net revenue

22  of $31.19 million for the same period in the prior year.

23  91.    ████████████████████████████████████████

24  ██████████████████████████████████████████████████

25  ██████████████████████████████████████████████████

26  ██████████████████████████████████████████████████

27  ██████████████████████████████████████████████████

28

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████████████ .

92.   On February 6, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2014Q2 financial and operating results (the "2014Q2 Investor Presentation").   The Form 8-K and the 2014Q2 Investor Presentation were prepared and signed by defendant Micheletti and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

93.   ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████

5  ██ .

6      94.    On May 6, 2014, BofI filed a quarterly report on Form 10-Q with the

7  SEC announcing the Company's financial and operating results for the quarter

8  ended March 31, 2014 (the "2014Q3 Form 10-Q").  The Form 10-Q was reviewed

9  and approved by the Board, and prepared and signed by defendants Garrabrants and

10  Micheletti.  For the quarter, the Company reported net income of $14.61 million, or

11  $1.00 per diluted share, on net revenue of $40.88 million, compared to net income of

12  $10.40 million, or $0.74 per diluted share, on net revenue of $33.04 million for the

13  same period in the prior year.

14      95.    ██████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ██████████████████████████    ████████████████████

21  ████████████████████████████████████████████████

22  ████████████████ .

23      96.    On May 7, 2014, BofI filed Form 8-K with the SEC containing an

24  Investor Presentation concerning the Company's third quarter 2014 financial and

25  operating results (the "2014 Q3 Investor Presentation").  The Form 8-K and the

26  2014 Q3 Investor Presentation were prepared and signed by defendant Micheletti,

27  and contained, in part, the following statements:

28

35

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

97. 

98.     On August 7, 2014, BofI issued a press release and filed a Form 8-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2014 (the "2014 Form 8-K"). The Form 8-K and the accompanying press release were prepared by defendants Garrabrants and Micheletti, and signed by Micheletti. For the quarter, the Company reported net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million, compared to net income of $11.13 million, or $0.78 per diluted share, on net revenue of $35.87 million for the same period in the prior year. For fiscal year 2014,

the Company reported net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million, compared to net income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million for fiscal year 2013.

99. ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███

100.   On August 28, 2014, BofI filed an annual report on Form 10-K with the SEC (the "2014 Form 10-K"). The Form 10-K Annual Report was prepared and signed by defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, and Ratinoff. The 2014 Form 10-K reiterated the financial and operating results previously announced in the 2014 Form 8-K.

101.   Among other things, the 2014 Form 10-K described that the BofI Federal Bank was subject to extensive federal regulation, as follows:

**REGULATION OF BOFI FEDERAL BANK**

***General***.  As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC.  Under the Dodd-Frank Act, the examination, regulation and

37

supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.    The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

\* \* \*

***Anti-Money Laundering and Customer Identification***.   The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.   The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements.   In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

102.   The 2014 Form 10-K contained certifications pursuant to Sarbanes-Oxley signed by defendants Garrabrants and Micheletti, which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the 2014 Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

103.   On September 3, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2014 Q4 financial and operating results (the "2014 Q4 Investor Presentation"). The Form 8-K and the 2014 Q4 Investor Presentation were prepared and signed by defendant Micheletti, and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

104.   On November 4, 2014, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "2015 Q1 Form 10-Q"). The Form 10-Q Quarterly Report was reviewed and approved by the Board, and prepared and signed by defendants Garrabrants and Micheletti. For the quarter, the Company reported net income of $17.84 million, or $1.20 per diluted share, on net revenue of $50.12 million, compared to net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million for the same period in the prior year.

105.   The 2015 Q1 Form 10-Q contained certifications pursuant to Sarbanes-Oxley signed by defendants Garrabrants and Micheletti, which were identical to the certifications signed by Garrabrants and Micheletti for the February 6, 2013 Form 10-Q (quoted *supra*), certifying that the financial information contained in the 2015 Q1 Form 10-Q was accurate and disclosed that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

106.   On November 17, 2014, BofI filed a Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2015 Q1 financial and operating results (the "2015 Q1 Investor Presentation"). Among other things, the 2015 Q1 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because

[the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

107.    On or about November 21, 2014, Mr. Erhart sent an e-mail to BofI's Chief Risk Officer, SVP Williams, in preparation for the upcoming Enterprise Risk Management ("ERM") audit.  Mr. Erhart asked whether Williams thought BofI had a deposit concentration risk.  Mr. Erhart was concerned and reported that a mere four customers accounted for approximately 25% of total deposits, and nine customers accounted for approximately 40% of total deposits.

108.    On or about December 12, 2014, the SEC served a subpoena on BofI, requesting account-identifying information for a certain investment advisory firm with the initials ETIA LLC ("ETIA").

109.    On or about December 18, 2014, BofI responded to the SEC that it did not have any information regarding ETIA.

110.    In or about early January 2015, Mr. Erhart became aware of the SEC subpoena, and knew that BofI did indeed have a loan file containing information regarding ETIA.  Mr. Erhart further learned that a file had been created in response to the SEC subpoena, containing the information regarding ETIA.  Mr. Erhart learned from a BofI employee that she had informed the Bank's legal department of the existence of the file on or about December 17, 2014, *before* the Bank sent its response to the SEC denying the existence of any such files.

111.    On or about January 15, 2015, BofI's principal regulator, the OCC, requested information on bank accounts at BofI with no Tax Identification Numbers ("TINs").  BofI responded to the OCC that there were no accounts without TINs.  Mr. Erhart had viewed a spreadsheet in the BSA folder disclosing approximately 150–200 accounts where the borrowers did not have a TIN.

112.    In or about January 2015, Mr. Erhart conducted a Loan Origination Audit.  During the Loan Origination Audit, Mr. Erhart discovered that BofI was

40

making substantial loans to foreign nationals including Politically Exposed Persons ("PEPs") in potential violation of BSA/KYC rules.  Mr. Erhart was able to readily uncover information that many of the borrowers were criminals and other suspicious persons who put the Bank at high risk for violating the BSA's Anti-Money Laundering Rules ("AML Rules"), as well as exposing BofI to reputational risk.  The purpose of the AML Rules is to help detect and report suspicious activity including the predicate acts to money laundering and terrorist financing.  The PEPs included very high-level foreign officials from major oil-producing countries and war zones.  Mr. Erhart reported his concerns regarding suspected illegal activity to his superiors.

113.   Around the same time, BofI received a subpoena from the SEC.  Mr. Erhart believed BofI failed to disclose information to the SEC when it responded to the subpoena.   On January 14, 2015, therefore, Mr. Erhart contacted the SEC regarding the subpoena.

114.   ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█    ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

115.   On January 29, 2015, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended December 31, 2014 (the "15Q2 Form 10-Q"). The Form 10-Q Quarterly Report was reviewed and approved by the Board and Audit Committee members Grinberg, Argalas, and Mosich, and prepared and signed by defendants Garrabrants and Micheletti. For the quarter, the Company reported net income of $19.37 million, or $1.26 per diluted share, on net revenue of $54.81 million, compared to net income of $13.15 million, or $0.91 per diluted share, on net revenue of $38.37 million for the same period in the prior year.

116.   The 15Q2 Form 10-Q contained certifications pursuant to Sarbanes-Oxley signed by defendants Garrabrants and Micheletti, stating that the financial information contained in the 15Q2 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

117.   As the evidence adduced in the Consolidated Whistleblower Action demonstrated, almost immediately after reporting his suspected illegal activity, BofI began to retaliate against Mr. Erhart. *See* Order Granting in Part and Denying in Part BofI Federal Bank's Motion for Summary Adjudication, Dkt. No. 40, Case No. 15cv2287 BAS (NLS) (S.D. Cal. Feb. 14, 2017) (attached as **Exhibit 2** hereto). In approximately February 2015, Mr. Erhart believed his job was in jeopardy. In a recent performance evaluation, Mr. Erhart's rating had been downgraded, with his bonus adversely affected. BofI identified Mr. Erhart's practice of preserving audit findings in writing as a performance issue. Mr. Erhart states BofI had repeatedly directed internal audit staff to not create written evidence of believed non-compliance and illegal conduct.

118.   In January 2015, Tolla walked by Mr. Erhart's workstation and stated,

in the presence of others, "If [Mr. Erhart] continues to turn over rocks, eventually he is going to find a snake and he's going to get bit."

119.   In or about February 2015, the OCC requested that BofI disclose all correspondence with federal and state banking agencies and law enforcement, including any and all subpoenas, criminal or otherwise.  BofI responded that it had not received any such documents for the review period in question.  However, Mr. Erhart alleges that the Bank had a BSA spreadsheet Mr. Erhart had seen that identified many subpoenas, including from law enforcement agencies, grand juries, and even from the U.S. Department of the Treasury, of which OCC is a part.  Mr. Erhart also knew that the Bank indeed had been served with subpoenas.

120.   On February 20, 2015, Mr. Erhart contacted the SEC regarding a BofI loan customer. Mr. Erhart contacted the SEC because he believed the "suspicious" loan customer was operating as an unregistered investment advisor. In doing so, he disclosed information about the customer to the SEC.

121.   On March 2, 2015, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2015 Q2 financial and operating results (the "2015 Q2 Investor Presentation").   The Form 8-K was signed by defendant Micheletti, and the 2015 Q2 Investor Presentation was prepared by defendants Micheletti and Garrabrants, and presented by defendant Garrabrants. Among other things, the 2015 Q2 Investor Presentation contained the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

122.   On March 5, 2015, Ball — BofI's Vice President-Internal Audit and Mr. Erhart's supervisor — resigned abruptly.  The next day, Mr. Erhart "felt very unwell" and "called off sick."  *See* Ex. 2.  Mr. Erhart requested, and was granted by BofI, an unpaid leave of absence pursuant to the Family Medical Leave Act and the California Family Rights Act beginning on March 6, 2015.

123.   On March 6, 2015, Mr. Erhart sent an e-mail to his mother that included "a spreadsheet that contained BofI customer social security numbers."  *See id.*  He states he sent the information to her for safekeeping.

124.   Around the same time, Mr. Erhart also contacted the OCC's Denver Regional Office — BofI Federal Bank's principal regulator.  After speaking with the OCC by phone, Mr. Erhart "provided documentary evidence to the OCC that he claims supports his allegations of wrongdoing by BofI."  *See id.*  Further, on March 12, 2015, Mr. Erhart "downloaded to a personal USB drive BofI files, including OCC supervisory information, audit findings, draft audit committee meeting minutes, wire transfer details, and bank account information."

125.   On April 14, 2015, Mr. Erhart filed a whistleblower protection complaint with the United States Department of Labor, Occupational Safety and Health Administration ("OSHA").

126.   ████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial



127.

128.   On April 30, 2015, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "2015 Q3 Form 10-Q"). The Form 10-Q Quarterly Report was reviewed and approved by the Board, including defendant Dada (who had joined the Board effective January 22, 2015), and prepared and signed by defendants Garrabrants and Micheletti. For the quarter, the Company reported net income of $21.07 million, or $1.35 per diluted share, on net revenue of $59.03 million, compared to net income of $14.61 million, or $1.00 per diluted share, on net revenue of $40.88 million for the same period in the prior year.

129.   The 2015 Q3 Form 10-Q contained certifications pursuant to Sarbanes-Oxley signed by defendants Garrabrants and Micheletti, stating that the financial information contained in the 2015 Q3 Form 10-Q was accurate and disclosed that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

130.   On May 6, 2015, BofI filed Form 8-K with the SEC, signed by defendant Micheletti, containing an Investor Presentation concerning the Company's 2015 Q3 financial and operating results (the "2015 Q3 Investor Presentation"). The 2015 Q3 Investor Presentation was prepared by defendants Garrabrants and

Micheletti and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

131.

46

132.  On July 30, 2015, BofI issued a press release and filed a Form 8-K with the SEC, prepared by defendants Garrabrants and Micheletti, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2015.  For the quarter, the Company reported net income of $24.40 million, or $1.54 per diluted share, on net revenue of $65.57 million, compared to net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million for the same period in the prior year.  For fiscal year 2015, the Company reported net income of $82.68 million, or $5.37 per diluted share, on net revenue of $229.54 million, compared to net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million for fiscal year 2014.

133.  On August 10, 2015, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's 2015 Q4 financial and operating results (the "2015 Q4 Investor Presentation").  The Form 8-K and the 2015 Q4 Investor Presentation were prepared by defendants Garrabrants and Micheletti and contained, in part, the following statements:

- BofI is "Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial";

- BofI is "a Top Performer among the Broader Universe of All Public Banks and Thrifts";

- BofI is "a Top Quartile Performer Versus Bank Peer Group";

- The Company's "Business Model is More Profitable Because [the Company's] Costs are Lower"; and

- The Company's "Asset Growth has been Driven by Strong and Profitable Organic Loan Production."

134.  On August 22, 2015, *The New York Times* published an article concerning BofI's strong growth during defendant Garrabrants's tenure as CEO. The article was entitled "An Internet Mortgage Provider Reaps the Rewards of

Lending Boldly" and stated, in relevant part:[1]

> As the leader of Bank of Internet USA, based in San Diego, Mr. Garrabrants has been issuing big mortgages to high earners whom other lenders might not necessarily welcome with open arms.   But because its financial performance has, in many ways, been spectacular, Bank of Internet has been turning heads — and setting off alarm bells as well.  ***The bank has made loans to people who were later found to have run afoul of the law***, and Mr. Garrabrants has had to reassure investors that the bank has good relations with regulators.
>
> Bank of Internet's loans have increased fivefold, to nearly $5 billion, over the last five years — an almost unheard-of rate of growth for these tepid times in banking.  Its losses from bad loans are practically nonexistent, and profits are surging, in part because it charges a much higher interest rate than the bigger banks operating in the same market.
>
> \* \* \*
>
> [Some investors] contend that the bank is attracting people who simply can't get cheaper loans — borrowers who may be more risky.  ***Bank of Internet also makes large mortgages to wealthy foreigners, a practice that requires meticulous controls to comply with federal regulations aimed at stopping money laundering.***   The bank's critics wonder whether its compliance department is up to the task, though Mr. Garrabrants vigorously defended its practices.  They also take issue with the bank's funding, contending that the lender is too dependent on customer deposits that could evaporate if turbulence returns to the banking world.
>
> \* \* \*
>
> Mr. Garrabrants, who has also worked at Goldman Sachs and McKinsey & Company, says the critics are spreading disinformation — and losing money — as they bet against his firm's soaring stock.
>
> "Here's the problem for them: They are going into an earnings juggernaut that has none of the things that they're talking about," Mr. Garrabrants said.  And he says the bank is as judicious as any other lender in picking its borrowers.  "It's about being thoughtful about

---

[1] All emphases are added unless otherwise noted.

what risks you take and watching them and being careful," he said, adding that Bank of Internet's deposits are a reliable source of funding.

\* \* \*

Still, **_Bank of Internet has lent money to some unsavory characters_**. For example, in 2012 it issued a $5 million mortgage to Purna Chandra Aramalla on a house in Sands Point, an affluent section of Long Island, according to local property records. In 2013, federal law enforcement authorities in New York charged Mr. Aramalla with Medicare and Medicaid fraud. In March, he was sentenced to three years in prison.

In mid-2014, Bank of Internet lent $1.05 million to Frederick Elm for a house in Fort Lauderdale, Fla., property records show. In January, the Securities and Exchange Commission accused Mr. Elm of running a "Ponzi-like" scheme that had raised $17 million since November 2013. Mr. Elm partly settled with the agency in June.

And in 2012, Bank of Internet issued a $1.26 million mortgage to Deepal Wannakuwatte, a Sacramento businessman who received a 20-year prison sentence last year for operating, for more than 10 years, what the F.B.I. called a Ponzi scheme.

\* \* \*

**_Then there are questions about Bank of Internet's marketing of itself as a lender to "foreign nationals." It does not disclose exactly what proportion of its loans are made to foreigners_**. When asked, Mr. Garrabrants said it was "nowhere near the majority." **_Banks that do this sort of lending can expect extra scrutiny from federal regulatory agencies, which have punished banks for not properly applying bank secrecy and anti-money-laundering laws when vetting their international customers._**

In recent months there has been unrest in the division of Bank of Internet that deals with regulatory compliance. **_Earlier this year, a senior internal auditor, Jonathan Ball, and another employee in the division, Matt Erhart, left the bank. Mr. Ball did not respond to requests for comment. Mr. Erhart's lawyer, Carol L. Gillam, said that she had communicated with regulators, including the Office of the Comptroller of the Currency, the bank's primary regulator. She declined to provide details_**.

Regulators have not publicly warned or penalized the bank for its lending to foreign nationals, and Mr. Garrabrants often sounds exasperated when defending that business.  In his view, short-sellers had sought to stir up concerns about those loans to try to persuade regulators to stop Bank of Internet from acquiring parts of H&R Block's banking unit.  The deal was concluded this month.

135.   On August 26, 2015, BofI filed an annual report on Form 10-K with the SEC (the "2015 Form 10-K").  The Form 10-K Annual Report was prepared and signed by defendants Garrabrants, Micheletti, Allrich, Mosich, Argalas, Burke, Court, Grinberg, Dada, and Ratinoff.  The 2015 Form 10-K reiterated the financial and operating results previously announced in the Form 8-K filed with the SEC on July 30, 2015.

136.   Among other things, the 2015 Form 10-K described that the BofI Federal Bank was subject to extensive federal regulation, as follows:

**REGULATION OF BOFI FEDERAL BANK**

*General*.  As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC.  Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act.  The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

* * *

*Anti-Money Laundering and Customer Identification*.  The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001.  The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements.  In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

137.   The 2015 Form 10-K contained certifications pursuant to Sarbanes-Oxley signed by defendants Garrabrants and Micheletti, stating that the financial information contained in the 2015 Form 10-K was accurate and that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of the Company's internal controls over financial reporting.

138.   The statements above were materially false and misleading because the Individual Defendants caused the Company to make false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, prospects, and performance.  Specifically, during the Relevant Period, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company's internal controls were frequently disregarded; (b) BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws; (c) many BofI accounts lacked required tax identification numbers; (d) BofI fired an internal auditor who raised the foregoing issues to management and to federal regulators; and (e) as a result of the above, the Company's statements regarding its internal controls and other financial statements were materially false and misleading at all relevant times.

139.   In addition, as this Court found in the Securities Class Action, plaintiffs there sufficiently alleged, under the heightened pleading standard of the Private Securities Litigation Reform Act of 1995, that BofI made false and misleading statements regarding its underwriting practices.  *See In re BofI Holding Sec. Litig.*, No. 15cv2324 GPC (KSC), 2016 U.S. Dist. LEXIS 132574, at *25 (S.D. Cal. Sep. 27, 2016).  Among the false and misleading statements alleged by plaintiffs, the Court specifically identified statements touting the low loan-to-value ("LTV") ratio of the majority of the mortgages originated by BofI: "Only 8% of the single-family has a loan-to-value ratio greater than 70%, less than 1% greater than 80% and no loans with a loan-to-value ratio of greater than 90%."  *Id.* at *18.  While touting its

origination of "only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages," BofI actually engaged in "'lax lending practices and fail[ed] to enforce adequate compliance measures." *Id.* at *29.

140.  The allegations of BofI's lax lending practices and inadequate internal controls find further support in the whistleblower complaint of Ms. Golub, who worked as a quality-control auditor at BofI from September 2014 until her termination in May 2015.   Ms. Golub's responsibilities involved identifying, documenting and reporting perceived underwriting deficiencies that potentially impact the credit decision or could affect the salability of a loan to designated underwriting personnel and/or BofI's Chief Credit Officer.   Ms. Golub reported significant deficiencies in BofI's underwriting practices — a key component to BofI's lending business — to BofI's management.   As a result, Ms. Golub was retaliated against and was ultimately terminated in May 2015.

141.  In fact, Garrabrants, Grinberg, Mosich, and Argalas took advantage of BofI's lax lending practices by participating in the mortgage-lending program designed for its directors, officers, and employees.   According to an November 4, 2015 *Seeking Alpha* article, Grinberg obtained a $2.192 million loan from BofI for the purchase of a single-family home in Orinda, California in November 2012 for $2.74 million, which implies 80% loan-to-value ratio.   Likewise, Mosich obtained a $985,000 loan in July 2013 with a 78% loan-to-value ratio.

142.  Because the Audit Committee members — Grinberg, Mosich, and Argalas — are directly benefiting from BofI's lax lending practices, Board oversight concerning underwriting practices, risk management, and internal control is deficient.   In fact, as Mr. Erhart stated in his January 19, 2016 declaration filed in the Consolidated Whistleblower Action, the "Audit Committee is not independent." Erhart learned from Ball that, on at least one occasion, Garrabrants listened in on a conference call between the Audit Committee and Ball without Ball's knowledge —

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

a violation of protocol and a direct interference with the auditing functions.

143.   Despite BofI's lax underwriting practices and inadequate internal controls, the Individual Defendants caused BofI to issue false and misleading statements in BofI's Form 10-K and Schedule 14A filed with the SEC during the Relevant Period, touting that (a) BofI maintained conservative underwriting criteria and originates primarily mortgages with low loan-to-value ratio; and (b) BofI's internal controls are effective and adequate.

144.   On September 4, 2013, the Individual Defendants caused BofI to file with the SEC a Form 10-K for the fiscal year ending June 30, 2013, in which BofI touted its low-risk underwriting practices:

> The ratio of the loan amount to the value of the property securing the loan is called the loan-to-value ratio ("LTV").  The following table shows the LTVs of our loan portfolio on weighted-average and median bases at June 30, 2013.  The LTVs were calculated by dividing (a) the loan principal balance less principal repayments by (b) the appraisal value of the property securing the loan at the time of the funding  or,  for  certain purchased seasoned loans, an adjusted appraised value based upon an independent review at the time of the purchase.
>
> …
>
> *We believe our weighted-average LTV of 54.68% at origination has resulted and will continue to result in the future, in relatively low average loan defaults and favorable write-off experience.*

145.   In the same 2013 Form 10-K, the Individual Defendants caused BofI to state that BofI maintained effective internal control over its financial reporting:

> Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2014.  In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework (1992 version).  Based on that assessment, we believe that, *as of June 30, 2014, our internal control over financial reporting is effective based on those criteria.*

The 2013 Form 10-K also included Sarbanes-Oxley certifications (substantively

similar to the one set forth above) affirming that (a) the report "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report"; and (b) all known significant deficiencies in BofI's internal controls have been disclosed to the Board and the Audit Committee.  Garrabrants and Micheletti signed the Sarbanes-Oxley certifications.

146.   All Director Defendants — Garrabrants, Mosich, Argalas, Burke, Grinberg, Court, Ratinoff, and Dada — signed the 2013 Form 10-K.

147.   On September 9, 2013, the Individual Defendants caused BofI to file with the SEC a Schedule 14A Proxy Statement, which included an Audit Committee Report that confirmed the adequacy of BofI's internal controls and the accuracy of the financial statements in the 2013 Form 10-K.  The Audit Committee Defendants — Grinberg, Mosich, and Argalas — signed the Audit Committee Report.

148.   The 2013 Proxy Statement stated that, as of June 30, 2013, BofI made $16.3 million in loans to its directors, executive officers, and employees "on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with [BofI]":

**Transactions with Our Directors**

In the ordinary course of its business and subject to applicable banking regulations, the Bank makes loans to and engages in other banking transactions with its directors, officers and employees and their associates.  *Such loans and other banking transactions are generally made on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with the Company or the Bank.*  Loans are made only to persons affiliated with the Company and the Bank if they do not involve more than the normal risk of collectability of loans made to non-affiliated persons and if they do not present any other unfavorable features.

149.   All Director Defendants — Garrabrants, Mosich, Argalas, Burke, Grinberg, Court, Ratinoff, and Dada — signed the 2013 Proxy Statement.

150.   The foregoing statements are false and misleading based on the Court's

findings in the Securities Class Action, the whistleblower complaints of Mr. Erhart and Ms. Golub, and other evidence of inadequate internal controls at BofI set forth herein.

151.   On August 28, 2014, the Individual Defendants caused BofI to file with the SEC a Form 10-K for the fiscal year ending June 30, 2014, in which BofI touted its low-risk underwriting practices:

> The ratio of the loan amount to the value of the property securing the loan is called the loan-to-value ratio ("LTV").  The following table shows the LTVs of our loan portfolio on weighted-average and median bases at June 30, 2014.  The LTVs were calculated by dividing (a) the loan principal balance less principal repayments by (b) the appraisal value of the property securing the loan at the time of the funding or, for certain purchased seasoned loans, an adjusted appraised value based upon an independent review at the time of the purchase.
>
> …
>
> *We believe our weighted-average LTV of 55.98% at origination has resulted and will continue to result in relatively low average loan defaults and favorable write-off experience.*

152.   In the same 2014 Form 10-K, the Individual Defendants caused BofI to state that BofI maintained effective internal control over its financial reporting:

> Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2014.  In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework (1992 version).  Based on that assessment, we believe that, as of June 30, 2014, *our internal control over financial reporting is effective based on those criteria.*

The 2014 Form 10-K also included Sarbanes-Oxley certifications (substantively similar to the one set forth above) affirming that (a) the report "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report"; and (b) all known significant deficiencies in BofI's internal controls have been disclosed to the Board and the Audit Committee.  Garrabrants and Micheletti signed the Sarbanes-Oxley

55

certifications.

153. All Director Defendants — Garrabrants, Mosich, Argalas, Burke, Grinberg, Court, Ratinoff, and Dada — signed the 2014 Form 10-K.

154. On September 8, 2014, the Individual Defendants caused BofI to file with the SEC a Schedule 14A Proxy Statement, which included an Audit Committee Report that confirmed the adequacy of BofI's internal controls and the accuracy of the financial statements in the 2014 Form 10-K.  The Audit Committee Defendants — Grinberg, Mosich, and Argalas — signed the Audit Committee Report.

155. The 2014 Proxy Statement stated that, as of June 30, 2014, BofI made $28.1 million in loans to its directors, executive officers, and employees "on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with [BofI]":

> **Transactions with Our Directors**
>
> In the ordinary course of its business and subject to applicable banking regulations, the Bank makes loans to and engages in other banking transactions with its directors, officers and employees and their associates.  *Such loans and other banking transactions are generally made on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with the Company or the Bank.*  Loans are made only to persons affiliated with the Company and the Bank if they do not involve more than the normal risk of collectibility of loans made to non-affiliated persons and if they do not present any other unfavorable features.

156. All Director Defendants — Garrabrants, Mosich, Argalas, Burke, Grinberg, Court, Ratinoff, and Dada — signed the 2014 Proxy Statement.

157. The foregoing statements are false and misleading based on the Court's findings in the Securities Class Action, the whistleblower complaints of Mr. Erhart and Ms. Golub, and other evidence of inadequate internal controls at BofI set forth herein.

158. On August 26, 2015, the Individual Defendants caused BofI to file with the SEC a Form 10-K for the fiscal year ending June 30, 2015, in which BofI

touted its low-risk underwriting practices:

> The ratio of the loan amount to the value of the property securing the loan is called the loan-to-value ratio ("LTV").  The following table shows the LTVs of our loan portfolio on weighted-average and median bases at June 30, 2015.  The LTVs were calculated by dividing (a) the loan principal balance less principal repayments by (b) the appraisal value of the property securing the loan.
>
> …
>
> *We believe our effective weighted-average LTV of 60.39% for loans originated during the fiscal year ended June 30, 2015, has resulted and will continue to result in relatively low average loan defaults and favorable write-off experience.*

159.   In the same 2015 Form 10-K, the Individual Defendants caused BofI to state that BofI maintained effective internal control over its financial reporting:

> Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2015. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control – Integrated Framework (2013 version).  Based on this assessment, *management has determined that our internal control over financial reporting as of June 30, 2015 is effective.*

The 2015 Form 10-K also included Sarbanes-Oxley certifications (substantively similar to the one set forth above) affirming that (a) the report "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report"; and (b) all known significant deficiencies in BofI's internal controls have been disclosed to the Board and the Audit Committee.  Garrabrants and Micheletti signed the Sarbanes-Oxley certifications.

160.   All Director Defendants — Garrabrants, Mosich, Argalas, Burke, Grinberg, Court, Ratinoff, and Dada — signed the 2015 Form 10-K.

161.   On September 4, 2015, the Individual Defendants caused BofI to file with the SEC a Schedule 14A Proxy Statement, which included an Audit Committee Report that confirmed the adequacy of BofI's internal controls and the accuracy of

the financial statements in the 2015 Form 10-K.  The Audit Committee Defendants — Grinberg, Mosich, and Argalas — signed the Audit Committee Report.

162.   The 2015 Proxy Statement stated that, as of June 30, 2015, BofI made $29.1 million in loans to its directors, executive officers, and employees "on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with [BofI]":

**Transactions with Our Directors**

In the ordinary course of its business and subject to applicable banking regulations, the Bank makes loans to and engages in other banking transactions with its directors, officers and employees and their associates. *Such loans and other banking transactions are generally made on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with the Company or the Bank.* Loans are made only to persons affiliated with the Company and the Bank if they do not involve more than the normal risk of collectibility of loans made to non-affiliated persons and if they do not present any other unfavorable features.

163.   All Director Defendants — Garrabrants, Mosich, Argalas, Burke, Grinberg, Court, Ratinoff, and Dada — signed the 2015 Proxy Statement.

164.   The foregoing statements are false and misleading based on the Court's findings in the Securities Class Action, the whistleblower complaints of Mr. Erhart and Ms. Golub, and other evidence of inadequate internal controls at BofI set forth herein.

165.   On August 25, 2016, the Individual Defendants caused BofI to file with the SEC a Form 10-K for the fiscal year ending June 30, 2016, in which BofI touted its low-risk underwriting practices:

The ratio of the loan amount to the value of the property securing the loan is called the loan-to-value ratio ("LTV").  The following table shows the LTVs of our loan portfolio on weighted-average and median bases at June 30, 2016. The LTVs were calculated by dividing (a) the loan principal balance less principal repayments by (b) the appraisal value of the property securing the loan.

…

*We believe our effective weighted-average LTV of 59.08% for loans originated during the fiscal year ended June 30, 2016, has resulted and will continue to result in relatively low average loan defaults and favorable write-off experience.*

166.   In the same 2016 Form 10-K, the Individual Defendants caused BofI to state that BofI maintained effective internal control over its financial reporting:

Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2016. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control – Integrated Framework* (2013 version).   Based on this assessment, *management has determined that our internal control over financial reporting as of June 30, 2016 is effective.*

The 2016 Form 10-K also included Sarbanes-Oxley certifications (substantively similar to the one set forth above) affirming that (a) the report "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report"; and (b) all known significant deficiencies in BofI's internal controls have been disclosed to the Board and the Audit Committee.   Garrabrants and Micheletti signed the Sarbanes-Oxley certifications.

167.   All Director Defendants — Garrabrants, Mosich, Argalas, Burke, Grinberg, Court, Ratinoff, and Dada — signed the 2016 Form 10-K.

168.   On September 9, 2016, the Individual Defendants caused BofI to file with the SEC a Schedule 14A Proxy Statement, which included an Audit Committee Report that confirmed the adequacy of BofI's internal controls and the accuracy of the financial statements in the 2016 Form 10-K.   The Audit Committee Defendants — Grinberg, Mosich, and Argalas — signed the Audit Committee Report.

169.   The 2016 Proxy Statement stated that, as of June 30, 2016, BofI made $31.2 million in loans to its directors, executive officers, and employees "on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with [BofI]":

**Transactions with Our Directors**

In the ordinary course of its business and subject to applicable banking regulations, the Bank makes loans to and engages in other banking transactions with its directors, officers and employees and their associates. *Such loans and other banking transactions are generally made on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with the Company or the Bank.* Loans are made only to persons affiliated with the Company and the Bank if they do not involve more than the normal risk of collectibility of loans made to non-affiliated persons and if they do not present any other unfavorable features.

170. All Director Defendants — Garrabrants, Mosich, Argalas, Burke, Grinberg, Court, Ratinoff, and Dada — signed the 2016 Proxy Statement.

171. The foregoing statements are false and misleading based on the Court's findings in the Securities Class Action, the whistleblower complaints of Mr. Erhart and Ms. Golub, and other evidence of inadequate internal controls at BofI set forth herein.

## III. The Individual Defendants Covered Up the Criminal Background of a Senior Officer

172. According to an article published on November 18, 2015 by *Seeking Alpha* entitled "Undisclosed Executive History May Be Final Blow for BofI,"[2] a senior executive who had been running the "wholesale/correspondent lending business (brokered mortgages) at BofI for the past five years was found guilty in a court of law for multiple felony crimes including Grand Theft, Forgery of a Credit Card Receipt, Burglary, and Dealing in Stolen Property." The article linked to police reports from Broward County, Florida, mugshots, signatures from public documents and publicly available date of birth information. This article also claims that BofI issued two loans to this individual for more than $700,000. Multiple felony convictions would be reported for any credit check, especially for a loan of this size,

---

[2] *Available at* http://seekingalpha.com/article/3695396-undisclosed-executive-history-may-final-blow-bofi (last visited Apr. 10, 2017).

strongly implying that the Individual Defendants knew of this individual's criminal history yet continued to employ him.

173.   This development is more than just embarrassing for BofI because Section 19 of the FDIA provides that a person convicted of criminal offenses involving "dishonesty or a breach of trust or money laundering," or who has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such offense," may not: (i) become, or continue as, an institution-affiliated party with respect to any insured depository institution; (ii) own or control, directly or indirectly, any insured depository institution; or (iii) otherwise participate, directly or indirectly, in the conduct of the affairs of any insured depository Institution. (12 U.S.C. § 1829(a)(1)(A)). An insured bank cannot permit any such person to engage in prohibited conduct or continue any relationship described above. (12 U.S.C. § 1829(a)(I)(B)).

174.   A regulated bank may file an application for the FDIC's consent for the individual to become an officer or director of the bank, or the individual may seek a waiver from the FDIC from complying with Section 19. Anyone who knowingly violates Section 19 "shall be fined not more than $1,000,000 for each day such prohibition is violated or imprisoned for not more than 5 years, or both." (12 U.S.C. § 1829(b)).

175.   Plaintiffs' Counsel was unable to locate an order granting a waiver for this individual in the FDIC's database. For almost six years of employment, the potential fines would be substantial.

**IV.   Garrabrants Abused His Position for Personal Financial Gain**

176.   According to his complaint, Mr. Erhart, who had conducted an audit in early 2015 of senior management's personal accounts at BofI, "discovered that CEO Gregory Garrabrants was depositing third-party checks for structured settlement annuity payments into a personal account, including nearly $100,000 in checks made

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

payable to third parties."   Mr. Erhart detailed these findings in a memo to his superiors. Mr. Erhart also alleged that "learned that the issue of Mr. Garrabrants's depositing of third-party checks had previously been raised to the Audit Committee before he started working at the Bank, and that restrictions were imposed on him." The Board's direct knowledge of and involvement with defendant Garrabrants's potential criminal misconduct has serious consequences for the demand futility analysis, discussed herein below.

177.   Mr. Erhart further alleged that he discovered that defendant Garrabrants was the signatory of a BofI consumer account opened in the name of his brother, Steven Garrabrants, with a balance of approximately $4 million — the largest consumer account at BofI at the time.  Mr. Erhart noted that $4 million was wired into the account but he could not find any evidence of how Steven Garrabrants came into possession of such a large amount of money given that his profession was a former minor league baseball player who signed with the Arizona Diamondbacks in 2003 for $50,000 per year and became a free agent in 2007.  Mr. Erhart expressed concerns that "CEO Garrabrants could be involved in tax evasion and/or money laundering."

## V.   The Emergence of the Truth

178.   On October 13, 2015, after the close of trading on the stock market, *The New York Times* reported that Mr. Erhart, a former internal auditor at BofI, had filed a lawsuit in this Court against the Company for violating federal laws designed to protect whistleblowers.  The *Erhart* Complaint alleged, *inter alia*, that:

- Bank of Internet's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

- Mr. Erhart had seen a spreadsheet that contained as many as 200 accounts without tax identification numbers, contrary to Bank of Internet's representations to the OCC, its primary regulator;

- Bank of Internet at times failed to provide full and timely

information to regulators; and

- Mr. Erhart was fired after he revealed wrongdoing at Bank of Internet to management and federal regulators.

179.   On this news, shares of BofI fell $42.87, or 30.2%, to close at $99.13 on October 14, 2015.

180.   In response to this news, the Individual Defendants caused BofI to issue a press release and Form 8-K filing with the SEC on October 15, 2015, in which BofI disparaged the whistleblower and stated that the whistleblower's allegations had no merit.

181.   However, in the October 15, 2015 press release and Form 8-K, BofI admitted that the Audit Committee and full Board of Directors had been fully informed of the whistleblower's complaint and related details back in March 2015. The press release stated:

> "The Audit Committee and Board of Directors of BofI were fully informed by management of the events involving audit team members immediately after their occurrence in March 2015.   The Audit Committee then conducted interviews with internal audit personnel and held conversations with the Office of the Comptroller of the Currency," stated Paul Grinberg, Director and Chairman of the Audit Committee.   "An internal investigation was conducted, including an examination of forensic evidence, and the complaints of the former audit team member were found to be without merit," stated Eshel Bar-Adon, Executive Vice President and Chief Legal Officer.

182.   Significantly, for purposes of this shareholder derivative action, the Company's concession that the full Board of Directors was fully and immediately advised by management of all facts concerning the whistleblower's claims, and thereafter conducted an investigation, is an admission that the full Board knew that Mr. Erhart, the whistleblower, had engaged in protected activity under Sarbanes-Oxley and Dodd-Frank.   The full Board also knew that it was illegal for the Company to fire Mr. Erhart in response for engaging in whistleblowing activity.

183.   In addition, Mr. Erhart's internal complaints to BofI's Audit

Committee also constituted "protected activity."  Section 301 of Sarbanes-Oxley requires publicly traded corporations to establish audit committees. These committees are required, in turn, to "establish procedures" for accepting employee complaints (both anonymously and non-anonymously) concerning "questionable accounting or auditing matters." 15 U.S.C. § 78j-1(m)(4). ***Under the whistleblower provisions, internal reports to such committees constitute fully protected activity.*** *See* 18 U.S.C. § 1514A(a)(1).  BofI and its Board were therefore prohibited from retaliating against Mr. Erhart both because he had reported suspected violations of law to the Company's own Audit Committee in addition to reporting suspected violations to the OCC and SEC.[3]

184.  Notwithstanding actual knowledge of Mr. Erhart's protected whistleblowing activity, when it was brought to the Board's attention that Mr. Erhart had been fired by BofI shortly after reporting his good-faith concerns of unlawful conduct to BofI's Audit Committee as well as to the SEC and the OCC, the Board failed to take any conduct whatsoever to comply with SEC and Dodd-Frank rules.

185.  There were several actions that the Board could have taken to comply with their fiduciary duties and ensure that BofI did not violate the anti-retaliation and other applicable provisions of Sarbanes-Oxley and Dodd-Frank.  For example, at a minimum the Board should have reported the retaliation to the SEC.  Also, the Board, after it learned that BofI had improperly fired Mr. Erhart for engaging in protected whistleblowing activities, could have reinstated Mr. Erhart's employment with the Company and ordered management to refrain from any further retaliation against Mr. Erhart.  However, despite these options for complying with their fiduciary duties even after Mr. Erhart was fired, the Board took no action ***with***

---

[3] The anti-retaliation provisions under Sarbanes-Oxley also expressly protect employees who report violations internally to supervisors or other company representatives. 18 U.S.C. § 1514A(a)(1)(C) (protecting those who report to "a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)").

*regard to ensuring that BofI did not violate the anti-retaliation prohibitions of Sarbanes-Oxley and Dodd-Frank* in the face of a clear and unequivocal known duty to act.

186.    Indeed, the Company's October 15, 2015 press release admits that all the Board did with respect to fulfilling its fiduciary duties was to order an investigation into Mr. Erhart's allegations after he had already been fired.  Ultimately, as the press release states, that investigation determined that Mr. Erhart's allegations were without merit.

187.    Recently, the Court presiding over Mr. Erhart's complaint determined that his allegations were not meritless, and denied the Company's motion for summary judgment. *See* Ex. 2.

188.    In any event, for purposes of evaluating whether the Board complied with its fiduciary duties, whether Mr. Erhart's allegations ultimately would turn out to be meritorious, non-meritorious, successful at trial, or unsuccessful at trial, is irrelevant.[4]  The key fact in the present shareholder derivative action is that the Board had a clear duty to act when presented with knowledge that Mr. Erhart had been retaliated against for engaging in whistleblowing activity.  Sarbanes-Oxley and Dodd-Frank rules and regulations do not provide protection solely for "meritorious" or "ultimately successful" claims.   They unequivocally protect all good-faith whistleblowing activity.

189.    Significantly, Sarbanes-Oxley amended the federal obstruction of justice statute and criminalized retaliation against whistleblowers who provide "truthful information" to a "law enforcement officer" about the "commission or

---

[4] "[T]he critical focus is on whether the employee reported conduct that he or she *reasonably believes* constituted a violation of federal law. 'Congress chose statutory language which ensures that an employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation of one of the six enumerated categories is protected'." *Sylvester v. Parexel, Int'l. LLC*, 2011 DOL Ad. Rev. Bd. LEXIS 47, at *45 (ARB May 25, 2011) (citing *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009)) (emphasis in original).

possible commission of any Federal offense."

190.   In addition, Section 3(b) of Sarbanes-Oxley contains an enforcement provision concerning every clause of Sarbanes-Oxley. This section states that "a violation by any person of this Act [*i.e.*, Sarbanes-Oxley] . . . shall be treated for all purposes in the same manner as a violation of the Securities Exchange Act of 1934." This section grants jurisdiction to the SEC to enforce every aspect of Sarbanes-Oxley, including the various whistleblower-related provisions.  It also provides for criminal penalties for any violation of Sarbanes-Oxley, including the whistleblower-related provisions.

191.   Thus, by knowingly allowing the Company to violate the anti-retaliation provisions of Sarbanes-Oxley, each Director Defendant committed a violation of the Securities Exchange Act of 1934.  Because they are liable for such violations of both Sarbanes-Oxley and the Exchange Act, each Director Defendant faces a substantial likelihood of liability.  Each director is therefore interested in the subject matter of this action and cannot exercise independent and objective judgment about whether the Company should bring suit against themselves and the other defendants.  Any demand upon the Board to bring the claims in this lawsuit would therefore be a useful and futile act, and demand is therefore excused.

192.   In denying the Company's motion for summary judgment in Mr. Erhart's case recently, the court held that Mr. Erhart had a good-faith belief to believe that wrongdoing had occurred at BofI and that the public policy behind the whistleblowing laws trump any alleged interest the Company claimed in the confidentiality agreement it claimed Mr. Erhart violated by reporting the suspected unlawful conduct at BofI to the SEC and the OCC.  *See* Ex. 2.

193.   Because Mr. Erhart had a good-faith belief that unlawful conduct had occurred and continued to occur at BofI, and because he claimed whistleblower protection under Sarbanes-Oxley and Dodd-Frank, it was illegal for BofI to retaliate

against him in any way, including but not limited to giving him poor performance reviews, reducing his compensation or bonus, and firing him.  Mr. Erhart alleges BofI retaliated in all these ways after he blew the whistle.

194.   Pursuant to federal regulations (*see* 29 C.F.R. 1980.102) adopted to implement and enforce Sarbanes-Oxley's anti-retaliation provisions, the following activities are specifically prohibited:

§ 1980.102 Obligations and prohibited acts.

(a)   No covered person may discharge, demote, suspend, threaten, harass or in any other manner retaliate against, including, but not limited to, intimidating, threatening, restraining, coercing, blacklisting or disciplining, any employee with respect to the employee's compensation, terms, conditions, or privileges of employment because the employee, or any person acting pursuant to the employee's request, has engaged in any of the activities specified in paragraphs (b)(1) and (2) of this section.

(b)   An employee is protected against retaliation (as described in paragraph (a) of this section) by a covered person for any lawful act done by the employee:

(1)   To provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of 18 U.S.C. 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by —

(i) A Federal regulatory or law enforcement agency;

(ii) Any Member of Congress or any committee of Congress; or

(iii) A person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

(2)   To file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with

any knowledge of the employer) relating to an alleged violation of 18 U.S.C. 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

195. Dodd-Frank also prohibits retaliation against whistleblowers. Dodd-Frank states that no employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower. *See* 15 U.S.C. § 78u-6.

196. Moreover, Section 1107 of Sarbanes-Oxley, codified as 18 U.S.C. § 1513(e), amended the obstruction of justice statute to clearly prohibit retaliation against employee whistleblowers. The provision states as follows:

Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

197. This provision has very significant implications. The law covers disclosures for any violation under federal law. It is not limited to employee reports of criminal corporate fraud. Moreover, employers who lose civil whistleblower cases may find themselves personally accountable in a subsequent criminal proceeding.

198. Mr. Erhart was not formally fired until June 9, 2015, well after BofI admits that the Board was "fully informed" by management of his whistleblowing activities in March 2015. *See* Ex. 1. The only reasonable inference based on such admission is that the Board continued to be fully informed by management after March 2015 about all the relevant details concerning Mr. Erhart, including the eventual decision to fire him in retaliation for filing complaints with the SEC and other agencies.

199. Significantly, BofI has never even attempted to premise Mr. Erhart's

termination on any activity that he engaged in prior to reporting suspected unlawful conduct at BofI. Instead, all the conduct which BofI has proffered as alleged grounds for Mr. Erhart's termination occurred *well after* he reported his concerns to the SEC — *e.g.*, BofI claims his absence from the office after he became ill in response to retaliation from Defendant Garrabrants was unexcused, and BofI claims that Mr. Erhart violated company confidentiality provisions by reporting information to the SEC in direct connection with his whistleblowing activities. The court presiding over Mr. Erhart's complaint recently rejected the Company's arguments regarding his alleged violation of the confidentiality provision, holding that such provisions were unenforceable and/or trumped by the public policy encouraging his whistleblowing activity. In any event, the key point is that these activities by Mr. Erhart occurred only after or in direct connection with his whistleblowing activities. The Board, based on being "fully informed" by management in March 2015 about the activities of Mr. Erhart and Ball "immediately after their occurrence" had actual knowledge that BofI never alleged that Mr. Erhart engaged in any alleged wrongful conduct *prior* to his whistleblowing activities. Instead, all of Mr. Erhart's alleged conduct that the Company said was wrongful and thus which served as the supposed basis for his firing on June 9, 2015 occurred *after* he blew the whistle on BofI and in fact was conduct he engaged in *in direct connection with* his whistleblowing activity.

200.   The full Board thus had actual knowledge beginning at least in March 2015, if not earlier, that Mr. Erhart was being retaliated against, and ultimately fired, for conduct which BofI itself admitted was directly related to his whistleblowing activities.

201.   The Board thus had a duty to ensure that BofI did not violate SEC and Dodd-Frank rules by retaliating against Mr. Erhart.

202.   Moreover, the Board at least acquired direct knowledge of retaliation

against Mr. Erhart when it was advised that he had been officially fired as of June 9, 2015.  Even if the Board could disclaim knowledge of retaliation against Mr. Erhart prior to this date, it cannot disclaim knowledge of his firing on June 9, 2015.  Thus, at least as of this date, the Board had a duty to rectify the Company's wrongdoing and to take action to prevent any further violations by BofI of the anti-retaliation provisions of SEC and Dodd-Frank rules.  Yet, the Board completely failed to do so, and thus acted in bad faith and breached its duty of loyalty to the Company.

203.  This is not an isolated incident showing the Board's approval of retaliatory conduct against whistleblowers and failure to rectify such conduct.  Court filings in the *Golub* action reveal that Ms. Golub's experience as a whistleblower bears, in BofI's words, "striking similarities" with Mr. Erhart's experience.  Ms. Golub began working as a quality-control auditor at BofI in September 2014.  In that position, Ms. Golub was responsible for performing quality control on single-family loans originated by BofI.  The quality-control function assigned to Ms. Golub involved identifying, documenting and reporting perceived underwriting deficiencies that potentially impact the credit decision or could affect the salability of a loan to designated underwriting personnel and/or BofI's Chief Credit Officer.  Ms. Golub reported significant deficiencies in BofI's underwriting practices — a key component to BofI's lending business — to BofI's management.  As a result, Ms. Golub was retaliated against and was ultimately terminated in May 2015 — around the same time of Mr. Erhart's termination.  Ms. Golub filed a whistleblower complaint with OSHA in October 2015.  Yet, BofI continued its retaliatory conduct against Ms. Golub, just like it did against Mr. Erhart, by bringing action against her.  In the *Golub* action, BofI successfully compelled Ms. Golub into arbitration and kept the public in the dark about its retaliatory conduct.  BofI has also brought claims against Ms. Golub for violating BofI's confidentiality agreement, yet the purported violation was entirely based on her whistleblowing activities.  BofI has also concealed from its

public disclosures, including SEC filings, any references to Ms. Golub's whistleblowing activities.

204.   The similarities between Ms. Golub and Mr. Erhart with respect to their whistleblowing activities give rise to a reasonable inference that the Audit Committee, as well as the Board, knew about and approved the retaliatory acts against Ms. Golub, and failed to rectify the Company's wrongdoing and to take action to prevent any further violations by BofI of the anti-retaliation provisions of SEC and Dodd-Frank rules.

205.   As a result of the Individual Defendants' wrongful acts and omissions, the Company has suffered significant losses and damages.

**DAMAGES TO BofI**

206.   BofI has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

207.   As a direct and proximate result of the Individual Defendants' conduct, BofI has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)   legal fees associated with the lawsuits filed against the Company for violations of the federal securities laws and for violation of the anti-retaliation provisions of Dodd-Frank and Sarbanes-Oxley by Mr. Erhart;

(b)   loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

(c)   amounts paid to outside lawyers, accountants, and investigators in connection with BofI's internal investigation; and

(d)   loss of revenues and profits due to any subsequent restatements.

///
///

**DERIVATIVE ALLEGATIONS**

208.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

209.   Plaintiffs bring this action for the benefit of BofI to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

210.   BofI is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiffs will adequately and fairly represent the interests of BofI in enforcing and prosecuting its rights.

211.   BofI's Board, at the time of the filing of this First Amended Consolidated Shareholder Derivative Complaint, consisted of the following eight directors:  Nicholas A. Mosich, James S. Argalas, Gregory Garrabrants, John G. Burke, Paul J. Grinberg, James J. Court, Edward J. Ratinoff, and Uzair Dada.[5]  Plaintiffs have not made any demand on the Board to institute this action against the Individual Defendants because, for the reasons set forth below, such demand would be a futile and useless act.

212.   Where the board consists of nine directors, Plaintiffs need only show that five of the directors lack independence or face a substantial likelihood of liability to establish that a demand on the board would be futile.  As shown below, the demand in this case would be futile because at least five of the Director Defendants lack independence or face a substantial likelihood of liability.

---

[5] Due to the resignation of defendant Allrich, only eight Director Defendants remain on the Board as of March 17, 2017, when this First Amended Consolidated Shareholder Derivative Complaint is submitted.  To satisfy the requirement of pleading demand futility under Rule 23.1(b) of the Federal Rules of Civil Procedure and Delaware law, Plaintiffs only need to demonstrate that demand on the current Board of eight Director Defendants is futile and thus excused.  *See Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006) ("the Rule 23.1 demand inquiry must be assessed by reference to *the board in place at the time when the amended complaint is filed*") (emphasis added).

I.      **Demand Is Futile Because a Majority of the Director Defendants Lacks Independence and Faces a Substantial Likelihood of Liability**

A.      **Garrabrants Lacks Independence**

213.    Demand is futile as to Garrabrants because he lacks independence. As admitted by BofI in its 2015 Proxy Statement: "Mr. Garrabrants is not an independent director because he is our President and Chief Executive Officer." This decision as to Garrabrants's lack of independence was made by the Board itself.

214.    Garrabrants is also interested in this litigation for purposes of demand futility because he faces a substantial likelihood of liability for his individual misconduct. Garrabrants is a named defendant in the currently-pending federal class actions, alleging that he violated § 10(b) of the Exchange Act and Rule 10b-5 when he disseminated or approved the false and misleading statements set forth above.

215.    If Garrabrants pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws. As such, Garrabrants is fatally conflicted and, therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims. Thus, demand is futile.

216.    Additionally, Garrabrants is interested because he prepared, signed, or caused the Company to issue many of the false and misleading statements. In fact, Garrabrants signed the Company's SEC filings that contained false and misleading statements, including the Forms 10-K dated September 3, 2013, August 28, 2014, and August 26, 2015, and the Forms 10-Q dated November 5, 2013, February 5, 2014, May 6, 2014, November 4, 2014, January 29, 2015, and April 30, 2015. Moreover, in conjunction with the filing of each of the above Forms 10-K and Forms 10-Q, Garrabrants signed certifications as required by Sarbanes-Oxley that, *inter alia*:

(a)      affirmed that he was "responsible for establishing and maintaining disclosure controls and procedures … and internal control over

financial reporting" for BofI;

(b)   certified that he has disclosed to BofI's auditors and the audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [BofI's] ability to record, process, summarize and report financial information," and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [BofI's] internal controls over financial reporting"; and

(c)   certified that, to the best of his knowledge: (i) the Annual and Quarterly Reports did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (ii) "the financial statements, and other financial information included in [each] report, fairly present in all material respects the financial condition, results of operations and cash flows of [BofI]"; and (iii) the information contained in the Forms 10-K and Forms 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company." The above representations were false and misleading (and thereby violated Sarbanes-Oxley) because, as noted above, during the Relevant Period, the Company's internal controls were frequently disregarded, and the Company's statements regarding its internal controls and other financial statements were materially false and misleading.

217.   Garrabrants also participated in conference calls with analysts and investors during the Relevant Period.  Garrabrants therefore faces a substantial likelihood of liability for breaching his fiduciary duties.  Consequently, Garrabrants cannot disinterestedly consider a demand.

### B. The Entire Board Faces a Substantial Likelihood of Liability for Retaliating Against the Whistleblower, Mr. Erhart, in Violation of Sarbanes-Oxley

218.   As alleged in detail by Mr. Erhart in a whistleblower complaint pending in this District (and of which the Court can take judicial notice), Mr. Erhart brought numerous specific violations of the law by BofI senior officers, including Garrabrants, Bar-Adon, and Tolla, to the attention of the Company, in the course of performing his duties as BofI's Staff Internal Auditor, which specifically included Sarbanes-Oxley testing.   After Mr. Erhart's good-faith whistleblower complaints were brushed aside by Garrabrants, Bar-Adon, and Tolla, Mr. Erhart lodged his complaints with the OCC and SEC.

219.   Section 806 of Sarbanes-Oxley prohibits employers such as BofI from discharging, constructively discharging, demoting, threatening, harassing, or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders.  In addition, an employer may not discharge or in any manner retaliate against an employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations, or violations of federal law relating to fraud against shareholders.  If an employer takes retaliatory action against an employee because he or she engaged in any of these protected activities, the employee can file a complaint with the OSHA.

220.   Mr. Erhart filed a complaint with OSHA regarding the retaliation he was faced with after reporting allegedly unlawful activities at BofI to federal agencies and regulators.  Dodd-Frank also prohibits retaliation against whistleblowers.

221.   Since at least December 2014, the Audit Committee (comprised of

defendants Grinberg (Chair), Mosich, and Argalas) was aware of the details of Mr. Erhart's complaints of violations of law committed by BofI senior officers, including Garrabrants, Bar-Adon, and Tolla.  In mid-December 2014, Tolla revised a draft evaluation of Mr. Erhart's job performance prepared by Ball.  As a result of these revisions, Tolla downgraded Mr. Erhart's performance in retaliation for his whistleblowing activities.  Concerned about the propriety of Tolla's conduct, Ball directly advised the Audit Committee about Tolla's downgrading of Mr. Erhart's performance evaluation.  Upon information and belief, the Audit Committee ratified and approved the retaliation against Mr. Erhart by failing to instruct Tolla to restore Mr. Erhart's performance grade to the level determined by Ball.

222.   In addition, on March 12, 2015, defendant Bar-Adon met with Mr. Erhart and told him he was acting as General Counsel to the Audit Committee.  Thus, Grinberg, Mosich, and Argalas had actual knowledge of Mr. Erhart's whistleblower complaints, and had directed Bar-Adon to meet with Mr. Erhart regarding such activities.  Moreover, Grinberg, as the Chair of the Audit Committee, is the person at BofI to whom all employee complaints regarding suspected unlawful conduct are directed.  Thus, all complaints at BofI were directed to Grinberg, who then shared them with the other Audit Committee members and later the full Board, as indicated below.

223.   As noted by BofI in its 2015 Proxy Statement, the Audit Committee "reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting."

224.   In an October 15, 2015 press release and Form 8-K (*see* Ex. 1), BofI admitted that the Audit Committee and *full Board of Directors* had been informed of Mr. Erhart's whistleblower complaints and related details "*immediately after their occurrence in March 2015.*"  The press release stated:

> "The Audit Committee and Board of Directors of BofI were fully informed by management of the events involving audit team members

immediately after their occurrence in March 2015.   The Audit Committee then conducted interviews with internal audit personnel and held conversations with the Office of the Comptroller of the Currency," stated Paul Grinberg, Director and Chairman of the Audit Committee.   An internal investigation was conducted, including an examination of forensic evidence, and the complaints of the former audit team member were found to be without merit.

225.  █████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████  ████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████  ███████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████



226.

227. Upon information and belief, at some point between March 2015 and June 9, 2015, despite having been "fully informed" of Mr. Erhart's whistleblowing activity, and despite knowing that Dodd-Frank, Sarbanes-Oxley, and other laws prohibit retaliation against employees who report alleged wrongdoing, the Board authorized or approved the firing of Mr. Erhart, to be effective as of June 9, 2015.

228. Moreover, after Mr. Erhart was fired effective June 9, 2015, the Board

indisputably had direct knowledge of ***unlawful retaliation*** against him since he had been fired.   As of this date, the Board had an additional duty to rectify the Company's wrongdoing and to take action to prevent any further violations by BofI of the anti-retaliation provisions of SEC and Dodd-Frank rules.  It completely failed to do so, and thus acted in bad faith and breached its duty of loyalty to the Company.

229.   All Board members thus face a substantial likelihood of liability for breaching their fiduciary duties by causing the Company to violate the anti-retaliation provisions of Sarbanes-Oxley, Dodd-Frank, and other laws.

230.   Moreover, all Board members can reasonably be charged with actual knowledge or reckless disregard of the unlawful activity alleged by Mr. Erhart during the Relevant Period because the wrongdoing concerned the Company's core (and only) business — consumer and business banking products and services.

## C.   Additional Reasons Demonstrating Futility of Demand

231.   The entire Board has demonstrated its inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein.  Every Board member has acted in violation of their fiduciary duties to the Company's shareholders, as described herein.

232.   For example, in addition to Garrabrants, defendants Allrich, Mosich, Argalas, Garrabrants, Burke, Grinberg, Court, and Ratinoff approved and signed the Company's SEC filings that contained false and misleading statements, including the Forms 10-K dated September 3, 2013, August 28, 2014, and August 26, 2015.[6] Therefore, no reasonable stockholder would reasonably believe that a majority of the members of the Board would be able to independently and properly consider a

---

[6] Defendant Dada, who joined the Board on January 22, 2015, only signed the false and misleading Form 10-K dated August 26, 2015.

demand in good faith and, accordingly, demand is excused.

233.    Every member of the Board declined to inform themselves of the misconduct complained of herein, even when they had a reasonable basis to believe that further investigation was warranted, as is evidenced for example by the Board's approval of the firing of Mr. Erhart just months after he filed whistleblower complaints against the Company with the OCC and SEC and claimed whistleblower protection.  Thus, demand is excused.  Intentionally causing the Company to violate the anti-retaliation protection of multiple federal laws amply demonstrates the Board's disloyal and bad faith conduct.  Any conduct evidencing bad faith and a lack of loyalty to the Company is outside the protection of the business judgment rule and constitutes conduct that is non-indemnifiable.  Thus, demand is excused as to the entire Board.

234.    █████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

235.   Although the Company has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing, the Board has not filed any lawsuits against any directors or officers who were responsible for the losses.   Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a substantial likelihood of liability for their breaches.   Yet, the Director Defendants continue to maintain their lucrative position as directors. According to BofI's Proxy Statement dated September 4, 2015, the Director Defendants' compensation for fiscal 2015 are as follows: Argalas, $188,210; Burke, $188,210; Court, $188,210; Dada, $85,061; Grinberg, $281,133; Mosich, $253,970; and Ratinoff, $188,210.[7]   And Garrabrants's compensation as CEO was $6,310,485. Indeed, the Director Defendants are more interested in protecting themselves than they are in protecting the Company by bringing this action. Thus, demand on the Board is futile.

236.   ██████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████     ██████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████

---

[7] Allrich's compensation was $514,598.

[8] Allrich also participated in BofI's mortgage-lending program by borrowing approximately $600,000 from BofI in 2014.

237.   Grinberg is further interested in this litigation for purposes of demand futility because he breached his fiduciary duty by failing to disclose a related party transaction between BofI and his employer Encore Capital.  Grinberg, who is a member of the Audit Committee of the BofI Board, is also Group Executive, Internal and Corporate Development, and the former CFO of Encore Capital.  On or about May 2014, BofI provided a $31.9 million loan to Encore Capital's affiliate Propel Tax to finance the purchase of tax liens.  Under Encore Capital's executive compensation plan, defendant Grinberg's incentive-based compensation is linked to Encore Capital's achievement of performance targets.  In 2014, Grinberg received a cash bonus of $975,385 based on Encore Capital's achievement of the performance target established for that year, driven, in part, by Encore Capital's tax lien business, Propel Tax.  Defendants, including Grinberg, were required to disclose this related party transaction.  However, they did not.  As a result, Grinberg is disabled from fairly and objectively considering a pre-suit demand because he faces a substantial likelihood of liability for failing to disclose the $31.9 million Encore Capital/Propel Tax loan, and, therefore, is interested in the outcome of this litigation.

## COUNT I
### For Breaches of Fiduciary Duties
### Against All Defendants

238.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

239.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of BofI's business and affairs, particularly with respect to issues regarding the Company's compliance with laws.

240.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, and loyalty.

241.   The Individual Defendants' conduct set forth herein was due to their

intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of BofI.

242.    In breach of their fiduciary duties owed to BofI, the Individual Defendants willfully participated in misrepresentation of the Company's financial condition, failed to correct the Company's public statements, and failed to properly oversee BofI's business, rendering them personally liable to the Company for breaching their fiduciary duties.

243.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misrepresentations and omissions of the material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly.

244.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

245.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, BofI has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT II**
**For Abuse of Control**
**Against All Defendants**

246.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

247.    The Individual Defendants' misconduct alleged herein constituted an

abuse of their ability to control and influence BofI, for which they are legally responsible.

248.   As a direct and proximate result of the Individual Defendants' abuse of control, BofI has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, BofI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT III
### For Unjust Enrichment
### Against All Defendants

249.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

250.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, BofI.

251.   During the Relevant Period, the Individual Defendants either received bonuses, stock options, or similar compensation from BofI that was tied to the financial performance of BofI or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

252.   Plaintiffs, as shareholders and representatives of BofI, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT IV
### For Breach of the Duty of Honest Services
### Against Defendants Garrabrants, Micheletti, Bar-Adon, Tolla, and Walsh

253.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

254.   This claim is brought derivatively on behalf of the Company against Defendants Garrabrants, Micheletti, Bar-Adon, Tolla, and Walsh for breach of their undivided duty of loyalty to their employer.

255.   Garrabrants, Micheletti, Bar-Adon, Tolla, and Walsh were employees of the Company during the Relevant Period.

256.   Garrabrants, Micheletti, Bar-Adon, Tolla, and Walsh breached their duty of loyalty to the Company by not acting solely in the Company's interests in performing their employment duties.

257.   Those breaches of duty consisted of the conduct alleged in this complaint including, without limitation, their conduct in causing the Company to issue false statements regarding its operations and financial results, misstate the fact that the Company maintained adequate internal controls, fire the whistleblower, Mr. Erhart, in violation of Dodd-Frank and Sarbanes-Oxley, and cause the Company to make other false and misleading statements during the Relevant Period.  Defendants benefitted from their wrongdoing because they were allowed to retain their jobs in exchange for their unlawful conduct and because they received compensation that was directly tied to the Company's financial performance, which was greater than it would have been absent the Defendants' wrongful conduct.

258.   The Company was harmed by these Defendants' breaches of the undivided duty of loyalty.

259.   By reason of the foregoing, the Company was harmed and will continue to suffer harm as described in greater detail above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in favor of Plaintiffs and the Company and against all Individual Defendants as follows:

A.   Declaring that Plaintiffs may maintain this action on behalf of BofI and that Plaintiffs are adequate representatives of the Company;

B.      Declaring that the Individual Defendants have breached and/or aided and abetted the breaches of their fiduciary duties to BofI;

C.      Determining and awarding to BofI the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.      Directing BofI and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BofI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

(1)      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(2)      a provision to permit the shareholders of BofI to nominate at least two candidates for election to the Board;

(3)      a proposal to strengthen the Board's supervision of the Company's CEO;

(4)      a provision to appropriately test and then strengthen the internal audit and control functions; and

(5)      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

E.      Awarding BofI restitution from the Individual Defendants, and each of them;

F.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  April 10, 2017                              Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002

*Lead Counsel for Plaintiffs*

THE SHUMAN LAW FIRM
Kip B. Shuman (SBN 145842)
1 Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone:  (303) 861-3033
Facsimile:   (303) 536-7849

*Additional Counsel for Plaintiff Zhang Yong*

First Amended Consolidated Shareholder Derivative Complaint; Demand for Jury Trial

**VERIFICATION**

I, Andrew Calcaterra, verify that I am a shareholder of nominal defendant BofI Holding, Inc. ("BofI"), and that I have continuously owned BofI stock since January 14, 2013. I have reviewed the allegations in this First Amended Consolidated Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 16, 2017, at Rochester, Michigan.

_____
Andrew Calcaterra

## VERIFICATION

I, Zhang Yong, verify that I am a shareholder of Nominal Defendant BofI Holding, Inc., and that I have continuously owned BofI stock since July 16, 2012. I have reviewed the allegations in this First Amended Consolidated Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on March 17, 2017.

_____
Zhang Yong

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS OF EXHIBITS TO THE**
**FIRST AMENDED CONSOLIDATED SHAREHOLDER**
**DERIVATIVE COMPLAINT**

| Exhibit No. | Exhibit Description | Page Nos. |
|---|---|---|
| Exhibit 1 | Form 8-K Current Report by BofI Holding, Inc. dated October 15, 2015. | 091-110 |
| Exhibit 2 | Order Granting in Part and Denying in Part BofI Federal Bank's Motion for Summary Adjudication, Dkt. No. 40, *Erhart v. BofI Holding, Inc.*, Case No. 15cv2287 BAS (NLS) (S.D. Cal. Feb. 14, 2017). | 111-145 |

# EXHIBIT 1

# EXHIBIT 1

Exhibit 1
091

**Section 1: 8-K (8-K)**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C.  20549

# FORM 8-K

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of the
### Securities Exchange Act of 1934

### Date of Report (Date of earliest event reported):  October 14, 2015



# BofI HOLDING, INC.
### (Exact name of registrant as specified in its charter)

| **Delaware** | **000-51201** | **33-0867444** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

| **4350 La Jolla Village Drive, Suite 140, San Diego, CA** | **92122** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(858) 350-6200**

**Not Applicable**

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act

Exhibit 1
092

**Item 7.01     Regulation FD Disclosure.**

On October 14, 2015, BofI Holding, Inc. (the "Company"), parent of BofI Federal Bank, held a conference call to discuss a recently published media report in the *New York Times* and a related lawsuit filed against the Company by a former employee.  In order to provide additional information to investors, a transcript of this conference call is furnished herewith as Exhibit 99.1. The attached transcript is a textual reproduction of the conference call and there may be minor omissions or discrepancies. An audio broadcast of the conference call is also available until Thursday, December 31, 2015, at the Company's website and telephonically by dialing toll-free number 888-203-1112, passcode 4259184.

On October 15, 2015, the Company issued a press release further addressing the matters discussed in the conference call. A copy of the press release is attached hereto as Exhibit 99.2.

This Form 8-K and the information attached below shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended ("Exchange Act"), nor shall it be incorporated by reference into a filing under the Securities Act of 1933, as amended ("Securities Act"), or the Exchange Act, except as expressly set forth by specific reference in such a filing. The furnishing of the information in this report is not intended to, and does not, constitute a determination or admission by the Registrant that the information in this report is material or complete, or that investors should consider this information before making an investment decision with respect to any security of the Registrant or any of its affiliates.

**Safe Harbor Statement**

Statements in the exhibits contain forward-looking statements that involve risks and uncertainties, including without limitation statements relating to the Company's operating results for the quarter ended September 30, 2015, financial prospects and other projections of its performance and asset quality, the Company's ability to grow and increase its business, diversify its lending, and the anticipated timing and financial performance of new initiatives. These forward-looking statements are made on the basis of the views and assumptions of management regarding future events and performance as of the date of this press release. Actual results and the timing of events could differ materially from those expressed or implied in such forward-looking statements as a result of risks and uncertainties, including without limitation changes in interest rates, inflation, government regulation, general economic conditions, conditions in the real estate markets in which we operate and other factors beyond our control. These and other risks and uncertainties detailed in the Company's periodic reports filed with the Securities and Exchange Commission could cause actual results to differ materially from those expressed or implied in any forward-looking statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this press release. All forward-looking statements are qualified in their entirety by this cautionary statement, and the Company undertakes no obligation to revise or update any forward-looking statements to reflect events or circumstances after the date of this press release.
.

**Item 9.01     Financial Statements and Exhibits**

(d) Exhibits

       99.1 BofI Holding, Inc. Media Call Transcript
       99.2 BofI Holding, Inc. Press Release

Exhibit 1

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

BofI HOLDING, INC.

Date:    October 15, 2015                    By:    /s/ Andrew J. Micheletti
                                                     _____
                                                     Andrew J. Micheletti
                                                     EVP and Chief Financial Officer

(Back To Top)

# Section 2: EX-99.1 (EXHIBIT 99.1)

**BofI Holding, Inc. October 14, 2015 Conference Call Transcript**

Exhibit 99.1

### Operator

Good day, ladies and gentlemen. Thank you for standing by. Welcome to the BofI Holding Inc. conference call to discuss a recent media report.

**(Operator Instructions)**

This conference is being recorded today, Wednesday, October 14, 2015. Now I would like to turn the conference over to Johnny Lai, VP of Corporate Development and Investor Relations, BofI Holding Inc. Please go ahead, sir.

### Johnny Lai - BofI Holding Inc - VP of Corporate Development and IR

Thank you, Stephanie, and good afternoon, everyone. With me today are the Company's President and Chief Executive Officer, Greg Garrabrants, and Executive Vice President and Chief Financial Officer, Andy Micheletti. Greg will provide prepared remarks, and both Greg and Andy will be available to answer questions thereafter.

Before we begin, I would like to remind listeners that remarks made on this call may contain forward-looking statements that are subject to risks and uncertainties, and that management may make additional forward-looking statements in response to your questions. Therefore, the Company claims the Safe Harbor protection for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Forward-looking statements related to the business of BofI Holding Inc. and its subsidiaries can be identified by commonly used forward-looking terminology, and those statements involve unknown risks and uncertainties, including all business related risks that are detailed in the Company's filings on Form 10-K, 10-Q, and 8-K with the SEC.

This call is being webcast, and there will be an audio replay available in the Investor Relations section of the Company's website located at bofiholding.com. Details for this call were provided on the conference call announcement, and in today's release. At this time, I would like to turn the call over to Mr. Greg Garrabrants who will provide opening remarks. Greg, please begin.

### Greg Garrabrants - BofI Holding Inc - President & CEO

Thanks, Johnny. Yesterday I received a copy of a complaint that was not file-stamped from the New York Times reporter that initially wrote a story about the Bank at the end of August. The New York Times reporter had received a complaint from the plaintiff's attorney who filed it. The complaint recycles old, baseless, and factually inaccurate allegations from an inexperienced, underperforming, junior audit team member who had been with the Bank for a short period of time. The complaint is riddled with evidence of basic misunderstandings, inaccuracies, out-of-context statements and illogical conclusions.

This junior disgruntled employee stated that he has contacted a variety of federal agencies, and that they have taken no action. Having failed in his attempt to get administrative agencies to act, he has turned to a stunt of filing a baseless lawsuit that was distributed first to the New York Times, rather than served on the only counter-party in the action. Additionally, Mr. Erhart asserts that he not only discussed in detail his issues with the OCC telephonically, but he met with them numerous times, and he provided a significant number of documents to them during our March 2015 examination.

Exhibit 1
094

As I have previously discussed, subsequent to these discussions that Mr. Erhart had with the OCC, the OCC approved our purchase of First Marblehead deposits in March of 2015, the same month that Mr. Erhart had talked to the OCC, and we also received approval for the H&R Block transaction on September 1. There are no regulatory issues of any kind that have arisen from Mr. Erhart's contact with the OCC.

Turning to specific allegations in the complaint, the Bank has never misstated its financials. And, at the time, the plaintiff was working at the Bank, he never made such an accusation. The plaintiff and plaintiff's counsel understand

1

Exhibit 1
095

**BofI Holding, Inc. October 14, 2015 Conference Call Transcript**

that they have no reasonable basis to make these serious claims today, so they have qualified their entire complaint with the word, "potentially."

The Bank presented the 2015 business plan to the Board of Directors in July 2014 for approval, at which time it was discussed in detail and approved. The plaintiff was not familiar with business plans. The delay in obtaining the proper evidence for his own file was due to his own confusion.

Today, and at no time during which the plaintiff was employed by the Bank, did the Bank have 25% of its total deposits with only four customers, and nine customers with 40% of total deposits. The plaintiff did not understand the Bank's management reporting system, and all management interactions were designed to ensure that accurate data is presented to Bank's constituents. The top four customers and top nine customers represent approximately 3% and 5% of total deposits, respectively, at the quarter ended June 30, 2015.

The Bank has never omitted a calculation which would impact the allowance for loan loss and leases. After reviewing the plaintiff's internal audit, it was clear that he did not understand which of the Bank's loan types had unfunded commitments, and that he did not understand the Generally Accepted Accounting Principles that would apply to this area. A review by the Bank's external auditors and examiners conclude that there are no significant findings.

It is important to note that we are a results-oriented culture, where poor performers are given an honest assessment of their shortcomings. Several elements of this allegation are factually inaccurate with regard to Mr. Ball's discipline procedures that were applied to him. First, the audit committee determines auditor compensation and bonuses, not the management team. Second, Jonathan Ball conducted Mr. Erhart's reviews, not Mr. Tolla, during his tenure, and communicated the results to the audit committee along with his recommended bonus.

During the 2013 performance review period, which was the first time Mr. Erhart received a performance review in June, and a performance review in December, which was Erhart's first full cycle review -- so he wasn't at the Bank that long -- Mr. Ball noted that Erhart's "audit work would not experience as many delays if he improved his communication skills, and did not wait for email responses from business units". In other words, Mr. Ball wanted him to get up and talk to people, because his emails were often incoherent and they did not elicit responses because of their incoherence.

During December 2014 review cycle, Mr. Ball, apparently, using a once-is-a-mistake, twice-is-a-habit rationale, was more direct in his criticism of the reliance on email alone to collect information. He indicated in the review that Erhart needs to quote, "use meetings and collaboration", end quote, to ensure that quote, "audit does not drag on". And that he continues to discourage him from drafting long emails, when a conversation would be more appropriate. Erhart was rated, 'needs development in certain areas', as a result of these and other various shortcomings.

With the regard to failure to disclose tax identification numbers, the alleged failure to disclose tax identification numbers to the OCC, the Bank did in fact respond to an OCC request pertaining to the deposit accounts without TINs, by stating that we do not have any. The request was under the heading CIP, Customer Information Program, and was related to deposit accounts.

Despite our confidence in the veracity of our response, the Bank also turned over a list of approximately 150 non-resident alien customer loans, each of which did not have TINs, though we did so under a more general catch-all request for information found elsewhere in the OCC letter. Mr. Erhart's complaint itself noted that factual disconnect. He states that he saw a folder under the heading, BSA, with approximately 150 to 200 accounts where the borrower did not have a TIN. That folder was prepared for and delivered to the OCC in response to the catch-all request for BSA information.

Mr. Erhart alleges that his Microsoft Outlook access was threatened. That's not correct. All Bank staff including the internal audit team and all staff has full and unfettered access to Microsoft Outlook, and there's not a shred of factual basis to this allegation.

Exhibit 1
096

**BofI Holding, Inc. October 14, 2015 Conference Call Transcript**

It is unfortunate that a coordinated and baseless set of allegations could cause loss to our shareholders. But the Bank's core business has never been stronger, and we continue to see strength in our margin, asset growth, and earnings per share. We look forward to reporting a strong record quarter that beats analyst expectations. With that, I will take questions.

## QUESTIONS AND ANSWERS

### Bob Ramsey - FBR & Co. - Analyst

Hey, good afternoon, and thanks for doing the call, and taking the questions. I guess, I wanted to make sure I'm clear. I think you guys did talk about on September 2 call. But this employee did make all these concerns aware to the examiners, not only examiners sort of on a remote whistleblower line, but those that were in the office performing your last Bank regulatory exam, and they did investigate all of his concerns. And coming out of that process, do you know -- they let you guys know that basically they'd completed that review? Could you just review that that's about right?

### Greg Garrabrants - BofI Holding Inc - President & CEO

That is correct.

### Bob Ramsey - FBR & Co. - Analyst

Okay. And so, they've let you know that there is nothing ongoing related to these concerns that he raised, that they are still investigating at this point?

### Greg Garrabrants - BofI Holding Inc - President & CEO

The OCC comes in and regularly reviews the Bank. If any of these things were true, we wouldn't have gotten our two acquisition deals done. You can take that as confirmation given that we got those deals done. One deal was done in the month that these allegations were made. We have great regulatory relations. We are under no regulatory orders, no regulatory restrictions on our business, and we continue to have great dialogue with our regulators. And there is no truth to any of these allegations that we did not provide information.

### Bob Ramsey - FBR & Co. - Analyst

Okay, great. And then, in terms of the allegation that you all are doing business with customers that are on BSA-- do not touch list. I mean, you were all sort of complimented previously on your BSA practices after the last exam, isn't that right?

### Greg Garrabrants - BofI Holding Inc - President & CEO

Yes, I have said that and that was a factually accurate statement. We do not do business with customers on the prohibited OFAC list. That's actually quite an easy thing to avoid, and that is a baseless allegation. Erhart had provided a series of loans that he had thoughts about to examiners at the prior examination, and they were reviewed.

### Bob Ramsey - FBR & Co. - Analyst

Okay, perfect. One other question on the deposit front, I appreciate you all giving the updated numbers on really what your biggest deposit customers represent as a percent of deposits. But any sense of maybe what accounts for the discrepancy or the misunderstanding was? Because to go from 40% to 5% is a massive shift.

### Greg Garrabrants - BofI Holding Inc - President & CEO

You're making the assumption that there is an attempt to actually have a good faith effort to reveal the truth here, and that is fundamentally mistaken as to what is going on. We will see ultimately what sort of payments are flowing to pa

Exhibit 1
097

**BofI Holding, Inc. October 14, 2015 Conference Call Transcript**

rticipants here. And I don't want to make allegations at this time until we further review this suit. But I will guarantee you in my view anyway, by the time we are done, we will find a coordinated effort with the media, with short-sellers, and with Mr. Erhart to provide a variety of material non-public information to individuals who ultimately have been worried about the dollar sign. But they are going to have to remove the [S]. So instead they can be worried about tiny bars.

There's a lot more going on here, and we have absolutely nothing to hide, and I am extremely unhappy with these sort of factual inaccuracies. And so, obviously, I look forward to attributing some component of our share price decline, and ensuring that the John Doe's name will include all the short-sellers who are participating in this action, appropriately reward the Bank and the shareholders for any losses they took today.

No, the deposit concentration statement doesn't make any sense. It never made any sense, and doesn't make any sense now. There are other statements that make no sense. I don't really truly believe, for example, with regard to other allegations that Mr. Erhart actually doesn't know the difference between deposit accounts and loans. He wasn't a great auditor, I will give you that, but he does know the difference between deposit accounts and loans, yet he conflates those two.

And because he had these discussions with the OCC, clearly they communicated things back to him. So the assumption that somehow these are misunderstandings is just simply not correct. It is a coordinated effort, and unfortunately there have been a lot of these efforts, but this one happened to be successful. And I feel badly for our shareholders for that. But I think that you are fundamentally misunderstanding what is going on here, if you're thinking that he is pursuing some sort of quest for truth, and not material advantage here.

**Bob Ramsey - FBR & Co. - Analyst**

All right. That's helpful, Greg. I appreciate all the color.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Thank you.

**Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst**

Good afternoon. Thank you for taking questions during this call. Just a couple of questions, and some of them have already been asked. Could you answer in terms of the deposits, you told us that the top three customers are 3%, and top 9 are 5%, respectively. Could you just size up, the size of your biggest customer relationships at the Bank so that we have that information for the record?

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Yes, I will let you go ahead, Andy

**Andrew Micheletti - BofI Holding Inc - EVP, CFO**

Sure. The largest uninsured size is about $30 million with a 1031 exchange company.

**Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst**

And that is multiple accounts, one relationship?

**Andrew Micheletti - BofI Holding Inc - EVP, CFO**

Yes, it is multiple underlying customers.

4

Exhibit 1
098

**Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst**

Great. And also, in terms of the OCC examination that was already done, answered, asked, moved on, approved the deals. So have you had a chance to talk to your regulators today about this situation and gotten comfort from them, that they view this as you do, that is a serious lawsuit?

**Greg Garrabrants - BofI Holding Inc - President & CEO**

One of the things, in my conversations with regulators today -- they always want to make sure that we ensure that we have confidentiality of our communications with them. But these allegations are exactly the same ones that were made by Erhart at the time of the March reviews. You should feel very, very comfortable that these are non-issues for the regulators. You should feel very comfortable with that.

**Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst**

Okay, very good. And last question, and I'll step back. Could you go over the time line of Erhart leaving the Bank. He claims to have left, not voluntarily. Did he leave voluntarily? If you could just clarify that side of the story?

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Yes -- so we had been provided some feedback about his performance. I went down to talk to him about it, and figure out what was going on. He went on some sort of family medical leave. He got a note from, some sort of doctor, I don't know. And the note that he filed said that he needed medical leave.

So he went on medical leave, and then we conducted an investigation of what he was doing. We talked to the audit committee to it figure out -- because he was doing a lot of things that he clearly was not competent to do and were outside his audit scope. And so, I don't run internal audit side, it reports to the audit committee. But I was asking them what was assigned to him? And, why was he so incompetent at what he was doing, and these sorts of things. And he was sort of moving around not finishing anything.

He didn't finish many audits -- he had about 25% of the completed audits that the other audit team members did. This is shocking, a shockingly low level of performance. And at that time, we were looking into what was happening. We did not fire him. We were asking him, when he was ready to communicate with us, to allow us to conduct our internal investigation of his efforts. He failed to provide a subsequent medical form, from whatever medical authority he had found to give him this medical form. And at that point in time, his medical leave expired.

So we were willing to very much listen to his story. We found a variety of information that he sent to people that did not make any sense. We found significant oddities in some of the things he was doing, and so we were interested in talking with him about it. And he didn't give us the opportunity to do that, because he refused to answer any questions.

**Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst**

No, go ahead, sorry.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Although he ultimately returned his laptop, he refused to answer any questions when he returned his laptop.

**Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst**

So we take that, to interpret that he let his own employment lapse?

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Yes, that is correct.

5

Exhibit 1
099

**BofI Holding, Inc. October 14, 2015 Conference Call Transcript**

**Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst**

Okay. And then, final question, and I'll step back. Could you comment on the paragraph in this complaint about the plaintiff was able to readily uncover information that many of the borrowers were notorious criminals? That is such a colorful statement.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Well, there are other colorful statements -- he accuses me of money laundering, and questioned where money came from in certain accounts, when you can clearly see a Form 4 filed with that information. So it's one of many colorful statements. And as I said, if you're take a look, the share price reduction is its own benefit. This complaint is riddled with nonsense. There were a couple of borrowers, maybe three, that subsequent to the time that we made the loan, had some involvement in either an investigation of some kind or some sort of criminal inquiry. These were all single family loans.

Any of that information about those allegations of criminality of these few borrowers were not apparent at the time diligence was done on the loans. The idea, in and of itself that any these customers didn't have substantive other banking relationships is not accurate. And the idea that somehow the New York Times mentions that we have three borrowers out of thousands of borrowers who had some subsequent criminal issue well after the loan is made is solely related to this attempt to have the short-sellers gain some benefit.

You're right, it's salacious, but it's also really irrelevant. And the fact is, obviously -- we didn't have deposit accounts for these customers. So you're saying that they didn't have deposit accounts anywhere else? It really is sort of an embarrassing one-sided presentation. But look, you have to say that it was effective today. And so, despite its silliness really, if you think about it logically, it was effective.

**Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst**

Okay. Thank you very much. I will step back now.

**Andrew Liesch - Sandler O'Neill & Partners - Analyst**

Hey, guys. Thanks for hosting this call.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Sure, Andrew.

**Andrew Liesch - Sandler O'Neill & Partners - Analyst**

Just a few questions from me. Just curious, it looked like he was talking to the OCC in Denver. And I mean, I thought the -- or I was under the impression that the OCC in DC was the one that was working on the approval of Block deal. I was just curious, how much conversation between the two offices might be, and just to confirm that they were talking to each other, if you even know?

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Yes, I would say, that clearly, the way that I can speak in generalities about how applications work, and that's absolutely the case, that if the district is not supportive, then the application is not going to go forward. The district then forwards application to the national office. At which point in time, the national office's recommendations are confirmed. So I think it would be very difficult, just speaking broadly, that there would be any chance that that wouldn't have happened.

But this is clear, right in the face of this, we had our deal approved. We are approved to process an incredible percentage of tax refund transactions for a huge portion of the country that this is -- as I've said it is, we don't have any regulatory

6

Exhibit 1
100

**BofI Holding, Inc. October 14, 2015 Conference Call Transcript**

issues with our business. Business has never been better. With minimal contributions from Block, we are looking at 30% plus EPS growth, and then you add Block on top of that.

We are going to have an absolutely fantastic year. And there has not been corner-cutting at this Bank. The investments we have in compliance, infrastructure, the culture we have, is fantastic. And so, it's unfortunate that they were able to get some traction, and they had been at it for a long time. But yes, we'll get through it, and performance will win out.

**Andrew Liesch - Sandler O'Neill & Partners - Analyst**

Okay. And then, could you just discuss -- the part in the complaint about John Ball abruptly resigning? In response to what?

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Yes, sure. Unfortunately, Jon had to deal with an auditor who was doing a lot of things that he turned out to be unqualified to do. And even though John had downgraded him, and given him specific feedback on his performance, and the fact that he had done such a few number of audits, this obviously caused John to come in for some discussion about how that management had occurred. John Ball talked with the audit committee and the regulators when he was done working at the Bank. John Ball didn't make any of these allegations of wrongdoing.

These are Erhart's allegations. John, I think, was tired of this. He had actually suggested earlier that Erhart be fired, and we wanted Erhart to finish up his discussions with the OCC. So we did not accept Mr. Ball's recommendation that Erhart be fired.

But there was a lot of concern because -- Mr. Erhart, as we go through all of this, what you'll see is that Mr. Erhart had a very belligerent manner with his emails. He had a belligerent manner with people in general. And what would happen is that there would often be very negative feedback communicated to John Ball about his interactions. Which is why, when I was discussing Mr. Erhart's performance reviews, I said, this is a polite way of saying, he needs to use meetings and collaboration to ensure that audits do not drag on, and Jon continues to discourage him from drafting long emails when a conversation would be more appropriate.

That performance review could have read, your emails caused me a firestorm with their lack of structure, their lack of coherence, and their lack of basic understanding of the things that you're looking at. If you go and actually talk to somebody, because you're a very junior person, you will learn something. And if you learn something from someone who knows a lot more than you, then you might not have this sort of negative reaction that you did. So that's kind of how all of that went.

**Andrew Liesch - Sandler O'Neill & Partners - Analyst**

Okay. And then, just one last question from me. So it sounds like the spreadsheet that he mentioned, that he didn't see the TINs in them. What -- and just a clarification for your prepared comments, were they elsewhere at the Bank.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

No, no, this is a wonderful example. The OCC was asking for deposit information. And we don't have any foreign deposit accounts that lacked TINs. And so, it was an accurate response to say, to the deposit question, that no TINs were missing on deposit accounts.

Now in a separate request for information, in a separate area, in an abundance of caution, they asked for general BSA items. We included a spreadsheet of review of around 150 non-resident alien loans that did not have TINs, but we sent that also to the OCC. This was what Erhart saw. It was provided to the OCC. There are no issues with any of this.

7

Exhibit 1
101

**BofI Holding, Inc. October 14, 2015 Conference Call Transcript**

From his performance reviews, he's not winning auditor of the year. However, I think he understood this, or he just saw it out of context and wasn't paying attention. But here's a bigger problem with this, okay? He wasn't assigned to audit this area.

So normally when you have a junior auditor the way this would work is they would actually get assigned an audit that would have a certain set of things he would look at. Then that auditor would be supervised by someone who has more experience. And when he sees something, he would talk to that person with more experience. And then, if he thought he was not getting something resolved, he would go to the audit committee, or he could see someone else in the organization, and say hey, I'm misunderstanding this. He did none of those things.

And so, the problem is, he routinely misunderstanding basic things, and this is a perfect example of this. And even when you read his complaint, it's funny because we don't call loans accounts. Now I'm not going to get into an epistemological argument of whether accounts can be loans, and loans can be accounts. But the way that the common nomenclature is utilized is that you talk about loans as loans, and accounts are deposit accounts.

His complaint read -- plaintiff saw a spreadsheet in the BSA folder disclosing approximately 150 accounts where the borrower does not have a TINs. Well, to be clear, none of those were deposit accounts, and so the word, borrower, makes clear he was talking about loans.

And so, what he was doing, is outside of an audit of anything he was working on, he decided to look in the BSA folder, found a spreadsheet that was given to the OCC in a different section, and decide that this was a big issue. Which is why there is not a lot of thinking from third parties that he is actually a whistleblower. It is right to call him a disgruntled employee - that is the right thing to call this guy.

**Andrew Liesch - Sandler O'Neill & Partners - Analyst**

Interesting. Well, thank you so much.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

It's shocking right, but that is something -- but you have to remember again, when something does not make sense about the reaction, it's because there is some interest behind it. He doesn't have money to fund a suit like this. And we have to find out who is funding it, and that's going to be a very interesting and fun opportunity for us.

**Andrew Liesch - Sandler O'Neill & Partners - Analyst**

All right. Well, thank you for taking my question.

**Edward Hemmelgarn - Shaker Investments - Analyst**

Yes, hi there, Greg. I guess I do have a couple of questions. One being, I get the impression that he was a bad internal auditor. And my question is, why did it take -- or why didn't you fire him earlier? I mean, based upon -- say what you are commenting about is the performance as an internal auditor was poor, right? As a former auditor, I would have fired him within a very short period of time because -- and so, it calls into question I guess somewhat, the quality of who is supervising the internal audit staff, and why aren't you getting that?

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Well, I accept responsibility for everything that happens here. The auditor, the audit manager reports to the audit committee. Now the audit manager is no longer here, and we have a new, more experienced audit manager.

Now that conclusion that you drew, would be a logical conclusion that you may think anyone who looked objectively at this would have, including third parties, right? As we conducted our own review, the General Counsel conducted its own review for the audit committee of what happened, and I think that that conclusion is difficult to argue with.

8

Exhibit 1
102

**BofI Holding, Inc. October 14, 2015 Conference Call Transcript**

The interesting thing is in some respects, because we have a culture that is focuses very strongly on ethics, the fact that when someone brings up something, we wanted to try to help him understand.

So this was an attempt, an overweening attempt to try to help, that there would be some improvement, and he really wasn't here that long. I mean, in his first review cycle, he was being told that his audit work would not experience as many delays, if he improved his communication skills and did not wait for email responses from business units. So that's his first full review cycle.

We have six month review cycles. So I'm not trying to justify that. But I am also saying that it's not as if nothing was done about this individual. He was being provided performance counseling, and he was given multiple direct feedback from a variety of people about style and these other sorts of things. Obviously, when you step back from this overall, neither he nor his supervisor are with the Bank anymore.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

When did he start his employment as an internal auditor with the bank?

**Andy Micheletti - BofI Holding Inc - EVP & CFO**

September 2013.

**Edward Hemmelgarn - Shaker Investments - Analyst**

So he was with the Bank a year and a half?

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Yes that's about right.

**Edward Hemmelgarn - Shaker Investments - Analyst**

That's a pretty long time.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

As I said, neither the manager nor the internal auditor are here anymore. I also said the manager had no issues and no allegations of any sort of improprieties and things like that. There was a direct discussion between Mr. Ball and the head of internal audit about what was going on, what happened, all these issues with fully discussed and there were no allegations made by Ball. Mr. Erhart is out on his plank with regard to this.

**Edward Hemmelgarn - Shaker Investments - Analyst**

Has there been any discussion or will there be any discussion at the audit committee and board level since they are the ones that I believe employ the internal audit director and manager? Frankly, it is about ways they can improve their oversight and standards with regard to these things.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

They've done a great job in the creation of a plan which included an implementation of the system which is currently in place that very specifically monitors performance of internal auditors and ensures that they would no longer be able to get away with having the type performance that Erhart did with the completion of so few audit. There are also other things in the plan to accelerate information about what auditors are working on. Was he working on a legitimate payroll audit or not? No he wasn't, he wasn't even working on a legitimate payroll audit. He obtained salary information from the payroll person by using his color of audit authority and he went down and spent time sharing that information with other people in the compliance and audit department to encourage them to be disgruntled. Part of the way that we

9

Exhibit 1
103

**BofI Holding, Inc. October 14, 2015 Conference Call Transcript**

found out that something had happened was that one of those individuals said why do I get a lower bonus when I produced the same number of audits. Clearly the systems implementation is absolutely important.

We have a system in place right now that tracks auditor performance very clearly. We have a better and more seasoned manager, someone who understands and who is going to focus on the right sorts of things, furthermore we also have a signed a contract to implement a program with a much more sophisticated system than we even have in place right now for the tracking of these audits.

I think that the audit committee has done a fantastic job of putting in place a very serious program and I would also say that the level of improvement that we have in general related to employment of Mr. Tolla and the enhancements of the audit function have been going very well.

**Edward Hemmelgarn - Shaker Investments - Analyst**

I understand. I guess what I'm trying to say is that it sounds to me as if this is the biggest problem that the Bank has, that this was an inadequately run and unsupervised internal audit group.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

I think that with regards to that, it's interesting. I don't have direct evidence yet of financial incentive associated with this, but whether it was that or something else, it's very strange that you have an internal auditor communicating results to the New York Times. When I get into detail with the New York Times reporter he would be mentioning things that are material nonpublic information that Erhart gave him.

So something went on here and I think in the management of somebody, we would expect people to work in good faith and you often do not assume that they are doing something with a nefarious motive. So I'm not defending Mr. Ball in every respect, but I am saying that frankly, there are other auditors where he did a fine job working with them and they were able to conduct their audits and did not go out of scope.

To my knowledge they never shared confidential information for extraneous purposes with other auditors, all of those are things that happened with Erhart didn't happen before. I think it is correct that the management of this should have caught this earlier and been more effective, but you can't take blame solely away from the party in interest when they complete 25% of the audits that every other team member does.

**Edward Hemmelgarn - Shaker Investments - Analyst**

And I'm not. I just found that everyone I've had discussions with at Bank of Internet to be very competent and so forth so this was an unusual situation that was a bit of a surprise, so that's all I was commenting. As a shareholder that this is one area that obviously needed improvement and it appears as if you tried to do so.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Thank you, anything else?

Okay, thank you.

**Don Worthington - Raymond James - Analyst**

Hi, good afternoon.

I think on the last conference call again in response to I guess some misinformation about a potential ongoing SEC investigation you said that there was none and I just wanted to clarify that that is still the situation.

Exhibit 1
104

**BofI Holding, Inc. October 14, 2015 Conference Call Transcript**

### Greg Garrabrants - BofI Holding Inc - President & CEO

100% that's the case. If you notice, I said it in the initial script of this conference call, but let me just reiterate that. Not that there's anything much truthful in this complaint, but under paragraph eight, it says Erhart exhausted his administrative remedies. So he filed complaints with a variety of federal agencies, Department of Labor, OSHA, SEC, and that the 180 days timeframe for pursuit of those claims has lapsed.

It is another way of saying that these agencies are not pursuing his allegations and in some cases we got the chance to respond to those and others it was so unimportant the agency didn't even ask for a response - they just determined not to pursue it. They didn't ask for a response because they did not deem it worthy. They would have asked if they thought it was something important and in the case of other agencies they asked and we responded and when you tell the facts of this they simply move on. But then, after he's exhausted these remedies he moved on to this private action which we will be responding to shortly in the next day or two with our own answer and cross complaint.

### Don Worthington - Raymond James - Analyst

I guess the other thing was, you just had your 10-K filed with a clean audit opinion so it seems like the external auditors, something were aware of some of this, obviously they didn't find anything either.

### Greg Garrabrants - BofI Holding Inc - President & CEO

We did inform them of all of this. We did our own investigation, all of that was provided to our external auditors and the external auditors reviewed it and found it to be completely without merit.

So that was that and obviously we were able to file our 10K timely.

Somebody told me that the short-sellers were going around saying we fired our external auditor today, and that was one of the pieces of disinformation that was put out and that was incorrect. The external auditor was not fired, everything's great, there is no issue. Our external auditor found nothing wrong, and there is no issue with that. I don't know if you heard that fabrication, but that was one that was floating around today.

### Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst

Thank you, I have a couple of follow-ups. One maybe going back to the conversation about Mr. Ball, given what the complaint alleges about his abrupt departure, could you state for the record what actually did happen and why did he leave?

### Greg Garrabrants - BofI Holding Inc - President & CEO

I don't want to comment on that internal personnel matter as I have no ongoing dispute with Mr. Ball. I didn't have a dispute with him when he was here. I did have a discussion with him subsequent to it coming to my attention about Mr. Erhart's out of scope work, his failure to complete audits in time, and some other matters. I communicated some of the comments that I was receiving about his management from a variety of third parties. However, I did not fire him. I communicated these issues and I'm sure that he would have felt like any person who had these serious issues communicated would have felt when those issues were communicated to him.

### Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst

Okay, and two more quick questions. One since we were talking about the external auditor, could you tell us, you have changed auditors over the last 10 years and I believe it was because of efficiency gains from auditors, so I just want to clarify before people makeup news stories.

### Greg Garrabrants - BofI Holding Inc - President & CEO

How long ago to the change auditors? Four years?

Exhibit 1
105

**Andy Micheletti - BofI Holding Inc - EVP & CFO**

It has been three years.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

So we had BDO for three years. This was based on the fact that they have a significantly greater number of local personnel in the area and they are a larger national firm.

**Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst**

I think that's a good sense.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Just to be clear, I know this is going to sound defensive, but there was no dispute with the former auditor or this auditor, none of that. This is a very clean handoff where everybody was happy. That was a long time ago, but in any event there was no dispute there.

**Julianna Balicka - Keefe, Bruyette & Woods, Inc. - Analyst**

Very good, makes sense. My final question that I will step back to the queue. The stock below $100, would you be buying it later?

**Greg Garrabrants - BofI Holding Inc - President & CEO**

Absolutely, I would and I am talking to legal counsel to see if I can get out of the blackout, that's going to be something that I'd like to find out.

I asked Andy if we could disclose the quarter today and kind of really show people what's going on and make them very happy, but he said we need to wait until the auditors finish their quarterly work. But the issue is that I have information about a very good quarter and the quarter is going to beat analyst expectations significantly. Margin is going to be as high as it has been, prepaid fees are going to be up, you will see this big growth quarter-over-quarter and then Block is going to be added on top of that and you can start doing the math. It looks very good. The problem is for me buying stock having that information. The thing that I want to make sure is that, although I would like to profit from this opportunity, I also want to make sure that somehow it is not twisted and used against me in some manner.

**Greg Garrabrants - BofI Holding Inc - President & CEO**

The final thing I did want to mention with regard to this question of whether I paid taxes on money from share sales. Taxes were paid. There's actually a form 4 with my stock gift, so having several million in a family trust is not particularly unusual and I think it is indicative of his lack of experience to assume that, as anyone can readily see the source of funds. These accusations are fairly odd things showing there wasn't a lot of diligence done on the complaint.

**Mark Heilweil - Spectrum Advisor Services - President**

Thank you Greg, you're doing a great job, I'm a long-term shareholder, we are at Spectrum as you know. I'm sure you have more productive things to deal with than these issues. I know I've written the writer of that article and I wonder whether we should encourage New York Times to spend some of their investigative expertise in finding out what is behind this because I think frankly they owe shareholder something at this point in time for being used.

I went to Peter and said you're being used, and you are publicizing a lawsuit that doesn't merit publicity.

Exhibit 1
106

BofI Holding, Inc. October 14, 2015 Conference Call Transcript

### Greg Garrabrants - BofI Holding Inc - President & CEO

It's interesting, because Peter is on the call and I've enjoyed my conversations with Peter, I found him willing to take my calls and listen and understand. I think the interesting question about this is, you need two factors, you need a media to publish something and you need people to react in a certain way. I think if I was arguing Peter's case, which I wouldn't normally do, but I will for the sake of intellectual honesty, is that he would say, I am simply reporting something that is newsworthy and the mere fact that the stock dropped by such percentage is demonstrative of its newsworthiness.

The tough part is, I think he felt like he needed to get it out quickly before we could respond with a counterclaim. And I didn't honestly expect the stock to react this way because these allegations had been out there already and I had effectively talked about them in detail.

But I believe that your point has merit and that if filing a meritless lawsuit enables someone to get a reaction and make some money, we need to work on this and push the SEC to figure out exactly who is coordinating this stuff. There were some puts at 100, and when you are sitting at 140 they are out of the money and they want to get something back there. We'll see where this goes.

There's a lot of money at stake and with the short interest, there are hundreds of millions of dollars at stake even for a relatively small company. If you can raise questions and you happen to be lucky enough to have someone inside who is ready and willing to talk, I've mentioned to Peter that there was a consultant who was hired to call our ex-employees. We have ex-employees who have been offered money to talk and one of our former heads of compliance was a great guy and runs a group at a larger bank now, and he called us and said that he got offered a consulting fee if he was willing to say things about BofI.

So if I've got a New York Times reporter asking me about a subpoena for an individual borrower, how did he get that information? Because that's not public and it is material. When the stock price dropped it was material. It will be worth thinking about those sorts of things.

### Mark Heilweil - Spectrum Advisor Services - President

I stand by my point that all the news is not fit to print. Once it is not fit to print, I think there are groundless lawsuits filed every day against corporations and I think the New York Times need to be -- needs to be more responsible and I'm glad Peter is more responsive -- is on the call in deciding what the heck they print given particularly the history of this.

I've got better things to do and you've got better things to do and this is a costly thing that reflects poorly on the reporter and I will stand by that.

### Greg Garrabrants - BofI Holding Inc - President & CEO

I understand and thank you for that. It's interesting to juxtapose this lawsuit. We had a frivolous lawsuit presented to us several years ago and it was an attempt to extract some money from the Bank. They asked for $300 million and called us immediately and said if you give us $5 million today we will not file this lawsuit. My response was, I don't negotiate with terrorists, you're not getting any money.

But the New York Times did not take that lawsuit up. It was nonmaterial. We paid absolutely nothing on that lawsuit, not a penny, and the plaintiff, the day before they were about to be deposed went away and got nothing. So it's interesting because they had all these ridiculous allegations, asking for $300 million, said they would take five million and ended up with nothing.

This lawsuit is interesting because if you look at what his actual damages are, it's not worth the cost of filing a complaint. If you think about the economic interest there has to be something else going on and we all know what it is. I think those are all important considerations to think about.

Exhibit 1
107

### Mark Heilweil - Spectrum Advisor Services - President

Thanks very much and keep up the good work.

### Operator

There are no questions in the queue at this time.

### Greg Garrabrants - BofI Holding Inc - President & CEO

Okay, thank you everybody, thanks for listening. I am very sorry that you would have to go through this, but rest assured that the quarter looks great, people are motivated and dedicated here to making this Bank not only a great financial performer, but continue to make it a great regulatory performer.

We've dedicated a lot of time and effort continually over the years to our systems and processes. I hope those of you who are serious about understanding more about the Bank will come out to analyst day and you will hear about our data-driven up compliance initiatives and all the wonderful things we're doing of the business and I think you'll walk away really excited about it.

We will vigorously defend this and get through it. Absolutely nothing will come of it and again, I'm sorry for what you had to put up with from the standpoint of the share price today. Take care.

### Operator

That does conclude today's conference, thank you for your participation.

14

(Back To Top)

## Section 3: EX-99.2 (EXHIBIT 99.2)



### BofI Holding, Inc. Addresses Media Reports

SAN DIEGO, CA - (MARKETWIRED) - October 15, 2015 - BofI Holding, Inc. (NASDAQ: BOFI) ("BofI"), parent company of BofI Federal Bank (the "Bank"), held a conference call yesterday to address specific questions raised by a recently filed lawsuit and related *New York Times* article.

"The complaint recycles old, baseless and factually inaccurate allegations from a junior audit team member no longer employed at the Bank. Having shopped his allegations to a variety of regulatory agencies who have taken no action, Mr. Erhart decided to file this meritless lawsuit," stated Greg Garrabrants, President and Chief Executive Officer. During the conference call Mr. Garrabrants provided examples of the inaccuracies of the allegations in the lawsuit and answered questions from analysts and investors. BofI has filed a copy of the transcript of the call as part of the 8-K filed today.

"The Audit Committee and Board of Directors of BofI were fully informed by management of the events involving audit team members immediately after their occurrence in March 2015. The Audit Committee then conducted interviews with internal audit personnel and held conversations with the Office of the Comptroller of the Currency," stated Paul Grinberg, Director and Chairman of the Audit Committee. "An internal investigation was conducted, including an examination of forensic evidence, and the complaints of the former audit team member were found to be without merit," stated Eshel Bar-Adon, Executive Vice President and Chief Legal Officer. The Company has taken steps to contact FINRA and NASDAQ to discuss the impact these allegations have had on our stock price and the possible market manipulation by the timing of the lawsuit.

During the conference call Mr. Garrabrants provided expectations as to the results for the fiscal quarter ended September 30, 2015, indicating that the Company is expecting a strong quarter. He noted that earnings per share is expected to exceed consensus estimates from analysts, net interest margin is expected to remain high and bank fees from prepaid programs are expected to increase. As concluded,

Exhibit 1
108

"We are excited about the upcoming quarters and the accountability and advantages part of our Bank's broader reach."

Case 3:15-cv-02722-GPC-KSC Document 65 Filed 04/10/17 PageID.2368 Page 110 of 146

**About BofI Holding, Inc.**

BofI Holding, Inc. ("BOFI") is the holding company for BofI Federal Bank, a nationwide bank that provides financing for single and multifamily residential properties, small-to-medium size businesses in target sectors, and selected specialty finance receivables. With over $5.8 billion in assets, BofI Federal Bank provides consumer and business banking products through its low-cost distribution channels and affinity partners. BofI Holding, Inc.'s common stock is listed on the NASDAQ Global Select Market under the symbol "BOFI" and is a component of the Russell 2000® Index and the S&P SmallCap 600® Index. For more information on BofI Federal Bank, please visit bofifederalbank.com.

Exhibit 1
109

**Forward-Looking Safe Harbor Statement**

*This press release contains forward-looking statements that involve risks and uncertainties, including without limitation statements relating to BofI's operating results for the quarter ended September 30, 2015, financial prospects and other projections of its performance and asset quality, BofI's ability to grow and increase its business, diversify its lending, and the anticipated timing and financial performance of new initiatives. These forward-looking statements are made on the basis of the views and assumptions of management regarding future events and performance as of the date of this press release. Actual results and the timing of events could differ materially from those expressed or implied in such forward-looking statements as a result of risks and uncertainties, including without limitation changes in interest rates, inflation, government regulation, general economic conditions, conditions in the real estate markets in which we operate and other factors beyond our control. These and other risks and uncertainties detailed in BofI's periodic reports filed with the Securities and Exchange Commission could cause actual results to differ materially from those expressed or implied in any forward-looking statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this press release. All forward-looking statements are qualified in their entirety by this cautionary statement, and BofI undertakes no obligation to revise or update any forward-looking statements to reflect events or circumstances after the date of this press release.*

Investor Relations Contact:
Johnny Lai, CFA
VP, Corporate Development & Investor Relations
858-649-2218
jlai@bofifederalbank.com

(Back To Top)

Exhibit 1
110

# EXHIBIT 2

# EXHIBIT 2

Exhibit 2
111

1

2

3

4

5

6

7

8

9

10          **UNITED STATES DISTRICT COURT**

11          **SOUTHERN DISTRICT OF CALIFORNIA**

12

13    CHARLES MATTHEW ERHART,          Case No. 15-cv-02287-BAS-NLS
                                        *consolidated with*
14                      Plaintiff,      15-cv-02353-BAS-NLS

15          v.                          **ORDER GRANTING IN PART
                                        AND DENYING IN PART BOFI**
16    BOFI HOLDING, INC.,               **FEDERAL BANK'S MOTION
                                        FOR SUMMARY**
17                      Defendant.      **ADJUDICATION OF CHARLES
                                        MATTHEW ERHART'S**
18                                      **TWELFTH THROUGH
                                        TWENTY-FOURTH**
19                                      **AFFIRMATIVE DEFENSES**

20
                                        **[ECF No. 45 (in 15-cv-02353)]**
21
      BOFI FEDERAL BANK,
22
                        Plaintiff,
23
24          v.

25    CHARLES MATTHEW ERHART,

26                      Defendant.

27

28

Exhibit 2
112

15cv2287

## I.   **INTRODUCTION**

These consolidated actions revolve around whistleblower protections under federal and state law. BofI Federal Bank employed Charles Matthew Erhart as an internal auditor at its headquarters in San Diego, California. After Erhart discovered conduct he believed to be wrongful, he reported it to the United States Department of the Treasury's Office of the Comptroller of the Currency—BofI's principal regulator. He later filed an action against BofI under federal and state law whistleblower protection provisions alleging BofI retaliated against him for reporting unlawful conduct to the government.

The next day, *The New York Times* published an article titled *Ex-Auditor Sues Bank of Internet*. The share price of BofI's publicly-traded holding company plummeted thirty percent. A few days later, BofI brought a countersuit against Erhart alleging he violated California state law and the Computer Fraud and Abuse Act by publishing BofI's confidential information and deleting hundreds of files from his company-issued laptop. The Court consolidated BofI's countersuit with Erhart's whistleblower retaliation action.

BofI now moves in its countersuit for summary adjudication of thirteen of Erhart's affirmative defenses, all of which relate to whistleblower protections. (ECF No. 45.)[1] Erhart opposes. (ECF No. 67.) After hearing oral argument, the Court **GRANTS IN PART** and **DENIES IN PART** BofI's motion for the following reasons.

## II.   **BACKGROUND**

### A.   **Confidentiality Clause**

BofI is a financial services company headquartered in San Diego, California. (Tolla Decl. ¶ 3, ECF No. 7-4.) On September 23, 2013, Erhart started working for

---

[1] The parties briefed BofI's motion before the Court consolidated BofI's countersuit with Erhart's whistleblower retaliation action. Therefore, unless otherwise noted, the Court's Electronic Case Filing citations are to documents filed in BofI's countersuit—Case No. 15-cv-02353.

Exhibit 2
113

15cv2287

BofI as an internal auditor. (Durrans Decl. ¶ 5, ECF No. 7-5; Erhart Decl. ¶ 5, ECF No. 67-5.) As an internal auditor, Erhart had access to information BofI treated as proprietary and confidential. (Tolla Decl. ¶ 6, ECF No. 7-4.) This information included consumer banking information, nonpublic communications between BofI and its regulators, communications between BofI's attorneys and its agents, internal audit findings, and BofI's employees' personal information. (*Id.*)

To safeguard this information, BofI required Erhart to execute an Employee Confidentiality, Non-Disclosure, and Non-Recruitment Agreement ("Confidentiality Agreement") as a condition of his employment. (Joint Statement of Undisputed Facts ("JSUF") ¶ 15; Confidentiality Agreement, BofI's App. Exs., Ex. 6, ECF No. 7-14.) This agreement forbids the unauthorized disclosure of BofI's "Trade Secrets" and "Confidential Information." (Confidentiality Agreement § 2.) The Confidentiality Agreement defines "Trade Secrets" by incorporating California law,[2] whereas "Confidential Information" is defined as information that is "proprietary and confidential in nature." (*Id.*) For these two types of information, Erhart agreed that:

> [A]t any time during [his] term of employment or following the termination of [his] employment with BofI, whether voluntary or involuntary, [he] shall not, except as required in the conduct of BofI's business or as authorized in writing by BofI, use, publish or disclose any of BofI's Trade Secrets and/or Confidential Information in any manner whatsoever.

(*Id.* § 2.E.)

Further, Erhart agreed that if his employment with BofI was terminated for any reason, he would promptly:

//

//

---

[2] California, which has adopted the Uniform Trade Secrets Act, defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

– 3 –

Exhibit 2
114
15cv2287

> Inform BofI of and deliver to BofI all records, files, electronic data . . .
> and the like in [his] possession, custody or control that contain any of
> BofI's Trade Secrets or Confidential Information which [Erhart]
> prepared, used, or came in contact with while employed by BofI . . . .

(*Id.* § 7.A.)

## B.   Erhart's Use of BofI's Information

In the course of performing his work as an internal auditor, Erhart claims he repeatedly encountered conduct he believed to be wrongful. (*See generally* Erhart Decl. ¶¶ 9–75, ECF No. 67-5.) One instance of believed wrongdoing involved a subpoena BofI received from the Securities and Exchange Commission ("SEC"). (*Id.* ¶ 26.) Erhart believed the bank failed to disclose information to the SEC when it responded to the subpoena. (*Id.* ¶ 27.) On January 14, 2015, Erhart contacted the SEC regarding the subpoena. (JSUF ¶ 1.) He did so "to be sure it was aware of the situation." (Erhart Decl. ¶ 29, ECF No. 67-5.) Further, on February 20, 2015, Erhart contacted the SEC regarding a BofI loan customer. (JSUF ¶ 2; *see also* Erhart E-mail, Towill Reply Decl. ¶ 2, Ex. A, ECF No. 72-2.) Erhart contacted the SEC because he believed the "suspicious" loan customer was operating as an unregistered investment advisor. (Erhart Decl. ¶ 31, ECF No. 67-5.) In doing so, he disclosed confidential information about the customer to the SEC. (*See* Erhart E-mail, Towill Reply Decl. ¶ 2, Ex. A, ECF No. 72-2.)

Further, during his employment as an internal auditor, "Erhart used his personal g-mail account to e-mail files containing confidential BofI information that was stored on BofI electronic media to his personal g-mail address." (JSUF ¶ 3.) He also "printed copies of BofI documents, including customer bank account information and internal audit reports." (*Id.* ¶ 4.) In addition, Erhart "downloaded to his personal computer BofI files, including [supervisory communications from BofI's principal regulator], audit communications, audit reports and backup information, law enforcement and SEC inquiries regarding a BofI customer, account

Exhibit 2
115

information, wire transfer details, account lists, and portions of loan files." (*Id.* ¶ 5.)

Approximately sixteen months after he joined BofI, Erhart believed his job was in jeopardy. (Erhart Decl. ¶ 47, ECF No. 67-5.) In a recent performance evaluation, Erhart's rating had been downgraded, with his bonus adversely affected. (*Id.* ¶ 25.) BofI identified Erhart's practice of preserving audit findings in writing as a performance issue. (*Id.*) Erhart states BofI had repeatedly directed internal audit staff to not create written evidence of believed non-compliance and illegal conduct. (*Id.* ¶¶ 15, 24.) One of BofI's senior vice presidents walked by Erhart's workstation and stated, in the presence of others, "If [Erhart] continues to turn over rocks, eventually he is going to find a snake and he's going to get bit." (*Id.* ¶ 47.)

Then, on March 5, 2015, BofI's Vice President-Internal Audit—Erhart's supervisor—resigned abruptly. (Ball Decl. ¶ 8, ECF No. 22; Erhart Decl. ¶ 51, ECF No. 67-5.) The next day, Erhart "felt very unwell" and "called off sick." (Erhart Decl. ¶ 53, ECF No. 67-5.) Erhart requested, and was granted by BofI, an unpaid leave of absence pursuant to the Family Medical Leave Act and the California Family Rights Act beginning on March 6, 2015. (Durrans Decl. ¶ 15, ECF No. 7-5.)

At this time, Erhart "became extremely concerned that the Bank would try to destroy the records of wrongdoing that [he] had placed on the Bank's computers." (Erhart Decl. ¶ 55, ECF No. 67-5.) On March 6, 2015, Erhart sent an e-mail to his mother that included "a spreadsheet that contained BofI customer social security numbers." (JSUF ¶ 6.) He states he sent the information to her for safekeeping. (Erhart Decl. ¶ 77, ECF No. 67-5.) Erhart's mother briefly accessed the e-mail, but she did not forward it or otherwise share it with anyone. (Pamela Erhart Dep. 36:8–24, 58:2–15, ECF No. 67-7.)

Erhart also contacted the Denver Regional Office of the United States Department of the Treasury's Office of the Comptroller of the Currency ("OCC")— BofI Federal Bank's principal regulator. (Erhart Decl. ¶ 55, ECF No. 67-5.) After Erhart spoke with the OCC by phone, (*id.* ¶ 65), he later "provided documentary

**Exhibit 2**
**116**

evidence to the OCC that he claims supports his allegations of wrongdoing by BofI,"
(JSUF ¶ 7). Further, on March 12, 2015, "Erhart downloaded to a personal USB drive
BofI files, including OCC supervisory information, audit findings, draft audit
committee meeting minutes, wire transfer details, and bank account information."
(*Id.* ¶ 8.) Erhart also used his live-in girlfriend's computer to "access some BofI
documents." (Erhart Decl. ¶ 3, ECF No. 67-3.) He used her computer because it had
software that he did not have installed on his computer. (*Id.*) Erhart's girlfriend never
viewed any of the BofI information placed on her computer, and she did not forward
the information to anyone. (Cornell Decl. ¶ 2, ECF No. 67-2.)

### C.   **Procedural History**

On April 14, 2015, Erhart filed a whistleblower protection complaint with the
Occupational Safety and Health Administration. (JSUF ¶ 9.) Several months later,
Erhart commenced his whistleblower retaliation action in this Court. (ECF No. 1 in
Case No. 15-cv-02287.) In his Complaint, Erhart alleges BofI retaliated against him
for reporting conduct he believed to be wrongful to the government. (*Id.*) Several
days later, BofI filed its countersuit against Erhart. (ECF No. 1.) In its First Amended
Complaint, BofI brings claims against Erhart for: (1) breach of contract; (2)
conversion; (3) breach of the duty of loyalty; (4) negligence; (5) fraud; (6) violation
of California Penal Code Section 502; (7) violation of the Computer Fraud and Abuse
Act, 18 U.S.C. § 1030(a)(5); and (8) unfair business practices in violation of
California Business & Professions Code Section 17220. (ECF No. 12.) On January
4, 2016, Erhart answered BofI's amended complaint, raising fifty-two affirmative
defenses. (ECF No. 23.) The present motion concerns thirteen of these fifty-two
affirmative defenses. (ECF No. 45.)

//

//

//

Exhibit 2
117

15cv2287

## III.   **LEGAL STANDARD**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing *Anderson*, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by . . . the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at

Exhibit 2
118

15cv2287

324 (quoting former Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## IV.   ANALYSIS

BofI seeks to extinguish thirteen of Erhart's affirmative defenses—all of which relate to whistleblower protections. (Mot. 1:1–13, ECF No. 45-1.) These defenses invoke a variety of statutes, including the Sarbanes–Oxley Act of 2002, the Fair Credit Reporting Act, and California Labor Code Section 1102.5. (Answer ¶¶ 111–123, ECF No. 23.) For each defense, Erhart alleges he cannot be held liable on BofI's claims because he was engaged in protected activity as a whistleblower under the identified statute. (*Id.*) Several of these defenses, however, are based on statutes that do not contain whistleblower protections. Further, two of Erhart's defenses are redundant of his other defenses. The Court addresses these sets of defenses first. The Court then turns to Erhart's remaining whistleblower defenses.

### A.   Nonexistent Defenses

Erhart's Fourteenth, Fifteenth, Twenty-First, and Twenty-Second Affirmative Defenses allege his actions "constituted protected activity as a whistleblower" under the following authority: (1) laws and regulations administered by the OCC, (2) laws and regulations administered by the Internal Revenue Service, (3) the Gramm–Leach–Billey Act, and (4) the Fair Credit Reporting Act. (Answer ¶¶ 113–114, 120–121.) BofI argues these defenses fail as a matter of law because the identified authorities do not contain express whistleblower protections. (Mot. 19:5–21:13.) At

Exhibit 2
119

15cv2287

oral argument, Erhart agreed. Accordingly, the Court will grant BofI's request for summary adjudication of Erhart's Fourteenth, Fifteenth, Twenty-First, and Twenty-Second Affirmative Defenses.

### B.     Redundant Defenses

Erhart's Thirteenth Affirmative Defense alleges his conduct "constituted protected activity as a whistleblower under the Dodd–Frank Act." (Answer ¶ 112.) The Dodd–Frank Wall Street Reform and Consumer Protection Act created a whistleblower protection and reward program that the SEC is responsible for administering. 15 U.S.C. §78u-6. A separate defense, Erhart's Eighteenth Affirmative Defense, seeks protection under the same authority by referencing laws and regulations administered by the SEC. (Answer ¶ 117.) Thus, Erhart's Eighteenth Affirmative Defense is redundant.

In addition, in his Sixteenth Affirmative Defense, Erhart alleges his conduct "constituted protected activity as a whistleblower" under laws and regulations administered by the Consumer Financial Protection Bureau. (Answer ¶ 115.) His Seventeenth Affirmative Defense invokes the same authority. (*Id.* ¶ 116.) Therefore, Erhart's Seventeenth Affirmative Defense is also redundant.

BofI recognizes these defenses are redundant, but it does not seek to dispose of them on that basis. (*See* Mot. 14:24–27, 15:25–27.) That said, this Court may "act on its own" to "strike from a pleading . . . any redundant . . . matter." *See* Fed. R. Civ. P. 12(f)(1). Because Erhart's Seventeenth and Eighteenth Affirmative Defenses are redundant, the Court concludes it is appropriate to strike them from his Answer. *See id.*

//

//

//

//

– 9 –

Exhibit 2
120
15cv2287

### C.     <u>Whistleblower Protection Defenses</u>

The remaining defenses BofI challenges share a common characteristic: each defense invokes a law that contains or incorporates protections for whistleblowers.[3]

---

[3] The Court construes Erhart's defenses as invoking the following laws and anti-retaliation provisions:

| Defense No. | Identified Law | Anti-Retaliation Provision | General Description |
|---|---|---|---|
| 12 | Sarbanes–Oxley Act of 2002 | 18 U.S.C. § 1514A | Prohibits retaliation against a covered person who reports conduct reasonably believed to be, *inter alia*, mail fraud, wire fraud, bank fraud, or securities fraud |
| 13 | Dodd–Frank Wall Street Reform and Consumer Protection Act | 15 U.S.C. § 78u-6 | Prohibits retaliation against a covered person who reports conduct reasonably believed to be a possible securities law violation or makes disclosures under Sarbanes–Oxley's provision |
| 16 | Consumer Financial Protection Bureau Administered Laws and Regulations (Consumer Financial Protection Act) | 12 U.S.C. § 5567 | Prohibits retaliation against a covered person who reports violations of laws subject to the Consumer Financial Protection Bureau's jurisdiction or violations of its regulations |
| 19 | Bank Secrecy Act | 31 U.S.C. § 5328 | Prohibits retaliation against a covered person who reports violations of bank recordkeeping and reporting requirements and anti-money laundering provisions |
| 20 | Federal Deposit Insurance Corporation Administered Laws and Regulations (Financial Institutions Reform, Recovery, and Enforcement Act) | 12 U.S.C. § 1831j | Prohibits retaliation against a covered person who reports a possible violation of law, "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety" |
| 23 | California Labor Code Section 1102.5 | Cal. Labor Code § 1102.5(b) | Prohibits retaliation against a covered person who reports violations of state or federal law |
| 24 | Common Law | Not Applicable | May prohibit imposing tort or contract liability on a whistleblower where doing so would be against public policy |

**Exhibit 2**
**121**

Bofi-Scv2287

BofI argues all of these defenses fail because at least some of Erhart's conduct cannot be considered protected whistleblower activity as a matter of law.

Whether Erhart's defenses fail necessarily depends on the claims they are being asserted against. Although BofI asserts a variety of tort, contract, and statutory claims against him, Erhart mainly focuses on demonstrating that his defenses may defeat BofI's first claim for breach of contract in his opposition. (*See* Opp'n 1:18–27, 4:2–5:8, 8:17–22.) The Court will primarily analyze Erhart's defenses in the context of this claim because it provides a framework for addressing the public policy issues raised by Erhart.

### 1.    Breach of the Confidentiality Agreement

BofI's first claim for breach of contract is based on the Confidentiality Agreement executed by Erhart at the start of his employment. (First Am. Compl. ¶¶ 47–53.) It is undisputed that California state law governs this agreement. (Confidentiality Agreement § 12.) To prevail on a claim for breach of contract under California law, "the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).

Erhart's whistleblower defenses allege Erhart cannot be held liable on BofI's claim because the law protects Erhart's conduct. Stated differently, these defenses allege enforcing the Confidentiality Agreement in these circumstances would be illegal. If "the illegality of a contract does not appear from the face of the complaint it becomes a matter of affirmative defense . . . . And in such case the burden of proof is on the defendant." *Fellom v. Adams*, 274 Cal. App. 2d 855, 863 (1969) (quoting *Eaton v. Brock*, 124 Cal. App. 2d 10, 13 (1954)); *see also Sweeney v. KANS, Inc.*, 247 Cal. App. 2d 475, 480 (1966) ("Defendant's contention of illegality is, of course, an affirmative defense. The burden of establishing this defense was, therefore, on

Exhibit 2
122

15cv2287

the defendant."). Here, the illegality of the Confidentiality Agreement does not appear on the face of BofI's First Amended Complaint. (*See* First Am. Compl. ¶¶ 7–46.) For instance, BofI does not allege that it is seeking to enforce the agreement despite that Erhart was using BofI's confidential information to support his reports of believed wrongdoing to the government. (*See id.*) Thus, the Court construes Erhart's whistleblower defenses as each raising a variation of the affirmative defense of illegality—the position that enforcing the Confidentiality Agreement would be against public policy.

"The law has a long history of recognizing the general rule that certain contracts, though properly entered into in all other respects, will not be enforced, or at least will not be enforced fully, if found to be contrary to public policy." *Kashani v. Tsann Kuen China Enter. Co.*, 118 Cal. App. 4th 531, 540 (2004) (alteration omitted) (quoting 15-79 Corbin on Contracts § 79.1 (2003)); *see also Lee On v. Long*, 37 Cal. 2d 499, 502 (1951) ("No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out[.]"). To determine whether a contract is unenforceable based on public policy, California courts "essentially engage in a weighing process, balancing the interests of enforcing the contract with those interests against enforcement." *Rosen v. State Farm Gen. Ins. Co.*, 30 Cal. 4th 1070, 1082 (2003). Accordingly, "the question of whether a contract provision is illegal or contrary to public policy 'is a question of law to be determined from the circumstances of each particular case.'" *Brisbane Lodging, L.P. v. Webcor Builders, Inc.*, 216 Cal. App. 4th 1249, 1256–57 (2013) (quoting *Jackson v. Rogers & Wells*, 210 Cal. App. 3d 336, 349–350 (1989)). However, California courts have cautioned that the "power to void a contract should be exercised only where the case is free from doubt." *Kaufman v. Goldman*, 195 Cal. App. 4th 734, 746 (2011) (citing *City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 777 n.53 (2007)).

//

– 12 –

Exhibit 2
123

15cv2287

In making this determination under California law, courts have often relied on Section 178 of the Restatement (Second) of Contracts. *See, e.g.*, *Kashani*, 118 Cal. App. 4th at 551; *Cariveau v. Halferty*, 83 Cal. App. 4th 126, 131–32 (2000); *Bovard v. Am. Horse Enters., Inc.*, 201 Cal. App. 3d 832, 840 (1988). This section states: "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." Restatement (Second) of Contracts § 178 (1981). The Restatement lists a series of factors to be considered when making this determination, including "any special public interest in the enforcement of the particular term" and the strength of the public policy against enforcement of the term "as manifested by legislation or judicial decisions." *Id.*

The public policy advanced to prevent the enforcement of a contract term may be based on a variety of sources. *E.g.*, *Kashani*, 118 Cal. App. 4th at 542 ("For purposes of illegality, the 'law' is a broad term."). It may be based on the "policy expressed in a statute" or "may be implied from the language of such statute[.]" *Cariveau*, 83 Cal. App. 4th at 132. A public policy may also "be enunciated in administrative regulations that serve the statutory objective." *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 80 (1998). In addition, "California law includes federal law." *Kashani*, 118 Cal. App. 4th at 543 (citing *People v. Sischo*, 23 Cal. 2d 478, 491 (1943)). Thus, California courts have refused to enforce contract terms in light of public policies that are based on federal statutes, regulations, and rules. *See generally*, *Green*, 19 Cal. 4th 66 (Federal Aviation Administration regulations); *Cariveau*, 83 Cal. App. 4th 126 (federal securities law and rules); *Kashani*, 118 Cal. App. 4th 531 (executive orders promulgated under the International Emergency Economy Powers Act, 50 U.S.C. § 1701).

//

//

– 13 –

Exhibit 2
124

For example, a settlement agreement's confidentiality clause that prohibits a securities customer "from discussing the selling agent's misconduct with regulatory authorities" is unenforceable on grounds of federal public policy. *Cariveau*, 83 Cal. App. 4th at 128. In *Cariveau*, a securities agent subject to the rules of the National Association of Securities Dealers, Inc. ("NASD") recommended inappropriate investments to an investor. *Id.* at 128. As a condition to returning the investor's money, the agent required the investor to enter into a settlement agreement providing that "the underlying events resulting in the negotiation of this Agreement shall remain . . . confidential . . . and shall not be disclosed . . . to any public or private person or entity, or to any administrative, law enforcement or regulatory agency." *Id.* at 129. The investor later wrote a letter to the agent's employer, which led to the agent's termination, an NASD investigation, and NASD sanctions against the agent. *Id.* at 130. The agent responded by suing the investor for breach of contract based on the investor's disclosure of information in violation of the settlement agreement's confidentiality clause. *Id.*

"The trial court refused to enforce the clause on grounds of public policy," and the California Court of Appeal affirmed. *Cariveau*, 83 Cal. App. 4th at 128. In doing so, the court looked to the former NASD Rules of Fair Practice, which "are derived from, and carry out the purposes of, the Securities Exchange Act of 1934." *Id.* at 133. These rules "require[d] reporting outside business activities to a member's employer so that the employer can maintain effective oversight of the activities. The rules also encourage[d] aggrieved investors to report wrongdoing so that the integrity of the system is preserved." *Id.* Because these rules served statutory objectives, they were "a valid source of public policy." *Id.* at 134. In weighing the interest in enforcing the settlement agreement against the public policy, the court noted "[t]he only interest appellant identifies in support of the contract term is the general policy in favor of promoting the settlement of disputes." *Id.* at 136. Balancing against this interest was "the policy of maintaining an honest and fair

Exhibit 2
125

15cv2287

national marketplace in securities," which "has been declared as a 'national public interest' in the Securities Exchange Act of 1934." *Id.* (citing 15 U.S.C. § 78b). After applying the factors in Section 178 of the Restatement (Second) of Contracts and reasoning that the "inclusion of a restrictive confidentiality clause in the [Settlement] Agreement . . . is an instance of misconduct in itself," the court concluded the agreement was unenforceable on grounds of public policy. *Id.* at 137–38.

Here, as mentioned above, Erhart argues his affirmative defenses should survive summary adjudication because the Confidentiality Agreement is unenforceable on public policy grounds. (Opp'n 4:1–5:28.) Accordingly, the Court considers the interest in enforcing the Confidentiality Agreement, the public policy against enforcement, and whether the public policy clearly outweighs the interest in favor of enforcement.

### a. Interest in the Enforcement of the Confidentiality Agreement

The Court starts by weighing "the interest in the enforcement" of the Confidentiality Agreement. *See* Restatement (Second) of Contracts § 178 (1981). The Court finds there is a strong interest in enforcing the Confidentiality Agreement because it serves several legitimate interests. First, enforcing the Confidentiality Agreement supports the "longstanding established public policy in California which respects and promotes the freedom of private parties to contract." *Brisbane Lodging*, 216 Cal. App. 4th at 1262; *see also Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 363 (1992) (citing *In re Garcelon's Estate*, 104 Cal. 570, 591 (1894)) ("[I]f there is one thing which more than another public policy requires, it is that [persons] of full age and competent understanding shall have the utmost liberty of contract, and that their contracts when entered into freely and voluntarily shall be held sacred, and shall be enforced by courts of justice.").

//

Exhibit 2
126

15cv2287

Second, enforcing the Confidentiality Agreement furthers the "significant government interests" promoted by legal protection of trade secrets. *See DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 885 (2003). These interests include promoting the sharing of knowledge, incentivizing innovation, and maintaining commercial ethics. *Id.* at 880–81. Although trade secret and contract law provide separate remedies, *see* Cal. Civ. Code § 3426.7(b), the two are often intertwined. To obtain trade secret protection, information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). One reasonable step to ensure secrecy is to require "employees to sign confidentiality agreements" because they can be used to prevent the disclosure of trade secret information. *See Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454 (2002) (citing *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir.1993)); *see also* Alan J. Tracey, *The Contract in the Trade Secret Ballroom-A Forgotten Dance Partner?*, 16 Tex. Intell. Prop. L.J. 47, 48–51 (2007) (summarizing the value of non-disclosure agreements in connection with the Uniform Trade Secrets Act). Here, at least some of BofI's files taken by Erhart, such as BofI's Fiscal 2015 Strategic Plan, contain information likely entitled to trade secret protection. *See, e.g.*, *Whyte*, 101 Cal. App. 4th at 1456 (holding company's strategic plan documents are trade secrets under California law). Thus, allowing BofI to enforce the Confidentiality Agreement where Erhart has appropriated documents with trade secret information furthers the interests promoted by legal protection of trade secrets.

Third, enforcing the Confidentiality Agreement serves the government interest in protecting nonpublic personal information possessed by BofI. Under 15 U.S.C. § 6801, "[i]t is the policy of Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." It is undisputed that Erhart appropriated files containing customers'

– 16 –

Exhibit 2
127

nonpublic personal information. He sent an e-mail from his personal e-mail account to a third party, his mother, containing a spreadsheet with BofI customers' social security numbers. (JSUF ¶ 6.) Thus, enforcing the Confidentiality Agreement furthers this interest.

Fourth, BofI has an interest in protecting other confidential business information that may not qualify for trade secret protection. *See O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) (recognizing an employer's "strong interest" in discouraging an employee from taking sensitive personnel documents, "copying those documents and showing them to a co-worker" in the context of a retaliation claim under the Age Discrimination in Employment Act); *see also Winston Research Corp. v. Minn. Mining & Mfg. Co.*, 350 F.2d 134, 138 (9th Cir. 1965) ("Unless protection is given against unauthorized disclosure of confidential business information by employees, employee-employer relationships will be demoralized [and] employers will be compelled to limit communication among employees with a consequent loss in efficiency . . . ."). Enforcing the Confidentiality Agreement furthers this interest as well.

Based on the foregoing, the Court concludes there is a significant interest in the enforcement of the Confidentiality Agreement.

### b.     Public Policy against Enforcement of the Confidentiality Agreement

Next, the Court weighs the "public policy against enforcement" of the Confidentiality Agreement. *See* Restatement (Second) of Contracts § 178 (1981). Both California state and federal law, including those laws specifically identified by Erhart's defenses, reflect the strong public policy in favor of protecting whistleblowers. California Labor Code Section 1102.5(b), invoked by Erhart's Twenty-Third Affirmative Defense, is "California's general whistleblower statute." *Carter v. Escondido Union High Sch. Dist.*, 148 Cal. App. 4th 922, 933 (2007). It

**Exhibit 2**
**128**

15cv2287

forbids retaliation against an employee who discloses "information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." Cal. Labor Code § 1102.5(b). "This provision reflects the broad public policy interest in encouraging workplace whistle blowers to report unlawful acts without fearing retaliation." *Green*, 19 Cal. 4th at 77.

This policy is similarly reflected in federal law invoked by Erhart's other whistleblower defenses. Under Sarbanes–Oxley's anti-retaliation provision, raised by Erhart's Twelfth Affirmative Defense, no covered company may retaliate against an employee who provides certain information to "a Federal regulatory or law enforcement agency" or "a person with supervisory authority over the employee . . . ." 18 U.S.C. § 1514A; s*ee also Lawson v. FMR LLC*, 134 S. Ct. 1158, 1161 (2014) (discussing the public purpose underlying Sarbanes–Oxley and its anti-retaliation provision). This provision demonstrates the "public policy in favor of whistleblowers in securities cases." *See In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127, 1136 (N.D. Cal. 2002). Dodd–Frank's whistleblower protection program, 15 U.S.C. § 78u–6, which contains an "anti-retaliation provision [that] appears to sweep more broadly" than Sarbanes–Oxley's provision and is identified in Erhart's Thirteenth Affirmative Defense, also reflects the strong public policy in favor of protecting whistleblowers. *See Wadler v. Bio-Rad Labs., Inc.*, 141 F. Supp. 3d 1005, 1014 (N.D. Cal. 2015). Regulations promulgated under Dodd–Frank expressly preclude parties, including employers, from interfering with Dodd–Frank's whistleblower program. Specifically, Rule 21F-17(a) states:

> No person may take any action to impede an individual from communicating directly with the [SEC] staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement . . . with respect to such communications.

17 C.F.R. § 240.21F-17; *see also* Richard Moberly et al., *De Facto Gag Clauses:*

**Exhibit 2**
**129**

15cv2287

*The Legality of Employment Agreements That Undermine Dodd-Frank's Whistleblower Provisions*, 30 ABA J. Lab. & Emp. L. 87, 87–92 (2014) (discussing Dodd–Frank's whistleblower program and SEC Rule 21F-17).

Accordingly, both federal and state law reflect a strong public policy in favor of whistleblowing and protecting whistleblowers from retaliation.

### c.   Balancing the Enforcement Interest and Public Policy

Last, the Court considers whether the interest in the enforcement of the Confidentiality Agreement is "clearly outweighed in the circumstances by a public policy against the enforcement" of the agreement. *See* Restatement (Second) of Contracts § 178 (1981). In these circumstances, Erhart engaged in a variety of conduct where he used information that he gained access to during his employment. Hence, the Court considers separately below whether the public policy in favor of whistleblower protection clearly outweighs the interest in the enforcement of the Confidentiality Agreement as to Erhart's conduct in (1) providing information to the government, (2) appropriating BofI's files, (3) sending BofI's information to his mother and placing BofI's information on his live-in girlfriend's computer, (4) purportedly providing information to the press, and (5) disclosing information in his publicly-filed whistleblower retaliation complaint.

### (1)   Erhart's Communications with the Government

The Court first considers Erhart's conduct in providing information to the government—the SEC and the OCC. (*See* JSUF ¶¶ 1, 2, 7.) Erhart disclosed BofI's information to the government in reporting believed wrongdoing at the bank. (*See id.* ¶¶ 1, 2.) Viewing the evidence in the light most favorable to Erhart, this conduct qualifies for protection under one or more of the whistleblower protection provisions relied upon by the Court as sources of public policy. *See, e.g.*, Cal. Lab. Code § 1102.5(b). In addition, any attempt to enforce the agreement as to this conduct would

**Exhibit 2**
**130**

15cv2287

violate the SEC's rule prohibiting BofI from "enforcing, or threatening to enforce, a confidentiality agreement" to impede Erhart from communicating with the SEC. *See* 17 C.F.R. § 240.21F-17. Consequently, as to these actions, the public policy in favor of whistleblower protection clearly outweighs the interest in the enforcement of the agreement, and the agreement is unenforceable. *See Cariveau*, 83 Cal. App. 4th at 138; *see also Green*, 19 Cal. 4th at 77.

### (2)     Erhart's Appropriation of BofI's Files

Next, the Court considers Erhart's conduct in appropriating various files from BofI. (*See* JSUF ¶¶ 3–5, 7.) In light of the strong interests in favor of enforcing confidentiality agreements and the public policy of whistleblower protection, courts are split on whether confidentiality agreements should be enforced in contexts involving comparable conduct.[4] For example, in *JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 697, 702 (E.D. Va. 2007), the court applied California law and enforced a confidentiality agreement despite the employee's counterclaim for whistleblower retaliation under Sarbanes–Oxley. The court reasoned that the public policy in favor of whistleblowing cannot "fairly be said to authorize disgruntled employees to pilfer a wheelbarrow full of an employer's proprietary documents in violation of their contract merely because it might help them blow the whistle on an employer's violations of law, real or imagined." *Id.* In the court's view:

> Endorsing such theft or conversion would effectively invalidate most
> confidentiality agreements, as employees would feel free to haul away
> proprietary documents, computers, or hard drives, in contravention of
> their confidentiality agreements, knowing they could later argue they
> needed the documents to pursue suits against employers under a variety

---

[4] *Compare Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1062 (9th Cir. 2011); *Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 915 (4th Cir. 1997); and *JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 697, 702 (E.D. Va. 2007); *with Shmushkovich v. Home Bound Healthcare, Inc.*, No. 12 C 2924, 2015 WL 3896947, at *1 (N.D. Ill. June 23, 2015); *Siebert v. Gene Sec. Network, Inc.*, No. 11-CV-01987-JST, 2013 WL 5645309, at *8 (N.D. Cal. Oct. 16, 2013); and *U.S. ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1039 (C.D. Cal. 2012).

**Exhibit 2**
**131**
15cv2287

of statutes protecting employees from retaliation for publicly reporting wrongdoing, such as Sarbanes–Oxley (18 U.S.C. § 1514A), the False Claims Act (31 U.S.C. § 3730), . . . or other statutes prohibiting retaliation for activity in opposition to discrimination.

*Id.*

Other courts, particularly in the context of actions brought under the False Claims Act, have refused to enforce a confidentiality agreement on public policy grounds. In *Ruhe*, the district court declined to strike exhibits appended to the relators' complaint that the defendant argued were taken and disclosed in violation of non-disclosure agreements. *Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1038–39 (C.D. Cal. 2012). The court explained that:

> Relators sought to expose a fraud against the government and limited their taking to documents relevant to the alleged fraud. Thus, this taking and publication was not wrongful, even in light of nondisclosure agreements, given "the strong public policy in favor of protecting whistleblowers who report fraud against the government." Obviously, the strong public policy would be thwarted if [the defendant] could silence whistleblowers and compel them to be complicit in potentially fraudulent conduct.

*Id.* at 1039 (citation omitted) (quoting *United States v. Cancer Treatment Ctrs. of Am.*, 350 F. Supp. 2d 765, 773 (N.D. Ill. 2004)); *see also Siebert v. Gene Sec. Network, Inc.*, No. 11-CV-01987-JST, 2013 WL 5645309, at *8 (N.D. Cal. Oct. 16, 2013) ("The Court agrees that any alleged obligation by [the relator] not to retain or disclose the confidential documents that form the basis of this action is unenforceable as a matter of public policy because it would frustrate Congress' purpose in enacting the False Claims Act.").

In *Cafasso, United States ex rel. v. General Dynamics C4 Systems Inc.*, 637 F.3d 1047, 1062 (9th Cir. 2011), the Ninth Circuit stated there is "some merit" in a public policy exception to a confidentiality agreement. There, the relator Cafasso executed a confidentiality agreement at the start of her employment that contained a confidentiality provision similar to that agreed to by Erhart. *See id.* at 1061. After

– 21 –

Exhibit 2
132

15cv2287

Cafasso copied various documents and instituted a False Claims Act ("FCA") case against her former employer after her termination, the employer counterclaimed that Cafasso's "appropriation of electronic documents and files" violated the confidentiality agreement. *Id.* The district court granted summary judgment in favor of the employer. *Id.*

On appeal, Cafasso, like Erhart, admitted to appropriating files covered by the confidentiality agreement but, also like Erhart, argued for a public policy exception to the enforcement of the contract. *Cafasso*, 637 F.3d at 1061–62. The Ninth Circuit declined to decide whether to adopt an exception, but, in recognizing that a public policy exception had "some merit," the Ninth Circuit forecasted that "[e]ven were we to adopt such an exception, it would not cover Cafasso's conduct given her vast and indiscriminate appropriation" of files. *Id.* at 1062. The court noted that "Cafasso copied nearly eleven gigabytes of data—tens of thousands of pages," and "she scanned only file names and 'did not look at any individual documents at all.'" *Id.* "An exception broad enough to protect the scope of Cafasso's massive document gather in this case would make all confidentiality agreements unenforceable as long as the employee later files a qui tam action." *Id.* (citing *JDS Uniphase Corp*, 473 F. Supp. 2d at 702). In affirming the district court, the Ninth Circuit provided the following guidance:

> Were we to adopt a public policy exception to confidentiality agreements to protect relators—a matter we reserve for another day—those asserting its protection would need to justify why removal of the documents was reasonably necessary to pursue an FCA claim . . . . The need to facilitate valid claims does not justify the wholesale stripping of a company's confidential documents. Although courts perhaps should consider in particular instances for particular documents whether confidentiality policies must give way to the needs of FCA litigation for the public's interest, Cafasso's grabbing of tens of thousands of documents here is overbroad and unreasonable, and cannot be sustained by reference to a public policy exception.

*Id.*; *see also* Richard Moberly et al., *De Facto Gag Clauses: The Legality of Employment Agreements That Undermine Dodd-Frank's Whistleblower Provisions*,

– 22 –

**Exhibit 2**
**133**

30 ABA J. Lab. & Emp. L. 87, 113 (2014) (citing *In re JDS Uniphase Corp. Secs. Litig.*, 238 F. Supp. 2d 1127, 1136 (N.D. Cal. 2002)) (noting courts "recognize that the federal interest in whistleblowing can trump employers' otherwise legitimate desire to protect confidential documents when there is a reasonable connection between the documents and the alleged securities violation").

Here, the Court concludes there is merit to a public policy exception to confidentiality agreements to protect whistleblowers who appropriate company documents. As discussed above, the Court recognizes the strong interest in the enforcement of confidentiality agreements like the one signed by Erhart. But at the same time, whistleblowers often need documentary evidence to substantiate their allegations. As several commentators have noted in the context of whistleblower tips submitted to the SEC:

> Relevant documents taken from an employer not only can provide potentially valuable evidence of a possible securities violation, but also can help the SEC confirm the veracity of the whistleblower's information and better distinguish between tips that warrant significant attention and those that do not. This is a critical function because the SEC received over 3,200 tips through the SEC Whistleblower Program in fiscal year 2013 alone, and receives tens of thousands of other tips and referrals through other means, such as investor complaints.

Richard Moberly et al., *De Facto Gag Clauses: The Legality of Employment Agreements That Undermine Dodd-Frank's Whistleblower Provisions*, 30 ABA J. Lab. & Emp. L. 87, 115 (2014). Allowing a whistleblower to appropriate documents supporting believed wrongdoing also mitigates the possibility that evidence of the wrongdoing will be destroyed before an investigation can be conducted. *Cf. United States v. Arthur Andersen, LLP*, 374 F.3d 281, 286 (5th Cir. 2004) (discussing accounting firm Arthur Andersen's shredding of two tons of documents on the eve of the SEC's investigation into Enron), *reversed on other grounds at* 544 U.S. 696. //

Exhibit 2
134

15cv2287

Further, the qualified approach forecasted by the Ninth Circuit strikes an appropriate balance between these interests. This type of "more nuanced approach" focuses on "the nexus between the confidential documents in question and the misconduct alleged by the whistleblower." *See* Richard Moberly et al., *De Facto Gag Clauses: The Legality of Employment Agreements That Undermine Dodd-Frank's Whistleblower Provisions*, 30 ABA J. Lab. & Emp. L. 87, 110 (2014). Under this approach, the burden is on the party seeking to invoke the public policy exception "to justify why removal of the documents was reasonably necessary" to support the allegations of wrongdoing. *See Cafasso*, 637 F.3d at 1062. In this Court's view, this determination is a question of fact, but one that can be made as a matter of law when a reasonable jury could only reach one conclusion. *See id.* ("Even were we to adopt such an exception, it would not cover Cafasso's conduct given her vast and indiscriminate appropriation of [company] files.").

In this case, Erhart states he "was very careful in [selecting] the information [he] accessed and turned over. Each document was specifically related to one of the allegations of wrongdoing [he] had discussed with [his supervisor] and then reported to federal law enforcement." (Erhart Decl. ¶ 79, ECF No. 67-5.) Further, Erhart states "every document" he used was one he "had properly accessed in the course of performing [his] work as an internal auditor," as directed by his immediate supervisor. (*Id.*) The Court, having previously reviewed lists of files taken by Erhart, notes many do appear to be related to his allegations of believed wrongdoing. (*See* ECF No. 21.)

Viewing the evidence in the light most favorable to Erhart, summary adjudication of his defenses based on this conduct is not warranted. BofI has not demonstrated Erhart engaged in a "wholesale stripping of [BofI]'s confidential documents"—or that his appropriation of its files was "vast and indiscriminate." *See Cafasso*, 637 F.3d at 1062. Thus, it is possible that a public policy exception may cover Erhart's conduct, and there is a genuine issue for trial as to whether Erhart's

Exhibit 2
135

removal of documents was "reasonably necessary" to support his allegations of wrongdoing. *See Cafasso*, 637 F.3d at 1062. This issue may also be inextricably intertwined with whether a jury concludes Erhart's beliefs of wrongdoing were reasonable. In sum, to the extent BofI's claim is predicated on Erhart's appropriation of files to support his allegations of believed wrongdoing, his whistleblower defenses survive BofI's request for summary adjudication.

### (3)    Erhart's Transmission of Confidential Information to His Mother and Use of Live-in Girlfriend's Computer

The Court turns to Erhart's conduct in e-mailing confidential information to his mother and using his live-in girlfriend's computer to access BofI documents. (JSUF ¶¶ 6, 13–14.) In a different procedural context, the Fourth Circuit discussed analogous conduct in *Deltek, Inc. v. Department of Labor, Administrative Review Board*, 649 F. App'x 320, 324 (4th Cir. 2016). There, the plaintiff alleged she was terminated in violation of Sarbanes–Oxley's whistleblower protection provision, 18 U.S.C. § 1514A. *Id.* at 322. The defendant employer discovered that the plaintiff had e-mailed company documents to her home e-mail account, which was shared by her husband, in violation of her employment contract and company policies. *Id.* at 332. Thus, the company argued the after-acquired evidence doctrine applied. *Id.* at 331. This doctrine allows an employer in a retaliation case to limit its liability if evidence discovered after termination would have led to the termination had the company known of the evidence earlier. *Id.*; *see also McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361–62 (1995). The Administrative Law Judge ("ALJ") rejected the defendant's argument, however, and the Department of Labor's Administrative Review Board affirmed. *Deltek*, 649 Fed. App'x at 332.

Under the deferential substantial evidence standard, the Fourth Circuit affirmed. *Deltek*, 649 Fed. App'x at 331–33. The court noted that the ALJ made

Exhibit 2
136

15cv2287

1    "specific findings, affirmed by the Board, that [the plaintiff] forwarded to her home

2    account only documents that were relevant to her whistleblowing reports; that when

3    she did so, she had a reasonable concern that the documents might be shredded by

4    [company] employees or otherwise destroyed; and that [the plaintiff's] motivation

5    for forwarding the documents was 'to support her [Sarbanes–Oxley] allegations.'"

6    *Id.* at 332 (third alteration in original). The court also noted the plaintiff, after

7    complaining of retaliation to the company's general counsel, had been directed to

8    gather information to support her internal complaint. *Id.* "[I]n light of the specific

9    factual findings of the ALJ and the Board," the Fourth Circuit agreed that the

10    plaintiff's "effort to protect select relevant documents" would not have justified her

11    termination, and it affirmed. *Id.*

12      The Ninth Circuit's decision in *O'Day v. McDonnell Douglas Helicopter Co.*,

13    79 F.3d 756, 763 (9th Cir. 1996), discussed contrasting circumstances in another

14    context. In that case, the plaintiff brought suit alleging employment discrimination

15    under the Age Discrimination in Employment Act ("ADEA"). *Id.* at 765. He "was

16    convinced he had been denied [a] promotion and laid off because of his age." *Id.* at

17    758. "The evening after he was denied the promotion," the plaintiff "searched his

18    supervisor's office. Ostensibly, he was looking for his own personnel file (to which

19    access was restricted), but while he was rummaging through his supervisor's desk,

20    [the plaintiff] came across other documents he found interesting, including his

21    supervisor's promotion recommendations and a handwritten list ranking employees

22    for layoff (a so-called 'totem' list)." *Id.* The plaintiff "photocopied the handwritten

23    'totem' list along with several other documents, and later showed them to another

24    employee who had been slated for layoff." *Id.*

25      After the defendant discovered these actions in discovery, the company,

26    similar to the defendant in *Deltek*, argued the plaintiff's later-discovered misconduct

27    "absolved the company of all liability for its alleged discrimination." *O'Day*, 79 F.3d

28    at 758. In response, the plaintiff claimed he was engaged in protected activity under

– 26 –

the ADEA's opposition clause, which "protects reasonable attempts to contest an employer's discriminatory practices." *Id.* at 763. In applying a balancing test, the court concluded the plaintiff's conduct was not protected activity. *Id.* It reasoned the plaintiff "committed a serious breach of trust, not only in rummaging through his supervisor's office for confidential documents, but also in copying those documents and showing them to a co-worker." *Id.* Further, although the plaintiff had an interest in preserving evidence of the defendant's unlawful employment practices, that interest did not "explain why he showed the purloined documents to a co-worker who had been slated for lay-off, or why he felt compelled to preserve evidence of [the defendant's] lay-off decisions," given that he had not yet been laid off. *Id.* Thus, the court rejected the plaintiff's protected activity argument. *Id.* at 764.

Here, it is undisputed that Erhart sent an e-mail to his mother that included a spreadsheet containing BofI customers' social security numbers. (JSUF ¶ 6.) Although this e-mail was briefly accessed by his mother, she did not print it, forward it, or otherwise provide it to anyone. (Pamela Erhart Dep. 36:8–24, 58:2–15, ECF No. 67-7.) In his declaration, Erhart states he was "fearful that the Bank would delete or alter material information, based on what [he'd] seen management do in the past." (Erhart Decl. ¶ 76, ECF No. 67-5.) In addition, Erhart states he was informed that the bank was breaking into the locked cabinets and computer at his workstation, where he had documented instances of believed wrongdoing. (*Id.* ¶¶ 46, 55–56.) Further, around this time, Erhart states he "feared upper management had accessed [his] work laptop remotely." (*Id.* ¶ 57.) Thus, Erhart states he sent his mother "a copy of some information to hold for safekeeping because [he] was fearful, in case something happened to [him] or that information." (*Id.* ¶ 77.) Viewing the evidence in the light most favorable to Erhart, the Court concludes a factfinder could determine that the information transmitted by Erhart was relevant to his whistleblower reports, that this information was transmitted because he had a reasonable concern the information might be destroyed, and that Erhart's motivation

– 27 –

Exhibit 2
138

1   for forwarding the information was to support his allegations of wrongdoing. *See*

2   *Deltek*, 649 Fed. App'x at 331–32. Moreover, unlike the circumstances in *O'Day*,

3   where the plaintiff showed a confidential layoff list to an employee who was slated

4   to be laid off, there is no evidence of a competing motive for Erhart's transmission

5   of confidential bank information to his mother—she had no reason to personally

6   benefit from receiving this information.

7        If the jury concludes Erhart's conduct was to protect relevant information

8   from what he reasonably perceived was a risk of destruction, then the public policy

9   in favor of whistleblowing clearly outweighs the interest in enforcement of the

10   Confidentiality Agreement in these specific circumstances—rendering the

11   agreement unenforceable. If, however, the opposite determination is reached, the

12   calculus shifts in favor of enforcement, and BofI may recover for breach of the

13   Confidentiality Agreement.

14        Further, it is undisputed that Erhart used his live-in girlfriend's computer to

15   access BofI documents. (JSUF ¶ 13.) Erhart used the computer, which was in his

16   home, "to access some BofI documents." (Erhart Decl. ¶ 3, ECF No. 67-3.) His

17   girlfriend never looked at any BofI information Erhart "may have placed on [her]

18   computer for his viewing purposes." (Cornell ¶ 2.) She did not share the information

19   with anyone. (*Id.*) The Court similarly concludes Erhart has made a sufficient

20   showing that his use of the computer to access BofI documents as part of his

21   reporting of believed wrongdoing may be found to be protected activity.

22        Accordingly, because Erhart has made a sufficient showing that this conduct

23   may be protected, the Court will not summarily adjudicate Erhart's whistleblower

24   defenses on this basis.

25   //

26   //

27   //

28   //

– 28 –

Exhibit 2
139

15cv2287

**(4)   Erhart's and His Counsel's Purported**

**Disclosures to the Press**

BofI also argues Erhart disclosed confidential information to *The New York Times* prior to his counsel transmitting a copy of his whistleblower retaliation complaint. (*See* Mot. 9:8–17.) In *Tides v. Boeing Co.*, 644 F.3d 809, 811 (9th Cir. 2011), the Ninth Circuit held "[l]eaks to the media" are not protected by Sarbanes–Oxley's anti-retaliation provision—the statute invoked in Erhart's Twelfth Affirmative Defense. The putative-whistleblower plaintiffs in *Tides* argued that their disclosures to the *Post-Intelligencer* were protected by Sarbanes–Oxley "because reports to the media may eventually 'cause information to be provided' to members of Congress or federal law enforcement or regulatory agencies." *Id.* at 815. The court "decline[d] to adopt such a boundless interpretation of the statute." *Id.* It reasoned that Sarbanes–Oxley's anti-retaliation provision "protects employees of public companies from retaliation only when they" provide information to "one of three individuals or entities: (1) a federal regulatory or law enforcement agency, (2) a member or committee of Congress, or (3) a supervisor or other individual who has the authority to investigate, discover or terminate such misconduct." *Id.* (citing 18 U.S.C. § 1514A(a)(1)). "Members of the media are not included. If Congress wanted to protect reports to the media under § 1514A(a)(1), it could have listed the media as one of the entities to which protected reports may be made. Or, it could have protected 'any disclosure' of specified information[.]" *Id.* This conclusion is in contrast to a government whistleblower statute that was not implicated in *Tides*, the Whistleblower Protection Act, 5 U.S.C. § 2302, which protects any disclosure of specified information. *Id.* Thus, "[w]hen Congress wants to protect the disclosure of any information to any entity, it knows how to do so." *Id.*

Although the plain meaning of the statute was dispositive, the Ninth Circuit also noted "we can sleep well knowing" that the legislative history of Sarbanes–Oxley's anti-retaliation provision reinforces the conclusion that disclosures to the

Exhibit 2
140

media are not protected. *Tides*, 644 F.3d at 816. The Senate Judiciary Committee "explained that the whistleblower provision was intended to protect 'employees . . . who report acts of fraud to federal officials *with the authority to remedy the wrongdoing* or to supervisors or appropriate individuals within their company." *Id.* (quoting S. Rep. No. 107–146, at 5 (2002)). The provision "protects employees 'when they take lawful acts to disclose information or otherwise assist . . . federal regulators, Congress, or their supervisors . . . ." *Id.* (quoting S. Rep. No. 107–146, at 18–19 (2002)). Thus, disclosures to the media are not protected. *Id.*

The plain meaning reasoning in *Tides* is equally applicable to all of the other whistleblower protection provisions invoked by Erhart. Consequently, none of these provisions protects disclosures to the press.

Here, however, BofI has not established that it is undisputed that Erhart or his counsel provided confidential information to the press. BofI only submits evidence demonstrating Erhart and his counsel communicated with a reporter—not that they disclosed confidential information to the reporter. Further, Erhart and his counsel dispute BofI's claim. (Gillam Decl. ¶ 9, ECF No. 67-1, Erhart Decl. ¶ 13, ECF No. 67-6.) Thus, at this point, Erhart is not relying on his whistleblower protection defenses to protect any alleged disclosures to the press. That said, if BofI establishes Erhart disclosed confidential information to the press, Erhart will not be able to raise these whistleblower defenses as to this conduct because leaks to the media are not protected. *See Tides*, 644 F.3d at 810–11.

### (5) Erhart's Disclosure of BofI's Information in His Whistleblower Retaliation Complaint

Last, BofI argues Erhart disclosed its confidential information in his publicly-filed whistleblower retaliation complaint. (Mot. 7:13–8:23.) After hearing oral argument on this point, the Court concludes this issue turns on whether it was reasonably necessary for Erhart to disclose this information in his complaint to

– 30 –

**Exhibit 2**
**141**

15cv2287

1  pursue his whistleblower retaliation claims.

2  Erhart's whistleblower retaliation action relies upon, among others, Sarbanes–

3  Oxley's and Dodd–Frank's provisions that authorize a private right of action against

4  employers that retaliate against whistleblowers. *See* 15 U.S.C. § 78u-6(h)(1)(B); 18

5  U.S.C. § 1514A(b). To proceed under these provisions, Erhart must plausibly allege

6  that he engaged in protected activity under the respective statutes. *See, e.g.*, *Tides*,

7  644 F.3d at 814; 17 C.F.R. § 240.21F-2. Meaning, for Sarbanes–Oxley's provision,

8  Erhart must allege that he "provide[d] information . . . regarding any conduct which

9  [he] reasonably believe[d] constitutes a violation of section 1341 [mail fraud], 1343

10  [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule

11  or regulation of the Securities and Exchange Commission, or any provision of

12  Federal law relating to fraud against shareholders . . . ." *See* 18 U.S.C. § 1514A.

13  Similarly, for Dodd–Frank's provision, Erhart must allege that he had a "reasonable

14  belief that the information [he was] providing relate[d] to a possible securities law

15  violation . . . or . . . a possible violation of the provisions" enumerated in Sarbanes–

16  Oxley's anti-retaliation provision. *See* 17 C.F.R. § 240.21F-2.

17  Accordingly, Erhart must include factual allegations regarding his believed

18  wrongdoing in his complaint to state a claim for whistleblower retaliation under

19  Sarbanes–Oxley and Dodd–Frank. Yet, the broad provisions in the Confidentiality

20  Agreement appear to apply to much of the information Erhart relies upon for his

21  allegations. In the Court's view, these confidentiality obligations must give way to

22  allow Erhart enough leeway to allege and pursue his whistleblower retaliation

23  claims. At the same time, Erhart should not be able to disclose any of BofI's

24  information in his complaint simply because he is pursuing a whistleblower

25  retaliation claim. Rather, like the approach taken by the Court with Erhart's

26  appropriation of BofI's documents, Erhart should be permitted to disclose BofI's

27  information in his complaint if doing so was "reasonably necessary" to pursue his

28  retaliation claim. *See Cafasso*, 637 F.3d at 1062; *see also Ruhe*, 929 F. Supp. 2d

**Exhibit 2**
**142**

15cv2287

1033, 1039 (citing *Cancer Treatment Ctrs. of Am.*, 350 F.Supp.2d at 773) (noting in a False Claims Act case that the publication of confidential documents in the relator's complaint "was not wrongful, even in light of nondisclosure agreements, given 'the strong public policy in favor of protecting whistleblowers who report fraud against the government'"); *cf. Wadler v. Bio–Rad Labs., Inc.*, --- F. Supp. 3d ---, 2016 WL 7369246, at *14 (N.D. Cal. 2016) (concluding former general counsel was permitted to rely on privileged communications and confidential information that was "reasonably necessary" to his claims and defenses in his whistleblower retaliation action).

Ultimately, this determination, like Erhart's appropriation of files, turns on issues of fact. BofI argues Erhart disclosed confidential information to inflict maximum damage on the company and "benefit short sellers at the Bank's expense," not simply to pursue his whistleblower retaliation claims. (*See* Reply 3:6–8.) However, BofI has not met its initial burden of demonstrating there is no genuine issue of material fact as to this conduct. Therefore, summary adjudication of Erhart's whistleblower defenses on this basis is not appropriate.

### 2.    Remaining Claims

Thus far, the Court's analysis has focused on considering Erhart's public policy arguments in the context of BofI's breach of contract claim. Summarily adjudicating Erhart's defenses in the context of this claim is not appropriate, and the Court reaches the same conclusion for BofI's remaining claims. For example, BofI asserts various tort claims against Erhart, including conversion and breach of the duty of loyalty. For these claims, the Court construes Erhart's defenses as raising a defense of justification or privilege. "A privileged act is by definition one for which the actor is absolved of any tort liability, whether premised on the theory of negligence or of intent." *Gilmore v. Superior Court*, 230 Cal. App. 3d 416, 421 (1991); *see also* Restatement (Second) of Torts § 890 (1979) (defining "privilege"

**Exhibit 2**
**143**

as denoting "the fact that conduct that under ordinary circumstances would subject the actor to liability, under particular circumstances does not subject him to the liability"). "When the correlation between justifiability and privilege is acknowledged, it inevitably follows that [a] plaintiff's cause of action cannot be sustained." *Id.* at 420. A privilege or justification may arise by statute. *See, e.g.*, 2 Cal. Affirmative Def. § 41:1 (2d ed.).

It is implicit in the various whistleblower protection provisions that if an employee is permitted to provide information regarding believed wrongdoing to the government, including documents, the employer cannot then seek to impose tort liability on the employee for the same conduct. The public policy considerations underpinning the Court's contract analysis would similarly influence its analysis under tort law.[5] Consequently, for the same reasons discussed above, the Court concludes summary adjudication of Erhart's defenses in the context of BofI's remaining claims is not warranted.

## V.   **CONCLUSION**

In light of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** BofI's motion for summary adjudication of thirteen of Erhart's affirmative defenses. (ECF No. 45 in Case No. 15-cv-02287.) Erhart's Fourteenth, Fifteenth, Twenty-First, and Twenty-Second Affirmative Defenses fail as a matter of law. These defenses invoke protections for whistleblowers, but Erhart concedes these protections do not exist. Therefore, the Court summarily adjudicates these defenses in BofI's favor. In addition, the Court strikes Erhart's Seventeenth and Eighteenth

---

[5] BofI also brings a claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. (First Am. Compl. ¶¶ 89–95). Because neither party substantively addresses this claim, the Court does not wade into the potential issues arising from the intersection of this claim and Erhart's whistleblower defenses. *See, e.g.*, *United States v. Nosal*, 844 F.3d 1024, 1032 (9th Cir. 2016) (discussing CFAA generally); *see also* Connor C. Turpan, *Whistleblower? More Like Cybercriminal: The Computer Fraud and Abuse Act As Applied to Sarbanes-Oxley Whistleblowers*, 42 Rutgers Computer & Tech. L.J. 120, 121–23 (2016) (discussing employers' use of the CFAA to deter whistleblower retaliation claims).

**Exhibit 2**
**144**

15cv2287

1  Affirmative Defenses from his Answer because these defenses are redundant of

2  Erhart's other defenses. Further, the Court denies BofI's request for summary

3  adjudication of Erhart's Twelfth, Thirteenth, Sixteenth, Nineteenth, Twentieth,

4  Twenty-Third, and Twenty-Fourth Affirmative Defenses.

5        **IT IS SO ORDERED.**

6

7  **DATED:  February 14, 2017**

8                                            **Hon. Cynthia Bashant**
                                          **United States District Judge**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– 34 –

**Exhibit 2**
**145**
15cv2287