1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2    Including Professional Corporations
   JOHN P. STIGI III, Cal. Bar No. 208342
3  jstigi@sheppardmullin.com
   POLLY TOWILL, Cal. Bar No. 120420
4  ptowill@sheppardmullin.com
   1901 Avenue of the Stars, Suite 1600
5  Los Angeles, California 90067-6055
   Telephone:  310.228.3700
6  Facsimile:  310.228.3701

7  Attorneys for Defendants

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10 | IN RE:                          | Case No. 15-cv-2722-GPC (KSC)

11 | BOFI HOLDING, INC.              | **MEMORANDUM OF POINTS AND**
   | SHAREHOLDER LITIGATION.         | **AUTHORITIES IN SUPPORT OF**
12 |                                 | **DEFENDANTS' MOTION FOR**
   |                                 | **JUDGMENT ON THE PLEADINGS**
13 |                                 | **ON PLAINTIFFS' FIRST**
   | This document relates to:       | **AMENDED SHAREHOLDER**
14 |                                 | **DERIVATIVE COMPLAINT**
   |      ALL ACTIONS.               | **UNDER FED. R. CIV. P. 12(c)**
15 |
16 |                                 | Date:     May 11, 2018
   |                                 | Time:     1:30 p.m.
17 |
   |                                 | The Hon. Gonzalo P. Curiel
18 |                                 | Courtroom 2D (2d Floor – Schwartz)
   |                                 | Suite 2190

19

20

21

22

23

24

25

26

27

28

SMRH:485274245.12

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................... 1

II. STATEMENT OF PLAINTIFFS' ALLEGED FACTS .......................... 4

    A.    BofI and the Individual Defendants ................................ 4

    B.    Erhart's Allegations Generally ........................................ 5

    C.    The Downgrading of Erhart's Performance Evaluation ........ 5

    D.    Erhart Contacts BofI's Regulators .................................. 5

    E.    The Board Ascertains Erhart's Complaints ....................... 6

    F.    The Internal Investigation .............................................. 6

    G.    Erhart's Alleged June 9, 2015 Termination ..................... 6

    H.    BofI's SEC Filings ......................................................... 7

III. PROCEDURAL BACKGROUND ........................................................ 7

IV. LEGAL STANDARDS .......................................................................... 8

V. ARGUMENT ........................................................................................... 8

    A.    Plaintiffs Allege No Cognizable Case or Controversy ........ 8

    B.    Alleged Fiduciary Duty Violations Based Upon Retaliation Against Erhart Fail Under Delaware Law .......................... 10

        1.    Erhart's Alleged June 9, 2015 "Firing" Does Not Support a Breach of Fiduciary Duty Claim .................. 10

            a.    No Factual Allegations Show the Board "Authorized or Approved" Erhart's Purported "Firing" ................................ 10

            b.    Any Board Decision Following Erhart's Alleged June 9, 2015 Termination is Protected by the Business Judgment Rule .......... 12

        2.    The Alleged Downgrading of Erhart's Performance Evaluation Supports No Claim Against Argalas, Grinberg and Mosich ....................... 13

    C.    The ASC Alleges No Duty of Candor Violation ................ 17

        1.    Statements Regarding the Adequacy of BofI's Internal Controls ................................................ 18

        2.    Statements Regarding Loan Underwriting Standards ................ 20

SMRH:485274245.12

3.      Statements Regarding BofI's Loan Transactions with Directors..................................................21

D.     Plaintiffs Attribute No Specific Misconduct to Defendants Allrich, Burke, Court, Ratinoff, Dada and Walsh ...............................21

E.     Even if True, the Items Alleged by Erhart Did Not Violate Any Law or Regulation...................................................22

VI. CONCLUSION ...................................................25

SMRH:485274245.12

Case No. 3:15-CV-02722-GPC-KSC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) ................................................................. 10

*In re BofI Holding, Inc. Sec. Litig.*
2017 U.S. Dist. LEXIS 198153 (S.D. Cal. Dec. 1, 2017) ................................... 19

*In re BofI Holding, Inc. Sec. Litig.*
2017 U.S. Dist. LEXIS 79062 (S.D. Cal. May 23, 2017) ................................... 21

*In re Caremark Int'l Inc. Deriv. Litig.*
698 A.2d 959 (Del. Ch. 1996) ................................ 12, 14, 15, 16, 17, 22

*Chavez v. United States*
683 F.3d 1102 (9th Cir. 2012) .............................................................. 8

*In re Chemed Corp.*
2015 U.S. Dist. LEXIS 171754 (D. Del. Dec. 23, 2015) ................................... 16

*In re Citigroup Inc. S'holder Deriv. Litig.*
964 A.2d 106 (Del. Ch. 2009) .............................................................. 14, 18

*City of Birmingham Ret. & Relief Sys. v. Good*
2017 Del. LEXIS 522 (Del. Ch. Dec. 15, 2017) ................................... 17

*City of Los Angeles v. Lyons*
461 U.S. 95 (1983) .............................................................. 8

*In re Cray Inc. Deriv. Litig.*
431 F. Supp. 2d 1114 (W.D. Wash. 2006) .............................................. 8, 10

*David B. Shaev Profit Sharing Account v. Armstrong*
2006 Del. Ch. LEXIS 33 (Del. Ch. Feb. 13, 2006), *aff'd*, 911 A.2d
802 (Del. 2006) .............................................................. 12

*Desimone v. Barrows*
923 A.2d 908 (Del. Ch. 2007) .............................................................. 14

*In re Facebook, Inc.*
922 F. Supp. 2d 445 (S.D.N.Y. 2013) ....................................... 8, 10

*In re GlenFed, Inc. Sec. Litig.*
42 F.3d 1541 (9th Cir. 1994) .............................................................. 19

*Guttman v. Jen-Hsun Huang*
823 A.2d 492 (Del. Ch. 2003) .............................................................. 16

*Heliotrope Gen., Inc. v. Ford Motor Co.*
189 F.3d 971 (9th Cir. 1999) .............................................................. 8

-iii-

SMRH:485274245.12

Case No. 3:15-CV-02722-GPC-KSC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

*In re Isologen Inc. Sec. Litig.*
   2007 WL 1101278 (E.D. Pa. Apr. 10, 2007)........................................................ 10

*Malone v. Brincat*
   722 A.2d 5 (Del. 1998).................................................................................. 18, 20

*Melbourne Mun. Firefighters' Pension Trust Fund v. Jacobs*
   2016 Del. Ch. LEXIS 114 (Del. Ch. Aug. 1, 2016) ............................................ 17

*Oklahoma Firefighters Pension & Ret. Sys. v. Corbat*
   2017 Del. Ch. LEXIS 848 (Del. Ch. Dec. 18, 2017)..................................... 15, 16

*Rosenbloom v. Pyott*
   765 F.3d 1137 (9th Cir. 2014) ............................................................................ 14

*Stone v. Ritter*
   911 A.2d 362 (Del. 2006).............................................................................. 12, 15

*In re Symbol Techs. Sec. Litig.*
   762 F. Supp. 510 (E.D.N.Y. 1991).................................................................. 9, 10

*Thomas v. Union Carbide Agric. Prods. Co.*
   473 U.S. 568 (1985) ............................................................................................. 8

*In re United Telecomms., Inc. Sec. Litig.*
   1993 U.S. Dist. LEXIS 4749 (D. Kan. Mar. 4, 1993) .......................................... 9

*White v. Panic*
   783 A.2d 543 (Del. 2000).................................................................................... 13

<u>Statutes and Rules</u>

FDIA § 19 .............................................................................................................25

12 C.F.R. § 363.3(b)(3) ........................................................................................ 23

12 C.F.R. § 1020.220(a)(2)(i)(4)(ii) ..................................................................... 24

Fed. R. Civ. P. 9(b) ........................................................................................ 18, 19

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 8

Fed. R. Civ. P. 12(c) ............................................................................................... 8

SMRH:485274245.12

Case No. 3:15-CV-02722-GPC-KSC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

# I.  INTRODUCTION

In March 2015, a junior internal auditor at BofI Federal Bank (together with its corporate parent, BofI Holding, Inc., "BofI") went on leave and never returned. This was after he stole thousands of pages of confidential customer and bank information that he stored on his personal computer and then disseminated to friends and others, and still refuses to return.  In October 2015, that individual, Charles Matthew Erhart, filed a purported whistleblower lawsuit, entitled *Erhart v. BofI Holding, Inc.*, Case No. 15-cv-2287-BAS-NLS (consolidated with Case No. 15-cv-2353-BAS-NLS) (S.D. Cal.) (the "*Erhart* Action").[1]  Based upon a blend of illogical misperceptions and intentional mischaracterizations, Erhart alleged a hodge-podge of wrongdoing at BofI, including regulatory and internal control violations.  (In fact, after reviewing these allegations for over two years, regulators and independent auditors have given them no credence, taken no action against BofI, not requested that BofI change its business practices or suggested BofI restate any reports or public filings.)  Erhart also alleged that because he reported those matters to his supervisors and certain governmental agencies, he was fired.  (In fact, he was not.)  In March 2015, immediately after learning of Erhart's reports of wrongdoing, BofI's Audit Committee conducted an internal investigation and found his allegations to be without merit.  After Erhart filed his lawsuit, BofI's Audit Committee performed a *second* internal investigation by retaining outside counsel to independently investigate Erhart's allegations.  "After an extensive investigation, [outside counsel] advised the Audit Committee that, based on its investigation, it found no support for the conclusions of Mr. Erhart in the Complaint that the Bank or management engaged in wrongdoing or acts of fraud or impropriety."  BofI Form 8-K, dated Mar. 14, 2016.

---

[1]  Previously, on April 28, 2015, unbeknownst to BofI, Erhart filed a complaint with the Occupational Safety and Health Administration ("OSHA").  This filing is required under Sarbanes-Oxley to exhaust administrative remedies before initiating federal whistleblower litigation.

SMRH:485274245.12

By then, however, Erhart and his counsel had disclosed stolen internal BofI information to a *New York Times* reporter well-known for publishing negative information about companies for the benefit of short-sellers. Documentary evidence confirms that before Erhart filed his lawsuit, his lawyer coordinated with this reporter for months, gave the reporter an advance copy of the complaint to enable him to instantly report and comment on its filing and, then, once the complaint was filed, signaled the reporter to release a negative article. Also, immediately upon filing the complaint but before it became public, Erhart's counsel sent the complaint to several short-selling hedge funds in an effort to cause a maximum downward stock-price impact. This effort succeeded: after the complaint became public, BofI's stock price dropped. Within two days, an opportunistic securities class action "strike suit" was filed, claiming in part that BofI and its management deceived BofI investors by not disclosing the same non-existent regulatory and internal control violations that were alleged by Erhart. *In re BofI Holding, Inc. Sec. Litig.*, Case No. 3:15-cv-02324-GPC-KSC (S.D. Cal. filed Oct. 15, 2015) (the "Securities Action").

Both the *Erhart* Action and the Securities Action spawned the instant "tag-along" shareholder derivative action. In this action, several putative stockholder plaintiffs allege, ostensibly on behalf of BofI, that the defendants[2] breached their fiduciary duties to BofI by causing or allowing BofI to (a) retaliate against Erhart, as alleged in the *Erhart* Action; (b) make false or misleading public statements about BofI's business and financial condition, as alleged in the Securities Action; and (c) commit the "grab-bag" of alleged regulatory and internal control violations alleged in the *Erhart* Action. The First Amended Consolidated Shareholder Derivative Complaint ("ASC"; Dkt. #64) is the operative complaint.

---

[2] The individual defendants are officers and/or current or former directors of nominal defendant BofI: Theodore C. Allrich, James S. Argalas, Eshel Bar-Adon, John Gary Burke, James J. Court, Uzair Dada, Gregory Garrabrants, Paul J. Grinberg, Andrew J. Micheletti, Nicholas A. Mosich, Edward J. Ratinoff, John C. Tolla and Derrick K. Walsh.

The pleading defects in this shareholder derivative action are pervasive.  They begin with the failure to plead that BofI suffered damages due to any of the alleged misconduct.   Plaintiffs allege only that BofI has incurred legal fees and costs defending itself in the *Erhart* Action and Securities Action.  Defendants' personal responsibility for those costs in this action cannot arise, however, unless and until BofI is found liable to the plaintiffs in those related actions.  Because alleged damages here are contingent upon the resolution of other litigation, no cognizable case or controversy exists, and judgment on the pleadings is required.[3]

But even if a cognizable case or controversy existed, the ASC still would fail to state a claim for relief.  Plaintiffs allege that the Board "authorized" Erhart's purported June 9, 2015 "firing" but plead no facts supporting this allegation.  Plaintiffs also criticize the Board for not taking action after-the-fact to "rectify" Erhart's phantom dismissal.  Although dressed up as a Delaware law failure-of-oversight claim, this claim is actually just a challenge the Board's decision to litigate the *Erhart* Action.  That decision, however, is protected by Delaware's business judgment rule, and plaintiffs allege no facts rebutting the presumptive validity of that Board decision.  The ASC also purports to plead a fiduciary duty violation against BofI's Audit Committee directors for supposedly "ratifying" Erhart's downgraded job performance evaluation.  As pled, this claim also fails under Delaware law.

The ASC's assertion that defendants breached their duty of candor also fails.  The ASC identifies no false or misleading statements and pleads no facts showing the deliberateness and bad faith necessary to state a claim.  The ASC relies upon allegations that the defendants learned about Erhart's allegations of regulatory and internal control violations by March 2015.  But it also concedes that BofI conducted

---

[3]   The ASC identifies no costs and fines associated with any government enforcement actions.  The reason is simple:  despite years of robust regulatory oversight and investigation, no fines have been imposed or enforcement actions commenced.  In fact, in June 2017, the enforcement staff at the Securities and Exchange Commission (the "SEC") informed BofI in writing that it would not be recommending any enforcement action.

an internal investigation in response and found the allegations to be without merit and is vigorously defending itself against the *Erhart* Action.  Plaintiffs allege no facts that call the integrity or good faith of this investigation into question.  All other allegations of false and misleading SEC disclosures also fail.  Finally, the conduct and events that Erhart allegedly observed and reported as regulatory and internal control violations were not, in fact, violations at all, and so provide no basis on which to state a breach of fiduciary duty claim.

The Court should enter judgment on the pleadings against plaintiffs dismissing the ASC in its entirety.  Alternatively, in the event the Court were to conclude that some aspects of the ASC survive, the Court should enter judgment dismissing the ASC in part and directing plaintiffs to file an amended complaint to clarify and properly narrow the aspects of this case that may be subject to further litigation.

## II.   STATEMENT OF PLAINTIFFS' ALLEGED FACTS

### A.   BofI and the Individual Defendants

BofI, a Delaware corporation, provides "consumer and business banking products."  (ASC ¶¶ 2, 17.)   The individual defendants include members of BofI's Board of Directors at the time of the alleged events:  Allrich, Argalas, Burke, Court, Dada, Garrabrants, Grinberg, Mosich and Ratinoff.  (*Id.* ¶¶ 18, 20-26.)  Garrabrants also served as a BofI officer.  The other individual defendants are BofI officers Bar-Adon, Micheletti, Tolla and Walsh.  (*Id.* ¶¶ 19, 27-30.)

The Board and its committees "provide enterprise-wide oversight of the Company's management and handling of risk."  (*Id.* ¶ 60.)  The Audit Committee "primarily oversees those risks that may directly or indirectly impact [BofI']s financial statements, including the areas of financial reporting, internal controls and compliance with public reporting requirements."  (*Id.* ¶ 63.)  Argalas, Grinberg and Mosich served on the Audit Committee.

**B.      Erhart's Allegations Generally**

In September 2013, Erhart began work as an internal auditor at BofI.  (*Id.* ¶ 80.)   Starting in December 2013, Erhart purports that he observed practices he allegedly believed (which is nonsensical as an auditor) to violate legal requirements or raised compliance concerns.  (*See*, *e.g.*, *id.* ¶ 111 (inaccurate response to an Office of the Comptroller of the Currency ("OCC") information request and maintaining accounts without tax identification numbers ("TINs")); *id.* ¶ 122 (lending to foreign "criminals and other suspicious persons" potentially subjecting BofI to Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") compliance risk); *id.* ¶¶ 176-177 (suspicious activity in Garrabrants' personal account and his brother's account).)  The ASC alleges that Erhart claims to have brought various concerns to the attention of Garrabrants, Bar-Adon and Tolla, who allegedly "brushed [them] aside." (*Id.* ¶ 218.)[4]

**C.      The Downgrading of Erhart's Performance Evaluation**

Erhart's supervisor, Jonathan Ball, prepared a draft evaluation of Erhart's performance.  (*Id.* ¶¶ 117, 221.)  In mid-December 2014, Tolla, supposedly "in retaliation for Erhart's whistleblower activity," revised the draft by downgrading the evaluation, which allegedly affected Erhart's bonus.  (*Id.* ¶¶ 117, 221.)  Ball allegedly "directly advised" the Board's Audit Committee (Argalas, Grinberg and Mosich) of the revision.  (*Id.* ¶ 221.)  Plaintiffs allege that "the Audit Committee ratified and approved the retaliation against Mr. Erhart by failing to instruct Tolla to restore Mr. Erhart's performance grade to the level determined by Ball."  (*Id.*)[5]

**D.      Erhart Contacts BofI's Regulators**

Erhart allegedly contacted the SEC in January 2015, regarding what he wrongly asserted was an incomplete response by BofI to an SEC subpoena, and in

---

[4]   In fact, Erhart's Complaint only alleges he spoke to Garrabrants and Bar-Adon about very limited issues.

[5]   Erhart complained that he received a "3.0" instead of a "3.22" on his performance review.

February 2015, regarding a BofI loan customer he claimed was "suspicious." (*Id.* ¶¶ 113, 121.) After Erhart's supervisor resigned on March 5, 2015, Erhart contacted the OCC and "made allegations of wrongdoing by BofI," allegedly supported with documentary evidence. (*Id.* ¶¶ 124, 218.)

**E.    The Board Ascertains Erhart's Complaints**

Plaintiffs allege that on March 12, 2015, Bar-Adon, BofI's Chief Legal Officer, acting as "General Counsel to the Audit Committee," met and interviewed Erhart. (*Id.* ¶ 222.) From this interview, the Audit Committee allegedly obtained directly from Erhart "knowledge of Erhart's whistleblower complaints." (*Id.*)[6] Also in March 2015, BofI's management allegedly "fully informed the Audit Committee and the board about events involving [Erhart]." (*Id.* ¶ 224.)

**F.    The Internal Investigation**

The Audit Committee promptly delved into the matter, conducting interviews with audit personnel and having "conversations with the OCC." (*Id.*) It initiated an investigation that "included examination of forensic evidence." (*Id.*) On April 27, 2015, the Audit Committee reviewed "additional details" about Erhart's complaints and "the Company's investigation into Mr. Erhart's complaints." (*Id.* ¶ 225.) On May 21, 2015, the Audit Committee presented to the Board a report containing "additional details" about the investigation. (*Id.* ¶ 226.) Through this investigation, the Board found "the complaints of [Erhart] to be without merit." (*Id.* ¶¶ 8, 186.)

**G.    Erhart's Alleged June 9, 2015 Termination**

Plaintiffs allege that the Board, "at some point between March 25 and June 9, 2015 . . . authorized or approved the firing of Mr. Erhart, to be effective June 9, 2015." (*Id.* ¶ 227.) They allege further that BofI terminated Erhart's employment on June 9, 2015. (*Id.* ¶¶ 198, 202, 228.)

---

[6]    Erhart's own allegations in the *Erhart* Action contradict this allegation. Erhart alleges that he in fact refused to speak to Bar-Adon but indicated he would speak to the Audit Committee "at a later time."

**H.   BofI's SEC Filings**

Plaintiffs allege that between February 6, 2013 and September 9, 2016, BofI filed reports with the SEC that contained false and misleading statements.  (*Id.* ¶¶ 64-79, 81-84, 89-106, 114-116, 121, 126-37, 144-171.)  In these filings, plaintiffs contend, BofI did not disclose that internal controls were "frequently disregarded," that its loans to foreign nationals potentially violated BSA/AML requirements, that it maintained customer accounts with missing TINs and that it had retaliated against Erhart in violation of the Sarbanes-Oxley Act of 2002 ("SOX") and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank").  (*Id.* ¶¶ 4, 138-143, 150, 157, 164, 171.).

## III.   PROCEDURAL BACKGROUND

On March 1, 2017, this Court granted the defendants' motion to dismiss the Verified Consolidated Shareholder Complaint ("CSC"; Dkt. #36) based upon plaintiffs' failure to plead demand futility.  (Dkt. #54.)  The Court held that the CSC did not sufficiently allege that a majority of BofI's then-nine-member Board of Directors would have been incapable of exercising its disinterested business judgment in responding to a stockholder demand had one been made.

In February 2017, outside director Allrich retired.  This change in Board composition gave plaintiffs the opportunity to relitigate demand futility.  On April 10, 2017, plaintiffs filed the ASC, and on August 8, 2017, this Court denied defendants' motion to dismiss the ASC, holding that plaintiffs adequately alleged that a demand on this temporarily truncated Board would have been futile.  (Dkt. #75.)[7]

---

[7]   In October 2017, a new outside director was elected to the BofI's Board, restoring it to nine members.  A Board majority of five independent and disinterested directors is once again capable of considering a stockholder demand.  The sufficiency of demand futility allegations in any further amended pleading will need to be tested against this new nine-member, majority independent and disinterested Board of Directors.

## IV.   LEGAL STANDARDS

"After the pleadings are closed, but early enough to not delay trial, a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  A Rule 12(c) analysis is substantially identical to a Rule 12(b)(6) analysis. *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).  The motion is properly granted when, taking all the allegations in the pleadings as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law. *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999).  When considering the motion, a court should not accept as true those allegations contradicted by uncontested facts set forth in judicially-noticed materials. *See id.* at 981 n.18.

## V.   ARGUMENT

### A.   Plaintiffs Allege No Cognizable Case or Controversy

To invoke federal court jurisdiction, a complaint must meet the threshold "case or controversy" requirement imposed by Article III of the United States Constitution. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).  Federal courts may not decide claims "contingent [upon] future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (quoting 13A Wright & Miller, Federal Practice & Procedure § 3532 (1984)).  Plaintiffs must plead facts showing that the injury from defendants' alleged conduct is "real and immediate," not "conjectural" or "hypothetical." *Lyons*, 461 U.S. at 101-02.  Where a derivative breach of fiduciary duty claim in federal court is predicated upon the resolution of other litigation, it presents no case or controversy and must be dismissed on constitutional ripeness grounds. *See In re Facebook, Inc.*, 922 F. Supp. 2d 445, 473-74 (S.D.N.Y. 2013) (dismissing breach of fiduciary duty claim under ripeness doctrine where alleged damages concerned costs corporation incurred defending itself and its officers in related pending securities fraud class action); *see also In re Cray Inc. Deriv. Litig.*, 431 F. Supp. 2d 1114, 1133-34 (W.D. Wash. 2006) ("[D]erivative claims are foreclosed when they merely

-8-

1    allege damages based on the potential costs of investigating, defending, or satisfying

2    a judgment or settlement *for what might be* unlawful conduct.") (emphasis added);

3    *In re United Telecomms., Inc. Sec. Litig.*, 1993 U.S. Dist. LEXIS 4749, at *11 (D.

4    Kan. Mar. 4, 1993) (applying Article III and holding that "[w]here, as here, the

5    claim of damages is contingent on the outcome of a separate, pending lawsuit, the

6    claim is not ripe and the complaint must be dismissed").

7         Here, plaintiffs allege that BofI incurred legal fees and other expenses in

8    defending the Securities Action and the *Erhart* Action.  (ASC ¶¶ 48, 207(a).)  They

9    also identify as damages those "amounts [BofI] paid to outside lawyers, accoun-

10   tants, and investigators in connection with BofI's internal investigation" of Erhart's

11   whistleblower complaints.   (*Id.* ¶ 207(c).)   Plaintiffs expressly predicate their

12   alleged litigation-expense damages upon the possibility that BofI, at some point in

13   the future, will *lose* the Securities Action and the *Erhart* Action.  (*See*, *e.g.*, *id.* ¶ 11

14   ("[T]he Company has been named as a defendant in the Securities Class Action and

15   the Consolidated Whistleblower Action, and has suffered significant losses and

16   damages.").)   But any right to recover these costs, including internal investigation

17   costs, depends entirely upon whether BofI ultimately suffers an adverse final judg-

18   ment in the Securities Action and the *Erhart* Action.  *See In re Symbol Techs. Sec.*

19   *Litig.*, 762 F. Supp. 510, 516 (E.D.N.Y. 1991) ("[D]efendants cannot be held liable

20   [in a derivative action] for the costs of defending a potentially baseless suit.").

21        As this Court is aware, the Securities Action has failed to withstand BofI's

22   pleading challenges, and BofI's pending motion to dismiss the latest amended plead-

23   ing with prejudice confirms that it remains inherently flawed and cannot survive.

24   Meanwhile, the *Erhart* Action is only just past the pleading stage and has been

25   stayed since September 2016.  BofI denies Erhart's substantive allegations and

26   intends to defend itself vigorously.  Where, as here, damages depend upon "nebu-

27   lous future events so contingent in nature that there is no certainty they will ever

28

occur, the case is not ripe for adjudication" and must be dismissed. *Facebook*, 922 F. Supp. 2d at 473 (citation omitted).[8]

**B.   Alleged Fiduciary Duty Violations Based Upon Retaliation Against Erhart Fail Under Delaware Law**

**1.   Erhart's Alleged June 9, 2015 "Firing" Does Not Support a Breach of Fiduciary Duty Claim**

The ASC uses the alleged June 9, 2015 termination of Erhart to support two theories of liability against the directors for breach of fiduciary duty.  First, "at some point between March 2015 and June 9, 2015" (ASC ¶ 227), despite allegedly knowing it would violate SOX (and other federal anti-retaliation statutes), the Board "approved or authorized" Erhart's termination "to be effective as of June 9, 2015" (*id.*), thereby causing BofI to commit an illegal act.  (*See id.* ¶¶ 9, 182, 198-201, 227.)  Alternatively, once the Board learned of Erhart's June 9, 2015 termination, it failed to take available "options" to "rectify" the violation.  (*See id.* ¶¶ 10, 184, 185, 200, 201, 201, 228.)  The ASC fails to state a claim under either theory.

**a.   No Factual Allegations Show the Board "Authorized or Approved" Erhart's Purported "Firing"**

Plaintiffs allege no facts showing that the *Board of Directors* (as opposed to BofI's officers) made any actual decision to terminate Erhart's employment.  Plaintiffs allege only that, between March and June 9, 2015, the Board became aware of Erhart's purported whistleblower complaints.  (ASC ¶¶ 181, 182, 198, 200, 222-225.)  That allegation does not support a plausible inference that the Board of Directors took the unusual step of deciding to fire a junior-level employee.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

---

[8]   The ASC also alleges vaguely that BofI "expended . . . significant sums" and suffered a "loss of reputation and goodwill, and a 'liar's discount' that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the market."  (ASC ¶ 207(b).)  Courts uniformly reject such conclusory allegations of purported reputational harm.  *See, e.g.*, *Cray*, 431 F. Supp. 2d at 1134; *Symbol*, 762 F. Supp. at 516-1; *In re Isologen Inc. Sec. Litig.*, 2007 WL 1101278, at *3 (E.D. Pa. Apr. 10, 2007).

1    Judicially noticeable facts confirm the implausibility of this conclusory alle-

2  gation.  For example, the complaint in the *Erhart* Action does not identify the Board

3  or any director as authorizing his termination.  (RJN Ex. A.)  Erhart alleges instead

4  that an unidentified BofI employee processed his termination paperwork on March

5  6, 2015.  (*Id.* at ¶ 70.)  That date does not directly coincide with, and may even pre-

6  cede, the unspecified "point between March 2015 and June 9, 2015" that the Board

7  supposedly "authorized or approved" the firing.  (*See* ASC ¶ 227; *see also id.* ¶ 222

8  (identifying Audit Committee counsel's meeting with Erhart on March 12, 2015).)

9  Equally implausible is plaintiffs' allegation that the Board made Erhart's "firing"

10  (which, according to plaintiffs, was made as early as March 2015) "to be effective as

11  of June 9, 2015."  (*Id.* ¶ 227.)  Nothing in the ASC explains why the Board would

12  make an allegedly punitive, retaliatory "firing" of Erhart to be effective *three*

13  *months later*.  Plaintiffs also allege nothing to suggest that in the period leading up

14  to June 9, 2015, the Board met or communicated about Erhart's employment —

15  despite plaintiffs having access to BofI's Board and Audit Committee minutes.

16  Plaintiffs' allegation that *the Board* fired Erhart on June 9, 2015 has no factual

17  support and thus states no claim for relief.[9]

18    In addition, plaintiffs' allegations concerning the Board's supposed

19  "approval" of Erhart's termination does not state a claim for breach of fiduciary

20  duty against any particular director defendant because plaintiffs fail to (and in fact,

21  cannot) plead how each director voted on the wholly made-up "decision" to termin-

22  ate Erhart.  Thus, even assuming this improperly pled allegation that the Board

23  weighed in on Erhart's supposed firing were true, it would still be insufficient to

24  state an actionable claim against any director.

25

26

27

28

[9]   The Erhart-termination allegations are directed at the Board only.  No allegations identify the officer defendants as participating in any decision to fire Erhart.

SMRH:485274245.12

1

### b. Any Board Decision Following Erhart's Alleged June 9, 2015 Termination is Protected by the Business Judgment Rule

2

3       Plaintiffs' alternative theory is that the Board breached its fiduciary duties by

4   failing to "rectify" Erhart's June 9, 2015 termination after the fact.  (*Id.* ¶ 202.)

5   Plaintiffs allege that, even though Erhart's termination violated SOX, Dodd-Frank

6   and other statutes, the Board had "options" available capable of "rectify[ing]" the

7   violations to "ensure" BofI's compliance.  (*Id.* ¶ 185.)  These post-termination

8   options included reporting to the SEC and rehiring Erhart.  (*Id.*)  Plaintiffs allege

9   that the Board breached its fiduciary duties by *not* taking those options.  (*See id.*)

10      The ASC casts this as a Delaware failure-of-oversight claim.  (*See, e.g., id.*

11  ¶ 242 ("In breach of their fiduciary duties owed to BofI, the Individual Defendants

12  . . . *failed to properly oversee* BofI's business.") (emphasis added); *see also id.*

13  ¶ 233 (alleging "[e]very member of the Board declined to inform themselves of the

14  misconduct complained herein").)  Such claims are referred to as "*Caremark*

15  claims" after *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996),

16  which arise when a Board "utterly fail[s] to implement any reporting or information

17  systems or controls" or, having put is such system or controls, "consciously fail[s] to

18  monitor or oversee its operation." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

19      A *Caremark* claim can arise when information showing legal noncompliance

20  or control deficiencies comes to a board's attention as so-called "red flags," but the

21  directors nonetheless *consciously* disregard their fiduciary duties "by fail[ing] to act

22  in the face of a known duty to act." *Stone*, 911 A.2d at 369 (citation omitted); *see*

23  *also David B. Shaev Profit Sharing Account v. Armstrong*, 2006 Del. Ch. LEXIS 33,

24  at *15 (Del. Ch. Feb. 13, 2006) (describing claim as directors acting "in defiance of

25  their duties"), *aff'd*, 911 A.2d 802 (Del. 2006).  It is this type of *Caremark* claim the

26  ASC purports to assert:  "Notwithstanding actual knowledge of Mr. Erhart's pro-

27  tected whistleblowing activity, *when it was brought to the Board's attention that*

28  *Mr. Erhart had been fired* by BofI shortly after reporting his good-faith concerns of

-12-

1   unlawful conduct to BofI's Audit Committee as well as to the SEC and the OCC, *the*
2   *Board failed to take any conduct whatsoever* to comply with SEC and Dodd-Frank
3   rules." (ASC ¶ 184 (emphasis added).)

4       Plaintiffs' hyperbolic allegation of Board inaction is belied by the facts actu-
5   ally alleged in the ASC.  Plaintiffs do not allege that the Board consciously disre-
6   garded its oversight function.  Nor can they allege "conscious disregard" in the face
7   of facts *admitted in the ASC* showing internal investigations and vigorous litigation
8   defense.  Instead, plaintiffs allege that the Board did not pursue various alternative
9   "options" to "rectify" the alleged June 9, 2015 violation, including by rehiring
10  Erhart or informing the SEC about it.  (ASC ¶ 185.)  In other words, plaintiffs allege
11  that, in their view, the Board should have done different things to address and mini-
12  mize BofI's potential exposure to civil actions and/or possible regulatory penalties
13  that might occur in the future, rather than the many actions the Board actually did
14  undertake in response to purported "red flags."

15      In reality, the ASC's "failure to rectify" allegations merely second-guess the
16  Board's business judgments (including the decisions to investigate Erhart's allega-
17  tions and defend against his lawsuit) that are presumptively valid under Delaware's
18  business judgment rule.  *See*, *e.g.*, *White v. Panic*, 783 A.2d 543, 552-53 (Del.
19  2000).  Just because plaintiffs might have done things differently if they were on the
20  Board does not suffice to rebut the business judgment rule presumption that protects
21  the directors absolutely from personal liability for their Board decisions.[10]

22      **2.    The Alleged Downgrading of Erhart's Performance Evaluation**
             **Supports No Claim Against Argalas, Grinberg and Mosich**
23

24      The ASC alleges that Tolla, in mid-December 2014, retaliated against Erhart
25  for whistleblowing by downgrading his job performance evaluation, thereby causing

26

27  [10]  The ASC levels the "duty to rectify" allegations against the Board members only.
28  No allegations concern the officer defendants and the ASC purports to state no
    claim against them based on that theory.

-13-

BofI to violate SOX and other laws.  (ASC ¶¶ 117, 221.)  Based upon this, the ASC purports to state a breach of fiduciary duty claim against Argalas, Grinberg and Mosich.  (*Id.* ¶ 221.)  As members of the Audit Committee, they allegedly learned of the downgrade from Erhart's supervisor, Ball, supposedly knew the downgrade was unlawful, never reversed it and so "ratified" Tolla's downgrade decision.  (*Id.*)[11]

The ASC, however, pleads no facts indicating that the Audit Committee approved a revision to Erhart's review before it happened.  Nor does it allege that, upon learning of the revision, the Audit Committee met and formally "ratified" it, or that the revision was part of any overall business or other "plan" the Audit Committee reviewed and adopted.  *See Rosenbloom v. Pyott*, 765 F.3d 1137, 1157-59 (9th Cir. 2014) (complaint alleged facts showing board of directors deliberately adopted a plan premised upon illegal conduct).  Other than use of the term "ratified," nothing in the ASC suggests that the Audit Committee participated in any actual decision, either before or after Tolla's revision, to knowingly cause BofI to violate the law.  Delaware law, however, does not recognize informal or *de facto* "ratification" of past misconduct as a basis for a fiduciary duty violation.  Liability based upon "inaction" must arise, if at all, under *Caremark*.  And *Caremark* requires facts showing a director's conscious failure to act in the face of a known duty to act.  *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009); *see also Rosenbloom*, 765 F.3d at 1137 (applying *Caremark* "red flag" analysis to allegations that board of directors "did nothing" in response to notice of wrongdoing).  By their novel theory of director liability, plaintiffs would deem any unresolved disputed legal violation by a corporation to be an *ipso facto* "ratification" by the directors.

---

[11]  Although Tolla is named as a defendant and allegedly owed fiduciary duties to BofI, no alleged facts show that Tolla downgraded Erhart's review from a "3.22" to a "3.0" knowing that it would be illegal.  (In fact, Tolla simply pointed out complaints with Erhart's performance.)  Liability for causing the corporation to engage in an unlawful act requires that the fiduciary *knowingly* violate positive law.  *See Desimone v. Barrows*, 923 A.2d 908, 934 (Del. Ch. 2007) (for liability, the fiduciary "must consciously cause the corporation to act unlawfully").

That is not Delaware law.  As the Delaware Supreme Court has stressed, "the directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both." *Stone*, 911 A.2d at 373.  Plaintiffs' "ratification" theory automatically "equate[s] a[n alleged] bad outcome with bad faith." *See id.*  This undermines *Caremark*.  After all, a *Caremark* claim seeks to hold disinterested directors who have no motive to injure the corporation liable for injuring the corporation based upon alleged inaction.  The hurdles needed to charge such a violation are far higher than the *de facto* "ratification" theory plaintiffs advance here.  *See Caremark*, 698 A.2d at 967 (there are "good reasons why" a *Caremark* claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win judgment").

*Caremark*'s standard is exacting, as the recent decision in *Oklahoma Firefighters Pension & Ret. Sys. v. Corbat*, 2017 Del. Ch. LEXIS 848 (Del. Ch. Dec. 18, 2017), illustrates.  There, banking regulators had determined that Citigroup suffered numerous and repeated BSA/AML compliance failures.  Citigroup entered into a regulatory order and, over a period spanning several years, a series of consent orders concerning its repeated compliance failures.  After each consent order with regulators, Citigroup still failed to comply, which culminated in a fine of $140 million.  *Id.* at *19-22.  Stockholders brought derivative claims against the directors of Citigroup, seeking to recoup that fine (among other damages) from the directors for allowing the numerous regulatory violations to occur on their watch.

Despite the undisputed facts showing that Citigroup was fined *$140 million* for violations the bank itself admitted, the Delaware Court of Chancery *dismissed the case*, holding that a majority of directors did not face a substantial risk of personal liability for plaintiffs' *Caremark* claims.  *Id.* at *55.  The alleged facts gave only the "impression" that the board had stood idly by in the face of multiple warnings, but did not show it  "chose to do nothing," only that the steps it took fell

-15-

short.  *Id.* at \*50-53.  Although plaintiffs alleged that "despite the[] red flags, [the board] failed to take actions that may have avoided the loss to the company" (*id.* at \*5), the court stressed, "[t]hat is not the standard."  *Id.*  In the end, what was required, but lacking, were facts showing "actual scienter" — a knowing failure to act for reasons other than the best interests of the corporation.  *Id.* at \*4; *see also id.* at \*55 (stating "a board's efforts can be ineffective, its actions obtuse, its results harmful to the corporate weal, without implicating bad faith").

Here, of course, there has been no finding of any actual regulatory violations, let alone any fine imposed on BofI.  Plaintiffs concede that the Audit Committee conducted follow up investigations and had procedures in place to detect retaliation in connection with performance reviews as demonstrated by Erhart's supervisor's "directly advis[ing]" the Audit Committee of the downgrade.  (*See* ASC ¶ 221.) Assuming this notice constituted a "red flag" showing potential unlawful conduct by Tolla, to state a *Caremark* claim, plaintiffs would need to allege, at a minimum, facts showing the Audit Committee did *absolutely nothing* in response.  *See In re Chemed Corp.*, 2015 U.S. Dist. LEXIS 171754, at \*39 (D. Del. Dec. 23, 2015) (allegations must show "board knew misconduct was occurring (*and did nothing about it*)") (emphasis added); *Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 507 n.37 (Del. Ch. 2003) (facts must show "board took no action").

Plaintiffs do not allege the Audit Committee ignored the information it received from Ball.  To the contrary, plaintiffs allege facts showing the Audit Committee took action.  Its counsel allegedly interviewed Erhart on March 12, 2015 and gathered information about "Mr. Erhart's whistleblower complaints."  (ASC ¶ 222.) Those complaints necessarily included Erhart's job performance downgrade.  (*See id.* ¶ 224 (alleging Audit Committee and full Board, as of March 2015, "had been informed of Mr. Erhart's whistleblower complaints and related details").)  Plaintiffs further allege that on April 27, 2015, Grinberg, "presented a review to the Committee of *all* complaints received by him as Chair of the Audit Committee."  (*Id.*

-16-

¶ 225 (emphasis added).)   Plaintiffs admit that an internal investigation was conducted based on Erhart's complaints and this investigation was in progress before he was allegedly terminated on June 9, 2015.  (*Id.* ¶¶ 224, 225.)  That investigation determined that "the complaints of [Erhart] were found to be without merit."  (*Id.* ¶¶ 8, 181, 186.)  The Audit Committee "expend[ed] significant sums" for "outside lawyers, accountants, and investigators in connection with BofI's internal investigation."  (*Id.* ¶ 207(c).)  The facts admitted in the ASC flatly contradict any inference of culpable failure of oversight by the Audit Committee.  *See Melbourne Mun. Firefighters' Pension Trust Fund v. Jacobs*, 2016 Del. Ch. LEXIS 114, at *30-31, 37-39 (Del. Ch. Aug. 1, 2016) (no inference that board consciously ignored oversight duty where it monitored antitrust accusations against corporation but took no further actions consistent with its repeated and publicly-expressed position that the accusations were "without merit"); *City of Birmingham Ret. & Relief Sys. v. Good*, 2017 Del. LEXIS 522, at *18 (Del. Ch. Dec. 15, 2017) (board presentations advising directors of status of environmental problems and steps being taken to investigate concerns did not lead to inference that the board consciously disregarded its oversight responsibility by ignoring concerns).

In the end, plaintiffs allege that the Audit Committee members breached their fiduciary duties because they did not produce the outcome plaintiffs, in their uninformed and self-serving judgment, would have preferred:  the "restor[ation] [of] Mr. Erhart's performance grade."  (ASC ¶ 221.)  Declining to capitulate to the demands of a disputed whistleblower where an independent investigation showed no merit to the allegations does not and cannot state a *Caremark* claim as a matter of law.

## C. The ASC Alleges No Duty of Candor Violation

Plaintiffs allege that the director defendants breached their duty of candor by causing BofI to make false and misleading statements in various SEC filings from February 6, 2013 to September 9, 2016.  (*Id.* ¶¶ 4, 64-136, 144-171.)  The challenged statements fall into three categories:  (1) the adequacy of BofI's internal con-

trols (including compliance with banking regulations and anti-retaliation laws), (2) BofI's loan underwriting standards and (3) BofI's residential mortgage loans to certain directors.  (ASC ¶¶ 138, 140, 143, 236.)  None supports a claim for relief.

Where the disclosures being challenged do not request shareholder vote or other action, plaintiffs must plead facts showing that defendants "*deliberately* misinform[ed] shareholders about the business of the corporation."  *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998) (emphasis added).  In addition, where, as here, the corporation's certificate of incorporation exculpates directors from personal liability for violations of fiduciary duty other than based on a breach of fiduciary duty or an act or omission in bad faith (*see* RJN B), the complaint must show the director made the misleading disclosure "in bad faith, knowingly, and intentionally."  *Citigroup*, 964 A.2d at 132.  Because a duty of candor violation "sounds in fraud," Rule 9(b)'s heightened pleading standard applies.

### 1.    Statements Regarding the Adequacy of BofI's Internal Controls

Plaintiffs allege that BofI's SEC filings were misleading because BofI failed to disclose Erhart's purported observations of regulatory and internal control violations.  (ASC ¶¶ 4, 47 (alleging BofI's failure to disclose that its internal controls "were frequently disregarded," its borrowers included foreign nationals to whom BofI could not lend under BSA/AML requirements (and which alleged violations purportedly caused BofI to overstate financial results), 150-200 BofI accounts lacked required tax identification numbers, and BofI "fired" Erhart in violation of federal law).)  In an attempt to plead that the director defendants made these alleged misstatements knowingly, the ASC points to Erhart's whistleblower complaints. But the earliest the ASC alleges with particularity that the director defendants fully learned of Erhart's allegations is March 2015.  (*See id.* ¶¶ 8, 222 (alleging March 12, 2015 meeting between Erhart and Bar-Adon acting as counsel for the Audit Committee).)  Accordingly, alleged misstatements about BofI's internal controls and regulatory compliance pre-dating March 2015 cannot be actionable.

-18-

That leaves at issue statements in BofI's 2015 and 2016 Form 10-K and the 2015 and 2016 Schedule 14A Proxy Statements.  (*See id.* ¶¶ 158-171.)  BofI's 2015 and 2016 Form 10-K reports disclosed that BofI maintained effective internal controls over its financial reporting and the accompanying SOX certifications represented that the reports "fairly present[ed] in all material respects the financial condition, results of operations and cash flows" and that "all known significant deficiencies in BofI's internal controls have been disclosed to the Board and the Audit Committee."  (*Id.* ¶¶ 159, 166.)  The 2015 and 2016 Schedule 14A Proxy Statements each included an Audit Committee Report confirming the adequacy of BofI's internal controls and the accuracy of BofI's financial statements.  (*Id.* ¶¶ 161, 168.)

These allegations do not show a duty of candor violation.  First, the ASC fails to explain how any statements are false or misleading.  For each identified disclosure, the ASC  alleges, "[t]he foregoing statements are false and misleading based on the Court's findings in the Securities Class Action, the whistleblower complaints of Mr. Erhart and Ms. Golub, and other evidence of inadequate internal controls at BofI set forth herein."  (*Id.* ¶¶ 164, 171.)  It never identifies the "findings" or shows how any statement was in fact false.[12]  Rule 9(b) requires more.  *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (holding that Rule 9(b) requires more than conclusory allegations of fraud and "must set forth an explanation as to why the statement or omission complained of was false or misleading").

Second, to the extent the Board became aware of Erhart's allegations in March 2015 (and assuming those allegations suggested deficiencies in BofI's internal controls), the ASC does not allege the director defendants ignored this "red flag."  To the contrary, the Board, through the Audit Committee, immediately began its inquiry into the substance of Erhart's complaints.  (ASC ¶¶ 8, 181, 224 (describ-

---

[12] Statements concerning the adequacy of BofI's internal controls (as opposed to BofI's investment in internal controls) are not among the statements this Court has determined are actionable in the Securities Action.  *See In re BofI Holding, Inc. Sec. Litig.*, 2017 U.S. Dist. LEXIS 198153, at *14 (S.D. Cal. Dec. 1, 2017).

-19-

SMRH:485274245.12

Case No. 3:15-CV-02722-GPC-KSC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

ing internal investigation, including examination of forensic evidence" and finding Erhart's complaints "to be without merit").)  This does not show bad faith conduct. Even assuming the 2015 and 2016 Form 10-K and Proxy Statements contained misstatements about the adequacy of BofI's internal controls (they did not), nothing suggests the director defendants (after allegedly learning of Erhart's complaints in March 2015) made any subsequent misstatement knowingly, deliberately and in conscious disregard of the duty to speak honestly.  *See Malone*, 722 A.2d at 14.

Third, the ASC alleges no facts suggesting BofI's internal controls were inadequate *at the time* BofI issued the 2015 and 2016 Form 10-Ks and Schedule 14A Proxy Statements.  Those disclosures were made on August 26 and September 4, 2015, and August 25 and September 9, 2016.  That is a full five months to a year-and-a-half after Erhart's alleged March 12, 2015 meeting with Bar-Adon as Audit Committee counsel.  Nothing indicates BofI did not have adequate internal controls in place at that time.  Plaintiffs do not and cannot point to any regulatory actions or fines against BofI or any determination by BofI's independent outside auditors of material weakness in BofI's internal controls.

### 2.   Statements Regarding Loan Underwriting Standards

According to the ASC, the 2013, 2014, 2015 and 2016 Form 10-Ks "touted [BofI's] low-risk underwriting practices" by disclosing its weighted average LTV ratios and stating that "we believe our weighted-average LTV . . . at origination has resulted and will continue to result in the future, in relatively low average loan defaults and favorable write-off experience."  (ASC ¶¶ 144, 151, 129, 165.)

The ASC fails to allege facts showing these statements were false or misleading, or that the director defendants knew they were false or misleading.  The ASC identifies two loans issued by BofI to Grinberg in 2012 and Mosich in 2013 that had an implied loan-to-value ratio of 80% and 78%, respectively.  (*Id.* ¶¶ 141, 236.) These ratios are higher than the weighted-average loan-to-value ratios reported in the 2013, 2014, 2015, and 2016 Form 10-Ks (54.68%, 55.98%, 60.39% and 59.08%,

-20-

SMRH:485274245.12

Case No. 3:15-CV-02722-GPC-KSC
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

respectively).  (*Id.* ¶¶ 144, 151, 158, 165.)  But this does not show that the reported weighted-average loan-to-value ratios were false.  In the ordinary course of business, BofI can and does make many loans at a higher loan-to-value ratio to borrowers both affiliated and unaffiliated with the bank than its weighted-average.  (*See id.* ¶ 139 (identifying statements in which BofI discloses its loan-to-value statistics in bands and that show 9% of BofI's loans have a loan to value greater than 70%)).  Plaintiffs allege no particularized facts to suggest that the allegedly higher LTV loans to Grinberg and Mosich were not included within BofI's reported weighted-average LTV ratios.  *See In re BofI Holding, Inc. Sec. Litig.*, 2017 U.S. Dist. LEXIS 79062, at \*54-55 (S.D. Cal. May 23, 2017) (BofI's public statements regarding its average LTV ratios did not provide a basis for securities fraud).

### 3.    Statements Regarding BofI's Loan Transactions with Directors

The ASC identifies disclosures in BofI's 2013, 2014, 2015 and 2016 Schedule 14A Proxy Statements concerning BofI's loan to its "directors, executive officers, and employees" and highlights this language:  "Such loans and other banking transactions are generally made on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with the Company or the Bank."  (ASC ¶¶ 148, 155, 162, 169.)  To the extent plaintiffs claim this statement is false or misleading, they fail to allege particularized facts showing why.  The allegation that the Grinberg and Mosich loans had LTV ratios of 80% and 78%, respectively (*see id.* ¶ 141), does not show BofI's loans to affiliates are not "generally made" on the same terms in comparable transactions with non-affiliates.  And, even assuming a misstatement, nothing in the ASC suggests that it was made deliberately, knowingly and in bad faith.

### D.    Plaintiffs Attribute No Specific Misconduct to Defendants Allrich, Burke, Court, Ratinoff, Dada and Walsh

Plaintiffs' allegations against the non-Audit Committee outside directors (Allrich, Burke, Court, Ratinoff and Dada) are limited to (i) their generally alleged parti-

cipation in the Board's purported "decision" to terminate Erhart (*id.* ¶ 227); (ii) their signatures on BofI's Form 10-Ks and Proxy Statements (*see*, *e.g.*, *id.* ¶¶ 76, 100, 135, 149); and (iii) Burke's and Allrich's participation in BofI's company-wide employee loan program.  (*Id.* ¶ 236.)  These allegations are not materially different from those in the CSC.  (*Cf.* Dkt #54, at 21 (holding that "the CSC's lack of allegations as to Allrich, Court, Dada, Burke and Ratinoff" were "sufficient to reject Plaintiffs' argument" that demand was futile).)  The allegations against BofI's Chief Accounting Officer Derrick Walsh are even more sparse — he is simply alleged to have attended some meetings of the Audit Committee where BofI's financial statements were discussed and approved.  (*See id.* ¶¶ 75, 81, 93, 97, 99, 131.)

Nothing alleged against the non-Audit Committee outside directors or Walsh can support a plausible inference that these defendants engaged in the sort of intentional misconduct necessary to hold officers and directors liable for an unexculpated claim for breach of fiduciary duty under Delaware law.  The Court should enter judgment on the pleadings in favor of Allrich, Burke, Court, Ratinoff, Dada and Walsh.

**E.    Even if True, the Items Alleged by Erhart Did Not Violate Any Law or Regulation**

The ASC refers to Erhart's allegations of regulatory violations to suggest a general failure of oversight by the Board.  (*See id.* ¶ 230.)  As demonstrated above, no *Caremark* claim is plausible given the Board's and Audit Committee's robust response to those allegations.  Moreover, the litany of alleged regulatory violations in the ASC are not, in fact, violations at all:

*Alleged Internal Control Deficiencies.*  Erhart alleges that BofI's internal controls were inadequate or frequently disregarded.  (*See*, *e.g.*, *id.* ¶¶ 4(a), 143, 150.) The adequacy of BofI's internal controls over financial reporting (and its operations as a federal savings bank generally), however, were subject not only to review by BofI's management, but also to independent review by BofI's independent public

accountant ("IPA"), the OCC, FDIC and Federal Reserve Board.  By law, BofI was required to submit reports from an IPA retained to assess and disclose all material weaknesses in BofI's internal control over financial reporting the IPA identified (unless remediated by fiscal year-end), and the IPA could not conclude that BofI's internal control was effective if it identified even one material weakness.  12 C.F.R. § 363.3(b)(3).  Pursuant to this regulation, on an annual basis, BofI's IPA, BDO USA LLP ("BDO"), assessed whether BofI's internal controls over financial reporting were effective based upon the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control — Integrated Framework* (2013 version).  (*See*, *e.g.*, RJN Ex. C, at 57.)  Each time, BDO reported publicly that BofI maintained, in all material respects, effective internal controls over financial reporting.

The OCC conducts internal control assessments and assessments of BofI's audit program of each bank the OCC regulates, which includes independent on-sight verification or testing of internal control integrity.  (*See* RJN D, at 8, 10.)  The BDO reports accompanied a broader submission of data by BofI to the OCC as part of the OCC's separate regulatory assessment of BofI's internal control and audit program. When considered against this framework of independent oversight, Erhart's allegations of inadequate internal controls are facially implausible.

*Allegations Regarding Missing TINS*.  Plaintiffs allege 150-200 BofI customer accounts lacked required TINs and that BofI inaccurately responded to a regulatory agency request for bank accounts lacking TINs by stating "there were no accounts without TINs."  (ASC ¶ 111.)  The ASC notes that Erhart alleges he viewed a spreadsheet disclosing accounts without TINs.  (*Id.*)  The  agency request at issue here, however, inquired as to foreign *deposit* accounts that lacked TINs, whereas the spreadsheet Erhart purportedly saw concerned *loan* accounts.  BofI in fact had no *deposit* accounts without TINs.  In response to a different request from the same regulator during the same period, BofI submitted a spreadsheet listing

-23-

Case No. 3:15-CV-02722-GPC-KSC

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

approximately 150 foreign loans that did not have TINs. The opening of any account without a TIN is *not ipso facto* a regulatory violation. *See* 12 C.F.R. § 1020.220(a)(2)(i)(4)(ii) (noting that, for non-U.S. persons, provision of the borrower's passport and country of issuance or alien identification card number or number and country of issuance of any other government-issued document can satisfy customer ID standards, even in the absence of a TIN).

*Alleged Loans to Foreign Nationals*. Plaintiffs allege that BofI's borrowers included foreign nationals who should have been off-limits under the BSA/AML, and that Erhart discovered that BofI was making substantial loans to foreigners, including politically exposed persons ("PEPs") in potential violation of BSA/Know Your Customer rules. (ASC ¶¶ 4(b), 112.) But there is no legal prohibition against lending to foreign nationals and PEPs. For example, the FFIEC's Bank Secrecy Act Anti-Money Laundering Examination manual specifically acknowledges that banks are permitted to open accounts for PEPs, so long as they "obtain risk-based due diligence information on PEPs and establish policies, procedures, and processes that provide for appropriate scrutiny and monitoring." (RJN Ex. E, at 2.) The policy then provides a list of due diligence procedures a bank should have that are "[c]ommensurate with the identified level of risk" posed by a PEP. (*Id.*)

*Garrabrants' Alleged Depositing of Third Party Checks*. Garrabrants allegedly deposited third-party checks for structured settlement annuity payments into a personal account. (ASC ¶ 176.) But court orders allowed these structured settlement annuity checks (generally made payable to the claimant in the settled personal injury claim) to go directly from the insurer to Garrabrants for deposit in his personal account by approving a related transfer contract that, among other provisions, granted Garrabrants power of attorney to endorse the checks. (RJN Exs. F, G.) Garrabrants' conduct was fully authorized by law.

*Allegations Regarding Garrabrants' Brother's Account*. Erhart allegedly observed that Garrabrants was the signatory of a BofI consumer account opened in

the name of his brother with a balance of approximately $4 million, and could find no evidence showing how Garrabrants' brother came into possession of that amount. (ASC ¶ 177.)   Garrabrants in fact gifted BofI shares to his brother in a properly reported transfer of stock, and placed them in a family trust account, for which Garrabrants appropriately had signing authority.  (RJN Exs. H, I.)  Taxes were paid on all sales of the BofI stock.

*Alleged Employment of a Senior Officer With a Criminal Background.*  Plaintiffs allege that defendants knew about a senior officer's criminal background but allowed BofI to continue to employ him.  (ASC ¶ 172 (citing *Seeking Alpha* blog post).)  Plaintiffs allege that this violated "Section 19 of the FDIA" and alleges that their counsel was unable to locate an order granting a FDIA waiver allowing BofI to employ this person.  (*Id.* ¶ 175.)  The FDIC, however, has in fact granted BofI a Section 19 waiver with respect to the subject employee, and BofI has incurred no liability or fines in connection with any purported Section 19 non-compliance.[13]

## VI.   CONCLUSION

For the reasons set forth above, the Court should enter judgment for defendants on all claims asserted in the ASC, and dismiss this lawsuit in its entirety. Alternatively, the Court should dismiss such portions of the ASC that fail on the pleadings as a matter of law and direct plaintiffs to file an amended complaint limited to only those aspects of the case that survive this motion.

Dated:  March 7, 2018          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By:  _____
                    *s/John P. Stigi III*
                    JOHN P. STIGI III
                    Attorneys for Defendants
                    Email:  jstigi@sheppardmullin.com

---

[13]  In addition to the ASC's failure to state a breach of fiduciary duty violation against all defendants under Count I,  the ASC's Counts II (Abuse of Control) and III (Unjust Enrichment) are derivative of and dependent on allegations stating a breach of fiduciary duty violation, and so also fail to state a claim.  (ASC ¶¶ 248, 252.)  Count IV (Breach of the Duty of Honest Services) against the officer defendants rests on a breach of the duty of loyalty and so likewise fails. (*See id.* ¶¶ 256, 258.)