UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE: BofI HOLDING, INC.
SHAREHOLDER LITIGATION

Case No.: 3:15-cv-02722-GPC-KSC

(publicly filed redacted version)

**ORDER GRANTING IN PART
MOTION FOR JUDGMENT ON THE
PLEADINGS**

**[ECF No. 95]**

Before the Court is Defendants' motion for judgment on the pleadings. (ECF No. 95.) The motion is fully briefed. (*See* ECF No. 103 (Plaintiffs' Opposition); ECF No. 107 (Defendants' Reply).) The nominal defendant in this case, BofI Holding, Inc., filed a notice stating that it does not oppose the motion. (ECF No. 98.) The Court issued a tentative order on the motion on May 11, 2018 (ECF No. 109), and it held a hearing on the motion on May 12, 2018 (ECF No. 111).

For the reasons set forth below, the Court determines that, based on the facts alleged in the operative First Amended Consolidated Shareholder Derivative Complaint (ECF No. 77 (the "ASC")), a sizeable portion of Plaintiffs' claims is unripe or otherwise unsupported by allegations of Article III standing. As a result, the Court must GRANT the motion in part. As explained further below, Plaintiffs have the option of

(1) proceeding with the small aspect of their claims that is ripe and supported by sufficient allegations of Article III standing, or (2) seeking to stay this case until the litigation on which Plaintiffs' unripe claims rely reaches a conclusion. Either way, the Court orders Plaintiffs to file an amended complaint that adheres to the contents of this ruling.

## I. Background

In this shareholder derivative suit, Plaintiffs—shareholders of stock of BofI Holding, Inc. ("BofI")—assert claims against members of BofI's Board of Directors and Audit Committee, as well as other BofI officers. The ASC alleges the following facts.

### A. BofI and the Individual Defendants

BofI is the holding company of BofI Federal Bank, which provides consumer and business banking products on the internet. (ASC ¶ 2.) BofI is a public company, and its shares are traded on the NASDAQ. (*Id.* ¶ 4.) Until February of 2017, BofI's Board of Directors (the "Board") consisted of Defendants Garrabrants (BofI's CEO), Allrich, Argalas, Mosich, Burke, Grinberg, Court, Ratinoff, and Dada. (*Id.* ¶¶ 18–30.) In February of 2017, Allrich resigned from the Board. (*Id.* ¶ 20.) During the relevant period, BofI's Audit Committee consisted of Defendants Argalas, Grinberg, and Mosich. (*Id.* ¶¶ 22, 22, 24.) The non-Board-member Defendants are Micheletti (Executive Vice President and CFO), Bar-Adon (Executive Vice President and Chief Legal Officer), Tolla (Chief Governance Risk and Compliance Officer), and Walsh (Chief Accounting Officer and Senior Vice President, previously First Vice President, Financial Reporting). (*Id.* ¶¶ 19, 27, 28, 30.)

As officers and/or directors of BofI, Defendants held duties of trust, loyalty, good faith, diligence, fair dealing, and due care to BofI. (*Id.* ¶¶ 34–35.) Defendants were obligated to comply with generally accepted accounting principles ("GAAP") and to supervise the company in a reasonable and prudent manner. (*Id.* ¶¶ 41–45.) According to the ASC, Defendants knowingly breached those duties by "causing the Company to make false and/or misleading statements and/or failing to disclose" information regarding

the facts that BofI (1) was doing business with foreign nationals who "should have been off-limits under federal anti-money-laundering laws"; (2) had at least 200 customer accounts without tax identification numbers despite telling the Office of the Comptroller of the Currency ("OCC") that no such customers existed; (3) overstating BofI's revenue and financial results; (4) failing to prepare BofI's statements in accordance with GAAP; (5) allowing BofI to lack adequate internal and financial controls, and (6) as a result of all of those conditions, causing BofI's financial statements to be materially false or misleading. (*Id.* ¶ 47.) The ASC asserts that Defendants' positions of control and authority over BofI meant that they knew about these misrepresentations. (*Id.* ¶¶ 49–51.) As a result of these actions, BofI is "now the subject of class action lawsuits that allege violations of federal securities laws, and a whistleblower lawsuit alleging violations of federal law" for which "BofI has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing." (*Id.* ¶ 48.)

As indicated in BofI's 2015 Proxy Statement, Defendants oversee BofI's management and handling of risk; at the Board's meetings, they receive regular updates and reports from management on matters such as risk management practices, credit quality, financial reporting, internal controls, compliance, legal matters, asset liability, and liquidity management. (*Id.* ¶¶ 60–62.) With respect to risk management, an Enterprise Risk Management program ("ERM") is used to identify business risks, develop monitoring processes, and craft responses to risk. (*Id.* ¶ 63.) ERM leaders submit regular reports to the Board regarding its work. (*Id.*) According to the same Proxy Statement, the Audit Committee "primarily oversees such risks that may directly or indirectly impact our financial statements, including the areas of financial reporting, internal controls and compliance with public reporting requirements," and that it "provides reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting." (*Id.*)

**B. BofI's Public Filings and Statements**

On February 6, 2013, Defendants caused BofI to file a Form 10-Q—reviewed and approved by the Board and signed by Garrabrants and Micheletti—disclosing BofI's financial results for the quarter ending on December 31, 2012. (*Id.* ¶¶ 65–67.) The Sarbanes-Oxley certifications in BofI's Forms 10-Q and 10-K signed by Garrabrants and Micheletti stated that to their knowledge the filing did not include any untrue—or omit material—facts, that they were responsible for ensuring that internal controls were adequate, that the statement included any changes to BofI's internal controls over financial reporting, and that the statement disclosed any significant deficiencies and material weaknesses in the design or operation of BofI's internal controls or fraud involving management or other employees with a significant role in the company. (*E.g.*, *id.* ¶¶ 68, 145.) Essentially the same procedure and statements were followed and made for subsequent quarterly Form 10-Q and annual Form 10-K statements as well as BofI press releases that accompanied those statements. (*E.g.*, *id.* ¶¶ 69–79, 81–83, 89–106, 114–16, 121, 126, 128–33, 135–38.)

The Form 10-K statements also included investor presentations prepared and signed by Micheletti stating that BofI was consistently ranked among the best of the "biggest thrifts by SNL Financial," is a top performer among public banks and thrifts, is a top quartile performer versus bank peer groups, that its business model is "more profitable because [its] costs are lower," and that its asset growth had been driven by "strong and profitable organic loan production." (*E.g.*, *id.* ¶ 96.) The Form 10-Ks also included statements that it maintained a low weighted-average loan-to-value ratio ("LTV") at origination (and would continue to keep it low in the future) and that management confirmed that there was effective internal control over financial reporting. (*E.g.*, *id.* ¶¶ 144–45.) Defendants also caused BofI to file with the SEC Schedule 14A Proxy Statements (signed by the Board members), including Audit Committee reports (signed by the Audit Committee members) confirming the adequacy of BofI's internal controls and the accuracy of the Form 10-K statements. (*E.g.*, *id.* ¶ 147.) Those

statements noted that loans to directors, executive officers, and employees of BofI were made generally on the same terms as those prevailing at the time for comparable customers, and that loans would be made to such individuals only if they do not involve more than normal risk and do not present any "other unfavorable features." (*E.g.*, *id.* ¶ 148.)

According to the ASC, the filings and releases discussed above were false and misleading because (1) BofI's internal controls were frequently disregarded; (2) borrowers included foreign nationals who should have been "off-limits" under anti-money laundering laws; (3) many customer accounts lacked required tax identification numbers; and (4) BofI fired an internal auditor who raised these issues to management and regulators. (*Id.* ¶ 138.) As to lax lending practices, the ASC notes that Grinberg obtained a $2.192 million loan from BofI in 2012 with an 80% LTV, and in 2013 Mosich obtained a $985,000 loan with a 78% LTV ratio. (*Id.* ¶ 141.) The ASC alleges that the Audit Committee members' receiving direct benefits from BofI's "lax lending practices" meant that it has deficient oversight over underwriting practices, risk management, and internal control. (*Id.* ¶ 142.) Moreover, according to an article on the website *Seeking Alpha*, BofI unlawfully employed, and issued loans to, an individual who had previously been convicted of criminal offenses "involving dishonesty or a breach of trust or money laundering." (*Id.* ¶¶ 172–75.)

### C. The Whistleblower and Securities Fraud Lawsuits

On December 19, 2013, Erhart completed an internal audit of BofI's Structured Settlements and Lottery practice, and found that BofI's employees who were calling potential customers might have been violating California law by failing to indicate that the calls were being recorded. (*Id.* ¶ 85.) Within 15 minutes of Erhart requesting a "standard meeting to conclude his audit," Garrabrants called Erhart, and within two hours, Erhart

was summoned with Ball to a meeting with Bar-Adon, during which Bar-Adon instructed them not to speak to anyone about the potential violation of California law, and to remove any discussion of such potential violation from Erhart's report or to mark it attorney-client privileged so it would not be discoverable in litigation. (*Id.* ¶ 86.) Tolla also later instructed Erhart never to include potential unlawful activity in his reports. (*Id.* ¶ 87.) In January 2014, BofI's Chief Credit Officer, Thomas Constantine, told Erhart and Ball that he could not "be responsible for" or vouch for any of "BofI's numbers" after they were turned over to Micheletti, suggesting that Micheletti would change those data. (*Id.* ¶ 88.)

On November 21, 2014, Erhart sent an email to BofI's Chief Risk Officer expressing concern about BofI's deposit concentration risk, in that too few depositors represented too high a proportion of BofI's deposits. (*Id.* ¶ 107.) On December 18, 2014, BofI falsely told the SEC that BofI did not have any account information for an advisory firm with the initials ETIA. (*Id.* ¶¶ 108–10.) Erhart learned of this false response in January 2015. (*Id.* ¶ 110.) BofI also falsely indicated to the OCC in January 2015 that it had no accounts without tax identification numbers ("TINs"). (*Id.* ¶ 111.) At some point in December 2014, Ball prepared an evaluation of Erhart. (*Id.* ¶ 221.) Tolla later revised Ball's evaluation of Erhart by downgrading Erhart's performance in retaliation for Erhart's whistleblowing activities. (*Id.*) Concerned about Tolla's conduct, Ball advised the Audit Committee that Tolla was retaliating against Erhart. (*Id.*) According to the ASC, the Audit Committee "ratified" Tolla's conduct. (*Id.*) On March 12, 2015, Bar-Adon, acting as General Counsel for the Audit Committee, met with Erhart. (*Id.* ¶ 222.) As a result of that conversation, and because Grinberg is the person to whom reports of potentially unlawful conduct are directed, the ASC alleges that around this time the Audit Committee must have become aware of Erhart's allegations of wrongdoing. (*Id.*)

Around the same time, Erhart discovered during a loan origination audit that BofI was making substantial loans to certain foreign individuals "in potential violation of"

Bank Secrecy Act and Know Your Customer rules; Erhart reported his concerns about these loans to his superiors. (*Id.* ¶ 112.) Erhart also discovered in early 2015 that Garrabrants was depositing third-party checks for structured settlement annuity payments into a personal account, and that Garrabrants was a signatory of BofI's largest consumer account, which was opened in the name of Garrabrants's brother despite that brother having few monetary resources. (*Id.* ¶ 176–77.) Erhart expressed concerns regarding these findings to superiors. (*Id.* ¶ 176.) After Erhart observed BofI again fail to disclose certain information in response to an SEC subpoena, he contacted the SEC regarding the subpoena. (*Id.* ¶ 113.) The same month, Tolla observed out loud in front of Erhart and other BofI employees that if Erhart "continue[d] to turn over rocks eventually he is going to find a snake and he's going to get bit." (*Id.* ¶ 118.)

In February 2015, in light of the performance evaluation downgrading his rating, Erhart began to believe his job was in jeopardy. (*Id.* ¶ 117.) In that evaluation, BofI identified as a "performance issue" Erhart's practice of preserving audit findings in writing. (*Id.*) The same month, BofI falsely responded to an OCC request for disclosure by stating that it had not received any agency or law enforcement subpoenas. (*Id.* ¶ 119.) On February 20, 2015, Erhart contacted the SEC regarding a BofI customer that Erhart suspected was an unregistered investment advisor. (*Id.* ¶ 120.) On March 5, 2015, Ball "resigned abruptly." (*Id.* ¶ 122.) Erhart then immediately obtained an unpaid leave of absence, sent an email to his mother that included a spreadsheet containing BofI's customer social security numbers "for safekeeping," and downloaded BofI files to a personal USB drive. (*Id.* ¶¶ 122–24.) Erhart also contacted the OCC and provided it with evidence of BofI's wrongdoing. (*Id.* ¶ 124.) On April 14, 2015, Erhart filed a whistleblower protection complaint with the U.S. Occupational Safety and Health Administration. (*Id.* ¶ 125.) ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

Erhart was formally terminated from BofI on June 9, 2015. (*Id.* ¶ 198.) According to the ASC, BofI's reasons for terminating Erhart were based on events that occurred after Erhart began expressing concerns to the SEC, such as Erhart's absence as a result of his unpaid leave and his violation of company confidentiality policies by reporting information to the SEC. (*Id.* ¶ 199.)

Meanwhile, in May 2015, a BofI quality control auditor with the last name Golub who was responsible for identifying and reporting deficiencies that impacted credit decisions reported certain deficiencies regarding BofI's underwriting practices to BofI management. (*Id.* ¶ 140, 203.) Golub was "retaliated against and was ultimately terminated." (*Id.*) Golub and BofI eventually engaged in arbitration. (*Id.* ¶ 203.) BofI has concealed from its public disclosures "any references to Ms. Golub's whistleblowing activities." (*Id.*)

On August 22, 2015, the *New York Times* published an article about BofI's strong growth under Garrabrants's leadership. (*Id.* ¶ 134.) The article stated that BofI had made loans to "people who were later found to have run afoul of the law"; "wealthy foreigners, a practice that requires meticulous controls to comply with federal regulations aimed at stopping money laundering"; and "unsavory characters" including individuals who had been convicted of fraud. (*Id.*) Garrabrants is quoted in the article stating that BofI "is as judicious as any other lender in picking its borrowers." (*Id.*)

On October 13, 2015, Erhart filed a lawsuit against BofI in this district court. *Erhart v. BofI Holding, Inc.*, No. 3:15-cv-2287-BAS-NLS (S.D. Cal.). The same day, the *New York Times* published an article describing Erhart's lawsuit. (*Id.* ¶¶ 5, 178.) Erhart's allegations include the following: that Tolla and other senior officers instructed Erhart to "refrain from putting anything in writing regarding the Company's violations of laws" and label anything incriminating to the Company as attorney client work product or communication "in order to shield such documents from later production"; BofI unlawfully lent to certain foreign national borrowers; BofI falsely represented to the OCC that it had no accounts without tax identification numbers; BofI failed to provide "full

and timely information to regulators"; and after Erhart revealed wrongdoing to BofI management and federal regulators, "his work performance evaluation was downgraded, and he was eventually fired." (*Id.*) The next day, BofI's stock price dropped over 30 percent. (*Id.* ¶¶ 6, 179.)

On October 15, 2015, BofI issued a press release and Form 8-K denying Erhart's allegations. (*Id.* ¶¶ 7, 180.) Those documents stated that the Audit Committee and Board of Directors had been fully informed of Erhart's allegations in March 2015, after which the Audit Committee conducted interviews with internal audit personnel, held conversations with the OCC, and conducted an internal investigation. (*Id.* ¶¶ 8, 181.) According to BofI's statements, the investigations led to the conclusion that Erhart's allegations were "without merit." (*Id.*)

According to the ASC, because the Board was made aware by March 2015 that Erhart had engaged in protected whistleblowing activity under federal law, the Board must have known that it was illegal to fire Erhart. (*Id.* ¶¶ 9, 182.) Further, according to the ASC, when the Board became aware that Erhart had been terminated after he revealed misconduct, the Board took no action, again in violation of federal law. (*Id.* ¶¶ 10, 184.) The ASC suggests that rather than taking no action, the Board could have reported the retaliation to the SEC or reinstated Erhart. (*Id.* ¶ 185.)

Also on October 15, 2015, BofI shareholders filed a putative class action securities fraud suit against BofI and several of the defendants in this case. *In re BofI Holding, Inc. Secs. Litig.*, No. 3:15-cv-2324-GPC-KSC (S.D. Cal.). On March 21, 2018, after concluding that the Plaintiffs in the securities case failed to state a claim for relief because their allegations of loss causation did not meet applicable heightened pleading standards, the Court entered final judgment in favor of the defendants. No. 3:15-cv-2324, ECF Nos. 156, 157 (S.D. Cal.).

### D. Plaintiffs' Allegations of Injury and Causes of Action

As a result of the actions, statements, and omissions discussed above, the ASC specifies that BofI has been damaged in the following ways: (1) "legal fees associated

9

with the lawsuits filed against the Company for violations of the federal securities laws and for violation of the anti-retaliation provisions of Doff-Frank and Sarbanes-Oxley by Mr. Erhart"; (2) "loss of reputation and goodwill, and a 'liar's discount' that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace"; (3) "amounts paid to outside lawyers, accountants, and investigators in connection with BofI's internal investigation"; and (4) "loss of revenues and profits due to any subsequent restatements." (*Id.* ¶¶ 206–07.)

The ASC asserts three causes of action against all Defendants—(1) breach of fiduciary duty, (2) abuse of control, (3) unjust enrichment—and one claim of breach of duty of honest services against Garrabrants, Micheletti, Bar-Adon, Tolla, and Walsh. (*Id.* ¶¶ 238–59.) As forms of relief, Plaintiffs seek a declaration that they may maintain this action on behalf of BofI and that they are adequate representatives of BofI; a declaration that Defendants have breached (or aided and abetted the breach of) their fiduciary duties; a damages award to BofI; injunctive relief ordering BofI and Defendants to reform and improve its governance and internal procedures; a restitution award to BofI; and costs and fees. (ASC at 85–87.)

## II.    Legal Standard

"Rule 12(c) is functionally identical to Rule 12(b)(6) and . . . the same standard of review applies to motions brought under either rule." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (internal quotation marks omitted). A Rule 12(b)(6) motion attacks the complaint as containing insufficient factual allegations to state a claim for relief. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-

conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

While Defendants formulate their motion as falling under Rule 12(c), the portion of their motion challenging the ripeness of this case and Plaintiffs' standing are subject-matter jurisdiction challenges that instead fall under Rule 12(b)(1). *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) ("Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss."). As a result, regardless of the label chosen by Defendants, the Court treats the portion of the motion challenging this case's ripeness and Plaintiffs' standing as jurisdictional challenges under Rule 12(b)(1). *See St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) ("Like other challenges to a court's subject matter jurisdiction, motions raising the ripeness issue are treated as brought under Rule 12(b)(1) even if improperly identified by the moving party as brought under Rule 12(b)(6)."). Because ripeness and standing are subject-matter jurisdiction issues, the Court addresses those issues before addressing the merits of the ASC's allegations. *See, e.g.*, *Coons v. Lew*, 762 F.3d 891, 897 (9th Cir. 2014) (before addressing merits of the plaintiff's claims, "we first must address the threshold question of whether [one of the plaintiffs] satisfies the demands of Article III for ripeness").

## III. Discussion

Defendants argue that this case is unripe because Plaintiffs' breach of fiduciary duty claims are "predicated upon the resolution of other litigation." (ECF No. 95-1 at 8.) According to Defendants, Plaintiffs' claims are unripe because they rely on the assumption that BofI will be liable in the securities fraud case and/or Erhart's whistleblower litigation. According to Defendants, because "Plaintiffs expressly predicate their alleged litigation-expense damages upon the possibility that BofI, at some point in the future, will lose the Securities Action and the *Erhart* Action," the damages alleged in the ASC have not yet occurred. (*Id.* at 9.) Plaintiffs' right on behalf of BofI to

recover any losses, according to Defendants, "depends entirely upon whether BofI ultimately suffers an adverse final judgment" in either of those cases. (*Id.*)

BofI has not been held liable in either case. As discussed above, after Defendants filed this motion, the Court entered final judgment in favor of the defendants in the securities fraud litigation. *In re BofI Holding, Inc. Secs. Litig.*, No. 3:15-cv-2324-GPC-KSC, ECF No. 157 (S.D. Cal.). That ruling is currently on appeal. As for Erhart's whistleblower litigation, the district court recently denied BofI's motion for reconsideration of an order granting in part and denying in part a motion to dismiss. *Erhart v. BofI Holding, Inc.*, No. 3:15-cv-2287-BAS-NLS (S.D. Cal.). In that case, Defendants have informed the Court, BofI denies the "substantive allegations and intends to defend itself vigorously." (ECF No. 95-1 at 9.)

Plaintiffs respond to this argument by asserting that BofI has already incurred losses as a result of the conduct alleged in the ASC. They argue that BofI has incurred injuries as a result of Defendants' conduct in the form of legal fees and loss of goodwill. (ECF No. 101 at 5.) The legal fees incurred by BofI have resulted from the securities and *Erhart* lawsuits as well as fees paid to "outside lawyers, accountants, and investigators in connection with BofI's internal investigation. (*Id.* at 5–6 (citing ASC ¶ 207).)

To resolve this issue, the Court must answer the following questions: (1) does the pendency of a case upon which a derivative action relies render the derivative action unripe? (2) if so, are there any aspects of Plaintiffs' claims here that are not reliant on a BofI-adverse outcome in the *Erhart* or securities action? and (3) if so, do those claims otherwise state a claim for relief? As explained below, the answers to these questions lead to the conclusion that a large portion of this case is unripe, and only a small aspect of Plaintiffs' claims not reliant upon the pending *Erhart* or securities litigation is supported by sufficient allegations of Article III standing.

## A. Effect of the *Erhart* and Securities Actions' Current Pendency

The parties disagree as to whether the fact that the *Erhart* action has not reached final judgment (and that the judgment in the securities action is being appealed) demands

the conclusion that a derivative claim seeking damages as a result of liability in those cases is unripe.

Ripeness is a component of Article III's requirement that any suit in federal court present a case or controversy. *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 579 (1985). The doctrine is "peculiarly a question of timing," in that it operates to "prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Id.* at 580 (internal quotation marks omitted). A case is not ripe, for example, when it is contingent upon "future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 580–81 (quoting 13A C. Wright, A. Miller, & E. Cooper, Fed. Prac. & Proc. § 3532 (1984)). Though considered an independent jurisdictional requirement, ripeness "is often treated under the rubric of standing,[1] and, in many cases, ripeness coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). As such, "ripeness can be characterized as standing on a timeline." *Id.*

The intersection of ripeness and standing can be explained in part by the ripeness doctrine's requirement that adjudication of a particular matter not be dependent upon a contingent event in the future. That prohibition exists "because, if the contingent events do not occur, the plaintiff likely will not have suffered an injury that is concrete and particularized enough to establish the first element of standing." *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012) (quoting *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009)). Thus, a claim must be dismissed if it is "based solely on harms stemming from events that have not yet occurred, and may never occur, because the plaintiffs raising such [a] claim[] have not 'suffered an injury that is concrete and particularized enough to survive the standing/ripeness inquiry.'" *Id.* (quoting *Bova*,

---

[1] Article III's standing requirement is satisfied only when a plaintiff establishes (1) that she has suffered an injury in fact; (2) "causation, meaning that the injury is fairly traceable to the complained-of action"; and (3) redressability. *Epona v. Cty. of Ventura*, 876 F.3d 1214, 1219 (9th Cir. 2017).

564 F.3d at 1096–97)).

While there does not appear to be a Ninth Circuit decision on point, several district courts have found that a shareholder derivative suit is unripe to the extent the alleged injury is liability from a different pending case. In *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 922 F. Supp. 2d 445 (S.D.N.Y. 2013), *aff'd* 797 F.3d 148 (2d Cir. 2015),[2] the district court found this scenario to present an unripe case. There, shareholders brought a derivative action against directors and officers of Facebook claiming that the defendants failed to disclose that the company was experiencing a reduction in revenue growth around the time of the initial public offering of Facebook shares. *Id.* at 452. The defendants moved to dismiss the derivative case because, *inter alia*, it was unripe, arguing that "Plaintiffs' claims are expressly predicated on speculative, future harm, i.e., that Facebook will lose the civil Securities Act cases filed against it." *Id.* at 454. The plaintiffs responded that their claims were ripe because they had alleged damages that Facebook had already incurred damages as a result of "[c]osts incurred in investigating and defending Facebook and certain officers and directors in the class actions for violations of federal securities laws," "[c]osts incurred from paying any potential settlement or adverse judgment in the already eight filed class actions for violations of federal securities laws," and "reputational harm as well as damages flowing from the sale of Facebook stock by individual Facebook Defendants." *Id.* at 473–74. The district court concluded that the derivative claims were unripe because of the uncertain outcome of the securities claims. Relying on similar conclusions by other courts, the district court explained that plaintiffs would be entitled to recover on behalf of the Facebook only if the company lost the pending securities claims. *Id.* at 474. The court also rejected the assertion that reputational harm could serve as a basis for finding the case ripe, because that harm was merely speculative: the only factual allegation in the

---

[2] While the Second Circuit affirmed this district court's dismissal of this case, it expressly declined to review the district court's conclusion regarding ripeness. *Facebook*, 797 F.3d at 155 n.5.

complaint relating to reputational harm—a citation to a "Slate opinion piece" noting that Facebook "now risks being synonymous with Wall Street money-grubbing"—was insufficient to show an actual and concrete harm. *Id.* Because "Plaintiffs have not demonstrated that the alleged costs were caused by an actual corporate wrong, which is not predicated on the resolution of other litigation," the court concluded, "their claims are not ripe." *Id.* at 474–75.

In reaching that conclusion, *Facebook* relied heavily on *In re Cray Inc.*, 431 F. Supp. 2d 1114 (W.D. Wash. 2006). There, shareholders brought a derivative action against directors and officials of Cray—a computer systems company—after the company revealed that it had failed to include an auditor's opinion regarding internal controls over financial reporting, which also adversely impacted revenue results. *Id.* at 1117. The defendants moved to dismiss several counts because the alleged damages incurred by the company relating to those counts—(1) "costs incurred to carry out internal investigations of, and defend against, potential legal liability from the pending class action lawsuit," and (2) harm to Cray's "corporate image and good will that impairs [the company's] ability to raise equity capital or debt"—were "speculative and unrecoverable." *Id.* at 1133. While the district court did not categorize its ruling under the label of ripeness, it agreed with defendants that the allegations of liability-related damages allegations were "insufficient to state a claim for relief," and that the allegations relating to loss of goodwill and increased financing costs were insufficient because the only factual allegation related to such losses—that the company's "fees, interested rates and terms" of a credit agreement "were far less favorable than those that would have been available to a well managed company with established and fully functioning internal financial controls"—was conclusory. *Id.* at 1134.

*Facebook* and *Cray* both relied on *In re Symbol Technologies Securities Litigation*, 762 F. Supp. 510 (E.D.N.Y. 1991), a derivative action against officers and directors of Symbol Technologies alleging the defendants wrongfully failed to disclose adverse information about their products. *Id.* at 512–13. The district court had earlier

consolidated the derivative action with a securities fraud class action premised on the same failure to disclose. *Id.* at 512. In the derivative action, the plaintiff asserted a claim of breach of fiduciary duty as a result of Symbol having to incur costs and expenses "defending the class action litigation, or as a result of a settlement or judgment in that action" as well as suffering "a present injury in the marketplace as a result of defendants' acts." *Id.* at 513. The defendants moved to dismiss that count because it was "speculative and premature." *Id.* The district court agreed with the defendants. Even assuming that the alleged acts were unlawful, the court explained, the derivative claims relied "upon the outcome of the [separate] class action." *Id.* at 516. "Unless plaintiff alleges and proves these violations," the court explained, "defendants cannot be held liable for the costs of defending a potentially baseless suit." *Id.* Because liability had not been determined in the class action, nor had any settlement been reached, Symbol had not incurred an injury from which it could recover from the defendants; indeed, the court explained, "[s]ince both of the damages claims addressed above hinge entirely on the outcome of another pending action, this cause of action is more appropriately treated as an action for indemnification, which has not yet accrued." *Id.* at 516–17. The court also found conclusory the plaintiff's allegations that Symbol's credibility in the securities market had been undermined. *Id.* at 517. The court suggested that plaintiff "could show present injury to the Corporation by demonstrating a lessened ability to attract public capital investment, or to obtain institutional financing" and explain how that harm was "attributable to such loss of credibility in the marketplace" as a result of defendants actions, but because no such specific allegations were included in the complaint, it was insufficient. *Id.*

Several other district courts have dismissed without prejudice derivative claims similarly based on the outcome of pending litigation against the company. *See, e.g.*, *Dollens v. Zionts*, No. 01 C 02826, 2002 WL 1632261, at *9 (N.D. Ill. July 22, 2002) (concluding that (1) to the extent plaintiffs' claims were based on the company's "exposure to defending class actions," such claims were "premature" because "plaintiffs

cannot bring a derivative action to recover expenses from a pending securities action involving [the company] until the case has proceeded to a final judgment or settlement"; and (2) claims regarding the company's "integrity in the market" and "loss of goodwill" were conclusory); *In re United Telecomms., Inc., Secs. Litig.*, No. 90-2251-EEO, 1993 WL 100202, at *2–3 (D. Kan. Mar. 4, 1993) (concluding that allegations of reputational harm were conclusory and that claims of damages resulting from securities class action was unripe because it was contingent upon the outcome of that pending case, and "[c]ourts routinely dismiss claims as premature if the alleged injury is contingent upon the outcome of a separate, pending lawsuit"); *Daisy Sys. Corp. v. Finegold*, No. C 86-20719 (SW), 1988 WL 166235, at *4 (N.D. Cal. Sept. 19, 1988) (finding the case under the same circumstances unripe because "the mere filing of lawsuits cannot provide a factual predicate for alleging damages"); *Falkenberg v. Baldwin*, No. 76 Civ. 2409, 1977 WL 1025, at *4 (S.D.N.Y. June 13, 1977) (same).

At least one court, however, has found that similar allegations produced a ripe case. In *In re Rasterops Corporation Securities Litigation*, No. C 92-20115 RMW EAI, 1993 WL 476651, at *2–3 (N.D. Cal. Sept. 10, 1993), the court rejected defendant's ripeness argument because the complaint alleged facts that were not derivative of an accompanying securities action alleging insider trading: (1) damage to the company's "goodwill and reputation," which impaired the company's "ability to raise capital at reasonable and/or low cost," (2) the company was "exposed to defense costs" as a result of the securities action, and (3) the defendants' conduct caused the company to "conduct its business in an unsafe, imprudent and dangerous manner." *Id.*

This Court sides with the courts that have found derivative plaintiffs do not state a ripe claim when it is dependent on a company-adverse resolution of securities or whistleblower litigation regarding the same conduct. When a claim depends on the *future* outcome of litigation, it is by definition contingent. And as discussed above, claims alleging injury contingent on a future event are unripe. *Thomas*, 473 U.S. at 580–81; *Alcoa*, 698 F.3d at 793. The intersection of ripeness and standing, discussed above,

highlights the ripeness problem at issue here: when a derivative claim is premised on the outcome of separate litigation, the company may seek indemnification for the costs and liability of that litigation from individual officers and board members *only* if the allegations of those individuals' misconduct are proven true. *Symbol Techs.*, 762 F. Supp. at 516–17. Plaintiffs offer no persuasive argument that if BofI prevails in both the *Erhart* and securities litigation, the company will have a recourse against defendants and officers for indemnification of litigation-related costs. Or to put it in the terms utilized in standing doctrine, the company's injury—the costs and liability stemming from litigation—would be caused by, or fairly traceable to, the directors' and officers' misconduct only if it turns out that those individuals actually engaged in the misconduct alleged in the securities or whistleblower litigation.[3]

In light of this conclusion, the question this Court must ask is whether parts of Plaintiffs' claims depend on the outcome of unresolved litigation. As the ASC makes clear, they do. As noted, the ASC alleges that BofI—on whose behalf Plaintiffs sue—has been harmed by Defendants' conduct because it has resulted in "legal fees associated with the lawsuits filed against the Company for violations of the federal securities laws and for violation of the anti-retaliation provisions of Dodd-Frank and Sarbanes-Oxley by Mr. Erhart." (ASC ¶ 207(a).) The liability that BofI *may* have to pay Erhart or the securities plaintiffs will not be imposed until a future date, and Plaintiffs here offer no reason to believe—and the Court cannot imagine—that if it both result in BofI's favor,

---

[3] The Court does not share Plaintiffs' concern, voiced during the hearing, that dismissal of this aspect of their claims will create a risk that by the time the *Erhart* action concludes, this aspect of Plaintiffs' claims will be time-barred. As the *Symbol Technologies* court explained, this type of derivative claim— one that seeks recoupment of costs and liability as a result of an adverse litigation outcome—"is more appropriately treated as an action for indemnification, which has not yet accrued." 762 F. Supp. at 516–17. This is because, under Delaware law, "[a] cause of action for indemnification against a company accrues when the officer or director entitled to indemnification can be confident any claim against him has been resolved with certainty," which generally occurs "only when the underlying investigation or litigation is definitely resolved." *Scharf v. Edgcomb Corp.*, 864 A.2d 909, 919 (Del. 2004). Definitive resolution in a case where an appeal has been taken, according to the *Scharf* court, does not occur "[u]ntil the final judgment of the trial court withstands appellate review." *Id.* at 920.

any costs incurred by BofI as a result of that litigation could be recovered from Defendants.

In sum, the only way to determine whether Plaintiffs (on BofI's behalf) have a claim against Defendants as a result of costs incurred in the course of the *Erhart* and securities litigation is to wait and see how those cases end. This situation, in other words, is a prototypical contingent case. *See Clear Channel Outdoor, Inc. v. Bently Holdings Cal. LP*, No. C-11-2573 EMC, 2011 WL 6099394, at *3 (N.D. Cal. Dec. 7, 2011) ("[W]here a claim involves outcomes dependent on an uncertain event, such as the resolution of another case, courts have dismissed the claim as unripe.").[4] Because ripeness is a threshold jurisdictional issue, *Southern Pacific Transportation Co. v. City of Los Angeles*, 922 F.2d 498, 508 (9th Cir. 1990), the Court cannot consider the merits of Plaintiffs' claims contingent upon the outcome of the *Erhart* action. As a result, the Court does not reach Defendants' arguments that Plaintiffs' allegations that Defendants unlawfully terminated Erhart are insufficient. (*See* ECF No. 95-1 at 10–17.)

## B. Aspects of Plaintiffs' Claims Not Contingent on Pending Actions

Having concluded that Plaintiffs' claims relying on the outcome of pending

---

[4] The Court is not persuaded by Plaintiffs' assertion that their requests for injunctive, declaratory, and/or restitutionary relief render otherwise unripe claims ripe. To the extent that these requests are premised on potential liability resulting from the outcome of Erhart's whistleblower claims, those requests are no more ripe than their claims for damages because the theory of liability is the same. This is especially so with the request for declaratory relief, which requires that the underlying dispute satisfy Article III's ripeness requirements. *See Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) ("The limitations that Article III imposes upon federal court jurisdiction are not relaxed in the declaratory judgment context."). With respect to the allegations relating to Erhart's termination, the ASC does not allege facts that would support injunctive or restitutionary relief. There are no allegations that there is "certainly impending" harm relating to Erhart's allegedly wrongful termination that would support a claim for injunctive relief. *Davidson v. Kimberly-Clark Corp.*, ___ F.3d ___, 2018 WL 2169784, at *7 (9th Cir. May 9, 2018) (quoting *Clapper v. Amnesty Ant'l USA*, 568 U.S. 398, 409 (2013)). With respect to restitutionary relief, as explained below, the ASC alleges only four ways in which BofI has been harmed as a result of Defendants' conduct, none of which involve BofI paying funds to *Defendants*. To the extent that any appropriate restitutionary theory is stated in the ASC, it is so buried among the other 140-some pages of allegations that the Court cannot reasonably identify it.

litigation are unripe, the Court must ask whether there are allegations of "costs . . . caused by an actual corporate wrong, which is not predicated on the resolution of [the *Erhart* or securities] litigation." *Facebook*, 922 F. Supp. 2d at 474–75. If there are aspects of the litigation that are ripe and otherwise state a plausible claim for relief, the Court will dismiss the unripe aspect of the claims and proceed with any others that are properly pled.[5]

Defendants contend that the remaining aspects of Plaintiffs' claims that are not contingent upon the outcome of the *Erhart* litigation otherwise fail because they are not connected to any actual injury. Other than liability resulting from the securities fraud and

---

[5] During the hearing on this motion, Plaintiffs argued that the Court cannot "split" Plaintiffs' claims so long as one of their claims satisfy Article III's requirements. In other words, Plaintiffs argue that if one of their theories of liability satisfies Article III's requirements, the Court can adjudicate all of Plaintiffs' theories even if the others do not meet Article III's requirements. Plaintiffs' briefing on this argument consists of a footnote with two citations. (ECF No. 101 at 25 n.13.) The first citation is to *Cafasso*, 637 F.3d at 1054–55. The only potentially relevant statement in that portion of the opinion states: "[i]n reviewing the dismissal of a complaint, we inquire whether the complaint's factual allegations, together with all reasonable inferences, state a plausible claim for relief." Plaintiffs' entire explanation of the relevance of this case is: "a complaint should be upheld if plaintiff state a plausible claim for relief." (ECF No. 101 at 25 n.13.) Nothing about the cited portion of *Cafasso* or Plaintiffs' explanation supports the assertion that the Court cannot "split" Plaintiffs' claims between those over which the Court possesses subject-matter jurisdiction and those it does not. The other case cited by Plaintiffs, *Fenimore v. Regents of the Univ. of Cal.*, 200 Cal. Rptr. 3d 345, 354 (Ct. App. 2016), supports Plaintiffs' assertion under California law. There, the Court of Appeals reversed a trial court's dismissal of the plaintiffs' elder abuse claim. The court held that the plaintiffs made sufficient allegations to state a claim of elder abuse under the theory that Defendant's conduct was reckless, but not under the separately asserted theory that the same conduct was fraudulent. *Id.* The Court of Appeals explained that the trial court "should enter a new order overruling the demurrer to the elder abuse cause of action" because the trial court "may not sustain a demurrer to only a part of a cause of action." *Id.* Of course, this statement is an assertion of California procedural law. Plaintiffs do not cite any federal case stating that a district court cannot dismiss particular "aspects" of or "theories" underlying a claim over which it lacks Article III jurisdiction. That is not surprising, considering the fact that Article III's limits govern this Court's power. *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597–98 (2007) ("Article III of the Constitution limits the judicial power of the United States . . ."). To the extent that aspects of Plaintiffs' claims lay outside of those limits, this Court lacks the power to adjudicate them and cannot proceed. And even if this were not an Article III issue, federal district courts routinely dismiss aspects or theories underlying a claim, leaving remaining aspects or theories to proceed. *See, e.g.*, *Alvarez v. Hyatt Regency Long Beach*, No. CV 09-4791 GAF (VBKx), 2010 WL 11509322, at *4–5 (C.D. Cal. Jan. 5, 2010) (dismissing two of plaintiffs' three theories underlying their minimum wage and overtime claims).

*Erhart* lawsuits, the ASC alleges three ways in which Defendants' conduct has caused BofI harm: (1) loss of reputation, (2) loss of revenues and profits due to "any subsequent restatements," and (3) costs incurred as a result of BofI's internal investigation in response to Erhart's initial allegations.  (ASC ¶ 207.)

Plaintiffs' assertion that BofI has experienced a "loss of reputation and goodwill," and that a "liar's discount" will plague the company's stock in the future is too vague to support an assertion of Article III standing.  (ASC ¶ 207(b).)  The ASC fails to point to any instance in which BofI has actually been harmed as a result of the alleged reputational harm.  The ASC does not allege, for example, that Defendants' misconduct has caused BofI to have to pay more for financing it has obtained since Erhart made his allegations against BofI public.  Nor can the ASC's allegation that a "liar's discount" will harm BofI at some time in the future confer Plaintiffs with standing; it offers no reason to believe that such harm is either "actual or imminent."  *Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776, 779 (9th Cir. 2018) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)).  Without an allegation tying the otherwise nebulous loss of BofI's reputation to an event showing actual or imminent harm, that allegation of injury is insufficient to demonstrate standing in this case.  *See Facebook*, 922 F. Supp. 2d at 474 (finding the same allegation of harm insufficient); *Symbol Techs.*, 762 F. Supp. at 517 (same); *Cray*, 431 F. Supp. 2d at 1134 (same).

The next allegation of injury—"loss of revenues and profits due to any subsequent restatements"—similarly fails.  (ASC ¶ 207(d).)  That allegation is not accompanied by any reference to an actual loss of revenue or profit.  To the extent that a "subsequent restatement" may cause a loss of revenue or profit, the ASC offers no indication of when or how likely such a restatement will occur.  In other words, Plaintiffs' allegations that BofI will incur losses in the future are speculative.

However, the last allegation of injury—"amounts paid to outside lawyers, accountants, and investigators in connection with BofI's internal investigation" (ASC ¶ 207(c))—both (1) is not contingent upon the outcome of the *Erhart* or securities litigation

and (2) identifies an actual and concrete injury sufficient to support an assertion of Article III standing. This injury is not contingent on the outcome of the *Erhart* litigation because BofI has already incurred these costs, and the alleged cause of these costs is the specific misconduct that Erhart claims he observed during his time at BofI. In other words, the internal investigation was prompted not by any wrongdoing relating to Defendants' alleged retaliation against Erhart, but rather the wrongdoing that Erhart originally reported. And unlike the nebulous or speculative injuries of loss of reputation and future profits, the costs of BofI's now-completed internal investigation are concrete. As a result, the aspect of Plaintiffs' claims stemming from the costs of BofI's internal investigation are ripe and identify an injury sufficient to satisfy Article III's standing requirements.

The allegations of wrongdoing that caused BofI to engage in its internal investigation, however, represent a very small subset of the universe of wrongdoing alleged in the ASC. The ASC alleges that Erhart observed or heard about the following wrongdoing while serving as an internal auditor at BofI: (1) telemarketers failing to inform call recipients that the calls were being recorded; (2) Bar-Adon and Tolla instructing Erhart and Ball not to put any findings of wrongdoing in writing, to mark any such discussion in their reports as attorney-client privileged, and not to speak to anyone about such findings; (3) Micheletti altering BofI's "numbers"; (4) high deposit concentration risk; (5) false responses to regulators' subpoenas; (6) "potentially" unlawful loans to certain foreign individuals; (7) Garrabrants depositing third-party checks into his personal account; and (8) Garrabrants controlling BofI's largest deposit account, which was in his brother's name. (ASC ¶¶ 85–88, 107–13, 176–77.) Most of these allegations do not tie any individual defendant to these actions; rather, they assert simply that "BofI" engaged in the wrongdoing. (*See, e.g.*, ASC ¶¶ 107 (Erhart voicing concerns that "BofI had a deposit concentration risk"); 108 ("BofI responded to the SEC that it did not have any information regarding ETIA."); 111 ("BofI responded to the OCC that there were no accounts without TINs."); 112 ("Erhart discovered that BofI was

making substantial loans to foreign nationals including Politically Exposed Persons"); 113 ("Erhart believed BofI failed to disclose information to the SEC when it responded to the subpoena.").)  This lack of specificity makes it difficult to determine against whom Plaintiffs are alleging particular misconduct.  Indeed, as the ASC stands, the only actions of misconduct alleged by Erhart that point to a specific defendant as the actor are (1) Bar-Adon's and Tolla's instructing Erhart and Ball to obscure audit findings, (2) Micheletti's doctoring of "numbers," and (3) Garrabrants's account deposits.  No other defendants in this case are implicated in the misconduct Erhart allegedly observed.  Thus, the aspect of Plaintiffs' claims stemming from BofI's injury in the form of internal investigation costs are stated against Bar-Adon, Tolla, Micheletti, and Garrabrants only.

Further limiting these claims is the fact that the ASC's allegations do not support an inference that a breach of duty of candor by the Board members caused BofI's internal investigation costs.  This is because the ASC fails to allege any actionable breach of the duty of candor that occurred prior to the time of the internal investigation.  Plaintiffs' allegations of breach of the duty of candor do not pertain to statements relating to shareholder action; as a result, Plaintiffs must allege that Defendants made false statements knowingly or deliberately.  *See In re BofI Holding, Inc. S'holder Litig.*, No. 3:15-cv-2722-GPC-KSC, 2017 WL 784118, at *13 (S.D. Cal. Mar. 1, 2017) ("In cases where a board's allegedly misleading disclosures do not relate to a specific shareholder action, a shareholder plaintiff can demonstrate a breach of fiduciary duty by showing that the directors 'deliberately misinformed shareholders about the business of the corporation, either directly or by a public statement.'" (quoting *In re Citigroup Inc. S'holder Litig.*, 964 A.2d 106, 133 (Del. Ch. 2009)); *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998) ("We hold that directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty . . ." (emphasis added)).  This scienter requirement is "similar to, but even more stringent than, the level of scienter required for common law fraud."  *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 158 (Del. Ch. 2004).

The only allegations in the ASC suggesting that the Board members made knowing or deliberate misstatements about BofI are those made after Erhart's allegations of misconduct were reported to the Board. According to the ASC, the Board ordered the internal investigation after it was made aware of Erhart's allegations. (ASC ¶¶ 8, 181, 224, 226.) Thus, even assuming Defendants made false statements after the Board was made aware of Erhart's allegations might have been made deliberately, those false statements did not cause the internal investigation.

To the extent that the ASC alleges that Defendants made misrepresentations about BofI in violation of their duties of candor *prior* to the internal investigation, those allegations do not state a claim for relief because they do not allege that Defendants made such misrepresentations knowingly or deliberately. *See In re Amyris, Inc. S'holder Derivative Litig.*, 2018 WL 1242075, at *3 (N.D. Cal. Mar. 9, 2018) (dismissing similar claim because there were no allegations that the defendants "knowingly disseminated false information about the company's revenue figures"). At the hearing on this motion, Plaintiffs contested the Court's tentative conclusion that the ASC does not allege that Board members knowingly or deliberately made false statements before initiating the internal investigation. Counsel pointed to the redacted portions of the complaint and argued that those allegations demonstrate that the Board knew about, for example, BofI's lack of internal controls. The Court disagrees. The redacted allegations do not support a reasonable inference that the Board members knew of any internal control deficiencies.



[6] Plaintiffs offer no persuasive argument, and cite no case, supporting the proposition that these allegations can plead a violation of a duty of candor. The only allegations in the ASC the Court is able to find that suggest Defendants knowingly or deliberately made false statements prior to the Board's initiating the internal investigation are the following: "[t]he Individual Defendants, because of their positions of control and authority as directors and officers of BofI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein" (ASC ¶¶ 36, 49); "each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing" (*id.* ¶ 56); and the Board received regular reports from committees and officers (*id.* ¶¶ 61–63). These conclusory assertions, however, are inadequate to state a claim of breach of the duty of candor.

The Court notes that Plaintiffs are incorrect in their assertion that this Court, in the

---

[6]

3:15-cv-02722-GPC-KSC

securities action, found the same allegations sufficient to state a claim that Garrabrants knowingly made misrepresentations. The statements that this Court found actionable in that ruling appear nowhere in the ASC. With respect to statements regarding BofI's loan underwriting standards, the Court in the securities case found actionable Garrabrants's statements that BofI "continue[s] to have an unwavering focus on credit quality of the bank and have not sacrificed credit quality to increase origination," that "[s]trong loan growth was achieved while maintaining high quality credit standards," "[f]or all multifamily and commercial loans, we rely primarily on the cash flow from the underlying property as the expected source of repayment," "[e]ach loan, regardless of how it is originated, must meet underwriting criteria set forth in our lending policies," and "[w]e continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages and have not reduced our loan rates for these products." *In re BofI Holding, Inc. Secs. Litig.*, No. 3:15-cv-02324-GPC-KSC, 2017 WL 2257980, at *7 (S.D. Cal. May 23, 2017). The Court explained that these statements were false in light of confidential witness statements that BofI, *inter alia*, did not focus on cash flow when making loans, often violated the ability-to-repay rule and used conflicted appraisers, and that BofI management pressured underwriters to approve risky loans. *Id.* at *7–9. With respect to BofI's internal controls and compliance infrastructure, the Court found actionable Garrabrants's statements that BofI had "made significant investments in our overall compliance infrastructure," and had "spent a significant amount of money on BSA/AML compliance." *Id.* at *10. The Court explained that those statements were false in light of the confidential witnesses' statements that no such investments had been made, and that Garrabrants told an auditor that BofI's BSA department's "tombstone was going to read 'died understaffed.'" *Id.* In contrast to the complaint in the securities fraud litigation, the ASC here includes no such confidential witness information. Perhaps most importantly, the Court did *not*, contrary to Plaintiffs' assertion here, find that BofI's statements regarding LTV were false or misleading. *Id.* at *17–18 (explaining that the complaint's discussion of a few high-LTV

26

loans did not suggest that BofI's statements about its average and median LTV were false or misleading).

   In sum, only a very small portion of the allegations in the ASC support a ripe claim for relief supporting by adequate standing allegations.  Plaintiffs have two options in proceeding: they may (1) proceed only on the claims relating to actions by Defendants that caused BofI to investigate Erhart's allegations, or (2) seek a stay of this case until the unripe claims become ripe, at which time the Court can proceed with all of Plaintiffs' surviving claims at the same time.  Either way, the Court orders that Plaintiffs must amend the operative complaint.  The 146-page ASC, as it stands, violates Rule 8(a)'s requirement that a complaint be short and plain.  *See* Fed. R. Civ. P. 8(a).  Plaintiffs' amended complaint shall (1) be confined to relevant allegations of wrongdoing, and (2) be asserted against *only* those defendants against whom specific conduct is alleged.

## IV.   Conclusion

   For the reasons explained above, the Court concludes that a significant portion of the operative complaint is unripe or fails to allege Article III standing.  The Court DISMISSES without prejudice those aspects of Plaintiffs' claims.  One aspect of Plaintiffs' claims, however, is ripe and supported by sufficient standing allegations: that specific instances of wrongful conduct by Defendants Bar-Adon, Tolla, Micheletti, and Garrabrants caused BofI to incur costs as a result of performing an internal investigation. Because the ASC includes so many assertions that are either irrelevant or pertain to unripe claims, however, to proceed meaningfully with that aspect of Plaintiffs' claims a significant revision of the operative complaint is necessary.

   Plaintiffs may choose to (1) proceed now with the single aspect of their claims that is ripe, or (2) seek a stay of the case until the other aspects of their claims ripen.  Within 21 days of this ruling, Plaintiffs shall file an amended complaint.

   **IT IS SO ORDERED.**

3:15-cv-02722-GPC-KSC

Dated: June 7, 2018

Hon. Gonzalo P. Curiel
United States District Judge