1
2
3
4
5
6
7
8
9    UNITED STATES DISTRICT COURT

10    SOUTHERN DISTRICT OF CALIFORNIA

11

12    IN RE:                                    Case No. 3:15-CV-2722-GPC-KSC
      BOFI HOLDING, INC.
13    SHAREHOLDER LITIGATION.                   **ORDER GRANTING DEFENDANTS'**
                                                **MOTION TO DISMISS**
14
      This document relates to:
15    ALL ACTIONS.                              **[ECF No. 209]**

16

17

18         The instant matter is a shareholder derivative suit, brought by Plaintiff Andrew

19    Calcaterra, an alleged stockholder of BofI Holding, Inc. ("BofI" or "the Company"), on

20    behalf of the Company, against seven current members of BofI's eleven-person Board of

21    Directors ("the Board"), a former director, and various other company officers. The

22    claims are presented in the third amended consolidated complaint ("the TAC"). ECF No.

23    178.[1]  Plaintiff allegedly seeks to protect the Company and to recover against the

24

25    _____

26    [1] Throughout the order, the pagination for docketed documents is derived from the
      numbering generated by the ECF system.
27
                                                1
28

directors and officers who have allegedly caused damage to it through breaches of fiduciary duty, abuse of control, unjust enrichment, and the duty of honest services. TAC ¶ 1.  Individual Defendants,[2] in response, argue that Plaintiff lacks standing to bring this shareholder derivative suit because he has failed to plead "demand futility" as to a majority of the Board as it existed at the time of the TAC filing.

Before the Court is Individual Defendants' motion to dismiss the TAC.  ECF No. 209-1 ("Motion" or "Mot."). The motion is fully briefed. *See* ECF No. 215 ("Opposition" or "Opp."); ECF No. 217 ("Reply"). The nominal defendant in this case, BofI Holding, Inc., joined the Individual Defendants' motion to dismiss on the argument that the TAC does not adequately plead demand futility. ECF No. 216. The Court held a hearing on the motion on June 26, 2025. ECF No. 219.

Based upon a review of the moving papers, the applicable law, and for the foregoing reasons, the Court agrees that Plaintiff has failed to plead demand futility as to a majority of the Board and therefore **GRANTS** Defendants' motion to dismiss without leave to amend.

## BACKGROUND

### A. BofI and Defendants

Nominal Defendant BofI Holding, Inc. ("BofI") is the holding company of BofI Federal Bank, and its shares are traded on the NASDAQ. TAC ¶ 3, 5. BofI provides online consumer and business banking products. *Id.* ¶ 3. Plaintiff brought this shareholder

---

[2] The Individual Defendants are: (a) seven current members of BofI's Board of Directors: Gregory Garrabrants (CEO and BofI director), Paul J. Grinberg, Nicholas A. Mosich, James S. Argalas, James J. Court, Edward J. Ratinoff, and Uzair Dada,; (b) a former member of the Board: Theodore C. Allrich; and (c) four officers of BofI: Eshel Bar-Adon, John C. Tolla, Derrick K. Walsh, and Andrew J. Micheletti. TAC ¶¶ 37-49. John G. Burke is a former director who was named as an Individual Defendant in the TAC but passed away earlier on March 31, 2023.

2

derivative action as an alleged stockholder on behalf of BofI against BofI's seven current directors (Gregory Garrabrants, Paul J. Grinberg, Nicholas A. Mosich, James S. Argalas, James J. Court, Edward J. Ratinoff, Uzair Dada), two former directors (Theodore C. Allrich and John G. Burke), and several of BofI's officers (Andrew J. Micheletti, Eshel Bar-Adon, John C. Tolla and Derrick K. Walsh).

Until February 2017, BofI's Board of Directors consisted of nine directors, including Defendants Garrabrants, Allrich, Argalas, Mosich, Burke, Grinberg, Court, Ratinoff, and Dada. *In re BofI Holding Inc. S'holder Litig.*, No. 3:15-cv-02722-GPC-KSC, 2018 U.S. Dist. LEXIS 96155, at *3 (S.D. Cal. May 11, 2018). Allrich then resigned from the Board, and Burke passed away on March 31, 2023. *Id*; ECF No. 209-1 at 6, n.1. Currently, the Board consists of eleven directors, including seven continuing Directors (Garrabrants, Grinberg, Mosich, Argalas, Court, Dada, Ratinoff), and four new Directors (Bohlig, Carter, Santi and Wardell-Smith). ECF No. 209-1 at 6.[3]

According to the TAC, Defendants caused BofI to make false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, prospects, and performance regarding the facts that (1) the Company's internal controls were frequently disregarded; (2) BofI's borrowers included foreign nationals who should have been off-limits under federal anti-money laundering laws; (3) the Company had as many as 200 customer accounts without tax identification numbers despite telling the Office of the Comptroller of the Currency ("OCC") the contrary; (4)

---

[3] In prior orders addressing demand futility, the Court has found that four of the Individual Defendants, Garrabrants, Grinberg, Mosich, and Argalas, face a substantial likelihood of liability for their actions. The Court once again reaches this same conclusion herein. Because the current board is made up of eleven directors, to show demand futility, Plaintiff must demonstrate that six directors, that is, two additional directors, cannot be independent or face a substantial likelihood of liability.

3

BofI's statements failed to follow generally accepted accounting principles (GAAP); (5) the Company lacked adequate internal and financial controls; (6) the Board had fired an internal auditor who raised the foregoing issues to senior management and to federal regulators in violation of anti-retaliation laws; and (7) as a result of all of those conditions, BofI's financial statements were materially false or misleading. TAC ¶¶ 5, 66. The TAC asserts that Defendants were aware of these misrepresentations due to their control and authority over BofI. *Id.* ¶¶ 68-70. As a result of the Defendants' actions and course of conduct, BofI became the subject of a securities class action and a whistleblower action for which "BofI has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing." *Id.* ¶ 67.

## <u>DEMAND FUTILITY ALLEGATIONS</u>

As stated previously, Plaintiff did not make a demand on BofI's Board of Directors before filing suit, urging them to institute this action against the individual Defendants. TAC ¶ 12. Plaintiff alleges that making such a demand would have been futile because a majority of the Board of Directors (six or more directors) lacks independence or faces a substantial likelihood of liability for their misconduct, thus rendering them incapable of fairly considering a demand. *See id.*

### A. General Board Allegations

The following are demand futility allegations lodged against the Board of Directors as a whole.

#### 1. Dismissal of Erhart

On October 13, 2015, Charles Matthew Erhart, a former BofI internal auditor who had raised compliance issues to senior management and federal regulators, *id.* ¶ 6, filed a whistleblower action against BofI. *See Erhart v. BofI Holding, Inc*., No. 15-CV-02287-BAS-NLS (S.D. Cal) (the "Whistleblower Action"). The whistleblower complaint alleged widespread wrongdoing at BofI.

On October 14, 2015, shares of BofI fell $42.87, or 30.2%, to close at $99.13. TAC ¶ 7. In response, BofI issued a press release and Form 8-K explaining that the Audit Committee and Board of Directors of BofI were fully informed of the events and stating that they conducted an internal investigation, which included an examination of forensic evidence, and found that Erhart's allegations were without merit. *Id.* ¶ 9. On October 15, 2015, BofI shareholders filed a putative class action securities fraud suit against BofI and several of the defendants in this case. *Id.* ¶ 13; *In re BofI Holding, Inc. Securities Litigation*, No. 15-cv-02324-GPC-KSC (S.D. Cal) (the "Securities Class Action").

The TAC avers that the entire Board was compromised and unable to impartially consider a demand at the time of filing the complaint because they all face a substantial likelihood of liability for retaliating against Erhart in violation of Sarbanes-Oxley ("SOX"). TAC ¶¶ 9-12, 225-48. Plaintiff contends that the entire Board is responsible for violating SOX because it authorized and approved the firing of Erhart on June 9, 2015 after being "fully informed" of Erhart's protected status as a whistleblower. *Id.* ¶ 245. "All Board members…[thus] face a substantial likelihood of liability for breaching their fiduciary duties by causing the Company to violate the anti-retaliation provisions of Sarbanes-Oxley, Dodd-Frank, and other laws." *Id.* ¶ 248. In addition, Plaintiff argues the Board also faces a substantial likelihood of liability for failing to rectify BofI's unlawful activities alleged by Erhart. *Id.* ¶ 246.

Paragraphs 225 through 248 of the TAC describe the circumstances leading to the alleged termination of Erhart, and together they narrate the following sequence of events.

Erhart "brought numerous specific violations of the law by BofI senior officers, including Garrabrants, Bar-Adon, and Tolla, to the attention of the Company, in the

5

course of performing his duties as BofI's Staff Internal Auditor."[4]  *Id*. ¶¶ 235.  At some point, he informed those three officers of his "good-faith whistleblower complaints," but Garrabrants, Bar-Adon, and Tolla each "brushed aside" his concerns.  *Id*.  As a result, Erhart "lodged his complaints with the OCC and SEC."  *Id*.  He also filed a complaint with OSHA regarding the retaliation he was facing for having spoken out.  *See id*. ¶ 237.

Simultaneously, news of Erhart's allegations and audit findings were rising through the company's chain of command.  In mid-December 2014, Jonathan Ball, the Vice President of Internal Audit (*id*. ¶ 83), drafted an evaluation of Erhart's job performance.  *Id*. ¶ 238.  That performance was later revised by Tolla, who "downgraded Erhart's performance in retaliation for his whistleblowing activities."  *Id*.  Ball, who was troubled by Tolla's actions, "directly advised the Audit Committee about Tolla's downgrading of Erhart's performance evaluation."  *Id*.  Allegedly, however, the Audit Committee did not correct Tolla's conduct and, in fact, approved of it.  *Id*.  ("Upon information and belief, the Audit Committee ratified and approved the retaliation against Erhart by failing to instruct Tolla to restore Erhart's performance grade to the level determined by Ball.")

Months later, on March 12, 2015, Erhart was approached by Bar-Adon who said that he sought to speak with Erhart in his capacity as "General Counsel to the Audit

_____

[4] *See* TAC ¶ 104 (describing how Erhart internal audit found BofI callers being recorded in violation of California Penal Code § 632); *id*. ¶¶ 191-192 (stating that Garrabrants "was depositing third-party checks for structured settlement annuity payments into a personal account, including nearly $100,000 in checks made payable to third parties" and that he was "the signatory of a BofI consumer account opened in the name of his brother, Steven Garrabrants, with a balance of approximately $4 million" who was a "former minor league baseball player who signed . . . in 2003 for $50,000 per year and became a free agent in 2007"); *id*. ¶ 105 (describing how Bar-Adon instructed Erhart to "remove evidence of the violation of California Penal Code § 632 from the Structured Settlement and Lottery audit" or to otherwise mark the "entire report 'Attorney Client Privileged'").

6

1  Committee." *Id.* ¶ 239.  Based upon this encounter, Plaintiff alleges that the Audit

2  Committee had "directed Bar-Adon to meet with Erhart regarding such activities" and,

3  therefore, "had actual knowledge of Erhart's whistleblowing complaints." *Id.*

4  Thereafter, the Audit Committee met in San Diego for a formal meeting on April

5  27, 2015.  *Id.* ¶ 243.  Grinberg, Argalas, and Mosich, the three Audit Committee

6  members, were all present at the meeting, along with Micheletti, Bar-Adon, Tolla, Tony

7  de la Mora, Interim FVP of Internal Audit, and other company auditors.  *Id.*  At the

8  meeting, Plaintiff alleges that Grinberg presented to the Audit Committee all complaints

9  received by him as Chair of the Audit Committee.  *Id.*  They further allege that "[u]pon

10  information and belief, Grinberg advised the other Audit Committee members about

11  Erhart's complaints."  *Id.*

12  A number of weeks later, on May 21, 2015, the entire Board of Directors

13  convened, with all nine members present.  *Id.* ¶ 244.  According to BofI's 2015 proxy

14  statement, the Audit Committee "reports to the full Board at regular meetings concerning

15  the activities of the committee and actions taken by the committee since the last regular

16  meeting."  *Id.* ¶ 241.  Plaintiff alleges that on May 21, 2015 Grinberg "made available in

17  the Board portal a report to the full Board from the Audit Committee, which report upon

18  information and belief included additional details regarding Erhart's complaints and the

19  fact that he had claimed whistleblower protection."  *Id.* ¶ 244.

20  Plaintiff goes on to state that "at some point between March 2015 and June 9,

21  2015, despite having been "fully informed" of Mr. Erhart's whistleblowing activity and

22  despite knowing that Dodd-Frank, Sarbanes-Oxley, and other laws prohibit retaliation

23  against employees who report alleged wrongdoing, the Board authorized or approved the

24  firing of Mr. Erhart to be effective as of June 9, 2015."  *Id.* ¶ 245.

25  / / /

26  / / /

27

28

15-CV-2722-GPC-KSC

### 2. False and Misleading Statements

It is alleged that Defendants caused BofI to file with the SEC Schedule 14A Proxy Statements, including Audit Committee reports (signed by the Audit Committee members) confirming the adequacy of BofI's internal controls and the accuracy of the Form 10-K statements (signed by the Board members). *Id*. ¶ 165-66.

Plaintiff further argues that: (1) "no reasonable stockholder would reasonably believe that a majority of the members of the Board would be able to independently and properly consider a demand in good faith" because the Board violated their fiduciary obligations by approving and signing the company's SEC filings containing false and misleading statements. *Id.* ¶ 255. Specifically, the TAC avers that the entire Board wrongly approved and signed the Form 10-Ks dated September 3, 2013, August 28, 2014, and August 26, 2015, all of which contained false and misleading statements about BofI's compliance with securities and other laws.[5] *See id.*

### 3. Compensation & Participation in Mortgage-lending Program

The TAC also alleges that for purposes of demand futility, "the Director Defendants are more interested in protecting themselves than in protecting the Company by bringing this action." *Id.* ¶ 258.

In support of this allegation, Plaintiff offers each Board member's compensation for fiscal year 2015: Garrabrants, $6,310,485; Argalas, $188,210; Court, $188,210; Dada, $85,061; Grinberg, $281,133; Mosich, $253,970; and Ratinoff, $188,210. *Id.* ¶ 258. In further support of this position, the TAC contends that the independence of Argalas, Garrabrants, Grinberg, and Mosich is further compromised by the fact that each obtained a mortgage on their primary residence at below market interest rates through participation

---

[5] Defendant Dada only signed the August 26, 2015 Form 10-K as he was the most recent addition to the Board.

in BofI's mortgage-lending program, which is made available to BofI's directors, officers, and employees. *Id.* ¶ 259. "As such, Argalas, Garrabrants, Grinberg, and Mosich are more interested in maintaining their lucrative positions at BofI than they are in protecting BofI by bringing this action." *Id.*

### B. Individual Board Member Allegations

Also, in furtherance of pleading demand futility, the TAC lodges a variety of individual demand futility allegations against specific Board members based upon their roles or conduct at BofI.

### 1. Garrabrants

The TAC's demand futility allegations contend that Garrabrants, notwithstanding any allegations attributed to the Board, independently lacks independence. *Id.* ¶¶ 229-34.

Plaintiff alleges that Garrabrants lacks independence because he "prepared, signed, or caused the Company to issue many of the false and misleading statements" that Plaintiff cites in the TAC. *Id.* ¶ 232. In particular, on February 6, 2013, the Individual Defendants caused BofI to file a Form 10-Q, disclosing BofI's financial results for the quarter ending on December 31, 2012. *Id.* ¶¶ 84-86. Garrabrants and Micheletti signed the Sarbanes-Oxley certifications, which stated that to their knowledge, the filing did not "contain any untrue statement of a material fact or omit to state a material fact," that they were responsible for ensuring adequate internal controls, that the statement included any changes to BofI's internal controls over financial reporting, and that the statement disclosed any significant deficiencies and material weaknesses in BofI's internal controls or fraud involving management or other employees with a significant role in the company. *Id.* ¶ 87. The same procedure and statements were followed and made for subsequent quarterly Form 10-Q and annual Form 10-K statements, as well as press releases that accompanied those statements. *Id.* ¶¶ 88-89, 100-02, 108-25, 132-35, 140, 145, 147-52, 154-57.

Also, Plaintiff alleges that making demand upon Garrabrants would have been futile because he faces a substantial likelihood of liability for his misconduct. Garrabrants, they contend, is "a named defendant in the currently-pending federal class actions, alleging he violated § 10(b) of the Exchange Act and Rule 10b-5 when he disseminated or approved the false and misleading statements." *Id.* ¶ 230. Thus, as a principal wrongdoer in the Whistleblower action, Garrabrants cannot consider a demand in a disinterested, independent manner. *Id.* ¶¶ 230, 234.

Yet another fact demonstrating the likelihood that Garrabrants will face liability for his conduct, they argue, is the fact that "Garrabrants also participated in conference calls with analysts and investors during the Relevant Period . . . [and] therefore faces a substantial likelihood of liability for breaching his fiduciary duties." *Id.* ¶ 233.

### 2. Audit Committee Members (Argalas, Grinberg, Mosich)

The TAC singles out Argalas, Grinberg, and Mosich as particularly lacking in independence or likely to face a substantial likelihood of liability because of their conduct and duties as Audit Committee members. *Id.* ¶¶ 238-243. Plaintiff contends that the Audit Committee Defendants "had a clear duty to be kept informed about the Company's accounting procedures" but failed to do so by reviewing and approving BofI's SEC filings that contained false and misleading statements. *Id.* ¶ 257.

### 3. Grinberg

Plaintiff argues that Grinberg additionally lacked independence to consider a shareholder demand because he "breached his fiduciary duty by failing to disclose a related party transaction between BofI and his employer Encore Capital." *Id.* ¶ 260.

1

## PROCEDURAL HISTORY

2    In response to these and other allegations, Plaintiff brought this derivative action,[6]

3    seeking damages and injunctive relief. TAC ¶ 14. Plaintiff has not made any demand on

4    the Board to institute this action against the Individual Defendants because he alleges that

5    "such demand would be a futile and useless act" since at least a majority of the Board

6    lacks independence or faces a substantial likelihood of liability. *Id.* ¶ 227.

7    On September 23, 2016, Defendants moved to dismiss the consolidated complaint,

8    challenging the sufficiency of Plaintiff's demand-futility allegations under Rule 23.1 of

9    the Federal Rules of Civil Procedure. TAC ¶ 15. On March 1, 2017, the Court granted

10   Defendants' motion to dismiss and ordered Plaintiff to show cause as to why the

11   complaint should not be dismissed with prejudice. *Id.* Plaintiff requested and received

12   leave to amend, and on April 10, 2017, Plaintiff filed the First Amended Consolidated

13   Shareholder Derivative Complaint (the "FAC"), which Defendants again moved to

14   dismiss by challenging the sufficiency of Plaintiff's demand-futility allegations. *Id.* ¶ 18.

15   On August 8, 2017, the Court denied Defendants' motion to dismiss, finding that Plaintiff

16   pled sufficient facts to demonstrate that a litigation demand would have been futile as to

17   the eight-member board, as director Garrabrants "face[d] a substantial likelihood of

18   liability for breaching his fiduciary duties to the company," and directors Grinberg,

19   Mosich, and Argalas "are compromised for purposes of demand futility." *In re BofI*

20   *Holding, Inc. S'holder Litig.*, No. 3:15-cv-02722-GPC-KSC, 2017 U.S. Dist. LEXIS

21   125431, at *17, 24-26 (S.D. Cal. Aug. 8, 2017) ("*BofI II*").

22   After answering the Complaint, Individual Defendants moved on March 7, 2018

23   for judgment on the pleadings under Rule 12(c), arguing that Plaintiff's claims were

24

25

26   [6] Plaintiff filed the initial complaint on December 3, 2015 and the consolidated

27   shareholder complaint on August 26, 2016.

28

unripe due to the fact that the Securities Class Action and the Whistleblower Action had not been resolved. TAC ¶¶ 19-20. On June 7, 2018, the Court granted the Defendants' motion and dismissed a portion of Plaintiff's claims without prejudice and required Plaintiff to file a second amended complaint. *Id.*

On June 27, 2018, Plaintiff moved to stay the action pending resolution of the Securities Class Action and the Whistleblower Action. *Id.* ¶ 21. On August 21, 2018, the Court denied Plaintiff's motion. *Id.* On September 11, 2018, Plaintiff filed the Second Amended Consolidated Shareholder Derivative Complaint ("SAC"), responsive to the Court's order to file an amended complaint that limits the claims to those not contingent on the other pending actions. *Id.* ¶ 22; ECF No. 128 ¶ 2. The SAC asserted claims against Garrabrants, Bar-Adon, Tolla and Micheletti. ECF No. 128 ¶¶ 19-22. Defendants moved to dismiss under Rule 12(b)(6) and Rule 23.1, and on May 23, 2019, this Court granted the dismissal with prejudice. TAC ¶ 23.

On June 6, 2019, Plaintiff sought review in the United States Court of Appeals for the Ninth Circuit of the aforementioned three orders of this Court, i.e., (1) the June 7, 2018 order granting in part Defendants' motion for judgment on the pleadings for the FAC; (2) the August 21, 2018 order denying Plaintiff's motion to stay; and (3) the May 23, 2019 order dismissing the SAC with prejudice. ECF No. 148. On February 25, 2021, the Ninth Circuit affirmed this Court's rulings on the FAC and SAC but reversed this Court's denial of Plaintiff's motion for a stay and for leave to amend the SAC. *In re BofI Holding, Inc. S'holder Litig.,* 848 Fed. Appx. 234, 238 (9th Cir. 2021). On April 9, 2021, this Court held a hearing spreading the appeal mandate and granted the Parties' joint request for a stay of this action pending resolution of the Securities Class Action. ECF No. 156.

On October 14, 2022, the Court entered final judgment in the Securities Class Action, approving a cash settlement of $14,100,000. TAC ¶ 27. On May 18, 2022, the

1    jury in the Whistleblower Action entered a verdict in favor of the plaintiff and against

2    BofI for the sum of $1,500,000. *Id.* ¶ 28. On October 4, 2023, an amended judgment was

3    entered in the Whistleblower Action, awarding Erhart $1,500,000, post-judgment interest,

4    attorneys' fees, and costs of $2,405,559.20, and pre-judgment interest of $169,872.74

5    (totaling $4,075,431.94). *Id.* ¶ 30. On October 14, 2022, the plaintiff in the

6    Whistleblower Action moved for an award of attorneys' fees and to alter the judgment,

7    seeking, among other things, an award of attorneys' fees in the amount of up to

8    $7,346,558.75 and pre-judgment interest of $1,187,472.62. Motion for Attorney Fees,

9    *Erhart v. BofI Fed. Bank*, 3:15-cv-02287-BAS-NLS, ECF No. 384 (S.D. Cal. Oct. 14,

10   2022). On October 27, 2022, BofI moved in the Whistleblower Action for judgment as a

11   matter of law or, in the alternative, for a new trial. Motion for Judgment as a Matter of

12   Law *Erhart v. BofI Fed. Bank*, No. 3:15-cv-02287-BAS-NLS, ECF No. 386 (S.D. Cal.

13   Oct. 27, 2022). On September 28, 2023, Judge Bashant denied BofI's motion. *Erhart v.

14   BofI Fed. Bank*, No. 15-cv-02287-BAS-NLS, 2023 WL 6377971, at *1 (S.D. Cal. Sept.

15   28, 2023), *aff'd*, No. 23-3065, 2025 WL 417000 (9th Cir. Feb. 6, 2025). Judge Bashant

16   granted in part and denied in part the plaintiff's motion in the Whistleblower Action.

17   *Erhart v. BofI Fed. Bank*, No. 15-cv-02287-BAS-NLS, 2023 WL 6382460, at *21 (S.D.

18   Cal. Sept. 28, 2023). On October 23, 2023, BofI filed a notice of appeal in the

19   Whistleblower Action, seeking appellate review of Judge Bashant's rulings, including the

20   order denying BofI's motion for judgment as a matter of law and the order awarding

21   attorneys' fees. Notice of Appeal, *Erhart v. BofI Fed. Bank*, No. 3:15-cv-02287-BAS-

22   NLS, ECF No. 408 (S.D. Cal. Oct. 23, 2023).

23        On December 1, 2023, the Court lifted the stay and instructed Plaintiff to file a

24   Third Amended Complaint ("TAC"). ECF No. 192 at 2. On January 2, 2024, Plaintiff

25   filed the TAC. ECF No. 178 (sealed). On February 2, 2024, Defendants moved to dismiss

26   the TAC under Rules 12(b)(1) and 23.1 of the Federal Rules of Civil Procedure. ECF No.

27

28

181-1 at 5. Nominal Defendant BofI joined the portion of Defendants' motion under Rule 23.1. ECF No. 182. By order dated March 5, 2024, the Court denied Defendants' motion without prejudice and stayed the action pending resolution of the appeal in the Whistleblower Action. ECF No. 192. On February 6, 2025, the Ninth Circuit affirmed rulings in the Whistleblower Action. *Erhart v. BofI Fed. Bank*, No. 23-3065, 2025 WL 417000, at *1 (9th Cir. Feb. 6, 2025). On February 24, 2025, the Ninth Circuit denied BofI's petition for panel rehearing in the Whistleblower Action. *See* ECF No. 207 ¶ 21. On March 4, 2025, the Ninth Circuit issued the mandate to the District Court in the Whistleblower Action. Mandate, *Erhart v. BofI Fed. Bank*, No. 3:15-cv-02287-BAS-NLS, ECF No. 414 (S.D. Cal. Mar. 4, 2025). On March 6, 2025, the Court lifted the stay and directed Defendants to file a motion to dismiss the TAC. ECF No. 208. On April 4, 2025, Defendants moved to dismiss the TAC based on Plaintiff's alleged failure to plead particularized facts showing that, when Plaintiff filed the TAC, a majority of the Board of Directors was unable to consider a pre-suit demand in good faith. Mot. at 7.

## LEGAL STANDARD

### A. Fed. R. Civ. P 23.1

A derivative shareholder's claim allows an individual stockholder to bring "suit to enforce a corporate cause of action against officers, directors, and third parties." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)). "Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Id.* (quotations omitted) (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)).

This derivative right, however, is not absolute. Before a shareholder can act on behalf of the corporation in this manner, he or she must demonstrate "that the corporation

itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." *Id.* at 95-96 (quoting *Ross*, 396 U.S. at 534). This precondition is codified at Federal Rule of Civil Procedure 23.1:

> The complaint must be verified and must: . . . (3) *state with particularity*: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) *the reasons for not obtaining the action or not making the effort*.

Fed. R. Civ. P. ("Rule") 23.1(b)(3) (emphasis added). Rule 23.1 provides the pleading standard for measuring the factual detail present in a shareholder complaint but does not provide the substantive rule for assessing what reasons are sufficient to excuse demand on the corporation. *See Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014). That rule is supplied by the law of the state of incorporation, *Kamen*, 500 U.S. at 109, which in this case is Delaware, BofI's state of incorporation, *see* TAC ¶ 36.

**B. Demand Futility Under Delaware Law**

The Delaware Supreme Court clarified and explicated the test for demand futility in its opinion *United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1048 (Del. 2021). Before then, there were two tests under Delaware law used to determine whether a stockholder had adequately pleaded demand futility. Under the *Aronson* test, which applied where the stockholder challenged a decision by the same board that would consider the demand, the complaint had to plead facts creating a reasonable doubt that "(1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *United Food*, 262 A.3d at 1048 (citing *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984)). "The *Rales* test applies in all other circumstances." *Id*. "Under *Rales*, demand is excused as futile if the complaint alleges particularized facts creating a 'reasonable doubt that, as of the time the complaint is filed,' a majority of the demand board 'could have properly exercised its

independent and disinterested business judgment in responding to a demand.'" *Id*. (quoting *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)).

Without overruling *Aronson* and *Rales*, the Delaware Supreme Court unified the two tests into a three-prong analysis as set forth in *United Food*:

> [F]rom this point forward, courts should ask the following three questions on a director-by-director basis when evaluating allegations of demand futility: (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.
>
> If the answer to <u>any</u> of the questions is "yes" for <u>at least half of the members of the demand board</u>, then demand is excused as futile. It is no longer necessary to determine whether the *Aronson* test or the *Rales* test governs a complaint's demand-futility allegations.

*Id.* at 1059 (emphasis added).

When assessing a motion to dismiss for failure to comply with the requirements of Federal Rule 23.1 and Delaware law, a court should credit the shareholders with "all reasonable factual inferences that logically flow from the particularized facts alleged." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (quoting *Brehm v. Eisner*, 746 A.2d 244, 255 (Del.2000)). A court should not, however, take as true "conclusory allegations of facts or law not supported by allegations of specific fact." *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1079 (C.D. Cal. 2008) (internal quotations omitted) (quoting *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991)). "Conclusory allegations" are those that add "no, or only *de minimis*, substance to the

Court's demand-futility inquiry." *See Khanna v. McMinn*, No. Civ.A. 20545–NC, 2006 WL 1388744, *14 (Del. Ch. May 9, 2006). By contrast, particularized facts are "substantive allegations that are by themselves insufficient but, when viewed *in toto*, may push the analysis over the threshold of 'reasonable doubt' and thereby excuse demand." *Id.*

Delaware Rule 23.1, like its federal counterpart, requires a shareholder to plead facts with particularity, which is a more stringent standard than that required by ordinary notice pleading.  *See Brehm*, 746 A.2d at 254 ("Those pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings").  The rationale behind Rule 23.1's heightened pleading standard, the Delaware Supreme Court has noted, is two-fold:

> *Aronson* and its progeny is designed to create a balanced environment which will: (1) on the one hand, deter costly, baseless suits by creating a screening mechanism to eliminate claims where there is only a suspicion expressed solely in conclusory terms; and (2) on the other hand, permit suit by a stockholder who is able to articulate particularized facts showing that there is reasonable doubt either that (a) a majority of the board is independent for purposes of responding to the demand, or (b) the underlying transaction is protected by the business judgment rule.

*Id.* at 255 (citing *Grimes v. Donald*, 673 A.2d 1207, 1216-17 (Del. 1996)).  Cast in this light, Delaware's particularity requirement is seen not just as a rigid procedural requirement but as a substantive rule of Delaware law that requires plaintiffs to make a strong, threshold showing that making a pre-suit demand would have been futile.  *See In re Sonus Networks, Inc., S'holder Deriv. Litig*., 499 F.3d 47, 66 (1st Cir. 2007) (applying Delaware law on demand futility).

As this Court has previously noted, "the exculpatory provision in BofI's Certificate of Incorporation insulates the Director Defendants from non-intentional breaches of their fiduciary duties." *In re BofI Holding Inc. S'holder Litig.*, No. 3:15-CV-02722-GPC-KSC,

2017 U.S. Dist. LEXIS 29122, at *41 (S.D. Cal. Mar. 1, 2017) ("*BofI I*").  "[B]ecause the Director Defendants are exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the Plaintiff plead a non-exculpated claim against the Directors based on particularized facts." *Id.* (citing *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 124-25 (Del. Ch. Feb. 24, 2009)). Hence, "to demonstrate demand futility, Plaintiff must have sufficiently plead particularized factual allegations 'support[ing] the inference that the disclosure violation was made in bad faith, knowingly or intentionally.'" *Id.* (citing *In re Citigroup, Inc*., 964 A.2d at 124-25).

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc*., 957 F.2d 655, 658 (9th Cir. 1992) (quoting S*chreiber Distrib. Co. v. Serv-Well Furniture Co*., 806 F.2d 1393, 1401 (9th Cir. 1986)). "It is not an abuse of discretion to deny leave to amend when any proposed amendment would be futile." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990).

## REQUEST FOR JUDICIAL NOTICE

Generally, on a motion to dismiss, courts will limit their review to the contents of the complaint and may only consider extrinsic evidence that is properly presented as part of the complaint.  *See Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001). However, under Federal Rule of Evidence 201, a district court may take notice of facts not subject to reasonable dispute that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b). Defendants seek judicial notice of three exhibits: (1) a redline comparing the TAC (ECF No. 175) to Plaintiff's prior First Amended Consolidated Shareholder Derivative Complaint (ECF No. 65), attached as Ex. A; (2) Defendant-Appellee's Answering Brief, filed in *Calcaterra v. Garrabrants*, No. 19-55721 (9th Cir.), attached as Ex. B; (3) the

18

final jury instructions filed on May 19, 2022 in *Erhart v. BofI Fed. Bank*, No. 3:15-cv-02287-BAS-NLS (S.D. Cal.), attached as Ex. C. Request for Judicial Notice ("RJN"), ECF No. 209-2. Plaintiff does not oppose the RJN.

Exhibit A is capable of accurate and ready determination by resort to sources (namely, court filings in this case) whose accuracy cannot be reasonably questioned. Exhibits B and C are relevant to the instant case and are matters of public record, so the Court may take judicial notice of them "without converting a motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 689 (quotations and citations omitted). But the Court will not take judicial notice of the truth of any disputed facts contained in those public records. *See id*.

## DISCUSSION

### A. The Law of the Case Doctrine

When the Court of Appeals decides a legal issue in a case, whether explicitly or by necessary implication, that decision is generally not open to relitigation in subsequent proceedings in the same case. *See Leslie Salt Co. v. United States*, 55 F.3d 1388, 1392 (9th Cir. 1995) (citation omitted). This is the "law of the case" doctrine. A final Ninth Circuit decision on a legal issue becomes the "law of the case," binding upon the district court on remand, as well as upon any subsequent Ninth Circuit panel reviewing the case. S*ee In re Rainbow Magazine, Inc*., 77 F.3d 278, 281-82 (9th Cir. 1996). Although the observance of the doctrine is considered discretionary, the Ninth Circuit has stated that the prior decision should be followed unless "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Hegler v. Borg*, 50 F.3d 1472, 1475 (9th Cir.1995).

Defendants argue that the Ninth Circuit directly addressed the issue of demand futility when several Orders in this case were up on appeal. Defendants had expressly

requested the Ninth Circuit to address the Court's denial of defendants' motion to dismiss the FAC on grounds of demand futility in *BofI II*. RJN, Ex. B. at 60-67.

In finding that this Court did not err in reconsidering (and ultimately not finding) demand futility in its order granting the motion to dismiss the SAC, the Ninth Circuit asserted that "[plaintiff] did not sufficiently allege that most of the board was conflicted at the time of filing for either the FAC or SAC." *In re BofI Holding, Inc. S'holder Litig.*, 848 Fed. App'x. 234, 237 (9th Cir. Feb. 25, 2021). Relying upon this one line, Defendants then argue that "[b]ecause the FAC and TAC have nearly identical demand futility allegations… the Court should apply the law of the case doctrine to preclude plaintiff from relitigating demand futility with respect to BofI's current eleven-director Board." Mot. at 17.

On close look, Plaintiff's June 20, 2019 notice of appeal, ECF No. 148, shows that he sought review of only three orders: the June 7, 2018 order granting Defendants' motion for judgment on the pleadings (ECF No. 116); the August 21, 2018 order denying Plaintiff's motion to stay (ECF No. 125); and the May 23, 2019 order dismissing the SAC (ECF No. 146). Plaintiff did not seek review of *BofI II*, in which the Court decided that Plaintiff had sufficiently pled demand futility in the FAC. Thus, the Ninth Circuit had no occasion or reason to review the pleading sufficiency of the FAC. The Ninth Circuit has said that it "lack[s] jurisdiction over matters not included in the Notice of Appeal." *Havensight Cap. LLC v. Nike, Inc.*, 891 F.3d 1167, 1171 (9th Cir. 2018).

Defendants sought review of *BofI* II, as an "alternative ground" for affirmance. RJN Ex. B at 60. But while defendants can bring up alternative grounds to affirm a district court judgment, they cannot seek review of matters that go beyond the appellant's notice of appeal. *See Havensight*, 891 F.3d at 1171; *see also* Fed. Rule of App. Proc. 3(c).

Defendants' appellee brief strives to evaluate the Court's ruling on *BofI II*, RJN Ex. B at 60-67, but Defendants were only allowed to articulate what – if anything – exists

in the record of the three orders on appellate review that could offer an alternative ground for affirmance for those three orders. Again, the appellate panel had no jurisdiction to review the sufficiency of the FAC, as the Court's *BofI II* holding was not properly before them as a part of appellant's notice of appeal. As such, the law of the case doctrine does not apply, and the Court does not consider the Ninth Circuit's brief sentence on the sufficiency of the pleading of the FAC and SAC to be authoritative.

"[T]he Rule 23.1 demand inquiry must be assessed by reference to the board in place at the time when the amended complaint is filed," not when the original complaint was filed. *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006). In other words, shareholders permitted leave to file an amended complaint "must make a demand on the board of directors in place at that time the amended complaint is filed or demonstrate that demand is legally excused as to that board." *Id*. Previously, when this Court examined Defendants' motion to dismiss the first amended complaint, it assessed whether Plaintiff's demand futility allegations impugned four directors of BofI's eight-person Board. *BofI Holding, Inc*., No. 3:15-cv-02722-GPC-KSC, 2018 U.S. Dist. LEXIS 96155, at *11 (S.D. Cal. June 7, 2018). Here, however, the Court's analysis will be distinct because the composition of the Board has changed.

As of the time of the filing of the TAC, there are eleven Board members, seven of which are named defendants in this case. To establish demand futility, Plaintiff needs to plead particularized facts that at least six of the directors of the Board were incapable of exercising their independent business judgment with regards to Plaintiff's claims because they lacked independence or faced a substantial likelihood of liability.

**B. Demand Futility**

Defendants move to dismiss the TAC because it fails to plead demand futility with particularity as required by Rule 23.1 and Delaware law. In their opposition to Defendants' motion to dismiss, Plaintiff advances three main theories of demand futility.

One, that it would have been futile to make a demand on the Board because the entire Board engaged in bad-faith conduct by firing Charles Matthew Erhart, an alleged whistleblower, in violation of the Sarbanes-Oxley Act and other laws protecting whistleblowers. Opposition at 14-22. Two, that demand would have been futile because all the Director Defendants face a substantial likelihood of liability for causing BofI to disseminate false or misleading statements. *Id.* at 22. And three, that demand would have been futile because a majority of the Board was conflicted because of their compensation and because a majority of them received a mortgage from BofI at below-market rates. *Id.* at 24, 26. For the following reasons, the Court rejects each of these arguments and concludes that Plaintiff has failed to meet their demand futility burden.[7]

### 1. Board's Dismissal of Erhart

Plaintiff's principal argument is that demand is futile as to all Director Defendants, including Court, Dada, and Ratinoff, because they knowingly violated anti-retaliation laws by approving the wrongful termination of Erhart and retaliatory actions against him. Opposition at 18-19.

Defendants contend that the new allegations in the TAC cannot plausibly support the inference that a majority of the current board cannot validly exercise its business judgment with respect to plaintiff's derivative claims. Mot. at 22. Delaware's business

---

[7] The Court's analysis focuses on these three arguments because they are the only demand futility allegations and arguments directed at all of the Director Defendants. Although Plaintiff's complaint and opposition contain other arguments as to why certain Board members — namely, Garrabrants, Grinberg, Mosich, and Argalas — are conflicted for demand purposes, those arguments are insufficient to carry Plaintiff's burden because they only individually address four of the eleven current board members. Meanwhile, Plaintiff does not lodge any specific demand futility allegations against Court, Dada, or Ratinoff. Because demand futility requires that Plaintiff demonstrates that a majority of BofI's Board of Directors were not independent or disinterested, the Court's inquiry focuses on these three generalized arguments.

judgment rule embodies the "acknowledgement of the managerial prerogatives of Delaware directors" and the "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). Courts should not assume that a Board-approved transaction "is a wrong to the corporation." *Id.* at 814. It is, therefore, incumbent upon the shareholders challenging board action to rebut the presumption that a board transaction is the result of sound judgment. *See id.* at 812.

The business judgment rule is not, however, unqualified. *Maldonado v. Flynn*, 413 A.2d 1251, 1257 (Del. Ch. 1980), *overruled on other grounds by Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981). Notably, it does not protect fraudulent, illegal, or reckless decisions made by the board's directors. *Id.* Accordingly, a board's decision to act illegally will always satisfy the demand futility standard because such a decision does not enjoy business judgment protection, as it necessarily contravenes the board's duty of loyalty to the company.

The jury verdict in the Whistleblower Action found that Erhart proved that he was wrongfully terminated, that BofI made defamatory statements about him, and that BofI failed to prove that the same personnel action would have been taken in the absence of Erhart's whistleblowing activities. TAC, Ex. 3 (Jury Verdict, *Erhart v. BofI Fed. Bank*, No. 15-cv-02287-BAS-NLS) at 155-56. As such, this Court accepts that termination of employment and defamation constituted retaliation against Erhart. However, Plaintiff must still plead with particularity how Court, Dada or Ratinoff actively participated in the decision to terminate Erhart's employment or defame him. While Plaintiff need not go "one by one through [the Board's] ranks" to evaluate demand futility for each officer or director, *see Rosenbloom v. Pyott*, 765 F.3d 1137, 1151 n.13 (9th Cir. 2014), he must still plead with particularity.

The key inquiry for the Court is whether or not Plaintiff's particularized allegations give rise to a reasonable inference that the Board fired Erhart and acted illegally. Here, the TAC alleges with particularity how Erhart's complaints travelled up the corporate chain and into the boardroom. According to the complaint, Erhart, in his capacity as a Staff Internal Auditor, uncovered and witnessed several alleged violations of the law committed by CEO Gregory Garrabrants, Eshel Bar-Adon, and John Tolla, Erhart's manager. TAC ¶ 235. Erhart related his concerns to Garrabrants, a board member, Bar-Adon, and Tolla, but they were "brushed aside." *Id.* Plaintiff alleges that in mid-December 2014, Jonathan Ball, the Vice President of Internal Audit (*id.* ¶ 83), drafted an evaluation of Erhart's job performance. *Id.* ¶ 238. That performance was later revised by Defendant Tolla, who "downgraded Erhart's performance in retaliation for his whistleblowing activities." *Id.* Ball, who was troubled by Tolla's actions, then "directly advised the Audit Committee about Tolla's downgrading of Erhart's performance evaluation." *Id.* That the Audit Committee was apprised of Erhart's allegations was further reinforced by the fact that Bar-Adon "met with Mr. Erhart and told him he was acting as General Counsel to the Audit Committee." *Id.* ¶ 239.

The particularized allegations, and the reasonable inferences drawn from them, demonstrate that the Audit Committee, at the very least, ratified the decision to retaliate against Erhart. The Audit Committee had direct knowledge not only of Erhart's whistleblowing activities but of the fact that Tolla, BofI's Executive Vice President and Chief Financial Officer, had "downgraded" Erhart's 2014 performance evaluation. *Id.* ¶ 238. According to the TAC, the Audit Committee Defendants also "directed Bar-Adon to meet with Erhart" regarding his whistleblowing activities, as was evidenced by the fact that Bar-Adon approached Erhart on March 12, 2014 in order to speak with him in his capacity as "General Counsel to the Audit Committee." *Id.* ¶ 239. That the Audit Committee Defendants knew that a BofI officer had "downgraded" Erhart but did nothing

to restore Erhart's performance evaluation or to prevent his firing on June 9, 2015, gives rise to the reasonable inference that Grinberg, Mosich, and Argalas ratified retaliation against Erhart. *See Rosenbloom v. Pyott*, 765 F.3d 1137, 1153 (9th Cir. 2014).

The Court also finds that there are sufficient particularized facts from which it can reasonably infer that the entire Board had *knowledge* of Erhart's complaint and whistleblowing activities. Plaintiff alleges that at a Board meeting on May 21, 2015, "Grinberg made available in the Board portal a report to the full Board from the Audit Committee, which report *upon information and belief* included additional details regarding Erhart's complaints and the fact that Erhart had claimed whistleblower protection." TAC ¶ 244. (emphasis added). The Court finds that this allegation is sufficiently substantiated by the fact that, according to BofI's 2015 Proxy Statement, the Audit Committee "reports to the full Board at regular meetings concerning the activities of the committee and actions taken by the committee since the last regular meeting." *Id.* ¶ 241. Thus, because BofI's own disclosures indicate that the Audit Committee reports to the full Board concerning all actions taken since the last Board meeting, the Court finds it reasonable to infer that the Audit Committee informed the Board about what it had learned about Erhart's audit findings, his complaints, and the downgrading of his job performance.

But even taking as true the allegation that the entire Board became aware of Erhart's complaint and whistleblowing activities on May 21, 2015, it is nonetheless unreasonable to infer, based on the particularized facts alleged, that the majority of the Board — much less the entire Board — collectively decided to fire Erhart. The only Erhart-related allegations attributed to the entire Board state the following:

1) the October 15, 2015 press release and Form 8-K state that the Board had been "fully informed of the events involving audit team members immediately after their occurrence in March 2015",
2) "[t]he full Board met a few weeks later, on May 21, 2015"
3) "[a]ll nine members of the Board…were present in person"

4) "Grinberg made available in the Board portal a report to the full Board from the Audit Committee…includ[ing] additional details regarding…Erhart's complaints and the fact that Erhart had claimed whistleblower protection."

5) "at some point between March 2015 and June 9, 2015, despite having been "fully informed" of Mr. Erhart's whistleblowing activity, and despite knowing that Dodd-Frank, Sarbanes-Oxley, and other laws prohibit retaliation against employees who report alleged wrongdoing, the Board authorized and approved the firing of Erhart, to be effective as of June 9, 2015."

TAC ¶¶ 196, 244-245. None of these allegations plausibly allege that the full Board fired Erhart. While Plaintiff alleges, on information and belief, that at some point between March 2015 and June 9, 2015 the Board unlawfully authorized or approved the firing of Erhart effective June 9, 2015, there are no facts which particularly support the allegation. As the Court previously held, the conclusion that the Board of Directors fired Erhart on June 9, 2015 does not "logically flow," *Rosenbloom*, 765 F.3d at 1148, from particularized facts demonstrating that the Board was aware of Erhart's complaint and whistleblowing activities. *In re BofI Holding, Inc. S'holder Litig.*, No. 3:15-cv-02722-GPC-KSC, 2017 WL 784118, at *11 (S.D. Cal. Mar. 1, 2017). Nor does the repeated claim that the Board was "fully informed" of the events involving Erhart supply particulars as to what the Board knew or whether the Board ratified the firing of Erhart. Even though Plaintiff summarily claims that "the trial in the Whistleblower Action revealed evidence of approval by the entire Board, including Court, Dada, and Ratinoff, to retaliate against Mr. Erhart," Opposition at 18, the TAC and the Opposition lack specific facts to supports this claim. The TAC adds no particularized allegations detailing what the Board learned and what occurred after the Board learned of Erhart's whistleblowing activities.

Plaintiff points to the reasoning in *Rosenbloom* as supporting his position on demand futility. But the analysis is incomplete and provides few parallels to the case at bar. The wrongdoing at issue in *Rosenbloom* involved the alleged promotion of Botox

26

for off-label purposes — meaning, for the care of symptoms other than the ones that the FDA approved the drug to treat. *Rosenbloom*, 765 F.3d at 1141. There was no question that Botox was being prescribed for off-label purposes (i.e., purposes other than ones approved by the FDA) and, thus, the case's central dispute concerned whether the board was rightfully deemed responsible for the off-label use of its product. Accordingly, for purposes of pleading demand futility, the *Rosenbloom* inquiry focused on whether the plaintiffs had adequately alleged scienter such that that the court could reasonably infer that the board participated or tacitly ratified the off-label scheme, thus making them incapable of impartially considering a shareholder demand. *Id.* at 1151.

Ultimately, the Ninth Circuit held that plaintiffs had met their burden by pleading "a battery of particularized factual allegations" that raised red flags sufficient to "support an inference at this stage of the litigation that the Board knew of and did nothing about illegal activity." *Id.* at 1152. Those red flags included: (1) the Board's decision to adopt strategic plans to maximize sales of the drug for off-label use before the FDA was slated to approve the drug for such uses; (2) that the Board closely and regularly monitored off-label Botox sales; (3) the Board's decision to fund organizations under their control that promoted off-label use of Botox; (4) Allergan's acquisition of a company that afforded Botox sales specialists access to physicians who would prescribe Botox for off-label purposes; (5) the Board's interest in Allergan's off-label sales programs that were spearheading the unlawful marketing; (6) the Board's receipt of data "directly linking Allergan's sales programs to fluctuations in off-label sales;" (7) the fact that the Board had received repeated FDA warnings about the illegal promotion of Botox; (8) the fact that "the illegal conduct in th[e] case involved one of the most important drugs at Allergan;" and (9) the fact that the illegal conduct persisted for over a decade and involved several divisions at Allergan. *Id.* at 1152-54.

Here, there is no "battery of particularized allegations that strongly support[] an inference . . . that the Board knew of *and did nothing about illegal activity*."  *Id*. at 1152 (emphasis added).  For one, there were no warnings from federal regulators.  Although the Erhart complaint revealed that he notified the SEC on February 20, 2015 regarding a "suspicious" customer and provided the OCC with documentary evidence that supported his allegations of wrongdoing by BofI in March 2015, there are no allegations that either the OCC or SEC took remedial actions based upon the allegations against BofI as of the date of the filing of the TAC.[8]  All that Plaintiff has alleged with particularity is that the Board became aware of Erhart's audit findings and whistleblower complaint and thereafter did not report the complaint to the SEC or rehire Erhart.  TAC ¶ 245-46.  Based on these allegations, Plaintiff argues that the Court can infer that the Board fired Erhart, that the Board deliberately disregarded or negligently did not investigate his audit findings, and that the Board knowingly misled the public to believe that the company was on sound legal footing when in fact it was aware that Erhart was correct when he reported that illegal activity was rampant at the bank.  These conclusory allegations are neither particularized or sufficient to support an inference that the Board fired Erhart or that it ratified illegal conduct. *See In re First Solar*, No. CV-12-00769-PHX-DGC, 2016 WL 3548758, at *13 (D. Ariz. June 30, 2016) (refusing to find that plaintiffs were entitled to demand futility under *Rosenbloom* because they did not allege enduring or pervasive

---

[8] Among the claims that Erhart made against BofI was that the Company had as many as 200 customer accounts without tax identification numbers despite telling the Office of the Comptroller of the Currency ("OCC") otherwise.  Meanwhile, at the October 2015 conference call, Garrabrants confronted these allegations and reported that BofI had sent a spreadsheet with a review of around 150 non-resident alien loans that did not have TINs. ECF 174 at 108.

misconduct or that that board was warned by government agencies about the alleged misconduct).

Further, the TAC does not state what, if any, actions were taken by the Board or point to any pattern of behavior occurring after May 21, 2015 that would indicate that the Board remained consciously inactive after learning of Erhart's findings or, to use Plaintiff's words, that they "declined to inform themselves of the misconduct" alleged by Erhart. In addition, Plaintiff fails to particularly allege what the Board (and specifically, Court, Ratinoff and Dada) actually knew and believed between March and June 9, 2015 that supports an inference that they failed to implement controls or consciously disregarded such controls. It is unreasonable to impute conscious disregard to Court, Ratinoff, and Dada, especially given that the internal investigation was not concluded, and relevant details were not shared with them until the report on the investigation was made available on May 21, 2015. TAC ¶ 244. Further, allegations of conscious disregard are belied by the October 15, 2015 BofI press release which reports "[a]n internal investigation was conducted, including an examination of forensic evidence, and the complaints of the former audit team member were found to be without merit." TAC ¶ 196. Plaintiff does not allege that the internal investigation was inadequate or a subterfuge to conceal wrongdoing by BofI. The Court thus rejects Plaintiff's attempt to rely on Directors Court, Ratinoff and Dada's mere knowledge of the whistleblowing activities as evidence of their conscious disregard of BofI's wrongdoing related to Erhart or the lack of insufficient internal controls.

Unlike *Rosenbloom*, where the court found that the board's knowledge of illegal activities made it reasonable to infer that the Board participated in—or at the very least ratified—those illegal activities, here, Plaintiff is asking the Court to infer that the Board's knowledge of Erhart's complaint necessarily made them act illegally, that is, by firing him. Even assuming that the TAC pleads enough to conclude that Director

15-CV-2722-GPC-KSC

Defendants Garrabrants, Grinberg, Mosich, and Argalas had a motive to fire Erhart, the complaint contains no specific allegations whatsoever as to Court, Dada, or Ratinoff.  *See Jones ex rel. CSK Auto Corp. v. Jenkins*, 503 F. Supp. 2d 1325, 1334 (D. Ariz. 2007) (refusing to hold an Audit Committee liable for participating in the issuance of false financial statements because the complaint did not detail how the committee learned of the challenged transaction, who presented the information to them, when, and "*how the committee members' response or lack thereof rendered them active participants in . . . wrongdoing*") (emphasis added).  For instance, Plaintiff has presented no allegations indicating that Court, Dada, or Ratinoff had a reason to ignore or bury Erhart's audit findings or demonstrated that Dada, Court, or Ratinoff actually voted to terminate Erhart, ratified a decision to terminate Erhart, or remained consciously inactive with regards to Erhart's impending dismissal.

By way of comparison, in *In re Veeco Instruments, Inc. Sec. Litig.*, the plaintiffs successfully argued that the audit committee would face a substantial likelihood of liability for failing to investigate a whistleblower complaint by pointing to the fact that violations raised by the whistleblower continued to occur after they were brought to the committee's attention.  434 F. Supp. 2d 267, 277-78 (S.D.N.Y. 2006).  Such repeated violations, the court concluded, supported the inference that the committee permitted the additional violations to occur because a later violation suggests that the whistleblower reports had been disregarded.  *Id.* at 278.  Here, however, the complaint does not adequately allege that any of the violations that Erhart raised in his whistleblower complaint continued to occur after the Board became aware of his audit findings.

In his TAC and Opposition, Plaintiff seeks to demonstrate continued violations and a pattern of retaliation by relying on a lawsuit filed by Veronica Golub, a former BofI employee who was terminated in May 2015 and made whistleblower allegations against BofI that were purportedly "strikingly" similar to Erhart.  TAC ¶¶ 159, 218-19;

Opposition at 16-17. While Plaintiff gives much credence to these allegations, Plaintiff failed to inform the Court that an arbitrator ruled in favor of BofI as to these "strikingly" similar allegations in 2018 and found, among other things, that Golub had failed to prove a causal nexus between her termination and any alleged "protected activity" on her part. *Golub v. BofI*, No. 18STCP03138, 2018 WL 10076337 (Cal. Super. May 22, 1018). Ultimately, the *Golub* case provides no support to the claim that the Board was consciously inactive in their response to claims of retaliation.

Beyond the TAC's shortcomings, the Erhart complaint itself which has been frequently cited by Plaintiff does not implicate the Board of Directors in the decision to fire him. *See generally* Erhart Complaint, *Erhart v. BofI Fed. Bank*, 15-cv-02287-BAS-NLS, ECF No. 32 (Nov. 17, 2016). Erhart's whistleblower complaint does not state, let alone suggest, that the Board of Directors had anything to do with his termination or misreported material information to the SEC. Notably, Erhart's complaint also does not even mention Court, Dada, or Ratinoff or implicate their participation in his dismissal in any way. *See generally id*. In fact, Erhart's complaint repeatedly describes BofI's upper management, not the Board of Directors, as the culprits of wrongdoing.

Meanwhile, Delaware courts have oft observed that plaintiffs who file shareholder derivative suits should take advantage of 8 Del. C. § 220, "which permits a stockholder . . . to obtain in a summary proceeding an order permitting inspection of specific books and records," in order to file complaints that meet Delaware's particularized pleading standard. *Rales v. Blasband*, 634 A.2d 927, 931 n.4 (Del. 1993); *see also Brehm v. Eisner*, 746 A.2d 244, 266-67 (Del. 2000). Here, Plaintiff acknowledged having followed such advice and filed a demand to inspect BofI's books and records. *See* ECF No. 55 at 10; *see also* TAC ¶ 1(c) (TAC allegations based on "documents produced by BofI in response to Plaintiff's inspection demand"). Given that Plaintiff made a books and record demand on Defendants, without more, the Court cannot accept as true

conclusory allegations that the Board met or conferred outside of board meetings to ratify or affirm Erhart's termination, without meeting minutes and with no paper trail of what was discussed.

In sum, Plaintiff's conclusion that the Board fired Erhart on June 9, 2015 is not supported by substantive, particularized allegations that, when viewed *in toto*, demonstrate that Court, Dada, or Ratinoff engaged in bad-faith or illegal conduct.  As *Aronson* indicates, absent particularized allegations demonstrating that the defendants breached an underlying fiduciary duty (in this case the duty of loyalty), it is not enough to simply plead that the director defendants knowingly participated in illegal activities.  *See Aronson v. Lewis*, 473 A.2d 805, 817 (Del. 1984).  Here, other than learning of Erhart's whistleblower allegations, there is no evidence to suggest that a majority of the Director Defendants breached their duties of loyalty to the corporation by firing Erhart in violation of SOX and other laws.  Plaintiff does not discuss what occurred after May 21, 2015 and points to no facts, let alone particularized facts, from which the Court can reasonably infer that a majority of the Board responded to the news of Erhart by acting illegally and in bad faith by firing him.  Accordingly, Plaintiff's allegation that the Board fired Erhart is conclusory and is insufficient to plead demand futility.

### 2.  Lawsuits against Erhart and his Family

Several days after Erhart filed the Whistleblower Action alleging retaliation against him, BofI filed countersuit against Erhart. After consultation with BofI's internal and external lawyers, the Board authorized lawsuits against Erhart's mother and former partner for the alleged "purpose of retaliating against Erhart and harassing and intimidating him and his family." TAC ¶ 247.  The allegation is cited as retaliatory action taken in bad faith by the Board and formed a basis of the Erhart's jury finding of retaliation. *Id.*

This allegation purportedly relies on the Whistleblower trial testimony of Garrabrants. However, a review of Garrabrant's testimony does not support the allegation that the full Board authorized such lawsuits or that Court, Dada and Ratinoff were involved in approving them. *See Erhart v. BofI Holding, Inc*., No. 15-cv-02287-BAS, ECF No. 296, at 73, 76-77, 97-98, 125-26 (S.D. Cal. May 6, 2022). There is no testimony that the full board authorized any lawsuits. Instead, the cited testimony demonstrates that Garrabrants learned that Erhart had taken a company laptop, which was believed to contain Erhart's audits, and was advised by in-house and outside attorneys that "we needed to get the (audit) documents back and that she refused to give them back." *Id*. at 77. As to the decision to sue Erhart's mother and girlfriend, Garrabrants testified that he made the decision after they refused to return the confidential information and that the action was dropped after the information was returned. *Id*. at 76-77.

Further, unlike Garrabrants, who Plaintiff alleges had participated in document preparation for the criminal prosecution against Erhart and consulted BofI's lawyers regarding the lawsuits against Erhart's family, Plaintiff fails to provide particularized facts to show that Court, Dada, or Ratinoff were personally involved in these lawsuits. TAC ¶ 247. Plaintiff again provides only general descriptions showing that Court, Dada, or Ratinoff were part of the Board that authorized these lawsuits, without specifying to what extent they were involved in the decision-making process. *Id*. ("the Board permitted BofI to countersue Mr. Erhart and . . . his mother and girlfriend, to threaten Mr. Erhart with criminal prosecution, and to accuse him of colluding with short-sellers . . . the Board . . . authorized BofI to sue Erhart's mother and girlfriend . . ."); TAC ¶ 248 ("All Board members (including . . . Court, Dada, Ratinoff . . .) face a substantial likelihood of liability for . . . causing BofI to violate the anti-retaliation provisions of Sarbanes-Oxley, Dodd-Frank, and other laws").

15-CV-2722-GPC-KSC

Moreover, although the Ninth Circuit held that evidence of BofI's lawsuits against Erhart's family were admissible as they were "relevant to BofI's retaliatory intent because the jury could infer . . . harbored animus toward Erhart," *Erhart v. BofI Fed. Bank*, No. 23-3065, 2025 U.S. App. LEXIS 2719, at *5 (9th Cir. Feb. 6, 2025), evidence of general litigative hostility is not enough to show demand futility, *cf. Brehm v. Eisner*, 746 A.2d 244, 257 n.34 (Del. 2000) (finding demand is not necessarily futile just because the directors would have to sue themselves, "thereby placing the conduct of the litigation in hostile hands"). Further, the court overseeing the Whistleblower Action held that "post-employment conduct is not actionable for the retaliation element of Erhart's claims" because they did not occur during the course of employment. *Erhart v. BofI Holding, Inc.*, No. 15-cv-02287-BAS-NLS, 2022 U.S. Dist. LEXIS 6481, at *4 (S.D. Cal. Jan. 12, 2022). Hence, the lawsuits against Erhart and his mother and girlfriend do not constitute retaliation like the termination of employment and defamation. If BofI's post-employment conduct is not actionable for Erhart's whistleblower claims, then the Board (even assuming a majority of the Board authorized these lawsuits) does not face any substantial likelihood of liability for pursuing litigation against Erhart, his mother, and his partner.

The Court concludes that the alleged retaliatory actions approving lawsuits against Erhart, his mother, and his girlfriend are relevant only on the issue of intent and that the TAC fails to plausibly and particularly allege that the Director Defendants participated in these decisions.

### 3. Issuance of False and Misleading Statements

Plaintiff alternatively argues that demand is futile because all of the Director Defendants face a substantial likelihood of liability for causing BofI to disseminate false and misleading statements regarding BofI's internal controls and risk management. *See* Opposition at 22-25.

To demonstrate that a board faces a substantial likelihood of liability sufficient to excuse demand, the shareholders must make a "threshold showing, through the allegation of particularized facts, that their claims have some merit." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1149 (9th Cir. 2014) (citing *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)). Here, the underlying claim is that the Board breached their duty of candor by knowingly issuing false and misleading statements in its regulatory disclosures. *See* TAC ¶ 190. Accordingly, Plaintiff is required to show that his claim that the Board breached their duty of candor has some merit.

The duty of candor, derived from the fiduciary duties of care, loyalty, and good faith, requires boards of directors to disclose all material facts when seeking stockholder action. *See Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998). "The essential inquiry in such an action is whether the alleged omission or misrepresentation is material," and "[m]ateriality is determined with respect to the shareholder action being sought." *Id.* at 12.

In cases where a board's allegedly misleading disclosures do not relate to a specific shareholder action, a shareholder plaintiff can demonstrate a breach of fiduciary duty by showing that the directors "*deliberately* misinformed shareholders about the business of the corporation, either directly or by a public statement." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 133 (Del. Ch. 2009) (emphasis in original) (quoting *Malone*, 722 A.2d at 14). What a shareholder must prove in a suit against director defendants protected by an exculpatory provision is even more exacting. *See id.* at 124-25. Here, the exculpatory provision in BofI's Certificate of Incorporation insulates the Director Defendants from non-intentional breaches of their fiduciary duties. *See BofI S'holder Litig. I*, No. 3:15-CV-02722-GPC-KSC, 2017 U.S. Dist. LEXIS 29122, at *41. Accordingly, in order to demonstrate demand futility, Plaintiff must have sufficiently pled particularized factual allegations "support[ing] the inference that the disclosure

violation was made in bad faith, knowingly or intentionally." *Id.*; *see also In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1016 (N.D. Cal. 2015).

Plaintiff argues that all the Director Defendants face a substantial likelihood of liability for causing BofI to disseminate false and misleading statements regarding BofI's underwriting practices, internal controls, related party transactions, and risk management in violation of their duty of candor.  Opposition at 22, 24.  In taking this position, he relies on the fact that (1) "this Court found in *In re BofI Holding, Inc. Securities Litigation*…that BofI made false and misleading statements regarding its underwriting practices and internal controls" and (2) the Director Defendants approved BofI's Forms 10-Q and Forms 10-K, in which BofI confirmed the adequacy of internal controls despite the fact that Erhart's audit findings revealed "internal controls at BofI were inadequate." *Id.* at 22, 24.  For the reasons stated below, the Court finds neither of these arguments persuasive.

First, the parallel that Plaintiff draws between this shareholder demand suit and the related securities litigation lawsuit brought against BofI is misplaced.  Here, this Court did not find that a strong inference of scienter attached to a majority of BofI's board of directors for purposes of pleading a securities fraud claim.  In fact, the Court only held that the plaintiffs had pled scienter with particularity as to Garrabrants.  *See In re: BofI Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324-GPC-KSC, 2016 WL 5390533, *12-14 (S.D. Cal. Sept. 27, 2016).  Accordingly, the securities fraud suit pending against BofI proves very little here because it only found that a single board member knowingly issued false and misleading statements, as opposed to a majority of them.  Thus, because the BofI securities fraud suit did not find that a strong inference of scienter attached to any of the ten remaining director defendants, the outcome of that suit has virtually no probative value in the demand futility context, except as to Garrabrants.

Second, Plaintiff contends that all the Director Defendants approved Forms 10-K and 10-Q allegedly contained false and misleading statements about BofI's condition, and the adequacy of its internal controls. *See* Opposition at 22.  Plaintiff offers the conclusory allegation that "evidence of inadequate internal controls" demonstrate that the Director Defendants knowingly caused BofI to issue false and misleading statements.  *Id*. at 25.

Plaintiff, however, has not pointed to any evidence suggesting that Court, Dada, or Ratinoff would have known that there were false and misleading statements contained in any of Forms 10-K or 10-Q.  Plaintiff summarily relies on the *Erhart* and *Golub* whistleblower complaints as demonstrating that the SEC statements were false.  TAC ¶¶169, 176, 183, 190.  Such summary allegations are insufficient to identify the false or misleading statements or plausibly aver that Court, Dada or Ratinoff made any misstatement knowingly, intentionally, or in bad faith.  *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 124-25 (Del. Ch. 2009).  Contrary to what Plaintiff argues, he has not pled specific facts that a majority of the Board was involved in the issuance of false or misleading statements.

Beyond the conclusory allegation of "inadequate internal controls", Plaintiff has relied on the *Golub* Whistleblower action to support this claim.  Plaintiff points to the *Golub* case as one that disclosed BofI's engaged in lax lending practices and inadequate controls. *See* Opposition at 24.  Golub reportedly alleged that BofI retaliated against her for reporting significant deficiencies in BofI's underwriting practices. *Id*.  However, Plaintiff has once again failed to inform the Court of the outcome of the *Golub* case. There, after reviewing the evidence and hearing the testimony of the witnesses presented, the *Golub* arbitrator concluded there was no evidence BofI was engaged in "fraudulent" and/or "illegal activity. *Golub v. BofI*, No. 18STCP03138, 2018 WL 10076337 (Cal. Super. May 22, 1018).

15-CV-2722-GPC-KSC

Courts have routinely rejected the notion that board members can be presumed substantially liable for misconduct occurring at the company absent particularized allegations evidencing that the Board knew about the illicit activities. *See Guttman v. Huang*, 823 A.2d 492, 504 (Del. Ch. 2003); *In re Verifone Holdings, Inc. S'holder Deriv. Litig.*, No. C 07–06347 MHP, 2009 WL 1458233, *8 (N.D. Cal. May 29 2009) ("It is conclusory to state that the directors knew about the internal problems in accounting. . . [t]hese facts suggest at most that there were weaknesses in the accounting division . . . not that the directors were conscious of the fact that they were not doing their jobs."). Thus, because Plaintiff has not set forth any allegations demonstrating that the majority of the Board should have known about any wrongdoing before May 21, 2015, the Court cannot reasonably conclude that a majority of the Board faces a substantial likelihood of liability for making false or misleading statements in a Form 10-K or Form 10-Q because Plaintiff has failed to particularly plead, any false or misleading statement. *See In re Citigroup*, 964 A.2d at 133-34 (finding, in part, that plaintiffs failed to meet the factual particularity standard because they did not "allege with particularity which disclosures were misleading . . . what specifically the Company was obligated to disclose, and how the Company failed to do so").

In its prior August 8, 2017 Order, the Court found Plaintiff had presented particularized facts that a demand upon Garrabrants would have been futile because he already faces a substantial likelihood of liability for his misconduct in violating § 10(b) of the Exchange Act and Rule 10b-5 when he disseminated or approved the false and misleading statements. ECF No. 75 at 10. The finding was premised, in part, on specific allegations that Garrabrants committed securities fraud by endorsing the strength of BofI's lending standards and compliance infrastructure when he, in fact, had first-hand knowledge that BofI was engaging in risky lending and auditing practices. *See id; In re BofI Holding, Inc. Secs. Litig.*, No. 15-cv-02324-GPC, 2017 U.S. Dist. LEXIS 79062, at

38

1    *20-21 (S.D. Cal. May 23, 2017). The TAC realleges these same allegations (TAC ¶

2    158), and the Court again finds that Garrabrants faces a substantial likelihood of liability

3    on the § 10(b) cause of action. *See* ECF No. 75 at 8-11.

4        However, the Court concludes that it is also not sufficient, for demand futility

5    purposes as to Court, Dada or Ratinoff, to rely on SOX certifications signed by

6    Defendants Garrabrants and Micheletti. While the SOX certifications are relevant insofar

7    as they state that "the Company has disclosed all significant deficiencies and material

8    weaknesses in the design or operation of the Company's internal controls over financial

9    reporting," they are not enough to plead demand futility because they were not signed by

10    the majority of the Board. *See* TAC ¶ 156. As such, the Court cannot conclude that a

11    majority of the Board is likely to face a substantial likelihood of liability for violating

12    their duty of candor.

13        Absent plausible allegations that a disclosure violation actually occurred, the Court

14    cannot conclude that the Board faces a substantial likelihood of liability. In sum, the

15    Court cannot conclude that a majority of the Board is substantially likely to face liability

16    for violating its duty of candor and for deliberately misinforming investors.

17        **4. Director Independence and Disinterestedness**

18        Plaintiff further alleges that there is reason to doubt the Director Defendants'

19    ability to impartially consider a demand because of their lack of independence and level

20    of self-interest arising from their compensation packages and other job-related

21    emoluments. TAC ¶¶ 161, 259; Opposition at 23-24.

22        Under *United Food*, the Court begins its independence analysis by inquiring

23    "whether the director received a material personal benefit for the alleged misconduct that

24    is the subject of the litigation." *United Food & Com. Workers Union v. Zuckerberg*, 262

25    A.3d 1034, 1059 (Del. 2021). Plaintiff does not assert that the Director Defendants

26    received such a material personal benefit. Instead, Plaintiff relies on *Aronson* which

27

28

15-CV-2722-GPC-KSC

permits a plaintiff to establish demand futility by showing that a majority of the board of directors are not disinterested and independent.  "Directorial 'interest' exists whenever divided loyalties are present, or where the director will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a 'materially detrimental impact' on a director but not the corporation or its stockholders."  *In re Computer Scis. Deriv. Litig.*, 244 F.R.D. 580, 586 (C.D. Cal. 2007) (citing *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).  Shareholders may also demonstrate that a director lacks independence by demonstrating that the director is "controlled" by another individual or entity.  *See In re Sagent Tech., Inc. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1088 (N.D. Cal. 2003).

> A director may also be considered "controlled" if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenge transaction objectively.

*Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) (citations omitted).  When making this inquiry, courts should be guided by "a kind of realism in analyzing the human dynamics at play in a director's relationships."  *See Union de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs. Inc. of Puerto Rico*, 704 F.3d 155, 164 (1st Cir. 2013).  As such, the proper inquiry is whether or not any given compensation or emolument would make a director defendant so personally or financially beholden to an interested person, or an interested entity such that "his or her discretion [is] sterilized."  *Beam ex rel Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) (citing *Aronson v. Lewis*, 473 A.2d 805, 816 (Del.1984)).

Here, Plaintiff has provided each Board member's compensation for fiscal year 2015: Garrabrants, $6,310,485; Argalas, $188,210; Court, $188,210; Dada, $85,061;

Grinberg, $281,133; Mosich, $253,970; and Ratinoff, $188,210. *Id.* ¶ 258. In general, it is not enough, for demand futility purposes, to rely on the amount that a director is compensated as evidence of nonindependence. *See In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1078 (C.D. Cal. 2008) ("While these numbers [$358,966 to $538,824] may be substantial, the Court cannot conclude, without more, that they are 'so lavish that a mechanical application of the [presumption of director independence] would be totally at variance with reality.'") (quoting *Grobow v. Perot*, 526 A.2d 914, 923 n.12 (Del. Ch. 1987) *aff'd* 539 A.2d 180 (Del. 1988)).

Plaintiff argues that he has pled enough to question the independence of Argalas, Garrabrants, Grinberg, and Mosich because they not only received substantial compensation but also received mortgages on their primary residences at below-market rates. Opposition at 24. There is no obvious connection between the conduct that the shareholders challenge (i.e., Erhart's dismissal and the violations he uncovered) and the fact that the board members can take advantage of a company-wide policy regarding loan rates.

Moreover, the Court has already found that Argalas, Garrabrants, Grinberg and Mosich face a substantial likelihood of liability for ratifying the illegal retaliation against Erhart. However, Plaintiff has failed to demonstrate that Court, Dada or Ratinoff are unable to act impartially because of their compensation. Accordingly, the Court concludes that Plaintiff's compensation-related allegations fail to establish demand futility as to a majority of the board.

### 5. Core Operations

Plaintiff also alleges that "all Board members can reasonably be charged with actual knowledge or reckless disregard of the unlawful activity alleged by Mr. Erhart… because the wrongdoing concerned the Company's core (and only) business – consumer and business banking products and services." TAC ¶ 249. In his Opposition, Plaintiff

invokes the core-product doctrine as forming "an additional basis for inferring [Director Defendants'] knowledge and conscious misconduct." Opposition at 26.

In federal securities claims, the "core operations inference," the inference that key company officers have knowledge of facts critical to a business's core operations or important transactions, can apply. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008). In federal securities claims, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud" or other allegations supporting scienter. *See Metzler Inv. GmbH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1068 (9th Cir. 2008) (concluding that the bare core operations inference fell short of the *Tellabs* standard). "[I]n derivative actions, courts 'have repeatedly held that a plaintiff must allege more than that Directors should have known or must have known about matters relating to the corporation's 'core business.'" *In re Accuray, Inc. S'holder Derivative Litig.*, 757 F. Supp. 2d 919, 928 (N.D. Cal. 2010) (quoting *Jones ex rel. CSK Auto Corp. v. Jenkins*, 503 F.Supp.2d 1325, 1337 (D.Ariz. 2007)); *see also South Ferry LP, No. 2*, 542 F.3d at 784-85 (finding an officer's position within a company was not usually sufficient on its own to create a strong inference of scienter but that additional specific and detailed allegations "made in conjunction" could create a strong inference of scienter).

Plaintiff's reliance on the core operations inference is based upon the idea that the wrongdoing involving BofI's core and only business, banking products and services, that is critical to the company's success. Opposition at 27. However, Plaintiff fails to provide more beyond the general awareness of the day-to-day workings of BofI's business. Plaintiff argues that this Court previously "found a strong inference of scienter on the part of defendants in making false and misleading statements regarding BofI's 'underwriting and audit procedures.'" Opposition at 27 (citing *BofI Holding, Inc. Sec. Litig.*, No. 3:15-

CV-02324-GPC-KSC, 2017 U.S. Dist. LEXIS 79062, at *43 (S.D. Cal. May 23, 2017)). As stated above, this is a misunderstanding of the Court's prior analysis. In that order, the Court only found the requisite scienter as to Garrabrants and did not conduct any analysis on the other relevant defendants.

As discussed in great detail hereinabove, the TAC does not provide any factual particularized allegations to support that the Director Defendants took part in the alleged misconduct arising from Erhart's whistleblower activities. Director Defendants' position on the Board or their officer roles, standing alone, cannot create a strong inference of scienter that would satisfy the PSLRA pleading standard. *See In re Accuray, Inc.*, 757 F. Supp. 2d at 928. For these reasons, the Court concludes that the core operations inference has no application to the instant case.

### 6.  Summary and the *Rosenbloom* Framework

In his opposition to Defendants' motion to dismiss, Plaintiff relies heavily on the Ninth Circuit's decision in *Rosenbloom v. Pyott* to support the sufficiency of their demand futility allegations. *See* Opposition at 15-16, 25-27. *Rosenbloom* provides courts with guidance on how to review the adequacy of shareholder demand futility pleadings, and, specifically, *Rosenbloom* instructs lower courts to (1) read the factual allegations as a whole, rather than in isolation; (2) credit the plaintiff's reasonable interpretations of the allegations rather than draw inferences in favor of the Defendants; and (3) not insist on a "smoking gun of Board knowledge." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1155-56 (9th Cir. 2014). Yet while Plaintiff relies upon these three tenets to defend against the Defendants' motion to dismiss, the Court concludes that Plaintiff's demand futility allegations are equally insufficient even when viewed within the *Rosenbloom* framework.

As identified above, each of Plaintiff's demand futility arguments suffer from fatal flaws that cannot be cured by reading the factual allegations as a whole or by drawing

15-CV-2722-GPC-KSC

reasonable inferences in favor of Plaintiff, including reasonable inferences of Board knowledge.  First, the complaint offers no particularized facts demonstrating that the entire Board fired Erhart.  Plaintiff would have the Court infer that the Board fired Erhart just because they had knowledge of his allegations, but that conclusion does not follow from the particularized facts alleged.  Similarly, Plaintiff fails to particularly connect Court, Dada, or Ratinoff to authorizing any lawsuits against Erhart, his mother, or his girlfriend to prop up allegations of retaliation against the Director Defendants.

Second, the complaint does not identify any false or misleading statement for which a majority of the Board could be held liable.  Plaintiff contends that the entire Board can be held responsible for the violations of law that Erhart uncovered, but Delaware law has made clear that the mere existence of wrongdoing or the mere fact that certain public statements were false or misleading does not make a board liable absent evidence that the board was aware of the misconduct. *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d at 124-25; *Guttman v. Huang*, 823 A.2d at 504. Plaintiff has alleged with sufficient particularity that the Board became aware of Erhart's allegations on May 21, 2015.  He has not, however, identified any statement in the SEC forms that was rendered false or misleading by Erhart's audit findings or plausibly alleged that the Board approved the disclosure knowing that it contained misinformation about the company's condition.

Third, Plaintiff has not presented sufficient particularized pleadings for the Court to infer that a majority of the Board is partial because of their board compensation and because they received a favorable mortgage on their primary residence.  Plaintiff contends that the Board members who participated in the Mortgage-lending Program would have been "jeopardizing the mortgages on their primary residences" if they were to have responded to Plaintiff's demand allegations.  Yet that conclusion strains credulity. Plaintiff's demand futility allegations have nothing to do with the mortgage lending

program, and moreover, there is no evidence to suggest that BofI raises the interest rates on such loans when an employee or board member departs.

Fourth, Plaintiff asserts the core business claim that "all Board members can reasonably be charged with actual knowledge or reckless disregard of the unlawful activity alleged by Mr. Erhart… because the wrongdoing concerned the Company's core (and only) business – consumer and business banking products and services." TAC ¶ 249. However, "in derivative actions, courts 'have repeatedly held that a plaintiff must allege more than that Directors should have known or must have known about matters relating to the corporation's 'core business.'" *In re Accuray, Inc. S'holder Derivative Litig.*, 757 F. Supp. 2d at 928 (quoting *Jones ex rel. CSK Auto Corp. v. Jenkins*, 503 F. Supp. 2d 1325, 1337 (D. Ariz.2007)).  The TAC fails to provide specific detailed allegations as to any misstatements in SEC reports or the retaliatory termination of Erhart. It relies on the Director Defendants' roles and the mere fact that they learned about Erhart's whistleblower claims sometime after his termination.

Reading the factual allegations as a whole and crediting the plaintiff's reasonable interpretations of the allegations, the Court concludes that Plaintiff has failed to prove that Directors Court, Ratinoff, and Dada would face such substantial likelihood of liability that would compromise their independence.

## CONCLUSION

Based on the foregoing, Plaintiff fails to meet the *United Food*'s demand futility test as to Court, Ratinoff, and Dada and therefore cannot plead demand futility as to a majority of the current Board.  Further, the Court does not see how Plaintiff, with another leave to amend, would be able to cure these defects. Plaintiff has had multiple opportunities to respond to the same concerns that have arisen in prior Orders but has been unable to address these concerns. As such, the Court does not find that leave to

amend is warranted here. For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss without leave to amend.  The Clerk is directed to CLOSE the action.

**IT IS SO ORDERED.**

Dated:  September 17, 2025

Hon. Gonzalo P. Curiel
United States District Judge

46